1  Guy B. Wallace – 176151
   Sarah Colby – 194475
2  Jennifer A. Uhrowczik – 302212
   **SCHNEIDER WALLACE**
3  **COTTRELL KONECKY**
   **WOTKYNS LLP**
4  2000 Powell Street, Suite 1400
   Emeryville, California  94608
5  Telephone:      (415) 421-7100
   Facsimile:       (415) 421-7105
6

   Gay Crosthwait Grunfeld – 121944
   Benjamin Bien-Kahn – 267933
   Christopher D. Hu – 293052
   **ROSEN BIEN**
   **GALVAN & GRUNFELD LLP**
   50 Fremont Street, 19th Floor
   San Francisco, California  94105-2235
   Telephone:      (415) 433-6830
   Facsimile:       (415) 433-7104

7  Kathryn A. Stebner – 121088
   Kelly Knapp – 252013
8  **STEBNER AND ASSOCIATES**
   870 Market Street, Suite 1212
9  San Francisco, California  94102
   Telephone:      (415) 362-9800
10 Facsimile:       (415) 362-9801

11 *Attorneys for Plaintiffs and the Proposed Classes*

12               UNITED STATES DISTRICT COURT

13     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15  PATRICIA EIDLER, by and through her Guardian Ad Litem, CHRISTOPHER 16  WILLIAM EIDLER; STACIA STINER; MARY-CATHERINE JONES, by and through 17  her Guardian Ad Litem, KELLY CLAPPER; and HELEN CARLSON, by and through her 18  Guardian Ad Litem, and JOAN CARLSON; on their own behalves and on behalf of others 19  similarly situated, <br><br> 20               Plaintiffs, <br><br> 21          v. <br><br> 22  BROOKDALE SENIOR LIVING, INC.; BROOKDALE SENIOR LIVING 23  COMMUNITIES, INC.; and DOES 1 through 100, <br><br> 24               Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** <br><br> 1.  **Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*)** <br><br> 2.  **Unruh Civil Rights Act (Cal. Civ. Code §§ 51 *et seq.*)** <br><br> 3.  **Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 *et seq.*)** <br><br> 4.  **Elder Financial Abuse (Cal. Welf. & Inst. Code §§ 15610.30)** <br><br> 5.  **Unlawful, Unfair and Fraudulent Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)** |

25

26

27

28

# INTRODUCTION

1.      Plaintiffs and the proposed Classes bring this action for declaratory and injunctive relief and damages to stop the unlawful and fraudulent practices of Brookdale Senior Living, Inc. and Brookdale Senior Living Communities, Inc. ("BROOKDALE" or "Defendants").

2.      Plaintiffs are elderly or dependent individuals living in California who have significant care needs and disabilities.  Plaintiffs and their families were overwhelmed by and required assistance with their activities of daily living including, but not limited to, assistance with managing and taking medication; housekeeping; laundry; dressing; bathing; toileting; hygiene; food preparation; and transportation.  Plaintiffs and their families and the classes they seek to represent either chose a BROOKDALE facility or chose to stay in a facility purchased by BROOKDALE because they believed BROOKDALE's repeated promises to provide the care and assistance that would allow them to age with dignity.  Instead, Plaintiffs, their family members, and the proposed class members have all encountered in BROOKDALE a system of understaffed assisted living facilities that fails to consistently provide even the most basic level of promised care.

3.      Defendant BROOKDALE has engaged in a policy and practice of violating Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, accompanying regulations, and the Unruh Civil Rights Act ("Unruh Act"), California Civil Code §§ 51 *et seq.*  Among other things, Defendant has violated the ADA by failing to make its assisted living facilities readily accessible to and usable by persons with disabilities.  Defendants' assisted living facilities are characterized by multiple, pervasive physical access barriers that limit or deny full and equal access to persons with disabilities.

4.      Moreover, Defendant has failed to make reasonable modifications to its policies, practices and procedures that are necessary for persons with disabilities to have full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations provided by BROOKDALE's facilities.  Defendants' goods, services, facilities, privileges, advantages, or accommodations include providing assistance with activities of daily

living (assistance with eating, housekeeping and laundry, bathing, grooming, dressing, toileting, personal hygiene, provision of nutritious meals), medication management (ordering and storage of medications, assistance taking medications), social and recreational activities (group exercise, games, movies, scenic drives, happy hours and social mixers, and assistance with arrangements for utilization of local resources), and transportation to and coordination of off-site services.  Plaintiffs have specifically requested that Defendant BROOKDALE make reasonable modifications to its staffing policies, practices and procedures for its assisted living facilities in order to ensure that there is staffing in sufficient numbers and with adequate training to provide timely and effective assistance and care to residents with disabilities.  Despite the fact that such modifications are necessary to ensure that residents with disabilities receive full and equal access to and enjoyment of Defendants' goods, services, facilities, privileges, advantages, or accommodations, and despite the fact that such modifications will not result in any fundamental alteration to BROOKDALE's public accommodations, Defendant has refused to do so.

5.     In addition, Defendant has violated the ADA by failing and refusing to provide residents with mobility disabilities with full and equal access to and enjoyment of its transportation services.  Further, Defendant has discriminated against residents with disabilities by failing to provide them with an emergency evacuation plan that is designed for and reasonably calculated to ensure the prompt and effective evacuation of persons with disabilities in the event of emergency.

6.     Defendant BROOKDALE has also engaged in a policy and practice of violating the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, committing Elder Financial Abuse, Cal. Welf. & Inst. Code § 15610.30, and Unlawful, Unfair and Fraudulent Business Practices ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Defendants promise to provide the elderly and disabled the "quality of life they've earned," but Defendants instead engage in a scheme to defraud seniors, persons with disabilities, and their family members.  In order to induce the elderly and disabled to move into and stay at its California assisted living facilities, BROOKDALE makes misrepresentations and misleading statements and conceals

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

material facts about the quality and availability of care available at BROOKDALE.  Reasonable consumers are misled to believe, and reasonably expect, that BROOKDALE determines each resident's needs and staffs each facility accordingly to deliver personalized care to meet those needs.  Instead, BROOKDALE systemically understaffs its facilities, cuts caregiver hours, and fails to train workers, all to boost its profitability, while the residents in BROOKDALE's care are forced to endure increasingly expensive monthly charges and worsening care.  The results of BROOKDALE's callous and profit-driven approach are devastating: as multiple reports by state regulators confirm, residents are left without assistance for hours after falling, they are given the wrong medications, they are denied clean clothing, showers, and nutritious food, and they are left in their own waste for long periods of time.

7.     On any given day, residents of BROOKDALE's many California facilities live with a substantial risk that they will not receive the care and services they have paid for and that they need.  Scores of family and resident council meetings and hundreds of communications to BROOKDALE management have failed to rectify these problems, leaving Plaintiffs and the class no choice but to seek redress in this Court.

8.     This lawsuit seeks to end this systemic discrimination against persons with disabilities by requiring Defendant to provide them with full and equal access to and enjoyment of BROOKDALE's facilities, services, goods, privileges, advantages and accommodations.  This action seeks to require that Defendants staff their facilities with a sufficient number of adequately trained staff to ensure that residents with disabilities are provided with full and equal access to and enjoyment of the services specified in BROOKDALE's own resident assessments.  In addition, this action seeks to require that Defendants provide assistive living facilities that are readily accessible to and usable by persons with disabilities as required by the ADA.  Further, Plaintiffs seek injunctive relief requiring Defendants to provide full and equal access to and enjoyment of Defendants' transportation services and activities.  Plaintiffs also seek injunctive relief requiring Defendants to provide adequate emergency planning and evacuation procedures for residents with disabilities.  With respect to the CLRA, the UCL and the Elder Financial Abuse statute, this action

1   seeks to require Defendant to disclose to prospective and current residents, their family members

2   or responsible parties, and the class that BROOKDALE's existing staffing policies and procedures

3   preclude it from providing its residents with all the care and services they have been promised and

4   are paying for.  Further, this action seeks to enjoin BROOKDALE from charging residents or their

5   responsible parties monthly fees based on their Personal Service Plans until BROOKDALE

6   implements staffing policies and procedures that enable it to deliver those services on a consistent

7   basis.

8        9.     Plaintiffs have no adequate remedy at law and, unless BROOKDALE is

9   preliminarily and permanently enjoined, Plaintiffs will continue to suffer irreparable harm as a

10  result of being denied full and equal access to and enjoyment of BROOKDALE's goods, services,

11  facilities, privileges, advantages, and/or accommodations.  Plaintiffs seek declaratory and

12  injunctive relief and statutory and actual damages as set forth below against BROOKDALE for its

13  policy and practice of denying Plaintiffs full and equal access to and enjoyment of its services and

14  facilities and violating the ADA and its accompanying regulations, the Unruh Act, the CLRA,

15  committing Elder Financial Abuse, and engaging in Unlawful, Unfair and Fraudulent Business

16  Practices.  Plaintiffs also seek recovery of reasonable attorneys' fees, costs and litigation expenses

17  under federal and state law.

18       **EXHAUSTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS**

19       10.    By letter dated June 2, 2017, Plaintiffs notified Defendants of Plaintiffs' intent to

20  file suit against it based on violations of the Consumer Legal Remedies Act, as required by

21  California Civil Code § 1782.  BROOKDALE received the letter on June 6, 2017.  More than 30

22  days have passed since BROOKDALE's receipt, and BROOKDALE has not corrected or

23  remedied the violations alleged in the notice and herein.

24       11.    Though they were not required to do so, Plaintiffs also notified BROOKDALE of

25  its multiple violations of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 1201 *et*

26  *seq.*, the Unruh Civil Rights Act, California's elder financial abuse law, and California's Unfair

27  Competition Law.

28

# JURISDICTION

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).  The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, presents federal questions and confers jurisdiction on this Court over Plaintiffs' claims regardless of the amount in controversy.  This Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action in which the proposed class includes at least 100 members, the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and at least one putative class member is a citizen of a state different from one of the defendants.  Plaintiffs seek damages in the amount of a minimum $9,000 per class member and believe that the class consists of over 5,000 persons, making the amount in controversy well in excess of $5,000,000.  BROOKDALE is a Delaware corporation with its principal place of business in Tennessee, making it a citizen of both Delaware and Tennessee, and each of the named Plaintiffs are citizens of the State of California.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' pendent claims under California law.

13.     Defendants are subject to personal jurisdiction in this Court because Defendants have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market through ownership and/or management of assisted living facilities located in California, derivation of substantial revenues from California, and other activities, so as to render the exercise of jurisdiction over Defendants by the California courts consistent with the traditional notions of fair play and substantial justice.

# VENUE

14.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b), because the acts upon which this action is based occurred in part in this District within the counties of Alameda, Contra Costa, Lake, Monterey, Napa, San Mateo, Santa Clara, and Sonoma.

15.     A substantial part of the events or omissions which gave rise to Plaintiffs' claims arose in the County of Sonoma and thus, pursuant to Civil Local Rules 3-2(c) and (d), assignment to the San Francisco Division of the District Court for the Northern District of California is proper.

**THE PARTIES**

16.     Plaintiff PATRICIA EIDLER is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also a dependent adult and an elder pursuant to Cal. Welf. & Inst. Code §§ 15610.23 and 15610.27; a senior citizen and a disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  PATRICIA EIDLER is 82 years old.  She needs assistance with the following activities of daily living: housekeeping, laundry, dressing, bathing, managing medications, transportation, and preparing nutritious meals.  She uses a walker and a wheelchair for mobility. PATRICIA EIDLER is and has been a resident of BROOKDALE San Ramon since approximately April 2013.  She is a resident of Contra Costa County in the State of California.  CHRISTOPHER WILLIAM EIDLER ("CHRIS EIDLER") is her son and holds power of attorney.  Simultaneous with the filing of this complaint, Plaintiffs are filing an application for the appointment of CHRIS EIDLER as PATRICIA EIDLER's guardian ad litem for the purposes of prosecuting this lawsuit.

17.     Plaintiff STACIA STINER is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also a dependent adult pursuant to Cal. Welf. & Inst. Code § 15610.23; a disabled person pursuant to Cal. Civ. Code § 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  She needs assistance with the following activities of daily living: housekeeping, laundry, dressing, bathing, managing medications, toileting, and transportation.  She uses a wheelchair for mobility.  STACIA STINER has been a resident of BROOKDALE San Ramon since approximately February 2016.  She is a resident of Contra Costa County in the State of California.

18.     Plaintiff MARY-CATHERINE JONES is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also a dependent adult and an elder pursuant to Cal. Welf. & Inst. Code §§ 15610.23 and 15610.27; a senior citizen and a

disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  MARY-CATHERINE JONES is 78 years old.  She has been diagnosed with cognitive impairments and needs assistance with the following activities of daily living: bathing, dressing, managing medications, housekeeping, laundry, and food preparation.  MARY-CATHERINE JONES is and has been a resident of BROOKDALE Fountaingrove since approximately January 2013.  She is a resident of Sonoma County in the State of California. KELLY CLAPPER is MARY-CATHERINE JONES's daughter and has had her power of attorney since October 2005.  Simultaneous with the filing of this lawsuit, Plaintiffs are filing a motion for the appointment of KELLY CLAPPER as the guardian ad litem of MARY-CATHERINE JONES for the purposes of prosecuting this lawsuit.

19.   Plaintiff HELEN CARLSON is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also a dependent adult and an elder pursuant to Cal. Welf. & Inst. Code §§ 15610.23 and 15610.27; a senior citizen and a disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  HELEN CARLSON is 93 years old.  She needs assistance with the following activities of daily living: managing medications, transferring, toileting, bathing, dressing, grooming, transportation, food preparation and meal setup, housekeeping, and laundry.  She uses a wheelchair for mobility.  HELEN CARLSON is and has been a resident of BROOKDALE Fountaingrove since approximately October 2011.  She is a resident of Sonoma County in the State of California.  JOAN CARLSON is HELEN CARLSON's daughter-in-law and has had her power of attorney since December 2006.  Simultaneous with the filing of this lawsuit, Plaintiffs are filing a motion for the appointment of JOAN CARLSON as the guardian ad litem of HELEN CARLSON for the purposes of prosecuting this lawsuit.

20.   Defendant BROOKDALE SENIOR LIVING, INC. is a corporation organized under the laws of the State of Delaware with its principal place of business in Brentwood, Tennessee.

21.     Defendant BROOKDALE SENIOR LIVING COMMUNITIES, INC. is a corporation organized under the laws of the State of Delaware with its principal place of business in Brentwood, Tennessee.

22.     BROOKDALE SENIOR LIVING, INC. and BROOKDALE SENIOR LIVING COMMUNITIES, INC. will be referred to collectively as "BROOKDALE" or "Defendants." BROOKDALE owns, manages, and/or operates approximately eighty-nine (89) assisted living facilities throughout California.  It is the largest chain of senior living facilities in California and in the United States.

23.     Defendants DOES 1-100 are sued herein under fictitious names because Plaintiffs do not presently know their true names and capacities.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when such are discovered.  Plaintiffs allege that each of these Defendants was responsible in some capacity for the events alleged herein, or is a necessary party for obtaining appropriate relief.  Plaintiffs are informed and believe and thereon allege that in carrying out each of the acts and violations alleged in this Complaint, each Defendant acted as an agent, principal, and/or representative for each other Defendant.

## FACTUAL ALLEGATIONS

24.     BROOKDALE is the largest provider of assisted living for senior citizens and persons with disabilities in the nation and has the largest number of assisted living facility residents within the state of California.  On information and belief, Plaintiffs allege that there are more than 5,000 residents in Defendants' eighty-nine facilities in California.

25.     Assisted living facilities, also called Residential Care Facilities for the Elderly ("RCFEs"), offer room, board and daily assistance for seniors and persons with disabilities in certain activities of daily living ("ADLs"), such as preparing meals, shopping, transportation, preparing and taking medication, housekeeping, laundry, bathing, toileting, grooming, dressing, and others.

26.     Assisted living facilities are intended to provide a level of care appropriate for those who are unable to live by themselves, but who do not have medical conditions requiring

1   more extensive nursing care.

2       27.    In recent years, BROOKDALE has increasingly been accepting and retaining more

3   residents with conditions and care needs that were once handled almost exclusively in skilled

4   nursing facilities.  This has allowed it to increase not only the potential resident pool but also the

5   amounts of money charged to residents and/or their family members.

6       28.    At BROOKDALE facilities, residents are charged a base rate, which includes

7   room, board, and basic maintenance, housekeeping, laundry, dining services, planned social and

8   recreational programs, scheduled transportation services, staffing 24 hours a day, observation and

9   consultation, and assistance with access to outside services.  BROOKDALE uses its resident

10  assessment system to assess each resident before admission and then again periodically throughout

11  residency and/or whenever there is a change of the resident's condition.  By performing these

12  assessments, BROOKDALE determines what additional services a resident needs, such as

13  assistance with ADLs, and develops a Personal Service Plan for the resident.  Each additional

14  need, or service, is assigned a monthly Personal Service Rate, which is added onto the resident's

15  base rate.  The more personal services determined by BROOKDALE to be needed by a resident,

16  the more money BROOKDALE charges that resident.

17      29.    Every month, BROOKDALE sends each resident or his or her legal representative

18  an invoice for services that BROOKDALE represents it will provide in the following month.

19  These invoices reflect the monthly rate for the Basic Services set forth in BROOKDALE's

20  standard residency agreements, the Personal Service Rate that is based on each resident's Personal

21  Service Plan, and any adjustments.  On information and belief, these monthly invoices range from

22  approximately $4,000 to $10,000 per person per month.

23      30.    On information and belief, as of January 1, 2016, BROOKDALE increased the

24  Basic Service Rate and Personal Service Rate for residents in its California facilities by roughly

25  6%, and as of January 1, 2017, it raised these rates again by approximately 7%.  In standard form

26  letters sent to residents attempting to explain these steep rate increases, BROOKDALE attributed

27  them to increases in "the operating costs of your community," including costs for "utility usage,

28

1    insurance, supplies, and food."  But in fact the Consumer Price Index for the Bay Area rose only

2    3.4% between approximately January 1, 2016 and December 31, 2016.

