Guy B. Wallace – 176151
Sarah Colby – 194475
**SCHNEIDER WALLACE**
**COTTRELL KONECKY**
**WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone:     (415) 421-7100
Facsimile:      (415) 421-7105

Gay Crosthwait Grunfeld – 121944
Benjamin Bien-Kahn – 267933
Devin Mauney – 294634
**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:     (415) 433-6830
Facsimile:      (415) 433-7104

Kathryn A. Stebner – 121088
George Kawamoto – 280358
**STEBNER AND ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, California  94102
Telephone:     (415) 362-9800
Facsimile:      (415) 362-9801

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

STACIA STINER; HELEN CARLSON, by and through her Guardian Ad Litem, JOAN CARLSON; LAWRENCE QUINLAN, by and through his Guardian Ad Litem, LORESIA VALLETTE; EDWARD BORIS, by and through his Guardian Ad Litem, MICHELE LYTLE; RALPH SCHMIDT, by and through his Guardian Ad Litem, HEATHER FISHER; PATRICIA LINDSTROM, as successor-in-interest to the Estate of ARTHUR LINDSTROM; and BERNIE JESTRABEK-HART; on their own behalves and on behalf of others similarly situated,

     Plaintiffs,

     v.

BROOKDALE SENIOR LIVING, INC.; BROOKDALE SENIOR LIVING COMMUNITIES, INC.; and DOES 1 through 100,

     Defendants.

Case No. 17-cv-03962-JD

CLASS ACTION

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

1.  **Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*)**

2.  **Unruh Civil Rights Act (Cal. Civ. Code §§ 51 *et seq.*)**

3.  **Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 *et seq.*)**

4.  **Elder Financial Abuse (Cal. Welf. & Inst. Code §§ 15610.30)**

5.  **Unlawful, Unfair and Fraudulent Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

## INTRODUCTION

1.      Plaintiffs and the proposed Classes bring this action for declaratory and injunctive relief and damages to stop the unlawful and fraudulent practices of Brookdale Senior Living, Inc. and Brookdale Senior Living Communities, Inc. ("BROOKDALE" or "Defendants").

2.      Plaintiffs are elderly or dependent individuals living in California who have significant care needs and disabilities.  Plaintiffs and their families were overwhelmed by and required assistance with their activities of daily living including, but not limited to, assistance with managing and taking medication, housekeeping, laundry, dressing, bathing, toileting, hygiene, food preparation, and transportation.  Plaintiffs and their families and the classes they seek to represent either chose a BROOKDALE facility or chose to stay in a facility purchased by BROOKDALE because they believed BROOKDALE's repeated promises to provide the care and assistance that would allow them to age with dignity.  Instead, Plaintiffs, their family members, and the proposed class members have all encountered in BROOKDALE a system of understaffed assisted living facilities that fails to consistently provide even the most basic level of promised care.

3.      Defendant BROOKDALE has engaged in a policy and practice of violating Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, accompanying regulations, and the Unruh Civil Rights Act ("Unruh Act"), California Civil Code §§ 51 *et seq.*  Among other things, Defendant has violated the ADA by failing to make its assisted living facilities readily accessible to and usable by persons with disabilities even though both the ADA and the Unruh Act impose affirmative duties upon Defendants to make their assisted living facilities accessible.  As set forth below, Defendants have a policy and practice of leaving physical access barriers in place in their newly constructed, altered and/or existing facilities in violation of the ADA and the Unruh Act.  Defendants have failed to perform new construction and alterations in compliance with applicable federal and state disability access standards, including but not limited to the 1991 Americans with Disabilities Act Accessibility Guidelines ("ADAAG") and the 2010 ADA Standards for Accessible Design, and have failed to

evaluate their newly constructed and/or altered assisted living facilities to identify and remediate non-compliant and inaccessible construction and alterations therein.  Defendants have also failed and refused to identify and remove physical access barriers from their existing assisted living facilities where such barrier removal was readily achievable within the meaning of the ADA.  As a result of Defendants' corporate policies and practices regarding disability access, Defendants' assisted living facilities are characterized by multiple, pervasive physical access barriers that limit or deny full and equal access to persons with disabilities.

4.     Moreover, Defendant has failed to make reasonable modifications to its policies, practices and procedures that are necessary for persons with disabilities to have full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations provided by BROOKDALE's facilities.  Defendants' goods, services, facilities, privileges, advantages, and/or accommodations include providing assistance with activities of daily living (assistance with eating, housekeeping and laundry, bathing, grooming, dressing, toileting, personal hygiene, provision of nutritious meals), medication management (ordering and storage of medications, assistance taking medications), social and recreational activities (group exercise, games, movies, scenic drives, happy hours and social mixers, and assistance with arrangements for utilization of local resources), and transportation to and coordination of off-site services.  Plaintiffs have specifically requested that Defendant BROOKDALE make reasonable modifications to its staffing policies, practices and procedures for its assisted living facilities in order to ensure that there is staffing in sufficient numbers and with adequate training to provide timely and effective assistance and care to residents with disabilities.  Despite the fact that such modifications are necessary to ensure that residents with disabilities receive full and equal access to and enjoyment of Defendants' goods, services, facilities, privileges, advantages, and/or accommodations, and despite the fact that such modifications will not result in any fundamental alteration to BROOKDALE's public accommodations, Defendant has refused to do so.

5.     In addition, Defendant has violated the ADA by failing and refusing to provide residents with mobility disabilities with full and equal access to and enjoyment of its

2

transportation services.  Further, Defendant has discriminated against residents with disabilities by failing to provide them with an emergency evacuation plan that is designed for and reasonably calculated to ensure the prompt and effective evacuation of persons with disabilities in the event of emergency.

6.     Defendant BROOKDALE has also engaged in a policy and practice of violating the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, committing Elder Financial Abuse, Cal. Welf. & Inst. Code § 15610.30, and Unlawful, Unfair and Fraudulent Business Practices ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Defendants promise to provide the elderly and disabled the "quality of life they've earned," but Defendants instead engage in a scheme to defraud seniors, persons with disabilities, and their family members.  In order to induce the elderly and disabled to move into and stay at its California assisted living facilities, BROOKDALE makes misrepresentations and misleading statements and conceals material facts about the quality and availability of care available at BROOKDALE.  Reasonable consumers are misled to believe, and reasonably expect, that BROOKDALE determines each resident's needs and staffs each facility accordingly to deliver personalized care to meet those needs.  Instead, BROOKDALE systemically understaffs its facilities, cuts caregiver hours, and fails to train workers, all to boost its profitability, while the residents in BROOKDALE's care are forced to endure increasingly expensive monthly charges and worsening care.  The results of BROOKDALE's callous and profit-driven approach are devastating: as multiple reports by state regulators confirm, residents are left without assistance for hours after falling, they are given the wrong medications, they are denied clean clothing, showers, and nutritious food, and they are left in their own waste for long periods of time.

7.     On any given day, residents of BROOKDALE's many California facilities live with a substantial risk that they will not receive the care and services they have paid for and that they need.  Scores of family and resident council meetings and hundreds of communications to BROOKDALE management have failed to rectify these problems, leaving Plaintiffs and the class no choice but to seek redress in this Court.

8.     This lawsuit seeks to end this systemic discrimination against persons with

3

disabilities by requiring Defendant to provide them with full and equal access to and enjoyment of BROOKDALE's facilities, services, goods, privileges, advantages and accommodations. This action seeks to require that Defendants staff their facilities with a sufficient number of adequately trained staff to ensure that residents with disabilities are provided with full and equal access to and enjoyment of the services specified in BROOKDALE's own resident assessments. In addition, this action seeks to require that Defendants provide assistive living facilities that are readily accessible to and usable by persons with disabilities as required by the ADA.  Further, Plaintiffs seek injunctive relief requiring Defendants to provide full and equal access to and enjoyment of Defendants' transportation services and activities.  Plaintiffs also seek injunctive relief requiring Defendants to provide adequate emergency planning and evacuation procedures for residents with disabilities.  With respect to the CLRA, the UCL and the Elder Financial Abuse statute, this action seeks to require Defendant to disclose to prospective and current residents, their family members or responsible parties, and the class that BROOKDALE's existing staffing policies and procedures preclude it from providing its residents with all the care and services they have been promised and are paying for.  Further, this action seeks to enjoin BROOKDALE from charging residents or their responsible parties monthly fees based on their Personal Service Plans until BROOKDALE implements staffing policies and procedures that enable it to deliver those services on a consistent basis.

9.     Plaintiffs have no adequate remedy at law and, unless BROOKDALE is preliminarily and permanently enjoined, Plaintiffs will continue to suffer irreparable harm as a result of being denied full and equal access to and enjoyment of BROOKDALE's goods, services, facilities, privileges, advantages, and/or accommodations.  Plaintiffs seek declaratory and injunctive relief and statutory and actual damages as set forth below against BROOKDALE for its policy and practice of denying Plaintiffs full and equal access to and enjoyment of its services and facilities and violating the ADA and its accompanying regulations, the Unruh Act, and the CLRA, for committing Elder Financial Abuse, and for engaging in Unlawful, Unfair and Fraudulent Business Practices.  Plaintiffs also seek recovery of reasonable attorneys' fees, costs and litigation expenses under federal and state law.

4

**EXHAUSTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS**

10.     By letter dated June 2, 2017, Plaintiffs notified Defendants of Plaintiffs' intent to file suit against it based on violations of the Consumer Legal Remedies Act, as required by California Civil Code § 1782.  BROOKDALE received the letter on June 6, 2017.  More than 30 days have passed since BROOKDALE's receipt, and BROOKDALE has not corrected or remedied the violations alleged in the notice and herein.

11.     Though they were not required to do so, Plaintiffs also notified BROOKDALE of its multiple violations of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 1201 *et seq.*, the Unruh Civil Rights Act, California's elder financial abuse law, and California's Unfair Competition Law.

**JURISDICTION**

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).  The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, presents federal questions and confers jurisdiction on this Court over Plaintiffs' claims regardless of the amount in controversy.  This Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action in which the proposed class includes at least 100 members, the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and at least one putative class member is a citizen of a state different from one of the defendants.  Plaintiffs seek damages in the amount of a minimum $9,000 per class member and believe that the class consists of over 5,000 persons, making the amount in controversy well in excess of $5,000,000.  BROOKDALE is a Delaware corporation with its principal place of business in Tennessee, making it a citizen of both Delaware and Tennessee, and each of the named Plaintiffs are citizens of the State of California.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' pendent claims under California law.

13.     Defendants are subject to personal jurisdiction in this Court because Defendants have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market through ownership and/or management of assisted living facilities located

in California, derivation of substantial revenues from California, and other activities, so as to render the exercise of jurisdiction over Defendants by the California courts consistent with the traditional notions of fair play and substantial justice.

### VENUE

14.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b), because the acts upon which this action is based occurred in part in this District within the counties of Alameda, Contra Costa, Lake, Monterey, Napa, San Mateo, Santa Clara, Santa Cruz, and Sonoma.

15.    A substantial part of the events or omissions which gave rise to Plaintiffs' claims arose in the County of Sonoma and thus, pursuant to Civil Local Rules 3-2(c) and (d), assignment to the San Francisco Division of the District Court for the Northern District of California is proper.

### THE PARTIES

16.    Plaintiff STACIA STINER is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also a dependent adult pursuant to Cal. Welf. & Inst. Code § 15610.23; a disabled person pursuant to Cal. Civ. Code § 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  She needs assistance with the following activities of daily living: housekeeping, laundry, dressing, bathing, managing medications, toileting, and transportation.  She uses a wheelchair for mobility.  STACIA STINER has been a resident of BROOKDALE San Ramon since approximately February 2016.  She is a resident of Contra Costa County in the State of California.

17.    Plaintiff HELEN CARLSON is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also an elder pursuant to Cal. Welf. & Inst. Code § 15610.27; a senior citizen and a disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  HELEN CARLSON is 93 years old.  She needs assistance with the following activities of daily living: managing medications, transferring, toileting, bathing, dressing, grooming, transportation, food preparation and meal setup, housekeeping, and laundry.  She uses a wheelchair for mobility.  HELEN

6

CARLSON is and has been a resident of BROOKDALE Fountaingrove since approximately October 2011.  She is a resident of Sonoma County in the State of California.  JOAN CARLSON is HELEN CARLSON's daughter-in-law and has had her power of attorney since December 2006.  This Court appointed JOAN CARLSON as the guardian ad litem of HELEN CARLSON for the purposes of prosecuting this lawsuit on September 22, 2017.

18.     Plaintiff LAWRENCE QUINLAN is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  He is also an elder pursuant to Cal. Welf. & Inst. Code § 15610.27; a senior citizen and a disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  LAWRENCE QUINLAN is 87 years old.  He uses a wheelchair for mobility and has dementia.  LAWRENCE QUINLAN stayed at the facility at BROOKDALE Hemet for respite on several occasions between 2013 and 2015.  He became a long-term resident of the assisted living at BROOKDALE Hemet on approximately September 13, 2015 and left the facility on or about April 30, 2017.  He is a currently a resident of an unrelated assisted living facility in Riverside County in the State of California.  LORESIA VALLETTE is LAWRENCE QUINLAN'S granddaughter.  Since January 25, 2016, she and her uncle Phillip Quinlan—who is Mr. QUINLAN's son—have shared power of attorney for Mr. QUINLAN.  On September 22, 2017, this Court appointed Ms. VALLETTE as Mr. QUINLAN's guardian ad litem for the purposes of prosecuting this lawsuit.

19.     Plaintiff EDWARD BORIS is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  He is also an elder pursuant to Cal. Welf. & Inst. Code § 15610.27; a senior citizen and a disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d). EDWARD BORIS is 86 years old.  He was an assisted living resident at BROOKDALE Fountaingrove from September 2015 through July 2016.  He is currently a resident of the skilled nursing facility at BROOKDALE Fountaingrove.  During his time as an assisted living resident at BROOKDALE Fountaingrove, EDWARD BORIS used a walker and wheelchair.  He is a resident of Sonoma County in the State of California.  MICHELE LYTLE is EDWARD BORIS's daughter.  Ms.

1    LYTLE has held Mr. BORIS's power of attorney since 2011 and has taken action on his behalf

2    as his attorney in fact since 2015.  Simultaneous with the filing of this Second Amended

3    Complaint, Plaintiffs are filing a motion for the appointment of MICHELE LYTLE as the

4    guardian ad litem of EDWARD BORIS for the purposes of prosecuting this lawsuit.

5         20.     Plaintiff PATRICIA "PAT" LINDSTROM is the wife of ARTHUR "ART"

6    LINDSTROM.  ART LINDSTROM died on February 23, 2018, and PAT LINDSTROM is his

7    successor-in-interest.  A successor-in-interest declaration is attached as Exhibit A to this

8    complaint.  At all times relevant to this complaint, Mr. LINDSTROM was a qualified person

9    with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  He was also

10   an elder pursuant to Cal. Welf. & Inst. Code § 15610.27; a senior citizen and disabled person

11   pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code §

12   1761(d). Mr. LINDSTROM was 83 years old when he died.  He suffered from diabetes, kidney

13   failure, heart disease, sleep apnea, and incontinence; used a cane to walk; and experienced

14   dementia-related cognitive impairment, including general memory loss, difficulty remembering

15   words, and difficulty speaking when under pressure.  He needed assistance with the following

16   activities of daily living: bathing, shaving, administration of medication, dressing, laundry, and

17   preparing nutritious meals.  He was a resident of BROOKDALE Scotts Valley from

18   approximately November 2015 until his death.  PAT LINDSTROM is a resident of Santa Cruz

19   County in the State of California.

20        21.     Plaintiff RALPH SCHMIDT is a qualified person with disabilities within the

21   meaning of the ADA and the Unruh Civil Rights Act.  He is also a dependent adult pursuant to

22   Cal. Welf. & Inst. Code § 15610.23; a disabled person pursuant to Cal. Civ. Code § 1761(g); and

23   a consumer pursuant to Cal. Civ. Code § 1761(d).  RALPH SCHMIDT is 53 years old, is blind,

24   and has significant cognitive impairments, including short-term memory loss.  Both his

25   blindness and cognitive impairments are the result of a traumatic brain injury suffered more than

26   20 years ago.  Mr. SCHMIDT has a court-appointed conservator who manages his financial,

27   medical, and legal affairs.  He needs assistance with the following activities of daily living:

28   housekeeping, laundry, navigating when outside of his dwelling, preparing nutritious meals, and

transportation.  Mr. SCHMIDT was an assisted living resident at the facility currently known as BROOKDALE Tracy from approximately September 2011 through October 30, 2017.  He currently resides at an assisted living facility not affiliated with BROOKDALE and is a resident of Stanislaus County in the State of California.  HEATHER FISHER is a professional fiduciary and has held a license from the California Professional Fiduciaries Bureau since March 14, 2014.  On August 17, 2017, the Superior Court of San Joaquin County appointed Ms. FISHER to serve as conservator for RALPH SCHMIDT, replacing Mary F. Gallagher who had been Mr. SCHMIDT's conservator since approximately November 2011.  Simultaneous with the filing of this Second Amended Complaint, Plaintiffs are filing a motion for the appointment of HEATHER FISHER as the guardian ad litem of RALPH SCHMIDT for the purposes of prosecuting this lawsuit.

22.      Plaintiff BERNIE JESTRABEK-HART is a qualified person with disabilities within the meaning of the ADA and the Unruh Civil Rights Act.  She is also an elder pursuant to Cal. Welf. & Inst. Code § 15610.27; a senior citizen and disabled person pursuant to Cal. Civ. Code §§ 1761(f), 1761(g); and a consumer pursuant to Cal. Civ. Code § 1761(d).  BERNIE JESTRABEK-HART is 72 years old.  She needs assistance with the following activities of daily living: dressing, bathing, food preparation, and transportation.  She uses an electric wheelchair and cane for mobility.  BERNIE JESTRABEK-HART has been a resident of BROOKDALE Scotts Valley since approximately October 2015.  She is a resident of Santa Cruz County in the State of California.

23.      Defendant BROOKDALE SENIOR LIVING, INC. is a corporation organized under the laws of the State of Delaware with its principal place of business in Brentwood, Tennessee.  Defendant BROOKDALE SENIOR LIVING COMMUNITIES, INC. is a corporation organized under the laws of the State of Delaware with its principal place of business in Brentwood, Tennessee.  BROOKDALE SENIOR LIVING, INC. and BROOKDALE SENIOR LIVING COMMUNITIES, INC. will be referred to collectively as "BROOKDALE" or "Defendants."  BROOKDALE owns, manages, and/or operates approximately eighty-nine (89) assisted living facilities throughout California.  It is the largest chain of senior living

9

facilities in California and the United States.  BROOKDALE's operations are centralized, hierarchical and standardized, and all of BROOKDALE's assisted living facilities in California use the same uniform corporate policies, practices and procedures.  These corporate policies, practices and procedures control all aspects of the operations, staffing and staff training in its assisted living facilities.  All of BROOKDALE's assisted living facilities in California are required to follow the uniform policies, practices and procedures established by BROOKDALE's corporate headquarters.

24.     BROOKDALE's unlawful conduct as alleged herein has been widespread, repeated, and consistent at each of its locations.  The operations of BROOKDALE's assisted living facilities in California are standardized, if not identical.  BROOKDALE's conduct, as alleged herein, was and is part of a statewide plan, practice, course of conduct and scheme, and affects all of the residents of BROOKDALE's assisted living facilities.

25.     Defendants DOES 1-100 are sued herein under fictitious names because Plaintiffs do not presently know their true names and capacities.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when such are discovered.  Plaintiffs allege that each of these Defendants was responsible in some capacity for the events alleged herein, or is a necessary party for obtaining appropriate relief.  Plaintiffs are informed and believe and thereon allege that in carrying out each of the acts and violations alleged in this Complaint, each Defendant acted as an agent, principal, and/or representative for each other Defendant.

**FACTUAL ALLEGATIONS**

26.     BROOKDALE is the largest provider of assisted living for senior citizens and persons with disabilities in the nation and has the largest number of assisted living facility residents within the state of California.  On information and belief, Plaintiffs allege that there are more than 5,000 residents in Defendants' eighty-nine facilities in California.

27.     Assisted living facilities, also called Residential Care Facilities for the Elderly ("RCFEs"), offer room, board and daily assistance for seniors and persons with disabilities in certain activities of daily living ("ADLs"), such as preparing meals, shopping, transportation, preparing and taking medication, housekeeping, laundry, bathing, toileting, grooming, dressing,

10

1    and others.

2        28.    Assisted living facilities are intended to provide a level of care appropriate for

3    those who are unable to live by themselves, but who do not have medical conditions requiring

4    more extensive nursing care.

5        29.    In recent years, BROOKDALE has increasingly been accepting and retaining

6    more residents with conditions and care needs that were once handled almost exclusively in

7    skilled nursing facilities.  This has allowed it to increase not only the potential resident pool but

8    also the amounts of money charged to residents and/or their family members.

9        30.    At BROOKDALE facilities, residents are charged a base rate, which includes

10   room, board, basic maintenance, housekeeping, laundry, dining services, planned social and

11   recreational programs, scheduled transportation services, staffing 24 hours a day, observation

12   and consultation, and assistance with access to outside services.  BROOKDALE uses its resident

13   assessment system to assess each resident before admission and then again periodically

14   throughout residency and/or whenever there is a change of the resident's condition.  By

15   performing these assessments, BROOKDALE determines what additional services a resident

16   needs, such as assistance with ADLs, and develops a Personal Service Plan for the resident.

17   Each additional need, or service, is assigned a monthly Personal Service Rate, which is added

18   onto the resident's base rate.  The more personal services determined by BROOKDALE to be

19   needed by a resident, the more money BROOKDALE charges that resident.

20       31.    Every month, BROOKDALE sends each resident or his or her responsible party

21   an invoice for services that BROOKDALE represents it will provide in the following month.

22   These invoices reflect the monthly rate for the Basic Services set forth in BROOKDALE's

23   standard residency agreements, the Personal Service Rate that is based on each resident's

24   Personal Service Plan, and any adjustments.  On information and belief, these monthly invoices

25   range from approximately $4,000 to $10,000 per person per month.

26       32.    On information and belief, as of January 1, 2016, BROOKDALE increased the

27   Basic Service Rate and Personal Service Rate for residents in its California facilities by roughly

28   6%, and as of January 1, 2017, it raised these rates again by approximately 7%.  In standard

form letters sent to residents attempting to explain these steep rate increases, BROOKDALE attributed them to increases in "the operating costs of your community," including costs for "utility usage, insurance, supplies, and food." But in fact the Consumer Price Index for the Bay Area rose only 3.4% between approximately January 1, 2016 and December 31, 2016.

