UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACIA STINER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BROOKDALE SENIOR LIVING, INC., et al.,<br><br>    Defendants. | Case No. 17-cv-03962-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, AND DENYING DEFENDANTS' MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 59, 60, 61 |

Before the Court are the Motion to Compel Arbitration, Dkt. No. 59, Motion to Dismiss and/or Strike Portions of Plaintiffs' Second Amended Complaint, Dkt. No. 60, and Motion to Strike Portions of the Second Amended Complaint, Dkt. No. 61, brought by Defendants Brookdale Senior Living Inc. and Brookdale Senior Living Communities, Inc. ("Brookdale").

## I. BACKGROUND

On July 13, 2017, Plaintiffs Patricia and Christopher Eidler, Stacia Stiner, Mary-Catherine Jones, and Helen Carlson filed this action against Defendants for violations of the Americans with Disabilities Act of 1990 ("ADA"), the Unruh Civil Rights Act ("Unruh Act"), the Consumer Legal Remedies Act ("CLRA"), California Business and Professions Code §§ 7200 *et seq.* ("UCL"), and California Welfare and Institutions Code § 15610.3. Dkt. No. 1. Plaintiffs allege that Defendants' assisted living facilities are not accessible by persons with disabilities, and that Defendants' policies prevent persons with disabilities from fully accessing and enjoying Defendants' facilities. Dkt. No. 52 ("SAC") ¶¶ 3–4. Plaintiffs additionally allege that Defendants misrepresent the quality of care at their facilities, in violation of California law. SAC ¶¶ 5–6.

Plaintiffs filed a first amended complaint on August 25, 2017, adding Bonita Hager and Lawrence Quinlan as plaintiffs. Dkt. No. 20. On September 28, 2017, Defendants filed a motion

1  to compel Plaintiffs Eidler, Hager, Jones, Carlson, and Quinlan to arbitration. Dkt. No. 23. On February 22, 2018, Plaintiffs voluntarily dismissed the claims of Plaintiffs Eidler, Hager, and Jones. Dkt. Nos. 40, 41, 42. The Court terminated Defendants' first motion to compel arbitration on March 15, 2018, when it granted leave for Plaintiffs to file the Second Amended Complaint. Dkt. No. 47. Plaintiffs filed the currently-operative Second Amended Complaint on March 29, 2018, which added Plaintiffs Edward Boris, Bernie Jestrabek-Hart, Arthur and Patricia Lindstrom, and Ralph Schmidt. *See* SAC.

## II. MOTION TO COMPEL ARBITRATION

### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983) (noting federal policy favoring arbitration). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.*

Arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In analyzing whether an arbitration agreement is valid and enforceable, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996). In interpreting the validity and scope of an arbitration agreement, the courts apply state law principles of contract formation and interpretation. *See Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d 1205, 1210 (9th Cir. 1998) (citation omitted).

When considering a motion to compel arbitration, the court is limited to determining (1) whether a valid arbitration agreement exists, and, if so (2) whether the arbitration agreement encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.,* 533 F.3d 1114, 1119 (9th Cir. 2008). If these conditions are satisfied, the court must compel arbitration. 9 U.S.C. § 4; *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration.").

### B. Helen Carlson

#### i. Factual Background

Helen Carlson ("Ms. Carlson") is a 94-year-old resident of Brookdale Fountaingrove[1] since approximately October of 2011. SAC ¶ 17. Joan Carlson is Ms. Carlson's daughter-in-law and guardian ad litem for the purposes of this lawsuit, and has held Ms. Carlson's power of attorney since December 2006. *Id.* Before Ms. Carlson moved into Brookdale Fountaingrove, Joan Carlson, "acting as Ms. Carlson's legal representative and power of attorney," read and signed a standardized residency agreement and arbitration addendum with Emeritus. SAC ¶ 115; Dkt. No. 31-1, Ex. B; Dkt. No. 69 at 2. The arbitration agreement specified that it "shall be governed by and interpreted under the Federal Arbitration Act." Dkt. No. 31-1, Ex. B. Joan Carlson signed a subsequent residency agreement with Emeritus in January of 2013. Dkt. No. 31-1 ¶ 5, Ex. C. The 2013 residency agreement does not address arbitration. Dkt. No. 31-1, Ex. C. On November 17, 2015, Joan Carlson, in her capacity as Ms. Carlson's legal representative and holder of her power of attorney, reviewed and signed an agreement with Brookdale entitled "Amendment to Continuing Care Residence and Services Agreement." SAC ¶ 119.

