Guy B. Wallace, State Bar No. 176151
Mark T. Johnson, State Bar No. 76904
Travis C. Close, State Bar No. 308673
Rachel L. Steyer, State Bar No. 330064
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA  94608
Telephone: (415) 421-7100
Facsimile:  (415) 421-7105
Email: gwallace@schneiderwallace.com
          mjohnson@schneiderwallace.com
          tclose@schneiderwallace.com
          rsteyer@schneiderwallace.com

Kathryn A. Stebner, State Bar No. 121088
Brian S. Umpierre, State Bar No. 236399
**STEBNER & ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, CA 94102
Telephone:  (415) 362-9800
Facsimile:  (415) 362-9801
Email: kathryn@stebnerassociates.com
          brian@stebnerassociates.com

Gay Crosthwait Grunfeld, State Bar No. 121944
Benjamin Bien-Kahn, State Bar No. 267933
Jenny S. Yelin, State Bar No. 273601
Amy Xu, State Bar No. 330707
**ROSEN BIEN GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, CA  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email: ggrunfeld@rbgg.com
          bbien-kahn@rbgg.com
          jyelin@rbgg.com
          axu@rbgg.com

David T. Marks (pro hac vice)
Jacques G. Balette (pro hac vice)
Jason N. Young (pro hac vice)
**MARKS, BALETTE, GIESSEL & YOUNG, P.L.L.C.**
7521 Westview Drive
Houston, TX 77055
Telephone: (713) 681-3070
Facsimile:  (713) 681-2811
Email:    davidm@marksfirm.com
            jacquesb@marksfirm.com
            jasony@marksfirm.com

Attorneys for Plaintiffs and the Proposed Classes

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STACIA STINER, et al., on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>BROOKDALE SENIOR LIVING, INC.; BROOKDALE SENIOR LIVING COMMUNITIES, INC.; et al.,<br><br>            Defendants. | Case No. 4:17-cv-03962-HSG (LB)<br><br>**DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:      May 26, 2022<br>Time:     2:00 p.m.<br>Place:    Courtroom 2<br>Judge     Hon. Haywood S. Gilliam, Jr. |

# <u>DECLARATION OF CRISTINA FLORES</u>

1. I, Cristina Flores, Ph.D., R.N., declare as follows:

2. I am familiar with the matters stated in this declaration. Unless otherwise stated, the matters contained herein are based upon my personal knowledge, which is derived from a review of the materials identified within this declaration and my education, experience, and training discussed below.  If called and sworn as a witness, I can and will testify competently thereto.

3. This declaration contains 16 sections.  A list of these sections and the corresponding pages number are set forth in the Table of Contents that follows.

I. Introduction ....................................................................... 2

II. Qualifications....................................................................... 4

III. Brookdale's California Facilities Are Required to Provide. 7 Sufficient Numbers of Staff to Meet the Needs of Residents

IV. Does a Reliable and Generally-Accepted Methodology ..... 8 Exist That Can Mathematically Determine the Minimal Amount of Staffing Hours Required By Residents in RCFEs?

V. Overview:  The Basis for Findings and Opinions ............... 9

VI. Brookdale Policy and Practice Documents ....................... 10

VII. Brookdale Deposition Testimony...................................... 11

VIII. Brookdale Facility-Specific Data ..................................... 12

IX. Summaries of Voluminous Facility-Specific Raw Data.... 15 for Brookdale's California Facilities

X. Simple Math Analysis of Six Brookdale Facilities ........... 19

XI. Brookdale Simple Math Results and Opinions.................. 31

XII. Ultra-Conservative Nature of Brookdale Simple Math..... 33 Analysis

XIII. Is Brookdale's Staffing Methodology Defective?............. 36

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

XIV.  Were Residents of Brookdale's California Facilities ........ 40

Impaired and Vulnerable?

XV.  To What Extent Did Residents of Brookdale's ................ 40

California Facilities (Not Subject to Arbitration Agreements)

Have Disabilities?

XVI.  Do Deficiencies Issued by the California .......................... 46

Department of Social Services' Community Care Licensing

(CCL) Division Provide Findings Relevant to the Staffing of

Brookdale's California Facilities?

## I.  <u>Introduction</u>

4.  I was engaged in this case[1] to review: (1) Brookdale's staffing methodology, (2) its task time standards/norms used within its staffing methodology (including time studies), (3) the care needs documented by Brookdale in residents' assessments, (4) the amount of staff time required to deliver these care services, and (5) the amount and number of staff at Brookdale available to provide these care services to residents.

5.  More specifically, I was asked to answer the following questions:

a.  Does a reliable and generally-accepted methodology exist that can mathematically determine the minimal amount of staffing hours required to provide care services needed by residents in assisted living facilities/RCFEs?

b.  Does the data and information described below provide a sufficient basis to apply that methodology and form an opinion, based on a

---

[1] It is my understanding that Plaintiffs are asserting claims with respect to staffing and related issues concerning 90 Residential Care Facilities for the Elderly ("RCFE") facilities (*see* Brookdale's Supplemental Responses to Plaintiff Helen Carlson's Interrogatories, Response to RFP #1) owned, operated, or managed by Brookdale Senior Living, Inc. and Brookdale Senior Living Communities, Inc. during all or part of the class period (May 16, 2015 to present), collectively referred to as "Brookdale" or "Brookdale's California facilities."

reasonable degree of nursing certainty, about (1) the amount of staff time required to deliver the care services documented by Brookdale in resident assessments and (2) the sufficiency of the actual numbers of staff and available staff time to meet the documented care needs of residents?

c.    How much staff time was required to provide Brookdale residents assistance with needed basic activities of daily living (ADLs), as documented by Brookdale in its resident assessments, including escorting/mobility, assistance to bathroom, grooming, dressing, and eating/dining?

d.    How much staff time was required to provide Brookdale residents assistance with other care services documented in resident assessments, including medication management, dementia and/or behavioral management, and other support services?

e.    Was it mathematically and realistically possible for Brookdale staff to provide the care services required by residents based on their assessments and the amount of staffing hours allotted by Brookdale to provide these services?

f.    If there was a staffing shortfall, what was the gap between the amount of care time *required[2] per day* versus the amount of time actually *available per day* to staff to deliver care?

g.    Does Brookdale's staffing methodology provide sufficient staffing to meet the needs of residents as documented in their assessments?

h.    Does Brookdale's staffing methodology (policies and procedures) ensure that its staffing is based on and adjusted to the number of residents and the care they need, as required by California law (22 CCR § 87411)?

---

[2] When used in this declaration, "required" refers to those services that Brookdale documented in its assessments as being needed by residents.

i.   Did Brookdale's staffing methodology (policies and procedures) place residents at substantial and routine risk for understaffing and of not receiving services that they required?

j.   Are the residents at Brookdale's California facilities elderly and physically and/or mentally impaired?

k.   To what extent did residents of Brookdale's California facilities who did not enter into arbitration agreements have disabilities?

l.   Do deficiencies issued by the California Department of Social Services' Community Care Licensing (CCL) Division provide findings relevant to the staffing of Brookdale's California Facilities?

6.   This declaration describes my analysis undertaken to date based on the documents and information presently available in connection with the above-referenced lawsuit asserted against Brookdale.

## II.   <u>Qualifications</u>

7.   **<u>Educational Background</u>**: I am a licensed Registered Nurse in the State of California. I have been a Registered Nurse for 32 years. In 1996, I received my Bachelor of Sciences in Nursing from California State Dominguez Hills, California. In 2003, I received my Masters in Gerontology--Long Term Care Administration from San Francisco State University, California, and in 2007, I received my Ph.D. in Nursing Health Policy from University of California, San Francisco. My education has focused on nursing and gerontology, specifically with respect to the care of individuals in Residential Care Facilities for the Elderly ("RCFE") which are also commonly called assisted living facilities (ALF) and memory care facilities.[3]

8.   **<u>Assisted Living Experience</u>**: Between 1993 and 1996, as a clinical nurse case manager with UCSF – Mount Zion, Home Care, I worked inside of a

---

[3] *See* my *curriculum vitae* that sets forth my qualifications, FLORES0001, and my prior deposition and trial testimony, FLORES0002.

1   number of RCFEs (assisted living facilities) in California where I was responsible

2   for resident assessments, evaluations, care management, skilled nursing care,

3   treatments, and staff and patient education.

4       9.      Since 1996, I have been certified as an RCFE Administrator in

5   California.  For over 23 years, I owned and operated three 6-bed RCFEs.  During

6   this 23-year period, the elderly individuals residing at my facilities were

7   comparable to the residents of Brookdale's Assisted Living (AL) or Memory Care

8   (MC) units, with similar ages, diagnostic profiles, acuity, and care services needed.

