Guy B. Wallace – 176151
Mark T. Johnson – 76904
Travis C. Close – 308673
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone:     (415) 421-7100
Facsimile:      (415) 421-7105
Email:   gwallace@schneiderwallace.com
             mjohnson@schneiderwallace.com
             tclose@schneiderwallace.com

Kathryn A. Stebner – 121088
Brian S. Umpierre – 236399
**STEBNER AND ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, California  94102
Telephone:     (415) 362-9800
Facsimile:      (415) 362-9801
Email:   kathryn@stebnerassociates.com
             brian@stebnerassociates.com

Gay Crosthwait Grunfeld – 121944
Benjamin Bien-Kahn – 267933
Jenny S. Yelin – 273601
Amy Xu – 330707
**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:      (415) 433-7104
Email:   ggrunfeld@rbgg.com
             bbien-kahn@rbgg.com
             jyelin@rbgg.com
             axu@rbgg.com

Attorneys for Plaintiffs and the Proposed Classes

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| STACIA STINER; RALPH CARLSON, in his capacity as Trustee of the Beverly E. Carlson and Helen V. Carlson Joint Trust; LORESIA VALLETTE, in her capacity as representative of the Lawrence Quinlan Trust; MICHELE LYTLE, in her capacity as Trustee of the Boris Family Revocable Trust; RALPH SCHMIDT, by and through his Guardian Ad Litem, HEATHER FISHER; PATRICIA LINDSTROM, as successor-in-interest to the Estate of ARTHUR LINDSTROM; BERNIE JESTRABEK-HART; and JEANETTE ALGARME; on their own behalves and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BROOKDALE SENIOR LIVING, INC.; BROOKDALE SENIOR LIVING COMMUNITIES, INC.; and DOES 1 through 100, <br><br> Defendants. | Case No. 4:17-cv-03962-HSG (LB) <br><br> **DECLARATION OF DOUGLAS J. CROSS SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date:     May 26, 2022 <br> Time:     2:00 p.m. <br> Place:     Courtroom 2 <br> Judge:    Hon. Haywood S. Gilliam, Jr. |

[3776952.2]

**REDACTED**

I, Douglas J. Cross, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Motion for Class Certification.

2.      I hold a Bachelor's degree in Urban Planning from the University of Cincinnati.

3.      I am the Principal of Douglas J. Cross Transportation Consulting. Since 2004, I have worked as a transportation consultant and trainer for government entities and private businesses. My practice specializes in the design, training, and operation of accessible transportation systems. My work involves providing technical assistance regarding transit system wheelchair securement policies and procedures for government agencies, including Sacramento Regional Transit, Santa Clara Valley Transportation Authority, Gold Coast Transit, Los Angeles County MTA, Access Services (L.A. County), San Joaquin RTD, SamTrans, California Transit Insurance Pool, Keolis Transit America, and City of Pleasant Hill, California, among others. My work includes vehicle and equipment design and research, policy and formal industry standards, regulatory analysis, and training curricula. I have also provided operational and compliance evaluations under the Americans with Disabilities Act (ADA) for New York City Transit, Maryland MTA, Capital Metro (Austin, TX), Summit Stage (Breckenridge, CO), and Corpus Christi Regional Transportation Authority (TX).

4.      I am a Certified Trainer for the Community Transportation Association of America (CTAA) for Passenger Service and Safety (PASS), a program for training drivers in proper assistance techniques for serving people with disabilities. I was also a Certified Trainer in passenger assistance and mobility device securement techniques at the University of Wisconsin-Milwaukee (which later merged with PASS) and the National Transit Institute at Rutgers University.

5.      Between 1996 and 2003 I was the Accessible Services Manager for the Alameda-Contra Costa Transit District. In this position I coordinated the implementation and management of a new paratransit service with an annual budget of $25 million. I oversaw the establishment of a new operating division with a fleet of 35 vehicles, 50 drivers, and 6 dispatchers. This included

drafting startup procedures and provided training and supervision for all staff associated with this program.  I planned and coordinated all aspects of accessible transportation for the East Bay area's 800-bus fixed route transit service and provided support to the Accessibility Advisory Committee. I also developed and implemented a wheelchair marking/tether strap program for customers, conducted accessibility equipment prototype demonstrations, and implemented the first rear-facing padded barrier wheelchair stations on transit buses nationwide.

6.      I serve on several professional committees. I am a member of the Access Committee of the American Public Transportation Association (APTA), including Universal Accessibility Standards Program/Technical Resources Group, Stop Announcement Standards Subcommittee, and past chair, Wheelchair User Issues Subcommittee. I am a member of the ANSI/RESNA Committee on Wheelchairs and Transportation (COWHAT) of the American National Standards Institute and Rehabilitation Engineering Society of North America (RESNA). I am member of the International Standardisation Organization, Technical Committee 173: "Assistive Products for Persons with Disability," Sub-Committee 1: "Wheelchairs," WG6 – Working Group 6: "Wheelchair Restraint Systems." I am a past Advisory Board Member of  the Rehabilitation Engineering Research Center for Wheelchair Transportation Safety (RERC-WTS) at the Universities of Michigan, Pittsburgh, and Louisville.

7.      I have developed and led workshops and taught university courses throughout the country on such topics as transporting seniors and passengers with disabilities, mobility device securement, and safety and accessibility guidelines under the ADA.

