1

**SEYFARTH SHAW LLP**
Gerald L. Maatman, Jr. (IL SBN 6181016) (*Pro Hac Vice*)

2

gmaatman@seyfarth.com
Jennifer A. Riley (IL SBN 6272366) (*Pro Hac Vice*)

3

jriley@seyfarth.com
233 South Wacker Drive, Suite 8000

4

Chicago, Illinois 60606-6448
Telephone:      (312) 460-5000

5

Facsimile:      (312) 460-7000

6

Justin T. Curley (SBN 233287)

7

jcurley@seyfarth.com
560 Mission Street, 31st Floor

8

San Francisco, California 94105
Telephone:      (415) 397-2823

9

Facsimile:      (415) 397-8549

Kristina M. Launey (SBN 221335)

10

klauney@seyfarth.com
400 Capitol Mall, 23rd Floor

11

Sacramento, California 95814
Telephone:      (916) 448-0159

12

Facsimile:      (916) 397-8549

13

**MOORE & LEE, LLP**
Erica Rutner (FBN 0070510) (*Pro Hac Vice*)

14

e.rutner@mooreandlee.com
501 East Las Olas Blvd. Suite 200

15

Fort Lauderdale, Florida 33301
Telephone: (703) 940-3763

16

Facsimile: (703) 506-2051

17

Attorneys for Defendants
BROOKDALE SENIOR LIVING INC.

18

BROOKDALE SENIOR LIVING COMMUNITIES, INC.

19

UNITED STATES DISTRICT COURT

20

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

21

22

STACIA STINER, et al.,

Case No. 4:17-CV-03962-HSG (LB)

23

Plaintiffs,

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

24

v.

25

BROOKDALE SENIOR LIVING INC. et al.,

**DATE: JUNE 16, 2022**
**TIME: 2:00 P.M.**

26

Defendants.

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 2

I.      THE BROOKDALE SENIOR LIVING BRAND IS NOT ASSOCIATED WITH COMMON OWNERSHIP ........................................................................................ 2

II.      RESIDENTS CONTRACT WITH DIFFERENT ENTITIES FOR DIFFERENT SERVICES .................................................................................................................. 4

III.      DIFFERENT COMMUNITIES HAVE DIFFERENT POLICIES AND PRACTICES ................ 5

LEGAL STANDARD .................................................................................................................... 7

ARGUMENT ................................................................................................................................ 7

I.      PLAINTIFFS FAIL TO DEMONSTRATE THAT A SUFFICIENT NUMBER OF INDIVIDUALS QUALIFY FOR MEMBERSHIP IN THEIR PROPOSED CLASSES, THEREBY DEFEATING NUMEROSITY ............................................................................ 7

II.      PLAINTIFFS CANNOT MEET THE COMMONALITY REQUIREMENT OF RULE 23(A)(2), MUCH LESS THE PREDOMINANCE REQUIREMENT OF RULE 23(B)(3) .......... 8

     A.      Plaintiffs Cannot Establish Any Actionable Injury on a Class-Wide Basis ...................... 9

         1.      Determining Who Suffered an Actual Injury in the Proposed Mobility and Vision Impaired Class Will Require Individualized Inquiries ............................. 10

         2.      Determining Who Suffered an Actual Injury in the Proposed Disabilities Class Will Require Individualized Inquiries .......................................................... 12

         3.      Determining Who Suffered an Actual Injury in the Proposed Contracting Class Will Require Individualized Inquiries .......................................................... 13

     B.      Plaintiffs Fail to Establish Any Common Question that Will Drive Resolution of the Claims Asserted on Behalf of the Mobility and Vision Class ................................... 14

         1.      Whether the Communities Comply with the ADA or CBC Is Not a Common Question that Will Drive Resolution of Plaintiffs' Claims ................. 15

         2.      Plaintiffs Have Not Shown Any Common Offending Policies or Practices Relative to Barrier Removal, Transportation, or Emergency Evacuation ........... 18

             a.      Readily Achievable Barrier Removal ...................................................... 18

             b.      Transportation ......................................................................................... 19

             c.      Emergency Evacuation ............................................................................ 21

i

3.    Whether the Communities Are Covered by Title III of the ADA Is Not a Common Question that Will Drive Resolution of Plaintiffs' Claims .................. 22

C.    Plaintiffs Fail to Establish Any Common Questions that Will Drive Resolution of Their Disabilities Class Claims ........................................................... 24

1.    Plaintiffs Have Not Shown (And Cannot Show) a Common Unlawful Policy or Practice Related to Staffing. ................................................. 24

2.    Plaintiffs Have Not Shown a Common Policy or Practice of Denying Requests to Modify Staffing Policies in a Discriminatory Manner ..................... 26

D.    Plaintiffs Fail to Establish Any Common Questions that Will Drive Resolution of their Contracting Class Claims .................................................... 28

1.    Whether Defendants' Statements and Omissions Were Deceptive Is Not a Common Question ............................................................... 28

2.    Whether the Alleged Statements Are Material Is Not a Common Question ........ 31

3.    Whether Defendants Allegedly Took the Property of Elderly Residents Is Not a Common Question ........................................................... 33

III.    PLAINTIFFS ARE NOT TYPICAL OF OTHER PROPOSED CLASS MEMBERS ............... 34

IV.    PLAINTIFFS FAIL TO SHOW THE COURT COULD RESOLVE THEIR CLAIMS FOR DAMAGES ON A CLASS-WIDE BASIS UNDER RULE 23(B)(3) ............................... 34

V.    PLAINTIFFS' PROPOSED CLASSES DO NOT SATISFY RULE 23(B)(2) .......................... 36

VI.    THE COURT SHOULD ALSO DENY CERTIFICATION BECAUSE A CLASS ACTION IS NOT A SUPERIOR OR MANAGEABLE WAY TO LITIGATE THE CLAIMS ..................................................................................................... 38

A.    Proposed Class Members Have an Interest in Individually Controlling the Prosecution of Separate Actions ............................................................ 38

B.    Litigating this Case as a Class Action Would Be Wholly Unmanageable ...................... 39

CONCLUSION ................................................................................................. 40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Access Now, Inc. v. S. Fla. Stadium Corp.*,
   161 F. Supp. 2d 1357 (S.D. Fla. 2001) ........................................................................19

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)......................................................................................................39

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
   2012 WL 3762440 (S.D. Cal. Aug. 28, 2012) ........................................................35, 39

*Arnold v. United Artists Theatre Circuit, Inc.*,
   158 F.R.D. 439 (N.D. Cal. 1994)..................................................................................18

*In Re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018)...........................................................................................35

*Badella v. Deniro Mktg. LLC*,
   2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ...............................................................31

*Bartels v. Saber Healthcare Grp.*,
   2020 WL 6173566 (E.D.N.C. Oct. 21, 2020)..........................................................30, 34

*Brooklyn Center for Indep. of the Disabled v. Bloomberg*,
   290 F.R.D. 409 (S.D.N.Y. 2012)...................................................................................22

*Castaneda v. Burger King Corp.*,
   264 F.R.D. 557 (N.D. Cal. 2009)............................................................................ passim

*Castillo v. Bank of Am. NA*,
   980 F.3d 723 (9th Cir. 2020) ........................................................................................13

*Civil Rights Education & Enforcement Center v. Hospital Properties Trust*,
   867 F.3d 1093 (9th Cir. 2017) ................................................................................ passim

*Cole v. CRST Van Expedited*,
   842 Fed. Appx. 162 (9th Cir. 2021)..............................................................................26

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)........................................................................................................34

*Cordoba v. DIRECTV, LLC*,
   2020 WL 5548767 (N.D. Ga. July 23, 2020).................................................................35

*Dent v. Nat'l Football League*,
   2021 WL 3885954 (N.D. Cal. Aug. 31, 2021) ..............................................................38

*Dunlap v. Liberty Nat'l Prods., Inc.*,
   878 F.3d 794 (9th Cir. 2017).........................................................................................27

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...............................................................................7, 15, 33, 34

*Ellis v. J.P. Morgan Chase & Co.*,
2015 WL 9178076 (N.D. Cal. Dec. 17, 2015) ........................................................................7

*Felknor v. Tallow Wood Apartments*,
2009 WL 3230607 (W.D. La. Sept. 28, 2009) ......................................................................23

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ..............................................................................................12

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)................................................................................................................34

*Gonzales v. Comcast Corp.*,
2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ............................................................................8, 9

*Gonzalez v. Millard Mall Servs., Inc.*,
281 F.R.D. 455 (S.D. Cal. 2012) ..........................................................................................26

*Gray v. Golden Gate National Recreational Area*,
279 F.R.D. 501 (N.D. Cal. 2011) ..........................................................................................18

*Gustavson v. Wrigley Sales Co.*,
961 F. Supp. 2d 1110 (N.D. Cal. 2013) ................................................................................29

*Guzman v. Chipotle Mexican Grill, Inc.*,
2020 WL 227567 (N.D. Cal. Jan. 15, 2020) (Gilliam, J.)................................................7, 34

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................................33

*Harris v. Best Buy Stores, L.P.*,
2018 WL 3932178 (N.D. Cal. Aug. 16, 2018) (Gilliam, J.) ..................................................9

*Heredia v. Sunrise Senior Living, LLC*,
2021 WL 6104188 (C.D. Cal. Nov. 16, 2021)................................................................10, 30

*Hernandez v. Cty. of Monterey*,
305 F.R.D. 132 (N.D. Cal. 2015) ..........................................................................................18

*Howard v. Cook County*,
989 F.3d 587 (7th Cir. 2021) ................................................................................................23

*Indep. Hous. Servs. v. Fillmore Ctr.*,
840 F. Supp. 1328 (N.D. Cal. 1993) ....................................................................................23

*Jankey v. Twentieth Century Fox Film Corp.*,
14 F. Supp. 2d 1174 (C.D. Cal. 1998) ..................................................................................23

*Johnson v. Laura Dawn Apartments, LLC*,
2012 WL 33040 (E.D. Cal. Jan. 6, 2012) ............................................................................23

iv

*Johnson v. Rai Rockling Investments, LLC*,
   2017 WL 3421848 (E.D. Cal. Aug. 9, 2017) .......................................................................37

*Juarez v. Jani-King*,
   2010 WL 3766649 (N.D. Cal. Sept. 24, 2010) ....................................................................39

*Kohn v. American Housing Foundation, Inc.*,
   178 F.R.D. 536 (D. Col. 1998) ...........................................................................................14

*Lane v. State*,
   2004 WL 1878659 (M.D. Tenn. Aug. 17, 2004) .................................................................17

*Langer v. Kiser*,
   516 F. Supp. 3d 1066 (S.D. Cal. 2021)................................................................................23

*Lara v. First Nat'l Ins. Co. of Am.*,
   2022 WL 414691 (9th Cir. Feb. 11, 2022) .......................................................................9, 14

*MacRae v. HCR Manor Care Services, LLC*,
   2018 WL 8064088 (C.D. Cal. Dec. 10, 2018) ....................................................................32

*Martinez v. Walt Disney Co.*,
   2012 WL 12913738 (C.D. Cal. Nov. 26, 2012)...................................................................22

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ..............................................................................................9

*Mielo v. Bob Evans Farms, Inc.*,
   2015 WL 1299815 (W.D. Pa. Mar. 23, 2015) .........................................................17, 37, 38

*Moeller v. Taco Bell Corp.*,
   2012 WL 3070863 (N.D. Cal. July 26, 2012)......................................................................35

*Morris v. Baldwin*,
   2018 WL 3016498 (S.D. Ill. June 14, 2018)........................................................................28

*Munoz v. InGenesis STGi Partners, LLC*,
   2015 WL 13559891 (S.D. Cal. Dec. 23, 2015)......................................................................7

*Nevarez v. Forty Niners Football Co., LLC*,
   326 F.R.D. 562 (N.D. Cal. 2018)....................................................................................18, 35

*Park v. Ralph's Grocery Co.*,
   254 F.R.D. 112 (C.D. Cal. 2008) .........................................................................................18

*In Re Paxil Litig.*,
   212 F.R.D. 539 (C.D. Cal. 2003) .........................................................................................40

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001)..............................................................................................................27

*Ranza v. Nike, Inc.*,
   793 F.3d 1059 (9th Cir. 2015) ..............................................................................................29

v

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2010) ................................................................................. 9

*Rocket Mortg., LLC v. Alig*,
   2021 WL 5893330 (U.S. Dec. 8, 2021) ...................................................................... 13

*Rosales v. El Rancho Farms*,
   2011 WL 6153276 (E.D. Cal. Dec. 12, 2011) ............................................................ 26

*Smith v. Microsoft Corp.*,
   297 F.R.D. 464 (S.D. Cal. 2014) ............................................................................... 39

*Smith v. Walgreens*,
   2021 WL 3861451 (N.D. Cal. Aug. 30, 2021) ........................................................... 28

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................................... 10

*Stiner v. Brookdale Senior Living, Inc.*,
   354 F. Supp. 3d 1046 (N.D. Cal. 2019) ..................................................................... 23

*Timoneri v. Speedway, LLC*,
   186 F. Supp. 3d 756 (N.D. Ohio May 12, 2016) ....................................................... 17

*In Re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   288 F.R.D. 445 (C.D. Cal. 2013) ................................................................................. 9

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ........................................................................................ *passim*

*Turcios v. Carma Labs., Inc.*,
   296 F.R.D. 638 (C.D. Cal. 2014) ............................................................................... 33

*U.S. v. Landsdowne Swim Club*,
   713 F. Supp. 785 (E.D. Pa. 1989) .............................................................................. 24

*Vargas v. Quest Diagnostics Clinical Labs., Inc.*,
   2021 WL 5989958 (C.D. Cal. Dec. 2, 2021) ....................................................... 35, 39

