# EXHIBIT 416

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

STACIA STINER, et al.,

            Plaintiffs,

    v.

BROOKDALE SENIOR LIVING INC. et al.,

            Defendants.

Case No. 4:17-CV-03962-HSG (LB)

**DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# I.    Background/Qualifications

1.    I am a Partner at LCM Architects ("LCM"), a Chicago-based architectural firm that specializes in accessible design requirements of Title III of the Americans with Disabilities Act ("ADA") and federal, state, and local disability access laws.  My business address is 819 S. Wabash Ave., Fifth Floor, Chicago, IL  60605, (312) 913-1717.

2.    I have served as an expert consultant on the ADA's accessibility requirements for facilities since 1998 and am thoroughly familiar with the requirements of the 1991 ADA Standards for Accessible Design (the "1991 Standards") and the 2010 ADA Standards for Accessible Design codified at 28 C.F.R. Part 36, Subpart D (2011) and 36 C.F.R. Part 1191, Appendices B and D (2009) (the "2010 Standards").  I acquired my extensive knowledge of the ADA's accessibility standards over the course of 30 years.

3.    From 1992 to 1998, I was the ADA Technical Assistance Specialist and Coordinator at the Great Lakes Disability and Business Technical Assistance Center ("Great Lakes ADA Center") which received funding by the U.S. Department of Education National Institute on Disability and Rehabilitation Research to provide education and training to the public about the ADA Regulations and ADA Standards for Accessible Design.

4.     Since joining LCM in 1998, I have personally conducted close to 900 inspections of public accommodations facilities to assess their conformance with the 1991 or 2010 Standards.

5.     I have been retained as the independent ADA consultant tasked to inspect facilities covered by consent decrees and settlements for Hilton Worldwide and Carnival Cruise Lines, with the approval of the U.S. Department of Justice.  I am serving as the independent ADA consultant assisting in the implementation of a nationwide ADA Title III class action settlement with Cracker Barrel.

6.     I am a Certified Access Specialist ("CASp") in California and a Registered Accessibility Specialist in Texas – the only two states that certify access specialists (following a rigorous written examination) who can conduct inspections and review plans for compliance with the ADA and state accessibility standards.

7.     Since 2015, I have served as a member of the ANSI A117.1 Accessibility Standards Committee.  This committee develops the accessibility standards for the International Building Code which is a model building code that many states ultimately adopt as their building code.  In 2020, I was appointed to serve as the Chair of the Accessible Bathing Task Group.

8.     From 2003 to 2011, I served as a member of the U.S. Access Board, the federal agency responsible for developing the 1991 and 2010 Standards which were then adopted by the DOJ into its ADA regulations. I was Chairman of the U.S. Access Board from 2009 to 2010.

9.     I have been retained by the U.S. Department of Justice ("DOJ") as a subject matter expert on three different occasions, most recently as a subject matter expert related to plan review and construction review of the Belmont Park Arena in New York.  The second occasion was also working as a subject matter expert managing surveys and reporting in a multifamily housing case involving over 50 housing developments for the DOJ. Third, I have completed surveys related to settlements for three additional multifamily housing matters.  Of those three settlements, one involved an agreement between private parties regarding multifamily housing developments located throughout the country, one involved a DOJ settlement regarding senior living facilities in the New England region, and one involved a voluntary compliance agreement between a city agency and the Department of Housing and Urban Development ("HUD") regarding properties subject to the Rehabilitation Act, California Building

2

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

80262021v.1

Code, ADA, and Fair Housing Act ("FHA"). As part of this DOJ-HUD matter, I conducted two multiday trainings for architects and building code officials in California which involved both classroom and field trainings.

10.     I have conducted over 50 full day trainings nationwide on the Fair Housing Act and multifamily housing for HUD. I was also one of the lead editors of HUD's second edition of the Fair Housing Act Design Manual.

## II.     Methodology for Assessing Existing Facilities

11.     Based upon my training and experience, the proper methodology for accurately assessing existing facilities for compliance with accessibility codes and standards requires four steps. These include:

1.      Determine the original construction date and type of occupancy.

2.      Determine if alterations have occurred since the original construction date.

3.      Determine if any applicable code or standard requires modifications to existing elements and if those modifications are readily achievable.

4.      Perform an on-site survey using generally accepted best practices to evaluate each element for compliance with any applicable code or standard.

12.     Without researching the information in Steps 1 - 3, it is not possible to accurately determine what codes or standards apply to each element within each facility. Without knowing what code or standard applies, you do not know what elements must be evaluated or the required measurements for those elements. You therefore cannot accurately determine if the existing elements are compliant or noncompliant with the applicable accessibility codes and standards.

13.     For example, until 2007 the California Building Code ("CBC") allowed a 42" by 48" configuration for accessible showers, as shown in the photo and diagram immediately below this paragraph. The Communities involved in the present case were built between 1961 and 2007. However, the Plaintiffs' experts used the 2016 and 2019 versions of the CBC to evaluate all of the Communities, regardless of construction or alteration date, and both of those versions of the CBC require different shower configurations. Without knowing when the shower was built or last altered, it

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

is not possible to know which shower configuration was required at the time of construction or alteration.  The Plaintiffs' experts' practice of assuming all elements of all facilities regardless of their construction or alteration date must comply with the most current accessibility codes and standards is incorrect.



Diagram of 42" by 48" shower from the CBC and photo from an existing condition from a Community.

14.    As another example, built-up curb ramps were allowed in access aisles of accessible parking spaces in the CBC until 1994.  If a parking lot has those built up curb ramps, and has not been altered since 1994, then there is no violation of the CBC.  However, this is a condition that the Plaintiffs' experts called out as a violation at multiple Communities, without regard to the date of construction or alteration of the parking lot.  To illustrate, below is a diagram of a built-up curb ramp from the 1994 CBC and photo of an existing built-up curb ramp condition from a Community from Plaintiffs' experts' report, but for which they did not note the date of construction or alteration.

