Guy B. Wallace – 176151
Mark T. Johnson – 76904
Travis C. Close – 308673
Rachel L. Steyer – 330064
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California  94608-1863
Telephone:     (415) 421-7100
Facsimile:     (415) 421-7105
Email:   gwallace@schneiderwallace.com
             mjohnson@schneiderwallace.com
             tclose@schneiderwallace.com
             rsteyer@schneiderwallace.com

Kathryn A. Stebner – 121088
Brian S. Umpierre – 236399
**STEBNER GERTLER**
**GUADAGNI & KAWAMOTO**
**A Professional Law Corporation**
870 Market Street, Suite 1285
San Francisco, California  94102-2918
Telephone:     (415) 362-9800
Facsimile:     (415) 362-9801
Email:   kathryn@sggklaw.com
             brian@sggklaw.com

Gay Crosthwait Grunfeld – 121944
Benjamin Bien-Kahn – 267933
Jenny S. Yelin – 273601
Amy Xu – 330707
**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:   ggrunfeld@rbgg.com
             bbien-kahn@rbgg.com
             jyelin@rbgg.com
             axu@rbgg.com

David T. Marks – *pro hac vice*
Jacques Balette – *pro hac vice*
**MARKS, BALETTE, GIESSEL**
**& YOUNG, P.L.L.C.**
7521 Westview Drive
Houston, Texas  77055
Telephone:     (713) 681-3070
Facsimile:     (713) 681-2811
Email:   davidm@marksfirm.com
             jacquesb@marksfirm.com

Attorneys for Plaintiffs and the Proposed Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| STACIA STINER; RALPH CARLSON, in his capacity as Trustee of the Beverly E. Carlson and Helen V. Carlson Joint Trust; LORESIA VALLETTE, in her capacity as representative of the Lawrence Quinlan Trust; MICHELE LYTLE, in her capacity as Trustee of the Boris Family Revocable Trust; RALPH SCHMIDT, by and through his Guardian Ad Litem, HEATHER FISHER; PATRICIA LINDSTROM, as successor-in-interest to the Estate of ARTHUR LINDSTROM; BERNIE JESTRABEK-HART; and JEANETTE ALGARME; on their own behalves and on behalf of others similarly situated, | Case No. 4:17-cv-03962-HSG (LB)<br><br>**[REDACTED]**<br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES**<br><br>Date:     June 16, 2022<br>Time:     2:00 p.m.<br>Crtrm.:   2, 4th Floor<br><br>Judge:   Haywood S. Gilliam, Jr. |
| Plaintiffs, | |
| v. | |
| BROOKDALE SENIOR LIVING, INC.; BROOKDALE SENIOR LIVING COMMUNITIES, INC.; and DOES 1 through 100, | |
| Defendants. | |

[3879192.2]

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND ....................................................................................................................3

    A. Brookdale's Staffing Methodology .................................................................................3

    B. Dr. Flores' Expert Opinions ...........................................................................................5

        1. Opinion 1: Brookdale's Defective Staffing Policy .................................................6

        2. Opinion 2: Description of Staffing "Shortfall" Methodology by way of Simple Math Analysis .............................................................................................6

III. LEGAL STANDARD .............................................................................................................8

IV. BROOKDALE'S ATTACKS ON DR. FLORES' ANALYSIS FAIL ......................................10

    A. Dr. Flores' Simple Math Analysis is Reliable and Based on A Sound Methodology ................................................................................................................11

    B. Dr. Flores' Opinions Will Assist in the Class Certification Determination ....................13

    C. Brookdale's Benchmark-Hours Staffing Procedure is Defective ....................................15

        1. Dr. Flores' Opinions on Brookdale's Task Times ..................................................15

        2. Dr. Flores' Opinions in Other Litigation ..............................................................22

        3. Dr. Flores Did Not Retract Any Opinions Offered in Her Declaration ..................23

        4. DSS Staffing Citations Support Dr. Flores' Opinion That Brookdale's Staffing Methodology is Defective .......................................................................24

V. CONCLUSION ....................................................................................................................24

1

# TABLE OF AUTHORITIES

2

**Page**

3

<u>**CASES**</u>

4

*Alaska Rent-A-Car v. Avis Budget Grp., Inc.*,
    78 F.3d 960 (9th Cir. 2013) ............................................................................................... 2, 9, 10

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ................................................................................................ passim

*Cotton v. City Eureka, Cal.*,
    No. C 08-04386 SBA, 2010 WL 5154945 (N.D. Cal. 2010) ..................................................... 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..................................................................................................... 23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................................ 8, 9, 11, 14

*Elosu v. Middlefork Ranch, Inc.*,
    No. 21-35309, — F.4th —, 2022 WL 534345 (9th Cir. Feb. 23, 2022) ......................... 9, 10, 16

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
    No. C 03-1431 SBA, 2006 WL 1390416 (N.D. Cal. May 18, 2006) ........................................ 11

*Giuliano v. Sandisk Corp.*,
    No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) .............................. 10, 11

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
    957 F.3d 979 (9th Cir. 2020) ................................................................................................... 8, 9

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ..................................................................................................... 13

*Heredia v. Sunrise Senior Living, LLC*,
    No. 8:18-cv-01974-JLS-JDEx, 2021 WL 6104188 (C.D. Cal. Nov. 16, 2021) ........... 2, 8, 11, 13

*In re Bextra and Celebrex Marketing Sales Practices and Products Liability Litig.*,
    524 F.Supp.2d 1166 (N.D. Cal. 2007) ...................................................................................... 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ............................................................................................. 10

*In re Ford Motor Co. Litig. (Pedante)*,
    No. CV 17-06656 AB (FFMx), 2019 WL 7177735 (C.D. Cal. 2019) ......................................... 9

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F.Supp.3d 1050 (C.D. Cal. 2015) ................................................................................. 11, 22

*In re PFA Insurance Marketing Litig.*,
    No. 4:18-cv-03771 YGR, 2021 WL 5994908 (N.D. Cal. Nov. 3, 2021) ............................... 8, 20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

*In re REMEC Inc. Sec. Litig.*,
    702 F.Supp.2d 1202 (S.D. Cal. 2010) ...................................................................................... 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*,
    978 F.Supp.2d 1053 (C.D. Cal. 2013) ...................................................................................... 14

*Kennedy v. Collagen Corp.*,
    161 F.3d 1226 (9th Cir. 1998) ................................................................................................... 10

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................. 9, 12, 13, 23

*Messick v. Novartis Pharmaceuticals Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ........................................................................... 8, 9, 12

*Miller v. Fuhu Inc.*,
    No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) ........................... 15

*Nguyen v. Nissan N. Am. Inc.*,
    932 F.3d 811 (9th Cir. 2019) ..................................................................................................... 14

*Patriot Rail Corp. v. Sierra R. Co.*,
    No. 2:09-cv-0009-TLN-AC, 2015 WL 4662707 (E.D. Cal. Aug. 5, 2015) ............................. 21

*Primiano v. Cook*,
    598 F.3d 58 (9th Cir. 2010) ............................................................................................... passim

*Ralston v. Mortgage Investors Group, Inc.*,
    No. 08-536-JF (PSG), 2011 WL 6002640 (N.D. Cal. Nov. 30, 2011) ............................. passim

*Rodman v. Otsuka America Pharmaceutical, Inc.*,
    No. 18-cv-03732-WHO, 2020 WL 2525032 (N.D. Cal. May 18, 2020) ................................. 22

*Sabadi v. Hartford Casualty Ins. Co.*,
    No. SACV 13-1928-JLS (ANx), 2015 WL 12698445 (C.D. Cal. Jan. 13, 2015) .................... 10

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) ....................................................................................................... 8

*Sarmiento v. Sealy, Inc.*,
    No. 18-cv-01990-JST, 2020 WL 4458915 (N.D. Cal. May 27, 2020) ...................................... 10

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
    29 F.3d 137 (4th Cir. 1994) ....................................................................................................... 21

