1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    STACIA STINER, et al.,                  Case No. 17-cv-03962-HSG

8                    Plaintiffs,             **REDACTED ORDER GRANTING IN
                                             PART AND DENYING IN PART
9           v.                               PLAINTIFFS' MOTION FOR CLASS
                                             CERTIFICATION AND GRANTING
10   BROOKDALE SENIOR LIVING, INC., et       AND DENYING *DAUBERT* MOTIONS
     al.,                                    AND MOTIONS TO STRIKE**
11
                    Defendants.              Re: Dkt. Nos. 278, 346, 347, 348, 350, 353,
12
                                             355, 504, 510, 511, 525
13

14

15          This is a putative class action lawsuit in which Plaintiffs allege that Defendants Brookdale

16   Senior Living, Inc. and Brookdale Senior Living Communities, Inc. (collectively, "Brookdale" or

17   "Defendants") operate their facilities in California in a manner that violates federal and state

18   disability laws.  Before the Court is Plaintiffs' motion to certify three different classes on several

19   different theories.  Dkt. No. 278 ("Mot.").  Brookdale opposes that motion.  *See* Dkt. Nos. 441 Ex.

20   A ("Opp.")[1] and 506 ("Reply").  The Court held a hearing on the motion.  For the reasons

21   discussed below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion.

22   Also pending before the Court are several evidentiary motions, discussed in more detail below.

23   I.     **BACKGROUND**

24          A.     **Factual Allegations**

25          Defendant Brookdale Senior Living Inc. is a for-profit corporation that maintains its

26

27   _____

     [1] The Court granted Defendants' request to replace the incorrectly filed opposition (Dkt. No. 363)
28   and replaced it with the redacted version attached as Exhibit A to Defendants' Motion to Remove
     Incorrectly Filed Document (Dkt. No. 441).  *See* Dkt. No. 448.

*United States District Court*
*Northern District of California*

principal place of business in Brentwood, Tennessee.  TAC  ¶ 24.  Brookdale is the largest

provider of assisted living for senior citizens and persons with disabilities in the nation and has the

largest number of assisted living facility residents within the state of California.  *Id.* ¶ 27.  Assisted

living facilities offer room, board, and daily assistance for seniors and persons with disabilities

with certain activities of daily living (or "ADLs"), such as preparing meals, shopping,

transportation, preparing and taking medication, housekeeping, laundry, bathing, toileting,

grooming, and dressing.  *Id.* ¶ 28.  Plaintiffs allege that there are more than 5,000 residents in

Brookdale's eighty-nine facilities in California (the "Facilities").  *Id.* ¶ 27.

Among those residents are the plaintiffs in this case.  Plaintiffs are elderly or dependent

individuals living in California who have significant care needs and disabilities and require

assistance with activities of daily living.  *Id.* ¶ 2.  According to Plaintiffs, they chose to stay in a

Brookdale facility because they believed Brookdale's promises to provide the care and assistance

that would allow them to age with dignity.  *Id.*  But they allege that they have instead encountered

a system of understaffed facilities that fails to consistently provide a basic level of care.  *Id.*

Specifically, Plaintiffs allege that Brookdale's facilities are not accessible by people with

disabilities, and that its policies regarding transportation, emergency evacuation, and staffing

prevent these residents from fully accessing and enjoying the Facilities.  *Id.* ¶¶ 3–4.  They also

allege that Brookdale conceals material facts about and misrepresents the quality of care at the

Facilities, in violation of California's consumer protection statutes.  *Id.* ¶ 6.

Plaintiffs accordingly brought this lawsuit, in which they seek to represent the following

three classes, as amended in their motion for class certification:

> **1.**   All persons with disabilities who use wheelchairs, scooters, or
> other mobility aids or who have vision disabilities and who reside or
> have resided at a residential care facility for the elderly located in
> California and owned, operated and/or managed by Brookdale
> during the three years prior to the filing of the Complaint herein
> through the conclusion of this action, including their successors-in-
> interest if deceased, excluding any persons who are subject to
> arbitration.

> **2.**   All persons with disabilities who require assistance with activities
> of daily living and who reside or have resided at a residential care
> facility for the elderly located in California and owned, operated
> and/or managed by Brookdale during the three years prior to the filing

*United States District Court*
*Northern District of California*

of the Complaint herein through the conclusion of this action, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.

**3.**     All persons who resided or reside at one of the residential care facilities for the elderly located in California and owned, operated and/or managed by Brookdale during the period from May 16, 2015 through the conclusion of this action, and who contracted with Brookdale or another assisted living facility for services for which Brookdale was paid money, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.

Mot. at 13 (emphasis in original).

### i.     Mobility and Vision Impaired Class

The Mobility and Vision Impaired Class would consist of all persons with disabilities who resided at a Brookdale residential care facility in California during the class period and who have visual disabilities or use wheelchairs, scooters, canes, or other mobility aids.  TAC ¶ 197.

Plaintiffs' theory underlying this class is that Brookdale has a corporate policy and practice of violating the ADA and the Unruh Act by rejecting the applicability of those laws to its facilities and operating its facilities as though those laws do not exist.  Mot. at 11.[2]  Plaintiffs allege that they have inspected fifty-two (52) of Brookdale's facilities and have found them all to be filled with various access barriers that violate the ADA and the Unruh Act.  *Id.* at 12.  They also allege that Brookdale has corporate policies regarding transportation and emergency evacuation services that violate the ADA and the Unruh Act.  *Id.*

### ii.     Disabilities Class

The Disabilities Class would consist of all persons with disabilities who resided at a Brookdale residential care facility for the elderly in California during the class period and who require assistance with activities of daily living.  TAC ¶ 197.

Plaintiffs' theory underlying this class is that Brookdale has violated the ADA and the Unruh Act by systemically understaffing the Facilities.  Mot. at 12.  As a result, Plaintiffs allege, residents are routinely denied essential services regarding their activities of daily living, such as assistance with toileting, dressing, grooming, bathing, ambulation, escorting, medication administration, and housekeeping.  *Id.*  They also allege that Brookdale has refused their requests

---

[2] All citations to the record refer to ECF pagination.

to make a reasonable modification in policy and practice to provide sufficient staffing.  *Id.*
Instead, they contend, Brookdale continues to staff its facilities based on corporate staffing
procedures that are not reasonably designed to ensure the level of staffing necessary to deliver the
services its residents need.  *Id.*

### iii.   Misleading Statements and Omissions Class

The Misleading Statements and Omissions Class[3] would consist of all persons who resided
at a Brookdale residential care facility in California during the class period and who contracted
with Brookdale or another assisted living facility for services for which Brookdale was paid
money.  TAC ¶ 197.

Plaintiffs' theory underlying this class is that Brookdale made misrepresentations and
concealed material facts about the quality and availability of care at the Facilities.  *Id.* ¶ 6.
Specifically, Plaintiffs allege that Brookdale represents that it will assess its residents' needs for
services, which leads reasonable consumers to expect that it will then staff each facility
accordingly to deliver personalized care to meet those needs.  *Id.*  But instead, Plaintiffs contend,
Brookdale systemically understaffs its facilities, cuts caregiver hours, and fails to train workers, all
to boost its profitability while the residents in Brookdale's care are forced to endure increasingly
expensive monthly charges and worsening care.  *Id.*  Plaintiffs contend that this conduct violates
California's consumer protection statutes and amounts to elder financial abuse.[4]

### B.   Procedural Posture

In July 2017, Plaintiffs Patricia and Christopher Eidler, Stacia Stiner, Mary-Catherine
Jones, and Helen Carlson filed this lawsuit against Brookdale.  Dkt. No. 1.[5]  In September 2017,

---

[3] The parties refer to this class in several different ways, including the "false or misleading statements class" (*see e.g.*, TAC ¶ 197), the "false and misleading statements and omissions class" (*see e.g.*, Mot. at 44) and the "contracting class" (*see e.g.*, Opp. at 28).  In the interest of clarity, the Court will refer to it as the "Misleading Statements and Omissions Class" for purposes of this order.

[4] Specifically, Plaintiffs allege that Brookdale has violated the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et. seq.*, engaged in unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and committed Elder Financial Abuse, Cal. Welf. & Inst. Code § 15610.30.  TAC ¶ 6.

[5] The First Amended Complaint added Bonita Hager and Lawrence Quinlan as plaintiffs, the Second Amended Complaint added Plaintiffs Edward Boris, Bernie Jestrabek-Hart, Arthur and

United States District Court
Northern District of California

United States District Court
Northern District of California

Brookdale filed a motion to compel certain Plaintiffs to arbitration. *See* Dkt. Nos. 23 (Motion to Compel Arbitration), 59 (Renewed Motion to Compel Arbitration). Brookdale also filed a motion to dismiss and a motion to strike. Dkt. Nos. 60, 61. The Court denied Brookdale's motion to compel arbitration and motion to strike and granted in part and denied in part Brookdale's motion to dismiss in January 2019. Dkt. No. 85. Brookdale appealed that order, and the Ninth Circuit affirmed the denial of the motion to compel arbitration as to Helen Carlson's claims and to Lawrence Quinlan's ADA and Unruh Act claims but reversed as to Quinlan's CLRA, UCL, and elder financial abuse claims. *See* Dkt. No. 185; *Stiner v. Brookdale Senior Living*, Inc., 810 F. App'x 531, 535 (9th Cir. 2020). Plaintiffs now move for class certification. Dkt. No. 278.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions, including the issue of class certification. Class certification is a two-step process. To warrant class certification, a plaintiff "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule.").

Rule 23(a) provides that a district court may certify a class only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th

---

Patricia Lindstrom, and Ralph Schmidt, and the Third Amended Complaint added Jeanette Algarme. Dkt. Nos. 20, 52, 90. Plaintiffs voluntarily dismissed the claims of Plaintiffs Eidler, Hager, and Jones. Dkt. Nos. 39, 40, 41.

1  Cir. 2022).

2        If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff

3  "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp.*

4  *v. Behrend*, 569 U.S. 27, 33 (2013). A class may be maintained under Rule 23(b)(2) if "the party

5  opposing the class has acted or refused to act on grounds that apply generally to the class, so that

6  final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

7  whole[.]" *Dukes*, 564 U.S. at 360. This provision applies "only when a single injunction or

8  declaratory judgment would provide relief to each member of the class." *Id.* Under Rule 23(b)(3),

9  "questions of law or fact common to class members predominate over any questions affecting only

10  individual members, and . . . a class action is superior to other available methods for fairly and

11  efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). To determine whether a

12  putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

19  Fed. R. Civ. P. 23(b)(3)(A)–(D).

20        The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap

21  with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Ret. Plans &*

22  *Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. at 350–51). However, "Rule

23  23 grants courts no license to engage in free-ranging merits inquiries at the certification stage,"

24  and "[m]erits questions may be considered to the extent—but only to the extent—that they are

25  relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

26  at 466; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district

27  court *must* consider the merits if they overlap with the Rule 23(a) requirements."). The issue to be

28  decided on a certification motion is whether the case should be "conducted by and on behalf of the

United States District Court
Northern District of California

1   individual named parties only" or as a class.  *See Dukes*, 564 U.S. at 348.

2   **III.   DISCUSSION**

3       Before turning to the motion for class certification, the Court will address the various

4   pending evidentiary motions.

5       **A.   *Daubert* Motions**

6       Both parties filed several motions to exclude the testimony of experts.  Federal Rule of

7   Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

12  Fed. R. Evid. 702.

13      Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See*

14  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance means that the

15  evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*,

16  510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.

17  2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to

18  relevance.") (internal quotation marks omitted).

19      Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the

20  knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure

21  reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate

22  such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at

23  564.  These factors are "helpful, not definitive," and a court has discretion to decide how to test

24  reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation

25  marks and footnotes omitted).  "When evaluating specialized or technical expert opinion

26  testimony, the relevant reliability concerns may focus upon personal knowledge or experience."

27  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (internal quotation marks

28

United States District Court
Northern District of California

7

omitted).

The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Cttee. Notes.

The Ninth Circuit has held that "in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.* Admissibility is also not sufficient: even if the evidence is admissible, the district court must then evaluate its persuasiveness during the class certification analysis. *See Ellis*, 657 F.3d at 982 (explaining that "the district court seems to have confused the *Daubert* standard it correctly applied to [Defendant's] motions to strike with the 'rigorous analysis' standard to be applied when analyzing commonality. Instead of judging the persuasiveness of the evidence presented, the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible."). The Ninth Circuit has also stated that it "license[s] greater evidentiary freedom at the class certification stage" and that courts should not "rely[ ] on formalistic evidentiary objections" to "exclude[ ] proof that tend[s] to support class certification." *Sali*, 909 F.3d at 1006.

### i. Motion to Exclude the Declaration and Testimony of June Kailes

Defendants move to exclude the declaration and testimony of June Kailes. Dkt. No. 346. The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 438, and Defendants filed a

United States District Court
Northern District of California

1    reply, Dkt. No. 486.

2         June Kailes "hold[s] a Bachelor's degree in Psychology from Hofstra University and a

3    Master's degree in social work from the University of Southern California." Dkt. No. 277-1

4    ("Kailes Decl.") ¶ 2.  Since 1985, Ms. Kailes has "worked as a disability policy consultant and

5    trainer" for various entities, offering "consulting and training services . . . related to integrating

6    access and functional needs into emergency planning, response, and recovery." *Id.*  Based on her

7    review of Brookdale's emergency evacuation policies and plans, Ms. Kailes opines that

8    Brookdale's emergency planning documents "reveal[] serious gaps in planning and many

9    deficiencies with regard to Brookdale's ability to meet the needs of its residents with mobility

10   and/or vision disabilities before and during an evacuation." *Id.* ¶ 18.  Ms. Kailes also opines that

11   "Brookdale's emergency plans and procedures also fail to ensure that accessible transportation is

12   provided to residents with mobility disabilities." *Id.* ¶ 27.

13        Brookdale argues that: 1) Ms. Kailes "considered limited, cherry-picked evidence and

14   failed to account for actual practices in place at the communities she purported to review," 2) Ms.

15   Kailes "failed to employ her admitted normal methodology for analyzing emergency evacuation

16   plans," 3) "contrary to the opinions offered in her declaration, Kailes admitted that the ADA does

17   not require emergency evacuation plans to contain any particular elements," and 4) Ms. Kailes

18   "fails to offer facts or opinions and provides only speculation that is inadmissible under relevant

19   case law authority and applicable rules."  Dkt. No. 346 at 8.

20        Brookdale first argues that Ms. Kailes's opinion should be excluded because her

21   methodology lacks a reliable scientific process.  But the Ninth Circuit has made clear that "[w]hen

22   evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may

23   focus upon personal knowledge or experience." *Sandoval-Mendoza*, 472 F.3d at 655.  The Court

24   is persuaded that Ms. Kailes's opinions are adequately based upon her extensive personal

25   knowledge and experience.

26        The Court further finds that none of Brookdale's other arguments show that Ms. Kailes's

27   opinions lack a "reliable foundation" or "relevan[ce] to the task at hand" for purposes of class

28   certification. *Daubert*, 509 U.S. at 597; *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d

United States District Court
Northern District of California

9

807, 813 (9th Cir. 2014) ("The judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." (quotations omitted)).

The Court **DENIES** Brookdale's motion to exclude the opinion of Ms. Kailes.

### ii.   Motion to Exclude the Declaration and Testimony of Douglas J. Cross

Defendants also move to exclude the declaration and testimony of Douglas J. Cross.  Dkt. No. 347.  The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 439, and Defendants filed a reply, Dkt. No. 485.

Mr. Cross holds a "Bachelor's degree in Urban Planning from the University of Cincinnati," is a "Certified Trainer for the Community Transportation Association of America (CTAA) for Passenger Service and Safety (PASS), a program for training drivers in proper assistance techniques for serving people with disabilities," and has worked since 2004 "as a transportation consultant and trainer for government entities and private businesses."  Dkt. No. 468-5 ("Cross Decl.") ¶¶ 2–4.  Based on his review of Brookdale's Fleet Safety Policy and other documents, Mr. Cross opined that Brookdale's policies "are out of compliance with applicable DOT regulations implementing the ADA by requiring residents who use electric wheelchairs, power chairs, or scooters to transfer to a bus seat or a manual wheelchair" and that Brookdale's policies also violate the ADA "by prohibiting scooter users and users who are not in 'approved' devices from boarding vehicles via lifts or ramps."  *Id.* ¶ 15.

Brookdale argues that Mr. Cross's testimony should be excluded because 1) his methodology is flawed, 2) he failed to base his opinions on sufficient data, 3) he "failed to examine how the very Fleet Safety Policy he claims violates the ADA comports with industry standards regarding boarding vehicles while seated on scooters," and 4) his opinions are impermissible legal conclusions.  Dkt. 347 at 8–9.

Brookdale argues that Mr. Cross failed to take into account deposition testimony and other evidence indicating that "community-specific practices vary from the written policies" he analyzed and that he failed to "seek out alternative sources of information."  *Id.* at 16.  Brookdale contends that "[l]acking any evidence that the Fleet Safety Policy was actually applied, Cross built his opinions on methodological errors, guesswork, and assumptions."  *Id.* at 18.  Brookdale further

argues that Mr. Cross failed "to incorporate relevant industry warnings regarding scooter use into his opinions of the Fleet Safety Policy." *Id.* at 21.  The Court finds that these considerations go to the weight that Mr. Cross's opinions should be given, not their admissibility. *Cf. Doyle v. Chrysler Grp. LLC*, No. SACV 13-00620 JVS, 2015 WL 353993, at *6 (C.D. Cal. Jan. 21, 2015) ("That counsel identified the relevant record for [the expert's] review is not unusual and does not render the opinion testimony inadmissible as unsupported by sufficient facts or data.  Deficiencies related to the failure of an expert to consider portions of the record not identified by counsel can easily be highlighted upon cross-examination of the expert; thus, any such deficiencies in this instance go to weight rather than admissibility.").

Brookdale also argues that Mr. Cross's "opinions that the Fleet Safety Policy, other operating procedures, and training guidelines are out of compliance with applicable DOT regulations implementing the ADA by requiring residents who use electric wheelchairs, power chairs, or scooters to transfer to a bus seat or a manual wheelchair, as well as his opinion that Brookdale's accessible transportation policies also violate the ADA and its regulations by prohibiting scooter users and users who are not in approved devices from boarding vehicles via lifts or ramps are legal conclusions."  Dkt. No. 347 at 22–23 (quotations omitted).  Brookdale further argues that Mr. Cross's opinion that "Brookdale Senior Living is covered by Title III of the ADA" is an impermissible legal opinion. *Id.* at 23.  Plaintiffs counter that Mr. Cross's testimony is helpful to the Court because he understands the concerns that went into formulating the regulations and how "they apply to real-world circumstances."  Dkt. No. 439 at 24.  Plaintiffs also contend that "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 24 (quoting *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1017 (9th Cir. 2004)).