3

4    <u>**BROOKDALE FAILS TO PROVIDE FULL AND EQUAL ACCESS TO AND ENJOYMENT OF ITS FACILITIES AND SERVICES TO PERSONS WITH DISABILITIES IN VIOLATION OF THE ADA AND THE UNRUH CIVIL RIGHTS ACT**</u>

5

6    **Physical Access Violations**

7    31.     BROOKDALE has violated Title III of the ADA and the Unruh Civil Rights Act

8 by failing to provide full and equal access to its facilities and services.  Rooms occupied by

9 persons with mobility disabilities at the BROOKDALE San Ramon, Windsor, and likely other

10 facilities, do not meet federal or state accessibility standards.  Under Title III, fifty percent of the

11 residential rooms in long-term care facilities must meet the requirements of the 1991 ADAAG or

12 the 2010 ADA Standards.  BROOKDALE's facilities do not meet these standards.

13    32.     There is a pattern of physical access barriers in BROOKDALE facilities, as

14 described below:

15          a.      Wheelchair users are placed in rooms that do not have sufficient turning

16               space in the bathrooms or the bedroom area.  This means that they often

17               cannot even use their bathroom unless they are able to transfer out of their

18               wheelchair and enter without it.  Those who can enter in their wheelchair

19               usually do not have enough space to transfer safely onto the toilet or into

20               the shower or to use the sink or vanity space.  Some residents have given up

21               on using their inaccessible toilet and must rely on adult briefs and

22               caregiving staff to clean them.

23          b.      There is no clearance for wheelchairs under the sinks and/or the sinks are

24               too high for a wheelchair user to reach them, preventing residents from

25               using them.

26          c.      The grab bars that do exist in the bathrooms are not compliant with

27               applicable access standards, and there are no roll-in showers.  Both of these

28

1    barriers are safety hazards, increasing the likelihood of falls.  They also

2    prevent most persons with mobility disabilities from bathing as

3    independently as possible.  Some wheelchair users have stopped using their

4    showers altogether and instead take sponge baths, hardly an adequate

5    substitute.

6        d.    There are barriers to using the outdoor space for the residents' rooms,

7    including hard-to-open sliding doors, a lip at the threshold of the door, and

8    insufficient space to accommodate a wheelchair.  This prevents persons

9    with mobility disabilities from using their outdoor space as persons without

10   disabilities can.

11       e.    The closets do not have accessible hanging and storage space, in that they

12   are placed out of the reach of a wheelchair user.  This prevents persons with

13   mobility disabilities from accessing their clothing and other personal items,

14   forcing them to rely on others for assistance.

15       f.    Kitchen countertops and sinks are too high for a wheelchair user to access,

16   preventing those residents from fully using their kitchens.

17       33.    These physical access barriers, which residents live with on a daily basis, prevent

18   them from having full and equal access to their rooms as required by law.

19       **Understaffing**

20       34.    BROOKDALE does not schedule or provide sufficient numbers of trained staff to

21   provide promised services and meet the needs of its residents.  Plaintiffs allege on information and

22   belief that BROOKDALE staffs its facilities based on predetermined labor budgets and desired

23   profit margins.  Pursuant to Defendants' corporate policies and procedures, the executive directors

24   who manage individual BROOKDALE facilities must request permission from Defendants'

25   corporate headquarters to deviate from these pre-determined budgets.  Executive directors have a

26   disincentive to request increased labor budgets for their facilities because they are not eligible for

27   bonuses unless they meet earnings targets set by Defendants' corporate headquarters.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

35.     Reports issued by California Department of Social Services' Community Care Licensing Division ("Community Care Licensing"), the state agency that regulates assisted living facilities, indicate that inadequate staffing pervades Defendants' California facilities.  For instance, Community Care Licensing recently issued a citation to BROOKDALE Corona after a licensing inspector found "that there are not enough staff present" and observed five residents sitting unsupervised in the dining room and 19 residents in the activity room with only one staff member present.  In March 2017, Community Care Licensing cited a BROOKDALE facility in Santa Cruz County after a licensing inspector found that the facility did not have an adequate amount of staff to meet residents' needs.  In June 2016, BROOKDALE Oceanside received a citation because it had only two caregivers on duty during daytime hours in the assisted living part of its facility.

36.     Plaintiffs allege on information and belief that BROOKDALE uses pre-determined staffing schedules at its facilities and does not change these schedules or the number of staff hours worked when the facility has more residents or residents with greater needs.  Community Care Licensing records demonstrate the inadequacy of Defendants' staffing to meet even the most basic needs of residents.  For instance, a personnel report that BROOKDALE filed with Community Care Licensing in February 2017 indicates that BROOKDALE Fountaingrove, a facility in Sonoma County, is understaffed for the night shift from 10:00 p.m. to 6:00 a.m.  That schedule lists only four resident caregivers assigned to the night shift, three of whom work only three days a week, with the result that in many instances there are as few as one resident caregiver on duty during the night shift to care for approximately 100 residents on three floors.  Moreover, the official numbers of caregivers on duty is often quite deceptive, as BROOKDALE frequently pulls caregivers from their responsibilities in order to perform other tasks, such as serving meals in the dining room.

37.     As a direct result of Defendants' discriminatory staffing practices, residents with disabilities have not received or run a substantial risk of not receiving the personal services, emergency and evacuation response, dining services, housekeeping and laundry services, transportation, and activities for which they are paying and that are necessary for full and equal

1    enjoyment of Defendants' goods, services, facilities, benefits, advantages and accommodations.

2                    ***Impact of Understaffing on Personal Services***

3           38.     The lack of sufficient numbers of trained staff at BROOKDALE means that

4    residents with disabilities who need and pay for assistance bathing, dressing, brushing their

5    teeth, toileting, incontinence care, and other hygiene assistance do not receive it on a routine basis.

6    Scheduled showers are routinely skipped by staff who do not have time to bathe residents.  Staff

7    often leave residents unattended on the toilet because another resident has activated their call

8    pendant, and there is no one else available to respond.  Residents have been left on their bed

9    undressed by staff called away to attend to other residents in need.

10          39.     Residents who need assistance getting to the bathroom often wait for long periods

11   of time for staff to respond to their call pendants.  Because they must wait so long for assistance,

12   some residents have given up using the toilet altogether, instead relying on adult briefs and a

13   caregiver to clean and change them when they have time.  Incontinent residents often wait for

14   thirty minutes or more for a staff member to help them change out of soiled briefs, raising the risk

15   of urinary tract infections and decubitus ulcers.  For example, an inspector from Community Care

16   Licensing found in May 2016 that BROOKDALE San Pablo had insufficient staff to meet the

17   residents' needs, noting that "[i]ndividuals requiring incontinence care are not always changed in a

18   timely manner."  In November 2016, a licensing inspector found that even though a resident at

19   BROOKDALE Cherry Hills was paying for regular incontinence checks, she was left lying on the

20   floor for an extended amount of time after a fall because staff failed to check on her.  In March of

21   2017, a licensing inspector cited BROOKDALE Palm Springs for not providing a resident with

22   those basic and personal care services—assistance with showering, dressing, transportation and

23   medication—that the resident needed and for which the facility was being paid.

24          40.     Insufficient staffing has also caused and continues to cause errors in medication

25   administration, including providing the wrong dosage or the wrong medication, untimely or

26   missed doses, and/or a failure to implement physicians' orders.  Community Care Licensing has

27   documented several recent examples from BROOKDALE's Sonoma County facilities that

28

illustrate the broader problem.  Community Care Licensing records show that the agency cited BROOKDALE Chanate five times on consecutive visits between October 28, 2015 and October 13, 2016 for failing to give residents their prescribed medications.  At BROOKDALE Windsor, a resident recently received a double dose of medication because the nurse who administered the first dose failed to document that it had been given.  On a different occasion, staff gave a resident at BROOKDALE Windsor a medication that had been prescribed for a different resident.  Meanwhile, at BROOKDALE Rohnert Park, licensing inspectors found that staff were not properly trained on storing and administering residents' medication, leading to a narcotic pill that went missing in August 2016 and staff's failure to administer medications in October 2016.  Numerous other reports issued by Community Care Licensing confirm that problems with medication administration pervade Defendants' facilities throughout California.  For example, Community Care Licensing cited BROOKDALE Palm Springs when 20 residents missed their medication doses on December 24, 2016 because there was no med tech on duty.

41.     BROOKDALE's understaffing creates many dangerous situations for residents.  Among those are an increase in elopements from facilities by persons with cognitive impairments, because the facilities do not hire staff in sufficient numbers or with the training necessary to monitor residents and prevent escapes.  For example, BROOKDALE Oceanside was cited in April and September of 2016 for relying on delayed egress systems to compensate for insufficient staffing, resulting in resident elopements.  An informal conference was held by Community Care Licensing with BROOKDALE Oceanside management in December 2016 as a result of the elopements and other compliance failures.  Subsequently, on April 26, 2017, BROOKDALE staff failed to monitor residents on an outing, and one wandered away for approximately an hour.

### Impact of Understaffing on Pendant Call Systems and Medical Emergencies

42.     BROOKDALE'S failure to staff sufficiently results in caregivers' inability to respond promptly to call pendants, if at all.  BROOKDALE has represented that residents who wear a call pendant, and pay a monthly fee for this service, may push a button to alert staff if they have an emergency, and staff will immediately respond to provide assistance.  Residents with

disabilities rely heavily on these call pendants for assistance with basic tasks and activities of daily living, as well as for emergencies.  However, the call pendants do not notify staff of the resident's location should they not be in their room.  A BROOKDALE San Ramon resident fell and hit his head on the pavement in the facility parking lot and pressed his pendant.  No one responded. Bleeding profusely from his head, he used his mobile phone to call the front desk.  The son of another resident, a fire chief with emergency response training, found the resident in the parking lot just as BROOKDALE's bookkeeper and maintenance director responded to the resident's telephone call.  Because those employees have no caregiver or emergency response training, they would not even touch the resident.  The fire chief had to call 911 and administer first aid while waiting.

43.    Moreover, contrary to Defendants' representations, staff do not immediately respond when residents use their call pendants.  For instance, a resident in the BROOKDALE Paso Robles facility pushed her emergency pendant after falling in her room and waited 22 hours on the floor with broken bones until staff finally found her.  A resident at BROOKDALE Fountaingrove fell, injured her head, pressed her call pendant, and waited thirty minutes bleeding profusely from her head before staff arrived.  She died 10 days later.  In January 2017, a former resident of BROOKDALE Fountaingrove waited three hours for staff to respond to a call. BROOKDALE's policy and practice of not maintaining its call pendant system properly and of not providing sufficient staff to respond to call pendants deprives residents with disabilities of full and equal enjoyment of its goods, services, facilities, and benefits.

44.    Community Care Licensing records indicate lengthy emergency response times at Defendants' facilities throughout California.  For example, in February 2017 a licensing inspector found that staff at BROOKDALE Riverside routinely took over 10 minutes to respond to emergency pendant calls, and on one occasion took 36 minutes to respond.  At BROOKDALE Orangevale, a licensing inspector tested an emergency call pendant during a January 2017 visit and found that it took over 45 minutes for facility staff to respond.  At BROOKDALE North Tarzana, a review of the facility's records revealed numerous response times of over 30 minutes,

including multiple response times of over an hour.  A licensing inspector who tested emergency

pull cords at BROOKDALE Chatsworth found that it took staff 24 minutes to respond during a

June 2016 inspection; during another visit, the inspector found that it took staff 30 minutes to

respond, and that they did so only after the inspector alerted the facility administrators.  At

BROOKDALE Oceanside, an inspector found that as of April and May 2016, there were times

when staff did not answer residents' calls for 15 to 45 minutes.  The inspector's report noted that

there were only two direct caregivers on duty during the day and evening shifts at the facility,

which has a capacity of 186 residents, and that those caregivers were responsible for numerous

tasks in addition to answering emergency calls on two floors.  Community Care Licensing cited

BROOKDALE Fountaingrove at the end of March 2017 after a review of the pendant system

report revealed many instances of extremely lengthy response times, noting in particular a pendant

pressed at 5:23 p.m. which was not answered for over 39 minutes and a pendant set off at 5:45

p.m. to which staff did not respond for one hour and 27 minutes.

45.     Even when Defendants' staff do respond within a reasonable amount of time to a

request for assistance, the response is often inadequate.  In one case, staff at BROOKDALE

Fountaingrove failed to notify a resident's family after the resident had a fall and was sent to the

emergency room.  Staff also failed to send identifying information or documents with the resident,

as required by Defendants' policies and procedures.  As a result, the resident was listed as a Jane

Doe until the next morning.  A doctor at the hospital told the resident's daughter that he would

have operated on the resident shortly after she was admitted, but had to wait until the next

morning because he had no family contact numbers to call.  The Community Care Licensing

inspector who investigated this incident noted that she observed insufficient staffing at

BROOKDALE Fountaingrove to ensure that the facility's own policies and procedures were being

followed.  On another occasion, a BROOKDALE Fountaingrove resident pressed the call button

on her pendant because she could tell she was going to have terrible diarrhea.  While she waited

for a response, the resident headed for the toilet, but by the time she got there, she had already

soiled herself and her nightgown.  Although a caregiver responded to the pendant call, when the

1    caregiver looked in the bathroom and saw the resident sitting on the toilet, she left without

2    providing assistance and never returned.  The resident screamed for help and pressed the

3    emergency button next to the toilet, but no one responded until roughly an hour later, when a new

4    set of caregivers started their shifts.

5          46.     Residents must resort to calling 911 for assistance when staff fail to promptly

6    respond to their call pendants.  For example, public records kept by the Rincon Valley & Windsor

7    Fire Protection Districts revealed that in a one-year period from June 2016 through May 2017, the

8    agency responded to 83 emergency calls from 907 Adele Drive, the address of BROOKDALE

9    Windsor.  Community Care Licensing records indicate that this facility has a capacity of 80, but

10   often has fewer than 70 residents, suggesting that BROOKDALE Windsor residents averaged well

11   over one 911 call per person over the past year.  Many of these calls were classified as "medical

12   assists," meaning the Rincon Valley & Windsor Fire Protection Districts provided assistance to

13   another group or agency that had primary responsibility for medical care, such as assisting with

14   moving a heavy patient.  Several of these 911 calls were classified as instances where a member of

15   the public called the fire protection districts for routine help, such as assisting a person in returning

16   to a bed or chair, with no transport or medical treatment given.

17         47.     In other cases, Defendants' staff failed to monitor residents' health status as

18   promised, placing residents in danger and distress in situations where the resident was not able to

19   call for help.  At BROOKDALE Fountaingrove, one resident was left in her wheelchair all night

20   because she requires staff assistance to get in and out of her wheelchair, but staff failed to help her

21   into bed and never checked on her during the night.  In another case, a resident at BROOKDALE

22   Scotts Valley fell in his apartment and went without food or water for 24 to 30 hours because staff

23   failed to check on him.  The resident was taken to a hospital, where doctors diagnosed him with

24   dehydration and rhabdomyolysis, a condition in which damaged skeletal muscle tissue breaks

25   down and the damaged muscle cells are released into the bloodstream, causing further injury.  At

26   BROOKDALE Riverside, a resident fell while outside and suffered severe sunburns because staff

27   failed to regularly check on him.  In November 2016, Community Care Licensing issued a citation

28

to BROOKDALE Hemet based on an incident in which staff left a resident with a known risk of falling unattended in a dining room chair.  The resident fell and hit his head, requiring ten stitches.  Just three days later, Defendants' staff again left the resident unattended, and he fell and re-injured his head.  The licensing inspector noted that this resident had additional staff supervision as part of his care plan, but that BROOKDALE Hemet lacked sufficient staff to meet the resident's needs.

48.     Because Defendants' staff are stretched so thin responding to emergency calls and attending to their other duties, they have attempted to dissuade residents from calling for assistance.  Residents have been told by overworked caregivers to use their call buttons "only in an emergency," despite the fact that, short of screaming for help, this is the only way to alert caregivers that they need the assistance for which they are paying BROOKDALE.  In many instances, residents feel bad for overworked caregivers and attempt to perform tasks on their own, despite paying BROOKDALE for these services.  This has led to residents' falling or otherwise injuring themselves.

### Impact of Understaffing on Dining Services

49.     BROOKDALE's policy and practice of understaffing has resulted in its cutting staffing hours and eliminating positions in dining services.  As a result, residents wait for long periods of time to be served.  Some residents give up in frustration.  Food is often served cold, and residents do not dare to make a special request, for fear that the wait will be extreme.  Moreover, the quality of the food has so deteriorated that it is in many cases nearly inedible.  Fresh ingredients are rare, meat of poor quality is hidden under sauces, and both residents and licensing inspectors have encountered food beyond its expiration date.  The understaffing also prevents staff from maintaining a clean and hygienic dining area.

50.     At BROOKDALE San Ramon, the hours of serving staff were cut, and servers have left as a result, leaving the dining department severely understaffed.  At breakfast, there is often one server for 80 people.  On at least one day during June 2017, there were no servers in the dining room for breakfast, and the activities director was cleaning the tables while the chef both

cooked and served meals.  At BROOKDALE Windsor, licensing inspectors found a single staff member working morning shifts in the dining room, with dirty dishes and food droppings strewn about because no other staff members were available to clean up.  BROOKDALE Riverside received a Community Care Licensing citation after investigators found that food was served cold and residents had to wait an unreasonable amount of time for food to be served.  The investigator attributed this problem to understaffing, noting in her report that "[i]t was revealed there is not enough servers for the number of residents in the dining room at one time."  On a recent visit to BROOKDALE Corona, the licensing inspector found five residents sitting in the dining room without supervision, and noted that caregivers were expected to serve lunch, clean the dining room after meals, and sweep the floors in the dining room in addition to their other duties.  The same inspector found uncovered and dried-out ham and cheese sandwiches in the refrigerator and unrefrigerated cartons of strawberry milk in a cupboard.