### BROOKDALE FAILS TO PROVIDE FULL AND EQUAL ACCESS TO AND ENJOYMENT OF ITS FACILITIES AND SERVICES TO PERSONS WITH DISABILITIES IN VIOLATION OF THE ADA AND THE UNRUH CIVIL RIGHTS ACT

**Physical Access Violations**

33.     BROOKDALE has violated Title III of the ADA and the Unruh Civil Rights Act by failing to provide full and equal access to its facilities and services. Rooms occupied by persons with mobility disabilities and common areas at the BROOKDALE San Ramon, Windsor, Fountaingrove, Scotts Valley, and likely other facilities, do not meet federal or state accessibility standards. Under Title III, fifty percent of the residential rooms in long-term care facilities must meet the requirements of the 1991 ADAAG or the 2010 ADA Standards. BROOKDALE's facilities do not meet these standards.

34.     There is a pattern of physical access barriers in BROOKDALE facilities, as described below:

     a.    Wheelchair users are placed in rooms that do not have sufficient turning space in the bathrooms or the bedroom area. This means that they often cannot even use their bathroom unless they are able to transfer out of their wheelchair and enter without it. Those who can enter in their wheelchair usually do not have enough space to transfer safely onto the toilet or into the shower or to use the sink or vanity space. Some residents have given up on using their inaccessible toilet and must rely on adult briefs and caregiving staff to clean them.

     b.    There is no clearance for wheelchairs under the sinks and/or the sinks are too high for a wheelchair user to reach them, preventing residents from using them.

c.   The grab bars that do exist in the bathrooms are not compliant with applicable access standards, and there are no roll-in showers.  Both of these barriers are safety hazards, increasing the likelihood of falls.  They also prevent most persons with mobility disabilities from bathing as independently as possible.  Some wheelchair users have stopped using their showers altogether and instead take sponge baths, hardly an adequate substitute.

d.   There are barriers to using the outdoor space for the residents' rooms, including hard-to-open sliding doors, a lip at the threshold of the door, and insufficient space to accommodate a wheelchair.  This prevents persons with mobility disabilities from using their outdoor space as persons without disabilities can.

e.   The closets do not have accessible hanging and storage space, in that they are placed out of the reach of a wheelchair user.  This prevents persons with mobility disabilities from accessing their clothing and other personal items, forcing them to rely on others for assistance.

f.   Kitchen countertops and sinks are too high for a wheelchair user to access, preventing those residents from fully using their kitchens.

g.   Heavy doors in common areas cannot be used independently by and pose a safety risk to many persons with disabilities.

35.   These physical access barriers, which residents live with on a daily basis, prevent them from having full and equal access to their rooms as required by law.

**Understaffing**

36.   BROOKDALE does not schedule or provide sufficient numbers of trained staff to deliver promised services and meet the needs of its residents.  Plaintiffs allege on information and belief that BROOKDALE staffs its facilities based on predetermined labor budgets and desired profit margins.  Pursuant to Defendants' corporate policies and procedures, the executive directors who manage individual BROOKDALE facilities must request permission from

13

Defendants' corporate headquarters to deviate from these pre-determined budgets.  Executive directors have a disincentive to request increased labor budgets for their facilities because they are not eligible for bonuses unless they meet earnings targets set by Defendants' corporate headquarters.  As a result of Defendants' corporate policies, practices and procedures BROOKDALE's assisted living facilities are inadequately staffed.

37.     Reports issued by California Department of Social Services' Community Care Licensing Division ("Community Care Licensing"), the state agency that regulates assisted living facilities, indicate that inadequate staffing pervades Defendants' California facilities.  For instance, Community Care Licensing recently issued a citation to BROOKDALE Corona after a licensing inspector found "that there are not enough staff present" and observed five residents sitting unsupervised in the dining room and 19 residents in the activity room with only one staff member present.  In March 2017, Community Care Licensing cited a BROOKDALE facility in Santa Cruz County after a licensing inspector found that the facility did not have an adequate amount of staff to meet residents' needs.  In June 2016, BROOKDALE Oceanside received a citation because it had only two caregivers on duty during daytime hours in the assisted living part of its facility.

38.     Plaintiffs allege on information and belief that BROOKDALE uses pre-determined staffing schedules at its facilities and does not change these schedules or the number of staff hours worked when the facility has more residents or residents with greater needs.  Community Care Licensing records demonstrate the inadequacy of Defendants' staffing to meet even the most basic needs of residents.  For instance, a personnel report that BROOKDALE filed with Community Care Licensing in February 2017 indicates that BROOKDALE Fountaingrove, a facility in Sonoma County, is understaffed for the night shift from 10:00 p.m. to 6:00 a.m.  That schedule lists only four resident caregivers assigned to the night shift, three of whom work only three days a week, with the result that in many instances there are as few as one resident caregiver on duty during the night shift to care for approximately 100 residents on three floors.  Moreover, the official numbers of caregivers on duty is often quite deceptive, as BROOKDALE frequently pulls caregivers from their responsibilities in order to perform other

1    tasks, such as serving meals in the dining room.

2         39.    As a direct result of Defendants' discriminatory staffing practices, residents with

3    disabilities have not received or run a substantial risk of not receiving the personal services,

4    emergency and evacuation response, dining services, housekeeping and laundry services,

5    transportation, and activities for which they are paying and that are necessary for full and equal

6    enjoyment of Defendants' goods, services, facilities, benefits, advantages and accommodations.

7                    ***Impact of Understaffing on Personal Services***

8         40.    The lack of sufficient numbers of trained staff at BROOKDALE means that

9    residents with disabilities who need and pay for assistance with bathing, dressing, brushing their

10   teeth, toileting, incontinence care, and other hygiene assistance do not receive it on a routine

11   basis.  Scheduled showers are routinely skipped by staff who do not have time to bathe residents.

12   Staff often leave residents unattended on the toilet because another resident has activated their

13   call pendant, and there is no one else available to respond.  Residents have been left on their bed

14   undressed by staff called away to attend to other residents in need.

15        41.    Residents who need assistance getting to the bathroom often wait for long periods

16   of time for staff to respond to their call pendants.  Because they must wait so long for assistance,

17   some residents have given up using the toilet altogether, instead relying on adult briefs and a

18   caregiver to clean and change them when they have time.  Incontinent residents often wait for

19   thirty minutes or more for a staff member to help them change out of soiled briefs, raising the

20   risk of urinary tract infections and decubitus ulcers.  For example, an inspector from Community

21   Care Licensing found in May 2016 that BROOKDALE San Pablo had insufficient staff to meet

22   the residents' needs, noting that "[i]ndividuals requiring incontinence care are not always

23   changed in a timely manner."  In November 2016, a licensing inspector found that even though a

24   resident at BROOKDALE Cherry Hills was paying for regular incontinence checks, she was left

25   lying on the floor for an extended amount of time after a fall because staff failed to check on her.

26   In March of 2017, a licensing inspector cited BROOKDALE Palm Springs for not providing a

27   resident with those basic and personal care services—assistance with showering, dressing,

28   transportation and medication—that the resident needed and for which the facility was being

1    paid.

2         42.    Insufficient staffing has also caused and continues to cause errors in medication

3    administration, including providing the wrong dosage or the wrong medication, untimely or

4    missed doses, and/or a failure to implement physicians' orders.  Community Care Licensing has

5    documented several recent examples from BROOKDALE's Sonoma County facilities that

6    illustrate the broader problem.  Community Care Licensing records show that the agency cited

7    BROOKDALE Chanate five times on consecutive visits between October 28, 2015 and October

8    13, 2016 for failing to give residents their prescribed medications.  At BROOKDALE Windsor,

9    a resident recently received a double dose of medication because the nurse who administered the

10   first dose failed to document that it had been given.  On a different occasion, staff gave a

11   resident at BROOKDALE Windsor a medication that had been prescribed for a different

12   resident.  Meanwhile, at BROOKDALE Rohnert Park, licensing inspectors found that staff were

13   not properly trained on storing and administering residents' medication, leading to a narcotic pill

14   that went missing in August 2016 and staff's failure to administer medications in October 2016.

15   Numerous other reports issued by Community Care Licensing confirm that problems with

16   medication administration pervade Defendants' facilities throughout California.  For example,

17   Community Care Licensing cited BROOKDALE Palm Springs when 20 residents missed their

18   medication doses on December 24, 2016 because there was no med tech on duty.  At

19   BROOKDALE San Ramon, someone stole a number of residents' medication from the facility

20   during the overnight shift ("NOC SHIFT") between July 9 and 10, 2017.  The facility did not

21   inform all of the residents' family members of the theft.  When one resident's daughter-in-law,

22   who learned about the theft from the resident, asked the facility's acting Executive Director,

23   Shawn Cull, which employees were on duty during the NOC shift, he told her that there were

24   only two employees on duty to respond to all residents at the facility.  The facility has an

25   occupancy of between approximately 70 to 80 residents.  Because no one was immediately

26   available at the facility to pick up refills, at least one resident did not receive her pain medication

27   until later that evening and was extremely anxious until that time.  Another resident's family was

28   not informed of the theft until almost 6 p.m., after the resident's physician's offices had closed

and the family could not obtain a refill. That resident was given an inadequate substitute pain medication in the evening, which was distressing to the resident and her family members, who had to reassure and calm her. The following day, although BROOKDALE was notified that the refill was ready for pick-up at 10 a.m., the resident told her family that she did not receive her prescribed pain medication until 4 p.m.

43. BROOKDALE's understaffing creates many dangerous situations for residents. Among those are an increase in elopements from facilities by persons with cognitive impairments, because the facilities do not hire staff in sufficient numbers or with the training necessary to monitor residents and prevent escapes. For example, BROOKDALE Oceanside was cited in April and September of 2016 for relying on delayed egress systems to compensate for insufficient staffing, resulting in resident elopements. An informal conference was held by Community Care Licensing with BROOKDALE Oceanside management in December 2016 as a result of the elopements and other compliance failures. Subsequently, on April 26, 2017, BROOKDALE staff failed to monitor residents on an outing, and one wandered away for approximately an hour.

### Impact of Understaffing on Pendant Call Systems and Medical Emergencies

44. BROOKDALE'S failure to staff sufficiently results in caregivers' inability to respond promptly to call pendants, if at all. BROOKDALE has represented that residents who wear a call pendant, and pay a monthly fee for this service, may push a button to alert staff if they have an emergency, and staff will immediately respond to provide assistance. Residents with disabilities rely heavily on these call pendants for assistance with basic tasks and activities of daily living, as well as for emergencies. However, the call pendants do not notify staff of the resident's location should they not be in their room. In or about late 2016, a BROOKDALE San Ramon resident fell and hit his head on the pavement in the facility parking lot and pressed his pendant. No one responded. Bleeding profusely from his head, he used his mobile phone to call the front desk. The son of another resident, a fire chief with emergency response training, found the resident in the parking lot just as BROOKDALE's bookkeeper and maintenance director responded to the resident's telephone call. Because those employees have no caregiver or

17

1   emergency response training, they would not even touch the resident.  The fire chief had to call

2   911 and administer first aid while waiting.

3        45.    Moreover, contrary to Defendants' representations, staff do not immediately

4   respond when residents use their call pendants.  For instance, in November 2016, a resident in

5   the BROOKDALE Paso Robles facility pushed her emergency pendant after falling in her room

6   and waited 22 hours on the floor with broken bones until staff finally found her.  That same

7   month, a resident at the BROOKDALE Fountaingrove fell, injured her head, pressed her call

8   pendant, and waited thirty minutes bleeding profusely from her head before staff arrived.  She

9   died 10 days later.  In January 2017, a former resident of BROOKDALE Fountaingrove waited

10  three hours for staff to respond to a call.  BROOKDALE's policy and practice of not

11  maintaining its call pendant system properly and of not providing sufficient staff to respond to

12  call pendants deprives residents with disabilities of full and equal enjoyment of its goods,

13  services, facilities, and benefits.

14       46.    Community Care Licensing records indicate lengthy emergency response times at

15  Defendants' facilities throughout California.  For example, in February 2017 a licensing

16  inspector found that staff at BROOKDALE Riverside routinely took over 10 minutes to respond

17  to emergency pendant calls, and on one occasion took 36 minutes to respond.  At

18  BROOKDALE Orangevale, a licensing inspector tested an emergency call pendant during a

19  January 2017 visit and found that it took over 45 minutes for facility staff to respond.  At

20  BROOKDALE North Tarzana, a review of the facility's records revealed numerous response

21  times of over 30 minutes, including multiple response times of over an hour.  A licensing

22  inspector who tested emergency pull cords at BROOKDALE Chatsworth found that it took staff

23  24 minutes to respond during a June 2016 inspection; during another visit, the inspector found

24  that it took staff 30 minutes to respond, and that they did so only after the inspector alerted the

25  facility administrators.  At BROOKDALE Oceanside, an inspector found that as of April and

26  May 2016, there were times when staff did not answer residents' calls for 15 to 45 minutes.  The

27  inspector's report noted that there were only two direct caregivers on duty during the day and

28  evening shifts at the facility, which has a capacity of 186 residents, and that those caregivers

were responsible for numerous tasks in addition to answering emergency calls on two floors. Community Care Licensing cited BROOKDALE Fountaingrove at the end of March 2017 after a review of the pendant system report revealed many instances of extremely lengthy response times, noting in particular a pendant pressed at 5:23 p.m. which was not answered for over 39 minutes and a pendant set off at 5:45 p.m. to which staff did not respond for one hour and 27 minutes.

47.     Even when Defendants' staff do respond within a reasonable amount of time to a request for assistance, the response is often inadequate.  In one case, staff at BROOKDALE Fountaingrove failed to notify a resident's family after the resident had a fall and was sent to the emergency room.  Staff also failed to send identifying information or documents with the resident, as required by Defendants' policies and procedures.  As a result, the resident was listed as a Jane Doe until the next morning.  A doctor at the hospital told the resident's daughter that he would have operated on the resident shortly after she was admitted, but had to wait until the next morning because he had no family contact numbers to call.  The Community Care Licensing inspector who investigated this incident noted that she observed insufficient staffing at BROOKDALE Fountaingrove to ensure that the facility's own policies and procedures were being followed.  On another occasion, a BROOKDALE Fountaingrove resident pressed the call button on her pendant because she could tell she was going to have terrible diarrhea.  While she waited for a response, the resident headed for the toilet, but by the time she got there, she had already soiled herself and her nightgown.  Although a caregiver responded to the pendant call, when the caregiver looked in the bathroom and saw the resident sitting on the toilet, she left without providing assistance and never returned.  The resident screamed for help and pressed the emergency button next to the toilet, but no one responded until roughly an hour later, when a new set of caregivers started their shifts.

48.     Residents must resort to calling 911 for assistance when staff fail to promptly respond to their call pendants.  For example, public records kept by the Rincon Valley & Windsor Fire Protection Districts revealed that in a one-year period from June 2016 through May 2017, the agency responded to 83 emergency calls from 907 Adele Drive, the address of

BROOKDALE Windsor.  Community Care Licensing records indicate that this facility has a capacity of 80, but often has fewer than 70 residents, suggesting that BROOKDALE Windsor residents averaged well over one 911 call per person over the past year.  Many of these calls were classified as "medical assists," meaning the Rincon Valley & Windsor Fire Protection Districts provided assistance to another group or agency that had primary responsibility for medical care, such as assisting with moving a heavy patient.  Several of these 911 calls were classified as instances where a member of the public called the fire protection districts for routine help, such as assisting a person in returning to a bed or chair, with no transport or medical treatment given.

49.     In other cases, Defendants' staff failed to monitor residents' health status as promised, placing residents in danger and distress in situations where the resident was not able to call for help.  At BROOKDALE Fountaingrove, one resident was left in her wheelchair all night because she requires staff assistance to get in and out of her wheelchair, but staff failed to help her into bed and never checked on her during the night.  In another case, a resident at BROOKDALE Scotts Valley fell in his apartment and went without food or water for 24 to 30 hours because staff failed to check on him.  The resident was taken to a hospital, where doctors diagnosed him with dehydration and rhabdomyolysis, a condition in which damaged skeletal muscle tissue breaks down and the damaged muscle cells are released into the bloodstream, causing further injury.  At BROOKDALE Riverside, a resident fell while outside and suffered severe sunburns because staff failed to regularly check on him.  In November 2016, Community Care Licensing issued a citation to BROOKDALE Hemet based on an incident in which staff left a resident with a known risk of falling unattended in a dining room chair.  The resident fell and hit his head, requiring ten stitches.  Just three days later, Defendants' staff again left the resident unattended, and he fell and re-injured his head.  The licensing inspector noted that this resident had additional staff supervision as part of his care plan, but that BROOKDALE Hemet lacked sufficient staff to meet the resident's needs.

50.     Because Defendants' staff are stretched so thin responding to emergency calls and attending to their other duties, they have attempted to dissuade residents from calling for

assistance.  Residents have been told by overworked caregivers to use their call buttons "only in an emergency," despite the fact that, short of screaming for help, this is the only way to alert caregivers that they need the assistance for which they are paying BROOKDALE.  In many instances, residents feel bad for overworked caregivers and attempt to perform tasks on their own, despite paying BROOKDALE for these services.  This has led to residents' falling or otherwise injuring themselves.

### *Impact of Understaffing on Dining Services*

51.      BROOKDALE's policy and practice of understaffing has resulted in its cutting staffing hours and eliminating positions in dining services.  As a result, residents wait for long periods of time to be served.  Some residents give up in frustration.  Food is often served cold, and residents do not dare to make a special request, for fear that the wait will be extreme.  Moreover, the quality of the food has so deteriorated that it is in many cases nearly inedible.  Fresh ingredients are rare, meat of poor quality is hidden under sauces, and both residents and licensing inspectors have encountered food beyond its expiration date.  The understaffing also prevents staff from maintaining a clean and hygienic dining area.

52.      At BROOKDALE San Ramon, the hours of serving staff were cut, and servers have left as a result, leaving the dining department severely understaffed.  At breakfast, there is often one server for 80 people.  On at least one day during June 2017, there were no servers in the dining room for breakfast, and the activities director was cleaning the tables while the chef both cooked and served meals.  At BROOKDALE Windsor, licensing inspectors found a single staff member working morning shifts in the dining room, with dirty dishes and food droppings strewn about because no other staff members were available to clean up.  BROOKDALE Riverside received a Community Care Licensing citation after investigators found that food was served cold and residents had to wait an unreasonable amount of time for food to be served.  The investigator attributed this problem to understaffing, noting in her report that "[i]t was revealed there is not enough servers for the number of residents in the dining room at one time."  On a recent visit to BROOKDALE Corona, the licensing inspector found five residents sitting in the dining room without supervision, and noted that caregivers were expected to serve lunch, clean

the dining room after meals, and sweep the floors in the dining room in addition to their other duties.  The same inspector found uncovered and dried-out ham and cheese sandwiches in the refrigerator and unrefrigerated cartons of strawberry milk in a cupboard.

53.     The long waits and substandard meals in the dining room mean that some residents either purchase their own food or often forgo meals altogether, despite the fact that residents are paying BROOKDALE for three meals per day and snacks.  Residents' nutrition needs are not being met, and to the extent that they look forward to meals as a pleasant social experience, they are being deprived of that benefit as well.  Residents have made numerous complaints to Defendants about the dining service, individually and through the family and resident councils.  For example, the Resident Council at BROOKDALE San Ramon has been complaining about the problems in dining services for over two years.  Yet residents have seen no durable improvements. There may be temporary improvements from time to time, but the overall trend is actually downward.

### Impact of Understaffing on Housekeeping and Laundry

54.     BROOKDALE's policy and practice of understaffing extends to housekeeping and laundry services.  For example, on information and belief, BROOKDALE San Ramon went for many months with only one housekeeper to clean approximately 80 rooms.  As a result, the maintenance director and the executive director also had to clean rooms and consequently had less time to perform maintenance and administrative duties.  Residents' rooms have been left in deplorable and often unsanitary conditions, including toilet seats and showers covered in feces and rooms which smell strongly of urine.

55.     BROOKDALE routinely fails to wash residents' personal belongings and bed linens.  Even when BROOKDALE's staff take these items for laundering, residents' clothes and linens are often lost, or they are given back other residents' clothing or linen instead of their own.  Residents are left in dirty and malodorous clothing.  For example, Loresia Vallette, the granddaughter of former BROOKDALE Hemet resident LAWRENCE QUINLAN observed that her grandfather's clothes were never washed, and that staff continued to dress him in the same pair of urine-stained pants.  Some residents or their family members have despaired of waiting

1    and begun to perform these services on their own, despite BROOKDALE's promise to provide

2    them as part of their base rate.

3                **Discrimination in Transportation/Activities**

4            56.    Due to chronic understaffing at Defendants' facilities, promised transportation

5    services and activities are often sporadic or nonexistent.  Many residents rely on BROOKDALE

6    for transportation to medical and lab appointments, church, grocery shopping, banking and other

7    activities.  Additionally, they expected and would enjoy both on- and off-site activities.  Yet they

8    do not receive these services on a regular basis, if at all.  Scheduled activities—such as poker,

9    bingo and movies—are frequently cancelled, and BROOKDALE regularly fails to provide the

10   promised transportation services to its residents.  Residents are often told about cancellations at

11   the last minute for shuttles to planned events, such as church services.  The lack of staffing at

12   BROOKDALE San Ramon means that its activities director must fulfill multiple duties.  In

13   addition to her expected duties, she often works in the dining room serving food or cleaning and

14   at the front desk as a receptionist.  She is frequently the only driver for facility-provided

15   transportation.  On several occasions, residents of BROOKDALE San Ramon have been left

16   waiting outside a medical office or a church because BROOKDALE staff forgot to pick them up

17   and had to rely on others to take them back to the facility.

18           57.    Additionally, BROOKDALE has implemented policies and practices regarding

19   its provision of transportation services that discriminate against persons with mobility

20   disabilities.  Residents at BROOKDALE San Ramon who use wheelchairs must be able to

21   transfer from their chairs to a seat in the bus, despite the existence of a wheelchair lift and a

22   system for securing wheelchairs in at least one of BROOKDALE San Ramon's buses.  Making

23   this transfer is impossible and/or unsafe for many wheelchair users.  The facility also requires

24   wheelchair users to arrange for a family member or an outside care attendant to accompany them

25   on any off-site activity, which deters many wheelchair users from participating and imposes a

26   surcharge on those who do.  The facility also limits the number of wheelchair users for each off-

27   site trip to two.  At BROOKDALE Fountaingrove, wheelchair users are limited to two off-site

28   trips per month.  At least one wheelchair user at BROOKDALE San Ramon was told that she

could not participate in regular Saturday trips to the grocery store and shopping, because the driver "couldn't handle her."