In December of 2017, Joan Carlson was informed that Ms. Carlson would need to move to the memory care section of Brookdale Fountaingrove. SAC ¶ 122. On or around December 18, 2017, five months after this lawsuit was filed, Joan Carlson read and signed a new residency

---

[1] When Ms. Carlson initially moved into the facility, it was known as Emeritus at Santa Rosa, and was owned and operated by Emeritus. SAC ¶ 115. Emeritus merged with Brookdale in 2015. SAC ¶ 118.

3

agreement with Brookdale reflecting Ms. Carlson's move to the memory care section. *Id.*; Dkt. No. 38-1, Ex. D. In that December 2017 agreement, Joan Carlson opted out of the arbitration provision. Dkt. No. 38-1, Ex. D at 9–12. That 2017 agreement also included a provision stating that "[t]his agreement and any written amendments constitute the entire agreement between the parties and supersede all prior and contemporaneous discussions, representations, correspondence, and agreements whether oral or written." *Id.* at 15.

### ii. Discussion

There is no dispute that the 2011 residency agreement with Emeritus contained a valid arbitration clause. Dkt. No. 69 at 4; Dkt. No. 59 at 4–5. However, Plaintiffs contend that both the 2013 residency agreement with Emeritus, which contained no arbitration clause, and the December 2017 residency agreement superseded the 2011 arbitration addendum. Dkt. No. 69 at 4. Defendants contend that the 2013 residency contract cannot terminate the 2011 arbitration addendum because it does not address arbitration at all, and that the 2017 residency agreement governs arbitration only with respect to Ms. Carlson's relocation and stay in the memory care section beginning in December of 2017. Dkt. No. 59 at 5–9. Defendants further contend that the 2017 residency agreement did not retroactively apply to the claims already at issue in this case when it was signed. *Id*.

    a. 2013 Residency Agreement

With respect to the 2013 Residency agreement, Defendants cite to *Huffman v. Hilltop Companies, LLC*, which addressed the issue of an arbitration clause that was not mentioned in the survival clause of the same contract. 747 F.3d 391, 397–98 (6th Cir. 2014). The Sixth Circuit concluded that the nature of the survival clause, along with the "strong presumption in favor of arbitration," led to the conclusion that there was no clear implication that the arbitration clause would expire with the contract. *Id.* at 397–399.

Defendants also cite to *Cione v. Foresters Equity Servs, Inc.*, a California Court of Appeal case in which the plaintiff signed an arbitration agreement as part of a contract with the National Association of Securities Dealers ("NASD"), and subsequently signed an employment contract with a third party. 58 Cal. App. 4th 625, 630–31 (1997). The third-party contract included an

4

integration clause stating that the agreement contained "the entire understanding of the parties hereto with respect to the subject matter contained herein," and that there were "no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to in this Agreement." *Id.* at 631. The court of appeals held that because the integration clause of the third-party contract explicitly applied only to the subject matter it described, and the contract made no mention of arbitration, that contract did not supersede the arbitration agreement in plaintiff's original contract with NASD. *Id.* at 637–638.

Defendants further cite *Ramirez-Baker v. Beazer Homes, Inc.*, an Eastern District of California case in which the plaintiff signed an arbitration agreement as part of an employment application, and subsequently entered into employment contracts that contained integration clauses, but were silent on the issue of arbitration. 636 F. Supp. 2d 1008, 1015–17 (E.D. Cal. 2008). The court found that the later employment contracts did not supersede the original arbitration agreement. *Id.* at 1017.

Plaintiffs contend that California contract law suggests that when parties have contracted to arbitrate, subsequent contracts between the same parties that are silent on the issue of arbitration will supersede the original contract's arbitration agreement. Dkt. No. 69 at 5. Plaintiffs cite three unpublished California Court of Appeals cases in support of this proposition: *Opri v. Birkhead*, No. B203506, 2009 WL 931681 (Cal. Ct. App. Apr. 8, 2009); *Cantu v. Pacesetter Corp.*, No. A106728, 2005 WL 697978 (Cal. Ct. App. Mar. 28, 2005); and *Zarate v. Bruker Nano, Inc.*, No. 2D CIV. B241217, 2013 WL 1247929 (Cal. Ct. App. Mar. 28, 2013). The California Court of Appeals determined in each of these cases that a later contract constituted a novation of a previous contract, thereby extinguishing the arbitration provision in the previous contract.

Based on these cases, Plaintiffs contend that Ms. Carlson's 2013 residency agreement constituted a novation of the 2011 agreement and arbitration addendum, and its silence on the issue of arbitration thereby extinguishes the 2011 arbitration addendum.