9       10.     Additionally, from 2012 to 2014, I served as Chief Programing Officer

10  and the Chief Operating Officer for the AgeSong chain which owned and operated

11  4 assisted living facilities, ranging in size from 50 to 100 beds.  My responsibilities

12  included all aspects of the operations of these facilities.

13      11.     **Knowledge of Assisted Living Regulations:**  As a Certified RCFE

14  Administrator, I am aware of the regulations that govern RCFEs (assisted living

15  facilities) in California and the standard of care recognized by assisted living/RCFE

16  licensees and administrators. The same regulations and standards apply to all

17  licensed RCFE facilities (including the Brookdale assisted living facilities that are

18  the subject of this declaration). All RCFEs in California are required to comply with

19  the regulations and standards prescribed by California Health and Safety Code

20  (HSC) section 1569, and by Title 22 of the California Code of Regulations (22 Cal.

21  Code Reg.), Division 6, Chapter 8. I am very familiar with these regulations and the

22  standards they establish.

23      12.     **Teaching Experience**:  Since 2003, I have been the Long-Term Care

24  Administration Coordinator at San Francisco State University. From 2001 to 2017, I

25  was responsible for teaching the Assisted Living/RCFE Administrator certification

26  courses that are required for every administrator of an RCFE in California as part of

27  the licensure process. I am also a vendor approved by the State of California to

28  teach continuing education classes regarding RCFE and nursing subjects.

Additionally, since 2007, I have been an Assistant Adjunct Professor at the University of California, San Francisco, in the Department of Social and Behavioral Sciences, School of Nursing.

13. **Grant-Supported Assisted Living Research:** As a result of my work in the assisted living field, I have been provided numerous research grants to study assisted living facilities in California. My research includes the study of 340 assisted living facilities in California supported by grants from the California Health Care Foundation and the Agency for Healthcare Research and Quality.

14. I have extensive education and experience regarding:

a. The operations of assisted living facilities,

b. The types of resident services provided in assisted living and long-term care facilities,

c. How these services are properly provided,

d. Measuring the amount of time required to provide care and services (time and motion studies),

e. The amount of time required to provide these services to residents,

f. Determining the amount of staff needed to deliver care and services to residents,

g. The process of assessing the care and service needs of residents,

h. How assessments, care and services are documented,

i. Teaching and training staff how to provide resident care and services,

j. The laws and regulations applicable to assisted living facilities/RCFEs,

k. Managing staff's delivery of care and services,

l. Scheduling staff,

m. Prioritizing staff workflow,

n.   How much care time that staff actually have on each shift—how breaks and non-service-related tasks that staff members in assisted living facilities are required to perform each shift impact available care time, and

o.   The amount of time required to perform these non-service-related tasks.

15.   Based on my education, training and experience, I am qualified to render an opinion and answer the questions set forth above.

16.   Further, by reason of my education and experience, I am qualified to render an opinion regarding the consequences to the health, safety, and welfare of elderly residents caused by the repeated failures of an assisted living facility to provide sufficient staff to deliver needed care and services.

### III.   Brookdale's California Facilities Are Required to Provide Sufficient Numbers of Staff to Meet the Needs of Residents

17.   In California, Residential Care Facilities for the Elderly (RCFEs) such as the ones operated by Brookdale in this case are governed by Title 22, Division 6, Chapter 8 of the California Code of Regulations, starting at 22 CCR § 80000, *et seq*. Article 7 of that Chapter discusses the personnel requirements of California law. Specifically, 22 CCR § § 87411 requires that "Facility personnel shall at all times be sufficient in numbers, and competent to provide the services necessary to meet resident needs."  For each of their residents, RCFEs are required to prepare a written record of their care needs. 22 CCR §§ 87467.  The care needs and service assessment required includes an evaluation of each resident's functional capabilities, mental condition, and an evaluation of specified social factors. 22 CCR § 87457. Further, all RCFEs are required to keep each resident's needs and service assessment accurate throughout their residency and to update it in writing as frequently as necessary to note significant changes. 22 CCR § 87463. These regulations applied to Brookdale and its California facilities.

18.     In order to ensure that its facilities have enough staff to meet the needs of the residents, Brookdale must employ a reasonable method to determine the staff time required to provide promised care services to its residents. It is widely-known in the field of assisted living and long-term care that a failure to correctly determine and set staffing levels can place residents at a substantial risk for not receiving needed care. When the labor time required is greater than the labor time available, care is delayed or omitted. Because there is, in fact, a limit to how much work a staff member can perform in a set timeframe, ensuring that there are sufficient numbers of staff on duty to deliver all care services required by frail, elderly, and/or disabled residents is critical to meeting the care needs of these residents and for the proper and safe operation of RCFEs in California.

## IV.   Does a Reliable and Generally-Accepted Methodology Exist That Can Mathematically Determine the Minimal Amount of Staffing Hours Required By Residents in RCFEs?

19.     Two separate and independent methodologies can mathematically determine the minimal amount of staffing hours required to deliver the care needed by residents in RCFEs. These 2 methodologies (described below) are generally-accepted and used by the assisted living industry and industrial engineers to quantitatively measure the amount of staff required to deliver needed care:

a.     *Simple Math Analysis:* This methodology mathematically calculates the labor time required each day to deliver all required line-item services to residents and compares this to the actual labor time available each day, and/or

b.     *Discrete Event Simulation (DES) Testing and Failure Analysis:* This methodology uses industrial engineering technology and computer software to model and compute the labor time required and the most work that labor force can possibly deliver based on the actual labor time available each day.

20.     While both methodologies quantitatively determine if Brookdale workers had enough labor time to deliver required care services to residents, the second methodology—industrial engineering *DES testing and failure analysis*—provides a much more accurate and scientifically-robust analysis of required staffing hours.

21.     The first methodology—*simple math analysis*—provides a quick way to initially measure if staffing levels are minimally sufficient to meet the care needs of residents. This approach (which is applied to 6 Brookdale facilities and illustrated herein) provides a blunt and ultra-conservative measure of the capacity of Brookdale's staff to meet resident care needs. The second methodology—industrial engineering *DES testing and failure analysis*—takes into account many time-consuming staff activities (discussed below) that are not accounted for in the simple math analysis. Accordingly, the simple math analysis is an approach that: (a) provides an extremely conservative measurement of required staffing hours; and (b) can be applied to initially test and quantify the amount of staffing shortfall, if any, occurring in each of Brookdale's California facilities.

**V.     Overview: The Basis for Findings and Opinions**

22.     The simple math analysis described in this declaration, as well as the findings and opinions expressed herein, are based upon the following records that can be organized into 4 categories of information:[4]

        a.     Brookdale Policy and Practice Documents,

        b.     Brookdale Deposition Testimony,

        c.     Brookdale Facility-Specific Raw Data, and

        d.     Summaries of Voluminous Brookdale-Specific Raw Data.

These categories of information are more specifically described below.

---

[4] Additionally, Plaintiffs' counsel provided me a list of Brookdale California residents who did not sign arbitration agreements.

## VI.   **Brookdale Policy and Practice Documents**

23.   I was provided and reviewed the following Brookdale Policy and Practice Documents related to Brookdale's resident assessment process, task times and frequencies, staffing, job descriptions, and resident contracts, including:

a.   Brookdale's Personal Service Assessment and Personal Service Plan Interpretive Guidelines, dated July 2018, ███████████████ ██████████████████████ (BKD0005133-5158);

b.   Brookdale's "Using the Personal Service System (PSS) Online—Quick Reference Guide" (BKD0005118-5131);

c.   Sample of completed Brookdale PSA/PSP Q&A Assessment form (used for prospective assisted living residents) that lists the services to be provided to residents for a fee (BKD1152669);

d.   Brookdale Acuity Minutes Norms spreadsheet (including both AL and MC information), █████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████ (BKD2874663);

e.   Brookdale Clinical Time Studies spreadsheets ███████████ ██████████████████████████ (BKD2886744 and BKD2886745);

f.   Brookdale's "Deep Dive Follow-Up Review of Current RSW[5] Time Standards" document dated October 18, 2011, ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ (BKD2882807);

_____

[5] According to this Brookdale Deep Dive Follow-Up document, ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████" (BKD2882807, page 1).

g.    Brookdale's community-specific spreadsheets that show how ████████████████████████████████████████████ ████████ that generally result in less staff time being available to provide line-item services (BKD2874670 though BKD2874674);

h.    Brookdale's Service Alignment (SA) QRG: Resident Services Summary Report for the Clinical Department ███████████████████ ████████████████████████████████████████████ (BKD1152619);

i.    All Brookdale job descriptions including those job titles who have primary responsibility for providing the line-item care services identified through the Personal Service Assessment (███████████ ████████████████████████ starting 01_BKD0023691 and ending 136_BKD0203521, █████████████████████████████); and

j.    Sample Maximum Daily Staffing for Clinical Department Report (BKD2517693).