8.      I have presented trainings on transportation for people with disabilities throughout the United States to diverse audiences, including community-based organizations serving people with disabilities, state and local transportation agencies, and nongovernmental transit organizations. I have given numerous presentations with the American Public Transportation Association (APTA), which is a nonprofit association of more than 1,500 public and private sector member organizations representing all forms of public transit. Such presentations include "Transporting Seniors and Passengers with Disabilities: Safety, Liability, and Training" (2017), "New Regulations and Standards for Disabled Accessibility" (2016), and "Wheelchair Access on

1    Transit and Paratransit Vehicles: Evolving Research and Best Practices – Transit System Policies

2    and Customer Information, Emerging Trends, and New Technologies" (2011).  I have given

3    numerous presentations on the topics of mobility device securement, wheelchair marking and

4    tether strap systems, passenger assistance, updates to the ADA Accessibility Guidelines

5    (ADAAG) for Non-Rail Vehicles, and other ADA regulatory issues.

6         9.    I have authored numerous publications on the topics of accessible transportation

7    and mobility device securement. Such publications include" Status Report on the Use of

8    Wheelchairs and Mobility Devices on Public and Private Transportation for Easter Seals Project

9    ACTION (Principal Investigator/Author) in 2008. This was the first national publication to

10   examine in depth the details of wheelchair securement problems and other wheelchair accessibility

11   issues on transportation vehicles.  I was co-author of a paper titled "Wheeled Mobility Device

12   Transportation Safety in Fixed Route and Demand-Responsive Public Transit Vehicles within the

13   United States," which was published in Assistive Technology, the official journal of RESNA, in

14   June of 2012. This study highlighted issues with wheelchairs themselves, vehicles, and training

15   that combine to present continuing hazards to individuals who travel while seated on their

16   mobility devices.

17        10.   One of my contributions to the field of accessible transportation and paratransit

18   services has been pioneering technical approaches for, and raising awareness about the need for,

19   wheelchair marking and tether strap programs. I presented the first research paper on the topic,

20   "Mobility Device Securement: Standards and Wheelchair Marking & Tether Strap Programs" at

21   several conferences. I also designed and helped implement marking and tether strap programs at

22   such major transit systems as LA Metro, Santa Clara VTA in San Jose, and SamTrans in San

23   Mateo, California. I served as an expert witness in CATHY GADDY, a.k.a. CATHY HORTON

24   v. LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, a case

25   about deficiencies in LA Metro's fixed route bus accessibility, including ADA compliance,

26   wheelchair securement, lift/ramp access, and passenger assistance policies. My work in that case

27   involved serving as the defendant's expert for overseeing the conduct of actions required by the

28   settlement agreement. I worked directly with the plaintiff's expert to agree upon needed changes

and new activities to bridge the difference between existing conditions and mandated improvement. This included on-board monitoring and reporting, changes in written policies and procedures, re-deployment of the existing wheelchair marking and tether strap program, and re-vamping of training for bus operators and supervisors.

11.     A true and correct copy of my most recent *curriculum vitae* is attached to this Declaration as Exhibit A.

**Consultation in This Matter**

12.     Plaintiffs' counsel have retained me to provide expert analysis in this case about the extent to which the policies and procedures of Brookdale Senior Living ("Brookdale") for providing transportation services at its facilities are accessible to Brookdale residents with disabilities, particularly those who use mobility aids or devices, in compliance with the requirements of the ADA and its implementing regulations, and whether they provide such services in a non-discriminatory manner.

13.     The opinions and conclusions I have reached in this matter are based on all of the following: (1) the evidence I have reviewed regarding Brookdale's accessible transportation services, policies and procedures, including the Fleet Safety Policy; (2) my background and experience as a specialist in the field of transportation for people with disabilities; and (3) my knowledge of federal rules, regulations, and guidance including applicable regulations published by the Department of Justice and the Department of Transportation.

14.     The documents I reviewed to arrive at my opinions include (1) Brookdale's Fleet Safety Policy dated June of 2020 (BKD1205388 at 3); (2) Wheelchair & Scooter Securement Safety Procedures for Drivers & Supervisors (BKD1205388 at 12); (3) Q'Straint (only) Recommended Securement Procedures for Three-Wheeled Scooters (BKD1205388 at 18); (4) Rules of the Road: Resident Transportation Guidelines (BKD1205388 at 2); (5) Summary of Training for Wheelchair Securement and Resident Safety (BKD1912457); (6) US Department of Transportation's (DOT) Questions and Answers Concerning Wheelchairs and Bus and Rail Service, available at https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/questions-and-answers-concerning-wheelchairs-and-bus-and; (7) various regulations

1    promulgated by the US Department of Justice (DOJ) and DOT applicable to accessible

2    transportation, as described herein; and (8) an email to Sarah Walberg from Sharon Monck, dated

3    October 16, 2018 (BKD2697544). A complete list of the documents I considered in arriving at the

4    opinions stated in this declaration is attached as Exhibit B.

5         15.    Based on my review of these documents, I make the opinions that (1) Brookdale's

6    "Fleet Safety Policy", other operating procedures, and training guidelines are out of compliance

7    with applicable DOT regulations implementing the ADA by requiring residents who use electric

8    wheelchairs, power chairs, or scooters to transfer to a bus seat or a manual wheelchair; and (2)

9    Brookdale's accessible transportation policies also violate the ADA and its regulations by

10   ████████████████████████████████████████████████████

11   ████████

12   **Coverage Under DOJ and DOT Regulations**

13        16.    Brookdale Senior Living is covered by Title III of the ADA, "Public

14   Accommodations and Services Operated by Private Entities." Federal regulations under this title

15   are promulgated by the DOJ. The regulations are found at Title 28 of the CFR, Part 36, "Non-

16   discrimination on the Basis of Disability by Public Accommodations and in Commercial

17   Facilities."

18        17.    Subpart C of Part 36 covers "Specific Requirements," and Sec. 36.310 addresses

19   "Transportation provided by public accommodations."  Subsection (a) of 36.310 - "General" states

20   that (1) "A public accommodation that provides transportation services, but that is not primarily

21   engaged in the business of transporting people, is subject to the general and specific provisions in

22   subparts B, C, and D of this part for its transportation operations".