*Vondesaar v. Starbucks Corp.*,
   2015 WL 629437 (C.D. Cal. Feb. 12, 2015) .............................................................. 35

*Wagner v. White Castle Sys., Inc.*,
   309 F.R.D. 425 (S.D. Ohio Sept. 21, 2015) ............................................................... 17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................................ *passim*

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011) ..................................................................... 9, 31, 32

*Wolin v. Jaguar Land Rover North America, LLC*,
   617 F.3d 1168 (9th Cir. 2010) ................................................................................... 30

vi

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ..................................................................................36, 38

**State Cases**

*Cohen v. DIRECTV, Inc.*,
    178 Cal. App. 4th 966 (2009) ...................................................................................29

*Downey v. Public Storage, Inc.*,
    44 Cal. App. 5th 1103 (2020) ...................................................................................30

*Stoner ex rel. Estate of Perkins v. Quinlan*,
    2015 WL 5970349 (Sup. Ct. Pa. 2015)....................................................................31

*Hale v. Sharp v. Healthcare*,
    183 Cal.App.4th 1373 (Cal. App. 2010)...................................................................10

*Kwikset Corp. v. Sup. Ct.*,
    51 Cal.4th 310 (Cal. 2011).......................................................................................10

*Passucci v. Absolute Ctr. For Nursing Rehab.*,
    2014 N.Y. Misc. Lexis 5834 (N.Y. Sup Ct. Jan. 10, 2014) ..................................31, 34, 40

**Federal Statutes**

42 U.S.C. §§ 12181(1)(A), (7)(K) ..................................................................................23

42 U.S.C. § 12182(a) .......................................................................................................23

42 U.S.C. § 12187..........................................................................................................23

ADA ....................................................................................................................... *passim*

**State Statutes**

Cal. Civ. Code § 55.56(c) ...............................................................................................35

Cal. Code Regs., Title 22, §§ 87101(l)(1), 87105.............................................................3

Cal. Health & Safety Code § 1569.10...............................................................................3

Cal. Wel. & Inst. Code § 15610.30.................................................................................10

California Building Code ..................................................................................................15

Unruh Act ............................................................................................................... *passim*

**Rules**

Rule 23 .................................................................................................................... *passim*

Rule 23(a)..........................................................................................................................7, 8

Rule 23(a)(1) ......................................................................................................................7

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

80236136v.2

Rule 23(A)(2) .................................................................................................................8, 15

Rule 23(b) ...............................................................................................................................7

Rule 23(b)(2) ......................................................................................................36, 37, 38, 39

Rule 23(B)(3) .................................................................................................................. *passim*

Rule 30(b)(6) .........................................................................................................................8

**Other Authorities**

*Sikowitz v. Brookdale Senior Living Inc.*,
     Case No. 19-CV-010992 ...............................................................................................39

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

80236136v.2

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' Motion for Class Certification [ECF No. 278] (the "Motion" or "Mot.") falls woefully short of meeting the requirements of Rule 23. Plaintiffs ask this Court to certify three different classes, each of which involve distinct issues and theories that can be adjudicated only through highly individualized inquiries. The cast of putative class members includes: (1) "[a]ll persons with disabilities who use … mobility aids or who have vision disabilities," (2) "[a]ll persons with disabilities who require assistance with activities of daily living," and (3) "[a]ll persons who resided or reside at one of the residential care facilities." (Mot. at 13.) Accordingly, Plaintiffs' proposed classes include thousands of individuals who lived at more than 80 different communities over the past eight years. Complicating matters further, these 80 plus communities were owned, managed and operated by numerous entities— none of whom are parties to this action. In turn, community leaders adopted different policies and practices on a wide variety of issues and residents experienced a wide variety of conditions. By virtue of these indisputable facts, there are numerous independent grounds for denying class certification.

At the outset, Plaintiffs have not even established a sufficient number of individuals who qualify for membership in their proposed classes. Plaintiffs define the classes as including persons who resided at communities "owned, operated and/or managed" by Defendants and "who contracted with" Defendants "for services for which [Defendants were] paid money." (*Id*. at 11, 13.) Yet, Plaintiffs fail to recognize Defendants do not own, operate, or manage any of the subject communities. Likewise, Defendants did not contract with or receive money from putative class members. The putative class members instead resided at communities owned and operated by various other entities. They also contracted with and paid money to various other entities. This not only defeats the numerosity requirement, it also negates the entire factual premise of Plaintiffs' Motion.

Plaintiffs also fail to identify a single common question that is susceptible to a class-wide answer—much less one that will predominate over individual issues. Perhaps most critically, Plaintiffs' proposed classes are defined to include numerous individuals who have not suffered any actual injury. In fact, Plaintiffs' theory of injury—"bare procedural violations, divorced from any concrete harm"— conflict with fundamental standing principles espoused in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

2203 (2021), and its progeny. Thus, to determine who (if anyone) suffered a concrete harm, the Court will have to engage in a host of highly individualized inquiries specific to each putative class member.

Moreover, while Plaintiffs point to an array of questions supposedly "common" to the proposed classes, they have not established that a class-wide proceeding has the capacity to generate common answers. Indeed, Plaintiffs have not identified a single common policy or practice relevant to their claims. That is because there are none. Each community leader adopts his or her own policies and practices best suited to the needs of the individual residents. Furthermore, residents contracted with different entities, they lived at different communities with different physical layouts, they resided in different apartments with different features, and they bargained for and received different services. The Court would therefore have to undertake a series of individualized inquiries to resolve the elements of each class member's claims.

In addition, the Court cannot manageably adjudicate Plaintiffs' claims on a class-wide basis. Instead, adjudication of the claims will require an analysis of a multitude of complex and individualized issues. For example, to resolve Plaintiffs' discrimination claims, a jury would need to analyze numerous design standards for over 80 buildings involving thousands of unique features. The jurors would then need to evaluate how each purported class member with a disability was harmed, if at all, by the individual policies and practices of the respective community. Similarly, Plaintiffs' allegations regarding staffing would require the jury to individually analyze each community's staffing practices and determine whether those practices led putative class members to be misled. It is no surprise Plaintiffs have not proposed any trial plan—much less one capable of overcoming these obstacles. Indeed, the sprawling and unmanageable nature of the putative class claims is reason alone to deny certification. But when coupled with all other issues, the Court should easily deny class certification.

## FACTUAL BACKGROUND

### I.    The Brookdale Senior Living Brand Is Not Associated with Common Ownership

The "Brookdale Senior Living" brand is synonymous in the senior living industry with enriching the lives of senior citizens by offering a variety of flexible living options. (Ex. 225 ¶ 4.)[1] These options

---

[1] References to "Ex." and "Exs." refer to exhibits contained within Defendants' Appendix of Exhibits in Support of their Response in Opposition filed concurrently herewith.

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

include independent living, assisted living, memory care, and continuing care retirement communities. (*Id*.) Each option offers an array of care levels and service plans tailored to a senior's individual needs. (*Id*. ¶ 5) These options allow seniors to live in their own private apartments, while still obtaining the support they need. (*Id*.) In turn, staff provide residents with individualized services and care to maximize each resident's independence and ensure their health and safety.

Plaintiffs seek to represent putative class members who resided at over 80 different communities in California at various times since July 13, 2014, each of which purportedly utilized or utilizes the "Brookdale Senior Living" brand (the "Communities"). (*Id*. ¶ 6; Mot. at 13.) Plaintiffs assert claims on behalf of residents with mobility and vision impairments on the grounds that Defendants had allegedly discriminatory policies regarding (a) physical barriers, (b) transportation, and (c) emergency evacuation (the "Mobility and Vision Impaired Class"). (Mot. at 13, 32-36.) They assert claims on behalf of residents with any disability on the grounds that Defendants had an allegedly discriminatory policy of failing to modify staffing policies at residents' requests (the "Disabilities Class"). (*Id*. at 3, 41-42.) And they assert claims on behalf of all residents of the Communities on the grounds that Defendants made contractual misrepresentations about staffing and are responsible for allegedly understaffing the Communities (the "Contracting Class"). (*Id*. at 3, 44-46.) However, neither Defendant owned, operated, or managed any of the Communities. (Ex. 392 at 17:23-18:1.) Indeed, both Defendants are holding companies that are not involved in either operations or management. (Ex. 225 ¶¶ 10-11.) Further, neither Defendant administers various support functions offered to Communities. (*Id*. ¶ 12.)

Contrary to Plaintiffs' suppositions, the Communities are in fact owned and operated by various non-parties. (Ex. 271.) These non-parties, in turn, either leased the Communities to various other non-parties or, alternatively, contracted with non-parties to either license, operate and/or manage the Communities. (*Id*.; Ex. 304.)[2] In other words: (i) some owners license and operate their Communities;

---

[2] California senior living communities (also known as residential care facilities for the elderly) are regulated by the State of California Department of Social Services ("DSS"). California senior living communities follow state regulations that differ from the federal regulations governing skilled nursing facilities and enforced by the Centers for Medicare & Medicaid Services. To operate in California, an operator must obtain a non-transferable license from DSS "to operate and maintain" the communities. *See* Cal. Health & Safety Code § 1569.10; Cal. Code Regs., tit. 22, §§ 87101(l)(1), 87105. (Exs. 6-47 (Community licenses).)

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

(ii) some owners lease their Communities to other entities to license and operate; and (iii) some owners and/or licensees/operators contract with property managers to manage the Communities. (*Id.*; Ex. 48.)[3]

Critically, the lease and management agreements assign to various non-parties responsibility for "all aspects of the operation of the Communit[ies]," including compliance with "all Legal Requirements." (Ex. 312 at BKD2951948.) These agreements also assign to non-parties control over modifications to physical structures and accessibility of the Community. (Ex. 304.)[4] Likewise, different non-parties designed and constructed the Communities, and they did so at different times and for different purposes. (Ex. 416, Ex. 3.) For example, Marriott International, Inc. Senior Living Services constructed the Northridge Community in 1998 as a skilled nursing facility. (*Id.*) In contrast, Goldrich-Kest constructed the Clairemont Community in 1987 as a guest home building. (*Id.*) These non-parties also used different designs—resulting in different footprints amongst the many different Communities. Communities also address residents' unique requests for physical accommodations and they permit residents to make unique changes to their private apartments. (*See, e.g.*, Ex. 390 at 251:20-252:1.) The Anderson Declaration sets forth examples of the individual construction history of the Communities and attaches 48 aerial photographs illustrating their various footprints. (Ex. 416 ¶¶ 23, 39, Exs. 3, 7.)

## II.   **Residents Contract with Different Entities for Different Services**

Each respective licensee/operator entered into contracts ("Residency Agreements") with residents of their respective Communities. Thus, Plaintiffs signed Residency Agreements with ten (10) different licensees/operators. (Ex. 501 at 1.) Neither Defendant contracted with Plaintiffs, nor are they parties to their Residency Agreements. (*Id.*)

The various licensees/operators agreed to provide residents with different types of services, based on the operations of the particular Community (as dictated by the licensee/operator). For example, BLC Oak Tree Villa, Inc., the licensee for Scotts Valley, agreed to provide Plaintiff Jestrabek-Hart with dining, housekeeping, and transportation services. (Ex. 271 at 6; Ex. 379 at BKD0026895.) The

---

[3] The chart attached as Ex. 271 illustrates the ownership and operational structure unique to each Community and illustrates that the owners, lessees, licensees/operators, or managers do not include Defendants. (Ex. 225 ¶ 25; Ex. 271; *see also* Ex. 228.)

[4] The chart attached as Ex. 304 summarizes the delegation of such responsibilities across the Communities, the various lease and management agreements confirm. (Ex. 225 & Exs. 305-377.)

transportation services offered included "transportation for medical, dental, financial and shopping within a ten (10) mile radius of the Community as well as for scheduled social and leisure activities." (Ex. 379 at BKD0026895.) By contrast, EmeriCare Inc., the licensee for Fountaingrove, did not agree to provide any transportation services to Plaintiff Boris. (Ex. 382 at PLTF0002369.)

The various licensees/operators also agreed to provide residents with different types of care, based on the personal care needs of the particular resident. To do so, in accordance with applicable regulations, the licensees/operators would assess the personal needs of each resident to determine what, if any, personal care services he or she required. (*See, e.g.*, Ex. 378 at 3; Ex. 394 at 59:24-60:12, 65:13-66:15.) If a resident required personal care services, the licensee/operator would use their personal care assessment to create a personal services plan and charge the resident accordingly. (*See, e.g.,* Ex. 378 at 3; Ex. 394 at 66:1-15, 114:9-115:12.)[5] While all licensees/operators agree to perform a personal care assessment (as required by regulation), the record reveals disparities in how Plaintiffs and putative class members interpreted the generic assessment language and any expectations they formed therefrom. *See infra*, n. 31. (Ex. 394 at 59:24-60:12.)

III.   **Different Communities Have Different Policies and Practices**

Each Community has an executive director ("ED"), who is responsible for the Community's operations. EDs exercise their discretion and utilize different practices based on their respective Community's unique characteristics, locale, staff tenure and diverse resident population profile. Thus, no two Communities are the same. EDs also have access to "multiple support services," such as technology and payroll support. (Ex. 392 at 73:21-74:4.) Plaintiffs point to a document called the Assisted Living Policies and Procedures Manual in an attempt to portray these support services as evidence of "extensive corporate policies and procedures." (Mot. at 24.) Yet, that very document states support functions "are offered as a ***resource*** [and] are ***not intended as a statement of a mandatory policy,***" *i.e.*, the exact opposite of what Plaintiffs allege. (Ex. 508 at BKD0022767 (emphasis added).)