4

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

80262021v.1

1
2
3
4
5
6
7
8
9



10      15.     The Certified Access Specialist Program Best Practices Manual issued by the California

11  Division of the State Architect states:

12          *It is recommended that the CASp ask the owner about the construction history of the facility so*
            *that the applicable standards can be determined, in order to establish the basis of the inspection.*
13          *If the applicable standards are unable to be determined, it is recommended that the CASp advise*
            *the owner that using current standards instead of the applicable standards may lead to*
14          *additional improvements as a result of the more restrictive compliance requirements of current*
            *standards.*
15

16      16.     In keeping with best practices, the following describes the steps necessary to conduct an

17  accurate evaluation of existing facilities.

18  **Step One – Determine the original construction date and type of occupancy.**

19      17.     Step One begins with researching permit records from the local building department or

20  permit plans to verify the original occupancy type and first occupancy date.  This information is

21  necessary to determine what edition of the CBC might apply to the facility, if the facility would be

22  subject to the design and construction requirements of the FHA, and if the facility falls within one of the

23  twelve categories listed as a potential place of public accommodation under the ADA. Exhibit 1 to this

24  Declaration diagrams the process for completing Step One.

25      18.     Step One must be fully completed before the inspector conducts the onsite survey

26  because knowing the elements that must be reviewed, the dimensions used to evaluate the elements, and

27
28                                                  5

any requirement for a number of units to which accessibility requirements may apply is essential to properly completing the assessment.

19.     For example, if the FHA applied to the property, the reviewer would need to know which of the 15 safe harbors was used to meet the FHA design and construction requirements and you would need to review each dwelling unit to verify compliance.  See Exhibit 2 to this Declaration for a list of FHA Safe Harbors.

20.     The DOJ has not provided any guidance or interpretation to suggest that residential assisted living facilities are a place of public accommodation or must comply with Title III of the ADA.  If, however, the ADA did apply to a portion of an existing property, you would need to know if the 1991 or 2010 ADA Standards applied and into which of the twelve categories of public accommodation the facility would be classified, as the requirements differ between the 1991 and 2010 Standards and the public accommodation categories.

21.     Once the applicable codes and standards that apply to the facility are identified, the inspector begins Step Two prior to the survey of each facility.

22.     In the present matter, the Plaintiffs' experts used new construction standards in the 1991 and 2010 ADA Standards and the 2016 and 2019 CBC to evaluate the compliance of all 40 Communities they inspected, regardless of the Community's date of construction or any alterations.

23.     Exhibit 3 to this Declaration shows the construction dates for each Community, based on the information that we have, and consistent with the dates reflected in materials to which Plaintiffs' experts referred.  Over 50% of the Communities were constructed prior to the 1991 ADA Standards, and 100% of the facilities were constructed prior to the 2010 ADA Standards and 2016 and 2019 CBC.  Therefore, applying the new construction standards is inappropriate.  You must apply the applicable standard in effect when each Community was built.

**Step Two – Determine if alterations have occurred since the original construction date.**

24.     Step Two involves researching records from the building department or information from the building owner to determine if any alterations had occurred after the original construction and occupancy date.  This is important because alterations would be subject to the accessibility code or

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

standard that was in effect at the time of the alteration.

25.     It is critical to know what elements were altered and where in the facility the alterations took place so that the appropriate code or standard can be used to evaluate compliance of the altered area(s) or element(s).  Often you will have multiple versions of a building code apply to different areas of a facility due to alterations that have taken place in different places over the life span of the facility.

26.     For example, if a common single-user toilet room in a facility built in 2008 is renovated today, it would be required to increase the clearance around the toilet to 60" if feasible to comply with the 2019 CBC requirements.  Other unaltered toilet rooms in the facility would be remain compliant with 28" of clearance from the edge of the toilet to an adjacent sink—which was the CBC requirement when the facility was built.  Both toilet rooms would be compliant, but two different versions of the CBC must be used to evaluate them.  It would be necessary to know which toilet rooms were altered in order to evaluate each one using the proper code or standard.  Exhibit 4 to this Declaration diagrams the process for completing Step Two.  I saw no evidence that Plaintiffs' experts did this.

**Step Three – Determine if any applicable code or standard requires modifications to existing elements and if those modifications are readily achievable or provide equivalent facilitation.**

27.     The final step for conducting an accessibility survey is to determine if there is any code or standard that would require elements that have not been altered to be modified to comply with a more recent version of the building code or standard.  Exhibit 5 to this Declaration diagrams the process for completing Step Three.

28.     The ADA imposes an ongoing obligation on places of public accommodation to remove barriers where it is readily achievable (in other words, without significant difficulty or expense) to do so, to bring the elements into compliance with current accessibility standards.  If an element does not comply with current 2010 Standards (or 1991 Standard if the element fell into in the safe harbor afforded at the time the 2010 Standards went into effect) and was not technically required to comply due to the date of construction or alteration, the next step is to determine whether removal of that barrier is readily achievable.  California law differs from the ADA here, and does not require readily achievable barrier removal.  If it is not readily achievable to remove the barrier, the ADA does not consider the

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

80262021v.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

barrier a violation of law nor require it to be removed (until/if it becomes readily achievable to remove the barrier at some later time).

29.     The surveyor must assess each barrier on a case-by-case basis to determine if the removal would be readily achievable.  The work that could be required to modify an existing condition to comply with the ADA Standards may require extensive work or not be possible due to structural constraints or, for example, the location of electrical chases, plumbing chases, or elevator shafts.  This evaluation would begin in the field, with the surveyor collecting measurements, photos, and other information about the barrier, as well as information about the structural conditions surrounding the barrier.  Even still, a surveyor cannot know the financial ability of a building owner to remove barriers (to know whether the barrier might require significant expense to remove) and usually a surveyor cannot determine if a proposed barrier removal is something that is easy to accomplish without too much difficulty without more information about the building constraints.