*U.S. v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ...................................................................................................... 9

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) ............................................................................................... 13, 19

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ................................................................................................. 2, 9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

*Yamada v. Nobel Biocare Holding AG*,
    825 F.3d 535 (9th Cir. 2016) ...................................................................................... 15

*Zagruzny v. Mercedes-Benz USA*,
    No. CV 19-1096 MRW, 2020 WL 3968672 (C.D. Cal. Jun. 4, 2020).................................. 9, 16

*Zakaria v. Gerber Prods. Co.*,
    No. LA CV15-00200 JAK (Ex), 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) ...................... 14

**OTHER AUTHORITIES**

Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ................................................. 3, 8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

# I.      INTRODUCTION

Brookdale has a legal obligation to ensure that its facilities are staffed at levels sufficient to meet the assessed needs of its residents. Brookdale purports to meet its obligations by using a ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████

Plaintiffs' expert, Dr. Cristina Flores, has analyzed and identified multiple defects in Brookdale's benchmark-hours methodology.  These defects place residents at a substantial and unreasonable risk of not receiving required care services. By the express terms of Brookdale's staffing formula, the ███████████████████████████ are far too low and are not realistically calculated to provide caregivers with enough time to perform particular care tasks. *See* Dkt. 278-4 (Declaration of Cristina Flores, PhD in Support of Plaintiffs' Motion for Class Certification ("Flores Decl.")), ¶¶ 71-72. Because the ███████████████████ are too low, the ultimate labor benchmarks also are too low, and are insufficient to ensure that Brookdale has enough caregiver staffing to provide its residents with all the services they have been promised in their Personal Service Plans. *Id.*, ¶¶ 59-63, 72. Of necessity, therefore, Brookdale's use of task times that are too low results in benchmark hours that also are too low. What is more, Brookdale consistently fails to meet even its benchmark hours. Based on an analysis of the Labor Detail Report data produced by Brookdale for all 54 facilities that Brookdale operated or managed in California between January 1, 2017 to December 31, 2020, Brookdale's staffing was ████████████████████████ of the total days within this period. *See id*, ¶ 71(d).[1]

Brookdale's attack on Dr. Flores' opinions and conclusions concerning Brookdale's staffing formula should be rejected. Dr. Flores' opinions are based on an application of the same methodology

---

[1] The original analysis of actual staffing versus benchmark staffing described in Dr. Flores' August 15, 2021 Declaration, was limited to the 54 Brookdale facilities that it operated during the entirety of the class period.  Subsequent to Dr. Flores' Declaration and deposition, Brookdale produced additional labor detail report data on December 31, 2021 (BKD2942805-7).   An updated analysis of the new data for 88 facilities shows that Brookdale was below ████████████████████ of days.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

that was recently found to rest on a reliable foundation and to be relevant to the class certification inquiry in the matter of *Heredia v. Sunrise Senior Living, LLC*, No. 8:18-cv-01974-JLS-JDEx, 2021 WL 6104188, at *5 (C.D. Cal. Nov. 16, 2021) ("… none of Sunrise's arguments show that [Dr. Flores'] opinions lack a 'reliable foundation' or 'relevan[ce] to the task at hand' for purposes of class certification.").

Further, the method Dr. Flores employed is a commonly accepted means of ensuring that a facility is staffed to meet the assessed needs of its residents. An examination of required versus available staff based on assessed resident needs "is a very common way to look at any kind of staffing … It's been used for many, many years in nursing homes and other businesses. They have to have some kind of simple way to know how much labor they need if they're providing a service." Declaration of Brian S. Umpierre in Support of Plaintiffs' Opposition to Motion to Exclude ("Umpierre Decl."), Ex. A (Flores Depo. at 32:14-16, 34:8-11.)[2] Indeed, Dr. Flores' methodology essentially mirrors the approach used in Brookdale's staffing procedures. *See, e.g., id*. at 38:16-18 ("Brookdale does theirs by doing an assessment and coming up with numbers. They use the simple math analysis."). Brookdale has, therefore, no valid basis to exclude her testimony. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017) (if an expert's "methodology is valid," attacks on data quality, method application or persuasiveness of opinions are "matters for cross-examination").

Brookdale contends that Dr. Flores' opinions and testimony should be excluded because she relied on unsupported assumptions, misinterpreted Brookdale's data, ignored facts, and cherry-picked data that would support her conclusions. But Brookdale's real disagreement lies with her inputs and conclusions, which are matters for cross examination, not exclusion. *Alaska Rent-A-Car v. Avis Budget Grp., Inc.*, 78 F.3d 960, 968-70 (9th Cir. 2013). Dr. Flores' methodology is well-supported factually in the record and her interpretation of disputed facts are tethered to her industry experience and the evidence produced in this case. As such, Dr. Flores is not required to accept Brookdale's version of the

---

[2] *See also* Umpierre Decl. Ex. A (Flores Depo. at 35:2-7 ("[I]n the long-term care setting, there are many, many articles – and they're all listed in Exhibit 21 to 56 – that use staffing levels to compare the amount of time required to that available time to know if you have enough staff to meet the needs of the residents.").

[3879192.2]

2

Case No. 4:17-cv-03962-HSG (LB)
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

1   facts. *See, e.g.*, Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("When facts are

2   in dispute, experts sometimes reach different conclusion based on competing versions of the facts. The

3   emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to

4   exclude an expert's testimony on the ground that the court believes one version of the facts and not the

5   other."). And Brookdale's related argument that Dr. Flores worked backwards to achieve her desired

6   result is meritless. Dr. Flores reviewed Brookdale's staffing methodology, the time standards used by

7   Brookdale in its staffing methodology, the care needs documented in the resident assessments, the

8   amount of time required to deliver the assessed care services, and the number of staff available at

9   Brookdale to provide such care services to residents. Flores Decl., ¶ 4. Only after analyzing all this

10   information did Dr. Flores conclude that use of Brookdale's staffing methodology would result in a

11   staffing shortfall – *i.e.*, that it was mathematically and realistically impossible for Brookdale staff to

12   produce the care services required by the residents based on their assessments and the amount of

13   staffing hours allotted by Brookdale to provide those services. The reliability of that conclusion is

14   further supported by the Discrete Event Simulation (DES) testing analysis performed by Mr. Schroyer,

15   (*see* Dkt. 278-5[3]), as well as by the substantial number of deficiencies issued to Brookdale's California

16   facilities during the class period that are indicative of insufficient numbers of staff, poor resident care,

17   and other problems consistent with facility understaffing.

18          For the reasons stated herein, Plaintiffs respectfully request that Brookdale's motion should be

19   denied in its entirety.

20   **II.      BACKGROUND**

21          **A.      Brookdale's Staffing Methodology**

22          Under Brookdale's Service Alignment system, ███████████████████████████

23   ███████████████████████████████████████. The targets, known as ██████

24   ████████████████████████████████████████████████████████

25   ███████████████████████ Dkt. 276-7 (Wallace Class Cert. Decl.), Ex. 24 at

26   BKD1918714. ██████████████████████████████████

27   _____

28   [3] Declaration of Dale Schroyer in Support of Plaintiffs' Motion for Class Certification ("Schroyer
     Decl.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

1  ████████████████████████████████████████████. *Id.,* Ex. 25 at

2  BKD2517637; Ex. 23 at BKD 1840459; Ex. 26 at BKD2507643; Ex. 27 at BKD1890853; Ex. 28 at

3  BKD2884686l *id.* at ¶ 41, Ex. 51 (Bowman Depo.) at 149:1-6 ████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████). Essentially, ████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████ Flores Decl., ¶ 68.