The Court agrees with Brookdale: Mr. Cross's opinions that Brookdale's policies or practices are out of compliance with the ADA and its regulations are improper legal conclusions and therefore grants the motion as to these opinions. *See A.G. v. Paradise Valley Unified Sch.*

United States District Court
Northern District of California

*Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016) ("[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." (emphasis in original) (internal citations omitted) (quoting *Hangarter,* 373 F.3d at 1016)); *see also id.* (determining that the district court committed error when it relied on expert testimony that "some of the services that plaintiffs claim were necessary were not legally required by federal or state statute" because the expert "was not in a position to provide an expert *legal* opinion" (emphasis in original) (internal citations omitted)).

The Court **GRANTS IN PART and DENIES IN PART** Brookdale's motion to exclude the testimony of Mr. Cross as set forth above.

### iii. Motion to Exclude the Declaration and Testimony of Jeffrey Mastin and Gary Waters

Defendants next move to exclude the declarations and testimony of Jeffery Mastin and Gary Waters.  Dkt. No. 348.  The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 440, and Defendants filed a reply, Dkt. No. 488.

Mr. Mastin has a five-year architectural degree from California Polytechnic State University, is a licensed architect in California, and has been a specialist in disability accessibility since 1999.  Dkt. No. 284 ("Mastin Decl.") ¶ 2.  Mr. Waters received his Bachelor of Architecture from California Polytechnic Institute, is a licensed architect in California (with a license renewal pending) and provides "access management consulting services."  Dkt. No. 280 ("Waters Decl.") ¶ 3, 6.

Mr. Mastin conducted access surveys of several of Brookdale's California facilities and reviewed other evidence, "including relevant documents and deposition testimony."  Mastin Decl. ¶ 79.  Based on his review of the evidence and his experience, he concluded that "Brookdale has a policy and practice of disregarding its obligations under the ADA and the Unruh Act by failing to take the necessary steps to identify and remediate barriers to access in its California facilities that violate those provisions of law and their accompanying federal and state regulations and access standards." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Mr. Waters also conducted site inspections of Brookdale facilities.  Waters Decl.  ¶ 57.

2   Based on his own and Mr. Mastin's site inspections, Mr. Waters concluded that "Brookdale's

3   facilities contain repeated violations of the 2010 ADAS, the 1991 ADAAG and the CBC, which

4   appear throughout their facilities" and that "the widespread, repeated violations of these minimum

5   standards in all parts of Brookdale's facilities make it inevitable that any person with a mobility

6   and/or vision disability who resides at Brookdale's facilities will encounter significant access

7   barriers that will impact their entire experience and deny them full and equal enjoyment of the

8   facility and its accommodations."  Id. at ¶ 57, 61.

9    Brookdale argues that Mr. Mastin's and Mr. Waters' opinions should be excluded because

10   1) they "used unorthodox methods to conduct their work," 2) they "conducted their inspections

11   without knowing the dates the communities were constructed, when any alterations occurred, or

12   ultimately which standards they would use to discern whether any alleged access barriers exist,"

13   and 3) they both "impermissibly offer legal conclusions unconnected to any analysis and based

14   solely on their interpretation of the law."  Dkt. No 348 at 7–8.

15    First, Brookdale argues that "[t]he methodology employed by both Mastin and Waters to

16   assess potential barriers deviated from what they described as their own normal process and from

17   the methodology accepted in the scientific community."  Id. at 10.  One of Brookdale's main

18   issues with Mr. Mastin's and Mr. Waters' methodology is that they failed to take measurements of

19   certain access barriers.  Id. at 11–17.  Plaintiffs point out, however, that 1) Mr. Mastin never stated

20   that he would usually measure every feature or element so he did not deviate from his usual

21   methodology, 2) Defendants do not offer evidence that "it is the standard practice of other experts

22   in the field . . . to measure every element of every feature," 3) due to their experience, Mr. Mastin

23   and Mr. Waters "are well equipped to determine by observation, without precise measurements,

24   whether certain features are far outside of the dimensions required to be accessible," and 4)

25   "Defendants present no actual evidence, nor do they even contend, that the underlying data and

26   factual findings on which Mr. Mastin and Mr. Waters based their opinions included barriers that

27   were not measured and documented by them during the inspection process."  Dkt. No. 440 at 11–

28   14.  Plaintiffs also explain the reasons and justifications for Mr. Waters's method for measuring

13

door closing speeds.  *See* Dkt. No. 440 at 15–17.  The Court agrees that the opinions satisfy

*Daubert*.  "[B]ased on the particular circumstances of [this] particular case," the Court finds that

Mr. Mastin and Mr. Waters had "a reliable basis in the knowledge and experience of the relevant

discipline." *Primiano*, 598 F.3d at 564–65.

Brookdale also argues that Mr. Mastin and Mr. Waters "failed to ascertain the relevant

standards, if any, applicable to each facility prior to their inspections."  Dkt. No. 348 at 17.  But

for purposes of assessing reliability under *Daubert*, the Court agrees with Plaintiffs' argument that

"knowing the standard to apply is irrelevant at the time of the inspection because the data that is

collected at the inspection is not going to change regardless of the facility's construction date."

Dkt. No. 440 at 19.

Finally, Brookdale argues that Mr. Mastin and Mr. Waters "inappropriately offer legal

conclusions based on *ipse dixit* without any expert analysis" when they opine that "certain

communities are covered by Title III of the ADA."  Dkt. No. 348 at 18–19 (emphasis in original).

Based on the same analysis described above regarding Mr. Cross, the Court also finds that this

constitutes an improper legal opinion and grants the motion as to this opinion.  *See A.G.*, 815 F.3d

at 1207; *Hangarter,* 373 F.3d at 1016.  In any case, the Court does not need to and did not rely on

it for purposes of this order.  As Plaintiffs point out, the Court has previously "held that Brookdale

facilities are public accommodations subject to the ADA." *Stiner v. Brookdale Senior Living, Inc.*,

383 F. Supp. 3d 949, 956 (N.D. Cal. 2019).

The Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to exclude

the declaration and testimony of Mr. Mastin and Mr. Waters as set forth above.

### iv. Motion to Exclude the Declaration and Testimony of Cristina Flores

Defendants move to exclude the declaration and testimony of Cristina Flores.  Dkt. No.

350.[6]  The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 445, and Defendants

filed a reply, Dkt. No. 483–4.

---

[6] Dkt. No. 350 is the pending motion before the Court but it is a fully redacted document.  A
public version of this document is available at Dkt. No. 591-2 and the Court cites to this docket
entry going forward.

United States District Court
Northern District of California

United States District Court
Northern District of California

Dr. Flores is a licensed Registered Nurse in California.  Dkt. No. 276-10 ("Flores Decl.") ¶ 7.  Dr. Flores has a Bachelor of Sciences in Nursing from California State Dominguez Hills, a Masters in Gerontology—Long Term Care Administration from San Francisco State University, and a Ph.D. in Nursing Health Policy from the University of California, San Francisco.  *Id.*

Dr. Flores reviewed Brookdale policy and practice documents, Brookdale deposition testimony, Brookdale facility-specific raw data, and summaries of Brookdale-specific raw data.  *Id.* ¶ 22.  Dr. Flores used this information as the basis for a "simple math analysis," *id.*, which "mathematically calculates the labor time required each day to deliver all required line-item services to residents and compares this to the actual labor time available each day," *id.* ¶ 33.  Dr. Flores concluded that the six facilities she studied were all "chronically understaffed, and as a consequence, Brookdale residents were placed at a substantial and ongoing risk for not receiving required and promised services."  *Id.* ¶ 59.  Dr. Flores also opined that "[i]nformation obtained to date from the California Department of Social Services' Community Care Licensing (CCL) Division confirms the staffing issues."  *Id.* ¶ 79.

First, Brookdale argues that "Flores' opinion that Brookdale's 'staffing methodology' is 'defective' lacks any sound or reliable basis."  Dkt. No. 591-2 at 12.  Brookdale argues that Dr. Flores's methodology is defective because 1) Dr. Flores allegedly relies on a "misinterpretation" of Brookdale's data, 2) Dr. Flores's "opinion about the sufficiency of total task times is contradicted by her conclusion in other cases" and 3) Dr. Flores allegedly "retracted her opinion that Brookdale does not allocate the tasks times it previously found were necessary."  *Id.* at 12, 17, 19.

Brookdale further argues that Dr. Flores's opinions about the DSS staffing citations are unreliable and unhelpful.  *Id.* at 22.  Brookdale also takes issue with Dr. Flores's "simple math" analysis.  *Id.*  Brookdale argues that this method did not account for certain scenarios (such as "the impact of combining care tasks together" and "the impact of having caregivers assist multiple residents simultaneously").  *Id.* at 22–23.  Brookdale also contends that Dr. Flores's simple math analysis is unhelpful because it "does nothing to advance a material aspect of this case."  *Id.* at 24.  According to Brookdale, the simple methodology "does not satisfy even one of the *Daubert*

factors." *Id.* at 26.  Finally, Brookdale argues that Dr. Flores did not reliably apply her simple math analysis to the facts of the case.  *Id.* at 28.

The Court is not persuaded by Brookdale's arguments.  The Court finds that none of Brookdale's arguments show that Dr. Flores's opinions lack a "reliable foundation" or "relevan[ce] to the task at hand" for purposes of class certification. *Daubert*, 509 U.S. at 597; *Pyramid Techs.*, 752 F.3d at 813.  Dr. Flores's personal knowledge and experience provide sufficient support for her opinions.  Further, disputes regarding the data Dr. Flores took into account go to the weight of her opinion rather than its admissibility.  *See* Fed. R. Evid. 702 Advisory Committee Note (2000 Amendment) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").  In sum, "[b]ased on the particular circumstances of [this] particular case," the Court finds that Dr. Flores's opinions had "a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.

The Court **DENIES** Brookdale's motion to exclude the opinion of Dr. Flores.

> **v.     Motion to Exclude the Declaration and Testimony of Dale Schroyer**

Defendants move to exclude the declaration and testimony of Dale Schroyer.  Dkt. No. 353.[7]  The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 444, and Defendants filed a reply, Dkt. No. 482.

Mr. Schroyer is "a systems engineer and Senior Consultant" at ProModel/MedModel.  Dkt. No. 277-5 ("Schroyer Decl.") ¶ 4.  Mr. Schroyer has a Bachelor of Science degree in Mechanical Engineering from the University of Michigan—Ann Arbor and a Master's degree in Management Science from Lesley University.  *Id.* ¶ 26.  Mr. Schroyer based his "DES testing, failure analysis, and opinions" on Brookdale facility-specific raw data and floor plans (for the selected facilities),

---

[7] Dkt. No. 353 is the pending motion before the Court but it is a fully redacted document.  A public version of this document is available at Dkt. No. 591-1 and the Court cites to this docket entry going forward.

United States District Court
Northern District of California

summaries of voluminous Brookdale facility-specific raw data, Brookdale policy and practice documents, and general inputs and programming logic. *Id.* ¶ 32. Mr. Schroyer ran "over 1.3 million MedModel DES tests and failure analyses . . . related to the 6 Brookdale California facilities (an average of over 210,000 engineering tests per facility) for those days during the 3-year timeframe for which Brookdale produced complete or substantially complete data." *Id.* ¶ 76 (emphasis removed). According to Mr. Schroyer, this testing showed a "pattern and practice of significant understaffing at each of the tested facilities" which placed "residents of the 6 selected Brookdale facilities . . . at a substantial and ongoing risk for not receiving required services." *Id.* ¶ 77.

Brookdale admits that "DES is not an inherently unreliable tool for evaluating and guiding staffing decisions in certain industries" but argues that Mr. Schroyer's opinions should be excluded because "there is too great an analytical gap" between the opinions he offers and the model on which he relied." Dkt. No. 591-1 at 11. Brookdale argues that Mr. Schroyer had "no reliable basis for using his DES model" to conclude that there was systematic understaffing at the communities and that "it was physically impossible for the staff to deliver the care required" by the residents. *Id.* at 12.

Brookdale also argues that Mr. Schroyer "expressly disregarded the rigors he admits are required to generate reliable conclusions from the DES model." *Id.* at 15. Brookdale contends that Mr. Schroyer's model was based on unverified assumptions and invalid data, and that Mr. Schroyer "failed to conduct at least two critical types of validation experts employ in the field when conducting a reliable and rigorous DES model." *Id.* at 15, 23.

The Court does not find Brookdale's arguments persuasive. In his declaration, Mr. Schroyer explains the use of MedModel in Assisted Living Facilities. *See* Schroyer Decl. ¶¶ 18–20; *see also* Dkt. No. 443-5 ("Schroyer Opp. Decl.") ¶ 16. The Court is satisfied with Mr. Schroyer's explanations and does not find Defendants' arguments on reply that Mr. Schroyer's application of the DES Model to the ALF industry was flawed to be persuasive. *See* Dkt. No. 482 at 7–11. Further, Plaintiffs point out that Mr. Schroyer addresses the general *Daubert* factors. Dkt. 444 at 13–16. Mr. Schroyer also enumerates the "numerous validation techniques utilized in

the Brookdale DES testing." Schroyer Opp. Decl. ¶ 40.

The Court finds that Mr. Schroyer's opinions are not so inherently unreliable or irrelevant that they should be excluded at the class certification stage. *Cf. Sali,* 909 F.3d at 1006. (noting that the Ninth Circuit "license[s] greater evidentiary freedom at the class certification stage").

The Court **DENIES** Brookdale's motion to exclude the opinion of Mr. Schroyer.

### vi.    Motion to Exclude the Declaration and Testimony of Patrick Kennedy

Defendants move to exclude the declaration and testimony of Patrick Kennedy.  Dkt. No. 355.  The motion is fully briefed: Plaintiffs filed an opposition, Dkt. No. 442, and Defendants filed a reply, Dkt. No. 487.

Dr. Kennedy has a Bachelor of Arts in Economics from the University of California, San Diego and a Doctorate in Economics from Stanford University.  Dkt. No. 468-6 ("Kennedy Decl."), Ex. A.  Dr. Kennedy opines that "class wide damages can be reliably quantified using a commonly applied methodology and reliable data."  Kennedy Decl. ¶ 71.

Brookdale makes four arguments regarding an alleged mismatch between Dr. Kennedy's model and Plaintiffs' theory of injury and the model's ability to accurately quantify damages that are based on actual injury.  Brookdale first argues that Dr. Kennedy's opinion should be excluded because he "fails to measure damages from Plaintiffs' claim of purported misrepresentation."  Dkt. No. 355 at 13.  Brookdale explains that "[a]lthough Plaintiffs base their claims on a supposed representation that they would receive particular services, Kennedy fails to measures damages associated with services Defendants failed to provide or Plaintiffs allegedly failed to receive."  *Id.*  Plaintiffs respond that "Dr. Kennedy proposes a damages model designed to determine the difference between what was paid by class members and what a reasonable consumer would have paid without the allegedly misrepresented or omitted information" which aligns with their theory of injury.  Dkt. No. 442 at 13–18.

Second, Brookdale argues that "[s]ince Kennedy's model only measures damages relating to an alleged 'staffing shortfall,' it cannot account for variables that affect the price of services."  Dkt. No. 355 at 17.  Plaintiffs respond that "[t]he market prices used by Dr. Kennedy were set by Brookdale (the supplier)" and "reflect the meeting point between supply-side willingness to sell

United States District Court
Northern District of California

and the demand-side willingness to pay."  Dkt. No. 442 at 19.  Plaintiffs also note that "the court

in *Heredia* found at the class certification stage that it was appropriate to base a damages analysis

on the defendants' own pricing model and found no fault with the model proposed there by Dr.

Kennedy, the same model he proposes here."  *Id.* at 20 (citing *Heredia v. Sunrise Senior Living,*

*LLC*, No. 818CV01974JLSJDE, 2021 WL 6104188, at *12 (C.D. Cal. Nov. 16, 2021)).

Third, Brookdale argues that "[t]he Court also should exclude Kennedy's model because it

assigns damages to individuals irrespective of whether they suffered any injury.  As a result, it is

irrelevant and not helpful to the Court in determining whether to certify any class."  Dkt. No. 355

at 19.  Plaintiffs respond that Defendants' argument is premised on a misunderstanding of

Plaintiffs' theory of injury.  Dkt. No. 442 at 21.

Fourth, Brookdale argues that "[a] model quantifying the amount paid for services on a

given day and relying on a community's alleged 'staffing shortfall' to provide or not provide an

offset is simply not relevant to the claims asserted in this case."  Dkt. No. 355 at 27.

The Court finds that these arguments, which relate to what Dr. Kennedy's model does and

does not measure and whether it aligns with Plaintiffs' theory of injury, go to the weight to be

given to Dr. Kennedy's model and not its admissibility.

Brookdale also argues that Dr. Kennedy's model "is entirely reliant on the inputs from the

work of Flores and Schroyer" and "[t]o the extent those inputs are flawed, for example, because

Flores and Schroyer considered only hours worked by certain non-exempt personnel, or failed to

take into consideration any effects of the COVID-19 pandemic, Kennedy's model is also flawed."

Dkt. No. 355 at 23.  The Court finds that this argument also goes to the weight to be given to Dr.

Kennedy's model and not its admissibility: the Court has determined that Dr. Flores's and Mr.

Schroyer's opinions are admissible, so unless Dr. Kennedy used them impermissibly, his use of

their findings does not make his opinions inadmissible.

On the issue of whether Dr. Kennedy impermissibly used Dr. Flores's and Mr. Schroyer's

opinions, the Court agrees with Plaintiffs that "[h]ere, Dr. Kennedy, a damages expert, looks to the

findings and conclusions of Mr. Schroyer and Dr. Flores about the staffing of Brookdale's

facilities to explain how those findings and conclusions could be used in his damages model.  He

United States District Court
Northern District of California

1    is not offering an opinion on Brookdale's staffing methodology or the staffing shortfalls that Dr.

2    Flores identified.  Nor could he do so, as he lacks expertise in that area."  Dkt. No. 442 at 24.  The

3    Court finds that Dr. Kennedy's reliance on Dr. Flores's or Mr. Schroyer's opinions did not run

4    afoul of *Daubert*.

5            Brookdale then argues that "Kennedy's opinions as to statutory damages are exercises in

6    simple math without reliable inputs" that are "not properly the subject of expert testimony."  Dkt.