51.     The long waits and substandard meals in the dining room mean that some residents either purchase their own food or often forgo meals altogether, despite the fact that residents are paying BROOKDALE for three meals per day and snacks.  Residents' nutrition needs are not being met, and to the extent that they look forward to meals as a pleasant social experience, they are being deprived of that benefit as well.  Residents have made numerous complaints to Defendants about the dining service, individually and through the family and resident councils. For example, the Resident Council at BROOKDALE San Ramon has been complaining about the problems in dining services for at least two years.  Yet residents have seen no durable improvements. There may be temporary improvements from time to time, but the overall trend is actually downward.

### Impact of Understaffing on Housekeeping and Laundry

52.     BROOKDALE's policy and practice of understaffing extends to housekeeping and laundry services.  For example, on information and belief, BROOKDALE San Ramon currently only one housekeeper to clean approximately 80 rooms.  As a result, the maintenance director must also clean rooms and consequently has less time to perform maintenance duties.  Residents'

1   rooms have been left in deplorable and often unsanitary conditions, including toilet seats and

2   showers covered in feces and rooms which smell strongly of urine.

3         53.     BROOKDALE routinely fails to wash residents' personal belongings and bed

4   linens.  Even when BROOKDALE's staff take these items for laundering, residents' clothes and

5   linens are often lost, or they are given back other residents' clothing or linen instead of their own.

6   Residents are left in dirty and malodorous clothing.  For example, the granddaughter of a resident

7   at BROOKDALE Hemet observed that her grandfather's clothes were never washed, and that staff

8   continued to dress him in the same pair of urine-stained pants.  Some residents or their family

9   members have despaired of waiting and begun to perform these services on their own, despite

10  BROOKDALE's promise to provide them as part of their base rate.

11                        ***Discrimination in Transportation/Activities***

12        54.     Due to chronic understaffing at Defendants' facilities, promised transportation

13  services and activities are often sporadic or nonexistent.  Many residents rely on BROOKDALE

14  for transportation to medical and lab appointments, church, grocery shopping, banking and other

15  activities.  Additionally, they expected and would enjoy both on- and off-site activities.  Yet they

16  do not receive these services on a regular basis, if at all.  Scheduled activities—such as poker,

17  bingo and movies—are frequently cancelled, and BROOKDALE regularly fails to provide the

18  promised transportation services to its residents.  Residents are often told about cancellations at

19  the last minute for shuttles to planned events, such as church services.  The lack of staffing at

20  BROOKDALE San Ramon means that its activities director must fulfill multiple duties.  In

21  addition to her expected duties, she often works in the dining room serving food or cleaning and at

22  the front desk as a receptionist.  She is also the only driver for facility-provided transportation.  On

23  several occasions, residents of BROOKDALE San Ramon have been left waiting outside a

24  medical office or a church because BROOKDALE staff forgot to pick them up and had to rely on

25  others to take them back to the facility.

26        55.     Additionally, BROOKDALE has implemented policies and practices regarding its

27  provision of transportation services that discriminate against persons with mobility disabilities.

28

Residents at BROOKDALE San Ramon who use wheelchairs must be able to transfer from their chairs to a seat in the bus, despite the existence of a wheelchair lift and a system for securing wheelchairs in at least one of BROOKDALE San Ramon's buses.  Making this transfer is impossible and/or unsafe for many wheelchair users.  The facility also requires wheelchair users to arrange for a family member or an outside care attendant to accompany them on any off-site activity, which deters many wheelchair users from participating and imposes a surcharge on those who do.  The facility also limits the number of wheelchair users for each off-site trip to two.  At BROOKDALE Fountaingrove, wheelchair users are limited to two off-site trips per month.  At least one wheelchair user at BROOKDALE San Ramon was told that she could not participate in regular Saturday trips to the grocery store and shopping, because the driver "couldn't handle her."

**Emergency Evacuation Procedures**

56.     BROOKDALE has emergency and evacuation policies and procedures in place for at least some of its facilities, but these policies and procedures do not take into account the needs of persons with disabilities, or if they do, Defendants have not informed the residents.  Residents with disabilities have been told to wait in their rooms for someone to come, and although the facilities have emergency drills, staff have not demonstrated for residents what will happen in the event of an actual emergency.

57.     Plaintiffs are informed and believe, and on that basis allege, that these practices have been and are an official policy and practice by which Defendants operate their businesses and/or services.

58.     Defendants' failure and refusal to provide equal services to persons with disabilities is humiliating and degrading to and creates a serious safety risk for the members of the proposed class of persons with disabilities.

59.     Defendants are responsible for their illegal operations and discriminatory policies and practices as described herein.  BROOKDALE residents, their family members, and staff members have raised these issues repeatedly with members of BROOKDALE management to no avail.

60.     Defendants have been notified of the civil rights violations described herein, but have refused to provide necessary reasonable modifications to its staffing policies, practices and procedures to provide residents with disabilities full and equal enjoyment of its goods, services, facilities, activities, benefits and accommodations and to comply with the requirements of the ADA and the Unruh Civil Rights Act as alleged herein.

### BROOKDALE MISREPRESENTS, MAKES MISLEADING STATEMENTS, AND CONCEALS MATERIAL FACTS ABOUT THE QUALITY AND AVAILABILITY OF CARE IT PROVIDES TO ALL RESIDENTS

61.     As a result of Defendants' corporate policies and practices, BROOKDALE subjects all residents, regardless of disability, to a substantial risk that they will not receive the care and services they require and have paid for on any given day, as described in Paragraphs 34-58. BROOKDALE lures residents to move into or stay at its facilities by misrepresenting in various corporate written materials that it will provide the basic, personal, and therapeutic services each resident needs based on individualized assessments performed by BROOKDALE staff, and by failing to disclose and concealing that it cannot provide the promised services to all residents because its facilities are chronically understaffed.

### BROOKDALE'S MISREPRESENTATIONS REGARDING THE SERVICES IT PROVIDES

#### *Standardized Residency Agreements*

62.     In order to move in to one of BROOKDALE's California facilities, residents must sign one of Defendants' standardized Residency Agreements.  In its standardized Residency Agreement, BROOKDALE represents to residents prior to move-in and throughout their residency that it will provide them with a standard set of basic services, additional personal services identified in the Personal Service Plan, and any select and therapeutic services for which the resident chooses to pay.  At the time of signing the Residency Agreement, residents or their responsible parties are required to confirm that they have reviewed and understood the document.

63.     In Section I.A of its standardized Residency Agreement, BROOKDALE affirmatively represents to prospective residents that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services": accommodations, including a residential suite and use of common areas; three meals a day plus snacks 24 hours a day; basic utilities; "light housekeeping once a week"; weekly laundry service of the resident's "personal belongings and bed linens"; "planned social and recreational programs"; transportation services; and staffing by "Community associates … available 24 hours a day, seven days a week."  Section I.A further represents that BROOKDALE will observe the resident's "health status to identify social and health care needs" and "will consult with you regarding social and health-related issues."  In addition, BROOKDALE represents in Section I.A of its standardized Residency Agreement that "[w]e will provide personal services that are included as part of the personal service assessment."

64.     In Section I.B of its standardized Residency Agreement, BROOKDALE represents that "[p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan."

65.     Defendants' standardized price schedule for personal care services is attached to the standardized Residency Agreement.  This price schedule includes a variety of personal services, such as staff assistance with ordering, storing, and taking medication; staff assistance with eating, dressing, bathing, using the toilet, and other activities of daily living; escort and mobility assistance to get around Defendants' facilities; and help taking care of residents' pets. This price schedule lists the monthly costs of each service and details how Defendants' caregivers and other staff will provide the services.  For instance, a resident may require and agree to pay for "[s]taff attention while you administer your insulin injections"; "additional staff involvement" for residents who are reluctant to accept care; and bathroom assistance such as "reminders to get to the bathroom," "pulling up and down pants, handling toilet paper, wiping, changing protective undergarments and getting onto and off of toilet," as well as "weight-bearing or balance assistance

from one associate" for residents "unable to stand independently while using the bathroom."

66.     BROOKDALE repeats these representations in the Personal Service Plan that it prepares for each resident before the resident moves in and updates periodically throughout his or her residency.  The Personal Service Plan lists the types of staff assistance that the resident requires and has agreed to pay for, along with the monthly fee for each.  For example, the Personal Service Plan for one former resident states that Defendants' staff will "[p]rovide physical assistance to and from the dining room and/or community activities as needed" for a monthly fee of $273.  Standardized language in the Personal Service Plan states that "[t]he Personal Service Assessment and the Physician Plan of Care are used to determine the personal services that you require at move-in and periodically throughout your residency.  The Personal Service Assessment will be used to develop your Personal Service Plan."

67.     Pursuant to Sections I.B and III.F of its standardized Residency Agreement, "[t]he results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal services (the 'Personal Service Rate') will be shared with you," and a change in the Personal Service Plan be offered or required "when we determine additional services are requested or required" and after 60 days' written notice has been provided.

68.     In Section I.C of its standardized Residency Agreement, BROOKDALE represents that it will make "Select Services and Therapeutic Services … available to you at your request," but that the fees for these services are not included in the rates residents pay for basic services and personal services.  Defendants' standardized Residency Agreement incorporates by reference a standardized price list which features prices for the select and therapeutic services that Defendants make available, many of which consist of staff assistance with the resident's activities of daily living.  For example, residents may elect to pay for tray service in their rooms for up to three meals a day or for additional laundry and housekeeping services beyond what is provided in the basic service rate.

69.     Every month, BROOKDALE sends each resident or his or her legal representative an invoice for services that the company represents it will provide the following month.  These

invoices list the monthly rate for basic services, the Personal Service Rate that is based on each

resident's Personal Service Plan, and any rate adjustments.

70.     BROOKDALE repeats these representations in the letters it periodically sends all

residents informing them of increases in the rates they owe for basic services, personal services,

and select and therapeutic services.  Using standardized language, Defendants' rate increase letters

notify the resident of changes to his or her monthly rates for these services, which BROOKDALE

attributes to increases in the cost of "providing the services you desire and depend upon."

### Defendants' Communications Regarding the Merger and New Assessment System

71.     In early 2014, Emeritus Senior Living ("Emeritus"), at the time a major chain of

senior living facilities, sent residents a standardized letter informing them of the merger between

BROOKDALE and Emeritus.  The letter promised that residents would not be impacted by the

change but would "receive the same excellent care and service you expect at your community"

and would "continue to enjoy all the amenities of your community."  It further stated the merger

would create a "senior living company offering the most comprehensive set of senior care

solutions" with a commitment to "customer-focused cultures and a commitment to continuous

improvement and innovation."  Rather than inform residents that the merger would result in even

lower staffing levels and poorly trained staff, the letter promised a continuum of care with likely

improvements.

72.     In or about October 2015, BROOKDALE sent residents a standardized letter

informing them of an upgrade to its community assessment and care planning system effective

December 1, 2015.  The upgrade would involve a conversion to a "new personal service system"

which would "enhance our ability to match your needs and preferences with the right services at

the right time."  The letter promised "benefits from enhancements," which included, *inter alia*,

"[p]ersonalized service planning and care systems."

73.     Based on these representations, Plaintiffs, and the putative class members reasonably expected that the merger would result in improvements in care, or at the very least, would not result in a decline in services.  Additionally, they reasonably expected that the conversion to the new assessment and care planning system would result in improved delivery of basic services, personal services, and select and therapeutic services for which they were paying.

### *Defendants' Marketing Materials*

74.     Defendants' public website, www.brookdaleliving.com, prominently features online marketing materials directed at prospective residents.  In a section of its website entitled "What is Assisted Living?", BROOKDALE claims that its "assisted living communities have staff and programs in place that support and assist residents with daily living and basic care in a homelike or apartment setting.  Residents receive three meals a day, recreational and social activities, housekeeping, linen service, apartment maintenance and transportation.  That means your loved one gets all the benefits of retired life, without the hassle of daily chores."

75.     Defendants' online marketing materials also tout the personalized services that its assisted living facilities provide.  The company's website explains that "[o]ur trained caregivers provide attention and assistance with medication support, bathing, dressing, cooking and other tasks throughout the day.  Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy so your loved one gets the care they need while enjoying the quality of life they've earned."

76.     Defendants' online marketing materials promise a "Culinary Arts" program that uses "only the freshest meat, seafood, produce, herbs, and spices."

77.     Defendants' online marketing materials further represent that "[a]t Brookdale, we believe in delivering senior care that's tailored to you and your loved one based on those unique needs and desires.  That's why we provide a variety of options.  This personalized approach ensures that you and your family get exactly what you need without paying for what you don't."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

78.     BROOKDALE represents to prospective and current residents that it tailors its services to residents' personal needs.  According to Defendants' representations, the process begins with an individualized assessment, which BROOKDALE uses to produce a Personal Service Plan for each resident.  The Personal Service Plan includes a list of services for which the resident pays a monthly fee.  Defendants' affirmative representations give rise to a reasonable expectation on the part of the reasonable consumer that BROOKDALE will determine and then provide the amount of caregiver and other staff time that is necessary to provide the personal services for which residents are paying.

79.     BROOKDALE makes similar representations in the standardized marketing folder it distributes to prospective and incoming residents.  In this marketing folder, BROOKDALE represents that at its facilities, "Carefully selected and trained associates do more than assist with activities of daily living such as dressing, bathing and dispending of medications; they implement custom care plans designed to meet the individual needs of each resident … It all begins with a Personal Service Assessment.  We take the time to listen to our residents so that we understand how to establish clinical, dining and program support that works for them in a meaningful way.  We recognize their individual needs and preferences and respond to them accordingly.  So, whether it's a scented lotion, a unique snack, a favorite recipe or a lifelong interest, we integrate everything we learn to create a truly individualized living experience."  Elsewhere in this marketing folder, BROOKDALE represents that it "provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go.  From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates.  Fees for care and services are based on each resident's needs and preferences, as determined by the Living Accommodation selected and their Personal Service Plan … This provides customer value because **our residents only pay for what they need and want**." (Emphasis in original).  BROOKDALE's marketing folder also promises an industry-leading dining services program that "continue[s] to satisfy the preferences and nutritional needs of residents with dining choices that offer mealtime

1   fulfillment while meeting dietary requirements."

2       80.    Based on all of Defendants' representations, Plaintiffs, the putative class members,

3   and the general consuming public reasonably expect that BROOKDALE will ensure adequate

4   staffing to perform the services promised to residents, including by providing sufficient levels of

5   qualified and adequately trained staff to perform the services identified in each resident's Personal

6   Service Plan.

7
8   **BROOKDALE FAILS TO DISCLOSE AND CONCEALS THAT ITS STAFFING POLICIES PREVENT IT FROM PROVIDING BASIC SERVICES, PERSONAL SERVICES, AND SELECT AND THERAPEUTIC SERVICES TO ITS RESIDENTS ON A CONSISTENT BASIS**

9

10

11       81.    Contrary to Defendants' representations regarding its provision of services,

12   BROOKDALE has a corporate policy and practice of staffing its facilities according to a system

13   that ensures all BROOKDALE residents run the continuing risk of not receiving the services for

14   which they are paying, of not having their care needs met, and of suffering injury from the lack of

15   care.

16       82.    In addition to the Community Care Licensing records described in Paragraphs 35-

17   36, 39-41, 44-47, and 50, current and former residents of BROOKDALE facilities confirm that

18   Defendants' staffing levels do not change when updates to personal service assessments show that

19   residents require additional personal services.  BROOKDALE has in many cases modified

20   residents' Personal Service Plans—and raised monthly personal service fees accordingly—even

21   though BROOKDALE failed to conduct an updated personal service assessment, failed to provide

22   residents or their legal representatives with the results and method of the assessment, and/or failed

23   to provide 60 days' written notice.  Despite paying higher fees as a result of these changes to their

24   Personal Service Plans, residents and their families have observed that neither the services

25   provided nor staffing levels increased and, in many cases, decreased.

26       83.    Caregivers have informed residents that although they would like to work a 40-

27   hour week, but BROOKDALE allows certain caregivers to work only 24 hours in a week.

28

Residents and their family members have also observed that BROOKDALE fails to ensure that all staff members receive necessary training.  At BROOKDALE Fountaingrove, the facility's interim executive director admitted to residents' families that BROOKDALE has insufficient staff to meet residents' needs.

### BROOKDALE'S MISREPRESENTATIONS AND CONCEALED FACTS WERE MATERIAL

84.    BROOKDALE's misrepresentations and the facts it conceals are material to the reasonable consumer.  An important and significant factor in choosing to move oneself or one's relative to a BROOKDALE facility, to stay there after the facility was purchased by BROOKDALE, and/or to continue to agree to pay the amounts charged by BROOKDALE is the provision of staffing that is necessary to provide the services its residents need and for which the residents are paying.

85.    BROOKDALE's misrepresentations, misleading statements and omissions regarding its provision of staffing are material to prospective residents and their family members. Assurances that a facility will provide the amount of staffing necessary to provide basic services and meet the personal service needs of residents based on BROOKDALE's own assessments is a substantial factor (and indeed often the most important factor) in deciding to enter a certain facility.  The named Plaintiffs would not have, and the members of the putative class would in all reasonable probability not have, entered BROOKDALE's facilities, or stayed at these facilities after BROOKDALE purchased them from other companies, or they would have insisted on paying a lower price, if they had known that, although BROOKDALE would charge them based on the staffing associated with their Personal Service Plans, BROOKDALE did not and does not provide adequate staffing to carry out the services identified in residents' Personal Service Plans, nor does it provide adequate staffing to perform basic services and select and therapeutic services.