**Emergency Evacuation Procedures**

58.     BROOKDALE has emergency and evacuation policies and procedures in place for at least some of its facilities, but these policies and procedures do not take into account the needs of persons with disabilities, or if they do, Defendants have not informed the residents. Residents with disabilities have been told to wait in their rooms for someone to come, and although the facilities have emergency drills, staff have not demonstrated for residents what will happen in the event of an actual emergency.

59.     Plaintiffs are informed and believe, and on that basis allege, that these practices have been and are an official policy and practice by which Defendants operate their businesses and/or services.

60.     Defendants' failure and refusal to provide equal services to persons with disabilities is humiliating and degrading to and creates a serious safety risk for the members of the proposed class of persons with disabilities.

61.     Defendants are responsible for their illegal operations and discriminatory policies and practices as described herein.  BROOKDALE residents, their family members, and staff members have raised these issues repeatedly with members of BROOKDALE management to no avail.

62.     Defendants have been notified of the civil rights violations described herein, but have refused to provide necessary reasonable modifications to its staffing policies, practices and procedures to provide residents with disabilities full and equal enjoyment of their goods, services, facilities, activities, benefits and accommodations and to comply with the requirements of the ADA and the Unruh Civil Rights Act .

**Retaliation Against Family and Resident Councils and Their Members**

63.     Plaintiff filed their original complaint on July 13, 2017.  They filed a First Amended Complaint on August 25, 2017.  Since that time, BROOKDALE has retaliated against Plaintiffs and members of the family or resident council in at least two of the facilities in which

24

the named Plaintiffs reside.

64.     Pursuant to Cal. Health & Safety Code § 1569.158(a), residential care facilities may not prohibit the formation of a family council.  California law also requires that the facility provide a meeting space for the family council, as well as a prominent, visible space for family council announcements, such as meeting notices, minutes, and newsletters.  Cal. H&S Code § 1569.158(d).  Moreover, a facility must respond in writing to any written concerns or recommendations submitted by the family council within 14 days. Cal. H&S Code § 1569.158(f).

65.     California law also prohibits assisted living facilities from willfully interfering with the "formation, maintenance, or promotion of a family council."  Cal. H&S Code § 1569.158(i).  The law defines "willful interference" as including "discrimination or retaliation in any way against an individual as a result of his or her participation in a family council, refusal to publicize family council meetings or provide appropriate space for meetings or postings as required . . ., or failure to respond to written requests by a family council in a timely manner. Cal. H&S Code § 1569.158(i).

66.     At the BROOKDALE San Ramon facility, the executive director has stopped responding to many of the written inquiries from the family council. On July 26, 2017, the executive director of BROOKDALE San Ramon, Shawn Cull, informed the family council by email that he would not respond to the family council's inquiries because of the lawsuit.  Despite a letter from Plaintiffs' counsel to BROOKDALE's counsel on August 17, 2017, informing them of Brookdale's obligations under the Health & Safety Code, the executive director has continued to refuse to provide substantive responses to many of the family council's inquiries. On February 2, 2018, Mr. Cull responded to a request by family council and residents that he address all of their questions by stating, "Unfortunately, due to a lawsuit, some questions I am unable to answer."

67.     On or about February 2, 2018, a family council board member, Sharon Eidler, posted family council flyers announcing an upcoming meeting in public announcement spots near the facility elevators and on the residents' doors.  Two hours later, she discovered that

someone had removed the flyers placed near the elevators.  The flyers posted on the resident doors had been turned over and covered with a facility questionnaire.  When questioned by Ms. Eidler, Mr. Cull admitted to tampering with the flyers.  When Ms. Eidler told Mr. Cull he could not tamper with family council announcements, Mr. Cull ordered Ms. Eidler to leave the facility and then called the police to come and remove her.  After arriving at the facility and speaking with witnesses, the police neither arrested Ms. Eidler nor did they ask her to leave the facility.

68.     Pursuant to Cal. Health & Safety Code § 1569.157(a), residential care facilities must assist the residents in establishing and maintaining a resident council.  Moreover, a facility must respond in writing to any written concerns or recommendations submitted by the resident council within 14 days. Cal. H&S Code § 1569.157(c).

69.     California law also prohibits assisted living facilities from willfully interfering with the "formation, maintenance, or promotion of a resident council."  Cal. H&S Code § 1569.157(g).  The law defines "willful interference" as including "discrimination or retaliation in any way against an individual as a result of his or her participation in a resident council, refusal to publicize resident council meetings or provide appropriate space for either meetings or a bulletin board, or failure to respond to written requests by the resident council in a timely manner."  Cal. H&S Code § 1569.157(g).

70.     BROOKDALE has not responded in writing to at least four letters sent to its corporate offices by Ms. JESTRABEK-HART in her capacity as chair of the BROOKDALE Scotts Valley residents' council.  The letters addressed the lack of adequate staffing, facility maintenance concerns, the lack of emergency signals in the laundry rooms, common room doors that are difficult to open, and the high price of meals for visitors.  The executive director at the Scotts Valley facility responded to one of the letters orally, but BROOKDALE has not responded in writing to any of the above-mentioned letters, in violation of Cal. H&S Code§ 1569.157(c) and (g) .

**BROOKDALE MISREPRESENTS, MAKES MISLEADING STATEMENTS, AND CONCEALS MATERIAL FACTS ABOUT THE QUALITY AND AVAILABILITY OF CARE IT PROVIDES TO ALL RESIDENTS**

71.     As a result of Defendants' corporate policies and practices, BROOKDALE subjects all residents, regardless of disability, to a substantial risk that they will not receive the care and services they require and have paid for on any given day, as described in Paragraphs 36-60.  BROOKDALE lures residents to move into or stay at its facilities by misrepresenting in various corporate written materials that it will provide the basic, personal, and therapeutic services each resident needs based on individualized assessments performed by BROOKDALE staff, and by failing to disclose and concealing that it cannot provide the promised services to all residents because its facilities are chronically understaffed.

**Standardized Residency Agreements**

72.     In order to move in to one of BROOKDALE's California facilities, residents must sign one of Defendants' standardized Residency Agreements.  In its standardized Residency Agreement, BROOKDALE represents to residents prior to move-in and throughout their residency that it will provide them with a standard set of basic services, additional personal services identified in the Personal Service Plan, and any select and therapeutic services for which the resident chooses to pay.  At the time of signing the Residency Agreement, residents or their responsible parties are required to confirm that they have reviewed and understand the document.

73.     In Section I.A of its standardized Residency Agreement, BROOKDALE affirmatively represents to prospective residents that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services": accommodations, including a residential suite and use of common areas; three meals a day plus snacks 24 hours a day; basic utilities; "light housekeeping once a week"; weekly laundry service of the resident's "personal belongings and bed linens"; "planned social and recreational programs"; transportation services; and staffing by "Community associates … available 24 hours a day, seven days a week." Section I.A further represents that BROOKDALE will observe the resident's "health status to

27

identify social and health care needs" and "will consult with you regarding social and health-related issues."  In addition, BROOKDALE represents in Section I.A of its standardized Residency Agreement that "[w]e will provide personal services that are included as part of the personal service assessment."

74.     In Section I.B of its standardized Residency Agreement, BROOKDALE represents that "[p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan."

75.     Defendants' standardized price schedule for personal care services is attached to the standardized Residency Agreement.  This price schedule includes a variety of personal services, such as staff assistance with ordering, storing, and taking medication; staff assistance with eating, dressing, bathing, using the toilet, and other activities of daily living; escort and mobility assistance to get around Defendants' facilities; and help taking care of residents' pets.  This price schedule lists the monthly costs of each service and details how Defendants' caregivers and other staff will provide the services.  For instance, a resident may require and agree to pay for "[s]taff attention while you administer your insulin injections"; "additional staff involvement" for residents who are reluctant to accept care; and bathroom assistance such as "reminders to get to the bathroom," "pulling up and down pants, handling toilet paper, wiping, changing protective undergarments and getting onto and off of toilet," as well as "weight-bearing or balance assistance from one associate" for residents "unable to stand independently while using the bathroom."

76.     BROOKDALE repeats these representations in the Personal Service Plan that it prepares for each resident before the resident moves in and updates periodically throughout his or her residency.  The Personal Service Plan lists the types of staff assistance that the resident requires and has agreed to pay for, along with the monthly fee for each.  For example, the Personal Service Plan for one former resident states that Defendants' staff will "[p]rovide physical assistance to and from the dining room and/or community activities as needed" for a monthly fee of $273.  Standardized language in the Personal Service Plan states that "[t]he

28

Personal Service Assessment and the Physician Plan of Care are used to determine the personal services that you require at move-in and periodically throughout your residency. The Personal Service Assessment will be used to develop your Personal Service Plan."

77. Pursuant to Sections I.B and III.F of its standardized Residency Agreement, "[t]he results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal services (the 'Personal Service Rate') will be shared with you," and a change in the Personal Service Plan be offered or required "when we determine additional services are requested or required" and after 60 days' written notice has been provided.

78. In Section I.C of its standardized Residency Agreement, BROOKDALE represents that it will make "Select Services and Therapeutic Services … available to you at your request," but that the fees for these services are not included in the rates residents pay for basic services and personal services. Defendants' standardized Residency Agreement incorporates by reference a standardized price list which features prices for the select and therapeutic services that Defendants make available, many of which consist of staff assistance with the resident's activities of daily living. For example, residents may elect to pay for tray service in their rooms for up to three meals a day or for additional laundry and housekeeping services beyond what is provided in the basic service rate.

79. Every month, BROOKDALE sends each resident or his or her responsible party an invoice for services that the company represents it will provide the following month. These invoices list the monthly rate for basic services, the Personal Service Rate that is based on each resident's Personal Service Plan, and any rate adjustments.

80. BROOKDALE repeats these representations in the letters it periodically sends all residents informing them of increases in the rates they owe for basic services, personal services, and select and therapeutic services. Using standardized language, Defendants' rate increase letters notify the resident of changes to his or her monthly rates for these services, which BROOKDALE attributes to increases in the cost of "providing the services you desire and depend upon."

29

**Defendants' Communications Regarding the Merger and New Assessment System**

81.     In early 2014, Emeritus Senior Living ("Emeritus"), at the time a major chain of senior living facilities, sent residents a standardized letter informing them of the merger between BROOKDALE and Emeritus.  The letter promised that residents would not be impacted by the change but would "receive the same excellent care and service you expect at your community" and would "continue to enjoy all the amenities of your community."  It further stated the merger would create a "senior living company offering the most comprehensive set of senior care solutions" with a commitment to "customer-focused cultures and a commitment to continuous improvement and innovation."  Rather than inform residents that the merger would result in even lower staffing levels and poorly trained staff, the letter promised a continuum of care with likely improvements.

82.     In or about October 2015, BROOKDALE sent residents a standardized letter informing them of an upgrade to its community assessment and care planning system effective December 1, 2015.  The upgrade would involve a conversion to a "new personal service system" which would "enhance our ability to match your needs and preferences with the right services at the right time."  The letter promised "benefits from enhancements," which included, *inter alia*, "[p]ersonalized service planning and care systems."

83.     Based on these representations, Plaintiffs, and the putative class members reasonably expected that the merger would result in improvements in care, or at the very least, would not result in a decline in services.  Additionally, they reasonably expected that the conversion to the new assessment and care planning system would result in improved delivery of basic services, personal services, and select and therapeutic services for which they were paying.

**Defendants' Marketing Materials**

84.     Defendants' public website, www.brookdale.com, prominently features online marketing materials directed at prospective residents.  In a section of its website entitled "What is Assisted Living?", BROOKDALE claims that its "assisted living communities have staff and programs in place that support and assist residents with daily living and basic care in a homelike or apartment setting.  Residents receive three meals a day, recreational and social activities,

30

housekeeping, linen service, apartment maintenance and transportation.  That means your loved one gets all the benefits of retired life, without the hassle of daily chores."

85.   Defendants' online marketing materials also tout the personalized services that its assisted living facilities provide.  The company's website explains that "[o]ur trained caregivers provide attention and assistance with medication support, bathing, dressing, cooking and other tasks throughout the day.  Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy.  So your loved one gets the care they need while enjoying the quality of life they've earned."

86.   Defendants' online marketing materials promise a "Culinary Arts" program that uses "only the freshest meat, seafood, produce, herbs and spices."

87.   Defendants' online marketing materials further represent that "[a]t Brookdale, we believe in delivering senior care that's tailored to you and your loved one based on those unique needs and desires.  That's why we provide a variety of options.  This personalized approach ensures that you and your family get exactly what you need without paying for what you don't."

88.   BROOKDALE represents to prospective and current residents that it tailors its services to residents' personal needs.  According to Defendants' representations, the process begins with an individualized assessment, which BROOKDALE uses to produce a Personal Service Plan for each resident.  The Personal Service Plan includes a list of services for which the resident pays a monthly fee.  Defendants' affirmative representations give rise to a reasonable expectation on the part of the reasonable consumer that BROOKDALE will determine and then provide the amount of caregiver and other staff time that is necessary to provide the personal services for which residents are paying.

89.   BROOKDALE makes similar representations in the standardized marketing folder it distributes to prospective and incoming residents.  In this marketing folder, BROOKDALE represents that at its facilities, "Carefully selected and trained associates do more than assist with activities of daily living such as dressing, bathing and dispensing of medications; they implement custom care plans designed to meet the individual needs of each resident … It all begins with a Personal Service Assessment.  We take the time to listen to our

31

residents so that we understand how to establish clinical, dining and program support that works for them in a meaningful way.  We recognize their individual needs and preferences and respond to them accordingly.  So, whether it's a scented lotion, a unique snack, a favorite recipe or a lifelong interest, we integrate everything we learn to create a truly individualized living experience."  Elsewhere in this marketing folder, BROOKDALE represents that it "provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go.  From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates.  Fees for care and services are based on each resident's needs and preferences, as determined by the Living Accommodation selected and their Personal Service Plan … This provides customer value because **our residents only pay for what they need and want**." (Emphasis in original).  BROOKDALE's marketing folder also promises an industry-leading dining services program that "continue[s] to satisfy the preferences and nutritional needs of residents with dining choices that offer mealtime fulfillment while meeting dietary requirements."

90.    Based on all of Defendants' representations, Plaintiffs, the putative class members, and the general consuming public reasonably expect that BROOKDALE will ensure adequate staffing to perform the services promised to residents, including by providing sufficient levels of qualified and adequately trained staff to perform the services identified in each resident's Personal Service Plan.

**Defendants' Failures to Disclose**

91.    Contrary to Defendants' representations regarding its provision of services, BROOKDALE has a corporate policy and practice of staffing its facilities according to a system that ensures all BROOKDALE residents run the continuing risk of not receiving the services for which they are paying, of not having their care needs met, and of suffering injury from the lack of care.

92.    In addition to the Community Care Licensing records described in Paragraphs 37-38, 41-43, 46-49 and 52, current and former residents of BROOKDALE facilities confirm that

32

Defendants' staffing levels do not change when updates to personal service assessments show that residents require additional personal services.  BROOKDALE has in many cases modified residents' Personal Service Plans—and raised monthly personal service fees accordingly—even though BROOKDALE failed to conduct an updated personal service assessment, failed to provide residents or their responsible parties with the results and method of the assessment, and/or failed to provide 60 days' written notice.  Despite paying higher fees as a result of these changes to their Personal Service Plans, residents and their families have observed that neither the services provided nor staffing levels increased and, in many cases, decreased.

93.     Caregivers have informed residents that they would like to work a 40-hour week, but BROOKDALE allows certain caregivers to work only 24 hours in a week.  Residents and their family members have also observed that BROOKDALE fails to ensure that all staff members receive necessary training.  At BROOKDALE Fountaingrove, the facility's interim executive director admitted to residents' families that BROOKDALE has insufficient staff to meet residents' needs.

## BROOKDALE'S MISREPRESENTATIONS AND CONCEALED FACTS WERE MATERIAL

94.     BROOKDALE's misrepresentations and the facts it conceals are material to the reasonable consumer.  An important and significant factor in choosing to move oneself or one's relative to a BROOKDALE facility, to stay there after the facility was purchased by BROOKDALE, and/or to continue to agree to pay the amounts charged by BROOKDALE is the provision of staffing that is necessary to provide the services its residents need and for which the residents are paying.

95.     BROOKDALE's misrepresentations, misleading statements and omissions regarding its provision of staffing are material to prospective residents and their family members.  Assurances that a facility will provide the amount of staffing necessary to provide basic services and meet the personal service needs of residents based on BROOKDALE's own assessments is a substantial factor (and indeed often the most important factor) in deciding to

enter a certain facility.  The named Plaintiffs would not have, and the members of the putative

class would in all reasonable probability not have, entered BROOKDALE's facilities or stayed

at these facilities after BROOKDALE purchased them from other companies, or they would

have insisted on paying a lower price, if they had known that, although BROOKDALE would

charge them based on the staffing associated with their Personal Service Plans, BROOKDALE

did not and does not provide adequate staffing to carry out the services identified in residents'

Personal Service Plans, nor does it provide adequate staffing to perform basic services and select

and therapeutic services.

96.     This is true even for residents who currently are nearly independent.  These

residents chose an assisted living facility as opposed to an independent living community or

remaining at home because they wish to "age in place."  They may not need significant

assistance with the activities of daily living initially, but they will become more dependent as

they age and do not want to move again when that happens.  Moreover, even the most

independent residents depend on the basic services that BROOKDALE promised them, such as

food, laundry, and housekeeping.  A key factor for these residents in selecting BROOKDALE is

that the facility will provide the staffing that BROOKDALE itself has determined is necessary to

meet their assessed needs, both now and as those needs increase.

97.     BROOKDALE has a duty to disclose that its staffing policies and procedures

preclude it from consistently providing basic services, personal services, and select and

therapeutic services, because of, among other things, the substantial safety risk to current and

future residents from BROOKDALE's conduct.

98.     The non-disclosure is material because, among other things, BROOKDALE

knows that its conduct risks the safety of its residents.  In addition to individual complaints made

by residents and family members, family and resident councils send regular correspondence to

Executive Directors of BROOKDALE facilities, as well as regional and national mangers

regarding the problems outlined above.  In the case of BROOKDALE San Ramon and

BROOKDALE Fountaingrove, local and regional management employees have attended

numerous meetings of the Family and Resident Councils and have made unfulfilled promises to

34

address the concerns outlined above.  Moreover, Community Care Licensing has conducted numerous licensing inspections which are delivered to BROOKDALE executives and managers of California facilities, describing the failure of various facilities to meet state laws and regulations.

99.     BROOKDALE is fully aware of the facts alleged above.  Yet, BROOKDALE has failed to disclose and actively concealed from residents, prospective residents and their family members the true facts about how staffing is provided at BROOKDALE's California facilities.

**Barriers to Moving Out**

100.     BROOKDALE's misrepresentations, misleading statements, and material omissions affect not only the decision of residents to enter the facility but also the decision to stay at a BROOKDALE facility.

101.     In choosing assisted living in general and a BROOKDALE facility in particular, the resident forgoes other options such as their former home, an independent living community, or other facilities.  Once in a facility, there are significant physical, emotional and other burdens for the residents that are triggered if they terminate residency, including impacts such as "transfer trauma."  BROOKDALE knows and relies on this fact.  As BROOKDALE notes on its website "[a]s a resident's health needs increase, they may transition from one level to the next— all within the same community.  This provides a permanent link to friends and families for them by assuring they remain in a single location."

102.     BROOKDALE puts great effort into increasing and maintaining building occupancy to the detriment of their current and future residents.  Plaintiffs allege on information and belief that when residents or their family members complain about staffing and/or conditions at a BROOKDALE facility, employees are instructed to reassure them that things will improve and that the incident or incidents are temporary snags.  For example, the Family Council of BROOKDALE Fountaingrove has been meeting every month for many months to address the inadequate staffing, slow response times to call buttons, and other health and safety issues faced by the Fountaingrove residents.  BROOKDALE representatives, including Vice President of Regional Operations Sharyl Ronan and Interim Executive Director Dan Devine,

have appeared at many meetings, listened to the numerous complaints, and assured those present that they are looking into the problems and all will be well.  Notwithstanding these claims, members of the Family Council report little to no changes or action items undertaken by BROOKDALE staff after these meetings.

103.    Similarly, residents and family members at BROOKDALE San Ramon hold monthly Family Council and Resident Council meetings and have informed facility management, as well as Rick Flynn, District Director of Operations, former Executive Director Steve Millard, Executive Director Shawn Cull, and former Acting Director Bill Grady of the problems described above.  In January 2017, Mr. Flynn, Mr. Grady and Mr. Cull attended a Family Council meeting at which family members and residents demanded answers to their questions about understaffing, poorly trained staff, undelivered services, food and dining deficiencies, cancelled activities, and problems with call pendants.  They were reassured at the meeting and subsequently told by email correspondence that BROOKDALE was working "diligently" on solutions and had reached out to the District Vice President of Operations Sheila Garner, who would be helping to resolve the problems.  BROOKDALE also represented that management had "made progress in our hiring process for clinical and dining," and was monitoring the call pendant system and providing additional training to staff.  Since that time, BROOKDALE announced the hiring of additional employees but concealed from residents that it was simultaneously cutting the hours of its current employees, cuts which have led to significant staff turnover.  Residents and family members report that the problems described above have in fact worsened.

104.    Such reassurances from BROOKDALE are common when residents and family members raise concerns about the quality of care and services they are receiving.  On information and belief, Regional Vice Presidents and Executive Directors are instructed to minimize potential move-outs.  Executive Directors are regularly told by upper management to do everything they can to "save" the move-out.

105.    BROOKDALE thereby unjustly continues to profit from the original fraud by perpetuating the misrepresentations, misleading statements, and failures to disclose.