The Court is not persuaded. As discussed in detail below, the parties explicitly addressed arbitration in two of the three agreements signed on Ms. Carlson's behalf. Based on those agreements, it is evident that Brookdale had specific procedures for opting out of arbitration

5

within its contracts, and that Ms. Carlson and Joan Carlson were able to understand those procedures. The 2013 residency agreement's silence on the issue of arbitration does not constitute a disavowal sufficient to extinguish the 2011 arbitration provision. Therefore, given the strong presumption in favor of arbitration, the Court finds that the 2013 agreement did not supersede the 2011 arbitration addendum.

### b. 2017 Residency Agreement

The 2017 residency agreement's arbitration provision applies to:

> Any and all claims or controversies arising out of, or in any way relating to, this Agreement or your stay at the Community, excluding any action for eviction, and including disputes regarding interpretation of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties, irrespective of the basis for the duty or the legal theories upon which the claim is asserted

Dkt. No. 38-1 at 10.

Defendants contend that this arbitration provision, from which Ms. Carlson opted out, relates only to Ms. Carlson's stay in the memory care section of the Brookdale Fountaingrove community and not to any events relating to her time at Brookdale prior to the signing of the 2017 agreement. Dkt. No. 59 at 8.

Defendants' position that the 2017 arbitration provision applies exclusively to Ms. Carlson's stay in the memory care section of the community is contrary to the plain language of the provision itself. The arbitration agreement applies to "[a]ny and all claims arising out of, or in any way relating to, this Agreement or your stay at the Community." Dkt. No. 38-1, Ex. D at 10. The same document defines the "Community" as the residential care facility building, without any mention of the memory care section. *Id.* at 1. Therefore, at least from December 18, 2017 forward, Ms. Carlson has opted out of arbitration of claims arising from her stay at Brookdale Fountaingrove.

Defendants also cite to *Lee v. Uber Techs., Inc.* for the proposition that an arbitration opt-out does not retroactively apply to claims that were brought before the opt-out. 208 F. Supp. 3d 886, 893 (N.D. Ill. 2016) (noting that even if plaintiffs had successfully opted out of arbitration in

6

a second contract, "that would have no bearing on the arbitrability of claims they had asserted based on earlier Agreements as to which they had not opted out of arbitration.").

The plain language of the provision is clear. The 2017 arbitration provision applies to "claims . . . whether existing or arising in the future." Dkt. No. 38-1, Ex. D at 10. The claims asserted in this lawsuit certainly existed at the time the 2017 contract was signed, and are therefore subject to the opt-out. Defendants' motion to compel Ms. Carlson to arbitrate her claims is therefore DENIED.

### C. Lawrence Quinlan

#### i. Factual Background

Lawrence Quinlan ("Mr. Quinlan") was admitted to Brookdale Hemet for a "respite stay" on July 14, 2015. SAC ¶ 132. Mr. Quinlan's granddaughter, Loresia Vallette, read and signed Brookdale's residency agreement on Mr. Quinlan's behalf. *Id.* On September 13, 2015, Mr. Quinlan left Hemet for his home, and was re-admitted as a long term resident at Brookdale Hemet on September 13, 2015. SAC ¶ 133. On or around his September 13 move-in, Mr. Quinlan's son, Phillip Quinlan, read and signed a residency agreement on Mr. Quinlan's behalf. *Id*; Dkt. No. 23-3, Ex. 8 at 15. That agreement included an arbitration opt-out clause, which Phillip Quinlan did not execute. Dkt. No. 23-3, Ex. 8 at 11. On the September 2015 agreement, Phillip Quinlan filled in Loresia Vallette's name and contact information under the section titled "Legal Representative/Responsible Party Address." *Id.* Mr. Quinlan granted Phillip Quinlan and Loresia Vallette his power of attorney on January 25, 2016. Dkt. No. 31-4, Ex. A.

#### ii. Discussion

Defendants contend that Mr. Quinlan is bound by the arbitration agreement provision of the September 2015 residency agreement signed by Phillip Quinlan because Phillip Quinlan had apparent authority to act on his father's behalf. Dkt. No. 59 at 11–12. Defendants contend that, in the alternative, Mr. Quinlan is subject to the arbitration provision based on equitable estoppel and direct benefits estoppel.[2] Dkt. No. 59 at 13. Plaintiffs contend that Phillip Quinlan did not hold

---

[2] Defendants also cite "accepting benefits of the contract estoppel" as an "independently sufficient theory," but with no authority cited to define it, the Court finds it to be equivalent to an equitable

7

Mr. Quinlan's power of attorney when he signed the September 13, 2015 residency agreement, and the arbitration agreement is therefore not binding on Mr. Quinlan. Dkt. No. 69 at 9–12.