## VII.    **Brookdale Deposition Testimony**

24.    I was also provided and reviewed the following Brookdale deposition testimony relating to Brookdale's staffing methodology, task time studies, and other issues germane to this case:

a.    The 30(b)(6) depositions of Brookdale's representative Audrey Withers, Senior Human Resources Business Partner, and Kevin Bowman, the Division Vice President of Operations, West Division—the person with the most knowledge of Brookdale's staffing methodology, and task time studies; and

b.    The depositions of Brookdale Director of Operations Jeffrey J. Toomer, District Director of Operation Rhonda Dolcater, and Brookdale Senior Vice President of Operations Sheila Garner, and the depositions of various Brookdale facility Executive Directors—including Anna Reddy,

Ferdinand Augustus Buot, Jr., Kimia Ataeian, Marie Harris, and Theresa Ward.

## VIII. Brookdale Facility-Specific Data

25.     Additionally, I was provided and reviewed the following Brookdale facility-specific data:  (a) Raw Resident Assessment Data, (b) Raw Resident Move-Out Data, (c) Raw Punch Detail Staffing Data, (d) Raw Job Title Lookup Tables, (e) Raw Labor Detail Report Data, and (f) Raw Resident Pendant Data, described below.[6]

a.     Raw Resident Assessment Data:  I reviewed the raw resident *assessment* data that was produced by Brookdale (in .csv format) in this case for residents who lived at Brookdale's California facilities during the class period. An examination of this raw resident *assessment* data reveals



iv.

v.

vi.

vii.

viii.

---

[6] Additionally, I have reviewed the floorplans for the Brookdale California facilities analyzed and discussed below.

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

ix. ████████.

Within this raw *assessment* data, each row contains a ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ *See*

BKD1299857 though BKD1299846.

b. <u>Raw Resident Move-Out Data</u>:  I also reviewed the raw resident *move-out* data showing if and when a resident moved-out of a Brookdale California facility (*see* BKD1820457). Using the PSA date (the date on which the assessment became active—discussed above) from the raw resident assessment data and the associated move-out date, if any, for a resident identification number, the total number of residents in a facility on any calendar day can be determined (census). For example, if a facility has 85 active resident assessments on January 14, 2016, the census on that day is 85. Based on the type of assessment (Assisted Living (AL) and the Memory Care (MC)), the PSA dates, and move-out dates provided by Brookdale for each resident identification number, the daily census for the entire facility, as well as the daily census for AL and MC, can be calculated.

c. <u>Raw Census Data</u>:  Brookdale produced Labor Detail Reports that showed the daily total census (count of residents) in its facilities.  *See* BKD2874675  through  BKD2874760_Confidential. ████████

███████████████████████████████████████

██████████████████████████████████████████. As described below, the total resident census per day, as well as the specific census levels on the assisted living unit and the memory care units, could be derived from a daily count of active resident assessments (based on move-in/move out data).[7]

      d.   <u>Raw Punch Detail Staffing Data</u>: Brookdale also produced, and I reviewed the raw, daily *punch detail staffing* data for Brookdale's California facilities, ██████████████████████████ ███████████████████████████ (*see* BKD1384958 through BKD1384975_Confidential). More specifically, this staffing data includes the following:

      i.   ████████████████████████████ ██████████████████

      ii.   ██████████████████████████ ████████████████████████

      iii.   ██████████████████████

      iv.   ████████████████████████ ██████████

      v.   ████████████████████████ ████████

      e.   <u>Raw Job Title Lookup Tables</u>: I was provided and reviewed lookup tables that contain ███████████████████ ███████████████████████████████ ██████████████████████ (*see* BKD1384976_Confidential). Although Brookdale did not produce the identities of the employees in the raw punch detail staffing data, it did provide this lookup table that allows █

---

[7] *See* discussion of census based on active resident assessments and census from Labor Detail Reports in paragraphs 41-44 below.

1 ███████████████████████████████████████████

2 ████████████████████████████████████

3       f.    <u>Raw Labor Detail Report Data</u>:  I was provided and reviewed

4 the raw *Labor Detail Report* data for Brookdale's California facilities that

5 identifies █████████████████████████████████████████

6 ██████████████████████████████████████████ (*see*

7 BKD2874675 through BKD2874760_Confidential).

8       g.    <u>Raw Resident Pendant Data</u>:  Additionally, I was provided and

9 reviewed raw resident pendant data produced by Brookdale and third-parties

10 (in response to subpoena) that details █████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████ (including BKD2882113-23, BKD2886780-

13 86, BKD2937371-73).[8]

14     26.    **Routine Business Records and Objectively Verifiable Facts**: The

15 above-referenced Brookdale documents and raw data are of the kind and type kept

16 by assisted living facilities in the normal course of business in California and other

17 states, and they contain the information needed to allow me to determine

18 mathematically the amount of staff *required* on a daily basis, the amount of staff

19 *available*, and any gap between the two, and also to determine if Brookdale

20 residents were at significant risk of not receiving documented and required care

21 services.

    **IX.**    **<u>Summaries of Voluminous Facility-Specific Raw Data</u>**
    **<u>for Brookdale's California Facilities</u>**

24     27.    The line-item raw resident *assessment data* produced by Brookdale for

25 all residents in Brookdale's California facilities contained hundreds of millions of

26 cells of data (it exceeds 290 GBs). Further, the raw daily *punch detail staffing data*

---

[8] It is my understanding that, although Plaintiffs requested pendants for all Brookdale's California facilities, complete pendant data was not provided.

produced by Brookdale contained over 150 million cells of data (totaling 2.38 GBs).

28.     Due to the voluminous nature of this raw assessment and staffing data, I directed that a database be constructed by Data Analytics' database specialist, William Blake Peters, to summarize the line-item care services and staffing hours on a per day basis. This database allowed us to compile and link the assessment and staffing data together on a per day basis and to perform thousands of simple math calculations, computing (a) the total number of each type of line-item service required by the patient population at each facility on a daily basis, (b) the total amount of staff time *required* to provide these line-item services, (c) the amount of staff time *available* to provide these line-item services, and (d) the daily gap, if any, between the amount of care time *required* versus the amount of time actually *available* to staff.

29.     Additionally, I directed and supervised Mr. Peters in creating summaries of voluminous data that include the following:

> a.      *Analysis of Line-Item Care Services Counts Per Day*:  The average daily count of line-item services, as well as the average percent of the total count of line-item care services per facility, based on assessment data and task frequencies (Daily Average Count of Line-Item Services, FLORES0003);
>
> b.      *Analysis of Required Time*:  Daily hours *required* to provide all line-item services to residents, based on assessment data, task times, and frequencies by Care Managers, Med Techs, Care Directors, and/or Licensed Nurses and by unit (AL, MC, and the entire facility) (Simple Math Analysis, FLORES0004);[9]

---

[9] This summary of voluminous data is described in more detail below in paragraphs 35 through 40.

c.      *Analysis of Available Time With Reductions for 10-Minute Breaks*:  Total hours of daily labor time *available*[10] after reductions were made for 10-minute staff breaks from the raw punch detail staffing data time, including daily summaries of the number of hours worked by Care Managers, Med Techs, Licensed Nurses, and Care Directors and by unit (AL, MC, and the entire facility) (*see* Simple Math Analysis, FLORES0004);[11]

d.      *Analysis of Required Versus Available Time:* Comparisons of the labor *hours required* per day by staff to deliver care documented in resident assessments versus the labor *hours available* to staff per day to deliver this care and the delta between the two (*see* Simple Math Analysis, FLORES0004);

e.      *Percent of Staffing Hours by Job Group* (*see* Staffing Hours by Job Group, FLORES0005);

f.      *Analysis of Labor Detail Report:*  Comparison of the actual staff hours per day at each of Brookdale's California facilities (according to Brookdale's Labor Detail Report) versus benchmark hours per day and counts of the days when the actual hours available at Brookdale's facilities were *less than* the benchmark hours (*see* Labor Detail Report Analysis, FLORES0006);

---

[10] *Available* hours per day means the amount of time staff has available to provide line-item services documented in resident assessments after staff activities that reduce available care hours have been deducted. Staff activities that reduce available care hours are discussed in more detail below.

[11] It should be noted that Brookdale's punch detail staffing data contained punch-in and punch-out times for meal breaks. Accordingly, for purposes of calculating work time available to staff, the time that staff spent on meal breaks was accounted for in these punch detail staffing records. However, since Brookdale staff did not punch-out for their paid 10-minute breaks, these 10-minute breaks were deducted from available work time in the simple math staffing analysis.

g.     *Analysis of Resident Census Data*: Comparison of the Labor Detail Report census numbers to the census numbers derived from active resident assessments (*see* Census Analysis, FLORES0007);

h.     *Analysis of Resident Diagnoses and Quantity of Line-Item Services Required Per Day* (*see* Resident Diagnoses and Line-Item Services Analysis, FLORES0008); and

i.     *Disability Profiles for Brookdale Residents* who did not sign arbitration agreements (*see* Disability Profile Analysis, FLORES0009).