23        18.    Subsection (c) of 36.310 sets forth "Requirements for vehicles and systems," and

24   specifically that "A public accommodation subject to this section shall comply with requirements

25   pertaining to vehicles and transportation systems in the regulations issued by the Secretary of

26   Transportation pursuant to section 306 of the Act."

27        19.    Section 306 of the ADA statute is equivalent to Section 12186 – "Regulations,"

28   which gives the Secretary of Transportation the authority to issue regulations to carry out ADA

Title III sections 12182(b)(2)(B) and (C). Subsection (b)(2)(B) covers fixed route transportation systems, and subsection (b)(2)(C) covers demand responsive transportation systems.

20.      The type of transportation service Brookdale provides falls under the broad definition of "Demand responsive system" under the DOT's Title II regulations, specifically 49 CFR 37.3 – "Definitions." Demand responsive transportation is any type of passenger transportation that is not fixed route or charter service. In general, it includes a large variety of modes, such as paratransit, jitney, dial-a-ride, call-a-bus/bus route deviation, taxi, senior center/assisted living, and social service transportation, unscheduled or advance reservation shuttles, and transportation network companies ("ride share"), to name some of the most common ones.

21.      In addition to the above-described DOJ regulations on applicability of DOT regulations to public accommodations, the DOT has its own language on applicability.  49 CFR § 37.21 explains that the DOT regulations apply to "any private entity that is not primarily engaged in the business of transporting people but operates a demand responsive or fixed route system." Section 37.37 further gives examples of a wide range of types of businesses that are covered. Brookdale Senior Living falls squarely into this application.

22.      Subpart G of 49 CFR Part 37 is called "Provision of Service". It contains requirements that apply to all types of accessible transportation, both fixed route and demand responsive. It addresses the manner in which the actual transportation being provided must be made and kept accessible to persons with disabilities. Examples of the requirements are: (a) maintenance of accessible features and equipment; (b) allowing service animals to accompany patrons with disabilities; (c) allowing individuals with disabilities to travel with a respirator or portable oxygen supply; (d) the process to be used in considering requests for reasonable modification of policies or practices; (e) training requirements.

23.      A key element of Subpart G is § 37.165: Lift and securement use. Major requirements of this section concern: enforcing lift and ramp design standards for weight, as defined in 49 CFR Part 38, use of securement spaces and devices, and assistance by vehicle operators. Section 37.165(e) states that "The entity may recommend to a user of a wheelchair that

the individual transfer to a vehicle seat. The entity may not require the individual to transfer." As used in this section, "wheelchair" is defined as "a mobility aid belonging to any class of three or more wheeled devices, usable indoors, designed or modified for and used by individuals with mobility impairments, whether operated manually or powered." 49 CFR § 37.3. Thus, scooters are included in this definition of "wheelchairs," meaning that users of electric wheelchairs, powerchairs, and scooters may not be forced to transfer from their device under this regulation. *See also* Disability Law Guidance, Department of Transportation, available at https://www.transit.dot.gov/regulations-and-guidance/civil-rights-ada/questions-and-answers-concerning-wheelchairs-and-bus-and ("[Q:] Is an electric scooter a wheelchair? [A:] Yes, provided that the electric scooter meets the definition of "wheelchair" in Section 37.3 of the DOT ADA regulations.").

24. Section 37.165(d) of Subpart G states that "The entity may not deny transportation to a wheelchair or its user on the ground that the device cannot be secured or restrained satisfactorily by the vehicle's securement system."

25. Section 37.165(g) of Subpart G states that "The entity shall permit individuals with disabilities who do not use wheelchairs, including standees, to use a vehicle's lift or ramp to enter the vehicle."

**Mobility Device Transfer Policy**

26. Brookdale's Fleet Safety Policy, BKD1205390 through BKD1205398, ("Fleet Policy") ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████ Fleet Policy at 5 (BKD1205394). For residents with mobility disabilities who use a scooter as their mobility device, ████████████████████ Section 4.e.iii. of the Fleet Safety Policy under the heading "Safety" states: ████████████████████████ ████████████████████████████ *Id.* This policy directly contravenes the regulation in Section 37.165(e) described above, which applies to scooters as well as other types of wheelchairs.

DECL. OF DOUGLAS CROSS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

27.     For residents with mobility disabilities who use electric wheelchairs or powerchairs, ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████ This "exception" does not alleviate Brookdale's violation of Section 37.165(e), because the regulation does not authorize an entity to impose such a limitation on the right of a person with a disability to use its transportation services without transferring. In addition, the exception contravenes Section 37.165(d), which prohibits an entity from denying transportation to a wheelchair or its user on the ground that the device cannot be secured or restrained satisfactorily by the vehicle's securement system.

28.     In addition, the conditions that must be satisfied to meet ████████████ ████████████████████████████████████████████████████████ ████████████████████████ are unnecessary. Vans and buses sold with wheelchair securement equipment are outfitted with universal-type systems that can accommodate the wide range of mobility devices currently in use. Such securement systems always include certification that they meet applicable industry standards that require that they are capable of successfully securing the broad range of mobility devices in use among the public (49 CFR 38.23(d)(5): *Movement* and ANSI/RESNA WC-4:2017, Section 18 - Wheelchair Tiedown and Occupant Restraint Systems (WTORS) for Use in Motor Vehicles, commonly known as "RESNA WC18".