One of the support services offered to the Communities during parts of the putative class period is known as Service Alignment. (Ex. 225 ¶ 13.) This program functions by gathering information from

---

[5] Dr. Ali Saad, whose Declaration is attached as Exhibit 415, illustrates the differences in these services across the proposed class members. (Ex. 415 ¶¶ 153-54.)

the Community regarding (*inter alia*) (a) a host of community-specific attributes and (b) data on residents' needs. (Ex. 392 at 136:21-137:4.) The community-specific data is collected through a detailed questionnaire that assesses a variety of community-specific characteristics as well as individual input from the community's personnel. (Ex. 398 at 176:8-177:1.) Communities collect resident-specific data through the personal services assessment, which assesses various individualized care needs, including, but not limited to, varying degrees of assistance with (1) ambulation, (2) bathing, (3) grooming, (4) dressing, (5) toileting and incontinence, (6) medication management, as well as (7) nutrition and (8) cognitive level. (*See, e.g.*, Ex. 126 at 20-25.)

Using these inputs and other specified assumptions, the program is able to generate staffing projections or "benchmarks" for the Communities to reference. (Ex. 394 at 151:13-152:6, 222:23-223:5; Ex. 413 at 96:17-97:5; Ex. 398 at 137:11-22, 148:13-19). These benchmarks serve as a resource to the Communities—not a mandated policy. (Ex. 398 at 104:7-20, 151:13-20.) All the EDs deposed in this matter testified that they use the benchmarks (if at all) in varying ways and that their staffing decisions are ultimately based on their discretion depending on the needs and conditions on the ground. (Ex. 413 at 96:17-22; Ex. 390 at 175:10-12, 177:7-178:4; Ex. 402 at 177:16-22; Ex. 408 at 128:8-14, 246:13-21; Ex. 391 at 202:13-203:6.) EDs in turn adopt their own practices for how to best staff their individual Communities, including the number of staff, the types of staff, and the way in which staffing is allocated across tasks. (Ex. 398 at 132:18-133:10; Ex. 502 at 1.)[6]

In addition to staffing, the Communities adopt different policies and practices on a variety of other relevant issues. For instance, different Communities utilize different policies on emergency evacuation—with each ED adopting his or her own emergency evacuation plan, tailored to their respective Communities (and often in consultation with local fire departments.) (Ex. 502 at 4-5; *see also* Ex. 226 ¶ 120; Exs. 450-500.) Different Communities also adopt different policies and practices relative to transportation services. (Ex. 133; *see also* Ex. 226 ¶ 120; Exs. 419-449.) For instance, different Communities (1) had differing numbers and types of vehicles, (2) offered transport at different frequencies, (3) offered different types of transportation alternatives, and (4) employed different

---

[6] ED Reddy, for instance, made her Health and Wellness Director responsible for hiring resident care associates "without any need for approval." (Ex. 408 at 246:3-12.)

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

practices on boarding and transport of mobility-assistance devices. The summary attached as Exhibit 131 shows the disparity in Community practices.

At bottom, the Brookdale Senior Living brand—while synonymous with quality—is not synonymous with common ownership, operation, or management. The Communities and their respective EDs have discretion over managerial and operational decisions. This, in turn, results in a variety of different policies and practices that the different Communities have adopted at different times.

## LEGAL STANDARD

Plaintiffs bear the burden of demonstrating that class certification is appropriate. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). To meet that burden, Plaintiffs must demonstrate in their opening brief that they have "met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Guzman v. Chipotle Mexican Grill, Inc.*, 2020 WL 227567, at *3 (N.D. Cal. Jan. 15, 2020) (Gilliam, J.); *Ellis v. J.P. Morgan Chase & Co.,* 2015 WL 9178076, at *5 (N.D. Cal. Dec. 17, 2015). The Court's "class-certification analysis must be 'rigorous' and inevitably may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Guzman*, 2020 WL 227567, at *4. Indeed, a "district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original). This rigor requires the Court to "resolve 'any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*.'" *Id.* at *3 (emphasis in original).

## ARGUMENT

### I. Plaintiffs Fail to Demonstrate that a Sufficient Number of Individuals Qualify for Membership in Their Proposed Classes, Thereby Defeating Numerosity

To satisfy Rule 23(a)(1), Plaintiffs must establish that their classes, "as set forth in [their] class definition," are so numerous that joinder of all members is impracticable. *Munoz v. InGenesis STGi Partners, LLC*, 2015 WL 13559891, at *8-9 (S.D. Cal. Dec. 23, 2015). Plaintiffs have not met (and cannot meet) that requirement. Plaintiffs define all their proposed classes as including only those "persons . . . who reside or have resided at a residential care facility for the elderly located in California and *owned, operated and/or managed* by Brookdale." (Mot. at 13 (emphasis added).) Plaintiffs define "Brookdale" as Defendants. (*Id.* at 2.) Yet, Plaintiffs have not shown that any proposed class members

ever resided at a facility "owned, operated, and/or managed" by Defendants. Nor can they. In fact, the proposed class members only resided at communities owned, operated, and/or managed by various non-parties—none of which include Defendants. (Ex. 271; 304.)

In addition, Plaintiffs define their third proposed class as limited to those who "contracted with Brookdale or another assisted living facility for services for which Brookdale was paid money." (Mot. at 13.) Yet, they have not demonstrated that any of their proposed class members "contracted" with or "paid money" to Defendants. Nor can they. As reflected in the Residency Agreements, Plaintiffs contracted with the respective licensees/operators of the Communities in which they resided. (Ex. 501 at 1.) They also paid money to those respective entities, in accordance with the plain terms of their Residency Agreements. (*See, e.g.*, *Id.*)

Plaintiffs' assertions to the contrary ignore the record and are indisputably wrong. Indeed, the plain terms of the ownership, lease, and management documents, as well as Plaintiffs' Residency Agreements, refute their characterizations as a matter of law. (*See* 304; 501.) Instead of acknowledging this irrefutable evidence, Plaintiffs cherry-pick portions of Defendants' discovery responses that refer to "Brookdale"—while failing to disclose that their own discovery requests defined "Brookdale" broadly as including, among other things, *any* "related company." (*See, e.g.*, Ex. 509 at 2.) In any event, shortly after Defendants served this discovery, their Rule 30(b)(6) witness expressly clarified that Defendants "do not . . . own" or "operate" any of the Communities. (Ex. 392 at 34:17-24.) Accordingly, Plaintiffs have not demonstrated (and cannot demonstrate) that any of their proposed classes is sufficiently numerous, or that there are any members at all.

## II. Plaintiffs Cannot Meet the Commonality Requirement of Rule 23(A)(2), Much Less the Predominance Requirement of Rule 23(B)(3)

To satisfy the commonality requirement of Rule 23(a), a plaintiff must affirmatively demonstrate "that there are *in fact*. . . common questions." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis in original). To do so, a plaintiff may not "merely allege any common question, for example, 'did Defendant's conduct violate the UCL or CLRA?" *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *10 (E.D. Cal. Jan. 3, 2012). This does little more than "rephrase Plaintiffs' causes of action and request for relief in question form." *Id.* at *11 (question of whether defendants violated the law fell short). Rather,

"[w]hat matters to class certification" is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis in original); *see also Harris v. Best Buy Stores, L.P.*, 2018 WL 3932178, at *8 (N.D. Cal. Aug. 16, 2018) (Gilliam, J.) ("merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient" to establish commonality). As the Ninth Circuit recently reiterated, a common question is one "where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Lara v. First Nat'l Ins. Co. of Am.*, 2022 WL 414691, at *3 (9th Cir. Feb. 11, 2022).

### A. Plaintiffs Cannot Establish Any Actionable Injury on a Class-Wide Basis

One of the most fundamental issues precluding class certification in this case is the lack of any common, class-wide injury. The Ninth Circuit has made clear that "the question [of] whether [named plaintiffs] may be allowed to present claims on behalf of" unnamed class members with dissimilar interests—specifically including "dissimilarity in injuries suffered"—depends on an assessment of the Rule 23 factors. *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015); *see also Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2010) (where "defendants argue that class certification is inappropriate because unnamed class members' claims would require individualized analysis of injury…a court should analyze these arguments through Rule 23."). This assessment is critical to any class certification analysis because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC*, 141 S.Ct. at 2208.

Pursuant to these principles, numerous courts have denied class certification where "figuring out whether each plaintiff was injured would be an individualized process." *Lara*, 2022 WL 414691, at *5; *see also Gonzales*, 2012 WL 10621, at *13, *21 (denying certification due to lack of commonality and predominance because the question of whether class members suffered an injury-in-fact was "not a question capable of generating common answers" and "a highly individualized inquiry would be required to determine whether each and every Class member had suffered an [ ] injury"); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 503 (C.D. Cal. 2011) (denying certification on the grounds that absent class members could not show any injury-in-fact on a class-wide basis); *In Re Toyota Motor Corp.*

9

*Hybrid Brake Mktg., Sales Pracs. & Prod. Liab. Litig.*, 288 F.R.D. 445, 450 (C.D. Cal. 2013) (same).

Here too, determining whether class members were injured would be a highly individualized process. "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm." *TransUnion LLC*, 141 S.Ct. at 2200. To establish a "concrete" harm, any injury must be "real" and not "hypothetical or abstract." *Id.* at 2203. A plaintiff does not automatically satisfy "the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Instead, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation" can establish an actionable injury. *TransUnion LLC*, 141 S.Ct. at 2205 (emphasis in original). Moreover, class members cannot establish an actual injury based on the theory that the *defendant's alleged conduct "exposed them to a material risk"* of future harm. *Id.* at 2210 (emphasis added). As *TransUnion* articulated, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *Id.* at 2210-11.[7]

Based on the principles espoused in *TransUnion* and its progeny, Plaintiffs cannot establish the existence of a class-wide injury. Indeed, their proposed classes consist of numerous individuals who have not suffered any concrete harm. But to determine who (if anyone) was concretely harmed, the Court would have to engage in highly individualized, class member-specific inquiries. Plaintiffs will almost certainly claim the class certification decision in *Heredia v. Sunrise Senior Living, LLC*, 2021 WL 6104188 (C.D. Cal. Nov. 16, 2021), validates their alleged class-wide injuries. But the district court in *Heredia* did not even consider *TransUnion* or its impact on class certification. The decision is under review by the Ninth Circuit for that reason. Case No. 21-80121. Thus, it provides no basis for dispensing with the individualized analyses that would be required to determine who suffered an actual injury.

1.   *Determining Who Suffered an Actual Injury in the Proposed Mobility and Vision Impaired Class Will Require Individualized Inquiries*

---

[7] In addition to being part of Article III standing requirements, an actual injury also is required as part of the elements of Plaintiffs' claims on behalf of those who allegedly paid money to Defendants. *Kwikset Corp. v. Sup. Ct.*, 51 Cal.4th 310, 321 (Cal. 2011); *Hale v. Sharp v. Healthcare*, 183 Cal.App.4th 1373, 1386 (Cal. App. 2010); Cal. Wel. & Inst. Code § 15610.30.

1      Plaintiffs' proposed Mobility and Vision Impaired Class alleges that Defendants violated the

2  ADA and Unruh Act by virtue of various alleged common discriminatory policies. But a bare statutory

3  violation, without more, is not sufficient to bestow standing. *TransUnion LLC*, 141 S.Ct. at 2213.

4  Instead, all class members must show the alleged statutory violations caused them to incur a concrete

5  harm. *Id*. As it pertains to the ADA, a party seeking injunctive relief can establish standing "where the

6  defendant's failure to comply with the ADA deters her from making use of the defendant's facility."

7  *Civil Rights Education & Enforcement Center v. Hospital Properties Trust* ("*Civil Rights*"), 867 F.3d

8  1093, 1098 (9th Cir. 2017). Critically, the plaintiff must have "***actual knowledge*** of illegal barriers at a

9  public accommodation," which requires "case-by-case determinations about whether a particular

10  plaintiff's injury is imminent," such that she has Article III standing.  *Id.* at 1098 (emphasis added).

11      Here, the putative class necessarily includes a substantial number of individuals who cannot

12  show an actual injury sufficient to establish standing. For instance, while Plaintiffs allege Defendants

13  violated the ADA by failing to remove physical barriers, a significant number of disabled residents

14  testified they did not encounter access barriers. (Ex. 905 at 5-6.) Moreover, while Plaintiffs assert

15  Defendants' alleged transportation policies are discriminatory, a significant number of individuals did

16  not (and could not have) encountered any such alleged policies. In fact, Plaintiffs' expert concedes only

17  7% of the proposed class can assert a viable claim based on an alleged policy of requiring transferring

18  out of scooters and wheelchairs because ***93% of the proposed class*** does not use these devices. (ECF

19  No. 278-4 at 41-43; Mot. at 32.) Further, while Plaintiffs assert Defendants' alleged emergency

20  evacuation policies were discriminatory, a significant number of individuals never experienced an

21  evacuation as confirmed by the admissions of Plaintiffs and their experts and by the testimony of

22  numerous residents and EDs. (Ex. 503 at 3; Ex. 503 at 7-8; Ex. 404 at 226:15-227:10.)  Even for those

23  who did, the record shows for instance that the Communities who had to evacuate residents because of

24  the recent wildfires in 2018 and 2019 safely evacuated all residents with disabilities. (Ex. 503.) In light

25  of these facts, it is readily apparent there are numerous proposed class members who also could not have

26  had actual knowledge of these alleged barriers and policies.

27      To the extent Plaintiffs argue any of these alleged policies put them at risk of harm, *i.e.*, the risk

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

of being subject to an ADA violation, such an argument is not sufficient to bestow standing under *TransUnion*. 141 S.Ct. at 2210-11. Instead, to determine whether any members of this putative class suffered an actual injury, the Court will have to engage in a class member-by-member inquiry regarding, *inter alia*, who had actual knowledge of any of the allegedly discriminatory policies. The Court will also have to determine who (1) encountered an access barrier, (2) experienced discriminatory transportation procedures, and (3) was subject to an emergency evacuation. Plaintiffs certainly have not shown—nor does there exist—any evidence that could answer those questions on a common basis.