30.     We also need to consider whether any condition, even if it might constitute a technical barrier under the applicable ADA Standards, might be considered a permissible equivalent facilitation. For example, if a resident requests a specific modification to a facility to increase access to them due to their disability, that would be considered an equivalent facilitation that provides equal or even greater access than what any applicable access standard might require.  The equivalent facilitation analysis is specific to and varies element by element, person by person, and condition by condition.

31.     A surveyor also needs to consider which portions of a facility are open to the public and which portions are not.  In residential facilities, generally the only portions that are covered by the ADA are the sales or leasing office (if the facility has one and it is open to the public), or common spaces where the public accesses its services (for example, if an apartment complex has a coffee shop that is open to the public but all other areas are resident-only, only the coffee shop would be subject to the ADA).  As another example, for residential facilities that have sales offices that are open to the public, the only areas subject to the ADA would be the future resident parking (if provided), an entrance, the sales office, and the restrooms serving the sales office.  In my inspections of Communities at issue in the

8

present matter, it varied as to if a Community had a sales office, as well as whether that sales office was open to the general public.

**Step Four – Perform an on-site survey using generally accepted best practices to evaluate each element for compliance with any applicable code or standard.**

32.    After gathering the background information regarding construction dates, alteration dates, and evaluation of the applicable codes and standards, a surveyor should look for information regarding each facility's site plan, building layout, unit plans, and common areas.  This exercise provides additional information about possible changes that were made during construction, any subsequent alterations, and to plan for an efficient survey.

33.    The surveyor then conducts an on-site survey.  The survey consists of identifying and inspecting any specific rooms or other areas that are subject to accessibility requirements.  The tools used to evaluate the facility should provide a level of accuracy that would equal the standard used, mandated, and/or recommended by state or federal enforcement agencies.  In our work with the DOJ, the DOJ requires the use of a digital two-foot level for assessing the running slope of and cross slope of accessible routes including sidewalks and ramps, as well as for the levelness of door maneuvering clearances, accessible passenger loading zones, accessible parking spaces, and clear floor spaces.  The following are the standard survey tools used by the DOJ Civil Rights Division in conducting its accessibility surveys: a metal measuring tape that is at least 25-feet long; a two-foot long electronic (digital) level; a digital camera (one with at least three megapixels of resolution with a zoom feature can be used to photograph measurements on tape measures and digital levels); and a pressure gauge.

34.    Another consideration in surveying existing conditions is that standard industry tolerances apply to all constructed conditions and will vary depending on the method of construction and construction material.  For instance, the anticipated plumbness of a tiled wall using a wood-studs, concrete backer board, 3/8" ceramic tile and thin set mortar will be allowed a greater tolerance range than a sink cabinet that is manufactured in a factory.  This is a recognized allowance in both the CBC and ADA Standards and the DOJ makes allowances for these deviations under Section 3.2 of the 1991 Standards, and 104.1.1 of the 2010 Standards, as well as under Section 104.1.1 of the 2016 and 2019

9

CBC.

35.     When surveying facilities that have multiple buildings located in the same or different locations, buildings built from a prototype plan will require less survey preparation and the survey execution will be more efficient.  Prototype facility layouts also allow for more efficient development of prototype accessibility modifications.

36.     There was no such prototype facility or layout here.  With the Communities at issue in this matter, each Community had a different site plan, building plan, and unit plans.  Each Community was developed, constructed, and experienced any alterations at different times, by different owners, managers, contractors, and architects, and would therefore be subject to different building codes.

## III.     Findings Regarding Existing Facilities

37.     When I was asked to review Plaintiffs' experts' findings of the Communities which the Plaintiffs' experts had surveyed, I and my team reviewed the Plaintiffs' experts' reports and other documents and information that we were informed Plaintiffs had produced in this matter.  We then performed in-person surveys of 37 of the Communities which Plaintiffs' experts had inspected.  For these surveys, we inspected the apartments and common areas that Plaintiffs' experts stated in their reports that they inspected.

38.     I reviewed original construction documents and building department records which Plaintiffs had produced, and which Defendants had produced to Plaintiffs, to verify whether the codes Plaintiffs' experts used were appropriate based on the time of any construction and alterations (without making any determination of whether the ADA would actually apply to a given Community).  See Exhibit 3 to this Declaration for a timeline showing when each facility was constructed and the codes and standards in effect.  Exhibit 6 contains building plans for a sample of Communities, which shows that the buildings were built using different building plans.

39.     I reviewed the layout for each Community to better understand what I would be surveying and to plan an efficient survey.  Exhibit 7 contains aerial views showing the site layout for each community, and plainly illustrates that each site is different.

10

40.     Exhibit 8 contains unit layouts from some of the communities, showing that the units at each community were designed using different footprints and/or layouts.

41.     From the surveys, I found that the elements identified as barriers in Plaintiffs' experts' reports varied greatly in configuration, measurements, and more.  I noticed that features Plaintiffs' experts identified in their reports as violations in one Community or in one room were compliant in other Communities or in other rooms in the same Community.  Exhibit 9 illustrates the many different configurations of elements identified in the Plaintiff's experts' reports.

42.     Even within the same Community, there are not standardized elements or designs, which means each element must be assessed individually to determine whether it is a barrier (rather than making any generalized assumptions that an element in one space will be exactly the same as the element in another space).  This also means that making modifications to any one of these conditions may require customized solutions.  This demonstrates the need to measure and photograph each element and surrounding conditions to determine if the element violates the applicable standards and if there any readily achievable solutions, or whether an equivalent facilitation may have been provided.  I found that in many instances the Plaintiffs' experts failed to do this; instead making generalizations as to "common conditions" that were in fact not common.  I noticed that even one the of the Plaintiffs' experts used a matrix he created in which he apparently noted how a certain condition varied greatly in different units within a specific Community.  However, the reports were often lacking photos or measurements of some of those conditions, preventing me from assessing whether each condition did in fact constitute a barrier and what—if any—barrier removal measures may have existed and been readily achievable.