11        Central to Brookdale's staffing methodology is ████████████████████████

12  ███████████████████████████████████████ Wallace Class Cert. Decl.,

13  Ex. 23 at BKD 1840459; Ex. 26 at BKD2507643; Ex. 51 (Bowman Depo.) at 154:14-22 ████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████"). The ████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████s. *See, e.g.,*

21  Flores Decl., ¶ 69 (referencing BKD1906860 concerning ████████████████████

22  ████████). Brookdale's assisted living facilities in California are required to staff in compliance

23  with the Labor Benchmarks. *See, e.g.,* Wallace Class Cert. Decl., ¶¶ 44-55, Exs. 31-42 (emails of

24  senior corporate officials including three Presidents for the West Division ████████████████████

25  ████████████████████████████████████). 

26        The Labor Detail Report data produced by Brookdale confirms that Brookdale used the

27  ████████████████████████████████ at all the company's California facilities. The Labor Detail

28  Report data identifies daily actual hours of staff time versus daily "benchmark" staff time for each

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

1  Brookdale facility. *See* Flores Decl., ¶ 25(f).

2      **B.    Dr. Flores' Expert Opinions**

3          Cristina Flores is a registered nurse licensed in the State of California for over 32 years, with a

4  masters' degree in gerontology and a Ph.D. in nursing health policy. She has worked in multiple

5  assisted living facilities in California. She has been certified as an RCFE administrator in California

6  where she owned and/or operated three 6-bed facilities for over 23 years.[4] She also served as Chief

7  Program Officer and Chief Operating Officer for a large ALF chain in California. Flores Decl. ¶¶ 7-16.

8  Based on her extensive experience and other evidence, Dr. Flores provides two separate opinions in

9  support of Plaintiffs' motion for class certification.

10         Dr. Flores opines that Brookdale's benchmark-hours staffing formula is defective because the

11  "norms" it uses to calculate labor benchmarks are far too low and are not realistically calculated to

12  provide caregivers with enough time to perform particular care tasks. Flores Decl., ¶¶ 71-72. Because

13  the "norms" used by the formula are too low, the ultimate labor benchmarks also are too low and are

14  insufficient to ensure that Brookdale has enough caregiver staffing to provide residents with all the

15  services for which they have been assessed and are paying. *Id.*, ¶¶ 59-63, 72.

16         In addition to her analysis of the defects in Brookdale's staffing formula, Dr. Flores describes

17  in her second opinion a method to analyze the extent to which actual daily staffing at Brookdale's

18  California facilities fell below levels required to meet the residents' assessed needs. Flores Decl., ¶¶

19  33-58. That method allows for the mathematical calculation, in hours, of the daily labor time required

20  to deliver assessed services, as compared to the actual labor time available through staff each day. The

21  "simple math" approach described by Dr. Flores is conservative. For example, it does not include as

22  part of its "required hours" the staff time spent on travel to and from residents, documenting resident

23  charts, attending meetings, and other administrative tasks.[5] Rather, it provides a "quick way to initially

24  measure if staffing levels are minimally sufficient to meet the assessed care needs of residents" before

25

26  [4] Pursuant to California regulations, assisted living facilities are referred to as Residential Care Facilities for the Elderly (RCFE).

27  [5] The alternative approach referenced by Dr. Flores and undertaken by Mr. Schroyer – Discrete Event Simulation (DES) Testing and Failure Analysis – accounts for these and other factors. Flores Decl., ¶¶ 19-20; Schroyer Decl., ¶¶ 50-65.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

1  moving on to a "more robust, more specific [DES] analysis." *Id., ¶* 21; Flores Depo. at 47:2-6.

2       Based on the simple math analysis Dr. Flores performed (for the days where the available data

3  was complete or substantially complete), she opined that each of the six facilities contained in the

4  "sample" data set was chronically understaffed and, as a consequence, Brookdale residents were placed

5  at a substantial and ongoing risk for not receiving required and promised services.

6            **1.**     **Opinion 1: Brookdale's Defective Staffing Policy**

7       The methodology Brookdale uses to determine staffing in its facilities is defective and places

8  residents at a substantial and unreasonable risk of not receiving required care services. Brookdale's

9  staffing methodology is defective and fails to ensure that facility personnel are sufficient in numbers at

10  all times to provide the services necessary to meet resident needs because the RSW/norm task times

11  used by Brookdale (BKD2874663)[6] regarding bathroom assistance and escorting/mobility assistance

12  are unreasonably low and simply not credible. Flores Decl., ¶¶ 50-52, 71. For example, based on Dr.

13  Flores' decades of experience (and as reinforced by industry literature), residents require on average

14  significantly more time than the ████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████ Indeed, Brookdale's own task time studies contradict the norm

17  task times used to calculate benchmark hours, and are more consistent with Dr. Flores' experience and

18  industry literature. Flores Decl., ¶ 71(a-b). Because Brookdale uses task times that are too low, its

19  benchmark hours – the maximum hours Brookdale allots for staffing on a per day basis – also are too

20  low. And Brookdale consistently fails to meet even its benchmark hours. Based on analysis of the

21  Labor Detail Report data produced by Brookdale for 54 facilities from January 1, 2017 to December

22  31, 2020, Brookdale's staffing was ██████████████████████ of the total days within

23  this period. Flores Decl., ¶ 71(d).

24           **2.**     **Opinion 2: Description of Staffing "Shortfall" Methodology by way of**

25                      **Simple Math Analysis**

26       The simple math methodology mathematically calculates the labor time required each day to

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[6] *See* Umpierre Decl., Ex. LL.

deliver all required line-item services to residents and compares this to the actual labor time available each day.[7]   Here, an examination of the available versus required staff hours per day during the 3-year timeframes for each sample facility reveals that, on average, total facility required time exceeded available staff time at the six "sample" facilities ███████████████████ Flores Decl., ¶ 60, Table 5. The average staffing deficit at the six sample facilities measured ████████y. *Id.,* ¶ 61, Table 6. Similarly, the average percent of required service time omitted at the six "sample" facilities on a per-day basis is ██████%. *Id., ¶* 62, Table 8.

As Dr. Flores' simple math analysis demonstrates, the quantity of line-item services contained in Brookdale's resident assessments and the amount of time required to deliver that care based on Brookdale's own norm task times and task time studies reveals that it was mathematically and physically infeasible for Brookdale's staff to deliver all the required line-item services, given the time that was available to staff according to Brookdale's punch detail staffing data. Flores Decl., ¶ 63. The resultant staffing shortfall at the six "sample" facilities was not an isolated occurrence but showed a pattern and practice of understaffing that subjected residents to a substantial and continuing risk of not receiving required care. That conclusion is further supported by the Discrete Event Simulation (DES) testing analysis performed by Mr. Schroyer.  *See* Schroyer Decl., ¶ 77 (over 1.3 million DES engineering test and failure analyses revealed a daily average staffing shortfall of 41.5% per facility over the 3-year study period).

Dr. Flores' analysis of deficiencies issued by the California Department of Social Services' Community Care Licensing Division (CCLD) lends further support to the conclusions reached in her simple math analysis. In particular, the vast majority of more than 800 deficiencies issued to 71 Brookdale facilities in California from 2015 and 2021 pertained to staffing issues either directly (for specifically failing to have sufficient numbers of staff)[8] or being indicative of insufficient numbers of staff, poor resident care, and other problems that are consistent with facility understaffing.[9] *See* Flores

---

[7] Complete or substantially complete assessment and staffing data must be available for the days analyzed. Here, Brookdale produced complete or substantially complete data for six facilities with specific time periods. Flores Decl., ¶¶ 33-34.

[8] *See* Flores Decl., ¶ 82(a-i).

[9] *See* Flores Decl., ¶ 83.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

1   Decl., ¶¶ 79-81.

2   **III.**     **LEGAL STANDARD**

3         The Ninth Circuit has stated that "in evaluating challenged expert testimony in support of class

4   certification, a district court should evaluate admissibility under the standard set forth in *Daubert*."