7    No. 355 at 26.  The Court disagrees, because Dr. Kennedy's opinion could "help the trier of fact to

8    understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

9            The Court finds that none of Brookdale's arguments show that Dr. Kennedy's opinions

10   lack a reliable foundation or relevance to the task at hand for purposes of class certification.   The

11   Court thus **DENIES** Brookdale's motion to exclude the testimony of Dr. Kennedy.

12           **vii.     Motion to Exclude Certain Testimony and Opinions of Douglas Anderson**

13           Plaintiffs move to exclude the declaration of Douglas Anderson.  Dkt. No. 516-1.[8]  The

14   motion is fully briefed: Defendants filed an opposition, Dkt. No. 526, and Defendants filed a

15   reply, Dkt. No. 534.

16           Mr. Anderson is a "a Partner at LCM Architects ("LCM"), a Chicago-based architectural

17   firm that specializes in accessible design requirements of Title III of the Americans with

18   Disabilities Act . . . and federal, state, and local disability access laws."  Dkt. No. 377-1 ¶ 1.

19   Based upon his review of Plaintiffs' experts' reports and his own "on-site review of actual

20   conditions," Mr. Anderson opined that Mr. Mastin's and Mr. Waters' findings had several

21   shortcomings, including, among other things, a flawed survey methodology, the use of

22   nontraditional tools, and survey and reporting errors.  *Id.*  ¶¶ 47–60.

23           Plaintiffs argue that Mr. Anderson's following opinions should be excluded: 1) "[a]

24   facility's construction history must be researched before an onsite survey of the facility can be

25   undertaken," 2) "Plaintiffs' experts improperly used new construction standards in the 1991

26   ADAAG and 2010 ADAS and the 2016 and 2019 CBC to evaluate compliance of all 40 facilities

27

28   ───────────────
     [8] Plaintiffs originally filed the motion as Dkt. No. 510 but submitted a corrected version at Dkt.
     No. 516-1.

United States District Court
Northern District of California

they inspected," 3) "[a] modification to a facility qualifies as an equivalent facilitation if a resident

requested it," 4) "[i]n residential facilities generally, only limited areas are open to the public and

covered by the ADA," 5) "Brookdale's facilities are not susceptible to a common analysis of their

accessibility because they were not constructed from prototype plans and were constructed at

different times, by different owners, managers, contractors, and architects," 6) "'Plaintiffs' experts

did not follow proper methodology for surveying existing facilities in that they evaluated the

Communities as new construction using the 2016 CBC and the 1991 and 2010 ADA Standards.'

'None of the standards used by Plaintiffs' experts may apply to the construction of these facilities

– and certainly none of these communities should have been surveyed as newly-constructed

facilities,'" and 7) "we found many incorrect measurements in our review of Plaintiffs' experts'

reports such as the toilet compartment at North Euclid pictured below." *See generally* Dkt. No.

516-1.

Plaintiffs make several arguments in support of their motion but the Court finds that none

of them show that Mr. Anderson's opinions lack a reliable foundation or relevance to the task at

hand for purposes of class certification.   The majority of Plaintiffs' arguments, for example,

critique Mr. Anderson's selection of the documents he chose to review to evaluate Plaintiffs'

experts' methodology.  *See* Dkt. No. 516-1 at 5–9.  As Defendants argue, this goes to the "the

weight of his testimony, not admissibility."  Dkt. No. 526 at 13 (citing *Hangarter*, 373 F.3d at

1017.

The Court finds Plaintiffs' other arguments similarly unpersuasive and **DENIES** their

motion to exclude the testimony of Dr. Anderson.

### viii.   Motion to Exclude Certain Testimony and Opinions of Sheldon Jacobson and Ali Saad

Plaintiffs next move to exclude certain testimony and opinions of Sheldon Jacobson and

Ali Saad.  Dkt. No. 511.  The motion is fully briefed: Defendants filed an opposition, Dkt. No.

523, and Plaintiffs filed a reply, Dkt. No. 538-2.

Dr. Jacobson is a Founder Professor of Engineering in the Department of Computer

Science and Director of the Simulation and Optimization Laboratory at the University of Illinois at

Urbana-Champaign.  Dkt. No. 377-2 ¶ 5.  He has a Bachelor of Science and a Master of Science in Mathematics from McGill University and wrote his PhD dissertation on Discrete Event Simulation ("DES") output analysis at Cornell University.  *Id.*  He has also taught DES courses at multiple education institutions.  *Id.*

Dr. Saad is a labor economist and applied statistician and holds a Ph. D. in economics from the University of Chicago and a B.A. in history and economics from the University of Pennsylvania.  *See* Dkt. No. 591-3 ¶¶ 1–2.

Plaintiffs first argue that some opinions by Dr. Jacobson and Dr. Saad should be excluded because they are not staffing experts.  *See* Dkt. No. 511 at 6–18.  Plaintiffs also specifically argue that Dr. Saad's opinions about the inputs used by Dr. Flores and Mr. Schroyer should be excluded because he is not an expert in staffing or any aspect of the operation of ALFs, has no experience or expertise in DES, and his firm did not perform any DES simulation to test Mr. Schroyer's DES Model.  *See id.* at 14–18.  Plaintiffs also argue that Dr. Saad's data related opinions should be excluded because "Dr. Saad's data analysis and programming suffers from errors and miscalculations and improper assumptions, rendering his critique of Plaintiffs' experts unreliable and irrelevant."  Dkt. No. 511 at 18.

Brookdale generally responds that the motion should be denied because it "cites to and relies on four new expert reports, including reports from two brand new experts never previously disclosed."  Dkt. No. 523 at 7.  The Court agrees with Defendants that the new reports are untimely, and improper to the extent they contain any new opinions.

As to the substance of the reports, Defendants argue that neither Dr. Jacobson nor Dr. Saad need to be experts in staffing or the ALF industry more broadly to be qualified to provide their opinions.  The Court agrees that both experts are qualified to provide their respective opinions.  "Rule 702 requires that a testifying expert be qualified as an expert by knowledge, skill, experience, training, or education" but "contemplates a *broad conception* of expert qualifications."  *Hangarter*, 373 F.3d at 1015 (emphasis in original).  Dr. Jacobson's opinions are mostly focused on a critique of Dr. Schroyer's DES analysis.  As an engineering professor who has taught several courses on DES and who wrote his dissertation on DES output analysis, *see* Dkt. No. 377-2 ¶ 5,

Dr. Jacobson is qualified to give the opinions he provides. Dr. Saad's declaration largely critiques Dr. Kennedy's damages model (and Dr. Flores's and Mr. Schroyer's opinions, to the extent Dr. Kennedy used their opinions as input). The Court finds that as a labor economist and applied statistician, Dr. Saad is qualified to provide the opinions he does. In reply, the Plaintiffs highlight specific opinions that they believe Dr. Jacobson and Dr. Saad were not qualified to make. *See* Dkt. No. 538-2 at 6–14. These arguments go to the weight of the opinions rather than to their admissibility.

Brookdale argues that Plaintiffs' substantive reasons for excluding Dr. Saad's and Dr. Jacobson's opinions are largely supported by the untimely new expert reports. Dkt. No. 523 at 23. Brookdale also argues that "disagreement amongst experts is an insufficient basis for exclusion." *Id*. The Court agrees. The issues Plaintiffs take with Dr. Jacobson's and Dr. Saad's opinions go to the weight of the opinions rather than the admissibility.

Accordingly, the Court **DENIES** Plaintiffs' motion to exclude the testimony of Dr. Jacobson and Dr. Saad.

### B.   Motions to Strike

#### i.   Objections to Reply Evidence

Brookdale contends that Plaintiffs' reply brief is accompanied by nine new expert declarations, three new attorney declarations, and hundreds of new exhibits, none of which were included with Plaintiffs' original motion for class certification. *See* Dkt. No. 518 at 2. Brookdale objects to Plaintiffs' new reply evidence and asks the Court to decline to consider the evidence in ruling on the Motion. *Id.*

The stipulated Scheduling Order and subsequent modifications required Plaintiffs to submit any expert witness testimony in support of their Motion, in the form of expert declarations or otherwise, with their Motion in August 2021. *See* Dkt Nos. 206, 315. The parties' schedule also required Plaintiffs to produce their expert witnesses for deposition no later than December 14, 2021, which was 75 days after they filed the Motion. *See* Dkt. No. 315. The Court set an extremely extended briefing schedule that accommodated expert discovery so that all expert issues could be vetted before the reply. In accordance with the Scheduling Order, Plaintiffs' Motion

23

disclosed seven expert reports in support of class certification, and Defendants timely deposed these experts in advance of their Opposition to the Motion and related *Daubert* motions.  *See* Dkt Nos. 279–300, 518 at 3.

On May 19, 2022, Plaintiffs filed their Reply.  Dkt. No. 506.  Defendants contend, and Plaintiffs have not disputed, that Plaintiffs accompanied their Reply with: (i) nine new expert reports; and (ii) three attorney declarations attaching hundreds of new exhibits.  *See id.*  Plaintiffs do not dispute that they submitted new evidence in the form of expert and attorney declarations with the Reply.  Instead, they contend that their reply declarations and evidence are proper because they "respond directly to the arguments made in Defendants' brief or their expert declarations filed in opposition to class certification."  *See* Dkt. No. 527 at 2.

Generally, "reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion."  *Burnham v. City of Rohnert Park*, 1992 WL 672965, at *1 n. 2 (N.D. Cal. May 18, 1992) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990)).  New evidence submitted as part of a reply is improper because it does not allow the defendant an adequate opportunity to respond.  *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) (citations omitted).  For this reason, the district court may decline to consider new evidence or arguments raised in reply, and generally "should not consider the new evidence without giving the non-movant an opportunity to respond."  *Id.* (citations omitted); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("We agree with the Seventh Circuit, which held that '[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.'")

In deciding this order, the Court only considered limited, discrete parts of the Wallace Reply Declaration and the Kailes Reply Declaration, and considered the entirety of the Kennedy Reply Declaration.  The Court considered certain parts of the Wallace Reply Declaration that directly respond to the argument that Defendants made in their opposition that they did not operate or manage Brookdale's California assisted living facilities.  *See* Opp. at 17–18; Dkt. No. 506-1 ("Wallace Reply Decl.")  ¶¶ 2–49 and related exhibits.  The Court also considered the Kailes

24

Reply Declaration for its contention that the emergency evacuation plans were all deficient in similar ways, *see e.g.*, Dkt. No. 506-12 ("Kailes Reply Decl.") ¶¶ 5–24, which was a response to Defendants' opposition argument that Plaintiffs would not be able to show that there was a common emergency policy, *see* Opp. 32–36. Finally, the Court also considered Dr. Kennedy's reply declaration which refuted Defendants' proposed damages model as inapposite, *see* Dkt. No. 506-13 ("Kennedy Reply Decl.") ¶¶ 5–40, and restated opinions that Dr. Kennedy provided in his initial declaration. The Court does not find that any of these discrete arguments or evidence are improper new reply material. *Cf. Sali*, 909 F.3d at 1006 (explaining that a district court should have considered certain declarations for the purposes of class certification instead of leaning "on evidentiary formalism in striking those declarations as 'new evidence' submitted in reply").

The Court therefore **DENIES** Defendants' motion to strike as to these limited, directly responsive aspects of the record. The Court finds that the remainder of the evidence was improperly submitted based on the scheduling order and the agreed-upon process, which did not contemplate (or even discuss) the submission of massive amounts of new material, proffered by brand new experts, on reply. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) (finding that "[s]lipping . . . new arguments into a rebuttal report was a clear-cut form of sandbagging and was simply unfair"). However, given the ultimate basis for the Court's ruling on the class certification motion, as detailed below, it did not need to consider or rely on any of the other evidence Defendants seek to strike. Accordingly, the Court **DENIES AS MOOT** Defendant's motion as to the remainder of the evidence.

### ii.   Motion to Strike the Supplemental Declaration of Ali Saad

Plaintiffs filed a motion to exclude the supplemental declaration of Ali Saad. Dkt. No. 504. The motion is fully briefed: Defendants filed an opposition, Dkt. No. 517, and Defendants filed a reply, Dkt. No. 528.

The Court does not rely on the supplemental declaration of Dr. Saad in this order and therefore **DENIES AS MOOT** Plaintiffs' motion to strike.

### iii.   Motion to Strike Improper Attorney Declarations

Defendants filed a motion to strike the reply declarations of Plaintiffs' counsel Guy B.

25

Wallace (Wallace Reply Decl.), Rachel L. Steyer (Dkt. No. 506-5 ("Steyer Reply Decl.")), and

Benjamin Bien-Kahn (Dkt. No. 506-7 ("Bien-Kahn Reply Decl.")).  Dkt. No. 525.  The motion is

fully briefed: Plaintiffs filed an opposition, Dkt. No. 543, and Defendants filed a reply, Dkt. No.

544.

Defendants argue that Plaintiff's counsel "assert numerous improper conclusions and

arguments in their Declarations in violation of Local Rule 7-5(b).  Dkt. No. 525 at 4.  Plaintiffs in

turn argue that Defendants violated the local rules with their motion because the "Local Rules

prohibit the submission of any additional memoranda or papers without prior court approval after the

filing of the reply in support of a motion, other than either a five-page pleading with evidentiary

objections or a notice of new authority."  Dkt. No. 543 at 2 (citing L.R. 7-3(d)).

Local Rule 7-5(b) provides that "[a]n affidavit or declaration may contain only facts . . . and

must avoid conclusions and argument."  L.R. 7-5(b).  The Court agrees with Brookdale that these three

declarations include "numerous improper conclusions and arguments . . . in violation of Local Rule 7-

5(b)."  Dkt. No. 525 at 4.  The Court, however, does not rely on any of the declarations at issue in this

order, with one discrete exception: the Court considered parts of the Wallace Reply declaration that

responded to Brookdale's ownership argument.  The Court finds that paragraphs 2–49 of the

Wallace declaration do not contain improper conclusions or arguments and are admissible.

The Court **DENIES** Defendants' motion to strike as to paragraphs 2–49 of the Wallace

Reply Declaration and related exhibits, and **DENIES** the motion **AS MOOT** as to the other parts

of the Wallace Reply Declaration, the Steyer Reply Declaration, and the Bien-Kahn Reply

Declaration.

### C.   Standing

As a preliminary matter, Brookdale contends that Plaintiffs' proposed classes are

improperly defined to include numerous individuals who have not suffered any "concrete" injury

under Article III.  Opp. at 24.  To determine who (if anyone) suffered a concrete harm, Brookdale

contends, the Court will have to engage in a host of highly individualized inquiries specific to each

putative class member.  *Id.* at 25.  For the reasons explained below, the Court will address

Brookdale's argument as part of the Rule 23 analysis.

United States District Court
Northern District of California

To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the alleged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And to fulfill the first element, a plaintiff must have suffered an injury that is both "concrete and particularized." *Id.* at 339. Further, "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (quoting *Spokeo*, 578 U.S. 330 at 341). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2208. In this Circuit, "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Melendres v. Arpaio*, 784 F.3d 1254, 1261–62 (9th Cir. 2015). Any remaining issues about the relationship between the class representative and class members—including dissimilarity in injuries suffered—"are relevant only to class certification, not to standing." *Id.* at 1262.

### i. Claims Asserted by the Mobilities and Vision Impaired Class and the Disabilities Class

All the Named Plaintiffs state that they were or are residents with disabilities who have encountered numerous barriers that, they contend, denied them full and equal access to Brookdale's facilities. Mot. at 37; *see also* Dkt. No. 291 ("Stiner Decl.") ¶¶ 19, 20; Dkt. No. 293 ("Carlson Decl.") ¶ 18; Dkt. No. 295 ("Vallette Decl.") ¶ 23; Dkt. No. 296 ("Lytle Decl.") ¶ 21; Dkt. No. 299 ("Jestrabek-Hart Decl.") ¶¶ 28; Dkt. No. 298 ("Lindstrom Decl.") ¶ 12; Dkt. No. 297 ("Fisher Decl.") ¶ 32; Dkt. No. 300 ("Algarme Decl") ¶ 23. These allegations constitute concrete ADA injuries in this Circuit. *See Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) ("The standard for injury in fact is whether [plaintiff] has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility."); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950 (9th Cir. 2011) (en banc). As to the transportation claims, Named Plaintiff Algarme states that she was required to transfer from her wheelchair to a seat on the facility's transportation

United States District Court
Northern District of California

van.  *See* Algarme Decl. ¶ 21.  Named Plaintiffs Stiner and Jestrabek-Hart make similar claims, *see* Stiner Decl. ¶ 17 and Jestrabek-Hart Decl. ¶¶ 23, 25, and Named Plaintiff Carlson's representative states that the fact that the facility's van only had space for one or two wheelchairs limited how often Carlson and other residents could use the transportation services, *see* Carlson Decl. ¶ 20.  As to the emergency evacuation claims, Named Plaintiff Jestrabek-Hart alleges that as a result, in part, of Brookdale's "failure to plan for emergencies," she had to wait for "three to four hours before firefighters arrived to assist people who could not walk up the stairs" during a power outage in 2018.  Jestrabek-Hart Decl. ¶ 31.  Named Plaintiff Jestrabek-Hart further alleges that she was unable to use her continuous positive airway pressure (CPAP) machine during the outage because Brookdale Scotts Valley only had one generator-powered electrical outlet, "which was located on the first floor near the nurse's office."  *Id.* ¶ 32.  Regarding the understaffing claims, each of the Named Plaintiffs also alleges that they did not receive timely assistance with an activity of daily living. *See* Stiner Decl. ¶ 10; Carlson Decl. ¶ 13; Vallette Decl. ¶ 15; Lytle Decl. ¶ 14; Jestrabek-Hart Decl. ¶ 12; Lindstrom Decl. ¶ 9; Fisher Decl. ¶ 21; Algarme Decl. ¶ 11.