86.    This is true even for residents who currently are nearly independent.  These residents chose an assisted living facility as opposed to an independent living community or

1   remaining at home because they wish to "age in place."  They may not currently need significant

2   assistance with the activities of daily living initially, but they will become more dependent as they

3   age and do not want to move again when that happens.  Moreover, even the most independent

4   residents depend on the basic services that BROOKDALE promised them, such as food, laundry,

5   and housekeeping.  A key factor for these residents in selecting BROOKDALE is that the facility

6   will provide the staffing that BROOKDALE itself has determined is necessary to meet their

7   assessed needs, both now and as those needs increase.

8        87.    BROOKDALE has a duty to disclose that its staffing policies and procedures

9   preclude it from consistently providing basic services, personal services, and select and therapeutic

10  services, because of, among other things, the substantial safety risk to current and future residents

11  from BROOKDALE's conduct.

12       88.    The non-disclosure is material because, among other things, BROOKDALE knows

13  that its conduct risks the safety of its residents.  In addition to individual complaints made by

14  residents and family members, family and resident councils send regular correspondence to

15  Executive Directors of BROOKDALE facilities, as well as regional and national mangers

16  regarding the problems outlined above.  In the case of BROOKDALE San Ramon and

17  BROOKDALE Fountaingrove, local and regional management employees have attended

18  numerous meetings of the Family and Resident Councils and have made unfulfilled promises to

19  address the concerns outlined above.  Moreover, Community Care Licensing has conducted

20  numerous licensing inspections which are delivered to BROOKDALE executives and managers of

21  California facilities describing the failure of various facilities to meet state laws and regulations.

22       89.    BROOKDALE is fully aware of the facts alleged above.  Yet, BROOKDALE has

23  failed to disclose and actively concealed from residents, prospective residents and their family

24  members the true facts about how staffing provided at BROOKDALE's California facilities.

25  //

26  //

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

1

### Barriers to Moving Out

2

90.     BROOKDALE's misrepresentations, misleading statements, and material

3

omissions affect not only the decision of residents to enter the facility but also the decision to stay

4

at a BROOKDALE facility.

5

91.     In choosing assisted living in general and a BROOKDALE facility in particular, the

6

resident forgoes other options such as their former home, an independent living community, or

7

other facilities.  Once in a facility, there are significant physical, emotional and other burdens for

8

the residents that are triggered if they terminate residency, including impacts such as "transfer

9

trauma."  BROOKDALE knows and relies on this fact.  As BROOKDALE notes on its website

10

"[a]s a resident's health needs increase, they may transition from one level to the next—all within

11

the same community.  This provides a permanent link to friends and families for them by assuring

12

they remain in a single location."

13

92.     BROOKDALE puts great effort into increasing and maintaining building

14

occupancy to the detriment of their current and future residents.  When residents or their family

15

members complain about staffing and/or conditions at a BROOKDALE facility, on information

16

and belief, employees are instructed to reassure them that things will improve and that the incident

17

or incidents are temporary snags.  For example, the Family Council of BROOKDALE

18

Fountaingrove has been meeting every month for many months to address the inadequate staffing,

19

slow response times to call buttons, and other health and safety issues faced by the Fountaingrove

20

residents.  At most meetings, BROOKDALE representatives, including Vice President of

21

Regional Operations Sharyl Ronan and Interim Executive Director Dan Devine, appear, listen to

22

the numerous complaints, and assure those present that they are looking into the problems and all

23

will be well.  Notwithstanding these claims, members of the Family Council report little to no

24

changes or action items undertaken by BROOKDALE staff after these meetings.

25

93.     Similarly, residents and family members at BROOKDALE San Ramon hold

26

monthly Family Council and Resident Council meetings and have informed facility management,

27

as well as Rick Flynn, District Director of Operations, Executive Director Steve Millard,

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Associate Executive Director Shawn Cull, and former Acting Director Bill Grady of the problems described above.  In January 2017, Mr. Flynn, Mr. Grady and Mr. Cull attended a Family Council meeting at which family members and residents demanded answers to their questions about understaffing, poorly trained staff, undelivered services, food and dining deficiencies, cancelled activities, and problems with call pendants.  They were reassured at the meeting and subsequently told by email correspondence that BROOKDALE was working "diligently" on solutions and had reached out to the District Vice President of Operations Sheila Garner, who would be helping to resolve the problems.  BROOKDALE also represented that management had "made progress in our hiring process for clinical and dining," and was monitoring the call pendant system and providing additional training to staff.  Since that time, BROOKDALE announced the hiring of additional employees but concealed from residents that it was simultaneously cutting the hours of its current employees, cuts which have led to significant staff turnover.  Residents and family members report that the problems described above have in fact worsened.

94.     Such reassurances from BROOKDALE are common when residents and family members raise concerns about the quality of care and services they are receiving.  On information and belief, Regional Vice Presidents and Executive Directors are instructed to minimize potential move-outs.  Executive Directors are regularly told by upper management to do everything they can to "save" the move-out.

95.     BROOKDALE thereby unjustly continues to profit from the original fraud by perpetuating the misrepresentations, misleading statements, and failures to disclose.

### NAMED PLAINTIFFS' EXPERIENCES IN BROOKDALE FACILITIES
#### Patricia Eidler

96.     PATRICIA EIDLER has been a resident at BROOKDALE San Ramon since approximately April 27, 2013.  When Ms. EIDLER moved into the facility, it was owned and operated by Merrill Gardens LLC ("Merrill Gardens") and was known as Merrill Gardens at San Ramon.  Prior to move-in, Ms. EIDLER, through her son and power-of-attorney, CHRIS EIDLER,

1   read, reviewed, and signed a standardized residency agreement with Merrill Gardens.  In this

2   agreement, Merrill Gardens promised to provide Ms. EIDLER with "standard services" that are

3   substantially similar to the basic services enumerated in Defendants' standardized residency

4   agreement.  Merrill Gardens also agreed to provide Ms. EIDLER with assisted living services for

5   her needs as determined by a pre-admission interview and assessment.  The agreement stated that

6   Merrill Gardens would "continue to monitor your needs and periodically reassess the services

7   being provided. …  Assessments may result in changes in the level of care you receive, as well as

8   the associated assisted living fee."  The agreement also provided that any change in the amount or

9   frequency of assisted living services would result in an immediate increase in the assisted living

10   charges.

11          97.     PATRICIA EIDLER, through her son and power-of-attorney, CHRIS EIDLER,

12   read and reasonably understood Merrill Gardens' representations in the residency agreement as

13   statements that it used resident assessments to determine its residents' needs and provide staffing

14   levels necessary to meet those needs.  Ms. EIDLER also reasonably understood and expected that

15   Merrill Gardens would staff the facility in a manner that would allow it to consistently provide the

16   services that Merrill Gardens had promised and that Ms. EIDLER would be paying for.

17   Ms. EIDLER also reasonably understood and expected that Merrill Gardens would regularly

18   assess Ms. EIDLER to ascertain any changes in her care needs and provide that care immediately

19   in exchange for an immediate increase in her assisted living charges, which she understood to be

20   necessary because of the increased staffing cost associated with providing those services to her.

21   Ms. EIDLER, through her son and power-of-attorney, CHRIS EIDLER, read and signed the

22   agreement acknowledging that she had reviewed and understood all of the terms contained in the

23   agreement.  Ms. EIDLER, through her son and power-of-attorney, CHRIS EIDLER, read and

24   relied on the representations in the residency agreement in making the decision to enter Merrill

25   Gardens at San Ramon; she did so with the reasonable expectation that she would age in place and

26   that as her needs increased, the facility would be able to provide increased services and

27   corresponding caregiver time to meet those needs.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

98.     While the facility was operated by Merrill Gardens, Ms. EIDLER received better care.  However, it was subsequently purchased by Emeritus, and shortly thereafter became BROOKDALE San Ramon, following the Emeritus-BROOKDALE merger.  In or about April 2014, CHRIS EIDLER received and read a letter from Emeritus informing residents about the merger between BROOKDALE and Emeritus.  The letter promised that residents would not be impacted by the change but would "receive the same excellent care and service you expect at your community" and would "continue to enjoy all the amenities of your community."  It further stated the merger would create a "senior living company offering the most comprehensive set of senior care solutions" with a commitment to "consumer-focused cultures and a commitment to continuous improvement and innovation."

99.     CHRIS EIDLER, as his mother's power of attorney and legal representative, read the letter and reasonably understood and expected that the care Ms. EIDLER received would be no worse than the care she had received under Merrill Gardens, and possibly improve. BROOKDALE did not inform the EIDLERS nor did they have any reason to believe that BROOKDALE would not staff the facility with sufficient staff in numbers and training to provide the services for which Ms. EIDLER and the other residents were paying.

100.    In or about November 2015, Mr. EIDLER, as power of attorney for his mother, received new contract paperwork from BROOKDALE, entitled "AMENDMENT TO CONTINUING CARE RESIDENCE AND SERVICES AGREEMENT," purporting to amend the residency agreement that Ms. EIDLER had signed with Merrill Gardens.  The "Schedule of Services and Rates" replaced references to "standard services" and "assisted living services" with the terms "basic service rate" and "personal service rate."

101.    Ms. EIDLER, through her legal representative and power of attorney CHRIS EIDLER, read and reasonably understood BROOKDALE's representations—as well as Merrill Gardens' representations in the agreement that was assigned to BROOKDALE—as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE San Ramon in a manner that would allow it to consistently provide the services

1   that BROOKDALE promised and that Ms. EIDLER was paying for.  Ms. EIDLER, through

2   CHRIS EIDLER, read and relied on these representations in making the decision to stay at the

3   facility despite the change in ownership.  At no time has BROOKDALE informed Ms. EIDLER or

4   her son CHRIS EIDLER that its corporate policy and procedure of providing pre-determined

5   staffing at its facilities precludes BROOKDALE from providing the care and services residents

6   have been promised and places all residents at a substantial risk that they will not receive the care

7   and services they have paid for on any given day.

8         102.   Had BROOKDALE disclosed this material fact to Ms. or Mr. EIDLER, he would

9   have begun looking for a place to move his mother and/or not agreed to pay the amounts charged

10  by BROOKDALE.

11        103.   Ms. EIDLER uses a walker and/or wheelchair for mobility.  In addition to her basic

12  services, Ms. EIDLER pays to receive assistance with her medication and with bathing.  Due to

13  understaffing at BROOKDALE San Ramon, Ms. EIDLER often waits 30 minutes or more for a

14  response to her call pendant.  When staff do arrive, they are clearly rushed, and Ms. EIDLER feels

15  guilty about seeking their assistance when they are overworked.  Consequently, instead of using

16  her call pendant, she performs some of the basic and personal care services for which she pays

17  BROOKDALE on her own or with the help of other residents, posing a safety risk.

18        104.   Ms. EIDLER and her family members have witnessed carelessness with

19  medications caused by overworked staff.  On at least two occasions, Ms. EIDLER has found

20  medication that did not belong to her in her room.  Just this month, BROOKDALE staff was

21  unable to locate a bottle of eye medication prescribed to another resident for two days, because it

22  had left the medication in Ms. EIDLER's room.  On information and belief, Plaintiffs allege that

23  the other resident did not receive her eye medication during that time.

24        105.   On or about July 10, 2017, Ms. EIDLER was informed that her pain medication

25  had been stolen from the facility.   Despite numerous requests that BROOKDALE contact Ms.

26  EIDLER's family regarding issues relating to her medication, the facility did not contact the

27  family, who learned of the burglary from Ms. EIDLER. When her daughter-in-law, Sharon Eidler,

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

asked the facility's acting Executive Director, Shawn Cull, about the incident, he explained that the staff believed that Ms. EIDLER's medication and that of other residents was stolen during the overnight shift ("NOC Shift") from July 9 to 10, 2017.  When Sharon Eidler asked Mr. Cull which employees were on duty during that shift, he told her that there were only two employees on duty to respond to all residents at the facility.  The facility has an occupancy of between approximately 70 to 80 residents.  Because no one was immediately available at the facility to pick up refills, Ms. EIDLER did not receive her pain medication until later that evening and was extremely anxious until that time.  Another resident's family was not informed of the theft until almost 6 p.m., after the resident's physician's offices had closed and the family could not obtain a refill.  That resident was given an inadequate substitute pain medication in the evening, which was distressing to the resident and her family members, who had to reassure and calm her.  The following day, although BROOKDALE was notified that the refill was ready for pick-up at 10 a.m., the resident told her family that she did not receive her prescribed pain medication until 4 p.m.

106.    BROOKDALE's staff, policies, and practices have deterred Ms. EIDLER from attending Defendants' off-site activities with her walker.  Ms. EIDLER would like to participate in the "Monday lunches" where residents are taken off-site for lunch at nice restaurants.  However, Ms. EIDLER has a hard time climbing the steps of the bus with her walker.  When she has attended in the past, BROOKDALE staff were very impatient with Ms. EIDLER and made her feel as if her walker was a nuisance and that she should not bring it with her.

107.    BROOKDALE's discriminatory policies and practices have also deterred Ms. Eidler from attending off-site activities with her wheelchair.  BROOKDALE posted a sign in BROOKDALE San Ramon stating its official policy that wheelchair users must be accompanied by a family member or private caregiver and must be able to transfer from their wheelchair to a bus seat.  Moreover, BROOKDALE San Ramon buses are fully equipped to handle only two wheelchairs, and the staff tasked with assisting residents on these off-site outings are unable or unwilling to operate the wheelchair harnesses.  Ms. EIDLER requires assistance transferring from her wheelchair and operating the wheelchair harnesses, and does not wish to burden her family

members or pay for a private caregiver, on top of the fees she already pays BROOKDALE, to attend off-site activities with her.  As a result of BROOKDALE'S discriminatory policies and practices, Ms. EIDLER has stopped participating in Defendants' off-site activities and will continue to be so deterred unless and until BROOKDALE changes its discriminatory policies and practices.

108.    Ms. EIDLER has been instructed to keep her legs elevated as much as possible to reduce the effects of edema.  Understaffing in the dining services department means that she often remain in the dining room for approximately two hours for each meal, something she cannot afford to do given her condition.  In addition to long wait times to place her orders and receive her food, Ms. EIDLER frequently receives food she did not order and/or cold food.  Ms. EIDLER used to enjoy eating lunch and dinner in the dining room.  However, the chronic understaffing and poor quality of food has deterred her from doing so.  She has instead increased her budget for food purchased outside the facility.  When she does eat at the facility, she chooses the simplest offerings, such as eggs for lunch or a grilled cheese sandwich for dinner, because the food quality is so poor.

**Stacia Stiner**

109.    STACIA STINER has been a resident at BROOKDALE San Ramon since approximately February 13, 2016.  On or about February 12, 2016, STACIA STINER's mother, RITA STINER, read, reviewed, and signed an agreement with BROOKDALE as STACIA STINER's legal representative and power of attorney.  As part of this "RESIDENCY AGREEMENT", BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services, which are included in the Basic Service Rate," which included, among other things, the room, three daily meals and snacks on demand, weekly room cleaning, weekly laundry and linen service, planned activities, transportation, observation, and the availability of staff "24 hours a day, seven days a week."  This standard residency agreement also

1  stated that:

2

3      [p]rior to moving in and periodically throughout your residency, we will use a
    personal service assessment to determine the personal services you require.  The

4      personal service assessment will be used to develop your Personal Service Plan.
    The results of the assessment, our method for evaluating your personal care needs,

5      and the cost of providing the additional personal services (the "Personal Service
    Rate") will be shared with you.

6

7  The Personal Service Plan lists the types of staff assistance that Ms. STINER requires and has

8  agreed to pay for, along with the monthly fee for each type of staff assistance.  In addition,

9  Ms. STINER's mother RITA STINER has received and reviewed, as enclosures to

10  BROOKDALE's rate increase letters, a personal service schedule and list of select and therapeutic

11  services.  These documents describe a variety of available services, list the monthly or per-

12  occurrence fee for each service, and detail how BROOKDALE's caregivers or other staff will

13  provide the service.  Every month, BROOKDALE sends Ms. STINER, through RITA STINER,

14  an invoice for services that the company impliedly represents it will provide in the following

15  month.  These invoices list the monthly rate for the basic services set forth in BROOKDALE's

16  standardized residency agreements, the Personal Service Rate that is based on Ms. STINER's

17  Personal Service Plan, and any rate adjustments.

18         110.    Ms. STINER, through her legal representative and power of attorney, RITA

19  STINER, read and reasonably understood BROOKDALE's representations as statements that

20  BROOKDALE would perform assessments to determine needed services and staff BROOKDALE

21  San Ramon in a manner that would allow it to consistently provide the services that

22  BROOKDALE promised and Ms. STINER was paying for.  Ms. STINER, through RITA

23  STINER, relied on these representations in making the decision to enter BROOKDALE San

24  Ramon.  BROOKDALE did not disclose to STACIA or RITA STINER at any time prior to her

25  admission nor has it disclosed since that time that its corporate policy and procedure of providing

26  pre-determined staffing at its facilities precludes BROOKDALE from providing the care and

27  services residents have been promised and places all residents at a substantial risk that they will

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

1    not receive the care and services they have paid for on any given day.  If BROOKDALE had

2    disclosed this material fact to STACIA and/or RITA STINER, STACIA STINER would have

3    looked for another facility for STACIA and would not have agreed to pay the rates charged by

4    BROOKDALE.

5         111.    Beginning in October 2016, BROOKDALE initiated increases in Ms. STINER's

6    basic service and personal service rates.  Ms. STINER and her mother RITA STINER have been

7    unable to decipher the changes in Ms. STINER's bills.  On or about October of 24, 2016, RITA

8    STINER received a letter from BROOKDALE's Executive Director informer her that

9    Ms. STINER's basic service rate would increase from $3,205 to $3,429 per month and that her

10   personal service rate would increase by approximately 6%.  During an in-person meeting in

11   January of 2017, BROOKDALE staff told RITA STINER that Ms. STINER's personal service

12   rates would rise as follows: the monthly medication management fee would rise from $567 to

13   $631; the monthly fee for staff assistance with dressing and grooming tasks would rise from $454

14   to 505; the monthly fee for assistance with two showers per week would rise from $113 to $631

15   per week (a significant increase because STACIA STINER was purportedly requiring more than

16   the allotted 20 minutes of caregiver time per shower); and the monthly fee for assistance with

17   toileting would increase from $397 to $442.  RITA STINER has had conversations with Shawn

18   Cull, the acting Executive Director, during which he told her that BROOKDALE would not

19   charge the full amount of the increases listed above.  Despite numerous communications with

20   Mr. Cull and the billing department, the monthly bills remain confusing and BROOKDALE has

21   sent RITA STINER notices of late payment and even a "30-DAY FINAL DEMAND TO PAY" in

22   December 2016, stating that "[i]n order to provide the care our residents expect and deserve and at

23   the same time support the professional staff we employ, it's imperative that we receive our

24   monthly rent and any additional charges in a timely fashion."