## NAMED PLAINTIFFS' EXPERIENCES IN BROOKDALE FACILITIES

### Stacia Stiner

106.    STACIA STINER has been a resident at BROOKDALE San Ramon since approximately February 13, 2016.  On or about February 12, 2016, STACIA STINER's mother, Rita Stiner, read, reviewed, and signed an agreement with BROOKDALE as STACIA STINER's legal representative and power of attorney.  As part of this "RESIDENCY AGREEMENT", BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services, which are included in the Basic Service Rate," which included, among other things, the room, three daily meals and snacks on demand, weekly room cleaning, weekly laundry and linen service, planned activities, transportation, observation, and the availability of staff "24 hours a day, seven days a week."  This standard residency agreement also stated that:

> [p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan.  The results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal services (the "Personal Service Rate") will be shared with you.

The Personal Service Plan lists the types of staff assistance that Ms. STINER requires and has agreed to pay for, along with the monthly fee for each type of staff assistance.  In addition, Ms. STINER's mother Rita Stiner has received and reviewed, as enclosures to BROOKDALE's rate increase letters, a personal service schedule and list of select and therapeutic services.  These documents describe a variety of available services, list the monthly or per-occurrence fee for each service, and detail how BROOKDALE's caregivers or other staff will provide the service.  Every month, BROOKDALE sends Ms. STINER, through Rita Stiner, an invoice for services that the company impliedly represents it will provide in the following month.  These invoices list the monthly rate for

37

the basic services set forth in BROOKDALE's standardized residency agreements, the Personal Service Rate that is based on Ms. STINER's Personal Service Plan, and any rate adjustments.

107.   Ms. STINER, through her legal representative and power of attorney, Rita Stiner, read and reasonably understood BROOKDALE's representations as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE San Ramon in a manner that would allow it to consistently provide the services that BROOKDALE promised and Ms. STINER was paying for.  Ms. STINER, through Rita Stiner, relied on these representations in making the decision to enter BROOKDALE San Ramon.  BROOKDALE did not disclose to STACIA or Rita STINER at any time prior to her admission nor has it disclosed since that time that its corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day.  If BROOKDALE had disclosed this material fact to STACIA and/or Rita STINER prior to or early in Ms. STINER's residency, RITA STINER would have looked for another facility for STACIA or would have told BROOKDALE that her daughter would not agree to pay the rates charged by BROOKDALE.

108.   Beginning in October 2016, BROOKDALE initiated increases in Ms. STINER's basic service and personal service rates.  Ms. STINER and her mother Rita Stiner have been unable to decipher the changes in Ms. STINER's bills.  On or about October of 24, 2016, Rita Stiner received a letter from BROOKDALE's Executive Director informing her that Ms. STINER's basic service rate would increase from $3,205 to $3,429 per month and that her personal service rate would increase by approximately 6%.  During an in-person meeting in January of 2017, BROOKDALE staff told Rita Stiner that Ms. STINER's personal service rates would rise as follows: the monthly medication management fee would rise from $567 to $631; the monthly fee for staff assistance with dressing and grooming tasks would rise from $454 to $505; the monthly fee for assistance with two showers per week would rise from $113 to $631

38

per week (a significant increase because STACIA STINER was purportedly requiring more than the allotted 20 minutes of caregiver time per shower); and the monthly fee for assistance with toileting would increase from $397 to $442.  Rita Stiner had conversations with Shawn Cull, the acting Executive Director, during which he told her that BROOKDALE would not charge the full amount of the increases listed above.  Despite numerous communications with Mr. Cull and the billing department, the monthly bills remain confusing and BROOKDALE has sent Rita Stiner notices of late payment and even a "30-DAY FINAL DEMAND TO PAY" in December 2016, stating that "[i]n order to provide the care our residents expect and deserve and at the same time support the professional staff we employ, it's imperative that we receive our monthly rent and any additional charges in a timely fashion."  Brookdale subsequently withdrew the demand, but the bills remain confusing, and every time there is an increase in Ms. STINER's monthly rates, the rate on Ms. STINER's bills does not correspond to the information given to her or her mother by Mr. Cull about the increase.

109.  Although Ms. STINER is a wheelchair user, BROOKDALE has not provided her with a room that has any physical access features.  It does not have sufficient turning space in the bathroom area, making it difficult for Ms. STINER to enter the bathroom in her wheelchair and impossible for Ms. STINER to turn around in the bathroom.  The bathroom does not have a roll-in shower, and the grab bars do not comply with applicable access standards, preventing her from bathing independently and creating a serious safety hazard.  Ms. STINER cannot reach most of the hanging or the storage space in her closet and therefore cannot access her clothing or other personal items without assistance from others.  Ms. STINER's room has a balcony, but a two-inch lip leading out to the balcony and insufficient turning space once outside makes it inaccessible to Ms. STINER.  She once tried to enter and exit the balcony by herself, but has not attempted to do so since because the experience scared her.  The complete lack of accessible features in Ms. STINER's room prevents her from being as independent as possible and causes her to rely on personal assistance from BROOKDALE staff.  In fact, Ms. STINER is charged more than $400 per month for toilet assistance because "resident is unable to use the bathroom on their own."  BROOKDALE charges Ms. STINER an elevated rate of over $600 for two

39

showers per week because, according to BROOKDALE management, she requires more than
the allotted 20 minutes per shower.  Compounding this problem is BROOKDALE's
understaffing in care services, which means that Ms. STINER must wait to accomplish most of
her activities of daily living, if at all.  This puts Ms. STINER in humiliating, frustrating and
hazardous situations on a daily basis.

110.    Despite STACIA STINER's paying approximately $600 per month for
BROOKDALE to "order and coordinate medications between family, health care providers and
pharmacy," Rita Stiner must pick up medication for her daughter at least once per week,
frequently with only one-day notice from BROOKDALE.  Rita Stiner also does the majority of
her daughter's laundry because BROOKDALE frequently loses her clothing or returns the
wrong clothing to her.

111.    Understaffing in the dining services department means that Ms. STINER has had
to wait up to 45 minutes just to order breakfast.

112.    On some days, there is only one caregiver available in the mornings, causing
Ms. STINER to wait anywhere from 10 minutes to one hour for assistance getting dressed.  At
night, Ms. STINER requires assistance if she needs to use the toilet.  She waits anywhere from
10 minutes to an hour for staff to respond and will occasionally have to urinate in her bed when
assistance takes too long to arrive.  She frequently resorts to using her mobile phone to call the
outside line when staff do not respond to her call pendant.  Due to short-staffing, caregivers
often attempt to leave Ms. STINER in the middle of assisting her with bathing or toileting
because they must respond to call pendants from other residents or because they left another
resident on the commode to respond to Ms. STINER.  Ms. STINER objects and insists that the
caregivers finish assisting her before they leave, but she knows that other residents are too afraid
to speak up for themselves and are often stranded by caregivers.

113.    Ms. STINER enjoys getting out of the facility and participating in off-site
activities.  However, BROOKDALE requires that, because she is a wheelchair user, she be
accompanied by a family member or a private personal caregiver.  Although she has been able to
participate in scenic drives or lunches by herself, Ms. STINER had to pay approximately $180

1   for a personal assistant to participate in a trip to a casino in Cache Creek in approximately

2   August 2016.  Ms. STINER enjoys outings to the casino, but BROOKDALE still requires that

3   she take her mother or a private caregiver on those trips.    Outings are also limited to two

4   wheelchair users per outing on a first come, first served basis.  If Ms. STINER does not sign up

5   immediately, she will lose her ability to participate on a particular outing.  This is true of other

6   wheelchair users in the facility.

7          114.    In case of fire and other emergencies, BROOKDALE staff has told Ms. STINER

8   to remain in her room until they come and get her.  However, staff members have not come to

9   get Ms. STINER when fire alarms go off at the facility, nor have they given her any additional

10  instructions about how they would assist her in exiting the facility.

11         **Helen Carlson**

12         115.    HELEN CARLSON has been a resident at BROOKDALE Fountaingrove since

13  October 2011.  When Ms. CARLSON moved into the facility, it was owned and operated by

14  Emeritus and was known as Emeritus at Santa Rosa.  Prior to move-in, CARLSON's daughter-

15  in-law JOAN CARLSON, acting as Ms. CARLSON's legal representative and power of

16  attorney, read, reviewed, and signed a standardized residency agreement with Emeritus.  In this

17  agreement, Emeritus promised to provide a list of "core services" that are substantially similar to

18  the basic services enumerated in Defendants' standardized residency agreement.  Emeritus also

19  agreed to "perform a comprehensive Resident Evaluation prior to your admission in the

20  Community, regularly thereafter, and as your condition warrants, in order to determine the level

21  of Personal Care Services that you need.  We will develop your Service Plan, based on your

22  Resident Evaluation, that describes how we will provide these services.  You will receive

23  services appropriate to your individual needs, as described in your Service Plan."  The

24  agreement reserved Emeritus's right to assign the agreement to any successor-in-interest selected

25  by Emeritus.

26         116.    Ms. CARLSON, through her legal representative and power of attorney JOAN

27  CARLSON, read and reasonably understood Emeritus's representations in the residency

28  agreement as statements that Emeritus used its resident assessment system and results generated

by it to determine and provide staffing levels necessary to meet residents' needs.

Ms. CARLSON also reasonably understood and expected that Emeritus would staff Emeritus at Santa Rosa in a manner that would allow it to consistently provide the services that Emeritus promised and Ms. CARLSON would be paying for.  Ms. CARLSON, through JOAN CARLSON, read and relied on the representations in the residency agreement in making the decision to enter Emeritus at Santa Rosa.  As Ms. CARLSON's legal representative and power of attorney, JOAN CARLSON read and signed the agreement acknowledging that she understood and agreed to all of the terms contained in the agreement.  In or about February 2014, JOAN CARLSON received and read a letter from Emeritus informing residents about the merger between BROOKDALE and Emeritus.  The letter promised that residents would not be impacted by the change but would "receive the same excellent care and service you expect at your community" and would "continue to enjoy all the amenities of your community."  It further stated the merger would create a "senior living company offering the most comprehensive set of senior care solutions" with a commitment to "consumer-focused cultures and a commitment to continuous improvement and innovation."

117.    JOAN CARLSON, as her mother-in-law's power of attorney and legal representative, read the letter and reasonably understood that the care her mother-in-law received would be no worse than the care she had received under Emeritus, and possibly improve. BROOKDALE did not inform JOAN or HELEN CARLSON nor did they have any reason to believe that BROOKDALE would not staff the facility with sufficient staff in numbers and training to provide the services for which Ms. CARLSON and the other residents were paying.

118.    In 2015, BROOKDALE merged with Emeritus, and Emeritus at Santa Rosa became BROOKDALE Fountaingrove.  Plaintiffs are informed and believe, and on that basis allege, that Emeritus assigned its residency agreements with existing residents to BROOKDALE, and that BROOKDALE assumed any liability arising from those agreements.

119.    On November 17, 2015, JOAN CARLSON read, reviewed, and signed an agreement with BROOKDALE as Ms. CARLSON's legal representative and power of attorney. This agreement, entitled "AMENDMENT TO CONTINUING CARE RESIDENCE AND

SERVICES AGREEMENT," amended the residency agreement that Ms. CARLSON signed with Emeritus and that was assigned to BROOKDALE after the merger with Emeritus.  Pursuant to this amendment, references to "core services" and "personal care services" were replaced with the terms "basic services" and "personal services," and Emeritus's price schedules for various services were replaced with BROOKDALE's standardized personal services price schedule and lists of select and therapeutic services.  The parties agreed that except as otherwise amended, the terms of the prior residency agreement would remain in full force and effect.

120.    BROOKDALE has also prepared and periodically updated a Personal Service Plan for Ms. CARLSON.  Ms. CARLSON's Personal Service Plan lists the type of staff assistance that Ms. CARLSON requires and has agreed to pay for, along with the monthly fee for each type of staff assistance.  In addition, Ms. CARLSON has received and reviewed as enclosures to BROOKDALE's rate increase letters a personal service price schedule and list of select and therapeutic services.  These documents describe a variety of available services, list the monthly or per-occurrence fee for each service, and detail how BROOKDALE's caregivers or other staff will provide the service.  Every month, BROOKDALE sends Ms. CARLSON, through JOAN CARLSON, an invoice for services that the company impliedly represents it will provide in the following month.  These invoices list the monthly rate for the basic services set forth in BROOKDALE's standardized residency agreements, the Personal Service Rate that is based on Ms. CARLSON's Personal Service Plan, and any rate adjustments.

121.    Ms. CARLSON, through her legal representative and power of attorney JOAN CARLSON, read and reasonably understood BROOKDALE's representations—as well as Emeritus's representations in the agreement that was assigned to BROOKDALE and expressly incorporated into BROOKDALE's November 17, 2015 agreement with Ms. CARLSON—as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE Fountaingrove in a manner that would allow it to consistently provide the services that BROOKDALE promised and that Ms. CARLSON was paying for.  Ms. CARLSON, through JOAN CARLSON, read and relied on these representations in making the decision to stay at the facility despite the change in ownership.

122.     In December 2017, BROOKDALE told JOAN CARLSON that Ms. CARLSON would need to move into the memory care section of BROOKDALE Fountaingrove.  When Ms. CARLSON moved, BROOKDALE presented JOAN CARLSON with a new RESIDENCY AGREEMENT.  On or about December 18, 2017, JOAN CARLSON read, reviewed, and signed an agreement with BROOKDALE as Ms. CARLSON's legal representative and power of attorney.  As part of this RESIDENCY AGREEMENT, BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services, which are included in the Basic Service Rate," which included, among other things, the room, three daily meals and snacks on demand, weekly room cleaning, weekly laundry and linen service, planned activities, transportation, observation, and the availability of staff "24 hours a day, seven days a week."  This standard residency agreement also stated that:

> [p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan. The results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal services (the "Personal Service Rate") will be shared with you.

The Personal Service Plan lists the types of staff assistance that Ms. CARLSON requires and has agreed to pay for, along with the monthly fee for each type of staff assistance.  In addition, JOAN CARLSON has received and reviewed, as enclosures to BROOKDALE's rate increase letters, a personal service schedule and list of select and therapeutic services.  These documents describe a variety of available services, list the monthly or per-occurrence fee for each service, and detail how BROOKDALE's caregivers or other staff will provide the service.

123.     Ms. CARLSON, through her legal representative and power of attorney, JOAN CARLSON, read and reasonably understood BROOKDALE's representations as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE Fountaingrove in a manner that would allow it to consistently provide the

44

services and supervision that BROOKDALE promised she would receive in their memory care unit and for which Ms. CARLSON was paying.  Ms. CARLSON, through JOAN CARLSON, relied on these representations in making the decision to move into the memory care unit of BROOKDALE Fountaingrove.  BROOKDALE has never disclosed to Ms. CARLSON or JOAN CARLSON that its corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the supervision, care and services residents have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day.

124.    BROOKDALE currently charges Ms. CARLSON a Basic Service Rate of $5,290 per month, plus a Personal Service Rate of $4,173 per month and a Select and Therapeutic Services rate of $105 per month, minus a loyalty credit of $529 per month.  Ms. CARLSON's Personal Service Rate includes, among other things, a $580 monthly fee for staff assistance with ordering, storing, and taking medications; a $811 monthly fee for staff assistance with dressing and grooming; a $637 monthly fee for assistance with her oxygen and respiratory equipment; a $1,507 monthly fee for help setting up, cleaning and assistance with nebulizer treatments; a $116 monthly fee for staff assistance with showering; a $927 monthly fee for staff assistance with using the bathroom; a $522 monthly fee for staff assistance with accomplishing and/or participating in daily routines due to memory loss or cognitive impairment; a $290 monthly fee for help going to and from the dining room and/or community activities; and a $290 monthly fee for "additional staff involvement because of demonstrating anxious, disruptive or obsessive behavior requiring additional attention."  Ms. CARLSON also pays $100 per month for incontinence supplies, which BROOKDALE represents its staff will order and stock.

125.    Beginning in early 2016, JOAN CARLSON and her husband Ralph Carlson began to observe a decline in the quality of care provided to Ms. CARLSON.  On one occasion, JOAN discovered that despite promising to fax certain paperwork to Ms. CARLSON's primary care physician in advance of a scheduled appointment, BROOKDALE's staff never did so.  In addition, JOAN and Ralph CARLSON stopped receiving phone calls to notify them of Ms. CARLSON's injuries and other noteworthy incidents.

126.   In June 2016, Ms. CARLSON was admitted to the hospital after falling while attempting to get out of bed.  BROOKDALE's staff failed to call JOAN or Ralph CARLSON, even though they are listed as Ms. CARLSON's emergency contacts.  As a result, Ms. CARLSON spent several hours in the emergency room without a family member present, and she was charged for ambulance transport back to BROOKDALE Fountaingrove because no family member was present to give her a ride.

127.   In December 2016, Ms. CARLSON's doctor took her off the blood thinner Coumadin.  Nonetheless, in January and February 2017, staff at BROOKDALE Fountaingrove continued to order and stock Coumadin for Ms. CARLSON.  BROOKDALE charged Ms. CARLSON a monthly fee for staff assistance with ordering and storing medications, even though BROOKDALE's staff failed to adequately perform that service.

128.   JOAN and Ralph CARLSON have also observed numerous failures by staff to assist Ms. CARLSON with using the bathroom, even though Ms. CARLSON pays a monthly fee for that service.  In addition, even though Ms. CARLSON pays a monthly fee for staff to order and stock incontinence products, she has often run out of such products because BROOKDALE's staff do not check whether supplies are running low or if orders need to be adjusted.

129.   Ms. CARLSON was unable to use the bathroom sink and kitchenette sink in her previous suite because they are installed at a height that makes them inaccessible for wheelchair users.  Ms. CARLSON requires glasses to see and dentures to eat, but BROOKDALE staff frequently misplace or lose these assistive devices.

130.   JOAN and Ralph CARLSON have complained to managers at BROOKDALE Fountaingrove about these problems on numerous occasions.  Although BROOKDALE management repeatedly reassured JOAN and Ralph CARLSON that BROOKDALE would address their concerns, they did not see any improvement when Ms. CARLSON resided in assisted living.  Since Ms. CARLSON has resided at BROOKDALE Fountaingrove, BROOKDALE has never disclosed that its staffing policies and procedures preclude it from providing its residents all of the care and services they have been promised and places all

46

residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day.  If BROOKDALE had disclosed this material fact to JOAN CARLSON early in Ms. CARLSON's residency, she would have looked for another facility for Ms. CARLSON and would have told BROOKDALE that Ms. CARLSON would not agree to pay the rates charged by BROOKDALE.

131.    In December 2017, BROOKDALE told JOAN and Ralph CARLSON that HELEN CARLSON needed to move to memory care, and that she would receive additional supervision and care if she moved to the memory care unit and paid additional fees.  BROOKDALE told them that if they did not move Ms. CARLSON into memory care at BROOKDALE Fountaingrove, Ms. CARLSON would have to move out of Fountaingrove entirely, and gave JOAN CARLSON only a little over a week to decide.  Because of the short time frame, JOAN CARLSON was unable to investigate whether there were comparable facilities in the area that might have accepted Ms. CARLSON.  JOAN CARLSON ultimately felt she had no choice but to move Ms. CARLSON into the memory care unit at BROOKDALE Fountaingrove.  Her decision was based on BROOKDALE's representations about additional supervision and care, her fear that Ms. CARLSON would suffer severe trauma if she were to be transferred to an entirely new facility, and the lack of time to investigate other options.  In the memory care unit, just as in assisted living, Ms. CARLSON is housed in a room with multiple inaccessible features, including a sink, toilet, and closet that are not wheelchair-accessible.

**Lawrence Quinlan**

132.    LAWRENCE QUINLAN stayed at the facility at BROOKDALE Hemet for short-term respite on several occasions between 2013 and 2015.  On approximately July 14, 2015, he was admitted to BROOKDALE Hemet for a "respite stay" following a hospitalization and rehabilitation for a broken leg.  On July 10, 2015, BROOKDALE gave his granddaughter, LORESIA VALLETTE, a Residency Agreement for LAWRENCE QUINLAN.  Ms. VALLETTE read, reviewed, and signed the agreement with BROOKDALE on behalf of LAWRENCE QUINLAN.  BROOKDALE did not ask LAWRENCE QUINLAN whether he could sign the document or whether LORESIA VALLETTE held Power of Attorney for him.

47

1  BROOKDALE did not ask Ms. VALLETTE for documentation showing that she had the legal

2  authority to sign the Residency Agreement on behalf of LAWRENCE QUINLAN.

3        133.    LAWRENCE QUINLAN left BROOKDALE Hemet for his home on or about

4  September 5, 2015.  On September 13, 2015, he was re-admitted to BROOKDALE Hemet as a

5  long-term resident.  Prior to LAWRENCE QUINLAN's move-in, on or about September 13,

6  2015, BROOKDALE gave his son, Phillip Quinlan, a Residency Agreement for LAWRENCE

7  QUINLAN.  Phillip Quinlan read, reviewed, and signed the agreement with BROOKDALE on

8  behalf of LAWRENCE QUINLAN.  BROOKDALE did not ask LAWRENCE QUINLAN

9  whether he could sign the document or whether Phillip Quinlan held Power of Attorney for him.

10  BROOKDALE did not ask Phillip Quinlan for documentation showing that he had the legal

11  authority to sign the Residency Agreement on behalf of LAWRENCE QUINLAN.  In fact, on

12  page 15 of the Residency Agreement, under his signature, Phillip Quinlan filled in the name and

13  contact information of his niece and LAWRENCE QUINLAN's granddaughter, LORESIA

14  VALLETTE, under the section titled "LEGAL REPRESENTATIVE/RESPONSIBLE PARTY

15  ADDRESS."  In its Resident Information/Emergency Contact Sheet, BROOKDALE listed

16  LORESIA VALLETTE as Mr. QUINLAN's "Legally Responsible Party" for both "Financial"

17  and "Health Care."

18        134.    As part of the "RESIDENCY AGREEMENT" provided first to Ms. VALLETTE

19  and then to Phillip Quinlan, BROOKDALE stated that "[i]n order to provide you with care,

20  supervision and assistance with instrumental activities of daily living in order to meet your

21  needs, we will provide you with the following Basic Services, which are included in the Basic

22  Service Rate."  These included, among other things, the room, three daily meals and snacks on

23  demand, weekly room cleaning, weekly laundry and linen service, planned activities,

24  transportation, observation, and the availability of staff "24 hours a day, seven days a week."

25  This standard residency agreement also stated that:

26       [p]rior to moving in and periodically throughout your residency, we will use a

27       personal service assessment to determine the personal services you require.  The

28       personal service assessment will be used to develop your Personal Service Plan.