### a. Apparent Authority

Normally, "apparent agency focuses on whether the principal (either intentionally or by want of ordinary care) caused or allowed a third person to believe the agent possessed authority to act on behalf of the principal, and therefore must be established through the conduct *of the principal* and cannot be created merely by a purported agent's conduct or representations." *Boling v. Pub. Employment Relations Bd.*, 10 Cal. App. 5th 853, 888–89 (Ct. App. 2017), *reh'g denied* (May 1, 2017) (citing Cal. Civ. Code, § 2317) (internal citations omitted, emphasis in original). "[A]n agency cannot be created by the conduct of the agent alone; rather, *conduct by the principal* is essential to create the agency." *Flores v. Evergreen At San Diego, LLC*, 148 Cal. App. 4th 581, 587–88 (2007) (emphasis in original). Notably, apparent agency may also "be premised on inaction by the principal because where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability." *Boling*, 10 Cal. App. 5th at 889 n.46 (internal quotation marks and citations omitted).

Defendants have offered no evidence that Mr. Quinlan, either by his conduct or by his inaction, caused Brookdale to believe Phillip Quinlan was acting as his agent when he executed the 2015 residency agreement. Defendants point only to the first amended complaint, which indicated that Phillip Quinlan was Mr. Quinlan's authorized agent in September of 2015. Dkt. No. 59 at 12. But the later-corrected assumption held by Mr. Quinlan's counsel in 2017 has no bearing on Mr. Quinlan's conduct in 2015 when the agreement was signed.

### b. Estoppel

A "non-signatory to an arbitration agreement may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of the agreement and receives benefits flowing directly from the agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir.

---

estoppel theory.

8

2014). "Equitable estoppel precludes a party from asserting rights 'he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity. In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Larson v. Speetjens*, No. C05-3176 SBA, 2006 WL 2567873, at *4 (N.D. Cal. Sept. 5, 2006), *order clarified,* No. C05-3176 SBA, 2006 WL 3365589 (N.D. Cal. Nov. 17, 2006) (internal quotation marks and citations omitted). One purpose of equitable estoppel in the context of arbitration is "to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of the same agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1129 (9th Cir. 2013) (internal citation omitted).

Defendants contend that several of Plaintiffs' claims rely on the residency agreement, and that Mr. Quinlan should therefore be estopped from abandoning the arbitration provision of that same residency agreement.

"[E]quitable estoppel applies only if the plaintiffs' claims against the nonsignatory are dependent upon, or inextricably bound up with, the obligations imposed by the contract plaintiff has signed with the signatory defendant." *Kramer*, 705 F.3d at 1129. Many of Plaintiffs' claims do not reference or rely solely upon the residency agreements. *See id.* ¶¶ 221–229, 264–277. Other claims do reference the representations made in Brookdale's residency agreements, though none of those claims relies on the residency agreements as valid and enforceable contracts. *See, e.g.*, SAC ¶¶ 134–135, 233, 254. Rather, Plaintiffs' claims reference the residency agreements as the source of allegedly false and/or misleading representations made to class members. *Id.* The rights asserted by Plaintiffs in this lawsuit are not based on the Defendants' contractual obligations under the 2015 residency agreement. Plaintiffs do not seek to enforce the terms of Mr. Quinlan's 2015 residency agreement and have not triggered any estoppel based on their claims. Defendants' motion to compel Mr. Quinlan to arbitrate his claims is therefore DENIED.

### III. MOTION TO DISMISS

#### A. Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A motion to dismiss pursuant to Rule 12(b)(6) may also challenge a complaint's compliance with Federal Rule of Civil Procedure 9(b) where fraud is an essential element of a claim. *See Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). Rule 9(b) provides a heightened pleading standard for such claims: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). These circumstances include the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (quotation omitted); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."). "Rule 9(b) demands that

the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns*, 567 F.3d at 1124.

**B. Standing**

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). To establish individual standing, a named plaintiff must (1) "have suffered an injury in fact,"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks omitted).

Defendants contend that, because the named Plaintiffs have lived in only five of the eighty-nine Brookdale communities in California, Plaintiffs have not suffered any injury traceable to the communities in which Plaintiffs have never resided. Dkt. No. 60 at 6–8. Because none of the Named Plaintiffs allege that they have visited or intend to visit the eighty-four Brookdale communities in which none of them reside, Defendants contend that Plaintiffs cannot establish standing with respect to those other facilities. *Id.* at 7. Defendants do not challenge Named Plaintiffs' standing as to the five facilities in which they have resided.