30.     <u>Quality Assurance Review of All Summaries of Voluminous Records</u>: The summaries of voluminous raw data described herein were compiled in accordance with my directions and under my supervision by Mr. Peters, Data Analytics. I have worked with Mr. Peters on several projects. As in prior projects, I provided instructions to Mr. Peters with respect to the analysis of the raw Brookdale data and the specific formatting of the summarized data[12]—all of which were followed in this case. The summary data provided by Mr. Peters is of the kind and type of data that I regularly use and rely upon. I have been provided this same type of data from Mr. Peters in the past and have found it to be reliable and accurate. Based on my prior work with Mr. Peters in this and other cases, I know that he has the required expertise, training, education, and tools necessary to create accurate summaries of voluminous data using standard SAS programming.

31.     I further understand that Mr. Peters has performed standard internal database checks to ensure that the above-described summaries of voluminous raw data are accurate and reliable. I have also reviewed, tested, and confirmed that these summaries are accurate and reliable. These summaries serve as an objectively verifiable basis for my findings and opinions contained in this declaration.

---

[12] Additionally, I understand that ProModel requested that Mr. Peters adhere to specific formatting instructions with respect to the certain summaries of voluminous data used in ProModel's DES testing and failure analysis.

1       32.    The above described raw data and summaries of voluminous data,

2   along with peer-reviewed journal articles and industry task time data, provide a

3   sufficient basis to form an opinion, based on a reasonable degree of nursing

4   certainty, about (1) Brookdale's staffing methodology, (2) the amount of staff time

5   required to deliver the care services documented by Brookdale in resident

6   assessments, (3) the sufficiency of the actual numbers of staff and available staff

7   time to meet the documented care needs of residents, and (4) whether residents

8   were placed at continuing and substantial risk for not receiving needed care.

9       **X.    Simple Math Analysis of 6 Brookdale Facilities**

10      33.    As stated previously, the simple math methodology mathematically

11  calculates the labor time <u>required</u> each day to deliver all required line-item services

12  to residents and compares this to the actual labor time <u>available</u> each day. In order

13  to perform this simple math staffing analysis on a per day basis, complete or

14  substantially complete assessment and staffing data must be available for the days

15  to be analyzed.

16      34.    <u>Six Brookdale Facilities</u>:  For purposes of this Declaration, I performed

17  simple analysis related to the following 6 Brookdale facilities on all days where

18  substantially complete assessment and staffing data was produced by Brookdale:

19          a.    Anaheim:  1/1/2017 to 12/31/2019,

20          b.    Brookhurst:  1/1/2017 to 12/31/2019,

21          c.    Irvine:  1/1/2017 to 12/31/2019,

22          d.    Mirage Inn:  1/1/2017 to 12/31/2019,

23          e.    North Euclid:  1/1/2017 to 12/31/2019, and

24          f.    Scotts Valley:  1/1/2017 to 12/31/2019.

25  The complete or substantially complete data produced by Brookdale[13] for these 6

26  facilities allowed me to examine and calculate the total daily staff time *required* to

27  _____

28  [13] See Tables 1 and 2 below and related discussion in paragraphs 41 through 44
    regarding missing resident assessment and move-out data.

provide all line-item services to all residents in each facility compared to the total daily staff time *available*.[14]

35.    **Mathematically Determining Daily Staff Time *Required* at Brookdale**:  In order to calculate the amount of staff time *required* at any RCFE or Brookdale facility, the following 3 elements must be determined on a daily basis:

      a.    The number of residents who require each unique *line-item service*,

      b.    The daily *frequency* that each line-item service is to be performed in each facility, and

      c.    The *task time* (minutes required) for each line-item service.

36.    The simple math formula for calculating the daily staff time *required* for a line-item service is to multiply (a) its total number of residents requiring a unique line-item service by (b) the corresponding frequency per day (that the unique line-item service is to be performed), multiplied by (c) its average task time in minutes. The product of these 3 elements equals the minimum time *required* to deliver each line-item service to all residents. To calculate the total daily staff time *required* to provide *all line-item services* to all residents in each facility, the total minutes required for each of the line-item services are simply added together.

37.    **Number of Brookdale Residents Who Require Each Line-Item Service (*Required* Time Element 1):** An examination of the raw resident assessment data for these 6 facilities reveals a total of 95 possible line-item service tasks to be performed by Brookdale staff. One hundred percent (100%) of AL

---

[14] It is my understanding that Plaintiffs have requested complete raw resident assessment data, raw resident move-out data, and raw punch detail staffing data for all of Brookdale's California facilities.  However, to date, it is my understanding that Brookdale has not produced all data required to perform simple math on all its California facilities.

residents (and MC residents, where applicable) at each of these 6 facilities[15] required some number of line-item services during their respective residencies within the specified timeframes. Each of these line-item services required staff time. As the number of line-item services for a resident increased, the amount of staff time required increased, thus reducing the available time the common and limited pool of staff had to deliver services to other residents. *See* Service Code Identifier Key, FLORES0010 (columns B and C list the possible 95 line-item services).

38.   **Unique Identification Codes Assigned to Each Line-Item Service:** In order to analyze the raw resident *assessment* data for these 6 Brookdale facilities, I assigned each specific service task (each row) a unique identifier—a single number referred to as a "Service Code." These Service Codes are utilized for purposes of compiling and counting how many residents required each specific service task on a daily basis in each of the AL and MC units, as well as for each entire facility.

39.   **Four (4) Major Categories of Line-Item Services:**  The 95 line-item services/service codes fall into 4 main groupings:  (1) activities of daily living—ADLs, (2) Medical, (3) Behavioral, and (4) Miscellaneous.  *See* Service Code Identifier Key, FLORES0010, Codes & Groups tab, column A-Main Groups.  Each of the 4 main groupings can be further divided into their own subcategories,[16] with each of these subcategories having a number of associated line-item services.  See FLORES0010, Codes & Groups tab, columns C and D-Service Code and Task. For instance, with respect to the "Bathroom Assistance" subcategory (part of the ADL

---

[15] Three of the 6 facilities—Anaheim, Brookhurst, and Mirage Inn—operated both AL and Memory Care units. Irvine, North Euclid, and Scotts Valley operated only AL units.

[16] For example, the ADL group can be subdivided into 5 service subcategories: Dressing & Grooming, Showering or Bathing, Bathroom Assistance, Escort & Mobility, and Nutrition (feeding assistance).  *See* FLORES0010, rows 2 through 53.

group), there are 7 distinct line-item services for which residents may be charged and which require staff time (*see* Service Codes 3.1 through 3.7). These distinct line-item services do not all require the same amount of time from staff. Some require little staff time (for instance, merely needing staff reminders to go to the bathroom), while other require more (for instance, the help of 2 staff members to provide toileting assistance because of the resident's inability to stand or balance with the assistance of only 1 associate).

40.   **Daily Counts of Resident Requiring Each Line-Item Service**: Based on the PSA dates and move-out dates available for each resident, the active resident assessment for each resident "in the building" can be determined and defined by calendar date. Once calendared, the resident assessments can then be used to determine the total daily number of each line-item service task required by *every resident* in the facility for each day. As previously discussed, the total amount of time required by staff per day is determined by taking the number of residents who require each line-item service each day, multiplying that count by the associated frequency and the associated task time, and then adding them altogether. The total amount of daily *required* time equals the facility workload.

41.   **Daily Counts of Line-Item Services Where Census Levels Based on Assessments and Labor Detail Variance Data Do Not Match**:   As a practical matter, the higher the resident census is in an RCFE, the more work staff must perform (*i.e.*, the greater the workload). For purposes of the simple math analysis, in order to ensure that the census count in the 6 facilities was correct, we compared the daily census reported by Brookdale in its Labor Detail Reports to the daily census calculated from active resident assessments (which contained the effective date of each assessment) and any dates residents moved-out of the facility from January 1, 2017 to December 31, 2019 (analysis included 1,095 days per facility, *see* Census Analysis, FLORES0006).