29.     Proper securement does sometimes require certain auxiliary aids, generically known as "tether straps", which are easily available from securement equipment suppliers as general accessories. Brookdale already knows this and must only equip its vehicles with appropriate lengths of tether straps, and provide adequate training to its drivers in how to use

1  them. If a unique situation presents itself in which a scooter or power chair actually can't be fully

2  secured, then Brookdale must avail itself of the methods allowed by 49 CFR 37.165(e) and

3  accompanying guidance, to recommend transferring in a non-coercive way, which can include

4  explaining the risks of staying seated in the scooter or power chair, to the passenger. If the

5  passenger still declines to transfer, operating personnel must make their best efforts to secure both

6  the mobility device and the passenger, using ADA-required lap and shoulder belts, so that they

7  both stay in place during transport, which must be approached cautiously due to perceived

8  securement inadequacies

9  **Prohibition on Boarding Without Approved Device**

10       30.  ██████████████████████████████████████████

11  ████████████████████████████████████████████ BKD1205388, at 5.

12  What constitutes "approval" is not explained in the Policy. ████████████████

13  ██████████████████ *Id.* ████████████████████████████

14  ████████████████████████████████████████████

15  ██████████████ scooter users must transfer to board on a ramp. This is a different issue than

16  requiring transfer to a vehicle seat once the passenger is onboard the vehicle. It makes such a

17  transfer moot, because the passenger would have had to transfer out of their scooter or power chair

18  BEFORE boarding the vehicle. ████████████████████████████████

19  ████████████████████████████████ is contrary to 49 CFR § 37.165(e),

20  which prohibits entities from requiring transfers from mobility devices.

21       31.  Brookdale's Fleet Safety policy also violates 49 CFR § 37.165(g) ████████

22  ████████████████████████████████████████████

23  ████████████████████████ Brookdale's policy states that ████████████

24  ████████████████████████████████████████ BKD1205388, at 5.

25  Section 37.165(g), on the other hand, requires that "individuals with disabilities who do not use

26  wheelchairs, including standees" be permitted to use a vehicle lift.

27

28

DECL. OF DOUGLAS CROSS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Conclusions**

32.     My analysis of Brookdale's Fleet Safety Policy has revealed serious deficiencies with respect to compliance with ADA regulations promulgated by the DOT and DOJ, ███████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████

33.     It is my opinion that because of these deficiencies in Brookdale's policies for transportation of residents with mobility disabilities who require use of mobility devices, these residents are denied full and equal access to Brookdale's programs and services with respect to transportation.

34.     The analysis and conclusions contained in this Declaration reflect my preliminary findings and conclusions, and these are subject to revision and supplementation, as further information becomes available through the discovery process in this case. My work is continuing. I may supplement, revise, or change the opinions contained within this Declaration as I review additional documents produced and additional deposition testimony in this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed in Oakland, California this 15th day of August 2021.

Digitally signed by Douglas J. Cross
DN: cn=Douglas J. Cross, o, ou,
email=djcross@pacbell.net, c=US
Date: 2021.08.15 15:08:14 -07'00'

Douglas J. Cross

DECL. OF DOUGLAS CROSS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Exhibit A

**Douglas J. Cross** Transportation Consulting                 www.douglasjcross.com

P. O. Box 10268                                                        djcross@pacbell.net
Oakland, California 94610-0268                                          510.530.7198

## Experience:

**Douglas J. Cross Transportation Consulting**                    **Oakland, California**

2004 to Present: Principal

- Independent consultant specializing in transit accessibility and paratransit. Projects have included:

  ◦ Assistance regarding bus system wheelchair securement policy, procedures, training, and marking/tether strap programs and/or ADA and passenger assistance for:  Sacramento Regional Transit, Santa Clara Valley Transportation Authority (San Jose), Gold Coast Transit (Oxnard, Calif.), Los Angeles County MTA, Access Services (L.A. County ADA paratransit agency), San Joaquin RTD (Stockton, Calif.), SamTrans (San Carlos, Calif.), California Transit Insurance Pool (CalTIP), Whistlestop (Marin Co., Calif.), Outreach & Escort (San Jose ADA paratransit), City of Pleasant Hill, Calif., Maui Bus (Hawai'i), SilverRide, and Keolis Transit America, as well as non-emergency medical transp. (NEMT) firms

  ◦ Research and co-authoring of a national study on wheelchair access in transportation sponsored by Easter Seals Project ACTION: *"Status Report on the Use of Wheelchairs in Transportation"*

  ◦ Evaluation and recommendations for ADA paratransit eligibility certification process of San Joaquin Regional Transit District (SJRTD), Stockton, California

  ◦ Expert witness evaluation/testimony in litigation involving wheelchair securement and lift/ramp access, passenger assistance, and paratransit service performance

  ◦ Operational and ADA compliance evaluations of ADA paratransit programs at Baltimore, Maryland (operated by Maryland MTA), Capital Metro (Austin, Texas), and Summit Stage (Breckenridge, Colorado)

  ◦ Operational and ADA compliance evaluation of fixed route transit service of the Corpus Christi Regional Transportation Authority (Texas)

  ◦ Operational and needs assessments for Cities of Emeryville and San Pablo, California senior/paratransit programs

  ◦ On-board service monitoring for transit systems in Sacramento, San Jose, Antioch, & Orange Co., Calif.

  ◦ ADA configuration audit of 2 new transit coaches by New Flyer of America, Inc., for New York City Transit

- Certified Trainer, *Passenger Service and Safety (PASS)*, Community Transportation Association of America (CTAA); a program for training drivers in proper assistance techniques for serving persons with disabilities; *Passenger Assistance: Certification for Trainers*, University of Wisconsin-Milwaukee; and *Advanced Mobility Device Securement*, National Transit Institute (NTI - Rutgers University)

**Alameda-Contra Costa Transit District**                         **Oakland, California**

1996; 1998 - 2003: Accessible Services Manager
1997: Acting Transportation Superintendent

- Coordinated implementation and management of a new, brokered ADA paratransit service *(East Bay Paratransit Consortium)*, which began in 1996 as a joint venture between AC Transit and BART; annual budget of $25 million. Managed study of alternative service delivery structure improvements; developed operating and rider policies; coordinated RFP process for continued broker/service provider contracts; and managed procurement and implementation of new scheduling software/hardware.