    2.    *Determining Who Suffered an Actual Injury in the Proposed Disabilities Class Will Require Individualized Inquiries*

Plaintiffs' proposed Disabilities Class alleges that Defendants violated the ADA and Unruh Act by virtue of Defendants' purported failure to make "reasonable modifications" to a supposed staffing policy—which Plaintiffs identify as "Service Alignment." (Mot. at 25.) Again, however, the putative class includes a substantial number of individuals who did not suffer any concrete harm under *TransUnion*. First, a significant number of individuals never requested any modification to caregiver staffing to accommodate their alleged disabilities—including Plaintiffs and many other residents. (Ex. 501 at 4-5; Ex. 905; ECF No. 278-3.) Because a reasonable modification request is an element necessary to state a claim under Title III, putative class members could not have been harmed by any failure or refusal to make such a modification. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004).

Second, a significant number of individuals could not have been harmed by Defendants' purported failure to modify the alleged staffing policy. For instance, many putative class members testified they did not experience any staffing shortfall and/or they otherwise received the services specified in their personal service plan. (Ex. 905 at 4-5.) In addition, Service Alignment was not available to many Communities during the class period.[8] Furthermore, many residents resided at Communities where EDs determined staffing irrespective of Service Alignment. (Ex. 1 502 at 2-3; Ex.

---

[8] Service Alignment was not available to 78% of the Communities until more than two years into the proposed class period. (Ex. 225 ¶ 14.) At least 8% of the proposed class resided at these Communities during this time. (Ex. 415 ¶ 135.)

12

415 ¶¶ 131-152.) As such, the Court would need to undertake highly individualized inquiries to determine which proposed members (if any) were actually injured by the alleged challenged conduct. Indeed, it is well-settled that a class cannot be certified where, as here, many class members "were never exposed to the challenged formulas or, if they were, were never injured by them." *Castillo v. Bank of Am. NA*, 980 F.3d 723, 732 (9th Cir. 2020).

### 3. Determining Who Suffered an Actual Injury in the Proposed Contracting Class Will Require Individualized Inquiries

Plaintiffs' proposed Contracting Class alleges that Defendants violated state consumer protection statutes because Defendants purportedly misled residents about staffing levels at the Communities. In contrast with their other two proposed classes, Plaintiffs do allege that proposed members of the Contracting Class all suffered a common injury. They theorize that "[t]he payment of money coupled with exposure to Brookdale's (undisclosed) defective staffing policies constitute *legal injury* for all class members"—"*even if some class members have not yet been deprived of promised services*." (Mot. at 48 (emphasis added).) But *TransUnion* forecloses the supposed "class-wide injury" that Plaintiffs assert.

To start, the Supreme Court held that "an injury in law is not an injury in fact" and that a plaintiff must have "suffered a concrete injury in fact under Article III." *TransUnion*, 141 S.Ct. at 2204. Thus, on its face, Plaintiffs' "legal injury" theory is not sufficient to establish standing. But even if Plaintiffs claim their theory also gives rise to an injury-in-fact, *TransUnion* still forecloses that conclusion. As *TransUnion* held, exposure to allegedly unreasonable procedures does not, without more, give rise to an injury. *Id*. at 2209-10. Moreover, even if challenged conduct "exposed [putative class members] to a material risk" of future harm, the mere risk of future harm, standing alone, cannot qualify as a concrete harm. *Id*. at 2211. Thus, exposure to Defendants' alleged staffing policies, without more, cannot give rise to an actual injury. Nor can an alleged risk that those policies will result in a deprivation of promised services give rise to an actual injury.

Instead, residents can only establish they were harmed if the allegedly offending policy in fact resulted in them not getting what they paid for, *i.e.*, the "promised care services." *Id*.[9] If all the promised

---

[9] *TransUnion* applies irrespective of Plaintiffs' allegation that they suffered an injury in the form of "the payment of money." For instance, in *Rocket Mortg., LLC v. Alig*, 2021 WL 5893330, at *7-8 (U.S. Dec. 8, 2021), the plaintiffs attempted to distinguish *TransUnion* on the grounds that their payment of money

13

services were provided, then the old adage of "no harm, no foul" would apply. *Lara*, 2022 WL 414691, at *5. As such, without evidence that residents did not actually receive "promised care services," they cannot show the existence of any concrete harm.[10]

While decided before *TransUnion*, the decision in *Kohn v. American Housing Foundation, Inc.*, 178 F.R.D. 536 (D. Col. 1998), is instructive here. In *Kohn*, the plaintiffs alleged understaffing claims against a skilled nursing facility and sought certification of a class of all residents of that facility. The court denied class certification, concluding that the mere fact of "substandard staffing levels" could not establish a class-wide injury because the possibility of an injury that might result was "not sufficient to 'impose any liability or give rise to a cause of action.'" *Id*. at 542. As the court aptly analogized: "If 20 persons were endangered by an act having the possibility of injury, it would be absurd to say that rights of action accrued to all of them at the moment the defendant's act was completed…. Only if and when harm came to any one of the 20 would a right of action accrue." *Id.*

As in *Kohn*, Plaintiffs cannot establish the existence of a class-wide injury based solely on allegations of understaffing and an associated risk of harm. To the contrary, to determine if a particular putative class member suffered an actionable injury, the trier of fact must determine: (i) what services each class member was promised; and (ii) whether those services actually were provided. Yet, as Plaintiffs' staffing expert conceded, determining if promised care services were provided requires "know[ing] everything about [each] person." (ECF No. 349-4, Ex. A at 278:25-279:9.) That is the exact opposite of a common question. Accordingly, under *TransUnion* and its progeny, the question of whether members of the proposed Contracting Class suffered an actionable injury cannot be established with common proof. Rather, it can only be established with highly individualized inquiries.

### B. Plaintiffs Fail to Establish Any Common Question that Will Drive Resolution of the Claims Asserted on Behalf of the Mobility and Vision Class

---

to the defendant constituted a concrete financial harm. The Supreme Court, however, did not find this distinction persuasive and instead vacated and remanded the decision "for further consideration in light of *TransUnion*." 142 S.Ct. 748 (2022).

[10] This is also confirmed by the Ninth Circuit's recent decision in *Lara*. There, the Ninth Circuit concluded that putative class members could not establish an actionable injury merely by being exposed to the defendant's allegedly unlawful practice; rather, they had to show they did not receive the "actual cash value" of what was owed to them. 2022 WL 414691, at *4.

14

Putting aside the issue of injury, Plaintiffs also fail to meet the requirements of Rule 23(a)(2) as to their proposed Mobility and Vision Impaired Class because they fail to demonstrate the existence of even a single common question capable of class-wide resolution. By extension, Plaintiffs also cannot meet the requirements of Rule 23(b)(3) as individualized issues will predominate over these claims.

### 1. Whether the Communities Comply with the ADA or CBC Is Not a Common Question that Will Drive Resolution of Plaintiffs' Claims

The fundamental issue with Plaintiffs' claims for the Mobility and Vision Impaired Class is that there is simply no way to determine whether the Communities complied with the ADA or California Building Code ("CBC") on a class-wide basis. Plaintiffs' lead argument on this issue is that Defendants allegedly "lack[ed] proper policies and practices." (Mot. at 34.) Plaintiffs' assertion regarding the lack of a "proper policy" does not establish a common issue. Instead, Plaintiffs' burden at the class certification stage is to offer "significant proof" of a common unlawful policy or practice. *Ellis*, 657 F.3d at 983 ("If there is no evidence that the entire class was subject to the same [unlawful] practice, there is no question common to the class."). Thus, for instance, the court in *Civil Rights* denied certification of an ADA claim involving 142 separately-managed hotels, even though the defendant lacked a policy regarding how its management companies should comply with the ADA. 867 F.3d at 1103-04. In so doing, the court held that "a 'policy *against having* uniform … practices' is decidedly not a common issue." *Id.* at 1105. Rather, the plaintiffs bore the burden of establishing a "common offending policy" proving that each of the 142 hotels violated the ADA. *Id.* at 1104. The Ninth Circuit affirmed, holding "[a]bsent any allegation that [defendant] somehow discourages its contractors from complying with the ADA, [plaintiff] cannot establish a pattern of discrimination orchestrated by [defendant], as it must in order to establish a question of fact common to its claims." *Id.* at 1105[11]; *see also, e.g., Castaneda v. Burger King Corp.*, 264 F.R.D. 557, 566, 568 (N.D. Cal. 2009) (denying certification where plaintiffs failed to establish "any common offending policies or design characteristics that called for common accessibility barriers at different restaurants").

---

[11] The Ninth Circuit rejected the argument that its holding would "give[] multiple-facility owners perverse incentives to vary their operating practices across facilities or contract out operations to independent managers," noting Rule 23 did not require the defendant "to manage its properties in a manner that would facilitate class actions if and when ADA violations do occur." *Id*. at 1105-06.

Here, as in *Civil Rights*, Defendants have no common policy or practice as to how Communities should comply with the ADA. Instead, per the terms of their lease and management agreements, the owners, operators, and managers of the Communities assigned responsibilities for compliance with the law (including maintenance and alterations) to other non-parties. As one example, Lessee S-H Opco Carrington Pointe had responsibility to "maintain the Leased Property" of the Fresno Community and to "make all necessary and appropriate repairs . . .including those necessary to comply with changes in any Legal Requirements, whether interior or exterior, structural or non-structural, ordinary or extraordinary." (*See, e.g.*, Ex. 331-32 at BKD2950617-18; *see also*, Ex. 304.)[12] In other words, as in *Civil Rights*, there was a "policy of delegation, not of non-compliance." 867 F.3d at 1104.[13] Plaintiffs also fail to show that any of these entities—let alone any Defendant—somehow discouraged compliance with the law. In fact, Plaintiffs' experts conceded that the Communities do comply with the law because they make physical modifications at residents' requests. (Ex. 407 at 240:24-241:5; Ex. 414 at 170:22-171:11.) ED Buot, for instance, *sua sponte* installed an automatic door at the request of his residents without any sign off or approvals. (Ex. 391 at 154:11-157:6; *see also* Ex. 503; Ex. 416 ¶ 42.)  As such, Plaintiffs have not established (and cannot establish) any pattern of discrimination orchestrated by Defendants, as required to give rise to a common question.

Plaintiffs also cannot prove non-compliance on a class-wide basis because they have not shown any connection among the violations they assert. As demonstrated by *Castaneda*, this is further reason to deny certification. In *Castaneda*, plaintiffs alleged ADA access barriers at 92 stores. 264 F.R.D. at 560. The vast majority of the stores "were constructed before the ADA became effective," were not constructed according to any "common blueprint," and "had a unique post-construction alteration history in terms of structure, design, facilities, accommodations, and times of alteration." *Id*. at 563. The court therefore denied class certification, holding that when alterations were made, "they were not based

---

[12] Plaintiffs conceded the agreements' significance when they moved to compel their production and noted the Ninth Circuit's ruling in *Civil Rights,* as finding "commonality absent based, in part, on the fact that long term management agreements established that hotels were 'managed' by various management companies, and not operated by the defendant." (ECF No. 312 at 1.)

[13] To the extent Plaintiffs argue the duty to comply with the ADA is non-delegable, *Civil Rights* makes clear that issue does not "bear[] on commonality" and does not turn a policy of delegation into a common question under *Wal-Mart Stores, Inc. Id*. at 1105.

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

on any centralized construction plans developed by" the defendant; rather, the lease agreements "put all responsibility for the condition of the premises, including the cost of any repairs or alterations, on the franchisees/lessees." *Id*. at 560, 566. Further, the restaurants "were built and remodeled at different times and in different architectural styles such that the same standards under the ADA, Unruh Act, and CDPA do not apply to them all." *Id*. at 568. As a result, "[w]hether or not any store was ever out of ADA compliance would have to be determined store by store, feature by feature." *Id*. at 560; *see also Wagner v. White Castle Sys., Inc*., 309 F.R.D. 425, 431 (S.D. Ohio Sept. 21, 2015) (finding it notable "Plaintiffs' own 'expert' identifies varied alleged ADA violations" among the restaurants he visited.").[14]

Here, as in *Castaneda*, Plaintiffs' experts concede the Communities were built and remodeled at different times, according to different blueprints, and different architectural styles. (Ex. 416 ¶¶ 23, 39, Exs. 3-4, 7-8.) While they identify certain features in the Communities that allegedly do not comply with the ADA, they also admit that the supposedly non-compliant features vary by Community, by room, and by issue. (*Id*. ¶¶ 41.) In fact, they concede that the features they identify as allegedly non-compliant in one Community or in one room were compliant in other Communities and/or in other rooms in the same Community. (*Id*.; Ex. 407 at 209:3-210:21 & Ex. 505; Ex. 387 at 121:20-124:1 (asserting closet rod placement was inappropriate in one unit but did not present a barrier in another unit with "[a] different setup"); Ex. 136 at 210:7-212:10.) Thus, as in *Castenada*, the Court would have to consider each supposed violation on a community-by-community and feature-by-feature basis through a multi-step process replete with individualized inquiries. That inquiry is made all the more complicated by the fact that Plaintiffs rely on fundamentally incorrect "measurements" of the challenged items because, among other things, Plaintiffs' experts "eyeballed" the subject of the inspection, failed to measure, measured incorrectly, and ignored obvious alternative paths of access. (*See, e.g*. Ex. 416 ¶¶ 47-60; ECF No. 348 at 1.)[15]

---

[14] *See also, e.g.*, *Timoneri v. Speedway, LLC*, 186 F. Supp. 3d 756 (N.D. Ohio May 12, 2016); *Mielo v. Bob Evans Farms, Inc.*, 2015 WL 1299815 (W.D. Pa. Mar. 23, 2015); *Lane v. State*, 2004 WL 1878659, (M.D. Tenn. Aug. 17, 2004).