43.     I also found that where Plaintiffs' experts proposed a potential barrier removal action, it may not have taken into account the realities of the condition or space, let alone whether removal of the barrier is readily achievable.  For example, Plaintiffs' expert indicated that he found the bathroom shown in the residential unit in the photos below for the Corona Community to lack sufficient turning space.  His proposed barrier removal of enlarging and reconfiguring the bathroom in one of the residential units would require reducing the living space and reframing of walls (and assumes the wall proposed to be removed is not load-bearing or containing immovable infrastructure).

11

1
2
3
4
5
6
7
8



Corona Community residential unit.

9
10
11
12
13
14
15

44.     During my inspections, I learned that each Community is responsible for its own alterations, which are designed and constructed independently at each site, and which created further distinctions within and between Communities.  During the surveys, the Executive Director ("ED") and Maintenance Director ("MD") of each Community informed us that modifications are made case-by-case based on the individual needs and requests of residents, to address maintenance issues, or to refresh finishes, fixtures, and furniture.

16
17
18
19
20
21
22
23
24
25

45.     Some of the modifications we observed or that EDs and MDs noted they had made for residents at their request were the installation or relocation of grab bars (including floor to ceiling grab bars near toilets, showers, or beds), addition of adaptive equipment such as toilet seats with integrated gab bars, removing doors and modifying closets, cutting bathtub walls, and providing adjustable shower chairs.  Even if these modifications did not strictly follow any applicable accessibility code or standard, if installed specific to a resident's request and needs, they would be considered an equivalent facilitation.  Some residents requested grab bars mounted at an angle or vertically to be customized to their needs rather than the standard horizontal orientation or lowering or removing a portion of the sidewall of a bathtub to assist with transfer to a bathtub seat or chair.  Exhibit 10 to this Declaration contains examples of customized modifications made at residents' requests.

26
27
28

46.     Maintenance is typically not considered an alteration for the purposes of accessibility codes and standards, and, at each Community, maintenance work is often completed by the MD or one

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of the MD's staff, subject to the resident's specifications.  Because the work is not typically considered an alteration, it would not be subject to review or approval by the local building code department.

## IV.    Findings Regarding Plaintiff's Expert Reports

47.    I was asked to review Plaintiffs' experts' reports of Communities, including conducting an on-site review of actual conditions compared against their findings in each specific Community and units that Plaintiffs' experts had reviewed, and to provide my professional opinions in my capacity as an accessibility expert.  The units I inspected were within the set of residential units the Plaintiffs' expert inspected.  My opinions as to Plaintiffs' experts' findings follow.

**Survey methodology**

48.    As noted above, the Plaintiffs' experts did not follow proper methodology for surveying existing facilities in that they evaluated the Communities as new construction using the 2016 CBC and 2019 CBC and the 1991 and 2010 ADA Standards.  As all the reviewed Communities were built between 1961 and 2007 and assisted living is not specifically classified as a place of public accommodation under Title III of the ADA, none of the standards used by the Plaintiffs' experts may apply to the construction of these facilities—and certainly none of these Communities should have been surveyed as newly-constructed facilities.

49.    When, as was the case here, surveys are conducted applying the current new construction standards to older facilities, the result is a skewed representation of the number of issues at the sites and a lack of site-specific remediation options for each condition.  All barrier removal recommendations Plaintiffs' experts provide in their reports are based on generic language without recognizing the unique nature of each condition and the consideration and investigation that would be necessary to determine the cost and scope of work for feasible and appropriate modifications.

50.    The Plaintiffs' experts also failed to provide federal regulatory, interpretive, or written guidance that these residential facilities would be covered as a place of public accommodation under the ADA—rather, they seem to have assumed that they are.  Even if the ADA applied to the Communities, the Plaintiffs' experts' reports did not consider that barrier removal work is only required if it is readily achievable, and they did not apply a readily achievable analysis to their barrier removal

13

recommendations—nor could they likely have done so due to the many necessary structural and financial considerations, as discussed above.  For example, as discussed above, many of Plaintiffs' experts' barrier removal recommendations called for enlarging restrooms and other actions that would require moving walls and relocating plumbing, without knowledge about feasibility or cost of such work.

**Use of Nontraditional Tools**

51.     It also appeared that Plaintiffs' experts used nontraditional survey equipment to find extremely small deviations. For example, a precision tool intended for custom millwork projects such as cutting compound molding angles was used to measure door thresholds. Use of such precision may cause them to call out minute differences that are within construction tolerances and not barriers, and to inflate the number relevant issues beyond those that could properly be considered barriers on the site.



52.     As another example, use of an electronic tape measure for determining height of closet rods and coat hooks, as seen in the photos below, or the height of trees or deployed table umbrellas, while suspending the tool over the floor without support can yield inaccurate readings.

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)
80262021v.1

1
2
3
4
5
6
7
8



Anaheim # 0166                          Anaheim # 0167

9      **Survey and Reporting Errors**

10          53.      I also noted problems in Plaintiffs' experts' execution of the surveys, which is reflected

11     in problems in the accuracy of their reports, such as missing photographs of measurements,

12     measurement errors, misleading information, and misinterpretation or application of the codes and

13     standards.