5   *Sali v. Corona Reg'l Med. Ctr.,* 909 F.3d 996, 1006 (9th Cir. 2018); *Heredia v. Sunrise Senior Living,*

6   *LLC*, No. 8:18-cv-01974-JLS-JDEx, 2021 WL 6104188 (C.D. Cal. Nov. 16, 2021).  While courts

7   should evaluate the admissibility of challenged expert testimony under the *Daubert* standard at class

8   certification, that evaluation is not "dispositive." *Sali,* 909 F.3d at 1006. Rather, consideration of the

9   *Daubert* factors and the "evidence's ultimate admissibility should go to the weight that evidence is

10   given at the class certification stage." *Id.* This is because at class certification the focus is the

11   "persuasiveness of the evidence presented" as it bears on the Rule 23 analysis. *Id.* (noting "greater

12   evidentiary freedom at the class certification stage" and that courts should not "rely[] on formalistic

13   evidentiary objections" to "exclude[] proof that tend[s] to support class certification")*; see also*

14   *Heredia,* 2021 WL 6104188, at *5 (same); *In re PFA Insurance Marketing Litig.*, No. 4:18-cv-03771

15   YGR, 2021 WL 5994908, at *2 (N.D. Cal. Nov. 3, 2021) ("At the class certification stage, the relevant

16   inquiry is a tailored Daubert analysis which scrutinizes the reliability of the expert testimony in light of

17   the criteria for class certification and the current state of the evidence.") (internal quotations and

18   citation omitted.)

19         Under *Daubert*, trial courts assess whether the "expert's testimony both rests on a reliable

20   foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

21   U.S. 579 (1993); *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 984-85 (9th Cir. 2020). As

22   post-*Daubert* decisions confirm, however, the general rule remains that expert testimony should be

23   "liberally admitted." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir.

24   2014). *See also Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)

25   ("The Ninth Circuit has placed a great emphasis on *Daubert's* admonition that a district court should

26   conduct an analysis with a liberal thrust favoring admission.") (internal quotations and citation

27   omitted.) The "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702

28   Advisory Committee Notes to 2000 Amendments.

An expert's testimony meets the low bar of relevancy if there is "a valid connection to the pertinent inquiry" at trial. *In re Ford Motor Co. Litig. (Pedante)*, No. CV 17-06656 AB (FFMx), 2019 WL 7177735, at *2 (C.D. Cal. 2019); *Primiano v. Cook*, 598 F.3d 58, 565 (9th Cir. 2010); *Messick.*, 747 F.3d at 1196-97 (relevance established if evidence "logically advances a material aspect of the proposing party's case").

The reliability prong can be established through multiple ways. *City of Pomona*, 750 F.3d at 1044 ("The test of reliability is flexible.").[10] Trial courts have "broad latitude" in determining whether an expert's testimony is reliable, and also in "deciding how to determine the testimony's reliability." *Ralston v. Mortgage Investors Group, Inc.*, No. 08-536-JF (PSG), 2011 WL 6002640, at *3 (N.D. Cal. Nov. 30, 2011) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999)). For example, where an expert's opinion is based on science, reliability can be supported by "scientifically valid reasoning, methodology, testing, or peer review." *Daubert*, 509 U.S. at 592-94. Yet even then, the *Daubert* factors are "meant to be helpful, not definitive." *City of Pomona*, 750 F.3d at 1044 (quoting *Primiano*, 598 F.3d at 564).

This inquiry is focused "solely on principles and methodology, not on the conclusions that they generate." *Grodzitsky*, 957 F.3d at 984-85. If the method is valid, "attacks on the quality of the data … application of the methodology to the data, and the overall persuasiveness of the expert's opinions are matters for cross-examination." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968-70 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

Credibility challenges do not justify the exclusion of expert evidence. *Alaska Rent-A-Car*, 738 F.3d at 969-970; *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). "Shaky but admissible evidence

---

[10] For example, reliability also can be shown from "personal knowledge or experience," if the expert possesses "the minimal foundation of knowledge, skill, and experience" to support the opinion. *Zagruzny v. Mercedes-Benz USA*, No. CV 19-1096 MRW, 2020 WL 3968672, at *1 (C.D. Cal. Jun. 4, 2020); *see also Elosu v. Middlefork Ranch, Inc.*, No. 21-35309, — F.4th —, 2022 WL 534345, at *6 (9th Cir. Feb. 23, 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' upon which they render an opinion."); *Ralston*, 2011 WL 6002640, at *4 ("Court's frequently accept experience-based expert opinion testimony on relevant aspects of industry practice that do not offer themselves readily to scientific or statistical analysis.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano,* 598 F.3d at 564. "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-1231 (9th Cir. 1998).

Further, "conflicting expert testimony" is insufficient to warrant exclusion of one side's experts. *City of Pomona,* 750 F.3d at 1049 ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable."); *Sabadi v. Hartford Casualty Ins. Co.*, No. SACV 13-1928-JLS (ANx), 2015 WL 12698445, at *2 (C.D. Cal. Jan. 13, 2015) (contention that expert's "two written reports [] reached inconsistent conclusions" insufficient to warrant exclusion on reliability challenge). Courts routinely apply this sound principle in the context of class certification motions. See, e.g., *Ralston,* 2011 WL 6002640, at *10; *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *11 (N.D. Cal. May 14, 2015); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 625 (N.D. Cal. 2015) (declining to engage in a "battle of the experts" at the class certification stage).

Finally, where objections are not based on *Daubert* concerns but rather on grounds of general admissibility, the Court should afford such testimony its proper weight rather than exclude it outright. *See, e.g.*, *Sarmiento v. Sealy, Inc.,* No. 18-cv-01990-JST, 2020 WL 4458915, at *2 (N.D. Cal. May 27, 2020).

## IV.   BROOKDALE'S ATTACKS ON DR. FLORES' ANALYSIS FAIL

Brookdale's motion attacks the accuracy and credibility of Dr. Flores' overarching conclusion – that Brookdale's benchmark staffing methodology is defective. But that is not a basis to exclude expert testimony under *Daubert*. *See Alaska Rent-A-Car,* 738 F.3d at 969-70. Indeed, Brookdale is asking the Court to do what the Ninth Circuit considers to be reversible error. *See, e.g., Elosu v. Middlefork Ranch Inc.,* No. 21-35309, — F.4th —, 2022 WL 534345, at *7 (9th Cir. 2022) ("… Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage").

Brookdale's *Daubert* challenge is based on the contention that Dr. Flores employed "no

methodology at all" because she ignored facts and formulated opinions based on subjective and unsupported assumptions. Mot. at 4-5. But Brookdale's self-serving characterization of Dr. Flores' work is directly at odds with the court's findings in *Heredia v. Sunrise Senior Living, LLC*, which accepted as relevant and reliable the same simple math methodology Dr. Flores put forward in its decision certifying a class of current and former residents similar to the class Plaintiffs seek to certify here. *Heredia.*, 2021 WL 6104188, at *5.

Further, an argument that an expert relied on incorrect facts is not a proper basis to exclude testimony. *Giuliano*, 2015 WL 10890654, at *10 (arguments regarding flawed methodological assumptions go to weight, not admissibility, citing *Cotton v. City Eureka, Cal.*, No. C 08-04386 SBA, 2010 WL 5154945, at *13 (N.D. Cal. 2010) ("The matter of whether the assumptions underlying [expert's] opinions are accurate is germane to the weight, as opposed to the admissibility, of his opinions.")). That is true even "when the parties' experts rely on conflicting sets of facts." *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL 1390416, at *7 (N.D. Cal. May 18, 2006) ("[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony"); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F.Supp.3d 1050, 1070-71 (C.D. Cal. 2015) (expert may testify on "his party's version of the disputed facts"). Rather, the *Daubert* inquiry centers on the soundness of the methodology at issue, not the correctness of the conclusions reached. *Daubert v. Merrell Dow Pharms., Inc. (Daubert II),* 43 F.3d 1311, 1318 (9th Cir. 1995).