The Court accordingly concludes that the Named Plaintiffs have standing to bring the claims asserted by the Mobility and Vision Impaired and the Disabilities Classes, and that is enough to satisfy Article III at the class certification stage.  *See Melendres*, 784 F.3d at 1261.[9]  However, the Court will consider the extent to which it will eventually have to engage in

---

[9] Under *TransUnion*, "[e]very class member must have Article III standing in order to recover individual damages" because Article III "does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."  141 S. Ct. at 2207–08 (2021) (citations omitted).  But that case did not address whether every class member must be shown to have standing at the class certification stage.  *See id.* at 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class." (emphasis in original)).  On this point, the Ninth Circuit had previously said that "[n]o class may be certified that contains members lacking Article III standing."  *Mazza*, 666 F.3d at 594.  But more recently, after the Supreme Court's decision in *TransUnion*, the Ninth Circuit clarified that that statement "does not apply when a court is certifying a class seeking injunctive or other equitable relief." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022).  At bottom, although *TransUnion* calls into question whether courts at the class certification stage should assess the standing of putative class members, it ultimately provides no basis for this Court to disregard binding Ninth Circuit law on point.  *See also Lauderdale v. NFP Ret., Inc.*, No. SA-CV-2:13-01-JVS-KESX, 2022 WL 1599916, at *4 (C.D. Cal. Feb. 16, 2022) ("Nothing in *TransUnion* indicates that it changed settled Ninth Circuit law regarding what it is required to demonstrate standing at the class certification stage.").

United States District Court
Northern District of California

1    individualized inquiries to determine whether each of the putative class members has standing as

2    part of the Rule 23 inquiry.

3        **ii.    Claims Asserted by the Misleading Statements and Omissions Class**

4        Regarding the claims brought by the Misleading Statements and Omissions Class,

5    Defendants argue that Plaintiffs' "'legal injury' theory is not sufficient to establish standing"

6    under *TransUnion* for the misleading statements and omissions class because "exposure to

7    Defendants' alleged staffing policies, without more, cannot give rise to an actual injury. Nor can

8    an alleged risk that those policies will result in a deprivation of promised services give rise to an

9    actual injury." Opp. at 27.  This class alleges economic harm.  *See e.g.*, TAC ¶ 284 ("As a direct

10   and proximate result of Defendants' conduct, Plaintiffs . . . have been harmed and continue to be

11   harmed.  Among other things, they paid money to Defendants to enter the facilities and/or for

12   services that were not provided or that were substandard to those promised by Defendants.").

13   Plaintiffs argue in their class certification motion that "[t]he payment of money coupled with

14   exposure to Brookdale's (undisclosed) defective staffing policies constitute legal injury for all

15   class members."  Mot. at 48.

16       The Named Plaintiffs aver in declarations that they would not have made the purchase at

17   the price they did (or perhaps even at all) but for Brookdale's alleged misrepresentations and/or

18   omissions.  *See* Stiner Decl. ¶ 26; Carlson Decl. ¶ 23; Vallette Decl. ¶ 32; Lytle Decl. ¶ 11;

19   Jestrabek-Hart Decl. ¶ 36; Lindstrom Decl. ¶ 15; Fisher Decl. ¶ 36; Algarme Decl. ¶ 28.  The

20   Named Plaintiffs also aver in those declarations that they experienced certain deprivations of

21   services.  *See e.g.*, Stiner Decl. ¶¶ 8-16; Carlson Decl. ¶¶ 12-17; Vallette Decl. ¶¶ 11-21; Lytle

22   Decl. ¶¶ 12-20; Jestrabek-Hart Decl. ¶¶ 10-21; Lindstrom Decl. ¶¶ 8-11; Fisher Decl. ¶¶ 17-31;

23   Algarme Decl. ¶¶ 7-14.

24       Defendant's argument is foreclosed by Ninth Circuit authority holding that "when a

25   consumer purchases merchandise on the basis of [a misrepresentation], and when the consumer

26   alleges that he would not have made the purchase but for the misrepresentation, he has standing to

27   sue under the UCL . . . because he has suffered an economic injury."  *Hinojos v. Kohl's Corp.*, 718

28   F.3d 1098, 1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013).

United States District Court
Northern District of California

*Hinojos* is not clearly irreconcilable with *TransUnion*, and the Court therefore must follow it here: the Named Plaintiffs have individual standing to bring their misleading statements and omissions class claims under this theory of injury. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (cautioning that only in cases of "clear irreconcilability" can district courts "consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled"); *see also Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (explaining that "[t]his is a high standard," which "requires [the district court] to look at more than the surface conclusions of the competing authority" (quotation omitted)).

As with the other claims, the Court will consider the extent to which it will eventually have to engage in individualized inquiries to determine whether each of the putative class members has standing as part of the Rule 23 inquiry.

**D.  Class Certification**

　　**i.  Preliminary Matters**

　　　　**a.  Numerosity**

Brookdale contends that Plaintiffs have not "established a sufficient number of individuals who qualify for membership in their proposed classes." Opp. at 15. Plaintiffs' proposed classes are defined to include only those "persons . . . who reside or have resided at a residential care facility for the elderly located in California and *owned, operated and/or managed* by Brookdale." Mot. at 13 (emphasis added). By that definition, Brookdale argues, there are zero class members because the Facilities are actually owned and operated by various other entities who are not parties to this lawsuit. *See* Opp. at 16–18; Dkt. No. 427 (Def. Ex. 271). In response, Plaintiffs argue that Brookdale's argument fails because it has repeatedly represented that it operates, manages, or controls the Facilities—both in public and in sworn filings during the four years of this litigation. Reply at 8.[10]

_____

[10] In support of its argument, Plaintiffs filed a request seeking judicial notice of certain Brookdale SEC forms and court filings from other cases. Dkt. No. 507 ("RJN"). Brookdale objected to the RJN, Dkt. No. 524, and Plaintiffs filed a reply, Dkt. No. 536. The Court takes "judicial notice of [these] matters of public record," but does not "take judicial notice of disputed facts contained in

United States District Court
Northern District of California

The Court agrees with Plaintiffs.  As Plaintiffs note, Brookdale's Answer, discovery responses, other filings in this case, and public statements plainly admit to controlling or operating the facilities where Plaintiffs live or lived.  *See* Wallace Reply Decl. ¶¶ 2–49; *see also* Dkt. No. 110 ("Answer") ¶ 2 ("Defendants admit that they operate communities in California where the named Plaintiffs live or lived.").  Moreover, Brookdale's own sources of evidence indicate that many (if not all) of the various entities that Brookdale contends license or operate the Facilities are its subsidiaries and/or predecessors-in-interest.  For example, most of the Facilities at issue in this case are either licensed or managed by "Emeritus Corporation."  *See* Dkt. No. 427 (Def. Ex. 271).  And Brookdale has represented—in this very lawsuit—that it acquired Emeritus Corporation in 2014 and has characterized Emeritus as one of its wholly owned subsidiaries.[11]

Brookdale's characterization of these admissions is that it only admitted ownership of the Facilities because Plaintiffs' interrogatories defined "Brookdale" broadly to include any "subsidiary, division, related company, officer, director, partner, employee, agent, board of directors, board member, and representative" of the named defendants.  Opp. at 18; Dkt. No. 411-8 at 4.  But that of course does not explain why Brookdale admitted to owning or operating the Facilities in any of the other filings, including the Answer.  *See generally* Answer.  Given these admissions and the other evidence in the record, Brookdale cannot now dodge a finding of numerosity by arguing that there are no class members because it does not own, operate, or manage the residences at issue.

Accordingly, each of the classes has enough proposed members to satisfy Rule 23(a)(1),

such public records."  *Khoja v. Orexigen Therapeutics,* 899 F.3d 988, 999 (9th Cir. 2018) (citation and quotations omitted).  Although the Court does not take judicial notice of the *truth* of Brookdale's representations, it does take judicial notice of the fact that Brookdale *made* these representations in settings in which accuracy is obviously important.  *See Plaskett v. Wormuth,* 18 F.4th 1072, 1084 n.6 (9th Cir. 2021) (explaining that "[w]e do not take judicial notice of the truth of the factual assertions contained in the parties' correspondence with one another or with the EEOC, but only of the fact that the parties have *made* these competing representations" (emphasis in original)).

[11] *See, e.g.*, Dkt. Nos. 23-2 ¶¶ 4–5 ("The Brookdale Fountaingrove community was previously operated by Emeritus Corporation. Brookdale Senior Living Inc. acquired Emeritus Corporation in 2014 and, as a result, became the successor-in-interest to the residency agreements entered into by Emeritus Corporation."); 34 at 9 ("As a result of the merger, Emeritus became a wholly owned subsidiary of defendant Brookdale Senior Living Inc. As the parent of Emeritus, Brookdale can enforce agreements to which Emeritus is a party[.]") (internal citations omitted).

which requires that the putative class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Plaintiffs contend, and Brookdale does not dispute, that there are: (1) 3,693 persons who reside or have resided at the facilities and have mobility or vision disabilities; (2) more than 3,617 persons who reside or have resided at the facilities and require assistance from caregivers to perform basic activities of daily living; and (3) 7,111 persons who reside or have resided at the facilities and have agreed to the Residency Agreements and opted out of arbitration.  *See* Mot. at 32, 41, 44.  These numbers readily meet the numerosity requirement. *See True Health Chiropractic Inc. v. McKesson Corp.*, 332 F.R.D. 589, 606 (N.D. Cal. 2019) ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." (alterations adopted and citations omitted)).

### b. Adequacy of Representation

The Rule 23(a)(4) adequacy determination turns on two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Similarly, Rule 23(g) requires courts to consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Fed. R. Civ. P 23(g)(1)(A).

#### 1. Named Plaintiffs' Adequacy

The Court finds that adequacy has been shown as to the Named Plaintiffs. The record contains no evidence that the Named Plaintiffs have a conflict of interest as to any other putative class member. Further, the Named Plaintiffs' claims are co-extensive with those of the putative class members and they have each submitted declarations attesting to their willingness to vigorously prosecute the action on behalf of the class.  *See* Carlson Decl. ¶¶ 25–27; Vallette Decl. ¶¶ 33–35; Lytle Decl. ¶¶ 30–32; Fisher Decl. ¶¶ 37–39; Lindstrom Decl. ¶¶ 18–19; Jestrabek–Hart Decl. ¶¶ 39–41; Algarme Decl. ¶¶ 29–31.   The Court therefore appoints Plaintiffs Stacia Stiner; Loresia Vallette, representative of the Lawrence Quinlan Estate; Heather Fisher, guardian ad litem

United States District Court
Northern District of California

United States District Court
Northern District of California

1  for Ralph Schmidt; Patricia Lindstrom, as successor in interest to the Estate of Arthur Lindstrom;

2  Michele Lytle, Trustee of the Boris Family Revocable Trust; Bernie Jestrabek-Hart; Jeanette

3  Algarme; and Ralph Carlson, Trustee of the Beverly E. Carlson and Helen V. Carlson Joint Trust,

4  as class representatives.

5              2.    Counsel's Adequacy

6         The Court finds that adequacy has also been shown as to Plaintiffs' counsel. The Court is

7  not aware of, and Brookdale does not raise, any conflicts between Plaintiffs' counsel and the

8  proposed class.  Likewise, Brookdale does not dispute that Plaintiffs' counsel has and will

9  continue to prosecute the action vigorously on behalf of the class.  Plaintiffs' counsel have

10  submitted several declarations attesting to their experience with class action lawsuits asserting

11  disability rights violations and elder abuse.  *See, e.g.*, Dkt. No. 278-1 ("Wallace Decl.") ¶¶ 4–10;

12  Dkt. No.289 ("Stebner Decl.") ¶¶ 3–7; Dkt. No. 290 ("Marks Decl,") ¶¶ 6–7. Plaintiffs' counsel

13  also represent that they are "committed to the full preparation of this case . . . willing to take this

14  case to trial should that become necessary . . . . [and] committed to acting in the best interests of

15  the putative classes."  *See e.g.*, Wallace Decl. ¶ 13.

16         The Court therefore finds that the adequacy requirement is satisfied as to all classes and

17  claims.   The Court appoints the law firms of Schneider Wallace Cottrell Konecky LLP, Rosen

18  Bien Galvan & Grunfeld LLP, Stebner & Associates, and Marks Balette Giessel & Young,

19  P.L.L.C as class counsel in this case.

20         **ii.    Mobility and Vision Impaired Class**

21         The Mobility and Vision Impaired Class would consist of all persons with disabilities who

22  reside or have resided at a Brookdale residential care facility in California during the class period

23  and who have visual disabilities or use wheelchairs, scooters, canes, or other mobility aids.  Mot.

24  at 13.  This proposed class seeks to bring three different categories of ADA discrimination claims.

25  First, they allege that the Facilities are filled with "access barriers" that violate the ADA and the

26  Unruh Act ("Access Barriers Claims").  *Id.* at 12.  They also allege that Brookdale has corporate

27  policies regarding transportation and emergency evacuation services that violate the violate the

28  ADA and the Unruh Act on their face ("Transportation Claims" and "Emergency Evacuation

1    Claims"). *Id.*

2        To prevail on these ADA discrimination claims, the Mobility and Vision Impaired Class

3    must establish that: (1) they are disabled within the meaning of the ADA; (2) Brookdale is a

4    private entity that owns, leases, or operates a place of public accommodation; and (3) Brookdale

5    "discriminated" against them by denying them "full and equal enjoyment" of places of public

6    accommodation because of their mobility and visual disabilities. *See Lopez v. Catalina Channel*

7    *Express, Inc.*, 974 F.3d 1030, 1033 (9th Cir. 2020); *Chapman*, 631 F.3d at 945 (citing 42 U.S.C. §

8    12182(a)).

9                            **a.   Access Barriers Claims**

10        The Access Barriers Claims allege that Brookdale discriminated against the Mobility and

11   Vision Impaired Class under Title III of the ADA by failing to remove "architectural barriers" in

12   its Facilities where such removal was "readily achievable." *Id.* § 12182(b)(2)(A)(iv).  Readily

13   achievable means "easily accomplishable and able to be carried out without much difficulty or

14   expense." 42 U.S.C. § 12181(9).  And whether an element is an "architectural barrier" is defined,

15   in part, by the ADA Accessibility Guidelines ("ADAAG"), which lay out the technical structural

16   requirements of places of public accommodation.[12]  *See Chapman*, 631 F.3d at 945.  Promulgated

17   by the U.S. Attorney General, these guidelines provide the objective standards for a facility's

18   architectural features.  *Id.*  The ADAAG's requirements are precise and the difference between

19   compliance and noncompliance with them is often a matter of inches.  *Id.*

20        Plaintiffs allege that they have inspected fifty-two (52) of Brookdale's facilities and have

21   found them all to contain various access barriers whose removal is readily achievable.  Mot. at 12.

22   For example, Plaintiffs contend that these facilities had ramps and curb ramps that were too steep

23   or uneven, designated parking spaces that were not level, restrooms that lacked compliant grab

24   _____

25   [12] In 2010, the U.S. Department of Justice published final regulations revising existing ADA
     regulations and updating the 1991 ADA Accessibility Guidelines.  *See Johnson v. Simper*

26   *Investments, Inc.*, No. 20-CV-01061-HSG, 2021 WL 4749410, at *4 (N.D. Cal. Oct. 12, 2021);
     *Johnson v. Wayside Property, Inc.*, 41 F. Supp. 3d 973, 976 n.3 (E.D. Cal. 2014) ("All

27   architectural and structural elements in a facility are required to comply with the 1991 Standards
     to the extent that compliance is readily achievable; by contrast, the 2010 standards apply only to

28   elements that have been altered in existing facilities, or that fail to comply with the 1991
     Standards, on or after March 15, 2012.").

                                          34

bars and paper dispensers, bedrooms with clothing rods and thermostats mounted too high for wheelchair users, and dining room furniture that lacked compliant knee clearance for wheelchair users. *Id.* at 17–19.

The dispositive question is whether Plaintiffs' Access Barrier Claims present questions of law or fact that are common to the entire Mobility and Vision Impaired Class. Fed. R. Civ. P. 23(a)(2). Plaintiffs raise three questions that they contend can generate common answers apt to drive the resolution of the litigation. The Court finds that none of those questions satisfy the commonality requirement and accordingly will not certify the Mobility and Vision Impaired Class to pursue the Access Barrier Claims.

A common question exists where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citations and quotation marks omitted). An individual question, by contrast, is presented when "members of a proposed class will need to present evidence that varies from member to member." *Id.* Plaintiffs bear the burden of showing the existence of common questions and "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quotation omitted) (emphasis in original).

### 1.   Whether the Facilities Are "Public Accommodations" as Defined by the ADA.

Plaintiffs first contend that the threshold question of whether the Facilities are "public accommodations" as defined by the ADA is common to the entire Mobility and Vision Impaired Class. Mot. at 33. Because the answer to this question will resolve "an important threshold issue," they contend, it is "therefore apt to drive the resolution of this case for all class members." *Id.*

It is true that this question of law can be resolved on a classwide basis. The Court has already found at the motion to dismiss stage that Brookdale's facilities are public accommodations subject to the ADA. *See Stiner v. Brookdale Senior Living, Inc.*, 354 F. Supp. 3d 1046, 1058–59 (N.D. Cal. 2019). But whether the Facilities are subject to the ADA is not a question that can

1    "drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations omitted). It is potentially

2    dispositive, of course, since Plaintiffs have no ADA claim if they cannot at minimum prove that

3    the ADA applies to the Facilities. But whether the ADA applies is the first lap of what would be a

4    very long race. The harder questions, like whether the Facilities are compliant with the ADA and

5    whether any of the Plaintiffs suffered harm because of those alleged violations, would remain. *See*

6    *Castaneda v. Burger King Corp.*, 264 F.R.D. 557, 564 (N.D. Cal. 2009) (finding that the threshold

7    question of whether a defendant is legally responsible for accessibility violations to be a

8    "straightforward" and "simple issue" that nonetheless could not drive resolution of the class's

9    claims).

10                    2.   Whether the Facilities Violated the ADA or CBC Standards and Whether
                           Brookdale Has Failed to Conduct "Readily Achievable" Barrier Removal.

11        Next, Plaintiffs contend that whether the Facilities violated the ADA or California

12   Building Code (CBC) standards are "overarching predominant common questions that are capable

13   of common answers for all class members based on the measurements and data from Plaintiffs'

14   site inspections." Mot. at 34. Relatedly, Plaintiffs contend that whether Brookdale has failed to

15   conduct "readily achievable" barrier removal is another important question common to all class

16   members. *Id.* After reviewing the vast record before it, the Court cannot agree. Whether

17   Brookdale's Facilities contain access barriers that violate the ADA and CBC is an "individual

18   question" because members of the proposed Mobility and Vision Impaired Class "will need to

19   present evidence that varies from member to member" to prove their cases. *Tyson Foods, Inc.*,

20   577 U.S. at 453 (citations omitted).