25        112.    Although Ms. STINER is a wheelchair user, BROOKDALE has not provided her

26   with a room that has any physical access features.  It does not have sufficient turning space in the

27   bathroom area, making it difficult for Ms. STINER to enter the bathroom and impossible for

28

Ms. STINER to turn around in the bathroom.  The bathroom does not have a roll-in shower, and the grab bars do not comply with applicable access standards, preventing her from bathing independently and creating a serious safety hazard.  Ms. STINER cannot reach most of the hanging or the storage space in her closet and therefore cannot access her clothing or other personal items without assistance from others.  Ms. STINER's room has a balcony, but a two-inch lip leading out to the balcony and insufficient turning space once outside makes it inaccessible to Ms. STINER.  She once tried to enter and exit the balcony by herself, but has not attempted to do so since because the experience scared her.  The complete lack of accessible features in Ms. STINER's room prevents her from being as independent as possible and causes her to rely on personal assistance from BROOKDALE staff.  In fact, Ms. STINER is charged more than $400 per month for toilet assistance because "resident is unable to use the bathroom on their own." BROOKDALE charges Ms. STINER an elevated rate of $631 for two showers per week because, according to BROOKDALE management, she requires more than the allotted 20 minutes per shower.  Compounding this problem is BROOKDALE's understaffing in care services, which means that Ms. STINER must wait to accomplish most of her activities of daily living, if at all. This puts Ms. STINER in humiliating, frustrating and hazardous situations on a daily basis.

113.    Despite paying approximately $600 per month for BROOKDALE to "order and coordinate medications between family, health care providers and pharmacy," RITA STINER must pick up medication for her daughter at least once per week, frequently with only one-day notice from BROOKDALE.  RITA STINER also does the majority of her daughter's laundry because BROOKDALE frequently loses her clothing or returns the wrong clothing to her.

114.    Understaffing in the dining services department means that Ms. STINER has had to wait up to 45 minutes just to order breakfast.

115.    On some days, there is only one caregiver available in the mornings, causing Ms. STINER to wait anywhere from 10 minutes to one hour for assistance getting dressed.  At night, Ms. STINER requires assistance if she needs to use the toilet.  She waits anywhere from 10 minutes to an hour for staff to respond and will occasionally have to urinate in her bed when

1   assistance takes too long to arrive.  She frequently resorts to using her mobile phone to call the

2   outside line when staff do not respond to her call pendant.  Due to short-staffing, caregivers often

3   attempt to leave Ms. STINER in the middle of assisting her with bathing or toileting because they

4   must respond to call pendants from other residents or because they left another resident on the

5   commode to respond to Ms. STINER.

6       116.    Ms. STINER enjoys getting out of the facility and participating in off-site

7   activities.  However, BROOKDALE requires that, because she is a wheelchair user, she be

8   accompanied by a family member or a private personal caregiver.  Although she has been able to

9   participate in scenic drives or lunches by herself, Ms. STINER had to pay approximately $180 for

10  a personal assistant to participate in a trip to a casino in Cache Creek in approximately August

11  2016.  She would like to return to Cache Creek on a future BROOKDALE outing, but is deterred

12  by BROOKDALE's discriminatory policy.  Outings are also frequently limited to two wheelchair

13  users per outing on a first come, first served basis.

14      117.    In case of fire and other emergencies, BROOKDALE staff has told Ms. STINER to

15  remain in her room until they come and get her.  However, staff members have not come to get

16  Ms. STINER when fire alarms go off at the facility, nor have they given her any additional

17  instructions about how they would assist her in exiting the facility.

18              **Mary-Catherine Jones**

19

20      118.    MARY-CATHERINE JONES has been a resident at BROOKDALE Fountaingrove

21  in Santa Rosa since approximately January 2013.  When Ms. JONES moved into the facility, it

22  was owned and operated by Emeritus and was known as Emeritus at Santa Rosa.  Prior to move-

23  in, KELLY CLAPPER, acting as Ms. JONES's legal representative and power of attorney, signed

24  a standardized residency agreement with Emeritus.  In this agreement, Emeritus promised to

25  provide a list of "core services" that are substantially similar to the basic services enumerated in

26  Defendants' standardized residency agreement.  Emeritus also agreed to "perform a

27  comprehensive Resident Evaluation prior to your admission in the Community, regularly

28

1   thereafter, and as your condition warrants, in order to determine the level of Personal Care

2   Services that you need.  We will develop your Service Plan, based on your Resident Evaluation,

3   that describes how we will provide these services.  You will receive services appropriate to your

4   individual needs, as described in your Service Plan."  The agreement reserved Emeritus's right to

5   assign the agreement to any successor-in-interest selected by Emeritus.

6   119.   In 2014, BROOKDALE merged with Emeritus, and Emeritus at Santa Rosa

7   became BROOKDALE Fountaingrove.  Plaintiffs are informed and believe, and on that basis

8   allege, that Emeritus assigned its residency agreements with existing residents to BROOKDALE,

9   and that BROOKDALE assumed any liability arising from those agreements.  In or about

10  February 2014, KELLY CLAPPER received and read a letter from Emeritus informing residents

11  about the merger between BROOKDALE and Emeritus.  The letter promised that residents would

12  not be impacted by the change but would "receive the same excellent care and service you expect

13  at your community" and would "continue to enjoy all the amenities of your community."  It

14  further stated the merger would create a "senior living company offering the most comprehensive

15  set of senior care solutions" with a commitment to "consumer-focused cultures and a commitment

16  to continuous improvement and innovation."

17  120.   KELLY CLAPPER, as her mother's power of attorney and legal representative,

18  read the letter and reasonably understood that the care Ms. JONES received would be no worse

19  than the care she had received under Emeritus, and possibly improve.  BROOKDALE did not

20  inform Ms. JONES or Ms. CLAPPER nor did they have any reason to believe that BROOKDALE

21  would not staff the facility with sufficient staff in numbers and training to provide the services for

22  which Ms. JONES and the other residents were paying.

23  121.   On November 18, 2015, KELLY CLAPPER read, reviewed, and signed an

24  agreement with BROOKDALE as Ms. JONES's legal representative and power of attorney.  This

25  agreement, entitled "AMENDMENT TO CONTINUING CARE RESIDENCE AND SERVICES

26  AGREEMENT," amended the residency agreement that Ms. JONES signed with Emeritus and

27  that was assigned to BROOKDALE after the merger with Emeritus.  Pursuant to this amendment,

28

1    references to "core services" and "personal care services" were replaced with the terms "basic

2    services" and "personal services," and Emeritus's price schedules for various services were

3    replaced with BROOKDALE's standardized personal services price schedule and lists of select

4    and therapeutic services.  The parties agreed that except as otherwise amended, the terms of the

5    prior residency agreement would remain in full force and effect.

6         122.    BROOKDALE has also prepared and periodically updated a Personal Service Plan

7    for Ms. JONES.  Ms. JONES's Personal Service Plan lists the types of staff assistance that

8    Ms. JONES requires and has agreed to pay for, along with the monthly fee for each type of staff

9    assistance.  In addition, Ms. JONES has received and reviewed, as enclosures to BROOKDALE's

10   rate increase letters, a personal service schedule and list of select and therapeutic services.  These

11   documents describe a variety of available services, list the monthly or per-occurrence fee for each

12   service, and detail how BROOKDALE's caregivers or other staff will provide the service.  Every

13   month, BROOKDALE sends Ms. JONES, through KELLY CLAPPER, an invoice for services

14   that the company impliedly represents it will provide in the following month.  These invoices list

15   the monthly rate for the basic services set forth in BROOKDALE's standardized residency

16   agreements, the Personal Service Rate that is based on Ms. Jones's Personal Service Plan, and any

17   rate adjustments.

18        123.    Ms. JONES, through her legal representative and power of attorney KELLY

19   CLAPPER, read and reasonably understood BROOKDALE's representations—as well as

20   Emeritus's representations in the agreement that was assigned to BROOKDALE and expressly

21   incorporated into BROOKDALE's November 18, 2015 agreement with Ms. JONES—as

22   statements that BROOKDALE would perform assessments to determine needed services and staff

23   BROOKDALE Fountaingrove in a manner that would allow it to consistently provide the services

24   that BROOKDALE promised and Ms. JONES was paying for.  Ms. JONES, through KELLY

25   CLAPPER, read and relied on these representations in making the decision to remain at the

26   facility despite the change in ownership.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

124.   BROOKDALE currently charges Ms. JONES a basic service rate of $3,790 per month, plus a personal service rate of $2,436 per month, minus a loyalty credit.  Ms. JONES's personal service rate includes, among other things, a $580 monthly fee for BROOKDALE's providing "attention and/or assistance with taking medications[] … [and] [a]ssist[ing] with medication storage," a $116 monthly fee for staff assistance with the "setup, selection, or laying out of clothes or grooming toiletries," a $116 monthly fee for staff assistance with showering, a $348 monthly fee for staff assistance to "accomplish and/or participate in daily routines due to memory loss or cognitive impairment," a $460 monthly fee due to Ms. JONES's "demonstrated reluctance to accept care related to showering or bathing assistance," a $290 monthly fee for "demonstrating anxious, disruptive or obsessive behavior," a $58 monthly fee because the "resident smokes," and a $464 monthly fee for "pet care assistance."

125.   Although Ms. JONES's Personal Service Plan includes a monthly fee for staff assistance with medications, BROOKDALE's staff have regularly failed to provide that service as promised.  In May 2016, Ms. JONES's doctor changed her blood pressure medication.  The doctor sent BROOKDALE Fountaingrove the instructions for administering the new medication, and Ms. JONES's daughter, Drue Rostel, personally dropped off the medication at BROOKDALE Fountaingrove, alerting staff to be on the lookout for the new doctor's orders.  However, staff at BROOKDALE Fountaingrove failed to give Ms. JONES the new medication.  When Ms. Rostel visited BROOKDALE Fountaingrove several days after dropping off the new medication, staff told her they had no idea that there had been a change, and they could not locate the new medication.  Staff also failed to log Ms. JONES's blood pressure as requested by her doctor.  As a result of these errors, Ms. JONES's doctor had to cancel an appointment that had been scheduled to review Ms. JONES's health status and the effectiveness of the new medication.  Ms. Rostel and Ms. CLAPPER filed a complaint with Community Care Licensing, which investigated the incident, found that the complaint was substantiated, and issued a citation to BROOKDALE.  Just two months later, BROOKDALE's staff again failed to follow medication instructions sent by Ms. JONES's doctor.

126.     Notwithstanding the high fees paid for medication monitoring, Plaintiff MARY-CATHERINE JONES' daughter recently discovered that Ms. JONES was taking an entire pill of the anti-anxiety medication prescribed by her physicians—not a half-pill as the physician ordered. This discovery was made two months after Ms. JONES began sleeping through lunch daily and losing five pounds per month.  Ms. JONES's daughters were not informed of the medication error or the excessive sleepiness for weeks.

127.     Although Ms. JONES pays a monthly fee for staff assistance with showers and dressing and grooming, Ms. Rostel and Ms. CLAPPER have observed that staff at BROOKDALE Fountaingrove regularly fail to bathe or dress Ms. JONES.  In addition, Ms. Rostel and Ms. CLAPPER have observed that Ms. JONES's laundry is almost never done, and that in one period, staff went several weeks without laundering Ms. JONES's clothes, even though weekly laundry service is part of Ms. JONES' monthly Basic Service Rate.

128.     In October 2016, Ms. JONES's Personal Service Plan was amended to add a monthly fee for staff assistance with Ms. JONES's pet dog, which included daily feeding, taking the dog on daily walks, and letting the dog outside to relieve himself multiple times per day. However, over the course of several months, staff at BROOKDALE Fountaingrove failed to feed the dog or take the dog outside to relieve himself.  As a result, on several occasions Ms. Rostel and/or Ms. CLAPPER found the dog unfed and Ms. JONES' floor smeared with dog feces.

129.     Ms. Rostel and Ms. CLAPPER complained about these problems numerous times to managers at BROOKDALE Fountaingrove.  Although BROOKDALE management has repeatedly reassured Ms. Rostel and Ms. CLAPPER that BROOKDALE will address their concerns, they have not seen any improvement.  Since Ms. JONES has resided at BROOKDALE Fountaingrove, BROOKDALE has never disclosed that its staffing policies and procedures preclude it from providing its residents all of the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day.  Ms. JONES has not received the care BROOKDALE promised her, and for which she pays significant fees each month.

**Helen Carlson**

130.     HELEN CARLSON has been a resident at BROOKDALE Fountaingrove since October 2011.  When Ms. CARLSON moved into the facility, it was owned and operated by Emeritus and was known as Emeritus at Santa Rosa.  Prior to move-in, CARLSON's daughter-in-law JOAN CARLSON, acting as Ms. CARLSON's legal representative and power of attorney, read, reviewed, and signed a standardized residency agreement with Emeritus.  In this agreement, Emeritus promised to provide a list of "core services" that are substantially similar to the basic services enumerated in Defendants' standardized residency agreement.  Emeritus also agreed to "perform a comprehensive Resident Evaluation prior to your admission in the Community, regularly thereafter, and as your condition warrants, in order to determine the level of Personal Care Services that you need.  We will develop your Service Plan, based on your Resident Evaluation, that describes how we will provide these services.  You will receive services appropriate to your individual needs, as described in your Service Plan."  The agreement reserved Emeritus's right to assign the agreement to any successor-in-interest selected by Emeritus.

131.     Ms. CARLSON, through her legal representative and power of attorney JOAN CARLSON, read and reasonably understood Emeritus's representations in the residency agreement as statements that Emeritus used its resident assessment system and results generated by it to determine and provide staffing levels necessary to meet residents' needs.  Ms. CARLSON also reasonably understood and expected that Emeritus would staff Emeritus at Santa Rosa in a manner that would allow it to consistently provide the services that Emeritus promised and Ms. CARLSON would be paying for.  Ms. CARLSON, through JOAN CARLSON, read and relied on the representations in the residency agreement in making the decision to enter Emeritus at Santa Rosa.  As Ms. CARLSON's legal representative and power of attorney, JOAN CARLSON read and signed the agreement acknowledging that she understood and agreed to all of the terms contained in the agreement.  In or about February 2014, JOAN CARLSON received and read a letter from Emeritus informing residents about the merger between BROOKDALE and

1   Emeritus.  The letter promised that residents would not be impacted by the change but would

2   "receive the same excellent care and service you expect at your community" and would "continue

3   to enjoy all the amenities of your community."  It further stated the merger would create a "senior

4   living company offering the most comprehensive set of senior care solutions" with a commitment

5   to "consumer-focused cultures and a commitment to continuous improvement and innovation."

6       132.    JOAN CARLSON, as her mother-in-law's power of attorney and legal

7   representative, read the letter and reasonably understood that the care her mother-in-law received

8   would be no worse than the care she had received under Emeritus, and possibly improve.

9   BROOKDALE did not inform JOAN or HELEN CARLSON nor did they have any reason to

10  believe that BROOKDALE would not staff the facility with sufficient staff in numbers and

11  training to provide the services for which Ms. CARLSON and the other residents were paying.

12      133.    In 2015, BROOKDALE merged with Emeritus, and Emeritus at Santa Rosa

13  became BROOKDALE Fountaingrove.  Plaintiffs are informed and believe, and on that basis

14  allege, that Emeritus assigned its residency agreements with existing residents to BROOKDALE,

15  and that BROOKDALE assumed any liability arising from those agreements.

16      134.    On November 17, 2015, JOAN CARLSON read, reviewed, and signed an

17  agreement with BROOKDALE as Ms. CARLSON's legal representative and power of attorney.

18  This agreement, entitled "AMENDMENT TO CONTINUING CARE RESIDENCE AND

19  SERVICES AGREEMENT," amended the residency agreement that Ms. CARLSON signed with

20  Emeritus and that was assigned to BROOKDALE after the merger with Emeritus.  Pursuant to this

21  amendment, references to "core services" and "personal care services" were replaced with the

22  terms "basic services" and "personal services," and Emeritus's price schedules for various services

23  were replaced with BROOKDALE's standardized personal services price schedule and lists of

24  select and therapeutic services.  The parties agreed that except as otherwise amended, the terms of

25  the prior residency agreement would remain in full force and effect.