1    The results of the assessment, our method for evaluating your personal care

2    needs, and the cost of providing the additional personal services (the "Personal

3    Service Rate") will be shared with you.

4  The Personal Service Plan listed the types of staff assistance that Mr. QUINLAN required and

5  had agreed to pay for, along with the monthly fee for each type of staff assistance.

6        135.    Mr. QUINLAN's son, Phillip Quinlan, and his granddaughter, LORESIA

7  VALLETTE, read the agreement on LAWRENCE QUINLAN's behalf and reasonably

8  understood BROOKDALE's representations as statements that BROOKDALE would perform

9  assessments to determine needed services and staff BROOKDALE Hemet in a manner that

10  would allow it to consistently provide the services that BROOKDALE promised and for which

11  Mr. QUINLAN was paying.  Ms. VALLETTE and Phillip Quinlan relied on these

12  representations in making the decision to place Mr. QUINLAN at BROOKDALE Hemet and to

13  pay BROOKDALE the monthly fees from Mr. QUINLAN's accounts.  BROOKDALE did not

14  disclose to LAWRENCE QUINLAN, Phillip Quinlan, or LORESIA VALLETTE at any time

15  prior to his admission nor has it disclosed since that time that its corporate policy and procedure

16  of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the

17  care and services residents have been promised and places all residents at a substantial risk that

18  they will not receive the care and services they have paid for on any given day.  If

19  BROOKDALE had disclosed this material fact to LAWRENCE QUINLAN, Phillip Quinlan, or

20  LORESIA VALLETTE, they would have looked for another facility for Mr. QUINLAN and

21  would not have agreed to pay the rates charged by BROOKDALE from LAWRENCE

22  QUINLAN's accounts.

23        136.    Mr. QUINLAN is a wheelchair-user.  He has right hemiparesis and aphasia due

24  to past strokes.  He has mild dementia.  During the time Mr. QUINLAN was a resident at

25  BROOKDALE Hemet, he required assistance with the following activities of daily living:

26  bathing, personal hygiene, dressing, laundry, housecleaning, taking medication, preparing meals,

27  toileting, and transfers to and from his wheelchair.  During Mr. QUINLAN's long-term stay at

28  BROOKDALE Hemet, he paid for but was not consistently provided that assistance.

137.     Although he was paying for assistance with laundry, dressing and showering, Mr. QUINLAN's granddaughter and son noticed that he smelled horrible and wore dirty clothing. When Ms. VALLETTE asked BROOKDALE staff why Mr. QUINLAN smelled so bad, they blamed him for refusing to take a shower.  BROOKDALE then raised Mr. QUINLAN's monthly personal care rate by $700, even though they were not giving him the promised showers, because he was "resistant."  Ms. VALLETTE requested that BROOKDALE's staff call her if Mr. QUINLAN refused to shower or change his clothing so that she could speak with her grandfather and try to convince him to cooperate.  BROOKDALE staff rarely called Ms. VALLETTE, but the facility continued to charge Mr. QUINLAN a premium for showers and dressing assistance they were not providing.

138.     Over time, BROOKDALE continued to increase Mr. QUINLAN's monthly care rates, blaming his resistance to care.  Ms. VALLETTE accepted the care rate increases with the expectation that Mr. QUINLAN would actually receive the services for which BROOKDALE was charging him.  Despite the increased fees, BROOKDALE staff rarely provided the promised assistance with showering, dressing or toileting to Mr. QUINLAN.  Toward the end of Mr. QUINLAN's stay at BROOKDALE Hemet, the Executive Director told Ms. VALLETTE that they would need to move Mr. QUINLAN to the memory care unit and take away his motorized scooter in order to care for him.  This would result in another increase in his monthly rate. In April 2017, frustrated by BROOKDALE's failure to provide the assistance her grandfather needed and for which he was paying increasingly higher fees, Ms. VALLETTE told BROOKDALE that Mr. QUINLAN would be moving out.  Prior to the move-out date, Ms. VALLETTE and Phillip Quinlan took Mr. QUINLAN to a physician's office to get a tuberculosis test.  When he transferred out of his wheelchair, they saw that the seating pad was soaked with urine and that the plastic was breaking down as a result.  It was clear that neither the seating pad nor Mr. QUINLAN had been washed for a very long time.  Although Mr. QUINLAN's move-out date was scheduled for early May 2017, Ms. VALLETTE moved him out on April 30, 2017.  Mr. QUINLAN is a currently a resident of an unrelated assisted living facility in Riverside, California.

**Edward Boris**

139.    EDWARD BORIS was a resident at BROOKDALE Fountaingrove's assisted living facility from approximately September 10, 2015 to approximately July 21, 2016.  On or about September 10, 2015, EDWARD BORIS's daughter MICHELE LYTLE, read, reviewed, and signed a "RESIDENCY AGREEMENT" with BROOKDALE as EDWARD BORIS's legal representative and power of attorney.  As part of this "RESIDENCY AGREEMENT," BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services, which are included in the Basic Service Rate."  These included, among other things, the room, three daily meals, planned activities, transportation, and the availability of staff "24 hours a day, seven days a week."  This standard residency agreement also stated that:

> [p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan.  The results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal service (the "Personal Service Rate") will be shared with you.

140.    Among the personal services Mr. BORIS required and agreed to pay for were catheter care, changing, and emptying; toileting assistance; assistance going to and from the dining room and other activities; medication administration; pharmacy services, including medication pick-up; assistance bathing; and application of topical anti-fungal medication.  On top of a $4,545 monthly Basic Service Rate, BROOKDALE charged Mr. BORIS a $2,697 monthly personal service fee.  In addition to the residency agreement's promises of adequate care and service provision, Ms. LYTLE received and reviewed a variety of rate increase letters and invoices that listed the fees for services BROOKDALE agreed its caregivers and other staff would provide to Mr. BORIS.  Mr. BORIS, through his legal representative and power of attorney, MICHELE LYTLE, read and reasonably understood BROOKDALE's representations as statements that BROOKDALE would perform assessments to determine needed services and

staff BROOKDALE Fountaingrove in a manner that would allow it to consistently provide the services that BROOKDALE promised and for which Mr. BORIS was paying.   Mr. BORIS, through MICHELE LYTLE, relied on these representations in making the decision to enter BROOKDALE Fountaingrove and to pay BROOKDALE the monthly fees it charged him.

141.     BROOKDALE did not disclose to Mr. BORIS or his legal representative at any time prior to his admission nor has it disclosed since that time that its corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day.  If BROOKDALE had disclosed this material fact to Mr. BORIS or his legal representative prior to or early in his residency, they would have looked for another facility for Mr. BORIS and would not have agreed to pay the rates charged by BROOKDALE.

142.     BROOKDALE staff failed to regularly monitor Mr. BORIS's catheter, even though Mr. BORIS required and paid for that service.  On one occasion in May 2016, Mr. BORIS's catheter overflowed, disconnected, and spilled urine all over his room.  On July 20, 2016, Mr. BORIS's catheter developed a blockage, but BROOKDALE's staff failed to identify or address the problem for about 24 hours.  Mr. BORIS's girlfriend, who visited Mr. BORIS at BROOKDALE Fountaingrove on the evening of July 20, noticed blood in the catheter bag and reported it to BROOKDALE's staff.  Staff came to Mr. BORIS's room, but they were rushed, failed to identify the blockage, and did nothing to assist Mr. BORIS.  Instead, they told Mr. BORIS's girlfriend not to worry.  The next day, Mr. BORIS was in extreme pain; there was still a blockage and very little urine appeared in the catheter bag.  Mr. BORIS's condition continued to deteriorate and eventually his girlfriend took him to a local hospital, where doctors diagnosed the blocked catheter.  As a result of the blockage, Mr. BORIS suffered a urinary tract infection and kidney failure, and had to stay in intensive care for several days.  After his discharge from the hospital, Mr. BORIS's condition was so bad that he had to be transferred out of assisted living and into skilled nursing.

143.     Aware that BROOKDALE's failure to adequately provide the care and services it

52

had promised contributed to Mr. BORIS's declining health, Ms. LYTLE sought to move him out of BROOKDALE's custody.  Ms. LYTLE conducted significant research and held onsite interviews with at least three other skilled nursing facilities.  However, because Mr. BORIS's condition had deteriorated so significantly, she was unable to find any facility willing to accept Mr. BORIS as a resident.  Thus, the same inadequate care that contributed to Mr. BORIS's illness prevented Ms. LYTLE from moving Mr. BORIS into a different facility.

144.    From February 2016 through the end of his time in BROOKDALE's assisted living facility, Mr. BORIS had a recurring fungal infection on his legs and in his groin area.  His doctor ordered him to keep the area clean and apply a topical medication twice a day.  Even though Mr. BORIS paid thousands of dollars per month for necessary personal services, including help with bathing and administering medications, BROOKDALE staff failed to bathe Mr. BORIS or apply his topical medication regularly.  As a result, the infection persisted for months.  At times, the infected area was bloody and emitted a foul odor that pervaded Mr. BORIS's room.

145.    Mr. BORIS takes a blood thinning medication as well as several other medications.  When he was in assisted living at BROOKDALE Fountaingrove, he paid $726 per month for staff assistance with ordering, storing, and administering his medications, but BROOKDALE staff regularly failed to perform these tasks.  At one point in May 2016, BROOKDALE staff failed to give Mr. BORIS his blood thinning medication for three days straight.  The problem was discovered only after Mr. BORIS's girlfriend noticed the lapse.  On several other occasions, staff failed to refill Mr. BORIS's prescriptions, so his girlfriend had to pick them up herself.  One time, Mr. BORIS's medication for his fungal infection ran out and staff failed to replace it for several days.

146.    One of the main reasons MICHELE LYTLE sought out an assisted living facility for her father was that Mr. BORIS needed regular staff assistance to prevent and respond to falls. However, on numerous occasions during his stay in the BROOKDALE Fountaingrove assisted living facility, Mr. BORIS fell in his room and was left on the ground for extended periods of time because the facility was so understaffed employees could not regularly check on him.

When Ms. LYTLE reported this problem to staff at BROOKDALE Fountaingrove, they dismissed the falls as minor even though Mr. BORIS had bruises on his body. Other times, even though BROOKDALE had agreed to provide Mr. BORIS with toileting assistance multiple times per day and charged him a substantial monthly fee for that service, he was left sitting in his own feces because BROOKDALE staff failed to check on him or help him use the bathroom. When he resided in assisted living, Mr. BORIS had difficulty getting around on his own, even with the assistance of a walker or wheelchair. He is also very introverted. As a result, he seldom left his room for meals unless prompted by staff. Although BROOKDALE charged Mr. BORIS a monthly fee for help going to and from the dining room, staff frequently failed to prompt Mr. BORIS at mealtimes or bring him food from the dining room, so he often missed meals. BROOKDALE charged Mr. BORIS $5 per meal when meals were supposedly brought to his room. However, when Ms. LYTLE asked BROOKDALE staff how often her father had been eating, they were unable to answer. Because BROOKDALE often failed to prompt Mr. BORIS to attend meals or to supply them in his room, Mr. BORIS relied on his girlfriend to take prepared food to him.

147. Even though BROOKDALE promises weekly laundry service in its residency agreement, staff frequently failed to wash Mr. BORIS's clothes and laundry on a weekly basis. In addition, staff often dumped Mr. BORIS's clean laundry in a pile in his room, even though he was not capable of putting it away himself. MICHELE LYTLE brought these problems to the attention of managers at BROOKDALE Fountaingrove. BROOKDALE management assured Ms. LYTLE that they were working to address her concerns, but she never saw significant improvement during the time that Mr. Boris resided in assisted living. Mr. BORIS ultimately had to move out of assisted living precisely because of a serious infection he developed due to BROOKDALE staff's failure to monitor his catheter. BROOKDALE has never disclosed to Mr. BORIS or Ms. LYTLE that its staffing policies and procedures preclude it from consistently providing its residents the care and services they have been promised and places all residents in an inherent and substantial risk that they will not receive the care and services they have paid for on any given day. However, several low-level, non-managerial BROOKDALE employees

1  admitted to Ms. LYTLE that the BROOKDALE Fountaingrove assisted living facility was

2  understaffed, that caregivers' hours were being cut, and that they did not have enough time or

3  resources to adequately attend to Mr. BORIS and the other residents.

4  **Ralph Schmidt**

5  148.    RALPH SCHMIDT is 53 years old, is blind, and has significant cognitive

6  impairments, including short-term memory loss.  Both his blindness and cognitive impairments

7  are the result of a traumatic brain injury suffered more than 20 years ago.  Mr. SCHMIDT has a

8  court-appointed conservator who manages his financial, medical, and legal affairs.  He needs

9  assistance with the following activities of daily living: housekeeping, laundry, navigating when

10  outside of his dwelling, preparing nutritious meals, and transportation.

11  149.    RALPH SCHMIDT was a resident at the assisted living facility currently known

12  as BROOKDALE Tracy from approximately September 2011 to October 30, 2017.  The

13  BROOKDALE Tracy facility was operated by Emeritus when Mr. SCHMIDT moved in.

14  However, BROOKDALE took over operation of the facility following its merger with Emeritus.

15  150.    In or about April 2014, Emeritus announced that it would merge with

16  BROOKDALE.  At the time of the merger, Mr. SCHMIDT's then-conservator and legal

17  representative, Ms. Gallagher, had no reason to believe that the care Mr. SCHMIDT would

18  receive from BROOKDALE would be any worse than the care he had received under Emeritus.

19  BROOKDALE did not inform Mr. SCHMIDT or his conservator nor did they have any reason

20  to believe that BROOKDALE would not staff the facility with sufficient staff in numbers and

21  training to provide the services for which Mr. SCHMIDT and the other residents were paying.

22  151.    After taking over operations at the Tracy assisted living facility, BROOKDALE,

23  on or about July 5, 2016, required Ms. Gallagher, Ms. FISHER's predecessor as RALPH

24  SCHMIDT's conservator, to execute an updated Residency Agreement with BROOKDALE on

25  Mr. SCHMIDT's behalf.  As part of this "RESIDENCY AGREEMENT," BROOKDALE stated

26  that "[i]n order to provide you with care, supervision and assistance with instrumental activities

27  of daily living in order to meet your needs, we will provide you with the following Basic

28  Services, which are included in the Basic Service Rate."  These included, among other things,

the room, three daily meals, housekeeping, laundry and linen service, planned social activities, transportation, and the availability of staff "24 hours a day, seven days a week." This standard residency agreement also stated that:

> [p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require. The personal service assessment will be used to develop your Personal Service Plan. The results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal service (the "Personal Service Rate") will be shared with you.

Among the personal services Mr. SCHMIDT required were assistance navigating from his second-floor room to the dining room at meal times and to other community spaces, prompts to engage in community and social activities, and medication management. In exchange for these necessary services, as of July 2016, Mr. SCHMIDT payed a monthly fee of over $1,000 in addition to his basic service rate.

152. Mr. SCHMIDT, through his conservator, read and reasonably understood BROOKDALE's representations as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE Tracy in a manner that would allow it to consistently provide the services that BROOKDALE promised and for which Mr. SCHMIDT was paying. Mr. SCHMIDT, through his conservator, relied on these representations in making the decision to remain at BROOKDALE Tracy and to pay BROOKDALE the monthly fees it charged him. BROOKDALE did not disclose to Mr. SCHMIDT or his legal representative at any time that its corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day. If BROOKDALE had disclosed this material fact to Mr. SCHMIDT or his legal representative, they would have looked much sooner for another facility for Mr. SCHMIDT and would not have agreed to pay the rates charged by BROOKDALE from Mr. SCHMIDT's estate's funds.

153. During his time with BROOKDALE, Mr. SCHMIDT lived in a second-floor

room.  Because of his blindness, short-term memory loss, and other cognitive impairments, Mr. SCHMIDT was unable to navigate to the dining room or other public areas from the second floor, which would have required him to use stairs or operate an elevator.  Placement on the second floor caused Mr. SCHMIDT to require the assistance of BROOKDALE staff for escort services he would not have needed had he been on the first floor, and BROOKDALE mandated that Mr. SCHMIDT pay for the escort services he received.  Thus the second-floor placement both unnecessarily reduced Mr. SCHMIDT's autonomy and increased the fees he paid to BROOKDALE.  A first-floor room would have provided Mr. SCHMIDT greater autonomy and would have reduced BROOKDALE's charges for escort services.  However, when Ms. Gallagher asked if Mr. SCHMIDT could be moved to an apartment that would accommodate his needs, BROOKDALE responded that a first-floor room would be more expensive and would thus negate any savings from the elimination of escort fees.

154.    Because Mr. SCHMIDT required staff assistance to navigate from his second-floor room to the dining room and other common areas, he frequently waited for staff to come and assist him.  Mr. SCHMIDT used a call button to summon an escort for each meal and typically waited twenty to thirty minutes before a BROOKDALE staff member would arrive.  Mr. SCHMIDT faced similarly lengthy waits when he wanted to return to his room.  These waits greatly frustrated Mr. SCHMIDT.

155.    BROOKDALE responded to Mr. SCHMIDT's frustration and need for appropriate accommodations in shockingly inappropriate ways.  Professing to be concerned that Mr. SCHMIDT might harm someone with his tapping cane, BROOKDALE staff once took it away from him for several weeks.  This rendered Mr. SCHMIDT unable to safely navigate around even the first floor of the BROOKDALE Tracy facility.  BROOKDALE staff did not return Mr. SCHMIDT's tapping cane until his conservator personally intervened.  On other occasions, BROOKDALE staff failed to provide Mr. SCHMIDT with a tapping cane or notify his conservator of his need for one when his previous cane was broken and unusable.  BROOKDALE's response to Mr. SCHMIDT's frustration with slow staff responses to calls for assistance simply rendered Mr. SCHMIDT more dependent on BROOKDALE staff.

156.    Several times during Mr. SCHMIDT's years at BROOKDALE, he formed relationships with other residents who would assist him in navigating from his apartment to the dining room at meals times.  During these periods in which Mr. SCHMIDT had the assistance of other residents, he did not rely on BROOKDALE staff as frequently for escort services.  Nevertheless, BROOKDALE continued to charge Mr. SCHMIDT the same escort fee.

157.    Because of his short-term memory loss and other cognitive impairments, Mr. SCHMIDT occasionally lost the key to the door of his apartment during his time at BROOKDALE Tracy.  On one occasion, rather than replace his key, BROOKDALE staff gave Mr. SCHMIDT a blank, uncut key, and told him that it was the key to his apartment.  Mr. SCHMIDT believed what BROOKDALE staff told him and could not understand why the key would not unlock his door.  This caused Mr. SCHMIDT great distress and made him unnecessarily reliant on BROOKDALE staff to open his apartment door when he wanted to enter his room.

158.    On several occasions the toilet in Mr. SCHMIDT's apartment overflowed.  BROOKDALE responded by locking Mr. SCHMIDT out of the bathroom in his apartment altogether.  Rather than fix the problems with the toilet, BROOKDALE gave Mr. SCHMIDT, via his conservator, HEATHER FISHER, the option of a portable toilet in Mr. SCHMIDT's room or paying for a full-time personal caretaker at the additional cost of $250 per day.  Mr. SCHMIDT's estate was unable to bear the expense of a full-time personal caretaker, so Ms. FISHER reluctantly accepted the option of a portable toilet.  However, BROOKDALE failed to regularly empty the toilet, which caused Mr. SCHMIDT's room to have an unpleasant odor.  Mr. SCHMIDT responded by routinely emptying the portable toilet himself, directly onto the roof outside of his window.  Aware of the problem and Mr. SCHMIDT's response, BROOKDALE failed to remove fecal matter sitting just outside of Mr. SCHMIDT's window.

159.    Mr. SCHMIDT also disliked using the portable toilet as he found it too small for him to comfortably sit on.  He would have preferred to use a toilet outside of his room, but staff responded so slowly to his call button that calling for an escort to a bathroom was not a realistic option.  On one occasion, he pressed his call button to use the bathroom around 11:00 p.m., and

1   no staff member ever responded.

2        160.    Denial of access to his bathroom also meant that Mr. SCHMIDT could not

3   shower without the assistance of BROOKDALE staff.  Having locked him out of his bathroom,

4   BROOKDALE staff allowed Mr. SCHMIDT to shower only twice per week, usually at night.

5   This too distressed Mr. SCHMIDT, as he preferred to shower more frequently and to do so in

6   the morning.  Moreover, if Mr. SCHMIDT was engaged in an activity and declined to shower at

7   the moment the opportunity was offered, he could shower only once per week.

8        161.    Although BROOKDALE promised to provide housekeeping among its basic

9   services, Mr. SCHMIDT's apartment was not well cared for and was rarely clean.  His carpets

10   were covered with stains and frequently dirty.  The windows to his room had no blinds, and the

11   screens had been almost completely torn off.  Before BROOKDALE locked Mr. SCHMIDT out

12   of the bathroom in his apartment, BROOKDALE also failed to keep it clean.  The bathroom was

13   frequently dirty and unhygienic.

14   **Art Lindstrom**

15        162.    ART LINDSTROM was a resident of BROOKDALE Scotts Valley from

16   approximately November 2015 until his death on February 23, 2018.  His wife, PAT

17   LINDSTROM, has also been a resident of BROOKDALE Scotts Valley from approximately

18   November 2015 and remains a resident of the facility.  On or about October 31, 2015, ART

19   LINDSTROM and his wife PAT LINDSTROM read, reviewed, and signed a "RESIDENCY

20   AGREEMENT" with BROOKDALE.  As part of this "RESIDENCY AGREEMENT,"

21   BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with

22   instrumental activities of daily living in order to meet your needs, we will provide you with the

23   following Basic Services, which are included in the Basic Service Rate."  These included,

24   among other things, the room, three daily meals, planned activities, transportation, ongoing

25   observation and consultation regarding social and health care needs, and the availability of staff

26   "24 hours a day, seven days a week."

27        163.    BROOKDALE also provided a standard form further elaborating on the

28   "Services and Care Covered by [the] Basic Service Rate."  These services and care described

1    included "housekeeping," "routine wellness monitoring," "consultation with [a] Brookdale

2    clinical team," and "signature dining programs with nutritious meals and snacks planned by a

3    registered dietician."

4           164.    Mr. and Ms. LINDSTROM read and reasonably understood BROOKDALE's

5    representations in the RESIDENCY AGREEMENT and other standard documents as statements

6    that BROOKDALE would staff the Scotts Valley facility in a manner that would allow it to

7    consistently provide them with the care, supervision and assistance they needed and for which

8    they were paying BROOKDALE, which included the services and care covered by the Basic

9    Service Rate.  Mr. and Ms. LINDSTROM relied on these representations in making the decision

10   to enter BROOKDALE Scotts Valley.  BROOKDALE did not disclose to Mr. and Ms.