Plaintiffs rely on *Kirola v. City & County of San Francisco*, which found that the plaintiff class had standing to bring suit under Title II of the ADA even against facilities the named plaintiff had not personally visited.[3] 860 F.3d 1164, 1175–76 (9th Cir. 2017). The Ninth Circuit found that the named plaintiff had demonstrated individual standing to bring her claims because she "encountered an access barrier and either intends to return or is deterred from returning to the facility." *Kirola*, 860 F.3d at 1174.

*Kirola* establishes that "once the named plaintiff demonstrates her individual standing to

---

[3] Although *Kirola* dealt with a challenge under Title II of the ADA, as opposed to the Title III claims brought in this case, the court noted that "despite the titles' different application and different standards for relief on the merits, the answer to the *constitutional question* of what amounts to injury under Article III is the same." *Kirola*, 860 F.3d at 1175 n.3 (9th Cir. 2017).

11

bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Kirola*, 860 F.3d at 1176 (quoting *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015)). The inquiry into facilities other than those in which the Named Plaintiffs have resided is properly subject to class certification analysis. *Id.* Because Defendants have not challenged any elements of Plaintiffs' standing as to the facilities in which they have resided, the Court finds that Plaintiffs have established standing at the pleading stage to allege putative class action claims against all eighty-nine facilities.

### C. Public Accommodations

The ADA prohibits discrimination in places of "public accommodation." 42 U.S.C. § 12182 (a). Places of public accommodation are defined within the ADA to include twelve categories, one of which is "senior citizen center[s]." 42 U.S.C. § 12181(7). The public accommodation categories "should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001) (internal quotation marks omitted).

Defendants contend that Plaintiffs cannot state a claim against the Brookdale facilities under the ADA or the Unruh Act because Brookdale facilities are not "public accommodations," and therefore are not subject to ADA provisions. Dkt. No. 60 at 8–12. Defendants cite to no cases in which facilities like those at issue here, which provide medical services to the elderly in a residential setting, have been exempted from ADA compliance. Defendants acknowledge that Brookdale communities that "offer skilled nursing and other, higher levels of medical care" may be subject to ADA regulations, but suggest that the Brookdale assisted living communities at issue in this case are more similar to private apartment complexes that would not fall under the governance of the ADA. *See* Dkt. No. 60 at 12; Dkt. No. 76 at 3.

Plaintiffs contend that the Brookdale long-term care facilities are "public accommodations" just like the assisted living and skilled nursing facilities at issue in *Hubbard v. Twin Oaks Health & Rehab. Ctr.*, 408 F. Supp. 2d 923 (E.D. Cal. 2004) and *Herriot v. Channing House*, No. C 06-6323JF, 2009 WL 225418 (N.D. Cal. Jan. 29, 2009).

12

Further, Brookdale's own SEC filings note that "[a]ll of our communities are required to comply with the Americans with Disabilities Act, or ADA." Dkt. No. 26-1, Ex. A at 32.[4]

The SAC describes the services offered by the Brookdale facilities:

> Assisted living facilities, also called Residential Care Facilities for the Elderly ("RCFEs"), offer room, board and daily assistance for seniors and persons with disabilities in certain activities of daily living ("ADLs"), such as preparing meals, shopping, transportation, preparing and taking medication, housekeeping, laundry, bathing, toileting, grooming, dressing, and others.

SAC ¶ 27.

The services allegedly provided at the Brookdale facilities place them firmly within the category recognized in *Hubbard* and *Harriot*. The Court agrees with the reasoning of those cases, and therefore finds that the Brookdale assisted living facilities are "public accommodations" subject to the ADA.

### D. Discrimination

Under Title III of the ADA, a valid claim for discrimination includes: "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii).

Defendants contend that Plaintiffs' ADA claims should be stricken to the extent that those claims are based on allegations of understaffing at the Brookdale facilities.[5] Plaintiffs allege that Brookdale's policy and practice of understaffing its assisted living communities leads to staff being "unavailable or unable to assist residents with disabilities with activities of daily living

---

[4] Plaintiffs request the Court take judicial notice of Brookdale's Form 10-K, filed with the SEC on February 15, 2017, as well a motion for clarification filed in *Winans v. Emeritus Corp.*, No. 4:13-cv-03962-HSG (N.D. Cal.). Dkt. No. 72. The Court **GRANTS** the request for judicial notice of the SEC filings, *see Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same). The Court also **GRANTS** the request for judicial notice of the public records from the related case. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). The Court will consider the judicially-noticeable materials to the extent they demonstrate what information was made publicly available by the respective parties.

[5] Defendants do not contest allegations of discrimination based on physical barriers and services denied to disabled residents. *See* SAC ¶¶ 57–58, 212–219; Dkt. No. 60 at 12 n.6.