42.   As set forth in Table 1 below, this comparison revealed:

a.     The days where Brookdale's reported census numbers (Labor Detail Reports) matched the census numbers derived from active resident assessments,

b.     The days where 1 assessment was missing,

c.     The days where 2 assessments were missing,

d.     The days where 3 assessments were missing,

e.     The days where 4 assessments were missing, and

f.     The days where 5 assessments were missing.

| Name of Facility | Number of Days When Daily Labor Report Census and Census Based on Active Resident Assessment **Match** | Number of Days When Assessment-Derived Census Is **1 Less** than Labor Detail Report Census | Number of Days When Assessment-Derived Census Is **2 Less** than Labor Detail Report Census | Number of Days When Assessment-Derived Census Is **3 Less** than Labor Detail Report Census | Number of Days When Assessment-Derived Census Is **4 Less** than Labor Detail Report Census | Number of Days When Assessment-Derived Census Is **5 Less** than Labor Detail Report Census |
|---|---|---|---|---|---|---|
| **Anaheim** | ■ | ■ | ■ | ■ | ■ | ■ |
| **Brookhurst** | ■ | ■ | | ■ | ■ | ■ |
| **Irvine** | ■ | ■ | | ■ | ■ | ■ |
| **Mirage Inn** | ■ | | ■ | ■ | ■ | ■ |
| **North Euclid** | ■ | ■ | ■ | ■ | ■ | ■ |
| **Scotts Valley** | ■ | ■ | ■ | ■ | ■ | ■ |

Table 1 (*Comparison of Labor Detail Report Census to Census Based on Active Resident Assessments*)

43.     The effect of these missing assessments is a reduction in workload, as each assessment represents a body of work that must be performed. Accordingly, on every day with an assessment missing, the simple math assessment would not fully capture all line-item care services required to be performed by staff and therefore would cause the analysis to be ultra-conservative.

44.     The days when the census comparison revealed that *more than five* assessments were missing were excluded from my analysis.  Further, the days when

23

the daily census numbers derived from resident assessments *exceeded* the daily census numbers found in Brookdale's Labor Detail Reports were also excluded. *See* Table 2 below and Census Analysis, FLORES0006.

| Name of Facility | Number of Days When More than 5 Resident Assessments Were Missing | Number of Days When Census Based on Active Resident Assessments Exceeds Labor Detail Report Census |
|---|---|---|
| **Anaheim** | ■ | ■ |
| **Brookhurst** | ■ | ■ |
| **Irvine** | ■ | ■ |
| **Mirage Inn** | ■ | ■ |
| **North Euclid** | ■ | ■ |
| **Scotts Valley** | ■ | ■ |

Table 2 (*Number of Days Excluded from Analysis During 3-Year Timeframe*)

The most plausible explanation for the daily census numbers derived from resident assessments *exceeding* the daily census numbers found in Brookdale's Labor Detail Reports (on specific dates) is: because resident move-out data was missing, the daily census calculated based on active resident assessments included an assessment for a resident(s) who no longer resided in the facility.   All dates where the calculated census (based on assessments) was *greater* than the daily census found in Daily Labor Reports were excluded from the simple math analysis for the following reasons--(1) it could not be determined which assessment(s) should be used or not used to calculate the number daily line-item care services required where the calculated census exceeded the Labor Detail Report census and (2) including line-item services for more residents than were in the facility would unfairly increase the workload being analyzed.  *See* Table 2 and Census Analysis, FLORES0006.

45.    Accordingly, all the simple math results set forth below for each of the 6 facilities are limited to and only consider the specific days where (1) the census

numbers from these 2 data sources matched or (2) where the calculated census numbers are *up to 5 residents less* than the corresponding census reported in the Labor Detail reports (meaning that up to 5 assessments are missing).

46. To the extent that additional and complete assessment and move-out data is provided, this simple math analysis can be updated.

47. **Daily Frequency of Each Line-Item Service (*Required* Time Element 2)**: There are certain line-item services that occur more than once a day, and others that occur only weekly or monthly. In order to calculate the total number of each line-item service required on a daily basis by all residents in a building, each line-item service task must be multiplied by its frequency. For example, if 3 residents in the building require feeding assistance at a frequency of 3 times per day, there is a total of 9 feeding assistance tasks required per day to be performed by staff for this line-item service.

48. For purposes of the simple math analysis, I used the Brookdale ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that are found in the Acuity Minutes Norms (BKD2874663), the Brookdale ▮▮▮▮▮▮▮ (BKD2886744 and BKD2886745), the "Deep Dive" document (BKD2882807), and the raw resident assessment data itself. To the extent that no task frequency was defined by Brookdale for a line-item service, I applied a reasonable frequency for the line-item service based on: (a) the task frequency used by other California ALF chains, (b) peer-reviewed literature, and (c) my experience and expert opinion as to what constituted a reasonable frequency for the particular care service. The specific task frequencies have been compiled and are restated in FLORES0010, Input Key for Assessed Service tab, columns K and L, Frequency and Frequency Period in Hours.

49. **Task Times (*Required* Time Element 3)**: In order to calculate the total number of hours of staff time required for each line-item task on a daily basis, the counts of each line-item must be multiplied by its *task time*. For example, the total daily amount of time required to provide complete feeding assist and

supervision to 3 residents on a Brookdale MC unit is calculated as follows: 3 residents multiplied by the frequency of 3 times per day equals 9 daily feeding assistance tasks. Nine (9) feeding assistance tasks multiplied by the associated task time of 15 minutes equals 135 minutes (2 hours and 15 minutes) to provide this 1 line-item service daily.

50.     Brookdale Task Times: For purposes of the simple math analysis conducted in this case, Brookdale's own task time information was used whenever available.[17] There are 2 sources for this Brookdale task time data: ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

51.     For purposes of the simple math analysis, I used the available task times for line-item care services found in the ████████████████████████

████████████, except for the task times for bathroom (toileting) assistance and escorting/mobility assistance. It is my opinion that the stated task times for bathroom (toileting) assistance (████████████) and escorting (██████████) in the ████████████████████████████████████ are too low and unreasonable.[18] Furthermore, these stated task times significantly contradict the

---

[17] For purposes of the simple math analysis, all the task times used were assumed to only include the clinical time required to deliver the line-item care services and did not include the time required by staff to travel to residents before delivering the services.

[18] To the extent that Brookdale claims that its task times (███████████████████████████) include the time required by staff to travel to residents before delivering line-item care services, I find that these task times are too low and unreasonable. As stated previously, for purposes of the simple math

1   times for bathroom (toileting) assistance and escorting found in ████████

2   ████████████████████████████████████████████)[19] that I find to be

3   reasonable. Accordingly, for the bathroom (toileting) assistance and escorting tasks,

4   I used the task times found in Brookdale's ████████████████████████████.

5        52.    To the extent that no task time data was defined by Brookdale's ████████

6   ████████████████████████████████ for a line-item service, I applied a

7   reasonable task time for the line-item service based on:  (a) the task times used by

8   other California ALF chains, (b) peer-reviewed literature, and (c) my experience

9   and expert opinion as to what constituted a reasonable task time for the particular

10  care service. The specific task times used in my analysis have been compiled and

11  are restated in FLORES0010, Input Key for Assessed Service tab, columns G and

12  H—AL Task Times and MC Task Times.

13       53.    **Mathematically Determining Daily Staff Time _Available_**:   In

14  California, employees are required to take a 30-minute unpaid meal break before

15  the start of the fifth hour of work. Because Brookdale employees are required to

16  clock-out for meal breaks, the hours of staff time that are recorded in the raw punch

17  detail staffing data do not include time for meal breaks. Additionally, according to

18  California Code of Regulations, it is mandatory that each employee take a 10-

19  minute paid break/rest period for every 4 hours worked. California Code of

20  Regulations 11040, Order No. 5-2001 of CA Industrial Welfare Commission

21  ("Order Regulating Wages, Hours, and Working Conditions in Professional,

22  Technical, Clerical, Mechanical, and Similar Occupations").   Accordingly, to

23

24  ───────────────────────────

25  analysis, all the task times used were assumed to include only the clinical time
    required to deliver the line-item care services (not travel time before delivery of the

26  service).

27  [19] _See_ Section XIII below for further discussion regarding the discrepancy between

28  ████████████████████████████ (BKD2886744 and BKD2886745).

Case No. 4:17-cv-03962-HSG (LB)
DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

calculate the maximum number of hours of staff time *available* to provide services to residents, these 10-minute breaks must be subtracted.

54.     As to the 6 Brookdale selected facilities, the to-the-minute time that staff were *on duty* per day was initially determined using the raw punch detail staffing data and job title lookup information produced by Brookdale in this case.[20] In order to calculate actual time *available* for each staff on each shift, 10-minute breaks were deducted from the *on duty time* (in accordance with California regulations). More specifically, with respect to all punch detail data produced by Brookdale for the 6 facilities, I caused the actual time *available* for each Care Manager, Med Tech, Licensed Nurse, and Care Director per day (on AL units and, where applicable, MC units) to be computed. The staffing analysis performed allowed us to break down the daily *available* staffing hours for each of these job titles, by AL and, where applicable, MC unit, as well as determine the combined total staff time available for the entire building on a per day basis.