- Directed establishment of a new operating division to provide a portion of the East Bay's ADA paratransit service under contract to a broker, including fleet of 35 vehicles, 50 drivers, and 6 dispatchers; budget of $3 million. Provided start-up procedures and training/supervision of all staff.

- Planned and coordinated all aspects of senior and disabled accessibility to the East Bay area's 800-bus fixed route transit service, including policies, procedures, equipment, and programs. Provided staff support to consumer-based Accessibility Advisory Committee.

- Developed and implemented a wheelchair marking/tether strap program for customers. Coordinated AC Transit participation in demonstrations of prototype wheelchair securement systems, as well as implementation of the first rear-facing padded barrier wheelchair stations in US transit buses.

**Sacramento Regional Transit District**                                    **Sacramento, California**
1992 - 1996: Accessible Services Administrator

- Planned and coordinated all functions related to accessibility of bus (200 vehicles), light rail (40 vehicles, 28 stations), and paratransit services (70 vehicles)

- Performed contract management and oversight of private, non-profit provider of ADA paratransit

**Door To Door Transportation Services, Inc.**                              **Cincinnati, Ohio**
1991: General Manager

- Chief operating officer for firm providing paratransit service to the SW Ohio Regional Transit Authority's county-wide *ACCESS* program, as well as airport limousine, charter, and Medicaid service.

**LAKETRAN (Lake County Regional Transit Authority)**                       **Grand River, Ohio**
1990: Operations Manager

- Chief operating officer for countywide fixed route and paratransit system serving suburban population of 225,000. Directed growth of revenue fleet from 40 to 60 vehicles and increase of driver complement from 30 to 80, as well as relocation of operating facility.

**Northeast Ohio Areawide Coordinating Agency**                             **Cleveland, Ohio**
1984 - 1990: Senior Transportation Planner

- Planned and administered 5-county paratransit coordination project.  Established non-profit umbrella vehicle leasing corporation, and developed lease agreements and service brokerage contracts.

- Planned and implemented routes, operating procedures, service RFP and contracts, and maintenance program for new community bus service for the City of Brunswick, Ohio.

- Authored *Lake County Paratransit Study*.  Developed vehicle specifications and bid packages; prepared federal and state operating and capital assistance grant applications.

**Previous Positions:**

- **Indiana Department of Transportation, Indianapolis, Indiana;** 1981 - 1984: Project Manager

- **City Of Norwood/Norwood Transit System, Norwood, Ohio;** 1980 - 1981: Transit Consultant

- **SW Ohio Regional Transit Authority/Queen City Metro, Cincinnati, Ohio;** 1979 - 1980: Transit Analyst

## Education:

- Bachelor of Urban Planning, *University of Cincinnati, School of Planning*, 1981

- Additional courses in transit, paratransit, and general management; wheelchair securement and passenger assistance techniques; ADA paratransit eligibility; microcomputers; and procurement

## Professional Affiliations:

- Member, *Access Committee* of the *American Public Transportation Association* (APTA), including *Universal Accessibility Standards Program/Technical Resources Group*, *Stop Announcement Standards Subcommittee*; and past chair, *Wheelchair User Issues Subcommittee*

- Past Advisory Board Member, *Rehabilitation Engineering Research Center for Wheelchair Transportation Safety* (RERC-WTS); Universities of Michigan, Pittsburgh, and Louisville

- Member, *ANSI/RESNA Committee on Wheelchairs and Transportation* (COWHAT), *American National Standards Institute / Rehabilitation Engineering Society of North America*

- Member, *International Standardisation Organisation, Technical Committee 173: "Assistive Products for Persons with Disability"*, Sub-Committee 1: "Wheelchairs", WG6 - Working Group 6: *"Wheelchair Restraint Systems"* (ISO/TC173/SC1/WG6)

Douglas J. Cross Transportation Consulting
P.O. Box 10268 Oakland, California 94610-0268                              www.douglasjcross.com
djcross@pacbell.net

**Douglas J. Cross** Transportation Consulting

www.douglasjcross.com

P.O. Box 10268
Oakland, California 94610-0268

djcross@pacbell.net
510.530.7198

## Publications & Presentations:

- *Transporting Seniors and Passengers with Disabilities: Safety, Liability, and Training*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Reno, Nevada, May 2017

- *Update of ADA Accessibility Guidelines for Non-rail Vehicles*, Spring Conference of the California Association for Coordinated Transportation (CalACT), Squaw Valley, California, April 2017

- *Transporting Seniors and Passengers with Disabilities: Safety, Liability, and Training*, 2016 National Aging Services Risk Management (NASRM) Conference, Chicago, November 2016

- *"New Regulations and Standards for Disabled Accessibility"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Charlotte, NC, May 2016

- *"Wheelchair and Vehicle Accessibility Changes Are Coming"*, Spring Conference of the California Association for Coordinated Transportation (CalACT), Tenaya Lodge, Calif. (Yosemite), April 2015

- *"Recommendations on Future Requirements for Mobility Devices"*, Spring Conference of the California Association for Coordinated Transportation (CalACT), San Diego, May 2014

- *"Developing Effective Rider Conduct Policies"*, Spring Conference of the California Association for Coordinated Transportation (CalACT), San Diego, May 2014