[15] While Plaintiffs may rely on a stipulation that the sampled units they examined are "typical," Defendants' experts identified numerous variations within this supposedly "typical" sample. (Ex. 416 ¶ 37; Mot. at 15; ECF No. 154 at 4.)

17

The Court would also have to engage in individualized inquiries regarding the design standards that apply to each challenged feature, as well as whether each feature actually violated the applicable standard. Because the Communities at issue were constructed and altered to different degrees by different entities at different times, different federal and state design standards, if any, would apply to different portions of different Communities. (Ex. 416 ¶¶ 17-26.)[16] Therefore, to determine which design standards apply to each challenged feature, the Court would have to assess (*inter alia*) the Communities' different dates of construction, whether any alteration(s) of the Communities occurred, whether the alteration(s) impacted the conditions, and, if so, the date(s) of any alteration(s). (*Id.* ¶¶ 11-47.)

Finally, the Court would have to determine whether any resident knew about and/or encountered any barrier and, if so, which residents, which barriers, how many times, and whether the barriers related to the resident's disability. In fact, 153 disabled residents testified they never encountered *any* barrier. (Ex. 905 at 11.) These issues cannot be resolved on a class-wide basis.[17]

> **2.    *Plaintiffs Have Not Shown Any Common Offending Policies or Practices Relative to Barrier Removal, Transportation, or Emergency Evacuation***

Setting aside the general lack of any common policies on ADA compliance, Plaintiffs also cannot substantiate their claims as to the specific common policies and practices with which they take issue—*i.e.*, readily achievable barrier removal, transportation, and emergency evacuation.

> a.    <u>Readily Achievable Barrier Removal</u>

Plaintiffs assert that the question of whether Defendants failed to conduct readily achievable

---

[16] Plaintiffs' assertion that 49 of the facilities that their experts inspected constitute "new construction" under the ADA and/or the Unruh Act is incorrect. (Mot. at 12; Ex. 416 ¶ 22.)

[17] The cases on which Plaintiffs rely are readily distinguishable. In *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 569 (N.D. Cal. 2018), the court considered one facility, not dozens of unique facilities as in this case. *Id.* at 586 (finding "it makes far more sense to compare the Stadium to one restaurant than to compare it to 92 restaurants" as in *Castaneda*). Plaintiffs' other cited cases are similarly misplaced because they "each involved an alleged common policy or practice instituted by a single defendant operating each of the accommodations in question." *Gray v. Golden Gate National Recreational Area*, 279 F.R.D. 501 (N.D. Cal. 2011); *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015), *Park v. Ralph's Grocery Co.*, 254 F.R.D. 112 (C.D. Cal. 2008); *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D. Cal. 1994). Indeed, multiple courts have distinguished these cases for that precise reason. *See Civil Rights*, 317 F.R.D. at 101-03 (N.D. Cal. 2016); *Castaneda*, 264 F.R.D. at 567-68.

barrier removal is common to the class. They are wrong. Whether removal of barriers is "readily achievable" is a "fact-intensive inquiry." *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1371 (S.D. Fla. 2001); *Castaneda*, 264 F.R.D. at 562 (holding "what would or would not be 'readily achievable'" is "clearly a site-by-site adjudication"). Plaintiffs concede as much, noting that the determination of this question "focuses on the defendant's conduct, the type of barriers at issue, and the nature of the defendant's operations and overall financial resources." (Mot. at 34.) But Plaintiffs fail to show that any entity, let alone Defendants, maintained any common policy prohibiting or discouraging the removal of any barriers. Indeed, Plaintiffs allege different barriers at each Community and in each apartment and area their experts examined. They also concede each supposed barrier allegedly violates different standards for different reasons. As to whether removal of any alleged barriers is readily achievable, Plaintiffs' experts make assessments without having the specific information as to each condition to be able to determine whether removal of the barrier is readily achievable. (Ex. 416 ¶ 43.) Plaintiffs have not shown that the Court could resolve this question through any form of common proof.

**b.**   Transportation

Plaintiffs contend that Defendants' alleged transportation policies give rise to a question common to the class. That contention is predicated on two supposedly offending policies. The first stems from a single document known as the "Fleet Safety Policy," which Plaintiffs allege violates the ADA by requiring mobility-impaired residents who use scooters or electric wheelchairs to transfer from their devices to passenger seats. (Mot. at 35; *see also* ECF No. 278-6.) The second stems from Plaintiffs' allegation that Defendants failed to maintain a sufficient number of accessible buses. (Mot. at 31.) The evidence, however, shows that neither of these alleged policies are actually common to the class.

First, as their lease and management agreements reflect, the entities that own and operate the Communities are responsible for operating and/or managing them in compliance with the law, including with respect to resident transportation. (Ex. 304.) As one example, the Lessee for the Sterling Court Community, S-H OpCo, contracted with its property manager, BKD Twenty-One Management Company, for BKD Twenty-One to "[m]anage and implement the operations" of the Community, including "establishing and . . . implement[ing] appropriate operational policies and procedures in order

19

1    to ensure that the Community is operated in accordance with . . . all Legal Requirements." (Ex. 366 at

2    BKD2954025.) None of the entities include Defendants, and Plaintiffs have not shown any common

3    policy or practice of Defendants discouraging compliance. Thus, as in *Civil Rights*, because "the

4    management companies" (not Defendants) "decide whether to offer local transportation services and [ ]

5    set the terms on which those services operate," Plaintiffs have no "evidence of a single, 'general policy

6    of discrimination,' that could serve as a common issue." 867 F.3d at 1104-05.

7         Second, Plaintiffs have not shown any common practice of adopting or following the Fleet

8    Safety Policy or any other transportation policy among the Communities. In fact, the vast majority of

9    Communities do not even have a copy of the Fleet Safety Policy.[18] Rather, as Plaintiffs' expert admitted,

10   different Communities elected to adopt different transportation policies and practices, including those

11   related to the transport of residents who use scooters or wheelchairs and those related to the types and

12   numbers of vehicles. (Ex. 396 at 120:18-121:4; Ex. 397 at 31:16-32:5.)[19]

13        EDs and Plaintiffs also squarely confirmed the lack of any common transportation policies—

14   much less discriminatory ones. As to mobility aide transfers, ED Reddy testified that if a scooter would

15   fit on the Community bus, she would allow it on the vehicle. (Ex. 408 at 288:7-20.) Witness Jeff Toomer

16   testified that he personally observed at least three Communities allowing residents to sit on scooters

17   during transport. (Ex. 44 at 208:2-14.) And other EDs allow residents to remain in their electric

18   wheelchairs, power chairs, or scooters while boarding a vehicle and while in transit, irrespective of

19   whether these devices are "approved." (Ex. 503.) As to accessible vehicles, there are significant

20   differences with respect to each Community's practices regarding the number, type and nature of

21   accessible vehicles they maintain (including available alternatives). (*Id.*) Further undermining the notion

22   of any common policy of discrimination, numerous EDs testified they provide disabled residents full

23   and equal access to transportation services, including alternative mechanisms when necessary (*e.g.*,

24   vendors). (*Id.*) ED Buot, for instance, did not limit the number of residents in wheelchairs who could use

---

[18] Defendants collected documents from dozens of Communities regarding transportation policies and procedures. Almost 80% of Communities did not even have a copy of the Fleet Safety Policy or anything resembling the Fleet Safety Policy. (Ex. 226 ¶ 120.)

[19] Plaintiffs' expert also admitted that alleged policies cannot impact individuals if they are not implemented. (Ex. 397 at 42:12-16.)

his bus at any one time. (Ex. 391 at 111:18-25.) ED Harris testified that her community has two accessible buses and one accessible van and otherwise finds solutions to accommodate the needs of any additional residents. (Ex. 402 at 248:3-13, 253:20-254:10.)

 Third, the vast majority of Plaintiffs' proposed class in fact did not encounter and/or were not impacted by any allegedly common transportation policies. Plaintiffs' disability expert identified only 109 putative class members who used a motorized wheelchair and 162 who used a scooter. That means, at most, only 7% of the putative class could have even encountered a policy regarding mobility aid transfers. (ECF No. 278-4 at 41-43; Mot. at 32.) Amongst those who could, many Plaintiffs and disabled residents confirmed their Communities allowed them to sit on their scooters while boarding vehicles and during transit. (Ex. 227; Ex. 501.) Numerous disabled residents also attested they were able to go on outings and never encountered a lack of accessible transportation services. (Ex. 227.)

In sum, to determine if any individual experienced transportation policies that violated Title III, the Court would need to engage in a series of individualized inquiries as to both (1) the policies and practices of each Community during the class period and (2) the residents who encountered those policies, if any. Commonality is obviously absent with respect to any alleged transportation policies.

### c.  Emergency Evacuation

Finally, Plaintiffs wrongly contend that the question of whether Defendants' emergency evacuation policies are discriminatory is common to the class. Indeed, Plaintiffs have not shown that Defendants maintained any policy to discriminate or prevent compliance with the ADA. Instead, each Community adopted its own emergency evacuation plan specifically tailored to that Community. *See Civil Rights*, 867 F.3d at 1097, 1104-05; *see also Castaneda*, 264 F.R.D. at 567. (Ex. 393 at 215:23-216:5.) Plaintiffs' emergency evacuation expert admitted that the components of these plans would be different for each Community and that each Community provides a different degree of information in the plan they are required to maintain pursuant to California state regulation. (Ex. 404 at 148:9-150:22.)[20] Many Community emergency evacuation plans in fact cover the specific issues that Plaintiffs claim are lacking. For example, the Bakersfield Community plan speaks to the use of stair chairs to

---

[20] In fact, Plaintiffs' expert highlighted the variation in these Community plans in a chart in which she rated the plans on a scale of compliance to purported non-compliance. (Ex. 507.)

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

assist residents with mobility impairments who need to be evacuated from upper and lower levels in the event of an emergency, with each stair chair holding one to two people. (Ex. 454 at BKD1809196.) The Anaheim Community plan speaks to an agreement for the Garden Grove Community to serve as a temporary relocation center for its residents in case of emergency. And the Carlsbad Community plan designates a hospital and a medical center as its temporary relocation sites in the event of an emergency. (*Compare* Ex. 451  at BKD1760549 with Ex. 506 at BKD1311802.) Notably, Communities relied on their respective plans in evacuating residents during the wildfires in 2018 and 2019.  These evacuations included residents with disabilities and all residents were evacuated safely. (Ex. 503 at 3.)

In an effort to refute these facts, Plaintiffs point to a document called the "Emergency Manual." (Mot. at 36.) But they fail to show that this constitutes a common policy to violate the ADA. Further, almost 80% of Communities did not even have a copy of the Emergency Manual. (Ex. 226 ¶ 120.) The manual also clearly states: "The procedures in this document do not replace the community-specific Emergency Preparedness Plan." (Ex. 510 at BKD1569805). The manual is therefore irrelevant to Plaintiffs' class-wide assertions.

Finally, Plaintiffs have not established any common emergency policy that could have violated the ADA. Plaintiffs' expert admitted Title III does not include specific requirements for an emergency plan. Plaintiffs' expert also opined Title III does not specify that the particular components she found lacking must be included in an emergency plan. (Ex. 404 at 104:1-116:8.)[21] Thus, even as a legal matter, this question is not susceptible to common proof.

   *3. Whether the Communities Are Covered by Title III of the ADA Is Not a Common Question that Will Drive Resolution of Plaintiffs' Claims*

Putting all the other individualized issues aside, Plaintiffs cannot even show that "whether the communities are covered by Title III of the ADA" is a common question susceptible to a class-wide

---

[21] Plaintiffs' expert initially testified that the DOJ issued guidance to this effect for ADA Titles II and III, but no such guidance exists as to Title III, and she later conceded that the DOJ guidelines she referenced pertain only to Title II. (*Id.* at 105:3-106:14, 231:12-22.) Similarly, *Brooklyn Center for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 412 (S.D.N.Y. 2012), which Plaintiffs cite, concerned Title II. (Mot. at 36.) *See Martinez v. Walt Disney Co.*, 2012 WL 12913738, at *4, 6-7 (C.D. Cal. Nov. 26, 2012) (granting summary judgment on Title III claims where plaintiffs "cite no legal authority mandating that all evacuation routes be fully accessible").

answer. (Mot. at 33.) In fact, this is nothing more than a "[s]uperficial common question[ ]"—which does not suffice on its face. *Howard v. Cook County*, 989 F.3d 587, 598 (7th Cir. 2021).[22]

Whether the ADA applies is a threshold question that turns on numerous elements, each of which depends on individualized facts specific to each Community. Title III applies to places of public accommodation. 42 U.S.C. § 12182(a). Whether a facility is a "place of public accommodation" depends on various elements, including whether its operations "affect commerce," whether it is "open to the public," and whether it qualifies as a "senior citizen center" (as opposed to "private residential housing" or a "private club"). 42 U.S.C. §§ 12181(1)(A), (7)(K); 42 U.S.C. § 12187; *Langer v. Kiser*, 516 F. Supp. 3d 1066, 1084 (S.D. Cal. 2021) (determination depends on whether a facility is indiscriminately open to members of general public); *Indep. Hous. Servs. v. Fillmore Ctr.*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993) (apartments and condominiums are not public accommodations).