14          54.      Specifically, some of the findings in Plaintiffs' experts' reports do not provide

15     photographs showing the measurement of the alleged barrier so I was unable to verify the issue or see

16     where the measurement was taken.  For example, as shown in the excerpt from Plaintiffs' Corona report

17     copied immediately below, the report indicates a bottom landing slope was 3.9%, but no photo of the

18     condition was provided nor description of the location of where the 3.9% measurement was taken.  My

19     team's field measurements of the bottom landing in the area where we assumed Plaintiffs' experts were

20     referring did not find a 3.9% measurement.  Our readings ranged from 0.4% to 2.4%, which are all

21     under or within construction tolerance for ADA slope measurement requirements.  The general

22     acceptable construction tolerance standards for the building industry are documented in a book titled

23     "Handbook of Construction Tolerances" Second Edition by David Kent Ballast.  This breaks down

24     several design and construction elements and we believe provides a good overall reference.

25          From the Plaintiffs' Corona Report:

26
27
28
                                                          15

| 7 | Ramp – Landing Slope | Is the slope of top, bottom and intermediate landings no more than 1:48? (≈ 2.1%) | 11B-405.7.1 | 11B-405.7.1 | | 4.3.7 | | 405.7.1 | Barrier: The slope of the bottom landing of the lower ramp is 3.9%.<br>Barrier Removal:  Remove and replace landing.<br>Photos: 461 thru 477 |



Corona # 0467

Photos from LCM Review of Corona Report Show bottom landing slope ranges from 0.4% to 2.4%.






DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

80262021v.1





DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)
80262021v.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

55.     We found many incorrect measurements in our review of Plaintiffs' experts' reports such as the toilet compartment at North Euclid pictured below.  The Plaintiffs' report listed this as an alleged violation with a width of 57.375".  No photo of their measurement was provided, but our measurement showed 59.875"—well within construction tolerance for the ADA 60" ADA requirement for this element.

From the Plaintiffs' North Euclid Report:

| 150 | Toilet Compartment – Clear Width | Is the interior width of the toilet compartment a minimum 60" wide? | 11B-604.3.1 | 11B-604.3.1 | 4.17.3 and Fig. 30(a). | 604.3.1 | Barrier: The compartment is not wide enough, measured at 57.375' wide. Barrier Removal:  Relocate the partitions. Photos: 430 thru 459 |



North Euclid # 0438

Photos from LCM's field review of the North Euclid report.



Photos from LCM's field review of the North Euclid report.

56.     Some of the Plaintiffs' findings were misleading about the severity of conditions at different Communities. One example of an overstated issue was at the Scotts Valley Community parking, where the Plaintiffs' report indicated that the slope of the parking space was measured up to 11.5%.  This extreme slope measurement was taken in the gutter pan in front of the parking space—

18

which is not part of the parking space, nor required to be level—instead of on the surface of the parking

space, and the photos even show that the Plaintiffs' surveyor had to hold his foot on the portion of the

level in the gutter pan because there was such an extreme difference between the slope of the parking

surface and the gutter pan.

From the Plaintiffs' Scotts Valley Report:

| 159 | Accessible Parking - Slope | Is the slope of the accessible parking spaces and access aisle serving them not more than 1:48 (2.1%) in any direction? | 11B-502.4 | 11B-502.4 | 4.6.3 | 502.4 | Photos: See aerial photo<br><br>Barrier: The slope of the accessible parking spaces and access aisle exceeds 1:48; measured up to 11.5%.<br><br>Barrier Removal: Overlay or replace the paving at the accessible parking spaces and access aisle as required to provide a slope not more than 1:48. I recommend accessible spaces be constructed in concrete.<br><br>Photos: 4415 thru 4422 |



Scotts Valley gutter pan slope



Scotts Valley gutter pan slope

57.    One of the challenges in reviewing the Plaintiffs' reports in the field was that often the

report would state that a unit was similar to a previously surveyed unit.  Quite often, however, the issues

that Plaintiffs' experts listed as similar in other units were not found in all of the units that they

referenced.  For example, at the Auburn property, the Plaintiffs' expert claimed that unit 120 was similar

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to unit 311 "except where noted".  However, I found that unit 120 was a unit with accessible features whereas unit 311 was a standard unit with no accessibility features—yet the Plaintiffs' experts noted no differences between the units on their report, and the two units were in no way similar.  This is a significant oversight.  The differences between those two units are clearly seen in the photos below.

Unit 311 – Kitchenette photos from Plaintiffs' expert:



Unit 120 – Kitchenette photos that I took shows that Unit 120 is not similar to Unit 311:



Unit 311 – Bathroom photos from Plaintiffs' expert:

20



Unit 120 – Bathroom photos that I took shows that Unit 120 is not similar to Unit 311:





21

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)

80262021v.1

Unit 120 – Bathroom photos that I took shows that Unit 120 is not similar to Unit 311.

58.     Other issues with the Plaintiffs' reports included misinterpretation or misapplication of the codes and/or standards.  One of the issues the reports listed as "common" relates to the accessibility of handles or controls.  The accessibility codes and standards require operable controls to be usable without tight grasping, pinching, or twisting of the wrist.  This is known as a performance standard as opposed to a technical standard because there is no objective way to measure for this characteristic.  Some surveyors use a "closed fist test" to see if a control meets these performance requirements.  While this test may be one method for trying to determine performance, it is not the technical standard, and should not be relied upon as the exclusive methodology for the usability of a control by someone with limited mobility or strength in their hands.  The standard precludes tight grasping, pinching, or twisting of the wrist.  For example, while the refrigerator handle space in the photographs below may not be large enough for a closed fist, it does not require a tight grasp, pinch, or twist to operate, and thus would not violate the accessibility standard.




DSCF7508

DSCF7507

Photo showing refrigerator handle space does not require a tight grasp, pinch, or twist to operate.

59.     Another issue plaintiffs raised that was misleading relates to the application of roll-in shower standards to modified bathtubs.  A modification we found that a Community may have made at a resident's request is lowering or removing a sidewall of a bathtub to make it easier for a user to transfer their feet and legs into the basin of the tub when using a tub seat or chair.  Plaintiffs' experts always erroneously identified these tub modifications as roll-in showers with inaccessible layouts.