## A.   Dr. Flores' Simple Math Analysis is Reliable and Based on A Sound Methodology

Brookdale argues that Dr. Flores' employed "no methodology at all" when forming her opinions in this case. Mot. at 4. Brookdale is wrong. The methodology underlying Dr. Flores' simple math approach is grounded in the well-accepted and common-sense principle that staffing levels must be sufficient to meet "workload," specifically, residents' assessed needs multiplied by the amount of time reasonably necessary to meet those needs. Flores Decl., ¶¶ 32-33. That methodology uses the same logic and structure that Brookdale uses to set staffing at its facilities. *See, e.g.,* Umpierre Decl., Ex. A (Flores Depo. at 38:16-18 ("Brookdale does theirs by doing an assessment and coming up with numbers. They use the simple math analysis.")). Essentially, ███████████████████

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 █████████████████████████. Flores Decl., ¶ 68. Dr. Flores evaluated

5 whether Brookdale's benchmark staffing formula generated sufficient caregiver hours to meet the

6 assessed needs of the residents. Flores Decl., ¶ 5.

7       Dr. Flores testimony and declaration establish that the foundation for the data inputs used in

8 both her simple math analysis and the more robust DES analysis derive from voluminous facility-

9 specific resident assessment data, resident move-out data, resident census data, punch detail staffing

10 data (including job title and department designation), task times and frequencies for assessed services,

11 and floor plans obtained directly from Brookdale. Flores Decl., ¶¶ 23-25; Umpierre Decl. Ex. A (Flores

12 Depo. at 44:6-12, 76:6-24, 100:17-19, 106:6-107:3, 107:17-22). Thus, to evaluate whether Brookdale's

13 benchmark-hours protocol is capable of providing sufficient hours to meet the required workload, Dr.

14 Flores compared actual staffing data from time punch records at six Brookdale facilities to the required

15 workload (*i.e.*, the time required to meet actual resident needs). Flores Decl., ¶¶ 53-58. That is the

16 same basic approach used by Brookdale. ███████████████████████████

17 ███████████████████████████████████████████. Umpierre Decl. Ex. D at

18 BKD2874675-BKD2874760_Confidential.

19       Brookdale's claim that Dr. Flores' opinions should be excluded because her methodology is

20 neither "scientific" nor "based on good grounds" is without merit. "In *Daubert,* the Court specified that

21 it is the Rule's word 'knowledge,' not the words (like 'scientific') that modify that word, that

22 'establishes a standard of evidentiary reliability.'" *Kumho Tire Co.,* 526 U.S. at 147 (citation omitted).

23 Dr. Flores' opinions are reliable because she has the requisite specialized knowledge, skill, and

24 experience in the assisted living industry to aid the trier of fact. *See, e.g., Messick,* 747 F.3d at 1198-99

25 (reversing exclusion of expert opinion for failing to explain the scientific basis for conclusion where

26 expert repeatedly referred to his own extensive clinical experience and his examination of medical

27 records and literature; "A doctor using a differential diagnosis grounded in significant clinical

28 experience and examination of medical records and literature can certainly aid the trier of fact and

1    cannot be considered to be offering 'junk science.'").

2        Brookdale claims that Dr. Flores' methodology is unreliable because it "does not satisfy even

3    one of the *Daubert* factors." Mot. at 19. But the *Daubert* factors do not constitute a definitive checklist

4    or test. Rather, a trial court should consider the specific *Daubert* factors where they are reasonable

5    measures of reliability. *Kumho Tire Co.,* 526 U.S. at 152; *see also Primiano,* 598 F.3d at 564 (factors

6    "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's

7    reliability as well as whether the testimony is reliable, based on the particular circumstances of the

8    particular case").  As such, an expert's personal knowledge or experience may be sufficient indicia of

9    reliability. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). Indeed, "the

10   *Daubert* factors … simply are not applicable to [non-scientific] testimony, whose reliability depends

11   heavily on the *knowledge and experience* of the expert, rather than the methodology behind it."

12   *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal

13   quotation marks and citations omitted).

14       **B.     Dr. Flores' Opinions Will Assist in the Class Certification Determination**

15       Brookdale claims that because the simple math analysis is "blunt" and "leaves out so many

16   things" it is "deeply flawed" and "unhelpful." Mot. at pp.15-17. Yet, the Judge Staton found Dr.

17   Flores' application of the simple math analysis in the matter of *Heredia v. Sunrise Senior Living, LLC*

18   to be helpful when she granted plaintiffs' class certification motion in that case. *Heredia,* 2021 WL

19   6104188, at *5. Indeed, the simple math methodology is a generally accepted approach used by the

20   assisted living industry and industrial engineers to quantitatively measure the amount of staff required

21   to deliver needed care. Flores Decl., ¶ 19. That is because, for assisted living facilities and other

22   businesses that require staff, "[t]hey have to have some kind of simple way to know how much labor

23   they need if they're providing a service." Umpierre Decl. Ex. A (Flores Depo. at 34:8-11; *see also id.*

24   at 35:2-7; *see also id.,* Exs. D-KK (literature regarding available/required time to determine staffing).

25       Thus, the simple math analysis "provides a quick way to initially measure if staffing levels are

26   minimally sufficient to meet the assessed care needs of residents." Flores Decl., ¶ 21. It is

27   "conservative" in its findings because it does not account for many time-consuming staff activities that

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

lessen the available time for Brookdale staff to provide care services to residents.[11] This "quick look" or "first step" tests and quantifies the amount of staffing shortfall, if any, occurring in each of the six "sample" facilities and is relevant to the class certification inquiry.[12] *See Daubert,* 509 U.S. at 596; *see also City of Pomona,* 750 F.3d at 1044 (noting that "[t]he district court is not tasked with dividing whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury") (internal quotations omitted).

Brookdale's related argument that Dr. Flores failed to show that Brookdale facilities actually were understaffed also is meritless. Dr. Flores has opined that the flaws in Brookdale's staffing policy place residents at "substantial and ongoing" risk of not receiving required care services. Flores Decl., ¶ 59; Umpierre Decl., Ex. A (Flores Depo. at 61:2-3; 61:16-19 ("A very high potential risk, because, based on the numbers, it seems almost impossible for the residents to have received the care that was required by them.")); *id.* at 65:4-8 ("[M]y years of experience … and my education and my knowledge tells me that if I don't have enough staff hours available to meet the needs of the residents, something is going to be missed."). As that is the risk consumers pay thousands of dollars to avoid when they contract with Brookdale for assisted living services, legal injury is established at the "time of purchase" under Plaintiffs' case theory. *Nguyen v. Nissan N. Am. Inc.*, 932 F.3d 811, 819 (9th Cir. 2019).

Moreover, Plaintiffs are not required to prove their claims on the merits at class certification; an expert "need not testify with certainty that the risk factors manifested." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 978 F.Supp.2d 1053, 1069-70 (C.D. Cal. 2013); *see also Primiano,* 598 F.3d at 565. Rather, at the class certification stage, an expert need only describe a workable method of analysis that will be used at trial. *See Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2016 WL 6662723, at *12 (C.D. Cal. Mar. 23, 2016).

---

[11] The simple math analysis understates the staffing shortfall, if any, because it does not account for staff time spent on travel to and from residents, documenting resident charts, attending stand up meetings, and other administrative tasks. *See* Flores Decl., ¶ 65.