21        The typical disability class action lawsuit proceeds against a single facility on behalf of

22   disabled consumers who use that facility. These cases are generally well-suited for class

23   certification because they present common questions about the defendant's facility, polices, and

24   practices, while permitting hundreds or even thousands of plaintiffs to pool claims which may be

25   uneconomical to bring individually. *See, e.g.*, *Nevarez v. Forty Niners Football Co.*, LLC, 326

26   F.R.D. 562, 589 (N.D. Cal. 2018) (certifying a Rule 23(b)(3) class of persons using wheelchairs

27   who alleged that Levi's Stadium in Santa Clara, California was not fully accessible to disabled

28

United States District Court
Northern District of California

individuals).  But lawsuits that seek to simultaneously challenge architectural features of dozens of different facilities are entirely different.  In those cases, physical differences between the different locations may make it impossible to identify a common body of evidence that each proposed class member can rely on to resolve their claim.

As a case study, consider *Castaneda v. Burger King Corp.*, 264 F.R.D. 557 (N.D. Cal. 2009).  In that case, Judge Alsup declined to certify an ADA class of mobility-impaired persons who sought to challenge 92 different Burger King restaurants in California because, without a common body of evidence, the jury would have had to engage in "bone-crushing feature-by-feature and store-by-store analyses" to determine whether each store violated the ADA or CBC. *Id.* at 564.  To properly litigate the case, both sides' experts would need to make (and then argue about) hundreds of measurements at each of the 92 restaurants—measurements that would vary depending on the configuration of each location.  *Id.* at 567.  Without a common core of salient facts, Judge Alsup reasoned, litigating 92 locations in a single case would be impossible. *Id.* at 569.

*Castaneda*'s relevance to this case is obvious.  The Access Barrier Claims here are sprawling in scope.  They include a proposed class of thousands of individuals who lived at more than 80 different facilities over the past eight years.  *See* Mot. at 32, 41, and 44.  And the evidence shows that the proposed class members live or lived in facilities with widely differing layouts and units with different architectural features.  *See* Dkt. No. 377-1 (Def. Ex. 416), Exs. 3, 7, 8 at 30–32, 43–66, 67–75.

1       For example, the Facilities have varying construction histories and different layouts, and

2   the individual studio units within those different facilities also appear to have different layouts.

3   To take just one example, compare an aerial photograph of Brookdale Scotts Valley with one of

4   Brookdale Sunwest and consider four different studios in four different Brookdale facilities:






*Id.*, Exs. 7, 8 at 43–66, 67–75.   Making the analysis harder, Plaintiffs do not challenge a narrow

category of design features.   Across dozens of facilities, they contest "non-compliant parking,

entrances, paths of travel, ramps, restrooms, residential units, dining rooms" and more.   Mot. at

34.   Moreover, the record shows that the elements Plaintiffs allege are "access barriers" may also

vary in configuration and measurements not only by facility, but even by unit within each facility.

While Plaintiffs seek to challenge the closets in the Facilities for having hanging and storage space

placed out of the reach of a wheelchair user, for instance, they have not presented evidence of

common design characteristics among those closets.   TAC ¶ 35.   Here again, the evidence shows

variation by facility and sometimes even by unit:



See Dkt. No. 377-1 (Def. Ex. 416), Ex. 9 at 81.  The same is true about Plaintiffs' allegation that

wheelchair users "do not have sufficient turning space in the bathrooms" and therefore cannot use

their toilets unless they are able to transfer out of their wheelchair.  TAC ¶ 35.  The layouts of the

bathrooms in the Facilities plainly vary:



Dkt. No. 377-1 (Def. Ex. 416), Ex. 9 at 80.

This says nothing about the merits of the Access Barrier Claims, of course. Some architectural features in some units may violate the ADA and CBC, while others in different units may not. At this stage, the Court is only concerned with whether Plaintiffs' proposed question—which is whether Brookdale's Facilities contain access barriers that violate the ADA and CBC—can be answered by the same body of evidence. Since the members of the proposed Mobility and Vision Impaired Class appear to have encountered different architectural elements in different units and in different facilities, they could not simply rely on the same measurements or data to prove their Access Barrier Claims.[13]

---

[13] Plaintiffs disagree and contend that all class members can rely on the measurements and data from Plaintiffs' experts' site inspections. Mot. at 34. Plaintiffs' experts inspected 52 of Brookdale's facilities before their facilities were closed to further inspections because of the pandemic, and they contend that the Facilities have pervasive physical access barriers. *See id.* at 15 n.2. But the breadth of the experts' effort does not prove that Brookdale's liability (or lack thereof) can be shown with a common body of evidence. The class members may be able to

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court does not suggest that an ADA class action lawsuit can *never* proceed against an entity with multiple (or even dozens of) different facilities.  But for such a lawsuit to be feasible, the proposed class would have to identify the common body of evidence that they can all use to prove their case.  That is, they must show the glue that can hold together their factually different claims.

That glue could be a common blueprint or design characteristics across the multiple facilities.  This is intuitive.  When the challenged architectural features have substantial similarities across facilities, there is no need for the "bone-crushing" store-by-store and feature-by-feature analyses of which Judge Alsup warned in *Castaneda*.  In that scenario, one common body of evidence exists.  *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 610 (N.D. Cal. 2004) (certifying a class of mobility-impaired patrons who challenged access barriers at hundreds of Taco Bell restaurants because all the stores were built in accordance with centrally designed blueprints that resulted in common alleged accessibility violations), *amended in part*, No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012).  But here, the Facilities themselves cannot hold together the proposed Mobility and Vision Impaired Class's factually different claims.  As explained above, Plaintiffs have failed to show that they challenge architectural features that are substantially similar in design across facilities.

A large multi-facility disabilities class may also band together to challenge a common offending policy or centralized decision-making.  This also makes sense.  When a centralized policy is responsible for common accessibility barriers, all class members can rely on evidence about the illegality of that policy to make their case.  Thus, in *Californians for Disability Rights v. California Department of Transportation*, a court in this District certified a class to challenge thousands of barriers in different physical locations.  249 F.R.D. 334, 349 (N.D. Cal. 2008).  The court found a common question in whether and to what extent the defendant had violated the ADA "through the use of improper design guidelines and the failure to ensure compliance with even

---

borrow the same experts to present their measurements and data, but that of course does not mean that they could use the same body of evidence to prove their cases.

1    those deficient guidelines." *Id.* at 346.  Similarly, in *Gray v. Golden Gate Nat. Recreational Area*,

2    a court certified a class to challenge accessibility barriers at a large national park because the

3    defendants had "centralized control over decision-making with respect to accessibility" within the

4    park. 279 F.R.D. 501, 513 (N.D. Cal. 2011).

5         Plaintiffs contend that they have identified a common offending policy here.  As they see

6    it, Brookdale has a policy and practice of disregarding the existence of access barriers and of

7    failing to remove them.  *See* Reply at 18.  On a closer look, though, this "policy" is simply a

8    restatement of Plaintiffs' cause of action.  It is not evidence of a uniform policy or practice.

9         The Ninth Circuit rejected a similar theory in *C.R. Educ. & Enf't Ctr. v. Hosp. Properties

10   Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017) ("*CREEC*").  The plaintiffs there, like Plaintiffs here,

11   sought to certify an ADA class on the ground that the defendant maintained an "unwritten, de

12   facto policy of non-compliance" at its 142 hotels that resulted in "widespread ADA violations."

13   *Id.*  The defendant, however, contracted with management companies to operate the hotels and,

14   under those contracts, required the companies "to comply with all laws in their fulfillment of their

15   management agreement obligations."  *Id.*  The district court found it "unclear" how the

16   defendant's "lack of a policy" could serve as the "glue" holding together the plaintiffs' claims, and

17   it denied certification.  *Id.*  The Ninth Circuit affirmed, finding that the hotel operator before it

18   merely had a "policy of delegation, not of non-compliance," and a "policy *against having* uniform

19   practices [was] decidedly not a common issue."  *Id.* at 1104–05.

20        Here, the Court finds that Plaintiffs have failed to identify a common offending policy or

21   centralized decision-making responsible for common accessibility barriers at the Facilities.  Like

22   the defendant in *CREEC*, Brookdale operates the Facilities with lease and management

23   agreements that assign responsibility for maintenance, structural changes, and legal compliance to

24   various other entities.  *See, e.g.*, Dkt. Nos. 366-1 (Def. Ex. 312) at 280, 369 (Def. Exs. 331–32).

25   In other words, to the extent Brookdale has a uniform policy on ADA compliance, it is a "policy

26   of delegation, not of noncompliance."  *CREEC*, 867 F.3d at 1104.  *CREEC* accordingly forecloses

27   Plaintiffs' argument that Brookdale's alleged *de facto* or informal policy of disregarding the

28   existence of access barriers can serve as the "glue" holding together their sprawling Access Barrier

42

Claims. *Id.*

Undeterred, Plaintiffs point to deposition testimony in which Brookdale officials, including those testifying on behalf of Brookdale as a corporate representative, have taken the position that the Facilities are not covered by the ADA. *See* Dkt. No. 276-5 (Unredacted Motion to Certify the Class) at 16. They argue that each member of the class has effectively been exposed to a corporate-wide policy of noncompliance. The Court disagrees.

The legal theory has at least some potential merit. The *CREEC* panel recognized that a defendant's intentional noncompliance with the ADA could amount to an unofficial policy of discrimination, which could be a common issue weighing in favor of class certification. *CREEC*, 867 F.3d at 1105. The problem is that notwithstanding Brookdale's apparent legal judgment that the ADA does not apply to it, there is no factual basis in the record to conclude that Brookdale intentionally does not comply with the ADA. There is no evidence, for instance, of Brookdale discouraging executive directors at Facilities from removing access barriers on the grounds that the ADA does not apply. At bottom, Plaintiffs have failed to establish a pattern of intentional discrimination orchestrated by Brookdale.

In the end, Plaintiffs have not identified the kind of evidence of common architecture, barriers to access, or policies that can make the proposed question of whether Brookdale's new or altered facilities comply with federal and California disability laws capable of resolution by classwide proof. Proving that each of Brookdale's facilities violated the ADA or CBC would instead require dozens of complicated trials within a trial. Plaintiffs have not met their burden of identifying a single common question that can drive the resolution of the Access Barrier Claims.

The Court therefore declines to certify the Mobilities and Vision Impaired Class to pursue the Access Barrier Claims.

### b. Transportation Claims

The Mobility and Vision Impaired Class also contends that Brookdale's policies and practices regarding transportation on its vans and buses violate the ADA and the Unruh Act. Mot. at 20. Brookdale provides transportation services to its residents using buses and vans. Mot. at 35. Residents use those buses and vans to attend events like shopping trips, medical and other

43

appointments, scenic drives and other scheduled outings.  *Id.*  Plaintiffs' Transportation Claims involve two separate and distinct theories: one regarding the Fleet Safety Policy and another regarding the number of accessible buses and vans available at each facility.  The Court finds that the Transportation Claims are not suitable for Rule 23(b)(3) certification under either theory but are suitable for Rule 23(b)(2) certification under the Fleet Safety Policy theory.

Plaintiffs first contend that Brookdale's Fleet Safety Policy violates federal regulations. That policy requires scooter and power wheelchair users to transfer out of their scooter or wheelchair and onto either manual wheelchair or a passenger seat within the van or bus in order to ride.  *See* Dkt. No. 276-7 ("Unredacted Wallace Decl.") ¶ 18, Ex. 5 at 99, Ex. 6 at 124–25; Ex. 7 at 132.  Residents, including some named plaintiffs, have testified that Brookdale enforces this requirement.  *See* Dkt. No. 278-2, Table 7-8.

Plaintiffs contend that Brookdale's "Fleet Safety Policy" is directly contrary to relevant Department of Transportation regulations promulgated to implement Title III of the ADA, which provide that a public accommodation *may only request* that the user of a wheelchair or scooter transfer from their mobility device.  *See* 49 C.F.R. § 37.165(e).  They therefore contend that the Fleet Safety Policy on its face violates Title III of the ADA.[14]

Plaintiffs also contend that the Facilities generally have too few accessible vans and buses, which in practice denies residents with mobility disabilities "full and equal access to and enjoyment of" Brookdale's transportation services and therefore violates Title III of the ADA. Mot. at 20.  As alleged, the Facilities typically only have one or two accessible vans or buses per facility which, in turn, can only transport up to two wheelchair or scooter users at a time.  *Id.* Plaintiffs allege that this is not enough capacity to meet the needs of the relatively large number of wheelchair and scooter users who reside at most of Brookdale's facilities, which often number ten

---

[14] It is not clear to the Court whether Plaintiffs are proceeding under a Title III access barrier claim or a Title III policy modification claim, but this is not an issue the Court needs to address at the class certification stage, particularly as it is unlikely that the particular theory of discrimination would make much practical difference at this stage. *Cf. Karczewski v. DCH Mission Valley LLC, 862 F.3d 1006, 1012* (9th Cir. 2017) (stating that "even assuming that some factual scenarios plausibly could fit within more than one of Congress' five illustrative examples of discrimination, we fail to see what problems that would cause").

United States District Court
Northern District of California

1    or more per facility.  *Id.*

2                    **1.   Rule 23(a) Analysis**

3                       a.   Commonality

4         Plaintiffs bear the burden of showing both that there are questions of law or fact common

5    to the class and that the claims or defenses of the representative parties are typical of the claims or

6    defenses of the class.  Fed. R. Civ. P. 23(a).  Beginning with commonality, Plaintiffs contend that

7    whether Brookdale's Fleet Safety Policy and alleged practice of maintaining one or two vehicles

8    per facility complies with the ADA and the Unruh Act raises common questions capable of

9    common answers.  Mot. at 35.  The Court agrees that the Transportation Claims based on the Fleet

10   Safety Policy can be resolved based on a common body of evidence.  On the other hand, the

11   Transportation Claims based on the number of vans available at each facility cannot.

12        In the Fleet Safety Policy, Plaintiffs have identified a common offending policy that by its

13   plain terms applies across all facilities.  *See* Unredacted Wallace Decl., Ex. 6 at 129 ("The

14   procedures outlined apply to communities and corporate offices; and to associates who drive

15   vehicles for company business[.]").  Because Plaintiffs' Transportation Claims are functionally a

16   facial challenge to the legality of Brookdale's Fleet Safety Policy, this issue is susceptible to

17   generalized, classwide proof.  *See Achem Prod. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  This

18   issue hinges on a central question of law that is capable of classwide resolution.  A common body

19   of evidence exists as to this theory.

20        Brookdale disagrees.  It contends that commonality is not met because Plaintiffs have not

21   shown a "common practice of adopting or following the Fleet Safety Policy or any other

22   transportation policy" across the Facilities.  Opp. at 34.  But as explained above, Plaintiffs have

23   provided sufficient evidence that the Fleet Safety Policy is a corporate-wide policy, and variation

24   in the implementation of a corporate policy does not defeat commonality.  As the Ninth Circuit

25   has explained, "[t]he unsurprising fact that some . . . decisions are made locally does not allow a

26   company to evade responsibility for its policies."  *Staton v. Boeing Co.*, 327 F.3d 938, 956 (9th

27   Cir. 2003); *see also Maney v. State*, No. 6:20-CV-00570-SB, 2022 WL 986580, at *16 (D. Or.

28   Apr. 1, 2022) ("Courts consistently certify classes . . . where class members' claims are based on a

United States District Court
Northern District of California

United States District Court
Northern District of California

centralized policy or procedure, even when those policies or procedures are filtered down through multiple layers of implementation and management.").  In the end, the Court finds that the Transportation Claims based on the Fleet Safety Policy raise common questions capable of common answers.

On the other hand, Plaintiffs' theory regarding the number of vans available at each facility is not susceptible to classwide proof.  Plaintiffs have provided evidence that most of the facilities had one or two accessible vehicles.  *See* Mastin Decl. ¶ 78 ("Almost all the facilities employed one shuttle vehicle equipped with a lift that can accommodate no more than two wheelchair users. Some facilities had two such shuttles.").  Plaintiffs also argue that their assertion that Brookdale lacks sufficient accessible vans and buses can be proven (or disproven) by comparing the number of existing accessible spaces in Brookdale's vehicles per facility to the total population of mobility disabled persons who require such accessible spaces.  *See* Dkt. No. 558 ("Hearing Transcript") at 36–37.  To the extent that Plaintiff is suggesting that the number of accessible spaces and the number of mobility disabled people can be compared on a company-wide basis, this comparison would be effectively meaningless.  Even a company-wide shortfall would provide no insight into whether any given *facility* had a shortage of accessible vehicles.  That could only be determined by comparing the number of mobility disabled residents at each facility to the number of accessible transportation vehicles available at that facility.  And to the extent that this is the approach that Plaintiffs are suggesting, it is clearly a facility-by-facility inquiry.  Accordingly, this theory is not susceptible to common, classwide proof.

### b.  Typicality

The typicality requirement is satisfied as to the Fleet Safety Policy theory.  Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interests of the class representative align with the interests of the class. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted).  The requirement is permissive, such that representative claims are "typical" if they are "reasonably coextensive" with those of absent class members; they need not be substantially identical.  *Id.*

Plaintiffs' claims are reasonably co-extensive with those of the Mobility and Vision

46

1   Impaired Class.  All the named plaintiffs are or were residents with mobility disabilities (except

2   Plaintiff Schmidt, who is blind) or represent such persons.  Mot. at 37.  All allegedly were or are

3   subject to Brookdale's transportation policies and practices.  *Id.*  Ms. Stiner and Ms. Jestrabek-

4   Hart are current residents of Brookdale and would therefore have standing to seek injunctive

5   relief.  *Id.*  Plaintiffs' claims thus arise from the same general course of conduct by Brookdale and

6   are based on the same legal theories.  Accordingly, their Transportation Claims based on the Fleet

7   Safety Policy are typical of those of the proposed class.

8           Because the numerosity and adequacy requirements are also satisfied, see discussion *supra*

9   at § III.D.i, Plaintiffs have met their burden as to each of the four requirements of Rule 23(a) with

10  respect to the Mobility and Vision-Impaired Class as to the Fleet Safety Policy theory.  The Court

11  will next assess whether that class meets at least one of the requirements of Rule 23(b).

### 2.  Rule 23(b)(2) Analysis

13          The Mobility and Vision Impaired Class seeks injunctive relief requiring Brookdale to

14  provide full and equal access to and enjoyment of its transportation services and activities.  *See*

15  Mot. at 38.  A class may seek injunctive relief under Rule 23(b)(2) if "the party opposing the class

16  has acted or refused to act on grounds that apply generally to the class, so that final injunctive

17  relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  *Dukes*,

18  564 U.S. at 360.  This provision does not authorize class certification when each individual class

19  member would be entitled to a different injunction or declaratory judgment against the defendant.