26      135.    BROOKDALE has also prepared and periodically updated a Personal Service Plan

27  for Ms. CARLSON.  Ms. CARLSON's Personal Service Plan lists the type of staff assistance that

28

1   Ms. CARLSON requires and has agreed to pay for, along with the monthly fee for each type of

2   staff assistance.  In addition, Ms. CARLSON has received and reviewed as enclosures to

3   BROOKDALE's rate increase letters a personal service price schedule and list of select and

4   therapeutic services.  These documents describe a variety of available services, list the monthly or

5   per-occurrence fee for each service, and detail how BROOKDALE's caregivers or other staff will

6   provide the service.  Every month, BROOKDALE sends Ms. CARLSON, through JOAN

7   CARLSON, an invoice for services that the company impliedly represents it will provide in the

8   following month.  These invoices list the monthly rate for the basic services set forth in

9   BROOKDALE's standardized residency agreements, the Personal Service Rate that is based on

10  Ms. CARLSON's Personal Service Plan, and any rate adjustments.

11       136.   Ms. CARLSON, through her legal representative and power of attorney JOAN

12  CARLSON, read and reasonably understood BROOKDALE's representations—as well as

13  Emeritus's representations in the agreement that was assigned to BROOKDALE and expressly

14  incorporated into BROOKDALE's November 17, 2015 agreement with Ms. CARLSON—as

15  statements that BROOKDALE would perform assessments to determine needed services and staff

16  BROOKDALE Fountaingrove in a manner that would allow it to consistently provide the services

17  that BROOKDALE promised and that Ms. CARLSON was paying for.  Ms. CARLSON, through

18  JOAN CARLSON, read and relied on these representations in making the decision to stay at the

19  facility despite the change in ownership.

20       137.   BROOKDALE currently charges Ms. CARLSON a Basic Service Rate of $4,227

21  per month, plus a Personal Service Rate of $3,710 per month, minus a loyalty credit.

22  Ms. CARLSON's Personal Service Rate includes, among other things, a $580 monthly fee for

23  staff assistance with ordering, storing, and taking medications; a $811 monthly fee for staff

24  assistance with dressing and grooming; a $927 monthly fee for staff assistance with using the

25  bathroom; a $522 monthly fee for staff assistance with accomplishing and/or participating in daily

26  routines due to memory loss or cognitive impairment; a $290 monthly fee for help going to and

27  from the dining room and/or community activities; and a $290 monthly fee for "additional staff

28

1  involvement because of demonstrating anxious, disruptive or obsessive behavior requiring

2  additional attention."  Ms. CARLSON also pays $100 per month for incontinence supplies, which

3  BROOKDALE represents its staff will order and stock.

4        138.    Beginning in early 2016, JOAN CARLSON and her husband Ralph Carlson began

5  to observe a decline in the quality of care provided to Ms. CARLSON.  On one occasion, JOAN

6  discovered that despite promising to fax certain paperwork to Ms. CARLSON's primary care

7  physician in advance of a scheduled appointment, BROOKDALE's staff never did so.  In addition,

8  JOAN and Ralph CARLSON stopped receiving phone calls to notify them of Ms. CARLSON's

9  injuries and other noteworthy incidents.

10        139.    In June 2016, Ms. CARLSON was admitted to the hospital after falling while

11  attempting to get out of bed.  BROOKDALE's staff failed to call JOAN or Ralph CARLSON,

12  even though they are listed as Ms. CARLSON's emergency contacts.  As a result, Ms. CARLSON

13  spent several hours in the emergency room without a family member present, and she was charged

14  for ambulance transport back to BROOKDALE Fountaingrove because no family member was

15  present to give her a ride.

16        140.    In December 2016, Ms. CARLSON's doctor took her off the blood thinner

17  Coumadin.  Nonetheless, in January and February 2017, staff at BROOKDALE Fountaingrove

18  continued to order and stock Coumadin for Ms. CARLSON.  BROOKDALE charged

19  Ms. CARLSON a monthly fee for staff assistance with ordering and storing medications, even

20  though BROOKDALE's staff failed to adequately perform that service.

21        141.    JOAN and Ralph CARLSON have also observed numerous failures by staff to

22  assist Ms. CARLSON with using the bathroom, even though Ms. CARLSON pays a monthly fee

23  for that service.  In addition, even though Ms. CARLSON pays a monthly fee for staff to order and

24  stock incontinence products, she has often run out of such products because BROOKDALE's staff

25  do not check whether supplies are running low or if orders need to be adjusted.

26        142.    Ms. CARLSON is unable to use the bathroom sink and kitchenette sink in her suite

27  because they are installed at a height that makes them inaccessible for wheelchair users.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

1 Ms. CARLSON requires glasses to see and dentures to eat, but BROOKDALE staff frequently

2 misplace or lose these assistive devices.

3      143.    JOAN and Ralph CARLSON have complained to managers at BROOKDALE

4 Fountaingrove about these problems on numerous occasions.  Although BROOKDALE

5 management has repeatedly reassured JOAN and Ralph CARLSON that BROOKDALE will

6 address their concerns, they have not seen any improvement.  Since Ms. CARLSON has resided at

7 BROOKDALE Fountaingrove, BROOKDALE has never disclosed that its staffing policies and

8 procedures preclude it from providing its residents all of the care and services they have been

9 promised and places all residents in an inherent and substantial risk that they will not receive the

10 care and services they have paid for on any given day.  Ms. CARLSON has not received the care

11 BROOKDALE promised her, and for which she pays significant fees each month.

12

13                                    **CLASS ALLEGATIONS**

14      144.    The named Plaintiffs bring this action on behalf of themselves and all persons

15 similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2)

16 and/or (b)(3) as set forth below.

17      145.    **Class Definitions.**

18      Plaintiffs PATRICIA EIDLER, STACIA STINER, MARY-CATHERINE JONES, and

19 HELEN CARLSON seek to represent the following two classes:

20

21      a.    RESIDENTS WITH DISABILITIES CLASS:  All persons with disabilities
           who use wheelchairs, scooters, canes or other mobility aids or who require
22         assistance with mobility or activities of daily living and who reside or have
           resided at a residential care facility for the elderly located in California and
23         owned, operated and/or managed by BROOKDALE during the CLASS
           PERIOD.
24
           b.    FALSE OR MISLEADING STATEMENTS CLASS: All persons who
25         resided or reside at one of the California assisted living facilities owned,
           operated, and/or purchased by BROOKDALE during the CLASS PERIOD
26         and who contracted with BROOKDALE or another assisted living facility
           for services for which BROOKDALE was paid money.

27

28

                                    50

146.     The CLASS PERIOD is defined as commencing three years prior to the filing of this action for the RESIDENTS WITH DISABILITIES CLASS and four years prior to the filing of this suit for the FALSE OR MISLEADING STATEMENTS CLASS.

147.     Excluded from the above-referenced class are the officers, directors, and employees of BROOKDALE, and any of Defendants' shareholders or other persons who hold a financial interest in BROOKDALE.  Also excluded is any judge assigned to hear this case (or any spouse or family member of any assigned judge), or any juror selected to hear this case.

148.     This action is brought as a class action and may properly be so maintained pursuant to Federal Rule of Civil Procedure 23 and applicable case law.  In addition to declaratory and injunctive relief, this action seeks class-wide damages pursuant to California Civil Code § 52(a) in the amount of $4,000 per class member based on Defendants' wrongful policy and practice of failing to provide residents with disabilities with full and equal access to and enjoyment of its services, goods, facilities, privileges, or advantages of BROOKDALE's assisted living facilities as alleged herein.  It also seeks class-wide statutory and punitive damages based on Defendants' misrepresentations, misleading statements, and material omissions, including $5,000 per class member pursuant to California Civil Code § 1780(b). This action also seeks treble damages pursuant to both California Civil Code § 52(a) and California Civil Code § 3345(b)(2) and (3). This action does not seek recovery for personal injuries or emotional distress that may have been caused by Defendants' conduct alleged herein.

149.     **Ascertainability**.  Members of the proposed Class are identifiable and ascertainable.  BROOKDALE retains admission contracts, resident service plans, and billing statements for all persons who currently reside or resided at BROOKDALE facilities during the CLASS PERIOD.

150.     **Impracticability of Joinder (Numerosity of the Class).**  The members of the proposed class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to this Court.  On information and belief, the number of persons in this case exceeds 5,000 persons.  The number of

persons in the class and their identities and addresses may be ascertained from Defendants' records.

151.    **Questions of Fact and Law Common to the Class.**  All members of the class have been and continue to be denied their civil rights to full and equal access to, and use and enjoyment of, the services and facilities operated by the BROOKDALE because of the violations of disability nondiscrimination laws, the CLRA, and Elder Abuse laws alleged herein.  There are numerous questions of law and fact common to the class, including, but not limited to, the following:

      a.      Whether BROOKDALE's assisted living facilities are public accommodations within the meaning of Title III of the ADA;

      b.      Whether BROOKDALE and its assisted living facilities are business establishments within the meaning of the Unruh Civil Rights Act;

      c.      Whether BROOKDALE constructed or altered any of its assisted living facilities after January 26, 1993;

      d.      Whether BROOKDALE's facilities that were newly constructed or altered between January 26, 1993 and March 15, 2012 comply with the requirements of the Americans with Disabilities Act Accessibility Guidelines;

      e.      Whether BROOKDALE constructed or altered any of its facilities after March 15, 2012;

      f.      Whether BROOKDALE's facilities that were constructed or altered after March 15, 2012 comply with the 2010 ADA Standards for Accessible Design;

      g.      Whether BROOKDALE has removed physical access barriers where doing so was readily achievable as required by Title III of the ADA;

      h.      Whether Plaintiffs are being denied full and equal access to and enjoyment of BROOKDALE's goods, services, facilities, privileges, advantages or

1     accommodations;

2  i.  Whether Plaintiffs requested that BROOKDALE make reasonable

3     modifications in policies, practices and/or procedures by providing its

4     facilities with a sufficient number of adequately trained staff to ensure that

5     residents with disabilities receive full and equal access to and enjoyment of

6     the services specified in BROOKDALE's own resident assessments;

7  j.  Whether Plaintiffs' requested modification in policies, practices or

8     procedures is reasonable;

9  k.  Whether Plaintiffs' requested modification in policies, practices or

10    procedures is necessary to ensure that residents with disabilities have full

11    and equal access to and enjoyment of BROOKDALE's goods, services,

12    facilities, privileges, advantages and accommodations as required by Title

13    III of the ADA;

14  l.  Whether BROOKDALE has provided Plaintiffs with full and equal access

15    to and enjoyment of its transportation services and activities as required by

16    Title III of the ADA;

17  m.  Whether BROOKDALE has provided Plaintiffs with full and equal access

18    to and enjoyment of its services and facilities with respect to emergency

19    planning and emergency evacuation;

20  n.  Whether BROOKDALE, by its actions and omissions alleged herein, has

21    engaged in a pattern and practice of discriminating against Plaintiffs and

22    other residents with disabilities in violation of the ADA and the Unruh Civil

23    Rights Act;

24  o.  Whether BROOKDALE has violated and continues to violate the Consumer

25    Legal Remedies Act, California Civil Code §§ 1750 *et seq.* by promising

26    residents that it will provide care and services including as identified by

27    resident assessments, when BROOKDALE knows that its corporate policy

28

1    and procedure of providing pre-determined staffing at its facilities precludes

2    BROOKDALE from providing the care and services residents have been

3    promised and places all residents at a substantial risk that they will not

4    receive the care and services they have paid for on any given day;

5    p.    Whether BROOKDALE's misrepresentations, misleading statements and

6    omissions regarding the staffing of its facilities as alleged herein were and

7    are material to the reasonable consumer;

8    q.    Whether by making the misrepresentations, misleading statements and

9    material omissions alleged in this Complaint, BROOKDALE violated and

10   continues to violate California Business & Professions Code §§ 17200, *et.*

11   *seq.* ("UCL");

12   r.    Whether BROOKDALE had exclusive knowledge of material facts not

13   known or reasonably accessible to the Plaintiffs and the class;

14   s.    Whether the Plaintiffs, the class, and the consuming public were likely to be

15   deceived by the foregoing concealment and omission;

16   t.    Whether the Plaintiffs, the class, and the consuming public have a

17   reasonable expectation that BROOKDALE will provide staffing at its

18   facilities to meet the aggregate care needs of the residents at its facilities;

19   u.    Whether BROOKDALE's misrepresentations, its misleading statements, its

20   failures to disclose and its concealment of its true policies, procedures, and

21   practices regarding how it staffs its facilities violated the CLRA and the

22   UCL;

23   v.    Whether BROOKDALE has engaged and continues to engage in a pattern

24   and practice of unfair and deceptive conduct in connection with the

25   management, administration, and operation of its California assisted living

26   facilities;

27   w.    Whether BROOKDALE has violated and continues to violate the UCL by

28

1    violating the CLRA, ADA, Unruh Civil Rights Act, and California Welfare

2    and Institutions Code § 15610.30 during the CLASS PERIOD;

3    x.    Whether BROOKDALE has committed financial elder abuse under

4    California Welfare and Institutions Code § 15610.30 by taking, secreting,

5    appropriating, obtaining, and/or retaining money from elders and dependent

6    adults for a wrongful use and/or with the intent to defraud them;

7    y.    Whether the Plaintiffs and the putative class members have been injured;

8    z.    Whether the Plaintiffs and the members of the putative class are entitled to

9    damages, and the nature of such damages; and,

10    aa.    Whether the Plaintiffs and the members of the putative class are entitled to

11    declaratory and/or injunctive relief, and the nature of such relief.

12    152.    **Typicality.**  The claims of the named Plaintiffs are typical of those of the proposed

13   classes.  Plaintiffs' claims are typical of the claims of the proposed classes in the following ways:

14   1) Plaintiffs are members of the proposed classes; 2) Plaintiffs' claims arise from the same

15   uniform corporate policies, procedures, practices and course of conduct on the part of

16   BROOKDALE; 3) Plaintiffs' claims are based on the same legal and remedial theories as those of

17   the proposed classes and involve similar factual circumstances; 4) the injuries suffered by the

18   named Plaintiffs are similar to the injuries suffered by the proposed class members; and 5) the

19   relief sought herein will benefit the named Plaintiffs and all class members alike.

20    153.    **Adequacy.**  The named Plaintiffs will fairly and adequately represent the interests

21   of the classes.  They have no interests adverse to the interests of other members of the class and

22   have retained counsel who are competent and experienced in litigating complex class actions,

23   including large-scale disability rights and senior care class action cases.

24    154.    **Predominance.**  With respect to Plaintiffs' claims under the ADA, the Unruh Civil

25   Rights Act, the CLRA, the UCL, and the Elder Abuse Act, class certification is appropriate under

26   Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the class

27   members predominate over any questions affecting individual members of the putative classes.

28

155.   **Superiority.**  A class action is superior to other methods for the fair and efficient adjudication of this controversy because, *inter alia*: 1) individual claims by the class members would be impracticable because the costs of pursuit of such claims would far exceed what any individual class member has at stake; 2) relatively little individual litigation has been commenced over the controversies alleged in this Complaint and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions; 3) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; 4) the proposed classes are manageable, and no difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action; 5) the proposed class members are readily identifiable from Defendants' own records; and 6) prosecution of separate actions by individual members of the proposed class would create the risk of inconsistent or varying adjudications with respect to individual members of the proposed classes that would establish incompatible standards of conduct for BROOKDALE.

156.   **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2).**  BROOKDALE has acted and refused to act on grounds generally applicable to the class, making the declaratory and injunctive relief sought on behalf of the class as a whole appropriate.

## FIRST CLAIM FOR RELIEF

**(Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*)**

157.   Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

158.   Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a) (2).

159.   Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b) (1)-(2).

160.   Title III of the ADA provides in pertinent part: "[N]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or leases to, or operates a place of public accommodation."  42 U.S.C. § 12182.

161.   At all times relevant to this action, Plaintiffs PATRICIA EIDLER, STACIA STINER, MARY-CATHERINE JONES, and HELEN CARLSON were and remain qualified individuals with disabilities within the meaning of the ADA.

162.   Defendants are each a "private entity," as defined under 42 U.S.C. § 12181(6). They own, operate and/or manage approximately 89 assisted living facilities in California.  These facilities are "public accommodations" pursuant to 42 U.S.C. § 12181(7).  BROOKDALE is subject to Title III of the ADA and its corresponding regulations.

163.   As alleged above in greater detail, BROOKDALE has violated Title III of the ADA in the following ways.

***Failure to Provide Reasonable Modifications in Its Staffing Policies, Practices and Procedures***

164.   BROOKDALE has a policy and practice of staffing its assisted living facilities based on pre-set corporate labor budgets and profit margins without regard for residents' needs. BROOKDALE's policy and practice of understaffing its assisted living facilities in order to minimize its labor expenses and maximize its corporate profits has resulted in facilities that are chronically understaffed, and in which skeletal levels of staffing make it commonplace for residents with disabilities to go without the services, goods, facilities, privileges, advantages or accommodations for which they have paid.  For example, staff are often unavailable or unable to assist residents with disabilities with activities of daily living including, *inter alia*, bathing, showering, toileting, transferring, taking medications, dressing, dining, and housekeeping.  In addition, residents with disabilities are often denied full and equal access to and enjoyment of social and recreational activities, as well as transportation to off-site locations for appointments

and other activities, because of the lack of a sufficient number of trained staff to assist residents with disabilities to participate in these activities.

165.     Plaintiffs have requested that BROOKDALE make reasonable modifications in policies, practices, or procedures as required by Title III of the ADA.  Plaintiffs have requested that BROOKDALE provides its facilities with a sufficient number of adequately trained staff to ensure that residents with disabilities are provided with full and equal access to and enjoyment of the services specified in BROOKDALE's own resident assessments.  Among other things, and without limitation, BROOKDALE should increase its level of trained staff in its assisted living facilities such that residents with disabilities are not required to wait for more than five minutes for a substantive response to their call pendants.  A substantive response means actual action taken to address the resident's need, rather than a staff member passing by the resident's room to say that they will return later.