11   LINDSTROM at any time prior to their admission nor has it disclosed since that time that its

12   corporate policy and procedure of providing predetermined staffing at its facilities precludes

13   BROOKDALE from providing the care and services residents have been promised and places all

14   residents at a substantial risk that they will not receive the care and services they have paid for

15   on any given day.  If BROOKDALE had disclosed this material fact to Mr. and Ms.

16   LINDSTROM prior to or early in their residency, they would have looked for another facility

17   and would not have agreed to pay the rates charged by BROOKDALE.

18          165.    When Mr. and Ms. LINDSTROM moved in to BROOKDALE, their "basic

19   service rate" was approximately $5,900 per month plus an additional $400 monthly second-

20   resident fee.  In addition to these recurring charges, Mr. and Ms. LINDSTROM were made to

21   pay move-in fees totaling more than $8,000.  When Mr. and Ms. LINDSTROM moved from

22   their initial two-bedroom suite into a studio apartment, their rate decreased to $4,295 per month

23   plus the $400 monthly second-resident fee.

24          166.    During his residency at BROOKDALE Scotts Valley, Mr. LINDSTROM was

25   diabetic; used a cane to walk; suffered from kidney failure, heart disease, and sleep apnea; had a

26   dementia-related cognitive impairment; and had difficulty controlling his weight. He required

27   assistance with the following activities of daily living:  bathing, shaving, administration of

28   medication, dressing, laundry, and preparing nutritious meals.  Because Mr. and Ms.

LINDSTROM could not afford the additional care fees related to many of these activities, Ms. LINDSTROM assisted Mr. LINDSTROM with most of these tasks.   However, Mr. and Ms. LINDSTROM sought and BROOKDALE promised to provide assistance with preparing nutritious meals and snacks planned by a registered dietician and to personally assess and provide necessary health and social services.  These promises were among the principal reasons Mr. and Ms. LINDSTROM decided to live at BROOKDALE Scotts Valley.  Although BROOKDALE promised to prepare meals appropriate for Mr. LINDSTROM's personal condition as part of its basic services, it failed to do so.

167.    After they moved in to BROOKDALE Scotts Valley, Mr. and Ms. LINDSTROM discovered that there was no registered dietician on staff to make sure Mr. LINDSTROM received meals appropriate for his condition.  Mr. and Ms. LINDSTROM also discovered that BROOKDALE's policy and practice of understaffing prevented kitchen staff from preparing and serving Mr. LINDSTROM meals appropriate for someone with diabetes.  Because there were too few staff to pay attention to individual residents' dietary needs, those who were unfamiliar with Mr. LINDSTROM's condition and personal health requirements often served him oversized portions of foods unsuitable for a diabetic when they noticed he was a large man. Mr. LINDSTROM's cognitive impairment made it especially difficult for him to resist tempting but unhealthy food once it was on his plate.

168.    The lack of adequate staffing left Mr. LINDSTROM without the individualized nutritional attention and assistance he required.  As a result, after moving into BROOKDALE, Mr. LINDSTROM gained 20 pounds, which exacerbated his difficulty walking and put him at increased risk of complications from diabetes.  Because his dementia was also exacerbated by his diabetes, Mr. LINDSTROM's cognitive decline may have accelerated.

169.    When the Mr. and Ms. LINDSTROM moved in to BROOKDALE Scotts Valley, there was an onsite physical therapist available to advise and assist residents with recovery from injuries.  The availability of a physical therapist was attractive to Mr. and Mrs. LINDSTROM, and they relied on BROOKDALE's representation that the onsite physical therapist would be available to them.  They also understood that BROOKDALE's promise to provide continuous

monitoring and consultation on health would include keeping an onsite physical therapist on staff.

170.     Approximately six months after Mr. and Ms. LINDSTROM arrived at BROOKDALE Scotts Valley, however, the physical therapist left, and BROOKDALE has failed to hire a replacement.  After entering BROOKDALE, Mr. LINDSTROM suffered a knee injury and would have used the onsite physical therapist's services during his recovery had that been an option.  Instead, Mr. LINDSTROM had to seek less convenient physical therapy services outside of the BROOKDALE facility.

**Bernie Jestrabek-Hart**

171.     BERNIE JESTRABEK-HART has been a resident of BROOKDALE Scotts Valley since approximately October 17, 2015.  On or about September 30, 2015, BERNIE JESTRABEK-HART read, reviewed, and signed a "RESIDENCY AGREEMENT" with BROOKDALE.  As part of this "RESIDENCY AGREEMENT," BROOKDALE stated that "[i]n order to provide you with care, supervision and assistance with instrumental activities of daily living in order to meet your needs, we will provide you with the following Basic Services, which are included in the Basic Service Rate."  These included, among other things, the room, three daily meals, planned activities, transportation, and the availability of staff "24 hours a day, seven days a week."  This standard residency agreement also stated that:

> [p]rior to moving in and periodically throughout your residency, we will use a personal service assessment to determine the personal services you require.  The personal service assessment will be used to develop your Personal Service Plan.  The results of the assessment, our method for evaluating your personal care needs, and the cost of providing the additional personal service (the "Personal Service Rate") will be shared with you.

The Personal Service Plan lists the types of staff assistance that Ms. JESTRABEK-HART requires and has agreed to pay for, along with the monthly fee for each type of staff assistance. Ms. JESTRABEK-HART has also received and reviewed a variety of rate increase letters and invoices that list the fees for services BROOKDALE agreed its caregivers and other staff would

provide to her.

172.    Ms. JESTRABEK-HART read and reasonably understood BROOKDALE's representations in the RESIDENCY AGREEMENT, invoices and rate increase letters as statements that BROOKDALE would perform assessments to determine needed services and staff BROOKDALE Scotts Valley in a manner that would allow it to consistently provide the services that BROOKDALE promised and for which Ms. JESTRABEK-HART was paying. Ms. JESTRABEK-HART relied on these representations in making the decision to enter BROOKDALE Scotts Valley.  BROOKDALE did not disclose to Ms. JESTRABEK-HART at any time prior to her admission nor has it disclosed since that time that its corporate policy and procedure of providing predetermined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day. If BROOKDALE had disclosed this material fact to Ms. JESTRABEK-HART prior to or early in her residency, she would have looked for another facility and would not have agreed to pay the rates charged by BROOKDALE.

173.    When Ms. JESTRABEK-HART moved in to BROOKDALE, her "basic service rate" was approximately $3,700 per month.  In addition, Ms. JESTRABEK-HART would pay a monthly fee of $750 for assistance showering at least four times per week and daily dressing and undressing.  These personal care services were among the principal reasons Ms. JESTRABEK-HART sought to live in an assisted-living setting.   Over and above these monthly payments, BROOKDALE required Ms. JESTRABEK-HART to pay approximately $1,350 in move-in fees.

174.    Despite these hefty monthly rates and move-in fees, BROOKDALE began to increase Ms. JESTRABEK-HART's basic service rate just months after her arrival and at least annually thereafter.  By January 2018, BROOKDALE had increased Ms. JESTRABEK-HART's basic service rate to $4,477, a 21% increase above her initial rate of $3,700 in just over two years.  In January 2018, BROOKDALE increased Ms. JESTRABEK-HART's fee for assistance with dressing and showering from $750 to $834 per month, an 11.2% increase.

175.    Ms. JESTRABEK-HART uses an electric wheelchair and cane for mobility, and many common areas at BROOKDALE Scotts Valley are difficult or dangerous for her and others with mobility disabilities to access.  A number of doors that connect common indoor space to outdoor courtyards are heavy and difficult to open.  Several doors to laundry rooms and bathrooms in common spaces are also heavy and difficult to open.  Attempting to open these doors is dangerous for Ms. JESTRABEK-HART, as the weight of the door could injure her directly or cause her to fall.

176.    Lack of safety precautions in laundry rooms at BROOKDALE Scotts Valley present unreasonable risk to residents with mobility disabilities.  On one occasion, Ms. JESTRABEK-HART tripped getting up from her wheelchair and fell onto the floor of the laundry room.  This laundry room is in a secluded corner of the facility enclosed by a heavy door and lacks emergency pull cords for residents to use in case of a fall.  Accordingly, Ms. JESTRABEK-HART had no way to summon help.  Fortunately, another individual whom Ms. JESTRABEK-HART believes to have been a resident was nearby and found Ms. JESTRABEK-HART on the floor.  Ms. JESTRABEK-HART informed BROOKDALE of the need for emergency pull cords in the laundry after her fall, but BROOKDALE has taken no action. Ms. JESTRABEK-HART continues to do her own laundry.  BROOKDALE's failure to remedy the dangerous conditions in the laundry rooms at BROOKDALE Scotts Valley puts Ms. JESTRABEK-HART at continuing risk of serious injury.

177.    Ms. JESTRABEK-HART enjoys getting out of the BROOKDALE Scotts Valley facility and participating in off-site activities.  She had been able to take her electric wheelchair on a bus provided by her previous assisted-living residence.  Prior to moving into BROOKDALE Scotts Valley, Ms. JESTRABECK-HART looked at BROOKDALE's website and saw that BROOKDALE offered free bus transportation to doctor's visits, social outings and other offsite activities.  That service was among the major selling points for Ms. JESTRABEK-HART, and she relied on BROOKDALE's representations that she would be able to participate in outings on the bus.  After moving in, she was surprised to learn that the transportation schedule was very limited and that BROOKDALE would not allow her to take her electric

64

wheelchair on the bus.  Her electric wheelchair is Ms. JESTRABEK-HART's primary means of personal transportation and is necessary for her to participate on shopping trips and other outings that require mobility upon arrival.  BROOKDALE has proposed that Ms. JESTRABEK-HART use a non-motorized wheelchair on these outings, but that would leave Ms. JESTRABEK-HART stranded upon arrival because she needs an electric wheelchair for mobility.

178.    BROOKDALE's understaffing and failure to plan for emergencies has also negatively affected Ms. JESTRABEK-HART.  On one occasion, a power outage caused the elevators to cease to function, stranding Ms. JESTRABEK-HART, whose room is on the facility's second floor, on a lower level.  BROOKDALE staff helped some residents get up to their rooms, but were unable to help Ms. JESTRABEK-HART and other residents who are wheelchair users.  She and other residents with mobility disabilities waited for three to four hours before firefighters arrived to assist those who could not walk up the stairs.  Because of BROOKDALE's inadequate staffing and emergency planning, many residents were stranded away from their rooms late into the night.

179.    While the power was out, Ms. JESTRABEK-HART was unable to use her continuous positive airway pressure ("CPAP") machine, which she requires to sleep due to sleep apnea.  BROOKDALE Scotts Valley had only one electrical outlet that was generator-powered, which was located on the first floor near the nurse's office.  As a result, the outlet was not accessible to Ms. JESTRABEK-HART.  BROOKDALE staff did not attempt to connect Ms. JESTRABEK-HART's CPAP machine to a generator-powered outlet.

180.    While Ms. JESTRABEK-HART does not require assistance to get to and from meals, she has witnessed those who do need assistance wait for long periods before a staff member is available to help.  On one occasion, Ms. JESTRABEK-HART and others waited with a resident who was left in the lunchroom for over an hour and a half following the end of the meal before she received the assistance she needed to return to her room.

181.    Ms. JESTRABEK-HART requires assistance with dressing and bathing and currently pays BROOKDALE $834 per month for these services.  When deciding whether to move in to BROOKDALE Scotts Valley, among the items most important to Ms. JESTRABEK-

HART was that she receive assistance showering at least four times per week, and she relied on BROOKDALE's representation that it would be able to meet this need.  Ms. JESTRABEK-HART usually informs BROOKDALE staff after dinner that she is ready to shower.  She frequently waits for two to three hours before a staff member can assist her.  On multiple occasions, Ms. JESTRABEK-HART has waited so long that she has gone to sleep only to be awakened by a staff member who has finally come to provide the necessary assistance.  Other times, BROOKDALE has canceled a previously scheduled shower altogether.

182.    With respect to assistance dressing, Ms. JESTREBEK-HART has asked for BROOKDALE staff to come to help her around the time she wakes at 7:00 a.m.  Often, however, she will wait until 8:30 a.m. or 9:00 a.m. before staff arrive to assist her.  Similarly, she often waits for long periods for assistance undressing in the evenings.  On several occasions when help has not come, Ms. JESTREBEK-HART has slept in her clothes and shoes, which can cause pain in her feet and make it otherwise difficult to get comfortable.  BROOKDALE staff has told her, often in the evening around 8:30 p.m. and sometimes in the morning around 7:00 a.m., that these delays occur because only one staff member is on duty to meet the needs of 150 residents.

## CLASS ALLEGATIONS

183.    The named Plaintiffs bring this action on behalf of themselves and all persons similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3) as set forth below.

184.    **Class Definitions.**

Plaintiffs STACIA STINER, HELEN CARLSON, LAWRENCE QUINLAN; EDWARD BORIS; RALPH SCHMIDT; PATRICIA LINDSTROM as successor-in-interest to the Estate of ARTHUR LINDSTROM; and BERNIE JESTRABEK-HART seek to represent the following three classes:

RESIDENTS WITH MOBILITY OR VISUAL DISABILITIES CLASS:  All persons with disabilities who use wheelchairs, scooters, canes or other mobility aids or who have visual disabilities and who reside or have resided at a residential care facility for the elderly

66

located in California and owned, operated and/or managed by BROOKDALE during the

CLASS PERIOD, including their successors-in-interest if deceased.

<u>RESIDENTS WITH DISABILITIES CLASS</u>: All persons with disabilities who require

assistance with activities of daily living and who reside or have resided at a residential care

facility for the elderly located in California and owned, operated and/or managed by

BROOKDALE during the CLASS PERIOD, including their successors-in-interest if

deceased.

<u>FALSE OR MISLEADING STATEMENTS CLASS</u>: All persons who resided or reside at

one of the residential care facilities for the elderly located in California and owned,

operated, and/or managed by BROOKDALE during the CLASS PERIOD and who

contracted with BROOKDALE or another assisted living facility for services for which

BROOKDALE was paid money, including their successors-in-interest if deceased.

185.    The CLASS PERIOD is defined as commencing three years prior to the filing of

this action for the RESIDENTS WITH MOBILITY OR VISUAL DISABILITIES CLASS and

commencing on May 16, 2015 for the RESIDENTS WITH DISABILITIES CLASS and the

FALSE OR MISLEADING STATEMENTS CLASS.

186.    Excluded from the above-referenced class are the officers, directors, and

employees of BROOKDALE, and any of Defendants' shareholders or other persons who hold a

financial interest in BROOKDALE.  Also excluded is any judge assigned to hear this case (or

any spouse or family member of any assigned judge), or any juror selected to hear this case.

187.    This action is brought as a class action and may properly be so maintained

pursuant to Federal Rule of Civil Procedure 23 and applicable case law.  In addition to

declaratory and injunctive relief, this action seeks class-wide damages pursuant to California

Civil Code § 52(a) in the amount of $4,000 per class member based on Defendants' wrongful

policy and practice of failing to provide residents with disabilities with full and equal access to

and enjoyment of the services, goods, facilities, privileges, and/or advantages of

BROOKDALE's assisted living facilities as alleged herein.  It also seeks class-wide statutory

and punitive damages based on Defendants' misrepresentations, misleading statements, and

material omissions, including $5,000 per class member pursuant to California Civil Code § 1780(b). This action also seeks treble damages pursuant to both California Civil Code § 52(a) and California Civil Code § 3345(b)(2) and (3).  This action does not seek recovery for personal injuries or emotional distress that may have been caused by Defendants' conduct alleged herein.

188.    **Ascertainability**.  Members of the proposed Class are identifiable and ascertainable.  BROOKDALE retains admission contracts, resident service plans, and billing statements for all persons who currently reside or resided at BROOKDALE facilities during the CLASS PERIOD.

189.    **Impracticability of Joinder (Numerosity of the Class).**  The members of the proposed class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to this Court.  On information and belief, the number of persons in this case exceeds 5,000 persons.  The number of persons in the class and their identities and addresses may be ascertained from Defendants' records.

190.    **Questions of Fact and Law Common to the Class.**  All members of the class have been and continue to be denied their civil rights to full and equal access to, and use and enjoyment of, the services and facilities operated by the BROOKDALE because of the violations of disability nondiscrimination laws, the CLRA, and Elder Abuse laws alleged herein. There are numerous questions of law and fact common to the class, including, but not limited to, the following:

a.    Whether BROOKDALE's assisted living facilities are public accommodations within the meaning of Title III of the ADA;

b.    Whether BROOKDALE and its assisted living facilities are business establishments within the meaning of the Unruh Civil Rights Act;

c.    Whether BROOKDALE constructed or altered any of its assisted living facilities after January 26, 1993;

d.    Whether BROOKDALE's facilities that were newly constructed or altered between January 26, 1993 and March 15, 2012 comply with the

68

1    requirements of the Americans with Disabilities Act Accessibility

2    Guidelines;

3    e.    Whether BROOKDALE constructed or altered any of its facilities after

4    March 15, 2012;

5    f.    Whether BROOKDALE's facilities that were constructed or altered after

6    March 15, 2012 comply with the 2010 ADA Standards for Accessible

7    Design;

8    g.    Whether BROOKDALE has removed physical access barriers where doing

9    so was readily achievable as required by Title III of the ADA;

10    h.    Whether Plaintiffs are being denied full and equal access to and enjoyment

11    of BROOKDALE's goods, services, facilities, privileges, advantages or

12    accommodations;

13    i.    Whether Plaintiffs requested that BROOKDALE make reasonable

14    modifications in policies, practices and/or procedures by providing its

15    facilities with a sufficient number of adequately trained staff to ensure that

16    residents with disabilities receive full and equal access to and enjoyment of

17    the services specified in BROOKDALE's own resident assessments;

18    j.    Whether Plaintiffs' requested modification in policies, practices or

19    procedures is reasonable;

20    k.    Whether Plaintiffs' requested modification in policies, practices or

21    procedures is necessary to ensure that residents with disabilities have full

22    and equal access to and enjoyment of BROOKDALE's goods, services,

23    facilities, privileges, advantages and accommodations as required by Title

24    III of the ADA;

25    l.    Whether BROOKDALE has provided Plaintiffs with full and equal access

26    to and enjoyment of its transportation services and activities as required by

27    Title III of the ADA;

28    m.    Whether BROOKDALE has provided Plaintiffs with full and equal access

69

1    to and enjoyment of its services and facilities with respect to emergency

2    planning and evacuation;

3    n.    Whether BROOKDALE, by its actions and omissions alleged herein, has

4    engaged in a pattern and practice of discriminating against Plaintiffs and

5    other residents with disabilities in violation of the ADA and the Unruh Civil

6    Rights Act;

7    o.    Whether BROOKDALE has violated and continues to violate the Consumer

8    Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, by promising

9    residents that it will provide care and services including those identified by

10   resident assessments, when BROOKDALE knows that its corporate policy

11   and procedure of providing pre-determined staffing at its facilities precludes

12   BROOKDALE from providing the care and services residents have been

13   promised and places all residents at a substantial risk that they will not

14   receive the care and services they have paid for on any given day;

15   p.    Whether BROOKDALE's misrepresentations, misleading statements and

16   omissions regarding the staffing of its facilities as alleged herein were and

17   are material to the reasonable consumer;

18   q.    Whether by making the misrepresentations, misleading statements and

19   material omissions alleged in this Complaint, BROOKDALE violated and

20   continues to violate California Business & Professions Code §§ 17200, *et.*

21   *seq.* ("UCL");

22   r.    Whether BROOKDALE had exclusive knowledge of material facts not

23   known or reasonably accessible to the Plaintiffs and the class;

24   s.    Whether the Plaintiffs, the class, and the consuming public were likely to be

25   deceived by the foregoing concealment and omission;

26   t.    Whether the Plaintiffs, the class, and the consuming public have a

27   reasonable expectation that BROOKDALE will provide staffing at its

28   facilities to meet the aggregate care needs of the residents at its facilities;

70

u.     Whether BROOKDALE's misrepresentations, its misleading statements, its failures to disclose and its concealment of its true policies, procedures, and practices regarding how it staffs its facilities violated the CLRA and the UCL;

v.     Whether BROOKDALE has engaged and continues to engage in a pattern and practice of unfair and deceptive conduct in connection with the management, administration, and operation of its California assisted living facilities;

w.     Whether BROOKDALE has violated and continues to violate the UCL by violating the CLRA, ADA, Unruh Civil Rights Act, California Welfare and Institutions Code § 15610.30, and Cal. Health & Safety Code §§ 1569.157 and 1569.158 during the CLASS PERIOD;

x.     Whether BROOKDALE has committed financial elder abuse under California Welfare and Institutions Code § 15610.30 by taking, secreting, appropriating, obtaining, and/or retaining money from elders and dependent adults for a wrongful use and/or with the intent to defraud them;

y.     Whether the Plaintiffs and the putative class members have been injured;

z.     Whether the Plaintiffs and the members of the putative class are entitled to damages, and the nature of such damages; and,

aa.     Whether the Plaintiffs and the members of the putative class are entitled to declaratory and/or injunctive relief, and the nature of such relief.

191.    **Typicality.**  The claims of the named Plaintiffs are typical of those of the proposed classes.  Plaintiffs' claims are typical of the claims of the proposed classes in the following ways: 1) Plaintiffs are members of the proposed classes; 2) Plaintiffs' claims arise from the same uniform corporate policies, procedures, practices and course of conduct on the part of BROOKDALE; 3) Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed classes and involve similar factual circumstances; 4) the injuries suffered by the named Plaintiffs are similar to the injuries suffered by the proposed class members; and

71

1    5) the relief sought herein will benefit the named Plaintiffs and all class members alike.

2        192.   **Adequacy.**  The named Plaintiffs will fairly and adequately represent the

3    interests of the classes.  They have no interests adverse to the interests of other members of the

4    class and have retained counsel who are competent and experienced in litigating complex class

5    actions, including large-scale disability rights and senior care class action cases.

6        193.   **Predominance.**  With respect to Plaintiffs' claims under the ADA, the Unruh

7    Civil Rights Act, the CLRA, the UCL, and the Elder Abuse Act, class certification is appropriate

8    under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the

9    class members predominate over any questions affecting individual members of the putative

10   classes.