13

including, *inter alia*, bathing, showering, toileting, transferring, taking medications, dressing, dining, and housekeeping." SAC ¶ 204.

Defendants contend that these allegations do not state a claim for discrimination because the requested modification is the introduction of additional staff, *see* SAC ¶ 205, and additional staffing is not an accommodation for people with disabilities, but a service that "would benefit disabled and non-disabled residents equally." Dkt. No. 60 at 13.

Plaintiffs have sufficiently alleged a claim for discrimination based on the staffing at Brookdale facilities. Plaintiffs allege that those residents who are disabled are unable to receive the benefits of their residence—e.g., "assistance with bathing, dressing, brushing their teeth, toileting, incontinence care, and other hygiene assistance"—without sufficient staffing. SAC ¶ 40. Non-disabled residents do not require staffing to receive these benefits.[6]

### E. Unruh Act Claim

Defendants seek to dismiss Plaintiffs' Unruh Act claim for the same reasons as the underlying ADA claim. Dkt. No. 60 at 14. Because the Court finds that Plaintiffs' ADA claim survives, Plaintiffs' Unruh Act claim likewise survives.

### F. Injunctive Relief

Defendants contend that, based on Judge Conti's previous ruling in *Winans*, this Court cannot rule on Plaintiffs' claims for injunctive relief under the California doctrine of abstention in areas of "complex economic policy." *See Alvarado v. Selma Convalescent Hosp.*, 153 Cal. App. 4th 1292, 1298 (2007). "Under California law, courts may abstain from deciding UCL claims where: (1) they implicate complex economic or policy decisions best handled by the legislature or an administrative agency; or (2) granting injunctive relief would impose an undue burden on the trial court." *Winans by & through Moulton v. Emeritus Corp.*, No. 13-CV-03962-SC, 2014 WL 970177 (N.D. Cal. Mar. 5, 2014), *clarified on denial of reconsideration*, No. 13-CV-03962-SC,

---

[6] Defendants' novel contention that an ADA "accommodation" cannot be a differing level of the primary service that Brookdale provides is wholly unsupported by the Ninth Circuit law on which they rely. *See* Dkt. No. 60 at 13 (citing *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017) and *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1078 (9th Cir. 2004)).

14

2014 WL 2586370 (N.D. Cal. June 9, 2014).

Defendants premise their argument on California law, but unlike the UCL claims at issue in *Winans*, the surviving ADA claims are not subject to this rule of abstention. Therefore, the Court has no basis to abstain from hearing Plaintiffs' equitable claims in this action.

### G. Understaffing Claims

Defendants contend that Plaintiffs Carlson and Schmidt released all claims against Brookdale related to "understaffing" in the earlier *Winans* settlement. Dkt. No. 60 at 18–19. Plaintiffs Carlson and Schmidt released the following claims in the *Winans* settlement:

> [A]ny and all actions, claims, demands, rights, suits, and causes of action of whatever kind or nature against the Released Parties, including damages, costs, expenses, penalties, and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity arising out of or relating to statements, representations, or failures to disclose made prior to May 15, 2015 by the Released Parties regarding the Released Parties' advertising, marketing, promotion, or use of [Defendants' computerized resident evaluation system] in connection with evaluating residents and setting facility staffing, which have been asserted or which could reasonably have been asserted by the Releasing Parties in the Action, including but not limited to claims alleging any type of fraud, misrepresentation, or unfair trade practice under any state or federal law; provided that: (a) Released Claims shall not include any claims for personal injuries, emotional distress or bodily harm; and (b) nothing stated herein shall preclude the Releasing Parties or Class Counsel from enforcing the terms and conditions contained in this Agreement

Case No. 13-CV-03962-SC, Dkt. No. 104, Ex. 1 at 19.

Defendants contend that Ms. Carlson and Mr. Schmidt's fraud allegations relate to pre-May 15, 2015 understaffing, and must therefore be dismissed. Dkt. No. 60 at 19. Defendants concede that claims based on "wrongful conduct after the settlement date" are not precluded by the *Winans* settlement. Dkt. No. 76 at 11.

The SAC clearly states that each claim is claim "limited to circumstances and facts occurring on or after May 16, 2015." SAC ¶¶ 211 (ADA), 228 (Unruh), 250 (CLRA claim), 262 (Cal. Welf. & Inst. Code), 276 (Cal. Bus & Prof. Code). The SAC could not be more clear that its claims fall outside the scope of the *Winans* release. Plaintiffs Carlson and Schmidt's claims are not subject to dismissal on that basis.