55.     **Brookdale Job Title Responsible for Each Line-Item Service**: Within the Labor Detail Report data (BKD2874675 through BKD2874760_Confidential), Brookdale specifies the type of staff (job title/classification) who work in the Clinical Department. The Clinical Department staff have primary responsibility for providing all line-item services to residents.[21] Brookdale's specification of the staff responsible for each line-item service allows

---

[20] Further, this daily staffing data can be used in conjunction with the daily census (discussed above) to determine at each facility, on each day the average amount of time available to provide care per patient, known as hours per patient day (HrsPPD). This is a common metric to measure staffing levels in healthcare facilities and allows for staffing to be compared at different facilities regardless of differing census levels.

[21] The job duties and responsibilities for each specific job type/job title (including responsibilities related to line-item services) are further explained within the numerous Brookdale job descriptions produced (identified above).

us to identify which employees' staffing records are relevant for determining the amount of staff time *available* to deliver required services. The staff responsible for providing each line-item service is compiled in the "Care Provider" and "Primary Care Provider Code" columns E and AM of FLORES0010, Input Key for Assessed Service tab.  The following table summarizes the number of line-item services (of the identified 95) each staff type is responsible for providing:

| Discipline | Count of Line-Item Care and Service Tasks |
|---|---|
| Care Manager[22] | |
| Med Tech[23] | |
| Licensed Nurse[24] | |
| Care Director[25] | |
| **Total** | **95** |

Table 3 (*Counts of Line-Item Services per Care Provider*)

---



[22]

,"

[23]

."

[24]

"

[25]

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

56.     Table 4 below shows the average total hours worked by all caregivers (Care Managers, MedTechs, LPNs, and Care Directors) in each of the 6 facilities and the average percent of this total time that is worked by each of these 4 types of caregivers, based on punch detail staffing data.  *See* Percent of Staffing Hours by Job Grouping, FLORES0005, Summary Punch Detail tab.

| Name of Facility | Average Total Hours of All Caregivers (Per Day) | % of Total Hours for Care Managers | % of Total Hours for MedTechs | % of Total Hours for LPNs | % of Total Hours for Care Directors |
|---|---|---|---|---|---|
| Anaheim | █ | █ | █ | █ | █ |
| Brookhurst | | | | | |
| Irvine | █ | █ | █ | █ | █ |
| Mirage Inn | █ | █ | █ | █ | █ |
| North Euclid | █ | █ | █ | █ | █ |
| Scotts Valley | █ | █ | █ | █ | |

Table 4 (*Percentage of Time by Each Type of Caregiver based on Punch Detail Staffing Data for 3-Year Timeframe*)

57.     As shown in Table 4, an average of ███ of the total caregiver time for the 6 facilities identified above is comprised of Care Manager and MedTech time based on the punch detail staffing data. Further, an analysis conducted of the Labor Detail Reports for 54 Brookdale California facilities that were operated during the entirety of the class period shows a strikingly similar result: an average of ███ of the total caregiver time at 54 Brookdale California facilities is comprised of Care Manager and MedTech hours.  *See* Percent of Staffing Hours by Job Grouping, FLORES0005, Summary Labor Detail Report tab.

58.     This determination of the actual staff time *available* each day, by-shift, and by job-type/title allows us to compare the total number of *available* hours at a facility to the total number of *required* hours each day. In sum, this simple math comparison allows us (a) to understand whether there was enough staff to provide

required and promised line-item services and (b) to measure the extent to which a facility was overstaffed or understaffed on a daily basis.

## XI.    Brookdale Simple Math Results and Opinions

59.    Based on the simple math analysis performed (for the days where the available data was complete or substantially complete),[26] it is my opinion that each of the 6 facilities was chronically understaffed, and as a consequence, Brookdale residents were placed at a substantial and ongoing risk for not receiving required and promised services.   The results of this simple math analysis are found in FLORES0004.  Key findings are summarized in the Tables below.

60.    *Prevalence Analysis*: An examination of the available versus required staff hours per day during the 3-year timeframes (1/1/17 to 12/31/19) for each facility reveals the following prevalence (full data is provided in Simple Math Analysis, FLORES0004):

| Name of Facility | Total Number of Days Where Complete or Substantially Complete Data Was Available on AL and MC (where applicable) | Number of Days on AL Unit Where *Required* Staff Time Exceeded Available Staff Time | Number of Days on MC Unit Where *Required* Staff Time Exceeded Available Staff Time | Number of Days Where Total Facility *Required* Time (AL + MC Units) Exceeded Available Staff Time |
|---|---|---|---|---|
| **Anaheim** | ■ | ■ | ■ | ■ |
| **Brookhurst** | ■ | ■ | ■ | ■ |
| **Irvine** | ■ | ■ | ■ | ■ |
| **Mirage Inn** | ■ | ■ | ■ | ■ |

[26] As discussed above, Tables 5 through 8 only consider the days where (1) the census numbers based on the assessments and from the Labor Detail Report data matched or (2) where the calculated census numbers from the assessments have *up to 5 residents less* than the corresponding census reported in the Labor Detail reports (meaning that up to 5 resident assessments are missing).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **North Euclid** | | ■ | | ■■ | | ■ | ■■ |
| **Scotts Valley** | | ■ | | ■■ | | ■ | ■■ |

Table 5 (*Prevalence Analysis*)[27]

61.   *Average Daily and Total Analysis*:   The summaries below show the average per day staffing deficits (measured in hours) and the total staffing deficits for each facility for all the days analyzed (full data is provided in Simple Math Analysis, FLORES0004):

| **Name of Facility** | **Average Daily Census (AL + MC)** for Days Where Data Was Complete or Substantially Complete | *AVAILABLE* **Staff Hours for Care Managers + Med Techs + LPNs + Care Directors** (with reductions for 10-minute breaks) (AL + MC) | *REQUIRED* **Staff Hours for Care Managers + Med Techs + LPNs + Care Directors (AL + MC)** | **Delta Between REQUIRED & AVAILABLE TOTAL Hours for Care Managers + Med Techs + LPNs + Care Directors (AL + MC)** |
|---|---|---|---|---|
| | **Daily Averages** | **Daily Averages** | **Daily Averages** | **Daily Averages** |
| **Anaheim** | ■ | ■ | ■ | |
| **Brookhurst** | ■ | ■ | ■ | |
| **Irvine** | ■ | ■ | ■ | |
| **Mirage Inn** | ■ | ■ | ■ | |
| **North Euclid** | ■ | ■ | ■ | ■ |
| **Scotts Valley** | ■ | ■ | ■ | ■ |

Table 6 (*Average Per Day Deficit Analysis*)

---

[27] This Table and the other Tables below are based on the resident assessment data, task times, and task frequencies described above, as compared to the Brookdale staffing data (with reductions for 10-minute breaks) also described above.

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

| Name of Facility | Average Daily Census (AL + MC) for Days Where Data Was Complete or Substantially Complete | AL and MC Units | Total Number of Days Analyzed (Including Days with Matching Census Numbers and Up to 5 Assessments Missing) | Delta Between REQUIRED & AVAILABLE TOTAL Hours for Care Managers + Med Techs + LPNs + Care Directors (AL + MC) |
|---|---|---|---|---|
| | | | | **All Days Total** |
| **Anaheim** | ■ | AL + MC | | ■ |
| **Brookhurst** | ■ | AL + MC | | ■ |
| **Irvine** | ■ | AL | | ■ |
| **Mirage Inn** | ■ | AL + MC | | ■ |
| **North Euclid** | ■ | AL | ■ | ■ |
| **Scotts Valley** | ■ | AL | ■ | ■ |

Table 7 (*Total Deficit Analysis for All Days Analyzed*)

62.   *Percent of Service Time Omitted Analysis*:  The summary below shows the percent of required time for line-item services that was mathematically impossible for the available staff to deliver. The summary displays the percent omitted for each facility on an average daily basis (full data is provided in Simple Math Analysis, FLORES0004):

| Name of Facility | Percent of Required Service Time Omitted AL Unit | Percent of Required Service Time Omitted MC Unit | Percent of Required Service Time Omitted Full Facility (AL + MC) |
|---|---|---|---|
| **Anaheim** | ■ | ■ | ■ |
| **Brookhurst** | ■ | ■ | ■ |
| **Irvine** | ■ | ■ | ■ |
| **Mirage Inn** | ■ | ■ | ■ |
| **North Euclid** | ■ | ■ | ■ |
| **Scotts Valley** | ■ | ■ | ■ |

Table 8 (*Percent of Required Line-Item Service Time Omitted Analysis*)

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

63.    In  summary,  the  quantity  of  line-item  services  contained  in Brookdale's  resident  assessments  and  the  amount  of  time  required  to  deliver  this care based on Brookdale's own norm task times and task time studies[28] reveals that it  was  mathematically  and  physically  impossible  for  Brookdale's  staff  to  deliver  all required  line-item  services,  given  the  time  was  available  to  staff  according  to  the Brookdale's  punch  detail  staffing  data.  The  resultant  staffing  shortfall  at  these  6 facilities  was  not  an  isolated  occurrence  but  represented  a  pattern  and  practice  that subjected  residents  to  a  substantial  and  continuing  risk  of  not  receiving  required care.