- *"Ask the Expert: 30 Questions Submitted by Conference Attendees"*, Putting the Pieces Together XVII - ADA Workshop, Leavenworth, Washington, April 22, 2013

- *"Roundtable Discussion: Coping with the Elimination of the Common Wheelchair Definition"*, Fall Conference of the California Association for Coordinated Transportation (CalACT), Monterey, California, September 2012

- *"ADA Policy Guidelines"*, Fall Conference of the California Association for Coordinated Transportation (CalACT), Monterey, California, September 2012

- *"Wheeled Mobility Device Transportation Safety in Fixed Route and Demand-Responsive Public Transit Vehicles within the United States"* (with Karen L. Frost, Ph.D., MBA; Linda van Roosmalen; and Gina Bertocci, Ph.D., PE), Assistive Technology (official journal of RESNA, the Rehabilitation Engineering and Assistive Technology Society of North America), June 2012

- *"The End of the Common Wheelchair: Service & Policy Implications of the New USDOT ADA Regulations"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Long Beach, California, May 2012

- *"Accommodating the Growing Diversity of Wheelchairs/Mobility Devices (Oversize/weight, Non--securable, Rollators, etc.): Policy, Procedure, and Customer Service Approaches"* - Annual Meeting /EXPO of the American Public Transportation Association (APTA), New Orleans, October 2011

- *"Wheelchair Securement Procedures, Strategies, Policies, & Solutions"*, North Carolina Public Transportation Association - 2011 Conference & Expo, Wilmington, NC, May 2011

- *"Wheelchair Access on Transit and Paratransit Vehicles: Evolving Research and Best Practices - Transit System Policies and Customer Information, Emerging Trends, and New Technologies"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Memphis, May 2011

- *"Mobility Device Securement: Standards and Wheelchair Marking & Tether Strap Programs"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Cleveland, Ohio, May 2010; and Spring Conference of the California Association for Coordinated Transportation (CalACT), San Francisco, June 2010

- *"Boarding Issues on Fixed Route and Paratransit"*, Easter Seals Project ACTION Distance Learning Audio Conference, March 24, 2010 (Co-presenter)

- *"Developing a Wheelchair Marking and Tether Strap Program"*, Transit Trainers' Workshop, National Transit Insititute, Cleveland, Ohio, October 2009; and article in *CalACTION*, newsletter of the California Association for Coordinated Transportation (CalACT)*, Fall 2009; and Bus & Paratransit Conference of the American Public Transportation Association (APTA), Austin, Texas, May 2008

- *"Wheelchair Securement on Buses and Paratransit Vehicles"*, Easter Seals Project ACTION Distance Learning audio conference, April 14, 2009 (Presenter)

- Status Report on the Use of Wheelchairs and Mobility Devices on Public and Private Transportation, Easter Seals Project ACTION, 2008 (Principal Investigator/Author, with Nelson/Nygaard Consulting Associates)

- *"ADA Paratransit Eligibility Models: Comparing the Options"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Nashville, Tennessee, May 2007

- *"Wheelchair Access: Improvements, Standards, and Challenges"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Anaheim, California, May 2006

- *"Wheelchair Access: Issues and Options for the 2000's"*, Bus & Paratransit/Bus Rapid Transit Conference of the American Public Transportation Association (APTA), Denver, May 2004

- *"Wheelchair Securement: Where Art Meets Science"*, article published in the newsletters of Easter Seals Project ACTION and the California Association for Coordinated Transportation (CalACT), 2004

- *"Securing Wheelchairs: Recent Developments, Future Challenges"*,  Bus & Paratransit Conference of the American Public Transportation Association (APTA), Milwaukee, May 2003

- *"AC Transit Offers Wheelchair Securement Aids"*, article in *Passenger Transport,* American Public Transportation Association (APTA), May 2002

- *"Developing Paratransit Rider Policies"*, Bus & Paratransit Conference of the American Public Transportation Association (APTA), Minneapolis, May 2002; and National Transit Institute (NTI) Training Conference, Portland, Oregon, 2000

- *"Making an Accessible Light Rail System More Accessible Under the Americans with Disabilities Act"*, Light Rail Conference sponsored by the Transportation Research Board and American Public Transportation Association (APTA), Baltimore, 1995

- *"Sacramento Upgrades Accessibility of Light Rail Stations"*, article in *Passenger Transport,* American Public Transportation Association (APTA), November 13,1995

- *"Developing Property Assessment Funding for Paratransit Service: County Service Areas in California"*, Transportation Research Board conference "Solving ADA Paratransit Problems", Phoenix, May 1993

- NOACA's Coordinated Paratransit Development Program, Northeast Ohio Areawide Coordinating Agency (Report # TR-89-16), Cleveland, July 1989

- Lake County Paratransit Study, Northeast Ohio Areawide Coordinating Agency, Cleveland, Ohio and LAKETRAN, Grand River, Ohio, October 1987

- *"Options for Accessible Paratransit Vehicles",* National Workshop on Bus Wheelchair Accessibility, US DOT, Seattle, May 1986

- Specification Guide for Small Transit Vehicles, Indiana Dept. of Transportation, Indianapolis (and reprinted by US DOT Technology Sharing Program, report # DOT-I-84-26), February 1984

KEY for titles:

*Italics* and "quotes" - Conference or teleconference presentation; or article in periodical

*Italics,* "quotes", and underline - Conference presentation and formal paper

Underline - Report or study

Exhibit B

## Exhibit B - List of Documents and Materials Considered

**Documents Produced by Defendants**

1. BKD2829594 (Brookdale's policy on Transportation – Residents: ADM-6)

2. BKD1205388-BKD1205514 ("Rules of the Road": Resident Transportation Guidelines; Brookdale's Fleet Safety Policy dated June of 2020; Wheelchair & Scooter Securement: Safety Procedures for Drivers & Supervisors; Q'Straint (only) Recommended Securement Procedures for Three-Wheeled Scooters (Q'Straint Kit # Q5-7583-A))