None of these factors can be resolved on a class-wide basis. First, whether a Community "affect[s] commerce" depends on its extra-territorial impact and, in this context, whether the Community offered "short-term or transient lodging facilities rather than residential facilities." *See, e.g., Felknor v. Tallow Wood Apartments*, 2009 WL 3230607, at *2 (W.D. La. Sept. 28, 2009). Second, whether a facility is "open to the public" turns on various factors unique to each Community and to each aspect of the Community. These factors include: (i) use of facilities by non-members; (ii) the purpose of the facility's existence; (iii) advertisement to the public; and (iv) profit or non-profit status. *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174, 1179-81 (C.D. Cal. 1998); *see, e.g., Johnson v. Laura Dawn Apartments, LLC*, 2012 WL 33040, at *1 n.1 (E.D. Cal. Jan. 6, 2012) ("leasing office of an apartment complex" may be a public accommodation, but "apartments themselves are not"). Third, whether a Community falls into one of the categories that constitute a place public accommodation, such as a "senior citizen center" (as Plaintiffs allege)—as opposed to "private residential housing" or a "private club"—depends on multiple individualized factors such as whether the Community maintained

---

[22] Plaintiffs' claim that the Court already resolved this question, rendering it a common issue, is a red herring. (Mot. at 33.) This Court declined to dismiss Plaintiffs' complaint on the pleadings; it has not considered any evidence or made any substantive ruling that the ADA, in fact, applies. *Stiner v. Brookdale Senior Living, Inc.*, 354 F. Supp. 3d 1046, 1050, 1056 (N.D. Cal. 2019).

23

formalities (*e.g.*, bylaws and meetings). *U.S. v. Landsdowne Swim Club*, 713 F. Supp. 785, 796-97 (E.D. Pa. 1989). The evidence shows that various Communities do not attract residents across state lines, offer short-term or transient lodging, permit use by non-members, maintain public leasing offices, accept government funding, or provide public access or host public events. (Ex. 225 ¶¶ 15-17; Ex. 52 at 5.) Accordingly, to determine whether the ADA applies, the Court must evaluate a variety of factors on a Community-by-Community and area-by-area basis. This question—like all other supposed common questions Plaintiffs proffer in support of their ADA claims—is not a common one.

### C. Plaintiffs Fail to Establish Any Common Questions that Will Drive Resolution of Their Disabilities Class Claims

#### 1. Plaintiffs Have Not Shown (And Cannot Show) a Common Unlawful Policy or Practice Related to Staffing.

Plaintiffs contend that the question of "[w]hether Defendants have made reasonable modifications in policies and practices with respect to caregiver staffing" is common to the class. (Mot. at 41-42.)[23] It is not. In fact, Plaintiffs have not shown that Defendants maintained any staffing policies or practices related to the determination of staffing—much less a policy of understaffing.  Plaintiffs' only purported evidence on this issue is the existence of the "Service Alignment" support function. (Mot. at 25.) Yet, Service Alignment was not even available to 78% of the Communities until more than two years into the class period. (Ex. 392 at 17:15-22; Ex. 225 ¶ 14.) Even when Service Alignment was available, the evidence shows Communities had their own practices with respect to staffing. (Ex. 415, Saad Decl. ¶¶ 131-152.)

- All the EDs who were deposed testified they staffed their Communities per their own discretion according to the needs of their respective residents, irrespective of Service Alignment. As one ED put it, "we do not use [Service Alignment] to determine anything other than information or a guide, but what determines what we're doing with our staffing has to do with what those needs of the residents are."[24]

---

[23] As with their proposed Mobility-Impaired and Vision-Impaired Class, Plaintiffs contend "whether the communities are covered by Title III of the ADA" is a common question relative to this proposed class. Plaintiffs' contention fails for the same reasons discussed above. (*Supra* at 23-24.)

[24] Ex. 413 at 96:17-22; *see also* Ex. 390 at 175:10-12, 177:7-178:4 ("I staff based on my residents' need . . . . Service alignment . . . is just the guidance I look at, for whatever reason," but "if it's [not] making any sense, then I will not follow that"); Ex. 402 at 177:16-22 ("I consider [Service Alignment as] a component," but staffing is "always about the resident's need."); Ex. 402 at 128:8-14, 246:13-21 ("We base our labor on the needs of the residents . . . . We use the benchmark as a starting point, but we

- Dozens of other EDs submitted declarations attesting that they staff their Communities based on the needs and personal service plans of the respective residents. (Ex. 272 at 1.)

- Individuals who provided support services likewise confirmed that they "did not have any expectation that the community had to run with their benchmarks." (Ex. 398 at 104:7-1; *see also* Ex. 401at 26:2-4, 65:8-14 ("Q . . . . Do the community-specific department benchmarks reflect the maximum daily staffing for each department? . . . A. No.").)

Consistent with the ED's testimony, Plaintiffs and putative class members have also confirmed that staffing levels and practices vary. Plaintiff Stiner, for instance, concedes that staffing levels at her Community varied over time and that she was aware of two other Communities at which staffing was adequate. (Ex. 387 at 53:13-56:2.) In addition, well over 100 disabled residents submitted declarations attesting they did not experience any issues with the levels of staffing at their Communities. (Ex. 227 at 7-8.) The objective data further corroborates the lack of any common staffing practice. For instance, the data shows significant variation amongst the Communities (and even amongst different EDs who worked at the same Community but at different times) in the: (1) hours worked over time; (2) resident-to-employee staffing ratios; (3) hours worked by department/business line; and (4) number of staff members throughout the day. (Ex. 415 ¶¶ 131-152.) Even more compelling, there is significant variability between actual labor hours and the Service Alignment benchmarks. (*Id*.) Indeed, Communities utilized more labor hours than the benchmarks would suggest on more than half of the days in the proposed class period. (*Id*.) On thousands of days across the Communities, staffing hours exceeded the benchmarks by well over 20% (equating to more than 25 additional staff hours per day). (*Id*.) Further, numerous putative class members resided at a Community only on days when staffing hours exceeded the benchmarks. (*Id*. at ¶ 98.) These objective variances in and of themselves defeat Plaintiffs' claims of a common staffing policy.

Tellingly, the "simple math" performed by Plaintiffs' staffing expert Flores also corroborates the lack of any common staffing model. Flores purported to perform a "simple" calculation of the required staff time, the available staff time, and any deficits between the two at six sampled Communities. Given

really base [the determination of how many caregivers the Community needs] off the needs of the residents."); Ex. 391 at 202:13-203:6 ("Q. Were you required . . . to be in compliance with labor benchmarks? . . . . A. No., . . . compliance is the need of my residents. The care that they require. . ., that is my compliance.").)

the "simple" nature of this approach, if the Communities had been employing a common staffing model predicated on Service Alignment benchmarks, then her math should have revealed consistency within and across the Communities with respect to the alleged time deficits. (*Id.*) Yet her math revealed just the opposite. Some Communities were adequately staffed up to 40% of the time—meaning that, under Flores' highly-biased and methodologically flawed method for assessing staffing, there were numerous days in the class period when the Communities were not allegedly understaffed. (ECF No. 278-4 ¶ 31; ECF No. 349-4, Ex. A, at 55:1-3.) Moreover, while Flores alleged that there was some percentage of omitted care time at the sampled Communities, her math shows wide discrepancies in those percentages. For instance, she contends that one of the Communities had a purported average time deficient of 1.29% whereas another one of the Communities had a purported average time deficit of 19.7%. (ECF No. 278-4 ¶ 62.)[25] Defendants adamantly dispute the existence of any such time deficits. But the fact that such "simple" math reveals wide discrepancies in both the existence and extent of these alleged time deficits illustrates that staffing levels are not determined by either the Service Alignment benchmarks or any other common "staffing model."

In sum, there is abundant evidence establishing the lack of any common staffing policy or procedure.[26] Based on the same types of evidence that exist here, multiple courts have denied class certification. *Cole v. CRST Van Expedited*, 842 Fed. Appx. 162, 163 (9th Cir. 2021); *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 469 (S.D. Cal. 2012); *Rosales v. El Rancho Farms*, 2011 WL 6153276, at *1, *26, *30 (E.D. Cal. Dec. 12, 2011).

> ### 2. Plaintiffs Have Not Shown a Common Policy or Practice of Denying Requests to Modify Staffing Policies in a Discriminatory Manner

---

[25] The separate staffing analysis of Plaintiffs' expert, Schroyer, also shows discrepancies in the supposed time deficits both within and across Communities. (*See, e.g.*, ECF No. 278-5 at Tables 6 & 7.)

[26] Plaintiffs cherry-pick a handful of emails in an effort to prove a common policy. (Mot. at 16-17.) But Plaintiffs' interpretation of these emails is not corroborated by the authors. As one author, Mr. Bowman, testified, he and others consider when there are significant variances between benchmarks and staffing hours so they can why and then offer assistance to the Community. For instance, variances may indicate that resident assessments are "not caught up" and need to be updated. (Ex. 394 at 209:17-210:4.) That in no way establishes a common policy for determining staffing levels. Similarly, although Plaintiffs argue an isolated corrective action plan establishes a common policy, Mr. Bowman explained his statements in the document concerned "an overall failure . . . of leadership, lack of responsiveness, lack of communication" of the individual who was the subject of the document.  (*Id.* at 190:3-191:7.)

Aside from the lack of any common staffing policy, there is also no common evidence capable of establishing that Defendants had a policy or practice of denying requests to modify staffing for disabled residents. To support their claim, Plaintiffs cite to a single letter dated March 3, 2017, which their counsel addressed to the ED of a single Community and to "General Counsel Brookdale Senior Living Communities, Inc." (Mot. at 22.) While Plaintiffs may contend the letter requested reasonable accommodations for residents with disabilities at the Communities generally, the letter is entitled "Re: Brookdale *San Ramon*" and clearly pertains to just the single Community of the ED to whom it was addressed. (Mot. at-1 at 98-102.) Thus, the letter is not evidence of a common policy.

Plaintiffs also cite certain resident declarations to support their claim. But those declarations merely reference complaints residents allegedly made to managers at specific Communities—not requests for anyone (much less Defendants) to modify staffing policies to accommodate disabilities. (ECF No. 278-3.) Indeed, Plaintiffs conceded they did not make requests for their Communities to modify any alleged staffing policies. (Ex. 135 at 185:4-14 ("I never requested more staffing."); Ex. 134 at 218:24-219:22 ("I can't state that I specifically said, can you, please, hire more people so that you can do what you agreed to do."); Ex. 121 at 2.)

Finally, even if Plaintiffs had made a modification request (which they did not), the reasonableness of such a request is inherently individualized and would require a fact-specific analysis of each Plaintiff's circumstance and the nature of the Community's services, staffing, and resources. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001); *Dunlap v. Liberty Nat'l Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017). Residents have vastly different abilities, different needs due to their claimed disabilities, and different preferences. To illustrate, Flores purports to identify proposed class members as "disabled" based on what she calls "disability indicators," but the "disability indicators" to which Flores points range from use of hearing devices to electric scooters. (ECF No. 278-4 at 41-43.) This means that even if a proposed class member made an actual request for a modification, the type of modification that would be effective in providing equal access to the resident would vary greatly depending on the particular need created by the resident's specific disability, as well as the specific circumstance prompting the modification request. For example, potential effective modifications to

27

policies for someone with a hearing-related disability would vary greatly from modifications needed by someone with a mobility disability.  Further, because each Community follows its own staffing practices, whether a resident's request for a modification of those practices is reasonable will vary (and present individualized issues) depending on the request and its impact to that Community. Individualized inquiries also would be required to determine whether additional staff would constitute an effective modification to the requesting resident's need, and whether other modifications would have been effective in providing equal access, each compounded by inherently individualized disability or related limitations of each proposed class member. *See, e.g., Morris v. Baldwin*, 2018 WL 3016498, at *2 (S.D. Ill. June 14, 2018) ("[e]ach accommodation request requires a separate consideration and raises different issues of fact"). Under those circumstances, the Court cannot resolve the questions raised by the Disability Class with any common evidence. *Id*.[27]

## D.    Plaintiffs Fail to Establish Any Common Questions that Will Drive Resolution of their Contracting Class Claims

As with their other proposed classes, Plaintiffs have not established any questions common to the Contracting Class that are susceptible to a common answer. Instead, they merely rephrase their claims as questions and do not explain how those questions can be resolved on a class-wide basis. But the record shows that each of their so-called common questions can be answered only with highly individualized evidence on a class member-by-member basis.

### 1.    *Whether Defendants' Statements and Omissions Were Deceptive Is Not a Common Question*

Plaintiffs assert that the question of "[w]hether Brookdale's statements and omissions regarding facility staffing were deceptive" is common to their proposed class. (Mot. at 44.) The only reasoning they offer is that all residents were exposed to the same "Residency Agreements and the resident assessment process." (*Id*). But that does not suffice for multiple reasons.

---

[27] Moreover, as the court articulated in *Smith v. Walgreens*, 2021 WL 3861451, at *9-10 (N.D. Cal. Aug. 30, 2021), a plaintiff cannot prove that the defendant failed to provide meaningful accommodations when the plaintiff "fails to establish that the alleged policies treat disabled persons any differently than similarly situated non-disabled persons." Yet, here, Plaintiffs broadly contend that "Defendants have a policy and practice of understaffing their facilities," and they assert that this applies to all residents— irrespective of whether they were disabled. (Mot. at 28, 42.)

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

First, Defendants did not contract with proposed class members and are not parties to any of the Residency Agreements. Thus, by definition, Defendants did not make any of the statements Plaintiffs contend were misleading and they cannot be held liable for any such statements. *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1110, 1133 (N.D. Cal. 2013) (holding that the mere fact of a parent-subsidiary relationship is insufficient to hold a parent liable for a subsidiary's conduct).[28] As such, a resident's exposure to a Residency Agreement cannot plausibly constitute common evidence of deception. And without evidence of class-wide exposure to statements for which Defendants can be held liable, Plaintiffs have no way to establish any deception on a class-wide basis.