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)
80262021v.1

Chatsworth Cut Wall Tubs:



Ocean House Cut Wall Tubs:



60.    Because the Plaintiffs' experts failed to follow the steps necessary to perform the surveys in the Communities according to accepted methodology, we don't have reliable information as to whether each element they pointed out is compliant or not with any applicable standards.  This is especially impactful because Plaintiffs raise different issues regarding each Community and each room in each Community and because every Community is different in site layout, unit layouts, common areas, and more.

61.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)
80262021v.1

1

2    Executed this 3rd day of March 2022, in Charlotte Amalie, St. Thomas.

3

4

5

6

7

8    _____

9    Douglas J. Anderson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DOUGLAS J. ANDERSON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION / CASE NO. 4:17-CV-03962-HSG (LB)
80262021v.1

# Step 1

Exhibit 1



# Step 2

Exhibit 4



# Step 3

<u>Exhibit 5</u>



**Exhibit 2**

**Fair Housing Act Design and Construction Safe Harbor Standards**
1. HUD Fair Housing Accessibility Guidelines and the Supplemental Notice
2. ANSI A117.1 (1986), used with the Fair Housing Act, HUD's regulations, and the Guidelines
3. CABO/ANSI A117.1 (1992) used with the Fair Housing Act, HUD's regulations, and the Guidelines
4. ICC/ANSI A117.1 (1998) used with the Fair Housing Act, HUD's regulations, and the Guidelines
5. The Fair Housing Act Design Manual (1998)
6. Code Requirements for Housing Accessibility 2000 (ICC/CRHA)
7. International Building Code 2000 with 2001 Supplement
8. International Building Code 2003, with one condition
9. ICC/ANSI A117.1 (2003) used with the Fair Housing Act, HUD's regulations, and the Guidelines
10. International Building Code 2006, with the January 31, 2007 Errata
11. ICC/ANSI A117.1 (2009) used with the Fair Housing Act, HUD's regulations, and the Guidelines
12. International Building Code 2009
13. International Building Code 2012
14. International Building Code 2015
15. International Building Code 2018

**Exhibit 3**

| | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Applicable Codes and Standards** | Uniform Building Code (UBC) | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Construction Date (New Constrction)** | Ocean House | | | | | Chatsworth | | | Corona | | | | Central Whittier | Valley View | | Garden Grove | Clairemont | | | | |
| | | | | | | | | | | | | | | | | Anaheim | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |

**Exhibit 3**

| 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1981 Edition of Title 24 (Part 2) Effective 1982 Based on 1979 UBC | | | 1985 Edition of Title 24 Effective 1985 Based on 1979 UBC,1982 UBC, 1985 UBC | | | | 1989 Edition of Title 24 Effective July 1, 1989 Based on 1998 UBC | | | 1992 Edition of Title 24 Effective July 1, 1982 Based on 1991 UBC | | | | 1995 Edition of Title 24 Effective January 1,1996 Based on 1994 UBC | | | 1998 Edition of Title 24 Effective July 1,1999 Based on 1997 UBC | | |
| | | | | | | | | | FHA - March 13, 1991  1991 ADA Standards – July 26, 1991 | | | | | | | | | | |
| Alhambra | | Oceanside | Nohl Ranch | Loma Linda | Brea | South Tarzana | Danville Diablo Road | | | | | North Fremont | Roseville | | Auburn | Hemet | Citrus Heights | Mirage Inn | Brookhurst |
| Chanate | | | | North Euclid | Redwood City | | San Ramon | | | | | | Windsor | | Lodi | | Kettleman Lane | Northridge | Fountaingrove |
| North Tarzana | | | | San Jose | Scotts Valley | | | | | | | | | | Murrietta | | Riverwalk | | |
| | | | | San Marcos | Tracy | | | | | | | | | | | | | | |
| | | | | Santa Monica Gardens | Uptown Whittier | | | | | | | | | | | | | | |

| 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|------|------|------|------|------|------|------|------|------|
| **2001 Edition of Title 24**<br>Effective November 1, 2002<br><br>Based on 1997 UBC | | | | | | **2007 Edition of Title 24**<br>Effective January 1, 2008<br><br>Based on 2006 IBC | | |
| | | | | | | | | |
| | | | | Cortona Park | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# Exhibit 6

**Brookdale Loma Linda**



# First Floor Plan

# Exhibit 6

**Brookdale Irvine**



# Exhibit 6



**Brookdale Clairemont**

EXIT

120  121  122  123  Office  Lobby  Lounge  125  127  128  129

119  Storage  Med Room  R R  Admin.  Reception  124  126  130  Storage  Laundry

118  117  Office  R R  P E  EXIT

115  116  131

114  **YOU ARE HERE**  132

113  112  Kitchen

110  111  Interior Courtyard  Dining #1

108  109  E P

107  Community Room  Activity Room

105  106  137  136  135  134  Dining #2  133  Storage

103  104  EXIT  EXIT

101  102  P  146  145  144  143  142  141  140  139  138

EXIT  EXIT

# Clairemont

# 1st Floor
# Evacuation Routes

© 2000 INTERSIGN CORPORATION

**LEGEND**

| | |
|---|---|
| ← | Evacuation Route |
| E | Fire Extinguisher |
| P | Pull Alarm |

# Exhibit 6

**Brookdale Murrietta**



# Exhibit 6



**Brookdale Brea**

# Exhibit 6

**Brookdale Auburn**



# Exhibit 6

**Brookdale Ocean House**



# Exhibit 6

**Brookdale Danville**



# Exhibit 6

**Brookdale Paulin Creek**



FIRST FLOOR PLAN
3/32" = 1'-0"