[12] Umpierre Decl. Ex. A (Flores Depo. at 47:2-6 ("[I]t is a blunt analysis that allows us to have some degree of results to let us know whether or not to move any further and have [Mr. Schroyer] do a more robust, more specific analysis.")).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

Nor was Dr. Flores required to offer any testimony about whether it was "substantially certain" that Brookdale's staffing policies and practices would result in the denial of services to residents. Under applicable law, the "substantially certain" or "substantial certainty" standard applies to claims for breach of implied warranty under California law, not to claims under the CLRA or the UCL. *See, e.g.*, *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 535, 541 (9th Cir. 2016) ("In *American Honda*, the California Court of Appeal stated that for a California breach of warranty claim to proceed, the movant for class certification must provide 'substantial evidence of a defect that is substantially certain to result in malfunction during the useful life of the product.' 199 Cal.App.4th at 1375, 132 Cal.Rptr.3d 91. To do that, the movant must demonstrate through expert testimony that 'there was an inherent defect and that it caused the product to malfunction or that it was substantially certain the product would malfunction as a result of the defect.' *Id.* at 1377, 132 Cal.Rptr.3d 91."); *Miller v. Fuhu Inc.*, No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794, at *14-15 (C.D. Cal. Dec. 1, 2015) (discussing the "substantially certain" to manifest standard and its application to breach of warranty claims under California law).

### C.     Brookdale's Benchmark-Hours Staffing Procedure is Defective

#### 1.     Dr. Flores' Opinions on Brookdale's Task Times

Brookdale argues that Dr. Flores misinterpreted the Acuity Norms spreadsheet by deriving specific task times to allocate for discrete care activities that Brookdale does not actually use to calculate labor benchmarks. Mot. at 7. ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████" *Id.* at 7:9-12. But that is precisely how Dr. Flores interpreted the spreadsheet. Umpierre Decl. Ex. A (Flores Depo. at 123:4-5 ("We're going by the average time per day."); *id.*, 124:17-25 ("No. I interpreted C to mean in one day they're getting 3 minutes, 8 times 8, 24 minutes. Q: So you actually took into account the amount of time that Brookdale allocates over a 24-hour period? A: We are talking about per day … 24 hours a day, yes."); *id.*, 142:20-22 (same); *id.*, 143:8-15 (same)).

Accordingly, Dr. Flores interpreted the Acuity Norms spreadsheet objectively and according to

its plain meaning, consistent with her background and experience. Declaration of Cristina Flores in Support of Plaintiffs' Opposition to Motion to Exclude ("Flores Opp. Decl."), ¶ 10; Umpierre Decl., Ex. A (Flores Depo. at 122:10-15 ("Yes. 3 minutes eight times a day is what this particular spreadsheet shows.")); *id.*, 120:12-121:8[13]; 124:4-9; 185:3-12 (Flores and Bowman with same interpretation).[14] Dr. Flores' deposition testimony is clear that her interpretation was not – as Brookdale suggests – to find "individualized episodes of care" but rather "the complete day's needs of service … We're going by average time per day." *Id.*, 122:25-123:5. However, because line-item care services are delivered at various frequencies throughout the day, the aggregate daily time allotted to perform a particular care task must be considered episodically in relation to the frequency with which it is delivered when making a reasonableness determination. *Id.*, 191:4-7 ("The way the simple math analysis works is to take the time required by the frequency to come up with the number. We're looking at it per day. We're not breaking it down."); *id.,* 143:12-15 ("I believe the overall time in the day is too small, because … the 3-minute factor is part of that [aggregate] number, so it's too low."). After extensive discovery (that remains ongoing), Plaintiffs are not aware of any Brookdale policy document interpreting Brookdale's task times any differently.

Dr. Flores specifically examined the task time data provided by Brookdale to ensure that such task time data was consistent with peer-reviewed scientific literature, her 30 years of experience as a registered nurse providing care to assisted living residents,[15] and other task time data for other assisted living facilities (ALF). Flores Decl., ¶¶ 51-52. For example, where Dr. Flores deemed that a Brookdale

---

[13] "I had already reviewed the policies and procedures and practices of Brookdale. And I can interpret this … 'Okay. What does this mean?' And I would look to it and see if I understood it, and … if I didn't know what something meant on it, I would have to refer back to the assessment information or to Brookdale's information, the policy [sic] of procedure. But this is fairly simple. They characterized care. They've assigned acuity levels. And if looks like … breakfast, lunch, supper, evening, night. And this is how they break things down in Brookdale."

[14] "Well, I interpreted the spreadsheet to mean that these numbers are what they use for their task times for specific categories of care."

[15] Expert witness reliability can be shown from "personal knowledge or experience," if the expert possesses "the minimal foundation of knowledge, skill, and experience" to support the opinion. *Zagruzny*, 2020 WL 3968672, at *1; *see also Elosu*, 2022 WL 534345, at *6 ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' upon which they render an opinion."); *Ralston*, 2011 WL 6002640, at *4 ("Court's frequently accept experience-based expert opinion testimony on relevant aspects of industry practice that do not offer themselves readily to scientific or statistical analysis.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

1  task time was contrary to her experience as a registered nurse, scientific peer-reviewed literature, and

2  ALF industry task time data, she replaced the unreasonable task time supported by one or more of the

3  above sources. *See* Flores Decl., ¶ 51. With respect to her review of the Brookdale task time data

4  however, out of the 95 repetitive services required by Brookdale residents, Dr. Flores used Brookdale's

5  times for services in 74% of instances. Flores Opp. Decl., ¶ 7.

6        Of the 95 possible care services used by Dr. Flores (and Mr. Schroyer) to calculate required

7  hours, the task times and frequencies for 70 of these services derived directly from Brookdale's own

8  Acuity Minutes Norms and Clinical Time Studies.[16] *Id.* Brookdale contends that Plaintiffs' experts

9  manipulated task frequencies and task times by intentionally misinterpreting the Acuity Minutes

10  Norms spreadsheet (BKD2874663) to define a per day task frequency or average task time for

11  bathroom assistance and mobility. *See, e.g.,* Mot. at 5-9.  A portion of this spreadsheet is set forth

12  below:

13
14
15
16
17
18

19  Flores Opp. Decl., ¶ 8.  This Brookdale spreadsheet contains
20
21
22
23
24   . Flores Opp. Decl., ¶ 9. Notably,
25
26

27  _____

28  [16] The remainder of the care service task times and frequencies derived from peer-reviewed scientific literature, the ALF industry, or upon the nursing experience of Dr. Flores. Flores Decl., ¶ 52.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

█████████████████████████████████

Plaintiffs' expert's interpretation of the Acuity Minutes Norm spreadsheet is consistent with the document's language and structure. Flores Opp. Decl., ¶ 10.  Further, their interpretation of the frequencies (in this Acuity Minutes Norms spreadsheet) is confirmed by a second Brookdale internal document known as the Clinical Time Studies spreadsheets (BKD2886744-5), which are attached as Exhibit E to the Umpierre Declaration. This document includes the following relevant information:

████████████████████████████████████████████████████████

Flores Opp. Decl., ¶ 11.

Brookdale argues that a ████████████████████████████████████ █████████████████ is unreasonable and constitutes a deliberate attempt to manipulate the minutes of required staff time.  Brookdale's attack ignores the fact that ████████████████████ ███████████████████ is well supported by scientific, peer-reviewed journal articles.[17]  This literature was disclosed to Defendants prior to Dr. Flores' deposition testimony, and is part of her declaration. Flores Opp. Decl., ¶¶ 12-13.

Moreover, Brookdale's contentions about the average task times used by Plaintiffs' experts ignores scientific, peer-reviewed journal articles regarding the amount of time required to deliver basic care services such as toileting assistance as well as ALF industry task times. Both the scientific literature and industry task times show that actual bathroom assistance (not mere reminders) invariably requires ████████████████████████████████████.[18] Furthermore, ██████████████████████

---

[17] *See* Umpierre Decl., Ex. D (Ouslander, J., Schnelle J.F., Simmons S.F., Bates-Jensen B., Zeitlin M. (1993).  *The Dark Side of Incontinence: Nighttime Incontinence in Nursing Home Residents*. J Am Geriatr Soc, 41: 371-376); *id.,* Ex. E (Engberg, *Effectiveness of Prompted Voiding*, J WOCN, September 2002, 252-265); *id.,* Ex. F (Newman D.K., *Evidence Based Practice Guideline—Prompted Voiding for Individuals with Urinary Incontinence*, Journal of Gerontological Nursing, Vo. 45, No. 2 (2019), 14-26).