20  *Id.*  And similarly, it does not authorize class certification when each class member would be

21  entitled to an individualized award of monetary damages.  *Id.* at 360–61.

22          The Ninth Circuit has explained that Rule 23(b)(2)'s requirements are "unquestionably

23  satisfied when members of a putative class seek uniform injunctive or declaratory relief from

24  policies or practices that are generally applicable to the class as a whole."  *B.K. by next friend*

25  *Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 688

26  (9th Cir. 2014)).   Where all members of the putative class are allegedly exposed to harm from a

27  specified set of centralized policies and practices, the defendants are alleged to have "acted or

28  refused to act on grounds that apply generally to the class."  *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

United States District Court
Northern District of California

That reasoning applies here.  Plaintiffs have not brought claims that must be redressed through individual injunctions.  Rather, a single, indivisible injunction ordering Brookdale to bring its Fleet Safety Policy into compliance with the ADA "would provide relief to each member of the class" and thus satisfy Rule 23(b)(2).  *Dukes*, 564 U.S. at 360.  Moreover, as the Ninth Circuit has also made clear, "the primary role of [Rule 23(b)(2)] has always been the certification of civil rights class actions" generally and cases against parties charged with unlawful, class-based discrimination specifically.  *Parsons*, 754 F.3d at 686 (citing *Windsor*, 521 U.S. at 614, (1997)).  In these cases, the fact that the alleged discriminatory conduct may have affected different members of the class in different ways does not prevent certification under Rule 23(b)(2).  *See Davis v. Lab'y Corp. of Am. Holdings*, 604 F. Supp. 3d 913, 926 (C.D. Cal. May 23, 2022).  This is such a case.  Brookdale is alleged to offer transportation services that cannot be fully used by those with vision and mobility impairments.  It therefore is alleged to have acted "on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  *Dukes*, 564 U.S. at 360.  The Court finds that the Mobility and Vision Impaired Class meets the requirement of Rule 23(b)(2) as to the Fleet Safety Policy theory.

Accordingly, the Court certifies the Wheelchair and Scooter Users Subclass, defined as follows, under Rule 23(b)(2) to pursue the Transportation Claims as to the Fleet Safety Policy theory:

> All persons with disabilities who use wheelchairs, scooters, or other powered mobility aids and who reside or have resided at a residential care facility for the elderly located in California and owned, operated and/or managed by Brookdale during the three years prior to the filing of the Complaint herein through the conclusion of this action, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.[15]

---

[15] Nothing in the record suggests that the redefined Wheelchair and Scooter Users Subclass would not meet the numerosity requirement.  Defendants themselves state that "Plaintiffs' disability expert identified only 109 putative class members who used a motorized wheelchair and 162 who used a scooter."  Opp. at 35.  Even if these numbers were halved, the redefined class would easily clear Rule 23(a)'s numerosity requirement.  *See True Health Chiropractic Inc*, 332 F.R.D. at 606 ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.").

### 3. Rule 23(b)(3) Analysis

The Mobility and Vision Impaired Class also seeks to recover damages based on the Transportation Claims.  This requires two different inquiries.  Under Rule 23(b)(3), the Court must assess whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As explained below, the Court finds the redefined Wheelchair and Scooter Users subclass does not meet the Rule 23(b)(3) requirements.

### a. Predominance

Rule 23(b)(3) only allows damages class actions if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry presumes that common issues of fact or law exist and focuses on whether the common questions "present a significant aspect of the case and . . . . can be resolved for all members of the class in a single adjudication."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc).  If so, there is "clear justification for handling the dispute on a representative rather than on an individual basis."  *Id.* (citations omitted).  If just one common question predominates, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately."  *Id.* (citations omitted).

The Court has found that whether Brookdale's Fleet Safety Policy violates the ADA and the Unruh Act raises common questions capable of common answers.  The next step is to give "careful scrutiny" to the relationship between those common questions and any individual questions.  *Tyson Foods, Inc.*, 577 U.S. at 453.  As Brookdale sees it, individual questions predominate because "the vast majority" of Plaintiffs' originally proposed class could not have encountered or been impacted by Brookdale's transportation policies.  Opp. at 35.  As Brookdale notes, Plaintiffs' own expert identified only 109 putative class members who used a motorized wheelchair and 162 who used a scooter—which, if true, would mean that a maximum of 7% of the Mobility and Vision Impaired Class could even have encountered a policy regarding mobility aid

49

transfers. *Id.*

The Court agrees that, for purposes of pursuing the Transportation Claims, the putative class as first proposed was significantly overinclusive. But "the problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., On Behalf of Itself & All Others Similarly Situated*, 143 S. Ct. 424 (2022)  (internal citations and quotation marks omitted).  Here, the Court adopts the same amended class definition it used to certify the Rule 23(b)(2) class, namely users of motorized wheelchairs, scooters, or other powered mobility aids, see discussion *supra* at § III.D.ii.b.2, for the purpose of its Rule 23(b)(3) analysis. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) ("Rule 23(c) enables district courts to divide classes into subclasses or certify a class as to only particular issues.").

Brookdale has another objection. It essentially argues that this subclass would still face predominant individualized questions about how many class members suffered an injury. Opp. at 35. It argues that, whatever the Fleet Safety Policy says on its face, in practice "many Plaintiffs and disabled residents confirmed that their [Facilities] allowed them to sit on their scooters while boarding vehicles and during transit." *Id.* As Brookdale sees it, this evidence shows that determining which, if any, of the class members suffered an injury as a result of the challenged Fleet Safety Policy would require a series of individualized inquiries. *Id.*

Unsurprisingly, Plaintiffs have the exact opposite take. In their view, if they prevail on their facial challenge to Brookdale's Fleet Safety Policy, then every class member who is a wheelchair or scooter user necessarily suffered an injury. *See* Hearing Transcript at 29–31. As the Court understands it, Plaintiffs' theory of injury proceeds as follows. Their damages claims arise under the Unruh Act, which authorizes statutory damages for each and every ADA violation "up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000)[.]" Cal. Civ. Code § 52(a); *id.* § 51(f); *see also Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 673 (2009). The Unruh Act does not require class members to prove that they suffered

"actual damages" to recover the minimum statutory damages of $4,000; all the class members need to prove is an ADA violation. *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007) ("The litigant need not prove she suffered actual damages to recover the independent statutory damages of $4,000."). So if Brookdale violated the ADA by providing unequal transportation services to residents who use wheelchairs and scooters, then each of those residents suffered an ADA injury by virtue of the provision of an unequal service, and thus may recover statutory damages under the Unruh Act. To Plaintiffs, then, the existence of injury is a common question that weighs in favor of predominance and certification, not an individual one.

The Court finds itself not entirely persuaded by either of these two extremes. The extent to which any class member suffered a concrete injury as a result of Brookdale's transportation policies raises individual questions. And the Court must ensure that only those who suffered a concrete injury ultimately recover damages. But the Court may not deny class certification merely because the proposed class may contain some uninjured class members.

To begin with, Plaintiffs are correct that the Unruh Act does not require them to show that they suffered any personal exclusion or "difficulty, discomfort, or embarrassment" to recover the statutory damages they seek. *See Davis*, 604 F. Supp. 3d at 929. But as a matter of Article III standing, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering *concrete harm* because of the defendant's violation of federal law." *TransUnion*, 141 S. Ct. at 2205 (emphasis added). The California Legislature is free to authorize plaintiffs to recover from defendants who violate a provision of the ADA, "[b]ut under Article III, an injury in law is not an injury in fact." *Id.* The Supreme Court has made clear that only those plaintiffs who have been "concretely harmed" by a defendant's statutory violation may sue that private defendant over that violation in federal court, and every class member must have full Article III standing in order to recover individual damages. *Id.* at 2205, 2208.

Given these principles, Plaintiffs' position goes too far. Even if Brookdale's policies and practices are facially unlawful under the ADA, a litigant still must have Article III standing to challenge them. *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) ("Even if the

United States District Court
Northern District of California

1    ADA labeled all violations of that act and its implementing regulations as discrimination—which

2    it does not—*TransUnion* makes clear that a statutory violation alone, however labeled by

3    Congress, is not sufficient for Article III standing") (internal citations omitted); *Mielo v. Steak'n*

4    *Shake Operations Inc.*, 897 F.3d 476, 479 (3d. Cir. 2018) ("To the extent that Plaintiffs allege only

5    a harm in the mere existence or absence of particular corporate policies, Plaintiffs lack standing.").

6    The proposed class members do not have to prove that Brookdale's transportation policies

7    *completely precluded* them from using the transportation services, of course.  *See Chapman*, 631

8    F.3d at 947 ("Under the ADA, when a disabled person encounters an accessibility barrier violating

9    its provisions, it is not necessary for standing purposes that the barrier completely preclude the

10   plaintiff from entering or from using a facility in any way.").  But to have Article III standing to

11   challenge Brookdale's transportation policies and practices, each class member still must show

12   how those policies and practices in some way interfered with their full and equal enjoyment of

13   Brookdale's transportation services.  *See id.* ("[T]he barrier need only interfere with the plaintiff's

14   'full and equal enjoyment' of the facility . . . . [And] a 'barrier' will only amount to such

15   interference if it affects the plaintiff's full and equal enjoyment of the facility on account of his

16   particular disability.").  So even if Brookdale's Fleet Safety Policy is found to violate the ADA on

17   its face, the Court does not see how a power wheelchair user who, for example, was nevertheless

18   always allowed to sit on their scooter while boarding vehicles and during transit could, without

19   more, have Article III standing to recover under the Unruh Act.  *See Doran v. 7-Eleven, Inc.*, 524

20   F.3d 1034, 1047 (9th Cir. 2008) (explaining that "[a]n ADA plaintiff who has encountered or has

21   personal knowledge of at least one barrier related to his or her disability when he or she files a

22   complaint, and who has been deterred from attempting to gain access to the public accommodation

23   because of that barrier, has suffered an injury in fact for the purpose of Article III").

24        The Court need not decide the merits of Plaintiffs' Transportation Claims at this stage.  *See*

25   *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants

26   courts no license to engage in free-ranging merits inquiries at the certification stage.").  It is

27   enough to recognize that whether and to what extent the members of the proposed class were

28   concretely injured by Brookdale's transportation policies raises evidentiary questions that likely

will vary by class member.  In other words, the Transportation Claims raise important "individual questions."  *See Tyson Foods, Inc.*, 577 U.S. at 453 ("An individual question is one where members of a proposed class will need to present evidence that varies from member to member[.]").

At the same time, the Court rejects Brookdale's view that any class pursuing the Transportation Claims would necessarily have too many uninjured members to be certified.  Even if, as Brookdale alleges, there might be "many" or "numerous" uninjured members in the putative class, at least in this Circuit there is no per se rule preventing district courts from certifying a class that may include more than a *de minimis* number of uninjured class members.  *Olean*, 31 F.4th at 669 ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.").  Rather, "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions."  *Id.* at 668.

Here, the Court finds that such individualized inquiries do predominate.  As redefined, the subclass includes only wheelchair, scooter, and other powered mobility aid users.  But an individualized inquiry would be needed to determine whether class members actually suffered an injury sufficient to confer Article III standing to bring a claim because the standard at issue focuses on whether the Fleet Safety Policy "affect[ed] the plaintiff's full and equal enjoyment of the facility on account of his particular disability."  *Chapman*, 631 F.3d at 947.  As a result, individualized inquiry is necessary to determine Brookdale's *liability* to any given class member as a threshold matter.  This class does not meet the predominance requirement because it "raises complicated questions of who was ever exposed to [the policy], and whether those who were exposed were harmed in a way giving rise to liability."  *Castillo v. Bank of Am., NA*, 980 F.3d 723, 733 (9th Cir. 2020).  In *Castillo*, a case where Plaintiff alleged that Defendant underpaid its workers, the Ninth Circuit affirmed the district court's denial of class certification, reasoning that:

> This case differs from *Tyson Foods* because [Plaintiff] cannot provide a common method of proof to establish [Defendant's] classwide liability. Unlike in *Tyson Foods*, here there is no common proof of liability, because a large portion of the proposed class was never exposed to the challenged formulas or was not underpaid, and thus could not have been injured by those formulas in the first place.

*Id.* at 732.  Here, the Court cannot determine even roughly how many class members were injured based on common proof.  Plaintiffs have provided the Fleet Safety Policy as evidence of Brookdale's classwide liability. But the policy is not enough to establish liability as to individual class members, because they have not suffered an injury unless the policy affected their full and equal enjoyment of the facility, a highly individualized inquiry.  In other words, individualized issues regarding who knew of or encountered enforcement of the Fleet Safety Policy predominate over common ones.  *See Doran*, 524 F.3d at 1047.

Accordingly, the Court declines to certify the Wheelchair and Scooter Users Subclass under Rule 23(b)(3) to pursue the Transportation Claims.

### c.  Emergency Evacuation Claims

The Mobility and Vision Impaired Class also contends that Brookdale's emergency evacuation policies discriminate against residents with mobility disabilities.  Specifically, they claim that the emergency manuals and disaster plans used by the Facilities: (1) fail to identify the specific steps regarding how residents who are wheelchair or scooter users will be transferred into evacuation chairs and then transported up or down the stairs and out of the facility; (2) fail to ensure that accessible transportation is provided to residents with mobility disabilities; and (3) fail to specify that residents with mobility and/or vision disabilities will be evacuated to assembly points or relocation sites that are accessible to them.  Mot. at 21–22.  To support these claims, Plaintiffs rely heavily on the Kailes Declaration, in which Ms. Kailes provides specific examples of alleged deficiencies in Brookdale's Emergency Manuals and explains that she reviewed supplemental Emergency and Disaster Plans "for a sample of facilities," which she also determined to be inadequate. *See* Kailes Decl. ¶¶ 24–26.

The Court finds that the Emergency Evacuation Claims fail at the threshold because

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs have not shown that they can be resolved based on a common body of evidence.  The

2    Emergency Manual is not the kind of "common offending policy" that can drive resolution of

3    Plaintiffs' claims.  It instead reads like a general guidelines document.  *See* Unredacted Wallace

4    Decl., Ex. 8 at 148 (Emergency Manual "establish[es] responsibilities and to provide general

5    guidelines for communication and corporate support during weather-related and other emergencies

6    which may require evacuation or notification to families.") (internal punctuation omitted).

7    Critically, the Emergency Manual makes clear that it is not intended to replace *facility-specific*

8    plans.  *See id.* ("**The procedures in this document do not replace the community-specific**

9    **Emergency Preparedness Plan**") (emphasis in original).  And it is undisputed that the Facilities

10   in fact adopt their own emergency evacuation plans, which vary by facility.  *See, e.g.*, Dkt. No.

11   411-6 (Def. Ex. 507).  Thus, Brookdale argues that many facility emergency evacuation plans "in

12   fact cover the specific issues that Plaintiffs claim are lacking."  *See* Opp. at 35–36; *see also id.* at

13   31–32 ("For example, the Bakersfield Community plan speaks to the use of stair chairs to assist

14   residents with mobility impairments who need to be evacuated from upper and lower levels in the

15   event of an emergency, with each stair chair holding one to two people.") (citing Dkt. No. 493-34

16   (Def. Ex. 454) at 100).  Plaintiffs respond that "[a]ll plans suffer from similar deficiencies" and

17   cite to Ms. Kailes's reply declaration as support for the argument that "[n]either Defendants'

18   Emergency Manual nor its facility plans are sufficient to provide residents with disabilities with

19   equal access to emergency evacuation services."  Reply at 11 (citing Kailes Reply Decl. ¶¶ 5–24).

20   The Court does not find Ms. Kailes conclusory statements that all facility emergency plans are

21   deficient in the same way to be persuasive in light of the evidence Brookdale has provided that

22   facilities adopt their own emergency evacuation plans.  Since the putative class members are

23   subject to dozens of different local policies and practices, the factfinder could not resolve the

24   Emergency Evacuation Claims based on a common body of evidence.

25          The Court finds that the commonality requirement is not met as to the Emergency

26   Evacuation Claims and thus declines to certify a class as to those claims.  *See CREEC*, 867 F.3d at

27   1104–06 (finding that "policy *against having* uniform practices [was] decidedly not a common

28   issue").

                                              55

### iii.    Disabilities Class

The Disabilities Class would consist of all persons with disabilities who reside or have resided at a Brookdale residential care facility for the elderly in California during the class period and who require assistance with activities of daily living.  TAC ¶ 197.  This class alleges that Brookdale violated Title III of the ADA by failing and refusing to make reasonable modifications to its caregiving staffing policies and practices ("Reasonable Modification Claims").  *See* Mot. at 41–42.  Although Plaintiffs' motion seeks to certify a Rule 23(b)(3) class to pursue damages, *see id.* at 44, at oral argument Plaintiffs' counsel withdrew this request.  *See* Hearing Transcript at 56 ("THE COURT: Just to be clear, though, are you withdrawing the request for (b)(3) certification of a damages class as to that second class? MR. WALLACE: Yes.").  The Reasonable Modification Claims are subtle and require some context to understand.  The Court first provides that context and then finds that the Reasonable Modification Claims are not suitable for class certification under Rule 23(b)(2).

Plaintiffs allege that Brookdale systemically understaffs the Facilities.  *See* Mot. at 12.  As a result, they contend, residents are routinely denied essential services regarding their activities of daily living, like help with toileting, dressing, grooming, bathing, ambulation, escorting, medication administration, and housekeeping.  *Id.*  Plaintiffs also allege that Brookdale has refused their requests to make a reasonable modification in policy and practice to provide sufficient staffing.  *Id.*  Instead, they contend, Brookdale continues to staff the Facilities based on corporate staffing procedures that are not reasonably designed to ensure the amount of staffing necessary to deliver the services residents need.  *Id.*

On those grounds, Plaintiffs allege that Brookdale has violated Title III of the ADA by failing and refusing to make reasonable modifications in policy or practice that are necessary for Plaintiffs to have "full and equal enjoyment of the goods, services, facilities, privileges, advantages, [and] accommodations" of Brookdale's assisted facilities.  42 U.S.C. § 12182(a); 28 C.F.R. § 36.302(a).  To prevail on their reasonable accommodation claims, Plaintiffs must show: (1) they are disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a

discriminatory policy or practice; and (4) the defendant discriminated against the plaintiffs based on the plaintiffs' disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiffs' disability. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004).

### a. Overview

An overview of how Brookdale staffs its Facilities is necessary to understand Plaintiffs' claims.



Unredacted Wallace Decl., Ex. 20 at 1069.

*See id.*, Ex. 25 at 1231; Ex. 23 at 1165; Ex. 26 at 1273; Ex. 27 at 1286; Ex. 28 at 1301; Ex. 51 at 1900.