166.     Such reasonable modifications in BROOKDALE's policies, practices and procedures are necessary to ensure that residents with disabilities receive full and equal access to and enjoyment of BROOKDALE's services, including assistance with, *inter alia*, bathing, showering, toileting, transferring, taking medications, dressing, dining, and housekeeping.  In addition, such modifications are necessary to ensure that residents with disabilities have full and equal access to and enjoyment of BROOKDALE's social and recreational activities, and transportation to off-site locations for appointments and other activities.  Unless and until BROOKDALE makes this requested reasonable modification in policies, practices, or procedures, residents with disabilities will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages or accommodations that BROOKDALE claims to provide to all of its residents, whether disabled or nondisabled.

167.     Plaintiffs' requested modification in policies, practices or procedures is eminently reasonable in that BROOKDALE already charges residents with disabilities for, and residents with disabilities pay to receive, the services specified in BROOKDALE's own resident agreements and resident assessments, including *inter alia*, assistance with activities of daily living such as

1  mobility, bathing, showering, toileting, transferring, taking medications, dressing, and

2  housekeeping, as well as participating in BROOKDALE's social and recreational activities

3  whether on-site or off-site.

4      168.    The requested modification in policies, practices or procedures will not make any

5  alteration (much less a fundamental alteration) in the nature of BROOKDALE's goods and

6  services.  Rather, Plaintiffs merely seek to ensure that BROOKDALE provides a sufficient

7  number of adequately trained staff to provide its residents with mobility disabilities with full and

8  equal access to and enjoyment of the types of services and goods that BROOKDALE already

9  promises to provide to its residents in its normal course of business.  Thus, the requested

10 reasonable modification in policy, practice or procedure would not change the nature or type of

11 services and goods that BROOKDALE sells to the public.

12     169.    The requested reasonable modification would impose only a minimal burden on

13 BROOKDALE.  Plaintiffs allege on information and belief that the staff who provide

14 BROOKDALE's services are hourly employees who are paid an average of $10 to $14 per hour.

15 Increasing BROOKDALE's skeletal night staffing and its minimal level of daytime staffing will

16 only result in a moderate increase in BROOKDALE's labor budget.  BROOKDALE will continue

17 to be able to realize substantial gross profits each year in the multibillion dollar range.

18     170.    Plaintiffs have repeatedly requested that BROOKDALE make reasonable

19 modifications in policies, practices, or procedures by increasing the number of trained staff that it

20 provides in its facilities.  Notwithstanding the reasonableness and necessity of such modifications,

21 and notwithstanding the fact that BROOKDALE could significantly increase its staffing without

22 changing the nature of its services, goods, facilities, privileges, advantages or accommodations,

23 and could make such modifications without undue financial or administrative burdens,

24 BROOKDALE has failed and refused to make any such modifications.

25 *Physical Access Barriers*

26     171.    Plaintiffs allege on information and belief that many of Defendants' facilities were

27 designed and constructed after January 26, 1993, thus triggering access requirements under Title

28

III of the ADA.  The ADA prohibits designing and constructing facilities for first occupancy after January 26, 1993 that are not readily accessible to and usable by individuals with disabilities when it was structurally practicable to do so.  42 U.S.C. § 12183(a)(1).  BROOKDALE has violated the ADA by designing and constructing their facilities in a manner that does not comply with federal disability access design standards including the Americans with Disabilities Act Accessibility Guidelines ("ADAAG") even though it was structurally practicable to do so.

172.    Plaintiffs allege on information and belief that Defendants' facilities were altered after January 26, 1993, thus triggering access requirements under Title III of the ADA.  The ADA prohibits altering facilities after January 26, 1993 in a manner that is not readily accessible to, and usable by, individuals with disabilities when it was structurally practicable to do so.  42 U.S.C. § 12183(a)(2).  Here, Defendants violated the ADA by altering its assisted living facilities after January 26, 1993 in a manner that did not comply with the ADAAG even though it was structurally practicable to do so.  Specifically, Defendants have failed to ensure that the areas of alteration complied with the ADAAG, and that the path of travel to the areas of alteration complied with the ADAAG.

173.    The removal of each of the barriers complained of by Plaintiffs herein was at all times "readily achievable" under the standards of §§ 12181 and 12182 of the ADA.  BROOKDALE could have removed each of the barriers alleged herein without much difficulty or expense within the meaning of Title III.  Notwithstanding the foregoing, BROOKDALE failed and refused to do so.

***Transportation and Activities***

174.    BROOKDALE has violated Title III of the ADA by failing and refusing to provide Plaintiffs with full and equal access to and enjoyment of its transportation services to off-site activities and appointments.  BROOKDALE has a policy and practice of limiting the number of wheelchair users who may use transportation to off-site activities.  This limitation is not imposed on residents who do not use wheelchairs.  In addition, BROOKDALE has required residents with mobility disabilities to transfer from their wheelchairs into the seats in its shuttles, and has not

1  permitted residents to remain in their wheelchairs.  BROOKDALE has done so despite the fact

2  that many residents with mobility disabilities have great difficulty in transferring from their

3  wheelchairs into the passenger seats in shuttles, and doing so is time consuming, physically

4  exhausting and sometimes dangerous.  Further, on numerous occasions residents with mobility

5  disabilities have been completely denied access to medical appointments, and other off-site

6  appointments and activities, because BROOKDALE has failed to provide any accessible

7  transportation to those appointments and activities

8  ***Evacuation Procedures***

9      175.    BROOKDALE has failed to provide or communicate to its residents with

10  disabilities any specific or definitive emergency evacuation plan in the event of earthquake, fire or

11  other emergency.  Defendants' failure to do so constitutes a denial of full and equal access to and

12  enjoyment of the services and facilities provided by BROOKDALE in violation of Title III of the

13  ADA.  Many of BROOKDALE's residents with disabilities are unable to exit the building without

14  assistance from staff.  While some residents have been advised to remain in their rooms in the

15  event of an emergency, in those instances in which an alarm has sounded, no one has come to their

16  rooms to assist them or to inform them as to whether there is an emergency or just a drill.

17      176.    The acts and omissions alleged herein constitute violations of Title III of the

18  Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12181 *et seq.*, and the regulations

19  promulgated thereunder.  Defendants' discriminatory conduct alleged herein includes, *inter alia*:

20      a.    Failing to provide residents with disabilities the opportunity to participate in

21          or benefit from BROOKDALE's goods, services, facilities, privileges,

22          advantages, and/or accommodations at its assisted living facilities in

23          California, in violation of 42 U.S.C. § 12182(b)(1)(A)(i);

24      b.    Failing to provide residents with disabilities the opportunity to participate in

25          or benefit from the goods, services, facilities, privileges, advantages and

26          accommodations that are equal to that afforded to individuals without

27          disabilities, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii);

28

c.   Failing to provide the goods, services, facilities, privileges, advantages, and accommodations at its assisted living facilities in California to residents with disabilities in the most integrated setting possible, in violation of 42 U.S.C. § 12182(b)(1)(B);

d.   Utilizing standards, criteria and methods of administration that have the effect of discriminating against residents on the basis of their disabilities, in violation of 42 U.S.C. § 12182(b)(1)(D);

e.   Imposing eligibility criteria that screen out or tend to screen out residents with disabilities from fully and equally enjoying BROOKDALE's assisted living facilities' goods, services, facilities, privileges, advantages, and/or accommodations, in violation of 42 U.S.C. § 12182(b)(2)(A)(i);

f.   Failing to make reasonable modifications in its policies, practices, and procedures which are necessary for its residents with disabilities to enjoy and access BROOKDALE's assisted living facilities' goods, services, facilities, privileges, advantages and/or accommodations, in violation of in violation of 42 U.S.C. § 12182(b)(2)(A)(ii);

g.   Failing to remove architectural barriers in those facilities constructed prior to January 26, 1993 and not altered after that date where such removal is readily achievable, in violation of 42 U.S.C. § 12182(b)(2)(A)(iv);

h.   Failing to design and construct facilities first occupied after January 26, 1993 such that they are readily accessible and usable by persons with disabilities, in violation of 42 U.S.C. § 12183(a)(1);

i.   Performing alterations after January 26, 1993 that affect the usability of its facilities or a part of its facilities, while failing to ensure that the altered portions and the path of travel to those altered portions are readily accessible to and usable by persons with disabilities, in violation of 42 U.S.C. § 12183(a)(2); and

j.     Failing to operate BROOKDALE's transportation services such that they ensure a level of service to persons with disabilities that is equivalent to that provided to persons without disabilities, in violation of 42 U.S.C. § 12182)(b)(2)(C)(i).

177.   As a direct and proximate result of the aforementioned acts, Plaintiffs have suffered, and continue to suffer irreparable harm including humiliation, hardship and anxiety due to Defendants' failure to provide full and equal access to and enjoyment of Defendants' facilities, services, goods, privileges, advantages and accommodations.

178.   WHEREFORE Plaintiffs pray for judgment as set forth below, including declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses incurred in bringing this action.

## SECOND CLAIM FOR RELIEF

### (Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*)

179.   Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

180.   California Civil Code § 51(b) provides in pertinent part that "All persons within the jurisdiction of this state are free and equal, and no matter what their…disability or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

181.   Pursuant to California Civil Code § 51(f), a violation of the ADA also constitutes a violation of California Civil Code §§ 51 *et seq.*

182.   Defendants own, operate and/or manage business establishments within the meaning of the Unruh Civil Rights Act.  Defendants are each a public accommodation whose services and facilities are open to the general public.

183.   Defendants provide services, privileges, advantages and accommodations to the general public.  Defendants have failed and refused to provide Plaintiffs with full and equal access to and enjoyment of the benefits of their goods, services, facilities, benefits, advantages, and

1   accommodations, and have done so by reason of Plaintiffs' disabilities.

2   184.   Defendants have discriminated against persons with disabilities in violation of

3   California Civil Code §§ 51 *et seq.* by failing to operate their facilities and services in full

4   compliance with the requirements of the ADA as set forth above.

5   185.   Defendants, by their actions and inactions alleged in this Complaint, have directly

6   discriminated against persons with disabilities.

7   186.   The actions of Defendants were and are in violation of the Unruh Civil Rights Act,

8   Cal. Civ. Code §§ 51 *et seq.* and therefore Plaintiffs are also entitled to injunctive relief and

9   reasonable attorneys' fees, costs and expenses.

10   **THIRD CLAIM FOR RELIEF**

11   **(Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*)**

12   187.   Plaintiffs incorporate by reference as though fully set forth herein the preceding

13   paragraphs of this Complaint.

14   188.   Plaintiffs and the members of the putative class are "consumer[s]" within the

15   meaning of California Civil Code § 1761(d).  They are also "senior citizen[s]" and/or "[d]isabled

16   person[s]" within the meaning of California Civil Code § 1761(f) and (g).

17   189.   Defendants are each a "person" as defined under California Civil Code § 1761(c).

18   The assisted living services that Defendants have promised to provide Plaintiffs are "[s]ervices"

19   within the meaning of the California Civil Code § 1761(b).  The agreement by Defendants to

20   provide assisted living services in return for payment of monthly fees by each of the Plaintiffs

21   constitutes a "transaction" under California Civil Code § 1761(e).

22   190.   In Defendants' uniform resident contracts presented to prospective residents and

23   their family members, Defendants represented and continue to represent that BROOKDALE will

24   assess each resident and provide the basic services, personal services, and select and therapeutic

25   services it has determined are needed.  That same representation is made in BROOKDALE's re-

26   evaluation of residents, rate increase letters, letters regarding the merger, letters regarding the

27   conversion to a new personal assessment system, corporate website statements, invoices, and other

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

standardized corporate promotional materials.  These uniform corporate representations are false and misleading, and likely to deceive the reasonable consumer.  As alleged herein, Plaintiffs and the putative class members reasonably expected based on these representations that BROOKDALE would provide sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive the services they have been promised and for which they are paying.

191.    Contrary to its representations regarding the provision of basic services, personal services, and select and therapeutic services, BROOKDALE knows that the policies and practices it uses to staff its facilities—most notably, its policy and practice of using predetermined labor budgets designed to meet corporate profit targets, goals, and margins without regard to residents' needs—preclude it from providing its residents all of the care and services they have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day.  BROOKDALE did not intend to provide and has no intention of providing sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive these services.  BROOKDALE does not disclose and conceals this material fact from the residents, their family members, and the general public.

192.    The named Plaintiffs, their family members and powers of attorney, the putative class members, and reasonable consumers considered material BROOKDALE's misrepresentations and misleading statements that it will provide residents the basic services, personal services, and select and therapeutic services they need and for which they are paying.  If the named Plaintiffs had known the true facts about BROOKDALE's staffing policies and procedures, they would not have agreed to enter or stay in a BROOKDALE facility or to place their relatives in a BROOKDALE facility, or would have paid less money.  If the putative class members had known the true facts, they would in all reasonable probability not have agreed to enter or remain in a BROOKDALE facility or to place their relatives in a BROOKDALE facility, or would have paid less money to BROOKDALE.

193.    The facts that BROOKDALE misrepresents, fails to disclose and actively conceals are material and are likely to deceive the reasonable consumer.  Reasonable consumers, including the residents and their family members herein, consider of great importance the staffing levels provided by the assisted living facility they select, and such consumers also attach great importance to BROOKDALE's claims regarding its provision of basic services, personal services, and select and therapeutic services.

194.    Residents and their family members would consider material BROOKDALE's uniform corporate policy and procedure of basing its staffing on fixed budgets and profit margins pursuant to staffing policies and procedures that are inadequate to meet residents' needs, as identified by BROOKDALE itself through periodic personal service assessments.  Residents and their family members could not reasonably have been expected to learn or discover these non-disclosed facts, and in fact, BROOKDALE has affirmatively concealed them.

195.    BROOKDALE has violated and continues to violate the Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.* ("CLRA") in at least the following respects:

    a.    In violation of § 1770(a)(5), BROOKDALE has misrepresented, failed to disclose and concealed the true characteristics and/or quantities of services provided at its facilities in California;

    b.    In violation of § 1770(a)(7), BROOKDALE has misrepresented, failed to disclose and concealed the true standard, quality and/or grade of services provided at its facilities in California;

    c.    In violation of § 1770(a)(9), in BROOKDALE's standard resident admission contracts and elsewhere, BROOKDALE has falsely advertised that it will provide the assistance specified by each resident's personal service assessment and which corresponds to that resident's Personal Service Plan, knowing that BROOKDALE does not intend to provide the services as advertised; and

1             d.      In violation of § 1770(a)(14), BROOKDALE has represented that the

2                agreement signed by residents and/or their representatives, and under which

3                they pay their monthly rate, confers on residents the right to reside in a

4                facility that provides the basic services, personal services, and select and

5                therapeutic services that residents have been promised and are paying for,

6                when in fact, BROOKDALE knows that the policies and practices it uses to

7                staff its facilities preclude it from providing its residents all of the care and

8                services they have been promised and places all residents in an inherent and

9                substantial risk that they will not receive the care and services they have

10               paid for on any given day.

11      196.    These misrepresentations, misleading statements, acts, practices, and omissions by

12 BROOKDALE are and were intended to induce and lure elderly and dependent adult residents and

13 their family members into agreeing to be admitted to BROOKDALE's facilities and to pay

14 community and monthly fees.

15      197.    BROOKDALE made the misrepresentations and misleading statements alleged

16 herein through various uniform means of communication, including without limitation, the

17 admission agreement; subsequent agreements based on updated Personal Service Plans; letters to

18 residents regarding the merger between BROOKDALE and Emeritus, the implementation of

19 BROOKDALE's new personal service system, and rate increases; standardized corporate

20 marketing and promotional materials; Defendants' website; scripted sales presentations; invoices;

21 and other written corporate materials disseminated to the public in connection with Defendants'

22 services.  These representations and misleading statements were made directly to the named

23 Plaintiffs, putative class members and their family members and/or representatives by

24 BROOKDALE in the uniform means of communication listed above.

25      198.    BROOKDALE failed to disclose and concealed from Plaintiffs, the putative class

26 members, and their family members, that BROOKDALE uses predetermined labor budgets

27 designed to meet corporate profit targets, goals, and margins without regard to residents' needs,

28

1   and; that these policies and practices preclude it from providing its residents all of the care and

2   services they have been promised and places all residents in an inherent and substantial risk that

3   they will not receive the care and services they have paid for on any given day; and that

4   BROOKDALE did not intend to provide and has no intention of providing sufficient qualified and

5   adequately trained staff at its facilities to ensure that all residents receive these services.

6         199.    BROOKDALE has exclusive and superior knowledge of materials facts not known

7   to the named Plaintiffs, class members or the general public at the time of the subject transactions

8   and actively concealed those material facts.

9         200.    BROOKDALE had exclusive and superior knowledge that its corporate policy and

10   procedure of providing pre-determined staffing at its facilities preclude BROOKDALE from

11   providing the care and services for which it charges its residents and places all residents at a

12   substantial risk that on any given day they will not receive the care and services for which they

13   have paid.  BROOKDALE had exclusive and superior knowledge that its policies and procedures

14   for staffing its facilities pose a heightened health and safety risk to the named Plaintiffs and class

15   members.  Defendants intentionally concealed, suppressed and/or failed to disclose the true facts

16   with the intent to defraud the named Plaintiffs and putative class members.  The named Plaintiffs

17   and putative class members did not know these material undisclosed facts and could not

18   reasonably have been expected to discover them.

19         201.    As a direct and proximate result of Defendants' conduct, Plaintiffs, the class

20   members, and members of the general public (including without limitation persons admitted to

21   and/or residing in the facilities, and their family members and/or representatives) have been

22   harmed and continue to be harmed.  Among other things, they paid money to Defendants to enter

23   the facilities and/or for services that were not provided or that were substandard to those promised

24   by Defendants.

25         202.    Plaintiffs sent BROOKDALE a notice to cure under California Civil Code

26   § 1782(a), which was received by BROOKDALE on June 6, 2017.  More than 30 days have

27   passed since BROOKDALE's receipt, and BROOKDALE has not corrected or remedied the

28

1  violations alleged in the notice and herein.