11       194.   **Superiority.**  A class action is superior to other methods for the fair and efficient

12   adjudication of this controversy because, *inter alia*: 1) individual claims by the class members

13   would be impracticable because the costs of pursuit of such claims would far exceed what any

14   individual class member has at stake; 2) relatively little individual litigation has been

15   commenced over the controversies alleged in this Complaint and individual class members are

16   unlikely to have an interest in separately prosecuting and controlling individual actions; 3) the

17   concentration of litigation of these claims in one forum will achieve efficiency and promote

18   judicial economy; 4) the proposed classes are manageable, and no difficulties are likely to be

19   encountered in the management of this class action that would preclude its maintenance as a

20   class action; 5) the proposed class members are readily identifiable from Defendants' own

21   records; and 6) prosecution of separate actions by individual members of the proposed class

22   would create the risk of inconsistent or varying adjudications with respect to individual members

23   of the proposed classes that would establish incompatible standards of conduct for

24   BROOKDALE.

25       195.   **The Class Meets the Requirements of Federal Rule of Civil Procedure**

26   **23(b)(2).**  BROOKDALE has acted and refused to act on grounds generally applicable to the

27   class, making the declaratory and injunctive relief sought on behalf of the class as a whole

28   appropriate.

# FIRST CLAIM FOR RELIEF

**(Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*)**
**(On behalf of Plaintiffs, the RESIDENTS WITH MOBILITY OR VISION**
**DISABILITIES CLASS and the RESIDENTS WITH DISABILITIES CLASS)**

196.  Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

197.  Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

198.  Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

199.  Title III of the ADA provides in pertinent part: "[N]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or leases to, or operates a place of public accommodation."  42 U.S.C. § 12182.

200.  At all times relevant to this action, Plaintiffs STACIA STINER, HELEN CARLSON, LAWRENCE QUINLAN; EDWARD BORIS; RALPH SCHMIDT; ARTHUR LINDSTROM; and BERNIE JESTRABEK-HART were and remain qualified individuals with disabilities within the meaning of the ADA.

201.  Defendants are each a "private entity," as defined under 42 U.S.C. § 12181(6). They own, operate and/or manage approximately 89 assisted living facilities in California.

202.  Brookdale's assisted living facilities provide services to its residents, including but not limited to, assistance with managing and taking medication, housekeeping, laundry, dressing, bathing, toileting, hygiene, food preparation, and transportation.  BROOKDALE staff include caregivers, certified nursing assistants (CNAs), and a licensed nurse working in the

73

1    facility or on-call 24 hours per day, seven days per week, to allow ongoing monitoring of

2    residents' health status.  These facilities are "public accommodations" pursuant to 42 U.S.C.

3    § 12181(7).  BROOKDALE is subject to Title III of the ADA and its corresponding regulations.

4          203.    As alleged above in greater detail, BROOKDALE has violated Title III of the

5    ADA in the following ways.

6    **Failure to Provide Reasonable Modifications in Staffing Policies, Practices and Procedures**

7          204.    BROOKDALE has a policy and practice of staffing its assisted living facilities

8    based on pre-set corporate labor budgets and profit margins without regard for residents' needs.

9    BROOKDALE's policy and practice of understaffing its assisted living facilities in order to

10   minimize its labor expenses and maximize its corporate profits has resulted in facilities that are

11   chronically understaffed, and in which skeletal levels of staffing make it commonplace for

12   residents with disabilities to go without the services, goods, facilities, privileges, advantages or

13   accommodations for which they have paid.  For example, staff are often unavailable or unable to

14   assist residents with disabilities with activities of daily living including, *inter alia*, bathing,

15   showering, toileting, transferring, taking medications, dressing, dining, and housekeeping.  In

16   addition, residents with disabilities are often denied full and equal access to and enjoyment of

17   social and recreational activities, as well as transportation to off-site locations for appointments

18   and other activities, because of the lack of a sufficient number of trained staff to assist residents

19   with disabilities to participate in these activities.

20         205.    Plaintiffs have requested that BROOKDALE make reasonable modifications in

21   policies, practices, or procedures as required by Title III of the ADA.  Plaintiffs have requested

22   that BROOKDALE provides its facilities with a sufficient number of adequately trained staff to

23   ensure that residents with disabilities are provided with full and equal access to and enjoyment of

24   of the services specified in BROOKDALE's own resident assessments.  Among other things,

25   and without limitation, BROOKDALE should increase its level of trained staff in its assisted

26   living facilities such that residents with disabilities are not required to wait for more than five

27   minutes for a substantive response to their call pendants.  A substantive response means actual

28   action taken to address the resident's need, rather than a staff member passing by the resident's

1    room to say that they will return later.

2        206.    Such reasonable modifications in BROOKDALE's policies, practices and

3    procedures are necessary to ensure that Plaintiffs and the members of the putative Residents with

4    Disabilities Class receive full and equal access to and enjoyment of BROOKDALE's services,

5    including assistance with, *inter alia*, bathing, showering, toileting, transferring, taking

6    medications, dressing, dining, and housekeeping.  In addition, such modifications are necessary

7    to ensure that Plaintiffs and the members of the putative Residents with Disabilities Class have

8    full and equal access to and enjoyment of BROOKDALE's social and recreational activities, and

9    transportation to off-site locations for appointments and other activities.  Unless and until

10   BROOKDALE makes this requested reasonable modification in policies, practices, and

11   procedures, Plaintiffs and the members of the putative Residents with Disabilities Class will

12   continue to be denied full and equal access to and enjoyment of the services, goods, facilities,

13   privileges, advantages and accommodations that BROOKDALE claims to provide to all of its

14   residents, whether disabled or nondisabled.

15       207.    Plaintiffs' requested modification in policies, practices or procedures is eminently

16   reasonable in that BROOKDALE already charges residents with disabilities for, and residents

17   with disabilities pay to receive, the services specified in BROOKDALE's own resident

18   agreements and resident assessments, including *inter alia*, assistance with activities of daily

19   living such as mobility, bathing, showering, toileting, transferring, taking medications, dressing,

20   dining, and housekeeping, as well as participating in BROOKDALE's social and recreational

21   activities whether on-site or off-site.

22       208.    The requested modification in policies, practices or procedures will not make any

23   alteration (much less a fundamental alteration) in the nature of BROOKDALE's goods and

24   services.  Rather, Plaintiffs merely seek to ensure that BROOKDALE provides a sufficient

25   number of adequately trained staff to provide its residents with disabilities with full and equal

26   access to and enjoyment of the types of services and goods that BROOKDALE already promises

27   to provide to its residents in its normal course of business.  Thus, the requested reasonable

28   modification in policy, practice or procedure would not change the nature or type of services and

1   goods that BROOKDALE sells to the public.

2       209.    The requested reasonable modification would impose only a minimal burden on

3   BROOKDALE.  Plaintiffs allege on information and belief that the staff who provide

4   BROOKDALE's services are hourly employees who are paid an average of $10 to $14 per hour.

5   Increasing BROOKDALE's skeletal night staffing and its minimal level of daytime staffing will

6   only result in a moderate increase in BROOKDALE's labor budget.  BROOKDALE will

7   continue to be able to realize substantial gross profits each year in the multibillion dollar range.

8       210.    Plaintiffs have repeatedly requested that BROOKDALE make reasonable

9   modifications in policies, practices, or procedures by increasing the number of trained staff that

10  it provides in its facilities.  Notwithstanding the reasonableness and necessity of such

11  modifications, and notwithstanding the fact that BROOKDALE could significantly increase its

12  staffing without changing the nature of its services, goods, facilities, privileges, advantages or

13  accommodations, and could make such modifications without undue financial or administrative

14  burdens, BROOKDALE has failed and refused to make any such modifications.

15      211.    Plaintiffs' claims under the ADA and the Unruh Act based on BROOKDALE's

16  failure to make reasonable modifications in policies, practices, or procedures in staffing policies

17  and practices are limited to circumstances and facts occurring on or after May 16, 2015.

18                              **Physical Access Barriers**

19      212.    Plaintiffs allege on information and belief that many of Defendants' facilities

20  were designed and constructed after January 26, 1993, thus triggering access requirements under

21  Title III of the ADA.  The ADA prohibits designing and constructing facilities for first

22  occupancy after January 26, 1993 that are not readily accessible to and usable by individuals

23  with disabilities when it was structurally practicable to do so.  42 U.S.C. § 12183(a)(1).

24  BROOKDALE has violated the ADA by designing and constructing their facilities in a manner

25  that does not comply with federal disability access design standards including the Americans

26  with Disabilities Act Accessibility Guidelines ("ADAAG") and the 2010 ADA Standards for

27  Accessible Design ("2010 ADA Standards") even though it was structurally practicable to do so.

28      213.    Plaintiffs allege on information and belief that Defendants' facilities were altered

76

after January 26, 1993, thus triggering access requirements under Title III of the ADA. The ADA prohibits altering facilities after January 26, 1993 in a manner that is not readily accessible to, and usable by, individuals with disabilities when it was structurally practicable to do so. 42 U.S.C. § 12183(a)(2). Here, Defendants violated the ADA by altering its assisted living facilities after January 26, 1993 in a manner that did not comply with the ADAAG or the 2010 ADA Standards even though it was structurally practicable to do so. Specifically, Defendants have failed to ensure that the areas of alteration complied with the ADAAG or the 2010 ADA Standards, and that the path of travel to the areas of alteration complied with the ADAAG or the 2010 ADA Standards.

214.    Additionally, Defendants have failed to remove physical access barriers in their facilities which existed prior to January 26, 1993 when removal of those barriers was "readily achievable," in violation of 42 U.S.C. § 12182(b)(2)(A)(iv).

215.    The removal of each of the barriers complained of by Plaintiffs herein was at all times "readily achievable" under the standards of §§ 12181 and 12182 of the ADA. BROOKDALE could have removed each of the barriers alleged herein without much difficulty or expense within the meaning of Title III. Notwithstanding the foregoing, BROOKDALE has failed and refused to do so.

### Transportation and Activities

216.    BROOKDALE has violated Title III of the ADA by failing and refusing to provide Plaintiffs with full and equal access to and enjoyment of its transportation services to off-site activities and appointments. BROOKDALE has a policy and practice of limiting the number of wheelchair users who may use transportation to off-site activities. This limitation is not imposed on residents who do not use wheelchairs. In addition, BROOKDALE has required residents with mobility disabilities to transfer from their wheelchairs into the seats in its shuttles, and has not permitted residents to remain in their wheelchairs. BROOKDALE has done so despite the fact that many residents with mobility disabilities have great difficulty in transferring from their wheelchairs into the passenger seats in shuttles, and doing so is time consuming, physically exhausting and sometimes dangerous. Further, on numerous occasions residents with

mobility disabilities have been completely denied access to medical appointments, and other off-site appointments and activities, because BROOKDALE has failed to provide any accessible transportation to those appointments and activities.

### Evacuation Procedures

217.    BROOKDALE has failed to provide or communicate to its residents with disabilities any specific or definitive emergency evacuation plan in the event of earthquake, fire or other emergency.  Defendants' failure to do so constitutes a denial of full and equal access to and enjoyment of the services and facilities provided by BROOKDALE in violation of Title III of the ADA.  Many of BROOKDALE's residents with disabilities are unable to exit the building without assistance from staff.  While some residents have been advised to remain in their rooms in the event of an emergency, in those instances in which an alarm has sounded, no one has come to their rooms to assist them or to inform them as to whether there is an emergency or just a drill.

218.    The acts and omissions alleged herein constitute violations of Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12181 *et seq.*, and the regulations promulgated thereunder.  Defendants' discriminatory conduct alleged herein includes, *inter alia*:

      a.    Failing to provide residents with disabilities the opportunity to participate in or benefit from BROOKDALE's goods, services, facilities, privileges, advantages, and/or accommodations at its assisted living facilities in California, in violation of 42 U.S.C. § 12182(b)(1)(A)(i);

      b.    Failing to provide residents with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages and/or accommodations that are equal to that afforded to individuals without disabilities, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii);

      c.    Failing to provide the goods, services, facilities, privileges, advantages, and/or accommodations at its assisted living facilities in California to residents with disabilities in the most integrated setting possible, in violation of 42 U.S.C. § 12182(b)(1)(B);

78

d.   Utilizing standards, criteria and methods of administration that have the effect of discriminating against residents on the basis of their disabilities, in violation of 42 U.S.C. § 12182(b)(1)(D);

e.   Imposing eligibility criteria that screen out or tend to screen out residents with disabilities from fully and equally enjoying BROOKDALE's assisted living facilities' goods, services, facilities, privileges, advantages, and/or accommodations, in violation of 42 U.S.C. § 12182(b)(2)(A)(i);

f.   Failing to make reasonable modifications in its policies, practices, and procedures which are necessary for its residents with disabilities to enjoy and access BROOKDALE's assisted living facilities' goods, services, facilities, privileges, advantages and/or accommodations, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii);

g.   Failing to remove architectural barriers in those facilities constructed prior to January 26, 1993 and not altered after that date where such removal is readily achievable, in violation of 42 U.S.C. § 12182(b)(2)(A)(iv);

h.   Failing to design and construct facilities first occupied after January 26, 1993 such that they are readily accessible to and usable by persons with disabilities, in violation of 42 U.S.C. § 12183(a)(1);

i.   Performing alterations after January 26, 1993 that affect the usability of its facilities or a part of its facilities, while failing to ensure that the altered portions and the path of travel to those altered portions are readily accessible to and usable by persons with disabilities, in violation of 42 U.S.C. § 12183(a)(2); and

j.   Failing to operate BROOKDALE's transportation services such that they ensure a level of service to persons with disabilities that is equivalent to that provided to persons without disabilities, in violation of 42 U.S.C. § 12182)(b)(2)(C)(i).

219.   As a direct and proximate result of the aforementioned acts, Plaintiffs have

79

1  suffered, and continue to suffer irreparable harm including humiliation, hardship and anxiety due

2  to Defendants' failure to provide full and equal access to and enjoyment of Defendants'

3  facilities, services, goods, privileges, advantages and/or accommodations.

4     220.   WHEREFORE Plaintiffs pray for judgment as set forth below, including

5  declaratory and injunctive relief, as well as reasonable attorneys' fees, costs and expenses

6  incurred in bringing this action.

7              **SECOND CLAIM FOR RELIEF**

8     **(Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*)**
   **(On behalf of Plaintiffs, the RESIDENTS WITH MOBILITY OR VISION DISABILITIES**
9    **CLASS and the RESIDENTS WITH DISABILITIES CLASS)**

10    221.   Plaintiffs incorporate by reference as though fully set forth herein the preceding

11  paragraphs of this Complaint.

12    222.   California Civil Code § 51(b) provides in pertinent part that "All persons within

13  the jurisdiction of this state are free and equal, and no matter what their…disability or medical

14  condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or

15  services in all business establishments of every kind whatsoever."

16    223.   Pursuant to California Civil Code § 51(f), a violation of the ADA also constitutes

17  a violation of California Civil Code §§ 51 *et seq.*

18    224.   Defendants own, operate and/or manage business establishments within the

19  meaning of the Unruh Civil Rights Act.  Defendants are each a public accommodation whose

20  services and facilities are open to the general public.

21    225.   Defendants provide services, privileges, advantages and accommodations to the

22  general public.  Defendants have failed and refused to provide Plaintiffs with full and equal

23  access to and enjoyment of the benefits of their goods, services, facilities, benefits, advantages,

24  and accommodations, and have done so by reason of Plaintiffs' disabilities.

25    226.   Defendants have discriminated against persons with disabilities in violation of

26  California Civil Code §§ 51 *et seq.* by failing to operate their facilities and services in full

27  compliance with the requirements of the ADA as set forth above.

28    227.   Defendants, by their actions and inactions alleged in this Complaint, have directly

80

1    discriminated against persons with disabilities.

2         228.    Plaintiffs' claims under the Unruh Act based on BROOKDALE's failure to make

3    reasonable modifications in policies, practices, or procedures in staffing policies and practices

4    are limited to circumstances and facts occurring on or after May 16, 2015.

5         229.    The actions of Defendants were and are in violation of the Unruh Civil Rights

6    Act, Cal. Civ. Code §§ 51 *et seq.*, and therefore Plaintiffs are also entitled to statutory damages,

7    injunctive relief and reasonable attorneys' fees, costs and expenses.

8                            **THIRD CLAIM FOR RELIEF**

9                **(Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*)**
     **(On behalf of Plaintiffs and the FALSE OR MISLEADING STATEMENT CLASS)**
10
          230.    Plaintiffs incorporate by reference as though fully set forth herein the preceding

11   paragraphs of this Complaint.

12        231.    Plaintiffs and the members of the putative False or Misleading Statements Class

13   are "consumer[s]" within the meaning of California Civil Code § 1761(d).  They are also "senior

14   citizen[s]" and/or "[d]isabled person[s]" within the meaning of California Civil Code § 1761(f)

15   and (g).

16        232.    Defendants are each a "person" as defined under California Civil Code § 1761(c).

17   The assisted living services that Defendants have promised to provide Plaintiffs are "[s]ervices"

18   within the meaning of the California Civil Code § 1761(b).  The agreement by Defendants to

19   provide assisted living services in return for payment of monthly fees by each of the Plaintiffs

20   constitutes a "transaction" under California Civil Code § 1761(e).

21        233.    In Defendants' uniform resident contracts presented to prospective residents and

22   their family members, Defendants represented and continue to represent that BROOKDALE will

23   assess each resident and provide the basic services, personal services, and select and therapeutic

24   services it has determined are needed.  That same representation is made in BROOKDALE's re-

25   evaluation of residents, rate increase letters, letters regarding the merger, letters regarding the

26   conversion to a new personal assessment system, corporate website statements, invoices, and

27   other standardized corporate promotional materials.  These uniform corporate representations are

28

                                            81

false and misleading, and likely to deceive the reasonable consumer.  As alleged herein, Plaintiffs and the putative class members reasonably expected based on these representations that BROOKDALE would provide sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive the services they have been promised and for which they are paying.

234.    Contrary to its representations regarding the provision of basic services, personal services, and select and therapeutic services, BROOKDALE knows that the policies and practices it uses to staff its facilities—most notably, its policy and practice of using predetermined labor budgets designed to meet corporate profit targets, goals, and margins without regard to residents' needs—preclude it from providing its residents all of the care and services they have been promised and places all residents at a substantial risk that they will not receive the care and services they have paid for on any given day.  BROOKDALE did not intend to provide and has no intention of providing sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive these services.  BROOKDALE does not disclose and conceals this material fact from the residents, their family members, and the general public.

235.    The named Plaintiffs, their family members and powers of attorney, the putative class members, and reasonable consumers considered material BROOKDALE's misrepresentations and misleading statements that it will provide residents the basic services, personal services, and select and therapeutic services they need and for which they are paying. If the named Plaintiffs had known the true facts about BROOKDALE's staffing policies and procedures, they would not have agreed to enter or stay in a BROOKDALE facility or to place their relatives in a BROOKDALE facility, or would have paid less money.  If the putative class members had known the true facts, they would in all reasonable probability not have agreed to enter or remain in a BROOKDALE facility or to place their relatives in a BROOKDALE facility, or would have paid less money to BROOKDALE.

236.    The facts that BROOKDALE misrepresents, fails to disclose and actively conceals are material and are likely to deceive the reasonable consumer.  Reasonable consumers,

including the residents and their family members herein, consider of great importance the staffing levels provided by the assisted living facility they select, and such consumers also attach great importance to BROOKDALE's claims regarding its provision of basic services, personal services, and select and therapeutic services.

237.    Residents and their family members would consider material BROOKDALE's uniform corporate policy and procedure of basing its staffing on fixed budgets and profit margins resulting in staffing that is inadequate to meet residents' needs, as identified by BROOKDALE itself through periodic personal service assessments.  Residents and their family members could not reasonably have been expected to learn or discover these non-disclosed facts, and in fact, BROOKDALE has affirmatively concealed them.

238.    Since May 16, 2015, BROOKDALE has violated and continues to violate the CLRA, Cal. Civ. Code §§ 1750 *et seq.*, in at least the following respects:

a.  In violation of § 1770(a)(5), BROOKDALE has misrepresented, failed to disclose and concealed the true characteristics and/or quantities of services provided at its facilities in California;

b.  In violation of § 1770(a)(7), BROOKDALE has misrepresented, failed to disclose and concealed the true standard, quality and/or grade of services provided at its facilities in California;

c.  In violation of § 1770(a)(9), in BROOKDALE's standard resident admission contracts and elsewhere, BROOKDALE has falsely advertised that it will provide basic services and the assistance specified by each resident's personal service assessment and which corresponds to that resident's Personal Service Plan, knowing that BROOKDALE does not intend to provide the services as advertised; and

d.  In violation of § 1770(a)(14), BROOKDALE has represented that the agreement signed by residents and/or their responsible parties, and under which they pay their monthly rate, confers on residents the right to reside in a facility that provides the basic services, personal services, and select and

83

therapeutic services that residents have been promised and are paying for, when in fact, BROOKDALE knows that the policies and practices it uses to staff its facilities preclude it from providing its residents all of the care and services they have been promised and places all residents in an inherent and substantial risk that they will not receive the care and services they have paid for on any given day.

239.    These misrepresentations, misleading statements, acts, practices, and omissions by BROOKDALE are and were intended to induce and lure elderly and dependent adult residents and their family members into agreeing to be admitted to BROOKDALE's facilities and to pay community and monthly fees.

240.    BROOKDALE made the misrepresentations and misleading statements alleged herein through various uniform means of communication, including without limitation, the admission agreement; subsequent agreements based on updated Personal Service Plans; letters to residents regarding the merger between BROOKDALE and Emeritus, the implementation of BROOKDALE's new personal service system, and rate increases; standardized corporate marketing and promotional materials; Defendants' website; invoices; and other written corporate materials disseminated to the public in connection with Defendants' services.  These representations and misleading statements were made directly to the named Plaintiffs, putative class members and their family members and/or responsible parties by BROOKDALE in the uniform means of communication listed above.

241.    BROOKDALE failed to disclose and concealed from Plaintiffs, the putative class members, and their family members, that BROOKDALE staffs its facility using predetermined labor budgets designed to meet corporate profit targets, goals, and margins without regard to residents' needs; that these policies and practices preclude it from providing its residents all of the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day; and that BROOKDALE did not intend to provide and has no intention of providing sufficient qualified and adequately trained staff at its facilities to ensure that all residents receive

1  these services.

2       242.   BROOKDALE had exclusive and superior knowledge of materials facts not

3  known to the named Plaintiffs, class members or the general public at the time of the subject

4  transactions and actively concealed those material facts.

5       243.   BROOKDALE had exclusive and superior knowledge that its corporate policy

6  and procedure of providing pre-determined staffing at its facilities preclude BROOKDALE from

7  providing the care and services for which it charges its residents and places all residents at a

8  substantial risk that on any given day they will not receive the care and services for which they

9  have paid.  BROOKDALE had exclusive and superior knowledge that its policies and

10  procedures for staffing its facilities pose a heightened health and safety risk to the named

11  Plaintiffs and class members.  Defendants intentionally concealed, suppressed and/or failed to

12  disclose the true facts with the intent to defraud the named Plaintiffs and putative class members.

13  The named Plaintiffs and putative class members did not know these material undisclosed facts

14  and could not reasonably have been expected to discover them.

15       244.   As a direct and proximate result of Defendants' conduct, Plaintiffs, the class

16  members, and members of the general public (including without limitation persons admitted to

17  and/or residing in the facilities, and their family members and/or responsible parties) have been

18  harmed and continue to be harmed.  Among other things, they paid money to Defendants to

19  enter the facilities and/or for services that were not provided or that were substandard to those

20  promised by Defendants.

21       245.   Plaintiffs sent BROOKDALE a notice to cure under California Civil Code

22  § 1782(a), which was received by BROOKDALE on June 6, 2017.  More than 30 days have

23  passed since BROOKDALE's receipt, and BROOKDALE has not corrected or remedied the

24  violations alleged in the notice and herein.

25       246.   Accordingly, Plaintiffs and the False or Misleading Statements Class members

26  are entitled to no less than $1,000 in statutory damages pursuant to California Civil Code

27  § 1780(a).  Moreover, as senior citizens and/or disabled persons, Plaintiffs and the False or

28  Misleading Statements Class members are also entitled to statutory damages of $5,000 per class

member pursuant to California Civil Code § 1780(b), as well as actual damages and restitution in an amount to be proven at trial.

247.    Plaintiffs and each of the putative False or Misleading Statements Class members are seniors and/or disabled persons as defined by California Civil Code § 1761(f) and (g). Plaintiffs and the putative False or Misleading Statements Class members have each suffered substantial economic harm.  Defendants knew that their conduct negatively impacted seniors and disabled persons.  Defendants' conduct caused the named Plaintiffs and the putative False or Misleading Statements Class members to lose property set aside for personal care and maintenance and assets essential to their health and welfare.  Further, Plaintiffs and the putative False or Misleading Statements Class members are substantially more vulnerable than other members of the public to Defendants' conduct because of their age, poor health, impaired understanding, restricted mobility and/or disabilities.

248.    Plaintiffs additionally seek treble damages under California Civil Code § 3345, punitive damages, reasonable attorneys' fees and costs, and all other relief the Court deems just and proper.  Excluded from Plaintiffs' request are damages related to any personal injuries, emotional distress or wrongful death suffered by any member of the class.

249.    Defendants' conduct presents a continuing threat of substantial harm to the public in that, among other things, Defendants continue to make misleading statements about and conceal material facts about whether and how they provide basic, personal care, and select and therapeutic services at BROOKDALE facilities in California, as well as the fact that their staffing policies and procedures preclude them from providing residents the services they have been promised.  Despite these misrepresentations, BROOKDALE continues to induce elderly and vulnerable citizens to enter and remain in its facilities, which conduct irreparably harms Plaintiffs and the putative False or Misleading Statements Class.  Accordingly, Plaintiffs seek an injunction that requires that BROOKDALE immediately cease the CLRA violations alleged herein regarding BROOKDALE's misrepresentations, misleading statements, and material omissions, and to enjoin it from continuing to engage in any such acts or practices in the future. Specifically, Plaintiffs seek an injunction requiring BROOKDALE to disclose to Plaintiffs, the

86

putative False or Misleading Statements Class members and the consuming public that

BROOKDALE's staffing policies and procedures preclude it from providing its residents the

care and services they have been promised and places all residents at an inherent and substantial

risk that they will not receive the care and services they have paid for on any given day.

Plaintiffs also seek an injunction prohibiting BROOKDALE from charging residents or their

responsible parties monthly fees based on their Personal Service Plans until BROOKDALE

implements staffing policies and procedures that enable it to deliver those services on a

consistent basis.

250.    Plaintiffs claims for violations of the CLRA are limited to misrepresentations,

misleading statements, and failures to disclose that occurred on or after May 16, 2015.

251.    WHEREFORE Plaintiffs pray for judgment as set forth below, including

declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses

incurred in bringing this action.

## **FOURTH CLAIM FOR RELIEF**

**(Elder Financial Abuse, Cal. Welf. & Inst. Code § 15610.30)**
**(On behalf of PLAINTIFFS and the FALSE OR MISLEADING STATEMENTS CLASS)**

252.    Plaintiffs incorporate by reference as though fully set forth herein the preceding

paragraphs of this Complaint.

253.    Plaintiffs and the putative False or Misleading Statements Class members are and

at all times were "elders" as defined under California Welfare & Institutions Code § 15610.27 or

"dependent adults" as defined under California Welfare & Institutions Code § 15610.23.

254.    BROOKDALE represented to the named Plaintiffs, and/or their responsible

parties, and the putative False or Misleading Statements Class members, and/or their responsible

parties, in standard agreements, service updates, monthly invoices, standardized corporate letters

to residents and/or their responsible parties, and/or annual notification of rate increases, that

BROOKDALE would provide care and assistance with activities of daily living, including but

not limited to staffing 24 hours a day, dining services, housekeeping, laundry, transportation,

and other basic services in exchange for community fees and monthly payments that it received

from the named Plaintiffs and the putative False or Misleading Statements Class members. However, BROOKDALE did not and has no intention of providing sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive these services.  As a result, residents do not consistently receive all of the basic services BROOKDALE has promised them and for which they are paying BROOKDALE.

255.    BROOKDALE further represented through these same corporate materials that BROOKDALE would provide personal services, including but not limited to assistance with bathing, toileting, grooming, dressing, transferring, and mobility, for additional monthly fees. BROOKDALE represented that it would perform an assessment of each resident to identify needed personal services and an individualized service plan to deliver those services.  Yet BROOKDALE did not intend to and does not provide adequate staffing for personal services at its facilities.  Rather, it has a policy and practice of providing pre-determined facility staffing that does not change with increases in residents' personal service needs.  This policy and practice precludes BROOKDALE from providing facility residents with all of the personal services BROOKDALE has promised them and for which they are paying BROOKDALE.

256.    BROOKDALE further represented through these same corporate materials that BROOKDALE would provide select and therapeutic services to residents, including but not limited to emergency call pendants and associated services.  However, BROOKDALE did not and has no intention of providing sufficient levels of qualified and adequately trained staff at its facilities to ensure that all residents receive these services.  As a result, facility residents do not consistently receive all of the select and therapeutic services BROOKDALE has promised them and for which they are paying BROOKDALE.

257.    BROOKDALE knew or should have known that such conduct would likely be harmful to Plaintiffs and the putative False or Misleading Statements Class members.

258.    BROOKDALE knew or should have known that Plaintiffs and the putative False or Misleading Statements Class members had a right to the funds used to pay new resident community fees and monthly fees to BROOKDALE.

259.    As such, BROOKDALE took, secreted, appropriated, obtained and/or retained

88

money belonging to Plaintiffs and putative class members for a wrongful use and/or with the intent to defraud.

260.   BROOKDALE's conduct was despicable, fraudulent, reckless, and carried out with a willful and conscious disregard for the rights and safety of Plaintiffs and the members of the putative False or Misleading Statements Class.

261.   Plaintiffs and putative False or Misleading Statements Class members also seek compensatory damages, reasonable attorneys' fees, costs and expenses, punitive damages, treble damages pursuant to California Civil Code § 3345, and all other remedies permitted by law. Plaintiffs do not seek certification of any claims for damages related to any personal injuries, emotional distress, or wrongful death suffered by any member of the class.

262.   Plaintiffs' claims under Cal. Welf. & Inst. Code § 15610.30 are limited to circumstances and facts occurring on or after May 16, 2015.

263.   WHEREFORE Plaintiffs pray for judgment as set forth below, including declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses incurred in bringing this action.

### FIFTH CLAIM FOR RELIEF

**(Unlawful, Unfair and Fraudulent Business Practices,
Cal. Bus. & Prof. Code §§ 17200 *et seq.*)
(On behalf of Plaintiffs and all Proposed Classes)**

264.   Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

265.   BROOKDALE has engaged in unlawful business acts and practices.  Such acts and practices constitute unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.*

266.   In particular, Defendants have engaged in unlawful business acts and practices by violating numerous laws, statutes and regulations including but not limited to:

a.   Systematically and uniformly representing to the residents of its assisted living facilities in California, family members, and the public that Defendants will assess residents to determine their needs, and will provide

89

residents specified basic services, personal services, and select and
therapeutic services based on those needs, when in fact, Defendants use
staffing policies and procedures that preclude them from providing their
residents all of the care and services they have been promised and that place
all residents in an inherent and substantial risk that they will not receive the
care and services they have paid for on any given day, in violation of
California Civil Code §§ 1750 *et seq.*;

b.  Failing to provide residents with disabilities full and equal enjoyment of
BROOKDALE's goods, services, facilities, privileges, advantages, and/or
accommodations at its assisted living facilities in California; failing to
remove architectural barriers in those facilities constructed prior to January
26, 1993 and not altered after that date where such removal is readily
achievable; failing to design and construct facilities first occupied after
January 26, 1993 such that they are readily accessible to and usable by
persons with disabilities; and performing alterations after January 26, 1993
that affect the usability of its facilities or a part of its facilities, while failing
to ensure that the altered portions and the path of travel to those altered
portions are readily accessible to and usable by persons with disabilities, all
in violation of 42 U.S.C. § 12182 and Cal. Civ. Code § 51 *et seq.*;

c.  Taking, secreting, appropriating, obtaining, and retaining the funds of elders
and dependent adults for a wrongful use and/or with the intent to defraud in
violation of California Welfare and Institutions Code § 15610.30;

d.  Willfully interfering with the maintenance and promotion of a family
council in violation of Cal. H&S Code § 1569.158; and

e.  Willfully interfering with the maintenance and promotion of a resident
council in violation of Cal. H&S Code § 1569.157.

267.  By virtue of the conduct alleged herein, Defendants have also engaged in
fraudulent business practices.  Members of the general public (including without limitation

90

persons admitted to and/or residing in BROOKDALE's California assisted living facilities during the CLASS PERIOD, and their family members and/or responsible parties) have been and are likely to be deceived by Defendants' misrepresentations and failures to disclose as alleged herein.

268.   The acts and practices of Defendants also constitute unfair business acts and practices within the meaning of California Business & Professions Code §§ 17200 *et seq.*, in that the conduct alleged herein is immoral, unscrupulous, and contrary to public policy, and the detriment and gravity of that conduct outweighs any benefits attributable to such conduct.

269.   Defendants' misrepresentations, misleading statements, acts, practices, and omissions were intended to induce and lure elderly and dependent adult residents and their family members into agreeing to be admitted to and remain at Defendants' facilities and to pay a community fee and monthly rates to live in an assisted living facility that features sufficient levels of qualified and adequately trained staff to ensure that all residents receive the basic services, personal services, and select and therapeutic services for which they are paying.

270.   Defendants made these misrepresentations and misleading statements through various uniform means of written corporate communications, including without limitation, the standardized Residency Agreement; subsequent agreements based on re-assessments of the resident; letters to residents regarding the merger between BROOKDALE and Emeritus, Defendants' conversion to a new personal service system, and rate increases; invoices, marketing and promotional materials, Defendants' corporate website and other materials disseminated to the public from its corporate headquarters in connection with Defendants' services.  These representations were made directly to the named Plaintiffs, class members, and their family members and/or responsible parties by Defendants in the uniform means of communication listed above.

271.   BROOKDALE concealed from Plaintiffs, the putative class members, and their family members that BROOKDALE's staffing policies and procedures preclude it from providing its residents all of the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they

1    have paid for on any given day.

2           272.    BROOKDALE had exclusive and superior knowledge of material facts not

3    known to named Plaintiffs, putative class members or the general public at the time of the

4    subject transactions and actively concealed these material facts.

5           273.    BROOKDALE had exclusive and superior knowledge of its corporate policy and

6    procedure.  Further, Plaintiffs allege on information and belief that Defendants' officers,

7    directors, and managers knew that Defendants' failure to provide adequate staffing posed a

8    substantial health and safety risk to the named Plaintiffs and class members.  BROOKDALE

9    intentionally concealed, suppressed and/or failed to disclose the true facts with the intent to

10   defraud the named Plaintiffs and putative class members.  The named Plaintiffs and the putative

11   class members did not know these material undisclosed facts and could not reasonably have

12   been expected to discover them.

13          274.    As a direct and proximate result of Defendants' conduct, Plaintiffs, the class

14   members, and members of the general public (including without limitation persons admitted to

15   and/or residing in the facilities, and their family members and/or responsible parties) have been

16   harmed and continue to be harmed.  Among other things, they paid money to Defendants to

17   enter the facilities and for services that were not provided or that were substandard to those

18   promised by Defendants.

19          275.    Plaintiffs seek an injunction that requires that Defendants immediately cease acts

20   of unlawful, unfair and fraudulent business acts or practices as alleged herein, and to enjoin

21   Defendants from continuing to engage in any such acts or practices in the future.

22          276.    Plaintiffs' claims under Cal. Bus. & Prof. Code §§ 17200 are limited to

23   circumstances and facts occurring on or after May 16, 2015 to the extent they are based on

24   Defendants' failure to provide staff with adequate training and in sufficient numbers to provide

25   their assisted living facility residents all of the care and services they have been promised.

26          277.    WHEREFORE Plaintiffs pray for judgment as set forth below, including

27   declaratory and injunctive relief as well as reasonable attorneys' fees, costs and expenses

28   incurred in bringing this action.

**ALLEGATIONS SUPPORTING DECLARATORY AND INJUNCTIVE RELIEF**

278.    Plaintiffs incorporate by reference as though fully set forth herein the preceding paragraphs of this Complaint.

279.    Plaintiffs STACIA STINER, HELEN CARLSON, and BERNIE JESTRABEK-HART continue to live at a BROOKDALE assisted living facility.  Unless and until BROOKDALE brings its facilities into compliance with the requirements of the ADA and applicable federal disability access design standards, the above-named Plaintiffs will continue to be denied full and equal access to and enjoyment of BROOKDALE's facilities as a result of physical access barriers in violation of the ADA.  Moreover, unless and until Defendant BROOKDALE makes the requested reasonable modification in policies, practices and procedures set forth above with respect to the staffing of its facilities, Plaintiffs will continue to be denied full and equal access to and enjoyment of the services, goods, facilities, privileges, advantages and accommodations provided to its residents by BROOKDALE.  In this regard, unless and until Defendants provide a sufficient number of adequately trained staff at their facilities, residents with disabilities will continue to suffer the denial and deprivation of basic services that are necessary to daily living, including assistance with bathing, showering, toileting, taking medications, transferring, dressing, dining, cleaning and laundry services.  Further, residents with disabilities will continue to be denied full and equal access to on-site and off-site social and recreational activities, and will be segregated and isolated in violation of the ADA's integration mandate.

280.    In addition, unless and until Defendants comply with the ADA, Plaintiffs STACIA STINER, HELEN CARLSON, and BERNIE JESTRABEK-HART will continue to suffer falls, and to be at risk of falls and/or serious physical injuries, as a result of Defendants' failure and refusal to provide full and equal access to its facilities and services.  In this regard, Defendants must be enjoined to provide facilities that comply with applicable federal disability access standards, a sufficient number of staff who are adequately trained to assist residents with disabilities to prevent falls and to assist them if a fall takes place, and a functioning and effective pendant system so that residents can obtain prompt and effective assistance when they have

93

fallen and/or are at risk of other physical injuries.  Further, unless and until Defendants provide adequate emergency planning and evacuation procedures for residents with disabilities, Defendants will continue to place them at significant risk of serious injury and death.

281.    Further, unless and until Defendants provide residents with disabilities with full and equal access to enjoyment of its transportation services, residents with disabilities will continue to be excluded from and denied access to off-site appointments and activities in violation of the ADA.

282.    Additionally, unless and until BROOKDALE ceases its false and/or misleading statements regarding its services and discloses that its corporate staffing policies and practices preclude it from providing its residents the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day, residents, their family members, their responsible parties and the general public will continue to be misled and will continue to expend very substantial sums of money for services, goods and facilities that are not as represented, and Defendants will continue to receive the benefits of their ill-gotten gains.

283.    Finally, unless and until BROOKDALE is ordered to refrain from interfering with the maintenance and promotion of resident and family councils at its facilities, Plaintiffs will continue to suffer from retaliation against resident and family councils and their members and be subjected to BROOKDALE's obstruction of the promotion and operation of said councils at its facilities.

284.    A present and actual controversy exists regarding the respective rights and obligations of Plaintiffs and Defendants.  Plaintiffs desire a judicial determination of their rights and Defendants' obligations in a declaration as to whether, and to what extent, the Defendants' conduct violates applicable law.

285.    Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights.  Such a declaration is also necessary and appropriate to prevent further harm or infringement of Plaintiffs' rights.

286.    Plaintiffs STACIA STINER, HELEN CARLSON, and BERNIE JESTRABEK-

94

HART have no adequate remedy at law for the harm to them arising from the conduct alleged herein.  Unless and until Defendants are preliminarily and permanently enjoined from engaging in such conduct, Plaintiffs will continue to suffer irreparable harm as a result of Defendants' violations of the ADA, the Unruh Act, the CLRA, the UCL, Cal. Welf. & Inst. Code § 15610.30, and Cal. H&S Code §§ 1569.157 and 1569.158 as alleged herein.

287.   Plaintiffs STACIA STINER, HELEN CARLSON, and BERNIE JESTRABEK-HART are entitled to declaratory and injunctive relief pursuant to each of the laws under which this action is brought.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.   Issue a declaratory judgment that Defendants' failure to provide full and equal access to and enjoyment of Defendants' goods, services, facilities, benefits, advantages and accommodations with nondisabled persons violates Plaintiffs' rights the ADA, § 42 U.S.C. 12101 *et seq*., and the regulations promulgated thereunder, and also violates their civil rights under California Civil Code §§ 51 *et seq.*;

2.   With respect to the Residents with Mobility or Visual Disabilities Class and the Residents with Disabilities Class issue preliminary and permanent injunctions requiring Defendants to come into full compliance with the requirements of the ADA and its implementing regulations;

3.   With respect to the Residents with Mobility or Visual Disabilities Class and the Residents with Disabilities Class issue preliminary and permanent injunctions enjoining Defendants from violating the Unruh Civil Rights Act in the operation of Defendants' business establishments and/or public accommodations with respect to its goods, services, facilities, advantages, benefits and accommodations at its assisted living facilities in California;

4.   Issue preliminary and permanent injunctions requiring that Defendants immediately cease acts that constitute false advertising and violations of the Consumer Legal Remedies Act and the Elder Financial Abuse statute as alleged herein with respect to Defendants' misrepresentations, misleading statements, and material omissions, and to enjoin

Defendants from continuing to engage in any such acts or practices in the future;

5.     Issue preliminary and permanent injunctions requiring that BROOKDALE disclose to Plaintiffs, the putative class members and the consuming public that its corporate staffing policies and procedures preclude it from providing its residents the care and services they have been promised and places all residents at an inherent and substantial risk that they will not receive the care and services they have paid for on any given day, and prohibiting BROOKDALE from charging fees based on the residents' Personal Service Plans when BROOKDALE does not, in fact, provide adequate staffing levels to perform the personal services identified in those plans;

6.     Issue preliminary and permanent injunctions ordering BROOKDALE to refrain from interference with the formation, maintenance and promotion of family or resident councils at its facilities.

7.     For statutory damages pursuant to California Civil Code § 52(a) for the Residents with Mobility or Visual Disabilities and the Residents with Disabilities classes;

8.     For statutory damages pursuant to California Civil Code § 1780(a) and (b) for the False or Misleading Statements class;

9.     For actual damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by the named Plaintiffs or any class member;

10.    For restitution and any other monetary relief permitted by law;

11.    For punitive damages;

12.    For treble damages pursuant to California Civil Code §§ 52(a) and 3345;

13.    For pre-judgment and post-judgment interest according to law;

14.    Award to Plaintiffs all costs of this proceeding, including reasonable attorneys' fees costs and litigation expenses, as provided by law;

15.    Issue any other preliminary and permanent injunctions the Court deems sufficient to rectify the acts and omissions alleged herein; and,

\\

SECOND AMENDED COMPLAINT FOR DECL. AND INJ. RELIEF AND DAMAGES - Case No. 17-cv-03962-JD

16.     For such other relief as the Court may deem just and proper.

Respectfully submitted,

DATED:                          SCHNEIDER WALLACE
                                COTTRELL KONECKY
                                WOTKYNS, LLP

                                By:   */s/Guy B. Wallace*
                                      Guy B. Wallace

DATED:                          ROSEN BIEN
                                GALVAN & GRUNFELD LLP

                                By:   */s/Gay Crosthwait Grunfeld*
                                      Gay Crosthwait Grunfeld

DATED:                          STEBNER AND ASSOCIATES

                                By:   */s/Kathryn A. Stebner*
                                      Kathryn A. Stebner

                                *Attorneys for Plaintiffs and the Proposed Classes*

SECOND AMENDED COMPLAINT FOR DECL. AND INJ. RELIEF AND DAMAGES - Case No. 17-cv-03962-JD

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

DATED:                             SCHNEIDER WALLACE
                                   COTTRELL KONECKY
                                   WOTKYNS LLP

                                   By:   */s/Guy B. Wallace*
                                         Guy B. Wallace

DATED:                             ROSEN BIEN
                                   GALVAN & GRUNFELD LLP

                                   By:   */s/Gay Crosthwait Grunfeld*
                                         Gay Crosthwait Grunfeld

DATED:                             STEBNER AND ASSOCIATES

                                   By:   */s/Kathryn A. Stebner*
                                         Kathryn A. Stebner

                                   *Attorneys for Plaintiffs and the Proposed Classes*

SECOND AMENDED COMPLAINT FOR DECL. AND INJ. RELIEF AND DAMAGES - Case No. 17-cv-03962-JD

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2018, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ Sarah Colby
Sarah Colby (SBN 194475)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
scolby@schneiderwallace.com