### H. CLRA & UCL Claims

#### i. Reliance

Defendants contend that Plaintiffs' UCL and CLRA claims rely on alleged misrepresentations that the Named Plaintiffs never actually saw or relied upon before deciding to live at Brookdale facilities. Dkt. No. 60 at 20. Defendants acknowledge that Plaintiffs have alleged that they "saw and relied on statements made by Brookdale in agreements that they signed once they already had decided to join a Brookdale community," but contend that any statements in these agreements, which include initial residency agreements, *see*, e.g., SAC ¶¶ 106, 115, 133, 139, 162, 171, "could not have influenced [Plaintiffs'] decision to contract with Brookdale. Dkt. No. 60 at 20.

Defendants assume that Plaintiffs decision to join a Brookdale community could not have been premised on the representations found in the residency agreements that they read and signed. But Plaintiffs allege that they did rely on the statements found in those residency agreements. *See*, e.g., SAC ¶¶ 107, 116, 135, 139, 164, 172. Those allegations are facially plausible, and there is no basis for dismissal.

#### ii. Rule 9(b)

Defendants further contend that Plaintiffs have failed to meet the heightened pleading standard of Rule 9(b) when pleading the falsity of the alleged misrepresentations. Dkt. No. 60 at 20.

Because Plaintiffs' CLRA and UCL claims are grounded in fraud, the complaint FAC "must satisfy the traditional plausibility standard of Rules 8(a) and 12(b)(6), as well as the heightened pleading requirements of Rule 9(b) . . . . To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (internal citations and quotation marks omitted).

Defendants contend that statements other than those made in the residency agreements are not pled with sufficient particularity under Rule 9(b). Dkt. No. 60 at 20–21. Defendants do not

16

claim that the allegedly false and/or misleading statements in Brookdale's residency agreements are not adequately pled under Rule 9(b). *Id.*

Plaintiffs have adequately pled misrepresentation in these residency agreements by alleging that the services promised in the residency agreements were not provided to Plaintiffs after the agreements were executed. *See*, *e.g.*, SAC ¶¶ 106–107, 115–116, 133–135, 139, 162–164, 171–172. Plaintiffs have additionally identified specific false and/or misleading statements outside the residency agreements. *See, e.g., id.* ¶ 177. Plaintiffs' claims are therefore not subject to dismissal for failure to meet the Rule 9(b) pleading standard.

### iii. Retaliation Claims

Defendants also contend that the "retaliation" and "interference" allegations in the SAC do not violate Cal. Health & Safety Code § 1569 because: (1) they allege retaliation as a result of this lawsuit, and not as a result of participation in a resident council; (2) the statute requires only that space be provided for postings, and the allegations do not claim that space was not provided; (3) the SAC acknowledges that Defendants responded to Plaintiffs' inquiries within the time period described in the statute; and (4) Plaintiffs do not allege economic loss as a result of the retaliation.

The relevant code section states:

> A facility shall not willfully interfere with the formation, maintenance, or promotion of a resident council, or its participation in the regulatory inspection process. For the purposes of this subdivision, willful interference shall include, but not be limited to, discrimination or retaliation in any way against an individual as a result of his or her participation in a resident council, refusal to publicize resident council meetings or provide appropriate space for either meetings or a bulletin board, or failure to respond to written requests by the resident council in a timely manner.

Cal. Health & Safety Code § 1569.157(g).

Plaintiffs have not alleged that any retaliation suffered by Plaintiffs was "as a result of his or her participation in a resident council." *See* SAC ¶¶ 63–70. Therefore, Defendants' motion to dismiss Plaintiffs' claims under Cal. Health & Safety Code § 1569 is GRANTED except with respect to the letters sent by Ms. Jestrebek-Hart. *See* SAC ¶ 70; Dkt. No. 60 at 21 n.11.

### I. Helen Carlson's Post-2017 Claims

Defendants contend that Ms. Carlson cannot assert claims based on alleged

misrepresentations made in the residency agreement Joan Carlson signed on her behalf in December 2017. Dkt. No. 60 at 22–24. Defendants contend that Ms. Carlson, a party to this lawsuit, knew that the services represented in that December 2017 agreement were not being provided, and therefore could not have been misled. Dkt. No. 60 at 22–24; SAC ¶¶ 122–131.

Defendants cite to *Prohias v. Pfizer*, *Heindel v. Pfizer*, and *Red v. Kraft Food Inc.* for the proposition that a plaintiff who is aware of a misrepresentation but continues to purchase the allegedly misrepresented product loses the ability to state a claim for misrepresentation. *See* Dkt. No. 60 at 23 (citing *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004); *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW AGRX, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011)).

In *Prohias* and *Heindel*, the Florida and New Jersey District Courts terminated the claims of plaintiffs who alleged that they paid an inflated price for a drug based on advertising misrepresentations. *Prohias*, 485 F. Supp. 2d at 1334–39; *Heindel*, 381 F. Supp. 2d at 379–380. Those courts found that, because the plaintiffs continued to purchase the drug after they understood the advertising to be false, those plaintiffs could not demonstrate claims for an injury or loss based on that advertising. *Id.* The *Red* court denied a motion for class certification partially based upon the typicality implications of a proposed class representative's continued purchasing of a product after suing based on advertising misrepresentations. *Red*, 2011 WL 4599833 at *12.

Plaintiffs contend that under *Davidson v. Kimberly-Clark Corp*, "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future," and Ms. Carlson's claims survive despite her knowledge of this suit at the time of the December 2017 residency agreement. *Davidson*, 889 F.3d at 969.

Under *Davidson*, the allegations in the complaint that Ms. Carlson was still deceived by the alleged misrepresentations in the 2017 agreement are plausible. The misrepresentations alleged here are different from those in *Prohias, Heindel,* or *Red*, each of which involved representations whose accuracy could not have changed at any relevant point. Here, it is plausible that Defendants, faced with a lawsuit alleging misrepresentation in their contracts, would

18

subsequently alter the services that they provided in the future. The allegations in the SAC, read in the light most favorable to Plaintiffs, plausibly allege deception based on the 2017 agreement.

### J. Conclusion

Defendants' motion to dismiss is **GRANTED** with **LEAVE TO AMEND** as to Plaintiffs' retaliation claims, except with respect to the letters sent by Ms. Jestrebek-Hart. Defendants' motion to dismiss is otherwise **DENIED**.

## IV. MOTION TO STRIKE

Defendants move to strike each of Plaintiffs' class allegations from the SAC.

### A. Legal Standard

Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[7] An affirmative defense is insufficiently pled if it fails to give the opposing party "fair notice" of the nature of the defense. *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979). In moving to strike, a party seeks "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). In ruling on a motion to strike, a "court[] may not resolve disputed and substantial factual or legal issue[s]." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted) (second brackets in original). "If a defense is struck, in the absence of prejudice to the opposing party, leave to amend should be freely given." *Joe Hand Promotions, Inc. v. Davis*, No. C 11-6166 CW, 2012 WL 4803923, at *2 (N.D. Cal. Oct. 9, 2012) (citing *Wyshak*, 607 F.2d at 826) (internal quotation marks and brackets omitted).

### B. Discussion

In the words of Judge Conti: "Class allegations typically are tested on a motion for class

---

[7] This Court "joins the robust and growing ranks of district courts that have lamented the time and expense squandered on Rule 12(f) motions," *see Inn S.F. Enter., Inc. v. Ninth Street Lodging, LLC*, No. 3:16-cv-00599-JD, 2016 WL 8469189, at *1 (N.D. Cal. Dec. 19, 2016) (citing cases), and agrees that motions to strike "serve little useful purpose in modern federal practice, and are often wielded mainly to cause delay and inflict needless burdens on opposing parties," *id.* (citation omitted).

certification, not at the pleading stage. However, sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *Winans*, 2014 WL 970177, at *10 (internal quotation marks and citations omitted).

Defendants contend that Plaintiffs cannot satisfy the typicality or adequacy requirements of Rule 23(a) due to unmanageability, lack of standing, release under the *Winans* settlement, and individualized factual issues related to the facilities and communities at issue and the circumstances of each Plaintiff's payment. Dkt. No. 61 at 2. Many of these arguments have been made simultaneously in Defendants' motion to dismiss, and the Court will not discuss them further here. Each of these contentions raises factual issues that the Court cannot decide at the pleading stage. "Moreover, to the extent that Defendant's argument has merit, the Court need not deny class certification altogether. Instead, it could potentially certify a narrower class than the one proposed by Plaintiff. Whether or not this is feasible or necessary is a question for another day." *Winans*, 2014 WL 970177, at *10–11.

The Court therefore **DENIES** Defendants' motion to strike.

## V. CONCLUSION

The Court **DENIES** Defendants' motion to compel arbitration and motion to strike in their entirety. The Court **GRANTS** Defendants' motion to dismiss with **LEAVE TO AMEND** as to Plaintiffs' retaliation claims, except with respect to the letters sent by Ms. Jestrebek-Hart. Any amended complaint must be filed within 21 days of the date of this order. The Court **SETS** a further case management conference on February 12, 2019 at 2:00 p.m. The parties shall meet and confer and submit a joint case management statement by February 5, 2019. The joint statement should include a proposed case schedule through trial.

**IT IS SO ORDERED.**

Dated: 1/25/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge

20