64.    This  same  simple  math  approach  can  be  applied  to  all  other  Brookdale California  facilities,  assuming  Brookdale  has  produced  or  will  produce  complete  or substantially complete data.

## XII.   Ultra-Conservative Nature of Brookdale Simple Math Analysis

65.    The  simple  math  analysis  and  results  described  above  are  ultra-conservative for the following reasons:

a.    Due  to  the  fact  that  on  many  of  the  days  analyzed  resident assessments  were  missing  for  as  many  as  five  residents,  the  simple  math analysis  does  not  fully  capture  all  the  line-item  care  services  required  by  the entire  resident  population  resulting  in  a  reduction  of  omitted  care  time  on those days;

b.    It  does  not  take  into  account  the  amount  of  time  Brookdale  staff spend  performing  activities  that  are  beyond/outside  of  the  line  item  care services  documented  and  required  in  resident  assessments  including  time

---

[28] As  previously  stated,  Brookdale  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ were  used  in  the  simple  math  analysis  unless  there  was  no  Brookdale  time available.  In  such  case,  a  reasonable  time  based  on:  (a)  the  task  times  used  by  other California  ALF  chains,  (b)  peer-reviewed  literature,  and  (c)  my  experience  and expert  opinion  as  to  what  constituted  a  reasonable  task  time  for  the  particular  care service.

spent:  (a) reporting to staff at the end and beginning of each work shift, (b) responding to and reporting incidents and accidents, (c) counting controlled substance at the end of each shift, and (d) performing medication administration audits;[29]

c.    It does not take into account the amount of time staff spend answering pendant/call-light requests by residents for assistance;[30]

d.    It assumes that 100% of the staff time related to the Care Director and Licensed Nurses at Brookdale is available for providing line-item care services to residents (such as ADL care)—when those staff members have numerous time-consuming managerial and oversight responsibilities that are *not* related to providing line-item care services;

e.    It assumes that *all hours* of time available per day to all the varieties of workers within the four groups (Care Managers, Med Techs, Licensed Nurses, and/or Care Directors) can be used to perform every type of line-item services; and

---

[29] The task times, frequencies, and job type/discipline for each of these non-service staff activities, and these items have been compiled and are restated in Service Code Identifier Key, FLORES0010, Inputs re Staff Availability tab, with source information. In my experience, these five non-service staff activities require considerable time that further erode the time available to staff to deliver line-item services.

[30] Moreover, according to the resident pendant data produced by Brookdale (pendants are widely-used in hospital, nursing homes, and ALF facilities and perform a similar function to call lights), facility staff at Brookdale facilities were ███████████████████████ (*see* BKD2882113-23, BKD2886780-86, BKD2937371-73). Responding to pendant calls should be treated as high priority task for staff as a pendant call can possibly indicate a resident emergency. Responding to pendant requests for assistance not only takes staff time but also interrupts work flow. The time required by staff to respond to pendants and the impact those interruptions have on work flow were not considered by the simple math analysis I performed in this case.

f.      It does not take into account staff bottle-necks in care delivery caused by scheduling conflicts or tasks which require more than the normal/average time to perform.

66.     Further, as previously stated, the task times used in the simple math analysis do not include time expended as a result of the distance that staff are required to travel within the building to deliver care to residents.   The time Brookdale staff spend traveling within the building (as well as performing administrative/non-line-item care activities listed above and responding to pendant requests) significantly decreases the time they have during a work shift to perform the line-item services documented in resident assessments.

67.     Accordingly, the simple math staffing analysis described herein provides an extremely conservative calculation of staffing because it does not account for certain staff activities that significantly reduce the time available to staff to deliver the care services documented in each resident's assessment. More specifically, if these above-described factors that take away from staff care time had been included in the simple math staffing analysis, the gap between *required* and *available* hours for the selected facilities would have been significantly greater. Stated another way, Brookdale's staffing was insufficient at these facilities even when time-consuming activities such as staff travel time, administrative tasks, and pendant response time were excluded from the simple math analysis.

## XIII.  Is Brookdale's Staffing Methodology Defective?

68.     **Brookdale's Staffing Methodology:** According to documents produced by Brookdale, to calculate staffing at each of its facilities, Brookdale uses

1 ████████████████████████████████████████████

2 ██████████████████████

3     69.    At the heart of Brookdale's own staffing methodology, ████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████

12     70.    The Labor Detail Report data produced by Brookdale confirms that

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████

17     71.    **Brookdale's Staffing Methodology Is Defective:**  The methodology Brookdale uses to determine staffing in its facilities is defective and places residents at a substantial and unreasonable risk of not receiving required care services. More specifically, Brookdale's staffing methodology is defective and fails to ensure that facility personnel are sufficient in numbers at all times to provide the services necessary to meet resident needs, for the following reasons:

    a.    First, the ██████████ ████ ████ used by Brookdale (BKD2874663) related to bathroom assistance and escorting/mobility assistance are unreasonably low and simply not credible. According to the ████████████████ used by Brookdale in its staffing methodology, toileting/bathroom assistance requires a ████████████████████████ ████████████████ Based on my experience (as well as on ALF industry

times and published literature), RCFE residents who need toileting/bathroom assistance require (on average) significantly more time than ████████ of staff time per toileting/bathroom episode. Further, according to the ██████████████ used by Brookdale in its staffing formula, escorting a resident (*i.e.*, assisting a resident to ambulate, pushing a resident in a wheelchair, or escorting a mentally or physically disabled resident) from one location to another within the facility (typically from their room to the dining room) requires a ████████████████████████████ ████. Based on my experience (as well as on ALF industry times and published literature), RCFE residents who need escort assistance require (on average) significantly more time than ██████ per escort episode.

b.     Second, the █████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ███████████████████████.

c.     Third, ██████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8 ██████████████████████████████████████████████ By using

9 bathroom assistance and escorting norm task times that are unreasonably low

10 and ████████████████████████████, Brookdale has fundamentally

11 reduced the amount of staffing provided to residents.[31]

12     d.    Fourth, Brookdale ████████████████████

13

14

15

16

17

18

19 72.    These facts form the basis of my opinion that Brookdale's other

20 facilities (not just the 6 selected facilities I analyzed) were subject to a common and

21 flawed staffing methodology that caused these facilities to be chronically

22 understaffed. As a result, residents were placed at a substantial and ongoing risk for

23 not receiving required and promised services.

24

25 ───────────────

26 [31] Furthermore, to the extent that any of Brookdale's █████████████████

27

28

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION

## XIV.  Were Residents of Brookdale's California Facilities Impaired and Vulnerable?

73.    **Impaired and Vulnerable Resident Population**:   As part of my analyses of the raw resident assessment data related to the 6 Brookdale facilities, I also reviewed the diagnoses and line-item care services required per resident. *See* Resident Diagnoses and Line-Item Care Service Analysis, FLORES0008.  Based on this review, I find that residents in these 6 facilities had very similar diagnoses and care needs to the RCFE residents I have personally cared for over my career. My analysis of the diagnoses and line-item care services required by these residents at the 6 Brookdale facilities confirm that these residents are elderly and require staff to compensate for their mental and/or physical impairments and meet the care needs that they are unable to perform for themselves or require assistance in performing. I have no reason to believe that the assisted living residents (and, where applicable, memory care residents) living in Brookdale's other California facilities are dissimilar in terms of their diagnoses, age, impairments, and care needs. As a consequence of their diagnoses, age, and mental and/or physical impairments, all Brookdale RCFE residents depended on a common and limited pool of staff to meet their needs in each Brookdale facility.

## XV.   To What Extent Did Residents of Brookdale's California Facilities (Not Subject to Arbitration Agreements) Have Disabilities?

74.    **Disability Profile for Residents Not Subject to an Arbitration Agreement**:   As part of my review, Plaintiffs' counsel provided me a listing of residents of Brookdale's California facilities who were not subject to an arbitration agreement. I was able to match 4,485 residents who were listed as not being subject to an arbitration agreement with their respective resident assessments using resident identification numbers. Based on my review of the resident assessment data produced in this case, I was able to determine which of these residents were

assessed by Brookdale as having disability-related needs and conditions. *See* Disability Profile for Residents without Arbitration Agreements, FLORES0009. More specifically, based on the definition of "disability" (28 C.F.R. § 36.105), I have isolated ███████████████████████ indicative of a disability, and determined the number of Brookdale residents without arbitration agreements who have those disability indicators. More specifically, of the identified non-arbitration residents who could be matched with their resident assessments, *eighty percent* of them (3,617 out of 4,485) have one or more of the following disability indicators:

a.   Use of a walker (2,639 residents—most Brookdale facilities in California have ten or more residents who use walkers for mobility),

b.   Use of a wheelchair (1,905 residents—most Brookdale facilities in California have ten or more residents who use wheelchairs for mobility),

c.   Use of a motorized wheelchair (109 residents),

d.   Use of a scooter (162 residents),

e.   Use of a cane (595 residents),

f.   Use of a sliding transfer board (13 residents),

g.   Requires Braille (1 resident),

h.   Has macular degeneration (257 residents),

i.   Uses Hearing aid (876 residents),

j.   Requires assistance in the use of hearing devices (167 residents),

k.   Requires assistance in cleaning hearing devices (90 residents),

l.   Requires assistance in inserting hearing devices (155 residents),

m.   Requires assistance in storing hearing devices and with batteries (186 residents),

n.   Using TTY (a teletypewriter device that helps people who are deaf, speech-impaired, or hard-of-hearing use a phone to communicate) (1 resident),

o.   Using sign language (2 residents), and

1

         p.     Requiring communication board (4 residents).

2     75.    Accordingly, my analysis shows that *eighty percent* (or 3,617 out

3 4,485 of non-arbitration residents for whom an assessment could be found) were

4 disabled within the definition of "disability" stated in the Americans with

5 Disabilities Act (ADA) (28 C.F.R. § 36.105). Based on the analysis above, the total

6 number of these Brookdale residents with *mobility* disabilities[32] is 3,435, and the

7 total number of these Brookdale residents with *vision* disabilities[33] is 258.

8     76.    Further, my analysis shows that disabled residents were found in *every*

9 Brookdale California facility (78 facilities) where non-arbitration residents could be

10 matched to resident assessments. *See* Disability Profile for Residents without

11 Arbitration Agreements, FLORES0009.

12     77.    The prevalence of disabled residents in Brookdale's California

13 facilities underscores: (a) the importance of Brookdale's continuing responsibility

14 to provide disabled residents with sufficient numbers of staff to meet their care

15 needs and (b) the common dependency on a limited pool of staff these residents

16 share.

17     78.    It is my understanding that Plaintiffs have requested that Brookdale

18 make a reasonable modification in its policies and practices regarding caregiver

19 staffing to increase the amount of such staffing so that it is sufficient at all times to

20 provide the assisted living services specified in the residents' assessments. In my

21 opinion, this modification is reasonable and is necessary to ensure that residents

22 with disabilities receive assistance with activities of daily living and other line-item

23 care services that they need because of their disabilities as set forth in Brookdale's

24 _____

25 [32] Residents who have mobility disabilities require the use of one or more of the

26 following: motorized wheelchair, cane, walker, wheelchair, scooter, or sliding
transfer board.

27

28 [33] Residents who have vision disabilities require the use Braille or have macular
degeneration.

resident assessments.  Modifying Brookdale's staffing policies and procedures so that they are (1) based on accurate and reasonable task times for care services, including but not limited to toileting and mobility escort and (2) account for all line-item care services documented in resident assessments is necessary to ensure that Brookdale's facilities provide staffing that is at all times sufficient in numbers to meet resident care needs.

## XVI.  Do Deficiencies Issued by the California Department of Social Services' Community Care Licensing (CCL) Division Provide Findings Relevant to the Staffing of Brookdale's California Facilities?

79.    Information obtained to date from the California Department of Social Services' Community Care Licensing (CCL) Division confirms the staffing issues described hereinabove. The citations provide ample evidence (1) directly related to insufficient staffing levels at Brookdale facilities and (2) indicative of the substantial and ongoing risk residents face as a result of Brookdale's staffing practices.

80.    For example, I have reviewed Facility Evaluation Reports and Complaint Investigation Reports evidencing 807 deficiencies issued by the Department of Social Services' Community Care Licensing (CCL) Division to 71 Brookdale California facilities from 2015 through 2021. Of these 807 deficiencies, the vast majority of them appear related to staffing issues either directly (for specifically failing to have sufficient staff) or indirectly being indicative of insufficient staff, poor resident care, and other problems consistent with facility understaffing (*see* DSS Citations Summary, FLORES0011).

81.    Based on my review of these deficiencies, I find that the high number of citations and the occurrence of repeated citations for the same deficiencies at individual Brookdale facilities are significant. I also note that Brookdale's California facilities have been repeatedly cited for failing to self-report violations, incidents, care failures, and even deaths. Moreover, the numerous instances where

residents called 911 when unable to get assistance from Brookdale staff (cited within these DSS deficiencies) further corroborates my findings of insufficient staffing at Brookdale's facilities.

82.   **Specific Staffing Failures Found by CCL**: Based on my review, CCL issued 63 citations to 33 facilities[34] for violating 22 CCR § 87411, which requires that "facility personnel shall at all times be sufficient in numbers, and competent to provide the services necessary to meet resident needs."   Further, there were 8 citations to 6 facilities[35] for violating Health & Safety Code § 1569.269(a)(6) or its implementing regulation, 22 CCR § 87468.2(a)(4), which provide that residents have the right "to care, supervision, and services that meet their individual needs and are delivered by staff that are sufficient in numbers, qualifications, and competency to meet their needs."   And there were 11 citations to 10 facilities[36] for violating 22 CCR § 87705(c)(4), which requires that facilities who accept residents with dementia are responsible for ensuring that "there is an adequate number of direct care staff to support each resident's physical, social, emotional, safety and health care needs as identified in his/her current appraisal.  For example:

   a.   Brookdale North Tarzana was cited for having insufficient staffing when one caregiver was found to be providing care and supervision to over 80 residents,

---

[34] These Brookdale facilities included:  Alhambra, Brookhurst, Camarillo, Chatsworth, Corona, Elk Grove, Fairfield, Folsom, Fountaingrove, Greenhaven, Hemet, Loma Linda, Magnolia, Mirage Inn, Murrieta, Napa, North Fremont, North Tarzana, Oceanside, Orangevale, Rancho Mirage, Redwood City, Riverside, Riverwalk, San Jose, San Pablo, Santa Monica, Santa Monica Gardens, Scotts Valley, South Tarzana, Sterling Court, Stockton, and Tracy.

[35] These Brookdale facilities included:  Anaheim, Corona, Greenhaven, Magnolia, Northridge, and Sterling Court.

[36] These Brookdale facilities included:  Citrus Heights, Clearlake, Corona, Elk Grove, Hemet, Rancho Mirage, Riverwalk, Roseville, Salinas, and Tracy.

b. Brookdale Scotts Valley was cited for having insufficient staffing when staff failed to check on a resident who was left on the floor without food or water for 24 to 30 hours,

c. Brookdale Magnolia was cited for violating the right to sufficient staffing when Brookdale staff did not know a resident had eloped from the facility until a staff member on her way home from work saw him down the street with paramedics—the resident had fallen and was sent to hospital,

d. Brookdale Corona was cited for having insufficient staffing when only 2 staff were present for 3 days on the night shift to monitor 47 residents,

e. Brookdale Northridge was cited for violating the right to sufficient staffing when facility staff waited 6 hours before calling 911 after a resident fell and fractured hip,

f. Brookdale Redwood City was cited for insufficient staffing after leaving a resident who requires toileting assistance on the commode for 1.5 hours,

g. Brookdale Fairfield was cited for failing to sufficiently staff its memory care unit when staff breaks left 1 staff member on the floor responsible for supervising more than 30 residents,

h. Brookdale Orangevale was cited for failing to ensure sufficient staffing to meet resident needs after a resident developed wounds on buttocks, thighs, and heel due to lack of staff monitoring and assistance, and

i. Brookdale Palm Springs was cited for failing to provide staff assistance with showering, dressing, and transportation, even though the resident was billed for those services.

83. **Failures Indicative of Insufficient Staffing Found by CCL**: Furthermore, CCL issued numerous citations to Brookdale for incidents that are

1  indicative of insufficient numbers of staff. The records I reviewed contain ample
2  evidence of incidents of indicative of insufficient numbers of staff. *See* DSS
3  Citations Review, FLORES0011.

4      84.    I reserve the right to revise my opinions and findings if additional
5  relevant information is made available regarding the subjects of this declaration.

6      85.    I declare under penalty of perjury under the laws of the United States
7  that the foregoing is true and correct.

8      Executed on August /5, 2021, in San Francisco, California.

CRISTINA FLORES

DECLARATION OF CRISTINA FLORES, PHD IN SUPPORT OF MTN FOR CLASS CERTIFICATION