3. BKD2837452-BKD2837458 (Brookdale's Fleet Safety Policy dated July of 2019)

4. BKD0002901-BKD0002907 (Brookdale's Fleet Safety Policy dated November of 2017)

5. BKD2829601-BKD2829602 (Resident Outings Safety Procedure )

6. BKD2881862 (Best Practices for Transportation & Company Vehicle Management )

7. BKD1912457-BKD1912460 and BKD2852938-2852941 (Summary of Training for Wheelchair Securement and Resident Safety)

8. BKD2697544-BKD2697545 (Email to Sarah Walberg from Sharon Monck of Brookdale, dated October 16, 2018)

9. BKD2697546-BKD2697550 (Brookdale's policy, procedures, and forms for Reasonable Accommodation and/or Modification Requests)

10. BKD2612842 (Resident Outings Form)

11. BKD2851013-BKD2851014 (Talking Points – Resident Outings and Transportation Policy/Form Updates December 2016)

12. BKD1726718-BKD1726804 (Collection of Transportation Policies and Training Attendance Forms)

13. BKD0066050 (Brookdale CDL and CMV Driver Required LMS Training)

**Federal Laws and Regulations**

1. US Department of Transportation's (DOT) Questions and Answers Concerning Wheelchairs and Bus and Rail Service, available at https://www.transit.dot.gov/regulations-and-

guidance/civil-rights-ada/questions-and-answers-concerning-wheelchairs-and-bus-and-rail service, including, but not limited to those identified in Exhibit C.

2. Various regulations promulgated by the US Department of Justice (DOJ) and DOT applicable to accessible transportation, as described in my opinions and including, but not limited to, those identified in Exhibit C.

**Other Documents**

1. Ride Safe Brochure – wheelchair transportation safety information from University of Michigan Transportation Research Institute: http://wc-transportation-safety.umtri.umich.edu/ridesafe-brochure (also available as a PDF download)

2. ANSI/RESNA WC-4:2017, Section 18 - Wheelchair Tiedown and Occupant Restraint Systems (WTORS) for Use in Motor Vehicles: http://wc-transportation-safety.umtri.umich.edu/wts-standards/wc18-wtors

Exhibit C

**Excerpts from US DOT ADA Regulations**

www.transit.dot.gov > Civil rights/ADA > ADA: Regulations; Guidance

Title 49: Transportation

## PART 37—TRANSPORTATION SERVICES FOR INDIVIDUALS WITH DISABILITIES (ADA)

### Subpart A—General

#### §37.3   Definitions.

*Demand responsive system* means any system of transporting individuals, including the provision of designated public transportation service by public entities and the provision of transportation service by private entities, including but not limited to specified public transportation service, which is not a fixed route system.

*Fixed route system* means a system of transporting individuals (other than by aircraft), including the provision of designated public transportation service by public entities and the provision of transportation service by private entities, including, but not limited to, specified public transportation service, on which a vehicle is operated along a prescribed route according to a fixed schedule.

*Designated public transportation* means transportation provided by a public entity (other than public school transportation) by bus, rail, or other conveyance (other than transportation by aircraft or intercity or commuter rail transportation) that provides the general public with general or special service, including charter service, on a regular and continuing basis.

*Specified public transportation* means transportation by bus, rail, or any other conveyance (other than aircraft) provided by a private entity to the general public, with general or special service (including charter service) on a regular and continuing basis.

*Wheelchair* means a mobility aid belonging to any class of three- or more-wheeled devices, usable indoors, designed or modified for and used by individuals with mobility impairments, whether operated manually or powered.

Editor's note: *The definition of "wheelchair" is commonly considered to include manual wheelchairs (including "transport" models with four small wheels), power wheelchairs, and mobility scooters, either three- or four-wheeled. It does not include bicycles or tricycles, Segway-type personal mobility devices, or rollators (steerable four-wheeled walkers with seat and brakes).*

### Subpart B—Applicability

#### §37.21   Applicability: General.

(a) This part applies to the following entities, whether or not they receive Federal financial assistance from the Department of Transportation:

(1) Any public entity that provides designated public transportation or intercity or commuter rail transportation;

(2) Any private entity that provides specified public transportation; and

Exhibit C – Page 1

(3) Any private entity that is not primarily engaged in the business of transporting people but operates a demand responsive or fixed route system.

(b) For entities receiving Federal financial assistance from the Department of Transportation, compliance with applicable requirements of this part is a condition of compliance with section 504 of the Rehabilitation Act of 1973 and of receiving financial assistance.

(c) Entities to which this part applies also may be subject to ADA regulations of the Department of Justice (28 CFR parts 35 or 36, as applicable). The provisions of this part shall be interpreted in a manner that will make them consistent with applicable Department of Justice regulations. In any case of apparent inconsistency, the provisions of this part shall prevail.

## §37.37   Other applications.

(a) A private entity does not become subject to the requirements of this part for public entities, because it receives an operating subsidy from, is regulated by, or is granted a franchise or permit to operate by a public entity.

(b) Shuttle systems and other transportation services operated by privately-owned hotels, car rental agencies, historical or theme parks, and other public accommodations are subject to the requirements of this part for private entities not primarily engaged in the business of transporting people. Either the requirements for demand responsive or fixed route service may apply, depending upon the characteristics of each individual system of transportation.

(c) Conveyances used by members of the public primarily for recreational purposes rather than for transportation (e.g., amusement park rides, ski lifts, or historic rail cars or trolleys operated in museum settings) are not subject to the requirements of this part. Such conveyances are subject to Department of Justice regulations implementing title II or title III of the ADA (28 CFR part 35 or 36), as applicable.

(d) Transportation services provided by an employer solely for its own employees are not subject to the requirements of this part. Such services are subject to the regulations of the Equal Employment Opportunity Commission under title I of the ADA (29 CFR part 1630) and, with respect to public entities, the regulations of the Department of Justice under title II of the ADA (28 CFR part 35).

(e) Transportation systems operated by private clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) or religious organizations or entities controlled by religious organizations are not subject to the requirements of this part.

(f) If a parent private company is not primarily engaged in the business of transporting people, or is not a place of public accommodation, but a subsidiary company or an operationally distinct segment of the company is primarily engaged in the business of transporting people, the transportation service provided by the subsidiary or segment is subject to the requirements of this part for private entities primarily engaged in the business of transporting people.

(g) High-speed rail systems operated by public entities are subject to the requirements of this part governing intercity rail systems.

(h) Private rail systems providing fixed route or specified public transportation service are subject to the requirements of §37.107 with respect to the acquisition of rail passenger cars. Such systems are subject to the requirements of the regulations of the Department of Justice implementing title III of the ADA (28 CFR part 36) with respect to stations and other facilities.

Exhibit C – Page 2

## Subpart G—Provision of Service

### §37.165   Lift and securement use.

(d) The entity may not deny transportation to a wheelchair or its user on the ground that the device cannot be secured or restrained satisfactorily by the vehicle's securement system.

(e) The entity may recommend to a user of a wheelchair that the individual transfer to a vehicle seat. The entity may not require the individual to transfer.

(g) The entity shall permit individuals with disabilities who do not use wheelchairs, including standees, to use a vehicle's lift or ramp to enter the vehicle.

## Appendix D to Part 37—Construction & Interpretation of Provisions of 49 CFR Part 37

### Section 37.165   Lift and Securement Use

Entities have often recommended or required that a wheelchair user transfer out of his or her own device into a vehicle seat. Under this rule, it is no longer permissible to require such a transfer. The entity may provide information on risks and make a recommendation with respect to transfer, but the final decision on whether to transfer is up to the passenger.

(Wheelchair Users…) People using canes or walkers and other standees with disabilities who do not use wheelchairs but have difficulty using steps (*e.g.,* an elderly person who can walk on a level surface without use of a mobility aid but cannot raise his or her legs sufficiently to climb bus steps) must also be permitted to use the lift, on request.

----------------------------------------------------------------------------------------------------------------------------------

## Questions and Answers Concerning Wheelchairs and Bus and Rail Service

DEPARTMENT OF TRANSPORTATION
DISABILITY LAW GUIDANCE

### Is an electric scooter a wheelchair?

- Yes, provided that the electric scooter meets the definition of "wheelchair" in Section 37.3 of the DOT ADA regulations.

### Can an operator require a person to transfer from a wheelchair to a vehicle seat?

- No. Section 37.165(e) of the DOT ADA regulations allows persons who use wheelchairs to transfer to a vehicle seat, if one is available. Such a move is the rider's decision and the operator cannot force a rider to transfer to a vehicle seat, although the operator can suggest a transfer in a non-coercive way.

### Can an operator refuse to carry a person with a disability, especially a person using an electric scooter that meets the definition of a "wheelchair," because of higher insurance rates or liability concerns?

- No. Section 37.5(g) of the DOT ADA regulations prohibits an operator from denying service to an individual with a disability because its insurance company conditions

Exhibit C – Page 3

coverage or rates on the absence of individuals with disabilities or persons who use wheelchairs.

## May a transit operator require that wheelchairs be secured in buses and vans?

- Yes, if the transit operator has established such a policy, and the vehicle is required to be equipped with a securement system by 49 CFR Part 38. Section 37.165(c)(3) of the DOT ADA regulations allows a transit operator to establish a policy that requires all riders to have their wheelchairs secured while aboard a transit bus or van. Therefore, the operator may decline to provide service to a rider who refuses to allow his or her wheelchair to be secured.

## May a transit operator deny boarding to a rider whose wheelchair is difficult to secure?

- No. If the transit operator has a policy that requires securement, or if a rider asks that the wheelchair be secured, Section 37.165(f) of the DOT ADA regulations requires transit personnel to use their best efforts to secure the device. Section 37.165(d) states that transit operators cannot refuse to accommodate a wheelchair because the device cannot be secured to the driver's satisfaction. Given the diversity of wheelchairs, transit operators should consult with the owner of the wheelchair to determine the best means of securement.

This guidance has been approved through the Department of Transportation's Disability Law Coordinating Council as representing the official views of the Department on this matter.

February 4, 2013

Last updated: Tuesday, September 1, 2015

---------------------------------------------------------------------------------------------------------------------------

## CIRCULAR: FTA C 4710.1
Federal Transit Administration
U.S. Department of Transportation
November 4, 2015
Subject: AMERICANS WITH DISABILITIES ACT (ADA): GUIDANCE

### *(See PDF document)*

Table of Contents:

**1.3 Applicability of the DOT Regulations** .................................................................................. **1-4**
1.3.1 Applicability in general..................................................................................................................1-4

**2.4 Lift/Ramp and SecurementUse**.................................................................................................. **2-10**
2.4.1 Accommodating Riders Using  Wheelchairs
2.4.5 Requesting that Riders Transfer to a Seat.............................................................................. 2-15
2.4.6 Allowing Standees on Lifts/Ramps ........................................................................................ 2-15

*-- End of compendium --*

Exhibit C – Page 4