Second, even if Defendants could be held liable for statements in the Residency Agreements (they cannot), the question of whether those statements were deceptive is individualized to each putative class member. At the outset, the statements in the Residency Agreements could be deceptive only if a resident was in fact deprived of the promised services. If a resident received all the services promised to them, then there simply cannot exist any deception. As discussed *supra*, determining whether a resident was deprived of promised care services is a highly individualized inquiry. Yet, even if putative class members are not required to show deprivation of services, they certainly must show they were exposed to understaffing. As the California Supreme Court has made clear that California law, "does not authorize an award . . . on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice." *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009). Consistent with this mandate, if a resident was never exposed to understaffing, then the statements at issue could not possibly give rise to a deceptive business practice—even under Plaintiffs' theory of liability. But determining whether a putative class member was exposed to understaffing is a highly individualized question.

For all the reasons discussed in Sections II(C)(1), *supra*, the Service Alignment benchmarks—

---

[28] While Plaintiffs' Motion does make allegations regarding corporate control, the Ninth Circuit has held that being "heavily involved" in a subsidiary's operations, having control over the "overall budget," and establishing general policies and procedures is insufficient to pierce the corporate veil. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1074-75 (9th Cir. 2015). Rather, there must be such "pervasive control" that the corporation "dictates every facet of [its subsidiaries'] business," including "routine matters of day-to-day operation." *Id.* As discussed, Plaintiffs fail to demonstrate that Defendants (or any other entity) had "pervasive control" over the Communities and contracting parties.

29

the only purported common staffing policy Plaintiffs identify—is not in fact a "common policy" and cannot plausibly constitute class-wide evidence of anything (much less understaffing). Rather, each Community and each ED at each Community has the discretion to set and determine staffing levels. As borne out by both witness testimony and objective analysis of the underlying data, this results in significant variability in staffing levels both between and within the Communities. This is a critical distinction from *Heredia*, where the Court did not even acknowledge—much less evaluate—differences in staffing levels and practices.

Tellingly, even under Flores' highly disingenuous and flawed methodology for assessing the adequacy of staffing, hundreds of class members were never exposed to any understaffing, and there are thousands of days where the communities were adequately staffed or overstaffed. (*See supra* at 26.) Flores was therefore forced to admit that, to determine if a particular resident was ever exposed to understaffing, the trier of fact would need to know the specific days the resident resided at a certain community, the total number of residents in that same Community on those same days, each of the residents' care needs on those days, the time required to meet those care needs, and the actual staffing levels on each of those days. (ECF No. 349-4, Ex. A at 275:4-276:11.)[29] Mini-trials would then be needed to determine whether a material time deficit existed on those days such that a particular class member could have been deceived by the alleged staffing representations.

Where, as here, variations exist "that directly affect whether the allegedly deceptive advertisements were, in fact, deceptive," individualized issues will predominate "on the issue of deceptiveness." *Downey v. Public Storage, Inc.*, 44 Cal. App. 5th 1103, 1118 (2020). Indeed, multiple courts addressing understaffing allegations against senior care providers have ruled that these same issues preclude certification. For instance, in *Bartels v. Saber Healthcare Grp.*, 2020 WL 6173566, at *2 (E.D.N.C. Oct. 21, 2020), the court found that the plaintiffs could not certify understaffing claims brought against a nursing home because staffing levels varied significantly across the class period, such

---

[29] This is distinguishable from *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010), on which Plaintiffs heavily rely. (Mot. at 31, 46, 48.) There, the Ninth Circuit concluded the plaintiffs' product defect allegations were susceptible to generalized evidence because liability allegedly resulted "from a single, defective alignment geometry" present in all class members' tires. *Id.* at 1176. Here, there is no single staffing method or staffing level applicable to the putative class.

that the court would have to determine what the staffing was during each shift and on each day of each putative class member's residency. Likewise, in *Passucci v. Absolute Ctr. For Nursing Rehab.*, 2014 N.Y. Misc. Lexis 5834, at *59 (N.Y. Sup Ct. Jan. 10, 2014), the court denied certification in an understaffing case because, to recover damages for each member of the class, the plaintiffs "ultimately would have to adduce proof of the level of staffing on each unit of each facility on each day, if not on each shift." In reaching that conclusion, the court rejected the exact types of evidence Plaintiffs purport to rely on here as supposed proof of a class-wide deception, *i.e.,* common ownership, expert testimony concerning the defendants' overarching practice of allocating insufficient staffing, and anecdotal evidence of various patients' care and treatment. *Id*. at *55; *see also Stoner ex rel. Estate of Perkins v. Quinlan*, 2015 WL 5970349, at *5 (Sup. Ct. Pa. 2015) (denying certification despite contention that there was "corporate decision for understaffing," because residents "were treated separately over a period of years" and, therefore, "proof as to one is not proof as to all").

### 2.  *Whether the Alleged Statements Are Material Is Not a Common Question*

Plaintiffs assert that the question of "[w]hether Brookdale's deceptive statements or omissions would be material to a reasonable consumer" is common to the class. Instead of citing any evidence in support, however, Plaintiffs fall back on the reasonable consumer standard that courts apply to CLRA and UCL claims. But that legal standard, by itself, does not constitute proof of commonality. Indeed, courts routinely deny certification of CLRA and UCL claims where the question of materiality cannot be decided with common proof. *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011).[30] Here, too, the question of materiality cannot be decided on a class-wide basis.

Plaintiffs premise their theory of liability on a "plausible nexus" between what was actually promised and what residents would purportedly expect. Specifically, the "key provisions" to which they point as forming the basis for their claims is that "an 'assessment' will be used to prepare 'a personal service plan'" and that residents will be charged for identified services. (Mot. at 23.) In Plaintiffs' view, the *operator's* promise to meet the *personal* needs of the resident is somehow equivalent to a promise by

---

[30] *See also Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011) (although "[m]ateriality is an objective standard, [] still, Plaintiffs will need to point to some type of common proof" to meet their burden of showing materiality can be resolved with common proof).

31

*Defendants* to provide some unspecified and subjective level of *community-wide* staffing. However, like some Plaintiffs, a reasonable consumer may very well understand the Residency Agreement to promise only what it says, *i.e.*, that an assessment would be conducted and their care needs met.[31] In fact, like Plaintiff Lytle, a reasonable consumer may not even think of staffing when signing the Agreement.[32] Thus, a reasonable consumer may only find the alleged statements material if they were in fact deprived of the promised services—which is a highly individualized inquiry. Other reasonable consumers may only find it material if they were in fact exposed to understaffing—yet another highly individualized inquiry. And others may only find it material if the operator (not Defendants) failed to disclose the alleged staffing practices—also a highly individualized inquiry.

These individualized inquiries are made all the more complicated by the lack of mandated staffing ratios for the Communities.[33] Thus, different consumers would have differing expectations as to what the staffing levels should have been and whether the actual levels were sufficiently material to cause them to be deceived. This is even further complicated by the COVID-19 pandemic and the undeniable impact it has had on staffing levels industry-wide.[34] Indeed, consumers' expectations about staffing are likely to have changed and many consumers may now anticipate a risk of staffing challenges but choose to reside at a Community anyway. In that case, the alleged risks that form the basis of Plaintiffs' claims could not have possibly been material to the consumer.

For all these reasons, it is clear that consumers "would not be expected to respond uniformly to the message" (*i.e.*, the statements about assessments and personal services). *Webb*, 272 F.R.D. at 502

---

[31] (*See, e.g.*, Ex. 379 at 89:7-90:10 (Plaintiff interpreted her agreement to mean only "[t]hat they will develop a personal service plan and method of evaluating your personal care needs" and "[t]he cost of providing the needs will be shared with me").

[32] (Ex. 382 at 99:19-23 (I "did not think of staffing at all when [she] signed this contract on any level").)

[33] This stands in stark contrast with *MacRae v. HCR Manor Care Services, LLC*, 2018 WL 8064088 (C.D. Cal. Dec. 10, 2018), a case on which Plaintiffs heavily rely. (Mot. at 34-38.) There, the court considered a class of individuals who resided at a single skilled nursing facility, which was subject to *statutorily mandated staffing ratios*. *Id*. Thus, there was no need to conduct individualized inquiries into residents' expectations about staffing levels.

[34] A September 2021 survey conducted by the American Health Care Association revealed that 99% of nursing homes and 96% of ALFs reported staffing challenges due to the pandemic. (*See* Ex. 501.)

(C.D. Cal. 2011); *see Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 646 (C.D. Cal. 2014) (same).[35] In these circumstances, Plaintiffs cannot establish materiality on a class-wide basis. *See id.*

### 3. Whether Defendants Allegedly Took the Property of Elderly Residents Is Not a Common Question

Relative to their elder abuse claim, Plaintiffs contend that there is a common question of "[w]hether Brookdale has wrongfully taken the property of elderly residents." (Mot. at 45.) In support, Plaintiffs point to the Flores Declaration to claim that the task times identified in "Brookdale's own time studies . . . are much higher than those Brookdale has used during the class period for purposes of determining staffing." (*Id.* at 46.) Yet, Flores retracted that opinion at her deposition, conceding the task times used to generate benchmarks "*doesn't contradict what's in the time studies.*" (ECF No. 349-4, Ex. A at 289:10-23; *see* ECF No. 350 at 5-9.) Plaintiffs' reliance on a non-existent discrepancy cannot persuade.[36] Indeed, even if Flores' retraction is not sufficient to exclude her opinion, the Court's "rigorous analysis" under Rule 23 requires that it "judg[e] the persuasiveness of the evidence presented"—specifically including expert testimony challenged under *Daubert*. *Ellis*, 657 F.3d at 982.

The only other supposed class-wide evidence that Plaintiffs reference are the "hundreds of citations [the non-party licensees/operators] received from DSS regarding incidents arising from understaffing." (Mot. at 36.) Flores, however, conceded that the vast majority of these citations are not in fact related to the staff who provide care—the only type of staffing at issue here. (ECF No. 349-4, Ex. A at 311:21-314:21.) In fact, more than half the Communities never received a single caregiver staffing citation, and those that did largely received only one citation over a seven-year period. (*See id.*). If, as Plaintiffs contend, staffing citations are indicative of whether common proof of understaffing exists,

---

[35] While Plaintiffs rely heavily on *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018), that case only reinforces the lack of commonality here. As *Hadley* noted, "exposure to statements displayed on the outside of a product's packaging is clearly more likely, and therefore much easier to infer, than exposure to statements buried in the middle of an owner's manual." *Id.* at 1099. Here, no statements are displayed on the outside (or inside) of a Community, and the statements at issue are not even contained in Residency Agreements.

[36] While not referenced in their legal arguments, Plaintiffs contend that the task times for toileting and mobility are too low. (Mot. at 27.) Again, they rely on Flores. But even if that were relevant (it is not), the benchmarks are not generated using the supposed times that Flores criticized. Indeed, as discussed in detail in the Motion to Exclude Flores' testimony, Flores wholly misinterpreted Brookdale's documents and then proceeded to criticize task times that play no role in the benchmarks. (ECF No. 350 at 5-9.)

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

1   then the record in this case surely establishes that no such common proof exists. *See Bartels*, 2020 WL

2   6173566, at *2 (holding that plaintiffs could not certify understaffing case in part because "state

3   regulators performing inspections found staffing levels to be appropriate except on three occasions").

### III. Plaintiffs Are Not Typical of Other Proposed Class Members

5           Plaintiffs' claims also are not typical of unnamed putative class members for reasons similar to

6   those regarding commonality and predominance. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13

7   (1982) ("The commonality and typicality requirements . . . tend to merge."). First, Plaintiffs cannot

8   show they were subject to any policies or practices common to the putative classes. This is reason alone

9   to deny certification. *See, e.g., Guzman*, 2020 WL 227567, at *11-12 (finding lack of typicality because

10  "Plaintiffs have not tendered significant proof that the English-Only Policy or Promotion Policy existed

11  on a company-wide basis so as to apply to all class members"); *Civil Rights*, 317 F.R.D. at 103-04;

12  *Castaneda*, 264 F.R.D. at 571-72. Indeed, just as in *Paccuci*, 2014 N.Y. Misc. Lexis 5834 at *31,

13  Plaintiffs cannot be typical of individuals who resided at different facilities or at different times because

14  their experiences "were [not] in fact reflective and representative…of the experience of all" and because

15  "the conditions were not necessarily the same."

16          Second, Plaintiffs cannot show they suffered "the same or similar injury" as other putative class

17  members—a prerequisite to typicality. *Elis*, 657 F.3d at 984. As to their proposed disabilities classes,

18  Plaintiffs contend they were purportedly harmed by Defendants' allegedly discriminatory policies. Yet,

19  many putative class members could not have been injured by those alleged policies because they were

20  never impacted by and/or never knew about them. Indeed, 151 disabled residents testified they did not

21  encounter access barriers; 131 did not experience any discriminatory transportation policies; 130 did not

22  experience any discriminatory emergency evacuation policies; and 133 did not experience any

23  discriminatory failure to modify alleged staffing policies. (Ex. 227.)

### IV. Plaintiffs Fail to Show the Court Could Resolve Their Claims for Damages on a Class-Wide Basis Under Rule 23(B)(3)

25          To certify a damages class under Rule 23(b)(3), Plaintiffs bear the burden of showing that their

26  alleged damages are "capable of [accurate] measurement on a class-wide basis." *Comcast Corp. v.*

27  *Behrend*, 569 U.S. 27, 34-35 (2013). Plaintiffs have not met that burden as to any of the classes.

28

As to Plaintiffs' claims under the ADA and Unruh Act, statutory damages are available only if a disabled individual experienced difficulty, discomfort, or embarrassment because of a violation that he or she personally encountered. Cal. Civ. Code § 55.56(c). Thus, as multiple rulings have confirmed, the Court must undertake a series of individualized determinations before awarding any damages to putative class members under the Unruh Act.[37] Plaintiffs' testimony corroborates that fact, as they admitted the allegedly discriminatory conduct caused them difficulty, discomfort, or embarrassment to varying degrees, if at all.[38] In fact, some Plaintiffs could not even say what, if any, difficulty or embarrassment they experienced. For instance, the representative for Plaintiff Boris was not aware of any difficulty her deceased father encountered because she was not there to observe it. (Ex. 382 at 184:12-185:14.) That same issue would certainly arise for numerous other members of the putative class.

In an attempt to rebut these obvious issues, Plaintiffs erroneously contend that a claims-form process can be used to determine the statutory damages to which putative class members would be entitled. (Mot. at 39.) But the sole case they cite for this proposition is inapposite as it discussed the use of claims forms in the context of ascertainability—not damages or predominance. *Nevarez*, 326 F.R.D. at 576-77. It also concerned only one facility, whereas this case involves numerous facilities with vastly different features and policies. Under the circumstances here, a claim form simply could not resolve the intricate and individualized issues present here. *Cordoba v. DIRECTV, LLC*, 2020 WL 5548767, at *4 (N.D. Ga. July 23, 2020). Moreover, relying on a clam form would deny Defendants their right to raise individualized challenges to each class member's claims. *In Re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018). Indeed, Plaintiffs' proposal would amount to "Trial by Formula"—a concept the Supreme Court has expressly rejected as contrary to the Rules Enabling Act. *Wal-Mart*, 564 U.S. at 367.

---

[37] *See, e.g., Moeller v. Taco Bell Corp.*, 2012 WL 3070863, at *5 (N.D. Cal. July 26, 2012); *Vargas v. Quest Diagnostics Clinical Labs., Inc.*, 2021 WL 5989958, at *9 (C.D. Cal. Dec. 2, 2021); *Vondesaar v. Starbucks Corp.*, 2015 WL 629437, at *4 (C.D. Cal. Feb. 12, 2015); *Antoninetti v. Chipotle Mexican Grill, Inc.*, 2012 WL 3762440, at *6 (S.D. Cal. Aug. 28, 2012).

[38] For instance, Plaintiff Carlson did not have any issues with washing her hands in spite of an alleged barrier under her bathroom sink because she already had assistance from Community staff with that activity. Similarly, Carlson did not have an issue with doors around her Community because the person escorting her opened the doors for her. Carlson also did not have an issue with her closet because she could reach up and access clothes from the hanger while in her wheelchair (or staff or family assisted her). (Ex. 395 at 206:22-209:11; Ex. 501 at 4.)

As to Plaintiffs' consumer protection claims, Plaintiffs contend that damages can be "calculated based on what a reasonable person would have paid for Brookdale's care services." (Mot. at 40.) In support, they claim the modeling performed by their expert Dale Schroyer is capable of "analyz[ing] the sufficiency of caregiver staffing at *all* of Brookdale's California facilities." (*Id.* at 27-28.) Yet, putting aside the flaws with his model generally, the data Schroyer says he needs to properly apply his model is simply not available for thousands of residents over the class period.[39] In fact, even as to just the six Communities he analyzed, there are 270 residents for whom there does not exist sufficient data to conduct his analysis. *Id.* Thus, his model is patently incapable of providing a way to accurately measure damages on a class-wide basis for the putative Contracting Class.

## V.   Plaintiffs' Proposed Classes Do Not Satisfy Rule 23(b)(2)

In addition to seeking certification of three damages classes, Plaintiffs also seek certification of three injunctive relief classes under Rule 23(b)(2). Their request fails on multiple fronts.

First, "Rule 23(b)(2) [certification] is appropriate only where the primary relief sought is declaratory or injunctive" and any monetary damages are "merely incidental" to the injunctive relief being sought. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001). Yet, the monetary damages Plaintiffs seek on behalf of their classes are not incidental to their requested injunctive relief. To the contrary, Plaintiffs seek significant damages under the Unruh Act for their proposed disability classes. (*See infra* at 39.) They also allege that putative class members have "each suffered substantial economic harm" under the CLRA/UCL, and they seek damages in the form of recovery of their monthly service fees. (ECF No. 90 ¶ 259; Mot. at 49-50.) Based on these assertions, it is clear that Plaintiffs' damages claims are not incidental to their claims for injunctive relief. As such, the Court cannot certify a Rule 23(b)(2) class. *See, e.g. Castaneda*, 264 F.R.D. at 571.

---

[39] In particular, as explained in his Declaration, Schroyer can apply his analysis only to days where the data shows a direct match between his assessment-derived census and the census on labor detail reports or on days where there are less than five missing resident assessments as compared to the labor detail census. (ECF No. 278-5 ¶ 42.) When that matching process is applied to all the available data, it reveals thousands of residents for whom the analysis simply cannot be conducted. Dr. Sheldon Jacobson, whose Declaration is attached as Exhibit 417, discusses in detail the flaws in Schroyer's analysis and the reasons why his analysis cannot be applied on a class-wide basis. (Ex. 417 ¶¶ 21-75.)

36

Second, a Rule 23(b)(2) class is appropriate only when "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360 "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or to none of them." *Id*. When plaintiffs fail to show every member would obtain relief from a single prospective injunction or declaratory judgment, certification under Rule 23(b)(2) is inappropriate. *Id.* at 364. Here, Plaintiffs have not shown (and cannot show) that each class member would obtain relief from an injunction. All three of the proposed classes are defined to include both current and *former* residents. Former residents, by definition, would not receive any relief if an injunction were granted. Furthermore, many of the Communities that bore the Brookdale Senior Living brand during the putative class period no longer do so. (Ex. 225 ¶ 7.) "An ADA claim for injunctive relief is moot if … the defendant no longer owns or controls the challenged premises." *Johnson v. Rai Rockling Investments, LLC*, 2017 WL 3421848, at *2 (E.D. Cal. Aug. 9, 2017) (citing *Kohler v. Southland Foods, Inc.*, 459 Fed. Appx. 617, 619 (9th Cir. 2011)). Even accepting Plaintiffs' theory as true, there would be many putative class members whose claims would be moot and who would therefore not receive any relief if an injunction were granted. This is yet another reason why certification under Rule 23(b)(2) is inappropriate. *See Wal-Mart*, 564 U.S. at 364 (Rule 23(b)(2) certification is improper where half of putative class were former employees and, therefore, had no interest in injunctive relief to stop allegedly discriminatory compensation policies and practices).

Third, when any violations are apt to vary across locations, such that any injunctive relief would need to be tailored to each location, class-wide injunctions are not appropriate. *See, e.g., Civil Rights*, 317 F.R.D. at 105; *Mielo*, 2015 WL 1299815, at *12-13. Thus, in *Castenada*, 264 F.R.D. at 569, for instance, the court denied certification under Rule 23(b)(2) because it found that, due to the variation among facilities, it could not issue any generally applicable relief. The court explained that "at one location, a bathroom mirror may need to be lowered. At another location, an automatic door may need to be adjusted to close more slowly.… Because every [community] will have different violations, any ordered injunctive relief will primarily need to be tailored [community]-by-[community]" and "there can

be no 'generally applicable' relief in this case as to [residents] of all [communities]." *Id.* Here too, Plaintiffs complain about different elements at different communities and different features in different apartments and areas. (Ex. 416 ¶¶ 41.) Thus, there can be no generally applicable relief.

Fourth, "[t]o satisfy Rule 23(b)(2), the proposed injunction must be 'more specific than a bare injunction to follow the law.'" *Civil Rights*, 317 F.R.D. at 105 (rejecting plaintiffs' argument "that the Court could 'issue an injunction requiring HPT to comply with the ADA at its properties'"); *Mielo*, 2015 WL 1299815, at *12 (same). Yet, Plaintiffs seek that precise injunction for their proposed Mobility and Vision Impaired Class and their proposed Disabilities Class. (Mot. at 38, 44.) For this additional reason, the Court cannot certify either of those proposed classes under Rule 23(b)(2).

## VI.    The Court Should Also Deny Certification Because a Class Action Is Not a Superior or Manageable Way to Litigate the Claims

Rule 23 requires that a class action be superior to other methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). "In determining superiority, courts must consider the four factors of Rule 23(b)(3)." *Zinser*, 253 F.3d at 1190. These factors include (*inter alia*) the class members' interests in individually controlling the prosecution of separate actions and the likely difficulties in managing a class action. *Id.* at 1190-1192. These factors preclude certification in this case.

### A.    Proposed Class Members Have an Interest in Individually Controlling the Prosecution of Separate Actions

In determining whether class members have an interest in individually prosecuting their claims, courts consider the relative value of the claims. *Id.* at 1191. A plaintiff's assertion for tens of thousands of dollars in damages on behalf of each putative class member "does not argue persuasively for class certification." *Id.*[40] That is precisely the case here.

Relative to Plaintiffs' proposed disability classes, Plaintiffs' damages expert opines "if a potential class member encountered three access barriers," his or her potential damages would be "$12,000 (3 x $4,000 = $12,000) *times* the number of occasions he or she encountered the barriers during the class period," *i.e.*, back to July 13, 2014. (Mot. at 278- ¶¶ 78-81; Mot. at 13; ECF No. 1.) In addition, Plaintiffs also seek statutory damages for each time "their ADA rights were violated" by

---

[40] *See also Dent v. Nat'l Football League*, 2021 WL 3885954, at *14 (N.D. Cal. Aug. 31, 2021) ("[R]elatively large damages… weighs against class action").

38

transportation policies and emergency evacuation policies, as well as "the $4,000 minimum statutory damages available under the Unruh Act" for failure to modify staffing policies. (Mot. at 40, 43.) Under similar circumstances, courts have held that the minimum statutory damages of $4,000 for each violation under the Unruh Act plus interest and attorneys' fees provides putative class members with significant incentives such that a class action is not a superior method of adjudication. *Vargas*, 2021 WL 5989958, at *10; *Antoninetti*, 2012 WL 3762440, at *7.

Relative to Plaintiffs' Contracting Class, Plaintiffs also seek significant individual damages—ranging in the tens of thousands of dollars per class member (excluding the punitive and treble damages Plaintiffs seek).[41] This is on top of and in addition to the damages sought on behalf of the other classes. The value of these alleged claims is demonstrated by the fact that, *after* this and other similar putative class actions had been filed, an individual plaintiff filed a virtually identical complaint on his own behalf raising the same allegations of understaffing and alleged deception against Brookdale Senior Living Inc.[42] The existence of individual actions further indicates that individual actions are sufficient. *See Smith v. Microsoft Corp.*, 297 F.R.D. 464, 469 (S.D. Cal. 2014).

At bottom, given the high damages Plaintiffs seek, the circumstances here do not comport with "[t]he policy at the very core of the class action mechanism[, which] is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

**B.     Litigating this Case as a Class Action Would Be Wholly Unmanageable**

The Ninth Circuit has made clear that a class action is not superior "[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually." *Id.*[43] That is precisely the case here. Plaintiffs are asserting several distinct theories of liability against

---

[41] (*See* ECF No. 278-8 ¶ 73 (up to $5,000 in statutory damages for CLRA violations); *id.* ¶ 77 (potential recovery for single Plaintiff of $18,372 per year).)

[42] *See Sikowitz v. Brookdale Senior Living Inc.*, Case No. 19-CV-010992, Complaint (Ex. 504).

[43] *See also, e.g., Juarez v. Jani-King*, 2010 WL 3766649, at *2-3 (N.D. Cal. Sept. 24, 2010) (superiority not established where "Plaintiffs present multiple, disparate theories of predominance, [ ] seek class certification for fourteen different causes of action, [ ] seek certification under both Rule 23(b)(2) and (b)(3), [and] attach sixty exhibits, totaling more than four thousand pages of documents").

Defendants on behalf of three separate classes. In so doing, they are requesting that a *single jury* adjudicate multiple complex and individualized claims that are predicated on different alleged wrongdoings and different theories of harm, including encountering (a) allegedly unlawful physical barriers, (b) allegedly deficient transportation services, (c) allegedly ineffective emergency evacuation practices, (d) alleged refusals to modify staffing policies and procedures, (e) allegedly deceptive statements regarding staffing, and (e) the alleged wrongful taking of their property. Even if these various issues could be decided on a class-wide basis (they cannot), they each require separate and distinct factual showings bearing on separate and distinct legal elements.

Tellingly, Plaintiffs have not presented any viable trial plan. Nor could they conceive of one that would entail manageable presentation and adjudication of each element of their claims. To the contrary, "[t]he completed picture will no doubt be too vast and too complicated for even the most diligent jury to grasp." *In Re Paxil Litig.*, 212 F.R.D. 539, 541, 543, 546, 548 (C.D. Cal. 2003). Indeed, in *Passuci*, 2014 N.Y. Misc. Lexis 5834, at *35, the court specifically noted that—even just as to understaffing claims—it would be unmanageable to simultaneously litigate the claims of thousands of nursing home residents to assess "the issue of the adequacy or inadequacy at 11 different facilities over so many years." Here, Plaintiffs are asking the Court to litigate not just understaffing claims—but numerous other claims involving numerous discrete issues requiring the jury to assess dozens of legal standards and their impact on both (1) the policies and practices of over 80 individual Communities and (2) each of the thousands of putative class members over thousands of days. That is not only unmanageable, it is virtually impossible. Thus, even putting all the other individualized issues aside, the Court should deny certification of the proposed Rule 23(b)(3) classes for these additional reasons.

## CONCLUSION

Defendants respectfully request this Court deny Plaintiffs' Motion for Class Certification.

1    **DATED: March 3, 2022**                    Respectfully submitted,

2                                                SEYFARTH SHAW LLP

3

4                                        By: */s/ Gerald L. Maatman, Jr.*
                                             Gerald L. Maatman, Jr.
5
                                             Attorneys for Defendants
6                                            BROOKDALE SENIOR LIVING INC.
                                             BROOKDALE SENIOR LIVING COMMUNITIES,
7                                            INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION /
CASE NO. 4:17-CV-03962-HSG (LB)

80236136v.2