# Exhibit 6

**Brookdale Northridge**



KEY

| | |
|---|---|
| Y | York |
| N | Nottingham |
| S | Somerset |
| B | Bristol |
| W | Wellington |
| SCC | Special Care |

## Exhibit 7



**Brookdale Alhambra**

1 E Commonwealth
Alhambra, CA 91801



**Brookdale Auburn**

11550 Education St
Auburn, CA 95602

## Exhibit 7



**Brookdale Anaheim**

200 North Dale Ave
Anaheim, CA 92801



**Brookdale Brea**

285 West Central Ave
Brea, CA 92821

## Exhibit 7



**Brookdale Brookhurst**

15302 Brookhurst St
Westminster, CA 92683



**Brookdale Central Whittier**

8101 Painter Ave
Whittier, CA 90602

**Exhibit 7**



**Brookdale Chanate**

3250 Chanate Rd
Santa Rosa, CA 95404



**Brookdale Chatsworth**

20801 Devonshire St
Chatsworth, CA 91311

## Exhibit 7



**Brookdale Citrus Heights**

7375 Stock Ranch Rd
Citrus Heights, CA 95621



**Brookdale Clairemont**

5219 Clairemont Mesa Blvd
San Diego, CA 92117

## Exhibit 7



**Brookdale Corona**

2005 Kellogg Ave
Corona, CA 92879

**Cortona Park**

150 Cortona Way
Brentwood, CA 94513

## Exhibit 7



**Brookdale Danville**

400 West El Pintado Blvd
Danville, CA 94526

**Brookdale Diablo Lodge**

950 Diablo Rd
Danville, CA 94526

## Exhibit 7



**Brookdale Folsom**

780 Harrington Way
Folsom, CA 95630



**Fountaingrove**

300 Fountaingrove Parkway
Santa Rosa, CA 95403

**Exhibit 7**



**Brookdale Garden Grove**

10200 Chapman Ave
Garden Grove, CA 92840



**Brookdale Gardens of Tarzana**

18700 Burbank Blvd
Tarzana, CA 91356

## Exhibit 7



**Hemet**

1177 South Palm Ave
Hemet, CA 92543

**Brookdale Irvine**

10 Marquette
Irvine, CA 92612

## Exhibit 7



**Brookdale Kettleman Lane**

2150 West Kettleman Lane
Lodi, CA 95242



**Brookdale Lodi**

2220 West Kettleman Lane
Lodi, CA 95242

## Exhibit 7



**Brookdale Loma Linda**

25585 Van Leuven St
Loma Linda, CA 92354



**Brookdale Mirage Inn**

72750 Country Club Drive
Rancho Mirage, CA 92270

## Exhibit 7



**Brookdale Monrovia**

201 East Foothill Blvd
Monrovia, CA 91016

**Brookdale Murrieta**

24350 Jackson Ave
Murrieta, CA 92562

**Exhibit 7**



**Brookdale Napa**

3255 Villa Lane
Napa, CA 94558



**Brookdale Nohl Ranch**

380 South Anaheim Hills Rd
Anaheim Hills, CA 92807

**Exhibit 7**



**Brookdale North Euclid**

1031 North Euclid Ave
Ontario, CA 91762



**Brookdale North Fremont**

38035 Martha Ave
Fremont, CA 94536

**Exhibit 7**



**Brookdale North Tarzana**

5711 Reseda Blvd
Tarzana, CA 91356



**Brookdale Northridge**

17650 Devonshire St
Northridge, CA 91325

## Exhibit 7



**Brookdale Ocean House**

2107 Ocean Ave
Santa Monica, CA 90405



**Brookdale Oceanside**

3524 Lake Blvd
Oceanside, CA 92056

**Exhibit 7**



**Brookdale Paulin Creek**

2375 Range Ave
Santa Rosa, CA 95403



**Brookdale Redwood City**
485 Woodside Rd
Redwood City, CA 94061

**Exhibit 7**



**Brookdale Riverwalk**

350 Calloway Drive
Bakersfield, CA 93312



**Brookdale Roseville**

1 Somer Ridge Drive
Roseville, CA 95661

**Exhibit 7**



**Brookdale San Jose**

1009 Blossom River Way
San Jose, CA 95123



**Brookdale San Marcos**

1590 West San Marcos Blvd
San Marcos, CA 92078

## Exhibit 7



**Brookdale San Ramon**

18888 Bollinger Canyon Rd
San Ramon, CA 94583

**Brookdale Santa Monica Gardens**

851 Second Street
Santa Monica, CA 90403

**Exhibit 7**



**Brookdale Scotts Valley**

100 Lockwood Lane
Scotts Valley, CA 95066



**Brookdale Sunwest**

1001 N Lyons Avenue
Hemet, CA 92545

## Exhibit 7



**Brookdale Tracy**

355 West Grant Line Road
Tracy, CA 95376



**Brookdale Uptown Whittier**

13250 Philadelphia Street
Whittier, CA 90601

## Exhibit 7



**Brookdale Valley View**

5900 Chapman Ave
Garden Grove, CA 92845



**Brookdale Windsor**

907 Adele Drive
Windsor, CA 95492

# Exhibit 8

## Studio Units

### Brookdale Diablo Lodge



### Brookdale Anaheim



### Brookdale Garden Grove



### Brookdale Alhambra



# Exhibit 8

## Studio Units

**Brookdale Brookhurst**



**Brookdale Chanate**



**Brookdale San Ramon**



**Brookdale Irvine**



# Exhibit 8

## One Bedroom Units

**Brookdale Uptown Whittier**



**Brookdale San Ramon**



**Brookdale Napa**



**Brookdale San Jose**



# Exhibit 8

## One Bedroom Units

### Brookdale Monrovia



One Bedroom
456 sq. ft.

### Brookdale Anaheim Hills



One Bedroom
Approx. 450 sq. ft.

### Brookdale Windsor



Chardonnay
605 sq. ft.

### Brookdale Paulin Creek



One Bedroom
678 sq. ft.

# Exhibit 8

## Two Bedroom Units

### Brookdale Nohl Ranch



### Brookdale Loma Linda



# Exhibit 8

## Two Bedroom Units

### Brookdale Tracy



### Brookdale Scotts Valley



# Exhibit 8

## Two Bedroom Units

### Brookdale San Jose



### Brookdale San Marcos



# Exhibit 8

## Two Bedroom Units

**Brookdale Redwood City**



**Corona Park**



# Exhibit 8

## Two Bedroom Units

**Brookdale Riverwalk**





| Door Hardware | | | | |
|---|---|---|---|---|
| Diablo Lodge | UNIT 179 - Entry Door | UNIT 247 - Entry Door | UNIT 175 - Bathroom Door | UNIT 247 - Bathroom Door |
| San Marcos | UNIT 107 - Entry Door | UNIT 107 - Entry Door | UNIT 108 - Bathroom | |
| Chanate | UNIT 106 - Entry Door | UNIT 106 - Bedroom Door | UNIT 212 - Entry Door | UNIT 212 - Bedroom Door / UNIT 205 - Entry Door |
| Windsor | UNIT 8 - Entry Door | UNIT 11 - Entry Door | UNIT 11 - Bedroom Door | UNIT 78 - Bedroom Door |
| Santa Monica Gardens | UNIT 228 - Bathroom Door | UNIT 315 - Bathroom Door | UNIT 228 - Balcony Door | UNIT 319 - Balcony Door |

1 of 8



| Door Pull Maneuvering Clearance | | | | |
|---|---|---|---|---|
| **Brookhurst** | UNIT 129 | UNIT 126 | UNIT 103 | | |
| **Diablo Lodge** | UNIT 261 | UNIT 261 | | | |
| **Windsor** | UNIT 8 | UNIT 8 | UNIT 11 | UNIT 11 | UNIT 78 |



| Toilet Clearance | | | | |
|---|---|---|---|---|
| Anaheim | UNIT 117 | UNIT 117 | UNIT 135 | UNIT 224 |
| Brookhurst | UNIT 129 | UNIT 126 | UNIT 103 | |
| Loma Linda | UNIT 105 | UNIT 106 | UNIT 185 | UNIT 277 |
| Diablo Lodge | UNIT 102 | UNIT 108 | UNIT 216 | UNIT 244 | UNIT 247 |
| Santa Monica Gardens | UNIT 228 | UNIT 315 | UNIT 318 | UNIT 319 | Unit 109 |



| Lavatories | | | | | |
|---|---|---|---|---|---|
| Alhambra | | UNIT 137 | UNIT 208 | | |
| Brea | UNIT 103 | UNIT 117 | UNIT 137 | UNIT 201 | UNIT 235 |
| Diablo Lodge | UNIT 102 | UNIT 108 | UNIT 247 | | |
| Windsor | UNIT 8 | UNIT 11 | | | |
| Riverwalk | UNIT 213 | UNIT 224 | UNIT 228 | UNIT 236 | |



| | Bathing Fixtures | | | | |
|---|---|---|---|---|---|
| Alhambra | UNIT 106 | UNIT 107 | UNIT 108 | UNIT 08 | UNIT 208 |
| Loma Linda | UNIT 101 | UNIT 105 | UNIT 185 | | |
| Daiblo Lodge | UNIT 102 | UNIT 216 | UNIT 263 | UNIT 177 | UNIT 247 |
| Chanate | UNIT 106 | UNIT 205 | | | |
| Nohl Ranch | UNIT 218 | UNIT 252 | UNIT 301 | UNIT 303 | |



| Closets | | | | | |
|---|---|---|---|---|---|
| Anaheim | UNIT 117 | UNIT 118 | UNIT 120 | UNIT 225 | UNIT 329 |
| Brookhurst | UNIT 129 | UNIT 129 | UNIT 126 | UNIT 103 | |
| Diablo Lodge | UNIT 102 | UNIT 108 | UNIT 236 | UNIT 247 | UNIT 247 |
| San Marcos | UNIT 107 | UNIT 107 | UNIT 107 | UNIT 108 | |
| Windsor | UNIT 8 | UNIT 11 | UNIT 11 | UNIT 53 | UNIT 78 |



| Kitchen / Kitchenette | | | | | |
|---|---|---|---|---|---|
| Brookhurst | UNIT 129 | UNIT 129 | UNIT 126 | UNIT 103 | UNIT 103 |
| San Ramon | UNIT 3302 | UNIT 2205 | | | |
| Diablo Lodge | UNIT 102 | UNIT 102 | UNIT 108 | UNIT 247 | UNIT 177 |
| Santa Monica Gardens | UNIT 105 | UNIT 109 | UNIT 228 | UNIT 315 | UNIT 319 |
| Loma Linda | UNIT 101 | UNIT 103 | UNIT 170 | UNIT 161 | UNIT 286 |

| Reception Desks | | |
|---|---|---|
| Diablo Lodge |  | |
| Windsor | | |
| Uptown Whittier | | |
| Loma Linda | | |
| San Marcos | | |

## Exhibit 10

Diablo Lodge – floor to ceiling grab bar next to the bed

 

Chanate – floor to ceiling grab bar between the toilet and bathtub

 

Riverwalk -  floor to ceiling grab bar next to the toilet and outside the shower

 

## Exhibit 10

Uptown Whittier – bathroom door and closet door removed



Santa Monica Gardens – resident request for a cusom closet with adjustable shelves clothes rod

 

 

## **Exhibit 10**

Cortona Park– resident request for additional grab bars



Paulin Creek – resident request for additional grab bars

 

Cortona Park –resident request for window shutters



## Exhibit 10

Santa Monica Gardens – resident request for window and door shutters