[18] *Basic* toileting assistance has been reported in the literature as requiring 5.5 to 7.9 minutes ██████████ ████████████. Umpierre Decl., Ex. G (Schnelle J.F., *A Behavioral Analysis of Labor Cost of*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES



1    ███████████████ is facially unreasonable for the level of care defined by the question, ████

2    ████████████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████████

4    ███████████████ Umpierre Decl., Ex. LL at BKD1165227. Dr. Flores states that, *for just one*

5    *episode of that level of care,* the time required could easily exceed the total daily time of ████

6    ████████████████ in the Acuity Minutes Norms spreadsheet. Flores Opp. Decl., ¶¶ 14-16

7    (emphasis added). This inadequate daily time allotment of ████████████████████

8    ██████████████████ is further contradicted by Brookdale's Clinical Time Studies

9    spreadsheets ███████████████████████████████████████████████████

10   ██████████████████████. Brookdale's input arguments regarding the task times and

11   frequencies for mobility/escorting assistance are similarly flawed. *Id.*, ¶17.

12           Regardless, Dr. Flores' expert opinion – based on her education, experience, and industry

13   literature – is that the aggregate times over the course of a day that Brookdale allocated for bathroom

14   (toileting) assistance and escorting/mobility were too low and unreasonable.[19] Umpierre Decl. Ex. A

15   (Flores Depo. at 143:20-144:6, 157:22-158:13, 161:2-11); Flores Decl., ¶¶ 50-52. Dr. Flores' extensive

16   experience with the provision of assisted living services, alone, is a sufficient basis to sustain a finding

17   that her opinion in this regard is reliable. *Ralston,* 2011 WL 6002640, at ** 4-5; *United States v.*

18   *Sandoval-Mendoza,* 472 F.3d 645, 655 (9th Cir. 2006) ("When evaluating specialized or technical

19   expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or

20   experience."). As the aggregate daily times were too low, so also were the corresponding benchmarks

21   too low, leading directly to the inability of Brookdale's staffing formula to provide a sufficient amount

22   of care staff time to meet the assessed needs of its residents. That Brookdale disagrees with Dr. Flores'

---

24   *Managing Continence and Incontinence in Nursing Home Patients*, Journal of Organizational Behavior
     Management, Vol. 9(2) (1988), 137-153)). Further, the Watermark ALF chain allots up to 20 minutes
25   per episode, and the Aegis ALF chain allots up to 30 minutes. These industry task times are a function
     of how bathroom assistance is defined – *i.e.,* the specific services included within bathroom assistance.

26   [19] Brookdale claims that Dr. Flores cannot offer a "new" opinion "about the sufficiency of the Total
     Task Time allocated for Bathroom Assistance and Mobility over the course of a 24-hour period." Mot.
27   at 10:7-8. But Dr. Flores' opinion in this regard is not "new." Umpierre Decl. Ex. A (Flores Depo. at
     143:8-15 ("… I believe the overall time in the day is too small, because [] the 3-minute factor is part of
28   that number, so it's too low.")).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES

data inputs and the conclusions she reached based on an analysis of Brookdale's data is not a basis to exclude her opinion or testimony in this case. *City of Pomona,* 750 F.3d at 1045 ("Dr. Sturchio's expert report details how he analyzed the relevant data and applied the data to reach his conclusions. The Federal Rules of Evidence do not require an endorsement from the EPA approving Dr. Sturchio's results. The district court's conclusion to the contrary was an abuse of discretion.").

*Ralston* is instructive. There, plaintiff moved to exclude a defense expert's testimony and rebuttal report opposing class certification on the grounds that the expert's opinions were simply "rank speculation" because they were not based on a reliable foundation including but not limited to empirical evidence. *Id.,* 2011 WL 6002640, at *3. The court declined to exclude the expert's opinions insofar as they related to the expert's knowledge and experience concerning standard industry practices. *Id.* at **4-5. Formal research and empirical evidence supporting an expert's opinions are not required for admissibility. *Id.* (noting that "[c]ourts frequently accept experience-based, expert opinion testimony on relevant aspects of industry practice that do not offer themselves readily to scientific or statistical analysis").

Here, Dr. Flores has extensive personal and professional experience in the assisted living industry, not only as an individual in practice but also as a Certified RCFE Administrator and educator who has been provided numerous research grants to study assisted living facilities in California. Flores Decl., ¶¶ 7-16. Far from being based on "subjective and unsupported assumptions," Dr. Flores describes in her declaration and her deposition testimony how that vast quantity of experience supports each of the opinions she has formulated in this case, including why Brookdale's aggregate task times for bathroom (toileting) assistance and escorting/mobility are too low and not reasonable. *See id.,* ¶¶ 50-52. *See Ralston,* 2011 WL 6002640, at *4 ("By relying solely or primarily on experience, however, [the expert] must establish how his experience provides a basis for and leads to the conclusions that he reaches."); *Cf In re PFA Insurance Marketing Litig.,* 2021 WL 5994908, at *5 (excluding expert's fourth opinion as speculative and unsupported where plaintiffs "have pointed to no portion of [the expert's] report or deposition testimony" where he explains how his industry experience supports his opinion).

Thus, Brookdale's reliance on *In re REMEC Inc. Sec. Litig.*, 702 F.Supp.2d 1202, 1219-20

(S.D. Cal. 2010), is unavailing. Like the expert in *Ralston* and Dr. Flores in this case, the opinions of the plaintiffs' expert in *In re REMEC* were "sufficiently reliable to be admissible evidence because his declaration elucidates the basis of his conclusions" which were sufficiently tied to plaintiffs' claims. *Id.* at 1218 (describing how expert chose assumptions used, including actual data from industry participant and industry expectations). The court rejected defendants' challenges to the expert's analysis and inputs – including his professional judgment,[20] his interpretation of the governing accounting standard,[21] and the accuracy of certain factual assertions and calculations[22] – correctly holding that such perceived deficiencies could be explored through cross examination. *Id.* at 1219. The single opinion the court did exclude as being based on the expert's subjective belief or unsupported speculation concerned the conclusion that defendants should have conducted interim impairment tests. *Id.* It did so because the expert reached this conclusion without analyzing whether a triggering event required defendants to conduct interim impairment tests. *Id.* ("When asked about his analysis at his deposition, [the expert] admitted that he had not performed an impairment test to demonstrate that the identified events would have reduced the fair value of the Commercial wireless segment below its carrying value."). Dr. Flores' analysis suffers from no such infirmity.

Brookdale's other authorities are similarly unavailing. The court in the out-of-circuit *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994), held that an expert's opinion was inadmissible because *undisputed* evidence, including the expert's own admission, explicitly negated the expert's damages theory. *Id.* at 142-143. "*Tyger* is a textbook example of the exception case in which an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [and] must … be excluded." *Patriot Rail Corp. v. Sierra R. Co.*, No. 2:09-cv-0009-TLN-AC, 2015 WL 4662707, at *13 (E.D. Cal. Aug. 5, 2015) (internal quotations and citation omitted). Here, Dr. Flores' opinions are based on sufficient, and sometimes *disputed*, facts and reasonable assumptions borne of

---

[20] For example, the expert's assertion that "Powerwave is the better indicator of expected REMEC commercial performance." *In re REMEC*, 702 F.Supp.2d at 1218-19.

[21] For example, the expert's assertion that "REMEC improperly excluded the best comparison company." *In re REMEC*, 702 F.Supp.2d at 1219.

[22] For example, the expert's assertions that "forecast results were directed by management … budgets must be regarded as inherently unreliable … REMEC's goodwill impairment test was based on unrealistic and unachievable targets." *In re REMEC*, 702 F.Supp.2d at 1219.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

her extensive experience in the assisted living industry. Brookdale's quibble with Dr. Flores' interpretation of the available evidence is not a basis to exclude her opinions. *Primiano,* 598 F.3d at 564.

*Rodman v. Otsuka America Pharmaceutical, Inc.*, No. 18-cv-03732-WHO, 2020 WL 2525032 (N.D. Cal. May 18, 2020) is distinguishable. There, an expert's opinion that an antipsychotic drug's label failed to adequately describe the incidence rate of tardive dyskinesia ["TD"] was based on a survey of published scientific literature. *Id.* at *4. However, published studies comprising two of the expert's sources cautioned that they could not be used to calculate an incidence rate for TD and the expert conceded at deposition that those studies did not provide her with an incidence rate of TD. *Id.* at *5. Here, the Acuity Norms spreadsheet upon which Dr. Flores partially relied in this case is "a generic spreadsheet containing Brookdale's baseline norms for various ADL care activities." Mot. at 5-6. It is not a published study in the scientific literature. *See id.*at 7-8. Nor is Dr. Flores required to accept Brookdale's interpretation of disputed facts. *In re NJOY,* 120 F.Supp.3d at 1070-71 (expert may testify on "his party's version of the disputed facts").

## 2.   Dr. Flores' Opinions in Other Litigation

Brookdale's argument that Dr. Flores' opinions in this case should be excluded because they are directly contradicted by her prior findings and opinions regarding task times and staffing in other litigation is a red-herring. As Dr. Flores explained, this is an apples to oranges comparison because Brookdale defines care tasks and categories differently from other assisted living chains. Umpierre Decl. Ex. A (Flores Depo. at 148:17-149:10 (Flores testimony that Brookdale defines the highest acuity bathroom task to include laundry and showering which other ALF chains do not); *id.,* 155:12-21 (same); *id.,* 210:12-16 (re Aegis); *id.,* 293:2-294:24). Stated differently, one cannot view any particular task time in a vacuum without also considering how that task is defined; and how that task is defined will bear directly on how long it takes and the frequency with which it is delivered. For example, Dr. Flores explained why it was not appropriate to compare Aegis task times to Brookdale task times: "Here's why: Aegis breaks down [] every little step of everything. That's why, in the Aegis case, there are more than – I believe more than three times the number of service items in my service code key for Aegis. They break things down completely differently than Brookdale. So we have to start over. You

can't go back and say, 'Okay, here's the Aegis times. Let's just apply this service code key to Brookdale.' It's a – you can't do it. It's impossible." Umpierre Decl., Ex. A (Flores Depo. at 199:8-20). *See also id.* at 294:4-5 ("They might have included the escort with their toileting."). That Dr. Flores tailored her analysis to the specific facts of this case, by using Brookdale's own data where appropriate, is an indicia of the relevance and reliability of same. *See Kumho Tire Co.,* 526 U.S. at 156-57; *City of Pomona,* 750 F.3d at 1044.

As such, Brookdale's claim that Dr. Flores based her opinion concerning the insufficiency of Brookdale's Total Task Times for Bathroom Assistance on cherry-picked evidence to the exclusion of evidence contradicting her conclusions is baseless. Mot. at 11. Unlike the plaintiffs' cardiology expert in *In re Bextra,* Dr. Flores' experience and training in the assisted living industry qualify her to opine that certain task times are more reasonable than others, when taking into account how specific tasks are defined. *Cf. In re Bextra and Celebrex Marketing Sales Practices and Products Liability Litig.*, 524 F.Supp.2d 1166, 1176 (N.D. Cal. 2007). What is more, Brookdale's characterization of Dr. Flores' opinions in this case as litigation driven misses the mark. Dr. Flores' decades-worth of experience in the assisted living industry vastly predates the offering of her opinions in this litigation. Flores Decl., ¶¶ 7-16. In other words, Dr. Flores' opinions and testimony "… grow[] naturally and directly out of research [she has] conducted independent of the litigation …" *In re Bextra* at 1176 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995)). And insofar as *In re Bextra* concerned the suitability of expert opinions on complex issues of causation and the use of epidemiological studies to prove Celebrex is capable of causing heart attacks or strokes at certain doses, it is inapposite. *Id.* at 1173. *Cf.* Flores Decl., ¶ 21 (simple math analysis "provides a quick way to initially measure if staffing levels are minimally sufficient care needs of residents … [it] (a) provides an extremely conservative measurement of required staffing hours; and (b) can be applied to initially test and quantify the amount of staffing shortfall, if any, occurring" in Brookdale's facilities).

### 3. Dr. Flores Did Not Retract Any Opinions Offered in Her Declaration

Dr. Flores did not retract any of her opinions at deposition and Brookdale's argument otherwise is a mischaracterization of her testimony. Mot. at 12-13. Dr. Flores' point – then and now – is that, when accounting for the frequency with which the toileting/bathroom assistance and mobility/escort

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF DR. CRISTINA FLORES

tasks are delivered on a daily basis, Brookdale's aggregate times for these tasks are *too low*, no matter

which source one considers. Umpierre Decl. Ex. A (Flores Depo. at 190:11-25; 191:12-17). Thus,

whether Brookdale's own task times contradict each other is of no moment; they are too low, as

evidenced by ██████████████████████████████████████████████████████████

██████████████████████████████████. *Id.*, 289:22-290:7.

### 4. DSS Staffing Citations Support Dr. Flores' Opinion That Brookdale's Staffing Methodology is Defective

Dr. Flores' opinions that Brookdale's benchmark-hours staffing methodology is defective and

results in understaffing that subjects Brookdale residents to a substantial and ongoing risk of not

receiving required and promised services are supported by the substantial number of deficiencies

issued to Brookdale by DSS during that class period. The vast majority of more than 800 deficiencies

issued to 71 Brookdale facilities in California from 2015 to 2021 were related to staffing issues either

directly (for specifically failing to have sufficient numbers of staff)[23] or indirectly being indicative of

insufficient numbers of staff, poor resident care, and other problems that are consistent with facility

understaffing.[24] *See* Flores Decl., ¶¶ 79-81. The DSS citations, therefore, are but another data point –

like the DES testing[25] performed by Dr. Schroyer among others – that support and validate Dr. Flores'

opinions.

## V. CONCLUSION

Based on her education, training, and experience, Dr. Cristina Flores has concluded after an

analysis of Brookdale's documents, data, and policies that its benchmark staffing methodology is

defective, such that residents face a "substantial and ongoing" risk of not receiving required care

services as a result. Her "simple math" approach is a commonly accepted means of ensuring that a

facility is staffed to meet the assessed needs of its residents, and her methodology essentially mirrors

---

[23] *See* Flores Decl., ¶ 82(a-i).

[24] *See* Flores Decl., ¶ 83.

[25] Indeed, the extensive DES testing performed in this case provides robust confirmation of Dr. Flores' analysis of the systemic flaws in Brookdale's corporate staffing procedures. Specifically, the over 1.3 million DES engineering tests and failure analyses conducted on the six Brookdale facilities for which Plaintiffs have substantially complete assessment and payroll data indicate over the 3-year study period a daily average staffing shortfall of 41.5% per facility. Schroyer Decl., ¶ 77.

1   the approach reflected in Brookdale's staffing procedures. Brookdale's various attacks – that Dr.

2   Flores relied on unsupported assumptions, misinterpreted Brookdale's data, ignored facts, and cherry-

3   picked data that would support her conclusions – are not only factually erroneous, but also do not

4   support the exclusion of her expert opinions. Brookdale's real disagreement lies with Dr. Flores' inputs

5   and conclusions, which are matters appropriate for cross examination. Accordingly, Brookdale's

6   motion should be denied.

7   DATED:  March 18, 2022                    Respectfully submitted,

8                                             **STEBNER GERTLER**
                                              **GUADAGNI & KAWAMOTO**
9                                             **A Professional Law Corporation**

10                                            By:   */s/ Brian S. Umpierre*
                                              _____
11                                                  Brian S. Umpierre

                                              Attorneys for Plaintiffs and the Proposed Classes

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY
OF DR. CRISTINA FLORES