*Id.*, Ex. 23 at 1165; Ex. 26 at 1273; Ex. 51 at 1905.

*Id.*, Ex. 26 at 1273.

*Id.*, Ex. 23 at 1165; Ex. 26 at 1273; Ex. 27 at 1286; Ex. 30 at 1322.

*Id.*, Ex. 24 at 1192, 1198.

*Id.*, Ex. 24 at 1195.

Plaintiffs' central allegation is that the "Brookdale Norms" values (also "norms" or "task times") that Brookdale uses to calculate the Labor Benchmarks for the Facilities are "far too low" and are "not realistically calculated" to provide caregivers with enough time to perform particular tasks. Mot. at 27. As alleged, these "systemic" flaws in Brookdale's corporate staffing policies

place all residents at "substantial and unreasonable risk" of not receiving promised services, including assistance with activities of daily living. *Id.* at 28. And as evidence, Plaintiffs cite declarations of residents and their families describing the effects of staffing shortages, which allegedly include falls resulting in broken bones or hospitalization; missed meals resulting in weight loss, dehydration, and UTIs; long response times to call buttons leaving residents to lie on the floor for hours before being discovered; missed bathing; soiled clothing and unchanged diapers; and other harms to resident safety and dignity. *Id.*

There is significant disagreement about the extent to which the Labor Benchmarks impact staffing conditions at each Facility. Brookdale characterizes "Service Alignment" as just a "support function" and contends that Plaintiffs have not shown that it maintains any organization-wide staffing policy or practice. Opp. at 38. But the evidence shows that Facility leaders face at least some pressure to comply with the Labor Benchmarks. ███████████████████████

████████████████████████████████████████████████

███████████████████████. Unredacted Wallace Decl., Ex. 24 at 1198. ██████████████

████████████████████ *Id.* ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *See, e.g., id.*, Exs.

31–42. ████████████████████████████████████████

████████████████████████ *Id.*, Exs. 46–49, Ex. 51 at 1941. ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████ *Id.*, Ex. 46 at 1408.

████████████████████████████████████████████

████████████████████████████████████████ *See* Opp. at

38 (citing Dkt. Nos. 365-1 (Def. Ex. 225), 376-1 (Def. Ex. 392) at 40–48). █████████████

████████████████████████████████████████████████

████████████████████████████████████████

1      ████████████████████████. *See id.* ████████████████████████

2      █████████████████████████████████████████████████████

3      ████████████████████████████████ *Id.* at 35.

4          Plaintiffs allege that they, on behalf of the proposed class, have requested that Brookdale

5 make a "reasonable modification" in its policies and practices regarding caregiver staffing to

6 increase the amount of such staffing so that it is always enough to provide the assisted living

7 services specified in the residents' assessments. *See* Mot. at 41–42. Specifically, Plaintiffs'

8 staffing expert, Dr. Cristina Flores, analyzed the task times Brookdale uses to calculate the Labor

9 Benchmarks and concluded that the times related to bathroom assistance and escorting/mobility

10 assistance are "unreasonably low" and "simply not credible." Flores Decl. ¶ 71. Plaintiffs

11 contend that modifying Brookdale's staffing policies and procedures so that they are based on

12 reasonable task times for those care services is necessary to accommodate their disabilities and is

13 "eminently reasonable." Mot. at 42. And Brookdale's alleged failure to make this reasonable

14 accommodation, Plaintiffs contend, violates Title III of the ADA. *See Fortyune*, 364 F.3d at 1082.

15          **b. Rule 23(a) Analysis**

16          Plaintiffs bear the burden of showing both that there are questions of law or fact common

17 to the class and that the claims or defenses of the representative parties are typical of the claims or

18 defenses of the class. Fed. R. Civ. P. 23(a). Beginning with commonality, Plaintiffs contend that

19 whether the ADA requires Brookdale to increase the amount of caregiver staffing is a common

20 question capable of a common answer. *See* Mot. at 41; Reply at 24. But the Court is not

21 convinced that this question is capable of classwide resolution.

22          Courts have been wary of certifying claims based on a defendant's failure to adequately

23 staff its facilities because such claims tend to require granular and individualized inquiries about

24 injury and causation. To determine whether and to what extent a class member suffered an injury

25 that was caused by understaffing, for example, a factfinder would have to assess how each facility

26 was staffed, the acts or omissions of staff, and the impact of the alleged wrongful acts or

27 omissions on a particular resident. This inquiry would vary by facility, by disability, by resident,

28 and perhaps even by shift. These kinds of individualized issues have been found to preclude class

certification. *See, e.g.*, *Bartels v. Saber Healthcare Grp., LLC*, No. 5:16-CV-283-BO, 2020 WL 6173566, at *2 (E.D.N.C. Oct. 21, 2020) (denying certification of understaffing claims in light of individualized issues as to (1) staffing levels across facilities and the time period; and (2) the putative class members' care plans and needs); *Kohn v. Am. Hous. Found., Inc.*, 178 F.R.D. 536, 543 (D. Colo. 1998) (denying certification of understaffing claims against a skilled nursing facility because of individualized questions as to whether the class members were exposed to and harmed by defendant's alleged understaffing); *Passucci v. Absolut Center for Nursing and Rehabilitation at Allegany, LLC*, No. 2010/6955, 2014 WL 7912858, at *21 (N.Y. Sup. Ct. Jan. 10, 2014) (denying certification of understaffing claims in light of individualized issues as to how each facility was staffed, the acts or omissions of short staff, and the impact of the alleged wrongful acts or omissions on the patients).

Plaintiffs' novel Reasonable Modification Claims attempt to avoid this result by reframing the injury that the proposed class members suffered. Their theory of injury is that the class members have suffered discrimination as defined by Title III of the ADA because they asked for a joint "reasonable modification"—i.e., that Brookdale change its policies and practices regarding caregiver staffing to increase the amount of such staffing—that is "necessary" to accommodate the class members' disabilities. And whether the request that they have made is "reasonable," they contend, is a determination that can be made on behalf of the Disabilities Class as a whole.

The fundamental problem with this theory is that although Plaintiffs try to repackage the injury they suffered from Brookdale's alleged understaffing, they have traded one fact-specific and individualized inquiry for another. To determine whether a modification is "reasonable," the factfinder must engage in a "fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune*, 364 F.3d at 1083; *see also Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 844 (9th Cir. 2004) ("[T]he determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry."). By nature, this is "an individualized inquiry." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) ("To comply with this command, an individualized inquiry must be made to

United States District Court
Northern District of California

United States District Court
Northern District of California

1  determine whether a specific modification for a particular person's disability would be reasonable

2  under the circumstances as well as necessary for that person[.]"); *see also Allen v. Ollie's Bargain*

3  *Outlet, Inc.*, 37 F.4th 890, 893 (3d Cir. 2022).

4        In the Court's view, assessing the reasonableness and necessity of a modification request

5  in practice requires an analysis similar to the one that applies to the substantive understaffing

6  claims discussed above.  That is, to determine whether and to what extent increasing staffing at a

7  facility is necessary to give a particular class member "full and equal access" to that facility, a

8  factfinder would have to assess how each facility was staffed, the acts or omissions of staff, and

9  the impact of the alleged wrongful acts or omissions on a particular resident.  Since the

10  Disabilities Class contains different residents in differently staffed facilities who live with

11  different disabilities and therefore require help with different activities of daily living, the Court

12  concludes that the reasonableness and necessity of some global level of increased staffing cannot

13  be resolved in one stroke for each of the claims.[16]

14        The Court thus finds that "whether Defendants have made reasonable modifications in

15  policies and practices with respect to caregiver staffing," Mot. at 41, is not a question capable of

16  "generat[ing] common answers apt to drive the resolution of the litigation," *Dukes*, 564 U.S at

17  350, because the "reasonableness" determination is heavily enmeshed in individualized questions

18  of fact.  The commonality requirement therefore is not met as to the Disability Class, and the

19  Court denies certification as to that class.

20        **iv.   Misleading Statements and Omissions Class**

21        The Misleading Statements and Omissions Class would consist of all persons who resided

22  or reside at a Brookdale residential care facilities for the elderly located in California during the

---

[16] Plaintiffs propose to prove their case with expert testimony showing that the disparity between workload and staffing hours at Brookdale's facilities is so large that it is mathematically and physically impossible for caregivers at these facilities to deliver all care and services required by residents.  *See* Flores Decl. ¶ 63; Schroyer Decl. ¶ 92.  As Defendants point out, however, even assuming that Flores's method for assessing staffing is proper, it showed "wide discrepancies in both the existence and extent of [the] alleged time deficits" which "illustrates that staffing levels are not determined by either the Service Alignment benchmarks or any other common 'staffing model.'"  Opp. at 40.  Accordingly, Plaintiffs also have not shown that facilities are similarly staffed, particularly in light of the evidence Brookdale has provided that executive directors retain discretion in how they staff their facilities.  *See* Opp. at 21.

61

class period and "who contracted with Brookdale or another assisted living facility for services for which Brookdale was paid money, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration." Mot. at 13. This class alleges that Brookdale violated the CLRA, UCL, and California's elder abuse statute by making false and misleading representations and omissions in resident contracts and other documents regarding the provision of services. *See* TAC ¶¶ 242–287. Plaintiffs seek both declaratory and injunctive relief, as well as damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3). Mot. at 13.

### a. Legal Standards for Commonality and Predominance

Plaintiffs bear the burden of showing that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a). To grant class certification pursuant to Rule 23(b)(3), the Court must also find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The commonality and predominance inquiries have significant overlap. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (explaining that "there is substantial overlap between" the tests for commonality and predominance); *Olean*, 31 F.4th at 664 (stating that "[t]he requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a): the plaintiffs must prove that there are questions of law or fact common to class members that can be determined in one stroke . . . in order to prove that such common questions predominate over individualized ones" (quotations and citations omitted)). The Supreme Court, however, has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34 (citing *Windsor*, 521 U.S. at 623–24). Accordingly, the Court will focus its analysis on Rule 23(b)(3) predominance requirement, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 594.

### b. Plaintiffs Fail to Show Predominance

Plaintiffs contend that there are four common questions of law or fact that are apt to drive resolution of the claims: 1) whether Brookdale's statements and omissions regarding facility staffing were deceptive or likely to mislead a reasonable consumer, 2) whether Brookdale's

United States District Court
Northern District of California

United States District Court
Northern District of California

deceptive statements or omissions would be material to a reasonable consumer, 3) whether Brookdale has wrongfully taken the property of elderly residents, and 4) whether Brookdale's conduct has caused classwide injury.  Mot. at 44–46.  Defendant argues that none of these issues present common or predominant questions.  Opp. at 42–48.  The Court agrees with Defendant, and will explain why in two sections: 1) CLRA and UCL claims, and 2) the Elder Financial Abuse claim.

### 1.   CLRA and UCL Legal Standards

"The CLRA prohibits a number of unfair methods of competition and unfair or deceptive acts or practices . . . ." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1310 (9th Cir. 2022) (quotation omitted).  "Unlike the UCL, the CLRA demands that each potential class member have both an actual injury and show that the injury was caused by the challenged practice . . . . However, if a material misrepresentation has been made to the entire class, an inference of reliance arises as to the class." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069–70 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).  "This rule applies to cases regarding omissions . . . as well." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011).  "A misrepresentation [or omission] is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) (quotation omitted).

"The UCL "bars 'unfair competition' and defines the term as a 'business act or practice' that is (1) 'fraudulent,' (2) 'unlawful,' or (3) 'unfair,'"…(e)ach of which (are) independent ground(s) for liability." *Shaeffer v. Califia Farms, LLC*, 258 Cal. Rptr. 3d 270, 276 (Ct. App. 2020).  Plaintiffs' claims under both the CLRA and the UCL "are governed by the reasonable consumer test." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quotation omitted).  "Under the reasonable consumer standard, [Plaintiffs] must show that members of the public are likely to be deceived." *Id.* (quotations omitted).  "However, the question of likely deception does not automatically translate into a class-wide question." *Berger*, 741 F.3d at 1068 (quotation omitted).

a.   Plaintiffs' Theory of Injury

As with their "reasonable modification" claim, Plaintiffs propose a theory of injury that they claim does not require individualized examination of whether any particular resident received particular services at any particular time.  They begin by arguing that:

> In their standard form contracts with the residents, Defendants represent that they will assess the residents' needs for services, and then provide them with those services. These statements are false and misleading to a reasonable consumer as a result of Defendants' corporate policy and practice of understaffing which often results in the denial of care services.

Mot. at 12.  Plaintiffs also allege that Brookdale failed to disclose its allegedly "deficient staffing policies."  Mot. at 45.  Plaintiffs directly disavow that their claim is one "for compensation for specific undelivered services."  Reply at 25.  Instead, Plaintiffs contend that their theory is that "the residents were deceived into paying upfront move-in fees and were subsequently overcharged for services."  *Id.*  Plaintiffs further assert that "[w]here, as here, the basis for the CLRA claim is that the defendant's product or service is allegedly defective, the defect itself is the injury even if the defect is latent.  That legal injury is sufficient to support class certification without proof as to the specific circumstances of any particular class member."  Mot. at 31 (quotations omitted). Accordingly, Plaintiffs contend that whether specific residents individually experienced under-staffing is irrelevant to their claim.  Mot. at 48.[17]

The Court understands why Plaintiffs characterize their theory this way.  First, as the discussion of the "reasonable accommodation" claim makes clear, any theory based on whether individual class members *actually* did or didn't receive services necessarily would implicate a large number of individualized inquiries that clearly would preclude class treatment.  And second, Plaintiffs' initial framing of the case as alleging that Defendant "subjects all residents, regardless

---

[17] The Court notes that this exact theory is being considered by the Ninth Circuit in a case against another senior living services company in which a class was certified.  *See Heredia v. Sunrise Senior Living, LLC*, No. 8:18-CV-01974-JLS-JDE, 2021 WL 6104188, at *15 (C.D. Cal. Nov. 16, 2021).  The *Heredia* appeal, in which one of Plaintiffs' lead counsel in this case is co-counsel, has been fully briefed and raises many of the same issues that confront the Court here.  If not for the age of this case and the advanced age of the named Plaintiffs and the putative class members, the Court would strongly consider staying this matter pending the Ninth Circuit's decision in *Heredia*. But those considerations counsel for deciding the motion now, with the understanding that the *Heredia* ruling may mandate reconsideration at some point.

United States District Court
Northern District of California

of disability, to a substantial risk that they will not receive the care and services they require and have paid for on any given day," TAC ¶ 67, was jeopardized as a basis for standing when the Supreme Court decided *TransUnion* over two years after the complaint was filed.

But notwithstanding the practical necessity of the current framing, Plaintiffs fail to meet their burden of proving that the misleading statements and omissions claims are suitable for class treatment, because they present no evidence that shows by a preponderance of the evidence that common issues predominate on the foundational question of which class members suffered Article III injury.

### b.   Plaintiffs Present no Evidence, as Opposed to Allegations, Establishing Classwide Injury

As discussed earlier in this order, "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668. This Court must "determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Id.* at 669. *Olean* also confirmed that "[b]ecause the Supreme Court has clarified that 'every class member must have Article III standing in order to recover individual damages,' . . . Rule 23 also requires a district court to determine whether individualized questions into this standing issue would predominate over common questions . . . ." *Id.* at 668 n.12 (citations omitted).

The core contention of Plaintiffs' current theory is that every single member of the Misleading Statements and Omissions Class "overpaid"—without regard to how much they paid, what they paid for (for example, move in fees, personal service fees, or select and therapeutic services fees), or what services were detailed in each individual resident's Personal Service Plan and Personal Service Rate Report. Plaintiffs' theory depends on the conclusion that a resident who contracted for services requiring one hour per week of care and a resident who contracted for services requiring 80 hours per week of care both paid too much based on Plaintiffs' claimed misrepresentations and omissions. Plaintiffs contend the same is true of residents whether or not

United States District Court
Northern District of California

they paid a move-in or "Community Fee," which, without dispute, is not uniformly collected by Defendant.  *See* Kennedy Decl. ¶ 63 (noting that executive directors at each facility can decide whether to charge or waive the community fee).

Under *Olean*, the Court must make a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the class-wide evidence to *prove* the common question in one stroke."  31 F. 4th at 666 (emphasis added) (citation and internal quotation marks and brackets omitted).  It follows that Plaintiffs have the burden of presenting evidence sufficient to back up their assertion that all class members, regardless of their specific circumstances, can be shown to have suffered injury without individualized inquiry.

Plaintiffs posit that they can do so based on the fact that all class members paid *something*, for *some* services, and the asserted corollary that whatever they paid, it was too much.  Plaintiffs argue that the Ninth Circuit's reasoning in *Hinojos v. Kohl's Corp.* establishes that this showing is enough to establish standing for all class members.  *See* Reply at 17 ("The payment of money constitutes 'monetary harm' that clearly establishes injury in fact under Article III." (citing *TransUnion* and *Hinojos*)).  In *Hinojos*, the Ninth Circuit held that "when a consumer purchases merchandise on the basis of [a misrepresentation], and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue under the UCL [and CLRA] . . . because he has suffered an economic injury."[18]  *Hinojos*, 718 F.3d at 1107.

As an initial matter, it is not clear to the Court that the *Hinojos* rationale from cases involving products, including allegedly defective products, fits well in a case involving a complex, highly individualized suite of services like residential elder care services.  In a case like *Hinojos*, at the time the consumer purchases the product, its attributes are fixed.  At the moment of purchase, then, both the representation (what was promised) and the actual condition of the product (what was delivered) are known, even if there is a latent alleged defect that never actually manifests.  For example, in *Mazza v. American Honda Motor Co., Inc.*, the Ninth Circuit

---

[18] Regarding the CLRA, the court reasoned as follows: "Because the [CLRA's] 'any damage' standard includes even minor pecuniary damage, we conclude that any plaintiff who has standing under the UCL's . . . 'lost money or property' requirement will, *a fortiori,* have suffered 'any damage' for purposes of establishing CLRA standing."  *Hinojos*, 718 F.3d at 1108.

considered a case involving an allegedly defective car braking system.  Plaintiffs argued that "class members paid more for the [system] than they otherwise would have paid, or bought it when they otherwise would not have done so, because Honda made deceptive claims and failed to disclose the system's limitations."  666 F.3d at 595.  While the court characterized the issue as "not a simple or a clear cut matter," it found "in the light of our prior precedent" that "[t]o the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact'" sufficient to establish class standing.  *Id.* (citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011)).

By contrast, when different members of the putative class contracted for substantially varying levels of service at customized prices, based on their individualized assessments, "what was delivered" will only become clear later, when a resident does or doesn't receive the promised level of care.  To the extent Plaintiffs' theory is that the quality of the services actually was fixed at the time of purchase because it incorporated a "design flaw" that gave rise to a "risk" that Defendant wouldn't be able to later provide the promised services, without regard to whether they actually did, it is difficult for the Court to reconcile that reading of *Hinojos* with *TransUnion*'s later holding that exposure to a risk of harm is not enough to establish Article III standing.  The *Heredia* appeal and the eventual appeal in this case will give the Ninth Circuit the opportunity to consider how these lines of cases apply in a circumstance like this one.

But even apart from these doctrinal questions, Plaintiffs' class bid suffers from a more fundamental problem: even if their theory of harm could under some circumstances establish injury *in concept*, they present no *evidence* establishing that it is true in this case.  As discussed above, Plaintiffs' current theory is that "the residents were deceived into paying upfront move-in fees and were subsequently overcharged for services."  Reply at 25.  *Olean* thus requires them to present evidence showing that all class members were so "overcharged," either now or before those class members can recover damages.[19]  So the question is, where is that evidence?  The

---

[19] The Ninth Circuit recently reiterated that it remains an open question "whether every class member must demonstrate standing before a court certifies a class," and that district courts "may be required to address this issue."  *Van v. LLR, Inc.*, No. 21-36020, 2023 WL 2469909, at *11 n.12 (quotation omitted) (9th Cir. Mar. 13, 2023).  But even though the standard remains unsettled,

complaint and counsel's arguments in briefs articulating the theory plainly are not *evidence* of the sort required by *Olean*.  *See* Mot. at 46 (asserting that "all class members have been injured as a result of Brookdale's defective staffing policy and model which is not reasonably designed to deliver the services promised to all residents," and contending without specifying any underlying evidence that "the question can be resolved through common proof, including Brookdale's documents and expert testimony").  And as the Seventh Circuit recently observed, neither is an asserted "truism" that a "good" product or service is worth more than an allegedly "bad" product or service.  *See Flynn v. FCA US LLC*, 39 F.4th 946, 952 n.1 (7th Cir. 2022) (explaining that the allegations in plaintiffs' complaint "cast their argument in the form of a truism: they maintained that consumers would pay less for an 'unsafe' car than they would a 'safe' car," but that "it was their burden to produce *evidence* in response to a factual challenge to standing") (emphasis in original).

The closest Plaintiffs come to offering evidence in support of their overpayment theory is the declarations of their damages expert, Dr. Patrick Kennedy.  *See* Kennedy Decl., Kennedy Reply Decl.  But a close review of these documents reveals that Dr. Kennedy does not provide any evidence supporting the existence of a classwide overpayment:  he simply *assumed* Plaintiffs' theory that there was an overpayment was true, then proposed a methodology (also flawed for the reasons explained later) for *valuing* that purported overpayment.  Dr. Kennedy first acknowledged the complaint's theory:  "Plaintiffs claim that residents live with a substantial risk that they will not receive the care and services that they have paid for and that they need."  Kennedy Decl. ¶ 20 (citing TAC ¶¶ 6–7).  Dr. Kennedy then stated his "understanding" that "under applicable law, the appropriate measure for calculating damages or restitution . . . is the excess of what Plaintiffs paid to the Defendant over the value, if any, of what the Plaintiffs received."  *Id.* ¶ 21.  He continued that "I understand that a focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of the transaction without the allegedly misrepresented or

---

here the Court finds that Plaintiffs simply have presented no evidence sufficient to meet their burden of showing that common issues predominate as to standing, which fails *Olean*'s explicit requirement.

United States District Court
Northern District of California

1   omitted information." *Id.*

2   Critically, though, what is missing from Dr. Kennedy's declarations is any effort to explain

3   *why or how* the putative class members uniformly paid more than a "reasonable consumer" would

4   have if they had received the purportedly omitted information.  His declaration catalogues at

5   length the sorts of fees that residents actually pay when they enter one of Defendants' facilities.

6   *Id.* ¶¶  23–35.  And in a generic sense, he opines that there is a connection between the services

7   Defendant agrees to provide and the prices charged.  *See, e.g., id.* at ¶ 34 (positing that "the

8   Personal Service Rate (the amount charged to each resident for care services) establishes the

9   market value of care services as bargained for, consistent with the level of care identified by

10   Brookdale in the individualized assessment").  But as to the central question of why these

11   *payments* constituted *injury* to all of the putative class members (i.e., why they exceeded what a

12   reasonable consumer would have paid *ex ante*), Dr. Kennedy again simply relies on Plaintiffs'

13   *allegations*:

>   According to Plaintiffs, Brookdale's misrepresentations regarding its
14   provision of staffing that is necessary to provide the services its
>   residents need and for which the residents are paying is material to
15   the reasonable consumer.  Plaintiffs claim that if they had known
>   Brookdale would charge them based on their personal service plan,
16   but not provide adequate staffing to provide the necessary level of
>   care, they would not have entered Brookdale's facilities, or they
17   would have insisted on paying a lower price.

18   *Id.* at ¶ 45 (citing TAC ¶¶ 90–91).  The Reply Declaration similarly relies on the allegations, not

19   evidence.  While there Dr. Kennedy says: "As described in my initial Declaration, if Plaintiffs had

20   been informed that Brookdale allegedly had a system that was not sufficiently staffed to provide

21   the services that were agreed upon and paid for, then Plaintiffs would therefore have paid less than

22   they actually paid," Kennedy Reply Decl. at ¶ 9, the cited reference is to part of paragraph 45,

23   which, as quoted above, simply described Plaintiffs' allegations.

24   Neither Dr. Kennedy or any other expert purports to explain why everyone in the putative

25   class was injured, without regard to their personal circumstances.  Dr. Kennedy did not, for

26   example, conduct a survey or apply any other method to try to substantiate or quantify the up-front

27   difference to a reasonable consumer between the value of the promised services as represented and

28   their value given the purported misrepresentations or omissions.  *Cf. Earl v. Boeing Co.*, 53 F.4th

897, 902 (5th Cir. 2022) (expert used conjoint analysis to support claim that demand for flights on purportedly defective airplane model would have been lower if consumers knew the information defendant allegedly fraudulently concealed; court found analysis insufficient to show any Article III injury).

Dr. Kennedy says he used "actual market prices," Kennedy Reply Decl. ¶ 32, but the problem is that his analysis can't show why or how payment of those prices was economic injury. Instead, he proceeded by quantifying the amounts paid by potential members in Community Fees and Personal Service Rate fees, then offsetting these amounts "for the potential value received." *See* Kennedy Decl. ¶ 71.  Dr. Kennedy's proposed damages calculation takes into account Mr. Schroyer's finding that "the number of hours required to perform the daily line-item services at each [of the six facilities tested] exceeded the number of staffing hours available on a daily basis, resulting in an average daily staffing shortfall of 41.5% per facility." *Id.* ¶ 60 (citation omitted). In Dr. Kennedy's opinion, "[t]he value bargained for would reflect 100 percent of the amount paid for care services. The staffing shortfall percentages can then be used to estimate the amount that residents would have paid if they had information regarding the extent of the shortfall." *Id.* ¶ 67.

In other words, Dr. Kennedy's theory of *ex ante* injury is explicitly linked to what *actually ended up happening* with respect to facility staffing, down to the level of particular facilities on particular days, which is the exact opposite of what Plaintiffs purport to be focused on.  *See id.* ¶¶ 61 (explaining that "this methodology can be applied by day, by facility and by type of care service provided," such that it supposedly "provides the ability to calculate class wide damages at whatever level of detail is required"); 70 (contending that the "above-described calculations can also be performed on a *class member-by-class mem*ber basis in order to accurately determine overall class wide damages and the allocation to each class member" (emphasis added)).  This mismatch between the purported injury (upfront overpayment detached from any actual failure to provide services) and the method for quantifying it (granular analysis in the aggregate of staffing levels that ended up actually being provided) collides with the principle that a plaintiff's damages theory must be consistent with her theory of liability, which would also pose a damages problem if the case were certified.  *See Comcast*, 569 U.S. at 37 (stating that "[t]he first step in a damages

United States District Court
Northern District of California

1    study is the translation of the *legal theory of the harmful event* into an analysis of the economic

2    impact of *that event*" (emphasis in original) (quotation omitted)).[20]

3           At bottom, nowhere does Dr. Kennedy explain why this post-hoc analysis of

4    individualized staffing patterns constitutes classwide common proof of the existence of the

5    purported "discount" that a reasonable consumer would have insisted upon had the allegedly

6    omitted facts been disclosed.  The Court finds that this failure is fatal under the "rigorous analysis"

7    it is required to conduct.

8           Relatedly, even setting aside Plaintiffs' failure to produce evidence to support classwide

9    standing as to their "overpayment" theory, the Court further finds that individualized issues

10   regarding what was promised and what was delivered would predominate over common issues.

11   Without dispute, the thousands of putative class members here underwent personalized

12   assessments, contracted for widely divergent customized suites of services, and paid resultingly

13   different amounts for those services.  *See, e.g.*, Dkt. No. 376 at 18, 24–29 (Residency Agreement

14   Addendum detailing individualized and itemized "select services" and "therapeutic services" with

15   "monthly recurring prices" ranging between $0 (if answer to threshold question about need is

16   "no") and $2,595 for "Dressing Change for 2 or more Stage I or II Wound").  They also no doubt

17   received different levels of services on a day-to-day basis, which is why Plaintiffs disavow any

18   suggestion that their class certification motion is based on what anyone actually received.  But

19   given the highly complex and highly individualized services at issue, the Court finds that the

20

---

21   [20] Plaintiffs cite the Ninth Circuit's holding in *Pulaski & Middleman, LLC v. Google, Inc.*, 802
     F.3d 979, 989 (9th Cir. 2015), in support of their damages model.  Mot. at 40.  But *Pulaski*

22   highlights the problems with their approach here.  In that case, online advertisers alleged that
     Google misled them about the prospect that their ads could be placed on certain types of

23   undesirable webpages called "parked domains and error pages."  *Id.* at 983.  The Ninth Circuit
     found that the plaintiffs' restitution model satisfied *Comcast* because Google's "Smart Pricing

24   ratio," which the company had created as part of its pricing model, was designed "to adjust the
     advertiser's bids to the same level that a 'rational advertiser' would bid if the national advertiser

25   had sufficient data about the performance of ads on each website."  *Id.* at 982, 989.  For this
     reason, "[b]ecause restitution under the UCL and FAL measures what the advertiser would have

26   paid at the outset, rather than accounting for what occurred after the purchase, using a ratio from
     Google's data that adjusts for web page quality is both targeted to remedying the alleged harm and

27   does not turn on individual circumstances."  *Id.* at 989.  By contrast, Plaintiffs' damages model
     here does not just "account[] for what occurred after the purchase": it openly and entirely relies on

28   post-purchase staffing occurrences, and thus inherently implicates consideration of "individual
     circumstances."

"reasonable consumer" standard cannot paper over the reality that the specifics of the promises made to class members and whether they suffered any injury in light of those promises would predominate, and require thousands of granular individual mini-trials.  *See Stearns*, 655 F.3d at 1020 (explaining that there is no predominance where "there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant"); *Van*, 2023 WL 2469909, at *12 (where defendant provided evidence that at least some class members were uninjured, district court had to "determine whether the plaintiff has proven by a preponderance of the evidence that the questions of law or fact common to class members predominate over any questions affecting only individual member—that is, whether a class-member-by-class-member assessment of the individualized issue will be unnecessary or unworkable" (citation omitted)); *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) (ordering class decertified because any common question as to vendor misclassification was "outweighed by the individual questions going to injury and damages").

Plaintiffs' theory relies on the idea that as long as each class member paid any amount, for any quantity and type of services, at any facility, there is no need to look to the details of what they actually contracted for or what they received to proceed with a mass trial on behalf of thousands of differently situated residents.  But that theory ignores that these substantial variations are meaningful, and would have to be examined on an individualized basis.  In *Lara v. First Nat'l Ins. Co. of Amer.*, 25 F.4th 1134, 1138 (9th Cir. 2022), for example, the Ninth Circuit affirmed the denial of certification, in part based on plaintiffs' failure to establish predominance.  That case was about the defendant insurance company's methodology for valuing totaled cars, and plaintiffs argued that the methodology resulted in them being underpaid for their cars and constituted both a breach of contract and an unfair trade practice under Washington law.  *Id.* at 1136–38.  The court found that "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person," specifically "looking into the actual pre-accident value of the car and then comparing that with what each person was offered, to see if the offer was less than the actual value."  *Id.* at 1139.  Because "proof of these injuries [would] be individualized," and would predominate, the district court did not abuse its discretion in declining to certify the

class. *Id.* at 1139–40.  And the Ninth Circuit rejected plaintiff's argument that "these

individualized issues of harm are 'damages issues' that can be tried separately," because "if

there's no injury, then the breach of contract and unfair trade practices claims must fail," which

was "not a damages issue [but instead] a merits issue."  *Id.* at 1140.  The Court finds the reasoning

of *Lara* persuasive here, and finds that it supports the conclusion that the predominance

requirement has not been met.[21]

      For all of these reasons, the Court finds that Plaintiffs have not met their legal or

evidentiary burden of showing that the Misleading Statement and Omissions Class satisfies Rule

23(b)(3)'s predominance requirement.  *See Dukes*, 564 U.S. at 350 (2011) (explaining in the

context of the lower Rule 23(a) commonality requirement that "[w]hat matters to class

certification . . . is not the raising of common 'questions'—even in droves—but rather, the

capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the

litigation," and that "[d]issimilarities within the proposed class are what have the potential to

impede the generation of common answers.").

      The Court therefore denies the motion to certify the Misleading Statements and Omissions

class as to the CLRA and UCL claims.

### 2.  Elder Financial Abuse

Plaintiffs bring a claim on behalf of the Misleading Statements and Omissions Class under

California's Elder Abuse statute, California Welfare and Institutions Code § 15610.30.  *See* TAC

¶¶ 263–73.  Under the statute,

> "financial abuse" of "an elder or dependent adult occurs when a person or entity," among other things, "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." . . .  A person or entity is "deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if . . . the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."

---

[21] Plaintiffs characterize *Lara* as "a breach of contract case based on a 'benefit of the bargain' analysis," Reply at 17, and purport to distinguish it on that basis.  But that characterization is not accurate:  as reflected in the above synopsis, *Lara* also involved an unfair trade practices claim that parallels the California claims here, and the Ninth Circuit affirmed the district court's conclusion that individual questions as to injury predominated with respect to that claim as well as the breach of contract claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Heredia*, No. 818CV01974JLSJDE, 2021 WL 6104188, at *11 (C.D. Cal. Nov. 16, 2021) (quoting Cal. Welf. & Inst. Code § 15610.30). The statute applies to the "real or personal property of an elder or dependent adult . . . regardless of whether the property is held directly or by a representative of an elder or dependent adult." Cal. Welf. & Inst. Code § 15610.30(c).

Plaintiffs motion to certify this class fails for a much less complex reason than did the prior class: determining *whose* property Brookdale obtained, a critical question in determining whether the statute even applies to any given class member, is not subject to classwide proof. If a 65-year-old resident paid Brookdale directly, then Brookdale would be liable under the statute (assuming all other elements were shown).[22] But if the 40-year old independent adult daughter of the same resident paid for her mother's care directly, using her own personal property, Brookdale would not be liable under the statute, even if it violated its substantive provisions. Accordingly, liability cannot be established on a classwide basis. The Court finds that individualized questions regarding Brookdale's liability and who can recover under the statue would predominate over any common questions. The Court therefore denies the motion to certify the Misleading Statements and Omissions class as to the elder financial abuse claim as well.[23]

## IV.   CONCLUSION

Accordingly, the Court **GRANTS IN PART and DENIES IN PART** Plaintiffs' motion for class certification as set forth above.

The Court **DENIES** Brookdale's motion to exclude the opinion of Ms. Kailes.

The Court **GRANTS IN PART and DENIES IN PART** Brookdale's motion to exclude the testimony of Mr. Cross as set forth above.

The Court **GRANTS IN PART AND DENIES IN PART** Brookdale's motion to exclude the declaration and testimony of Mr. Mastin and Mr. Waters as set forth above.

---

[22] For the purposes of the statute, "'[e]lder' means any person residing in this state, 65 years of age or older." Cal. Welf. & Inst. Code § 15610.27.

[23] Based on its conclusion that classwide injury remediable by a common injunction cannot be shown with common proof, the Court also denies certification under Rule 23(b)(2), recognizing that there is no predominance requirement under that section. *See* Fed. R. Civ. P. 23(b)(2) (detailing required showing that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole").

1    The Court **DENIES** Brookdale's motion to exclude the opinion of Dr. Flores.

2    The Court **DENIES** Brookdale's motion to exclude the opinion of Mr. Schroyer.

3    The Court **DENIES** Brookdale's motion to exclude the testimony of Dr. Kennedy.

4    The Court **DENIES** Plaintiffs' motion to exclude the testimony of Dr. Anderson.

5    The Court **DENIES** Plaintiffs' motion to exclude the testimony of Dr. Jacobson and Dr.

6    Saad.

7    The Court **DENIES AS MOOT** Plaintiffs' motion to strike the supplemental declaration

8    of Dr. Saad.

9    The Court **DENIES IN PART** and **DENIES AS MOOT IN PART** as set forth above

10   Brookdale's motion to strike Wallace Reply Declaration, the Steyer Reply Declaration, and the

11   Bien-Kahn Reply Declaration.

12   The Court has redacted parts of the publicly available version of this order in accordance

13   with the parties' previous motions to seal.  Any party who contends that any part of those sections

14   should remain under seal must file a declaration within 14 days providing detailed word-by-word

15   proposed redactions and the "compelling reasons" for maintaining these parts of the order under

16   seal.  *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v.*

17   *City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).  If the parties fail to provide a

18   timely and sufficient basis for sealing the material, an unredacted version of the order will be

19   placed on the public docket.  The Court notes that in its view all or nearly all of the high-level

20   descriptions in the order need not be sealed, even when the underlying documents are.

21   The Court **SETS** a case management conference on April 25, 2023, at 1:00 p.m.  The

22   Court further **DIRECTS** the parties to submit a joint case management statement by April 18,

23   2023.  The conference will take place in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA.

24   **IT IS SO ORDERED.**

25   Dated:   3/30/2023

26   

27   HAYWOOD S. GILLIAM, JR.
     United States District Judge

28