2      203.    Accordingly, Plaintiffs and the class members are entitled to no less than $1,000 in

3  statutory damages pursuant to California Civil Code § 1780(a).  Moreover, as senior citizens

4  and/or disabled persons, Plaintiffs and the class members are also entitled to statutory damages of

5  $5,000 per class member pursuant to California Civil Code § 1780(b), as well as actual damages

6  and restitution in an amount to be proven at trial.

7      204.    Plaintiffs and each of the putative class members are seniors and/or disabled

8  persons as defined by California Civil Code § 1761(f) and (g).  Plaintiffs and the putative class

9  members have each suffered substantial economic harm.  Defendants knew that their conduct

10  negatively impacted seniors and disabled persons.  Defendants' conduct caused the named

11  Plaintiffs and the putative class members to lose property set aside for personal care and

12  maintenance and assets essential to their health and welfare.  Further, Plaintiffs and the putative

13  class members are substantially more vulnerable than other members of the public to Defendants'

14  conduct because of their age, poor health, impaired understanding, restricted mobility and/or

15  disabilities.

16      205.    Plaintiffs additionally seek treble damages under California Civil Code § 3345,

17  punitive damages, reasonable attorneys' fees and costs, and all other relief the Court deems just

18  and proper.  Excluded from Plaintiffs' request are damages related to any personal injuries,

19  emotional distress or wrongful death suffered by any member of the class.

20      206.    Defendants' conduct presents a continuing threat of substantial harm to the public

21  in that, among other things, Defendants continue to make misleading statements about and conceal

22  material facts about whether and how they provide basic, personal care, select and therapeutic

23  services at BROOKDALE facilities in California, as well as the fact that their staffing policies and

24  procedures preclude them from providing residents the services they have been promised.  Despite

25  these misrepresentations, BROOKDALE continues to induce elderly and vulnerable citizens to

26  enter and remain in its facilities, which conduct irreparably harms Plaintiffs and the putative class.

27  Accordingly, Plaintiffs seek an injunction that requires that BROOKDALE immediately cease the

28

CLRA violations alleged herein regarding BROOKDALE's misrepresentations, misleading statements, and material omissions, and to enjoin it from continuing to engage in any such acts or practices in the future.  Specifically, Plaintiffs seek an injunction requiring BROOKDALE to disclose to Plaintiffs, the putative class members and the consuming public that BROOKDALE's staffing policies and procedures preclude it from providing its residents the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day.  Plaintiffs also seek an injunction prohibiting BROOKDALE from charging residents or their responsible parties monthly fees based on their Personal Service Plans until BROOKDALE implements staffing policies and procedures that enable it to deliver those services on a consistent basis.

207.    WHEREFORE Plaintiffs pray for judgment as set forth below, including declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses incurred in bringing this action.

### FOURTH CLAIM FOR RELIEF

### (Elder Financial Abuse, Cal. Welf. & Inst. Code § 15610.30)

208.    Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

209.    Plaintiffs and the putative class members are and at all times were "elders" as defined under California Welfare & Institutions Code § 15610.27 and/or "dependent adults" as defined under California Welfare & Institutions Code § 15610.23.

210.    BROOKDALE represented to the named Plaintiffs, and/or their personal representatives, and the putative class members, and/or their personal representatives, in standard agreements, service updates, monthly invoices, and/or annual notification of rate increases that BROOKDALE would provide care and assistance with activities of daily living, including but not limited to staffing 24 hours a day, dining services, housekeeping, laundry, transportation, and other basic services in exchange for community fees and monthly payments that it received from the named Plaintiffs and the putative class members.  However, BROOKDALE did not and has no

1  intention of providing sufficient levels of qualified and adequately trained staff at its facilities to

2  ensure that all residents receive these services.  As a result, residents do not consistently receive all

3  of the basic services BROOKDALE has promised them and for which they are paying

4  BROOKDALE.

5       211.   BROOKDALE further represented through these same corporate materials that

6  BROOKDALE would provide personal services, including but not limited to assistance with

7  bathing, toileting, grooming, dressing, transferring, and mobility, for additional monthly fees.

8  BROOKDALE represented that it will perform an assessment of each resident to identify needed

9  personal services and an individualized service plan to deliver those services.  Yet BROOKDALE

10  did not intend to and does not provide adequate staffing for personal services at its facilities.

11  Rather, it has a policy and practice of providing pre-determined facility staffing that does not

12  change with increases in resident personal service needs.  This policy and practice precludes

13  BROOKDALE from providing facility residents with all of the personal service BROOKDALE

14  has promised them and for which they are paying BROOKDALE.

15       212.   BROOKDALE further represented through these same corporate materials that

16  BROOKDALE would provide select and therapeutic services to residents, including but not

17  limited to emergency call pendants and associated service.  However, BROOKDALE did not and

18  has no intention of providing sufficient levels of qualified and adequately trained staff at its

19  facilities to ensure that all residents receive these services.  As a result, facility residents do not

20  consistently receive all of the select and therapeutic services BROOKDALE has promised them

21  and for which they are paying BROOKDALE.

22       213.   BROOKDALE knew or should have known that such conduct would likely be

23  harmful to Plaintiffs and the putative class members.

24       214.   BROOKDALE knew or should have known that Plaintiffs and the putative class

25  members had a right to the funds used to pay new resident community fees and monthly fees to

26  BROOKDALE.

27

28

215.     As such, BROOKDALE took, secreted, appropriated, obtained and/or retained money belonging to Plaintiffs and putative class members for a wrongful use and/or with the intent to defraud.

216.     BROOKDALE's conduct was despicable, fraudulent, reckless, and carried out with a willful and conscious disregard for the rights and safety of Plaintiffs and the members of the putative class.

217.     Plaintiffs and putative class members also seek compensatory damages, reasonable attorneys' fees, costs and expenses, punitive damages, treble damages pursuant to California Civil Code § 3345, and all other remedies permitted by law.  Plaintiffs do not seek certification of any claims for damages related to any personal injuries, emotional distress, or wrongful death suffered by any member of the class.

218.     WHEREFORE Plaintiffs pray for judgment as set forth below, including declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses incurred in bringing this action.

## FIFTH CLAIM FOR RELIEF

**(Unlawful, Unfair and Fraudulent Business Practices,
Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

219.     Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

220.     BROOKDALE has engaged in unlawful business acts and practices.  Such acts and practices constitute unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.*

221.     In particular, Defendants have engaged in unlawful business acts and practices by violating numerous laws, statutes and regulations including but not limited to:

a.     Systematically and uniformly representing to the residents of its assisted living facilities in California, family members, and the public that Defendants will assess residents to determine their needs, and will provide

1       residents specified basic services, personal services, and select and

2       therapeutic services based on those needs, when in fact, Defendants use

3       staffing policies and procedures that preclude them from providing their

4       residents all of the care and services they have been promised and that

5       places all residents in an inherent and substantial risk that they will not

6       receive the care and services they have paid for on any given day, in

7       violation of California Business & Professions Code §§ 17500 *et seq.* and

8       California Civil Code §§ 1750 *et seq.*; and

9          b.    Taking, secreting, appropriating, obtaining, and retaining the funds of elders

10       and dependent adults for a wrongful use and/or with the intent to defraud in

11       violation of California Welfare and Institutions Code § 15610.30.

12     222.    By virtue of the conduct alleged herein, Defendants have also engaged in

13 fraudulent business practices.  Members of the general public (including without limitation

14 persons admitted to and/or residing in BROOKDALE's California assisted living facilities during

15 the CLASS PERIOD, and their family members and/or representatives) have been and are likely

16 to be deceived by Defendants' misrepresentations and failures to disclose as alleged herein.

17     223.    The acts and practices of Defendants also constitute unfair business acts and

18 practices within the meaning of California Business & Professions Code §§ 17200 *et seq.*, in that

19 the conduct alleged herein is immoral, unscrupulous, and contrary to public policy, and the

20 detriment and gravity of that conduct outweighs any benefits attributable to such conduct.

21     224.    Defendants' misrepresentations, misleading statements, acts, practices, and

22 omissions were intended to induce and lure elderly and dependent adult residents and their family

23 members into agreeing to be admitted to and remain at Defendants' facilities and to pay a

24 community fee and monthly rates to live in an assisted living facility that features sufficient levels

25 of qualified and adequately trained staff to ensure that all residents receive the basic services,

26 personal services, and select and therapeutic services for which they are paying.

27

28

225.    Defendants made these misrepresentations and misleading statements through various uniform means of written corporate communications, including without limitation, the standardized Residency Agreement; subsequent agreements based on re-assessments of the resident; letters to residents regarding the merger between BROOKDALE and Emeritus, Defendants' conversion to a new personal service system, and rate increases; invoices, marketing and promotional materials, Defendants' corporate website and other materials disseminated to the public from its corporate headquarters in connection with Defendants' services.  These representations were made directly to the named Plaintiffs, class members, and their family members and/or representatives by Defendants in the uniform means of communication listed above.

226.    BROOKDALE concealed from Plaintiffs, the putative class members, and their family members that BROOKDALE's staffing policies and procedures preclude it from providing its residents all of the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day.

227.    BROOKDALE had exclusive and superior knowledge of material facts not known to named Plaintiffs, putative class members or the general public at the time of the subject transactions and actively concealed these material facts.

228.    BROOKDALE had exclusive and superior knowledge of its corporate policy and procedure.  Further, Plaintiffs allege on information and belief that Defendants' officers, directors, and managers knew that Defendants' failure to provide adequate staffing posed a substantial health and safety risk to the named Plaintiffs and class members.  BROOKDALE intentionally concealed, suppressed and/or failed to disclose the true facts with the intent to defraud the named Plaintiffs and putative class members.  The named Plaintiffs and the putative class members did not know these material undisclosed facts and could not reasonably have been expected to discover them.

229.    As a direct and proximate result of Defendants' conduct, Plaintiffs, the class members, and members of the general public (including without limitation persons admitted to and/or residing in the facilities, and their family members and/or representatives) have been harmed and continue to be harmed.  Among other things, they paid money to Defendants to enter the facilities and for services that were not provided or that were substandard to those promised by Defendants.

230.    Plaintiffs seek an injunction that requires that Defendants immediately cease acts of unlawful, unfair and fraudulent business acts or practices as alleged herein, and to enjoin Defendants from continuing to engage in any such acts or practices in the future.

231.    WHEREFORE Plaintiffs pray for judgment as set forth below, including declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses incurred in bringing this action.

**ALLEGATIONS SUPPORTING DECLARATORY AND INJUNCTIVE RELIEF**

232.    Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

233.    Each of the Plaintiffs continues to live at a BROOKDALE assisted living facility. Unless and until BROOKDALE brings its facilities into compliance with the requirements of the ADA and applicable federal disability access design standards, Plaintiffs will continue to be denied full and equal access to and enjoyment of BROOKDALE's facilities as a result of physical access barriers in violation of the ADA.  Moreover, unless and until Defendant BROOKDALE makes the requested reasonable modification in policies, practices and procedures set forth above with respect to the staffing of its facilities, Plaintiffs will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations provided to its residents by BROOKDALE.  In this regard, unless and until Defendants provide a sufficient number of adequately trained staff at its facilities, residents will continue to suffer the denial and deprivation of basic services that are necessary to daily living, including assistance with bathing, showering, toileting, taking medications, transferring, dressing,

dining, as well as cleaning and laundry services.  Further, residents with disabilities will continue to be denied full and equal access to on-site and off-site social and recreational activities, and will be segregated and isolated in violation of the ADA's integration mandate.

234.    In addition, unless and until Defendants comply with the ADA, Plaintiffs will continue to suffer falls, and to be at risk of falls and/or serious physical injuries, as a result of Defendants' failure and refusal to provide full and equal access to its facilities and services.  In this regard, Defendants must be enjoined to provide facilities that comply with applicable federal disability access standards, a sufficient number of staff who are adequately trained to assist residents with disabilities to prevent falls and to assist them if a fall takes place, and a functioning and effective pendant system so that residents can obtain prompt and effective assistance when they have fallen and/or are at risk of other physical injuries.  Further, unless and until Defendants provide adequate emergency planning and evacuation procedures for residents with disabilities, Defendants will continue to place them at significant risk of serious injury and death.

235.    Further, unless and until Defendants provide residents with full and equal access to enjoyment of its transportation services, residents with disabilities will continue to be excluded from and denied access to off-site appointments and activities in violation of the ADA.

236.    Finally, unless and until BROOKDALE ceases its false and/or misleading statements regarding its services and discloses that its corporate staffing policies and practices preclude it from providing its residents the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day, residents, their family members, their representatives and the general public will continue to be misled and will continue to expend very substantial sums of money for services, goods and facilities that are not as represented, and Defendants will continue to receive the benefits of their ill-gotten gains.

237.    A present and actual controversy exists regarding the respective rights and obligations of Plaintiffs and Defendants.  Plaintiffs desire a judicial determination of their rights and Defendants' obligations in a declaration as to whether, and to what extent, the Defendants'

1  conduct violates applicable law.

2      238.  Such a declaration is necessary and appropriate at this time in order that Plaintiffs

3  may ascertain their rights.  Such a declaration is also necessary and appropriate to prevent further

4  harm or infringement of Plaintiffs' rights.

5      239.  Plaintiffs have no adequate remedy at law for the harm to them arising from the

6  conduct alleged herein.  Unless and until Defendants are preliminarily and permanently enjoined

7  from engaging in such conduct, Plaintiffs will continue to suffer irreparable harm as a result of

8  Defendants' violations of the ADA and the Unruh Act as alleged herein.

9      240.  Plaintiffs are entitled to declaratory and injunctive relief pursuant to each of the

10  laws under which this action is brought.

11  **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs respectfully pray that this Court:

13      1.  Issue a declaratory judgment that Defendants' failure to provide full and equal

14  access to and enjoyment of Defendants' goods, services, facilities, benefits, advantages and

15  accommodations with nondisabled persons violates Plaintiffs' rights the ADA, § 42 U.S.C. 12101

16  *et seq.*, and the regulations promulgated thereunder, and also violates their civil rights under

17  California Civil Code §§ 51 *et seq.*;

18      2.  Issue preliminary and permanent injunctions requiring Defendants to come into full

19  compliance with the requirements of the ADA and its implementing regulations;

20      3.  Issue preliminary and permanent injunctions enjoining Defendants from violating

21  the Unruh Civil Rights Act in the operation of Defendants' business establishments and/or public

22  accommodations with respect to its goods, services, facilities, advantages, benefits and

23  accommodations at its assisted living facilities in California;

24      4.  Issue preliminary and permanent injunctions requiring that Defendants immediately

25  cease acts that constitute false advertising and violations of the Consumer Legal Remedies Act and

26  the Elder Financial Abuse statute as alleged herein with respect to Defendants' misrepresentations,

27  misleading statements, and material omissions, and to enjoin Defendants from continuing to

28

engage in any such acts or practices in the future;

5.      Issue preliminary and permanent injunctions requiring that BROOKDALE disclose to Plaintiffs, the putative class members and the consuming public that its corporate staffing policies and procedures preclude it from providing its residents the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day, and prohibiting BROOKDALE from charging fees based on the residents' Personal Service Plans when BROOKDALE does not, in fact, provide adequate staffing levels to perform the personal services identified in those plans;

6.      For statutory damages pursuant to California Civil Code § 52(a);

7.      For statutory damages pursuant to California Civil Code § 1780(a) and (b);

8.      For actual damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by the named Plaintiffs or any class member;

9.      For restitution and any other monetary relief permitted by law;

10.     For punitive damages;

11.     For treble damages pursuant to California Civil Code §§ 52(a) and 3345;

12.     For pre-judgment and post-judgment interest according to law;

13.     Award to Plaintiffs all costs of this proceeding, including reasonable attorneys' fees costs and litigation expenses, as provided by law;

14.     Issue any other preliminary and permanent injunctions the Court deems sufficient to rectify the acts and omissions alleged herein; and,

15.     For such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted.

DATED:  July 13, 2017                  SCHNEIDER WALLACE
                                       COTTRELL KONECKY
                                       WOTKYNS, LLP


                                By:   */s/Guy B. Wallace*
                                      _____
                                      Guy B. Wallace

DATED:  July 13, 2017                  ROSEN BIEN
                                       GALVAN & GRUNFELD LLP


                                By:   */s/Gay Crosthwait Grunfeld*
                                      _____
                                      Gay Crosthwait Grunfeld

DATED:  July 13, 2017                  STEBNER AND ASSOCIATES


                                By:   */s/Katheryn A. Stebner*
                                      _____
                                      Kathryn A. Stebner

                                *Attorneys for Plaintiffs and the Proposed Classes*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

1

## **ATTESTATION PER LOCAL RULE 5-1(i)(3)**

2      The e-filing attorney hereby attests that concurrence in the filing of the document has been

3  obtained from each of the other signatories indicated by a conformed signature (/s/) within this e-

4  filed document.

5

6                                    /s/ *Guy B. Wallace*
                                    Guy B. Wallace (SBN 176151)
7                                    SCHNEIDER WALLACE
                                    COTTRELL KONECKY WOTKYNS LLP
8                                    2000 Powell Street, Suite 1400
                                    Emeryville, California 94608
9                                    Telephone: (415) 421-7100
                                    Facsimile: (415) 421-7105
10                                   gwallace@schneiderwallace.com

11

12

13

## **CERTIFICATE OF SERVICE**

14      I hereby certify that on July 13, 2017, I electronically filed the foregoing document with

15  the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic

16  filing to all CM/ECF participants.

17

18

19                                   /s/ *Guy B. Wallace*
                                    Guy B. Wallace (SBN 176151)
20                                   SCHNEIDER WALLACE
                                    COTTRELL KONECKY WOTKYNS LLP
21                                   2000 Powell Street, Suite 1400
                                    Emeryville, California 94608
22                                   Telephone: (415) 421-7100
                                    Facsimile: (415) 421-7105
23                                   gwallace@schneiderwallace.com

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES