UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 17-cv-03962-HSG

STACIA STINER, et al.,

Plaintiffs,

v.

BROOKDALE SENIOR LIVING, INC., et al.,

Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CERTIFICATION OF SUBCLASSES AND DEFENDANTS' MOTION FOR CLARIFICATION OF THE COURT'S MARCH 30, 2023 ORDER**

Re: Dkt. Nos. 740, 782

Pending before the Court are Plaintiffs' motion for certification of subclasses, Dkt. No. 740, and Defendants' motion for clarification of the Court's March 30, 2023 order, Dkt. No. 782. The Court held a hearing on the motion for certification on June 27, 2024. *See* Dkt. No. 814. The Court finds Defendants' motion for clarification appropriate for disposition without oral argument and deems the matter submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** both motions.

## I. BACKGROUND

Given the long-running nature of this case and the parties' familiarity with its details, the Court provides only a brief recapitulation of the facts relevant to the instant motions.

On March 30, 2023, the Court ruled on Plaintiffs' then-pending motion for class certification, which sought certification of three classes. The Court declined to certify either the proposed Disabilities Class or the Misleading Statements and Omissions Class. Dkt. No. 593 at 61, 73–74.[1] It also did not certify the Mobility and Vision Impaired Class to pursue their ADA

---

[1] For ease of reference, the Court refers to the PDF pages rather than the document's internal pagination unless otherwise noted.

1    and Unruh Act claims for allegedly unlawful access barriers in the facilities.  *Id*. at 43.  The Court

2    did, however, certify a subclass of the Mobility and Vision Impaired Class – the Wheelchair and

3    Scooter Users Subclass – under Rule 23(b)(2) to pursue claims concerning the Fleet Safety Policy

4    theory.  *Id*. at 48.

5         On October 19, 2023, Plaintiffs timely filed a motion for leave to file a motion for

6    certification of subclasses – specifically, of six facility-based access barrier subclasses to pursue

7    ADA and Unruh Act claims, and two Misleading Statements and Omissions Claims subclasses to

8    pursue UCL and CLRA claims.  Dkt. No. 650.  The Court granted Plaintiffs leave to seek

9    certification for their access barrier facility-based subclasses on their ADA and Unruh Act claims,

10   but ruled that they could not seek class certification for their misleading statements and omissions

11   claims.  Dkt. No. 733.  On February 9, 2024, Plaintiffs filed their motion seeking certification of

12   facility-level access subclasses.  Dkt. No. 740 ("Cert. Mot.").  It is now fully briefed and was

13   argued before the Court on June 27, 2024.  *See* Dkt. Nos. 783 ("Cert. Opp."), 805 ("Cert. Reply"),

14   814 (hearing minutes).

15        Meanwhile, on May 13, 2024, Defendants filed a motion requesting that the Court clarify

16   two aspects of its March 30, 2023 order.  Dkt. No. 782 ("Clarification Mot.").  Specifically,

17   Defendants seek confirmation that the Court (1) did not include manual wheelchair users in the

18   certified Wheelchair and Scooter Users Subclass ("the Subclass") and (2) did not include former

19   residents in the Subclass.  If the Court did define the Subclass to include either kind of resident,

20   Defendants move to modify the Subclass definition to only include current residents who use a

21   motorized wheelchair, scooter, or other powered mobility device.  Plaintiffs timely opposed, Dkt.

22   No. 793 ("Clarification Opp."), and Defendants replied, Dkt. No. 803 ("Clarification Reply.").

23   **II.    DISCUSSION**

24        **A.    Plaintiffs' Motion for Certification of Subclasses**

25        Plaintiffs move to certify six subclasses of current and former residents of six Brookdale

26   facilities to pursue ADA and Unruh Act claims related to access barriers for persons with mobility

27   and/or vision disabilities.  Specifically, they seek to certify Rule 23(b)(3) subclasses on behalf of

28   certain residents at the San Ramon, Scotts Valley, Brookhurst, Fountaingrove, Tracy, and Hemet

United States District Court
Northern District of California

facilities (the "Facilities"), and Rule 23(b)(2) subclasses on behalf of certain residents at only the San Ramon, Scott Valley, and Brookhurst facilities.  The San Ramon, Scotts Valley, Brookhurst, and Tracy subclasses are identically defined but for the relevant facility name:

> All persons with disabilities who use wheelchairs, scooters, or other mobility aids or who have vision disabilities and who reside or have resided at the [Facility Name] residential care facility for the elderly located in California and owned, operated and/or managed by Brookdale during the three years prior to the filing of the Complaint herein through the conclusion of this action, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.

Cert. Mot. at 10 (alterations added).  The subclasses for the Fountaingrove and Hemet facilities are defined almost identically to the others:

> All persons with disabilities who use wheelchairs, scooters, or other mobility aids or who have vision disabilities and who resided at the [Facility Name] residential care facility for the elderly located in California that was owned, operated and/or managed by Brookdale during the three years prior to the filing of the Complaint herein through the conclusion of this action, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.

Cert. Mot. at 10 (alterations added).[2]

Plaintiffs seek minimum statutory damages for their proposed Rule 23(b)(3) subclasses, and injunctive and declaratory relief for their proposed Rule 23(b)(2) subclasses.  The Court will **GRANT** the motion **in part** and **DENY** it **in part.**

---

[2] The only significant distinction between these two versions of the subclass definition is the scope of covered residents.  The subclass definition proposed for the San Ramon, Scotts Valley, Brookhurst, and Tracy facility-based subclasses encompasses both current and prior residents, whereas the definition for the Fountaingrove and Hemet subclasses includes just former residents. The rationale for limiting the Fountaingrove and Hemet subclasses in this fashion is that Brookdale no longer operates those facilities.  As a logical matter, then, Plaintiffs only seek to certify those facility-based subclasses pursuant to Rule 23(b)(3), and do not request injunctive relief under subsection (b)(2).  However, it is not the case that Plaintiffs are seeking to certify as (b)(2) subclasses all subclasses that include current residents.  While the definition for the Tracy facility contemplates both current and former residents in its subclass, Plaintiffs have only moved to certify a (b)(3) Tracy damages subclass – apparently because identifying a (b)(2) class representative has been unavailing.  Though Plaintiffs' counsel suggested at the hearing that they could endeavor to identify someone in short order if the Court so permitted, the Court declines to do so given the already extremely extended nature of this case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

###### i.   Legal Standard

Federal Rule of Civil Procedure 23 governs class actions, including the issue of class certification. Class certification is a two-step process.  To warrant class certification, a plaintiff "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule . . . .").

Rule 23(a) provides that a district court may certify a class only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Plaintiffs assert that they meet the requirements of both Rule 23(b)(2) and 23(b)(3).  *See* Dkt. No. 740.   Rule 23(b)(2) provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3), in turn, applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  To determine whether a putative class action satisfies the requirements of

4

Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. at 350–51); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements.") (emphasis in original). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466. At bottom, the issue to be decided on a certification motion is whether the case should be "conducted by and on behalf of the individual named parties only" or as a class. *Dukes*, 564 U.S. at 348.

### ii.   **Analysis**

#### a.   Standing

Plaintiffs argue that all of the proffered subclass representatives have standing for the types of relief sought.[3]   The subclass representatives state that they were or are residents with disabilities

---

[3] Plaintiffs propose adding two additional (b)(3) subclass representatives: Wendy DeMello (successor-in-interest to late grandmother and former Brookdale resident Lois Lewright) to represent residents with visual impairments in the San Ramon subclass, and Denise Margie (successor-in-interest to late father and former Brookdale resident Norman Rheinor) to represent residents with mobility impairments in the Tracy subclass.  The Court is satisfied that these proposed class representatives have standing to represent their (b)(3) damages subclasses, and

who have encountered numerous barriers that, they contend, deny or denied them full and equal access to Brookdale's facilities.  *See, e.g.*, Dkt. Nos. 740-20 (Stiner Declaration), 740-24 (DeMello Declaration), 740-23 (Jestrabek-Hart Declaration), 740-22 (Lindstrom Declaration), 740-14 (Algarme Declaration), 740-25 (Margie Declaration).  As this Court has previously held, those allegations constitute concrete injuries.  *See Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1181 (N.D. Cal. 2023) (citing *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017)).  The Court is accordingly satisfied, and Defendants do not dispute, that the subclass representatives have suffered an injury-in-fact capable of conferring standing to represent the proposed (b)(3) damages subclasses for the facilities at which they reside or resided.

That is not the end of the analysis, however, as standing for injunctive relief must be separately established through demonstrating "a real and immediate threat of repeated injury in the future."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (internal quotation omitted).  The Ninth Circuit has held that a plaintiff seeking injunctive relief under the ADA may establish standing for injunctive relief (1) by showing "he intends to return to a noncompliant accommodation and is therefore likely to reencounter a discriminatory architectural barrier," or (2) by demonstrating that "discriminatory architectural barriers deter him from returning to a noncompliant accommodation."  *Id*. at 950.  Plaintiffs seeking injunctive relief on behalf of a (b)(2) class are not required to show that every class member has suffered an injury of this variety, but need only show that the proposed (b)(2) class representatives have standing to seek injunctive relief.  *See, e.g.*, *Olean*, 31 F.4th at 682 n.32 (collecting authorities); *Rodriguez v. Hayes*, 591 F.3d 1105, 1125-26 (9th Cir. 2010); *Stiner*, 665 F. Supp. 3d at 1181–82 & n.9.  And class representatives must support their standing for injunctive relief "at each stage of the litigation in the same manner as any other essential element of the case."  *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

Defendants do not dispute that Stacia Stiner and Bernie Jestrabek-Hart – both current Brookdale residents – have standing to seek injunctive relief on behalf of their respective (b)(2)

---

agrees that they are eligible to serve as subclass representatives.

San Ramon and Scotts Valley subclasses.  The Court finds that on account of their ongoing residency in Brookdale facilities, these plaintiffs plainly face "a real and immediate threat of repeated injury in the future" given the very high likelihood that they will reencounter allegedly unlawful access barriers in their facilities.[4]

The parties, however, dispute whether the same can be said of Jeanette Algarme, who resided at Brookhurst when the complaint was filed but moved out in October 2021.  *See* Dkt. No. 740-14 at 6.  While Ms. Algarme's status as a prior resident certainly does not foreclose the possibility that she could face future injury under the relevant precedents, *see Chapman,* 631 F.3d at 950, Defendants argue that Ms. Algarme has not sufficiently established that threat.  Ms. Algarme's supplemental declaration states that "[she] would return to visit the Brookdale Brookhurst facility, but only if it were made accessible to people with mobility disabilities by the removal of all of the current access barriers."  Dkt. No. 740-15.  Defendants argue that this statement is too conclusory to articulate a plausible risk of future harm, as it is silent about "when she plans to return, whether she has returned in the past, or how frequently she travels to the area in general."  Cert. Opp. at 31.

But Ms. Algarme is not *required* to furnish this level of detail.  While some courts in this circuit have evaluated factors such as a plaintiff's frequency of travel to an establishment and her past patronage of it in order to assess whether that plaintiff faces imminent future injury, the Ninth Circuit has not adopted such a test.  *See Strojnik v. Bakersfield Convention Hotel I, LLC*, 436 F. Supp. 3d 1332, 1343 n.4 (E.D. Cal. 2020) ("Since this test was first articulated fifteen years ago . . . the Ninth Circuit has not adopted it despite having confronted the same or similar issue repeatedly . . . ."); *see also Johnson v. Jew*, No. 20-CV-08457-EJD, 2021 WL 3621828 at *6 (N.D. Cal. Aug. 16, 2021).  Under *Chapman*, the "inquiry instead centers on whether the alleged intent to return is 'genuine.'"  *Johnson v. Simper Investments, Inc.*, No. 20-CV-01061-HSG, 2021 WL 4749410 at *3 (N.D. Cal. Oct. 12, 2021).  Although Ms. Algarme's declaration is admittedly

---

[4] Notably, plaintiffs such as Stiner and Jestrabek-Hart moving for injunctive relief to eliminate access barriers at a given facility need not have *personally* encountered each of the barriers they seek to redress.  *See, e.g.*, *Chapman*, 631 F.3d at 950–951.

short, the Court finds at this stage that it plausibly demonstrates a genuine intent to return.[5]  In

contrast to many ADA tester plaintiffs, Ms. Algarme previously lived at the Brookhurst facility,

and accordingly has a clear connection to that place and the people who continue to work and

reside there.  The Court finds that a sworn statement declaring her intent to return provided access

barriers are removed evidences a "genuine" intent to revisit Brookhurst, and is sufficient to confer

standing for injunctive relief.  Accordingly, the Court finds that Ms. Algarme may serve as the

representative for the (b)(2) Brookhurst subclass.[6]

    b.  Rule 23(a): Prerequisite Issues

        Having covered the threshold issue of class representatives' standing, the Court will

evaluate whether the subclasses they purport to propose comport with the requirements of Rule

23(a).

        1.  *Numerosity*

        Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members

is impracticable."  *See* Fed R. Civ. P. 23(a)(1).  "[C]ourts have routinely found the numerosity

requirement satisfied when the class comprises 40 or more members."  *Villalpando v. Exel Direct*

---

[5] This conclusion notwithstanding, the Court finds puzzling Plaintiffs' repeated insistence that "whether a plaintiff has standing to seek injunctive relief 'depends upon the facts as they exist when the complaint is filed.'"  Cert. Mot. at 18, Cert. Reply at 20 (quoting *Langer v. Kiser*, 57 F.4th 1085 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 823 (2024), *reh'g denied*, 144 S. Ct. 1132 (2024)).  While those facts are certainly relevant, the Court is not aware of any authorities that stand for the proposition that if a plaintiff has standing for injunctive relief at the time of filing, they have standing forever – which is what the Court understands Plaintiffs to argue as to Ms. Algarme.  The *Langer* court certainly did not make such a finding; rather, it raised the distinction between "facts as they exist when the complaint is filed" and those that develop afterwards in the context of discussing whether to consider post-complaint developments that clearly validated the plaintiff's alleged intent to return.  *See Langer*, 57 F.4th at 1098 ("While standing 'ordinarily depends' on the facts that exist at the time the complaint is filed . . .  Langer stated in his complaint that he intends to return to the Lobster Shop, and his repeated return visits support that fact.  Because the defense attempted to impeach his stated intent to return at trial, we may properly consider his return visits as evidence of his intent to return.") (internal citation omitted).  The *Langer* court recognized that under *Lujan*, "at the final stage, [standing-establishing] facts (if controverted) must be supported adequately by the evidence adduced at trial."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  Seeing as *Langer* itself considered the plaintiff's post-filing visits to the establishment at issue, that case simply does not stand for the principle that this Court is precluded from considering post-filing developments that affect the standing analysis, and confirms that standing may be contested even as late as trial.
[6] Defendants did not challenge her eligibility to serve as a (b)(3) class representative, and the Court does not independently identify any standing or other issue that would preclude that.

8

1  *Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014).

2  Plaintiffs argue that their subclasses are sufficiently numerous.  They point to Defendants'

3  assessment data to show that there are 180 putative subclass members at San Ramon, 219 at

4  Brookhurst, 219 at Scotts Valley, 114 at Fountaingrove, 42 at Tracy, and a similar number at

5  Hemet.  Cert. Mot. at 19.  Plaintiffs argue that although they do not have data on the exact number

6  of members of the Hemet subclass – due, in their view, to Defendants' incomplete data production

7  – the Court "can draw the reasonable inference that the Hemet subclass is of comparable size to

8  that of the other five [similarly sized] facilities at issue."  *Id*. at 20.

9  Defendants do not agree.  They argue that the class period for the (b)(3) Hemet subclass is

10  shorter than for the other subclasses due to the facility's dates of operation, undermining

11  Plaintiffs' speculative assumption that Hemet's subclass would be of a similar size.  *See* Cert.

12  Opp. at 30 n.1.  Defendants further contend that the data clearly show that Hemet's subclass is

13  simply not comparable.  According to Defendants' records and the relevant residency agreements,

14  they argue that a maximum of five individuals could possibly fit the (b)(3) Hemet subclass

15  definition, as only five Hemet residents have opted out of arbitration as the subclass definition

16  requires, even setting aside how many of those five would actually satisfy the other aspects of the

17  definition.  Opp. at 30.  On these facts, the Court agrees with Defendants that drawing the

18  inference that Hemet's subclass is similarly sized to the others would be unreasonable.

19  Accordingly, the Court finds that Plaintiffs have not established numerosity for the (b)(3) Hemet

20  subclass, and declines to certify it.

21  As for the (b)(2) subclasses, Defendants maintain that the numbers Plaintiffs rely upon to

22  establish numerosity are overinclusive, and that when properly evaluated, the (b)(2) subclasses

23  contain only 15, 23, and 29 people.  Cert. Opp. 28–29.  This line of argument is predicated on

24  Defendants' belief that the (b)(2) subclasses contain *only* current residents – a belief they may, to

25  some extent, be forgiven for having.  After all, Plaintiffs straightforwardly state in their opening

26  motion that the (b)(2) subclasses are "limited to current residents," but then somewhat

27  convolutedly shift gears in their Reply.  Cert. Mot. at 10; Cert. Reply at 19.  But notwithstanding

28  Plaintiffs' injection of unnecessary confusion, the Court finds that the subclass definitions

United States District Court
Northern District of California

themselves – rather than any descriptive characterization of them – are what it must consider in determining the contours of the proposed subclasses.  And the definitions of the (b)(2) subclasses do not restrict membership to only "current" residents.  On the contrary, they encompass "[a]ll persons with disabilities who use wheelchairs, scooters, or other mobility aids or who have vision disabilities and *who reside or have resided* at the [San Ramon, Scotts Valley, or Brookhurst] residential care facilit[ies] . . . *during the three years prior to the filing of the Complaint* herein *through the conclusion of this action . . . .*"  Cert. Mot. at 10.  Given that these definitions clearly contemplate subclasses comprised of both current *and* former residents, the Court is not persuaded that Defendants' estimate as to the (much smaller) population of current resident class members controls the analysis, and finds that the figures Plaintiffs point to adequately establish numerosity for the (b)(2) subclasses.

In short, the Court is satisfied that the (b)(2) subclasses, as well as the San Ramon, Scotts Valley, Brookhurst, Tracy, and Fountaingrove (b)(3) damages subclasses, are sufficiently numerous for class treatment.

### 2.  *Common questions of law or fact*

Rule 23(a)(2) certification requires a finding of "questions of law or fact common to the class."  Fed R. Civ. P. 23(a)(2).  This requirement has "been construed permissively, and all questions of fact and law need not be common to satisfy the rule."  *Ellis*, 657 F.3d at 986 (internal quotation marks and alteration omitted).  Instead, "for purposes of Rule 23(a)(2), even a single common question will do."  *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted).  A question is sufficiently common where "it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*. at 350.  Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class."  *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008).  "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S at 350 (emphasis omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs identify numerous "common questions" that they argue are "capable of common answers" with respect to each of the facility-based subclasses. Cert. Mot. at 20–21. Some examples they provide include (1) whether Brookdale's assisted living facilities are covered by the ADA, (2) when each facility was constructed and what access standard applies, (3) whether Brookdale's new facilities comply with the 1991 Americans with Disabilities Act Accessibility Guidelines ("ADAAG") and/or the California Building Code ("CBC"), and (4) whether Brookdale has failed to comply with its duty to remove ADAAG and CBC violations from its new facilities under the ADA and California law. *Id*. at 20–27.

The Court agrees that, at a minimum, resolving the question of whether each of the Facilities is in full compliance with applicable federal and state disability access standards will "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350. Plaintiffs' theories rise and fall based on the facilities' compliance: if a given facility does not conform to applicable access standards, Defendants will be in violation of the ADA and Unruh Act.[7] Plaintiffs argue that the evidence collected through their experts' site inspections confirms Defendants' liability, and that these site inspections offer "common proof" that not one of the Facilities is compliant with regard to "parking, entrances, paths of travel, ramps, restrooms, residential units, dining rooms and other common areas." Cert. Mot. at 23.

Defendants' motion does not raise arguments as to Plaintiffs' findings concerning ADAAG

---

[7] Defendants dedicate pages to stressing that Brookdale acquired these facilities after they were built, and that Brookdale affiliates merely lease the facilities from non-affiliated owners who retain "authority and financial responsibility for various types of capital expenditures." Cert. Opp. at 11. To the extent that Brookdale raises these points in an effort to relitigate its relationship to the facilities at issue, the Court rejects that effort. The Court has already found that Brookdale "control[s] or operat[ed] the facilities where Plaintiffs live or lived." *Stiner*, 665 F. Supp. 3d at 1184. But even putting that aside, Defendants' arguments appear to be meritless on their face. To the extent they draw a distinction between "operators" and "landlords," the ADA contemplates liability for both in a manner that cannot be disclaimed through contract. 42 U.S.C. §§ 12182(a) (prohibiting discrimination "by any person who owns, leases (or leases to), or operates a place of public accommodation"); 12182(b) (prohibiting discrimination "though contractual, licensing, or other arrangements"). And to the extent Defendants intimate that they are not liable for ADAAG and/or CBC violations because they are not the original owners of the six facilities, the Court is not convinced. Relieving subsequent owners of the obligation to make places of public accommodation accessible would be at odds with the language and spirit of the ADA and its implementing regulations, and Plaintiffs point to a slew of authority that holds as much. Cert. Reply at 8–9.

and CBC violations at the Facilities, but instead focuses on disputing that the question of compliance is a common one.  They argue that a single facility could be subject to different access standards depending on which parts of the facility have or have not been altered since construction, triggering an individualized and fact-intensive deep dive.  Cert. Reply at 11. Defendants stress in particular the difficulty of determining whether an alleged barrier's removal is "readily achievable," and discuss the litany of financial factors that the Court would have to consider in making such a determination.  Cert. Opp. at 17.  But as Plaintiffs point out, they are not pursuing any claims "for alterations or readily achievable barrier removal" this time around. Cert. Reply at 6; *see also id*. at 12.  Instead, they are only raising claims as to Defendants' noncompliance with the ADA and CBC standards operative at the time a given facility was *built*.[8]

Since the ADA was not in effect when the San Ramon, Scotts Valley, and Tracy facilities were built, Plaintiffs cannot pursue any "new" construction claims as to these facilities under the ADA.  But they can as to the Brookhurst, Hemet, and Fountaingrove facilities, which were constructed after January 26, 1993, and must accordingly comply with the 1991 ADAAG in full. *See* 28 C.F.R. 36.401(a) ("[D]iscrimination for purposes of this part includes a failure to design and construct facilities for first occupancy after January 26, 1993, that are readily accessible to and usable by individuals with disabilities."); *see also Chapman*, 631 F.3d at 945–46 (explaining that "whether a facility is 'readily accessible' is defined, in part, by the [ADAAG].").[9]  Meanwhile, *all* of the Facilities, by virtue of their vintage, are subject to accessibility requirements imposed under state law by the CBC, which may impose requirements that are more stringent that federal law with respect to disability access.  *See* Cert. Reply at 11.  The parties' experts agree that the Scotts Valley and Tracy facilities are subject to the 1985 edition of California Building Standards Code,

---

[8] The "readily achievable" barrier removal standard applies to facilities that *already* existed when the ADA went into effect, as opposed to those newly constructed after January 26, 1993.  *See Chapman*, 631 F.3d at 945–46 ("In the context of existing facilities, discrimination includes "a failure to remove architectural barriers . . . where such removal is readily achievable.") (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)).

[9] The Brookhurst facility was built in 1998, and the Hemet and Fountaingrove facilities were built in 2001.  Cert. Mot. at 12.  Based on their dates of construction, these facilities must be in full compliance with the 1991 ADAAG, which applies to newly constructed facilities constructed between January 26, 1993 and March 15, 2012.  *See* 42 U.S.C. § 12183(a)(1); 28 C.F.R. §§ 36.401(a), 36.406(a).

United States District Court
Northern District of California

the San Ramon facility to the 1989 edition, and the Brookhurst and Fountaingrove facilities to the 1998 edition. *See* Cert. Mot. at 22. Given that the 1991 ADAAG and applicable CBC regulations therefore define what constitutes minimum compliance for new construction under state and federal law at each facility, the jury will not be required to wade through a patchwork of different disability access standards to assess Defendants' liability under the ADA and Unruh Act for a given facility.

Defendants further argue that the supposedly high degree of physical variation within the Facilities – especially between residents' apartments – defeats commonality. They point to the testimony of Plaintiff Stiner as an example, suggesting that the fact that she "had issues" with the closet rod in one apartment she lived in at the San Ramon facility but not in another demonstrates that "a resident in one type of apartment could not rely on the same measurements or data as a resident in another type of apartment to prove noncompliance." Cert. Opp. at 16. Putting aside that the standard for compliance obviously is not whether or not a resident "had issues" with a given architectural feature, the Court finds this argument unconvincing. While Defendants are right that the Court had serious concerns about physical variations within and between facilities when it considered (and ultimately rejected) Plaintiffs' motion for class certification last year, those concerns reflected the unwieldiness of the class Plaintiffs sought to certify. Last year, Plaintiffs proposed certifying a single class of residents with mobility and vision impairments across 89 different Brookdale facilities to pursue access barrier claims based on Defendants' failure to conduct "readily achievable" barrier removal. The Court held that Plaintiffs "failed to show that they challenge[d] architectural features that are substantially similar in design across [the nearly 90] facilities," such that their compliance with federal and state access standards did not pose a common question. *Stiner*, 665 F.3d at 1191.

In light of that ruling, Plaintiffs – in their present bid for class certification – have significantly reoriented their case and appreciably reduced the risk of miring the Court in "bone-crushing feature-by-feature and [facility]-by-[facility] analyses." *Castaneda v. Burger King Corp.*, 264 F.R.D. 557, 564 (N.D. Cal. 2009). Instead of lumping thousands of residents across more than six dozen facilities into a single class, Plaintiffs have proposed a handful of facility-

United States District Court
Northern District of California

1  based subclasses based on new construction claims only.  This approach accords with the Court's

2  prior guidance that facility-based classes are "generally well-suited for class certification because

3  they present common questions about the defendant's facility, polic[i]es, and practices," and

4  alleviates the Court's prior concerns regarding commonality.  *Stiner*, 665 F.3d at 1187.  Most

5  critically, the Court agrees with Plaintiffs that the site inspections of common areas and

6  representative residential units at each of the Facilities constitute "common proof" as to

7  Defendants' liability at each facility, such that subclass members may rely on the "same

8  measurements and data" to prove their claims.

9         While the Court is cognizant that each facility contains both common areas and residential

10  units that vary to some degree (in terms of layout, features, etc.), it nevertheless is persuaded that

11  each of the six Brookdale facilities at issue "is more comparable to a single Burger King [than to]

12  92 Burger Kings."  *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 586 (N.D. Cal.

13  2018).  This is not only because the common areas of each facility expose all subclass members

14  equally to allegedly unlawful barriers, but also because the parties have already agreed to limit

15  inspections to a representative sample of residential units.  In 2019, the parties stipulated that "for

16  purposes of class certification and the merits as to Plaintiffs' claims under the [ADA] and the

17  [Unruh Act]," the residential units selected for inspection at a particular facility would be

18  considered "typical, in all material respects affecting disability access, of all other residential units

19  of the same configuration (e.g., studio, one-bedroom, two-bedroom, etc.)" at that same facility.

20  Dkt. No. 154 ¶ 7.  They further agreed that no other units provided *greater* access to persons with

21  disabilities than those inspected.  *Id.*  Given this long-standing agreement regarding the units'

22  typicality, the Court is not now inclined to entertain Defendants' complaints about their

23  "widespread and material differences."  Reply Opp. at 16.

24         For this and other reasons, the Court is convinced that Plaintiffs have teed up at least one

25  common question capable of generating common answers as to Defendants' liability under the

26  relevant state and federal access standards.[10]

27

28  ────────────────────
[10] A few other factors make the Court comfortable with this conclusion.  For instance, the Court
finds that the claims Plaintiffs bring this time are more susceptible to common treatment.

United States District Court
Northern District of California

### 3.  *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed R. Civ. P. 23(a)(3).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Ellis*, 657 F.3d at 984 (internal quotation omitted).  Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted).  "The commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158 & n.13 (1982).  However, typicality looks at whether Plaintiffs are proper parties to proceed with the suit.  *Id.*

Plaintiffs contend that typicality is satisfied here because the class representatives, just like members of the subclasses they seek to represent, are residents with mobility and/or vision disabilities that have encountered or continue to encounter allegedly unlawful access barriers at the Facilities.  Mot. at 27–28.  In other words, the injury they allegedly experience is substantially similar to the injuries experienced by other class members, and emanates from the same purportedly unlawful conduct.  Defendants make no arguments against typicality, and the Court

---

Whereas Plaintiffs last year sought to certify a class to pursue claims against Defendants for failing to conduct readily achievable barrier removal, they focus this time on new construction claims.  The question of what barriers are "readily" removable strikes the Court as appreciably more fact-intensive than the binary inquiry of whether an architectural feature is compliant with the access standards operative at the time of the building's construction.  Further, Plaintiffs explain that the continued maintenance of disability access violations stems from a common practice of neglecting accessibility standards, which is borne out in a few ways.  Plaintiffs point to the testimony of Defendants' 30(b)(6) designee, who indicated that "Brookdale does not require ADAAG compliance during construction, nor does it inspect for ADAAG compliance at the conclusion of projects."  Cert. Mot. at 14.  If Defendants routinely fail to implement safeguards during the construction process, Plaintiffs argue that noncompliance is to be expected.  Plaintiffs additionally argue that a practice of noncompliance is reinforced by Defendants' default policy of shifting the costs of alterations onto residents, which they contend amounts to an impermissible "access upon request" policy.  Cert. Mot. at 26.

1    does not otherwise identify any defects.  Accordingly, it finds that typicality is satisfied.

2                    4. *Adequacy*

3        Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent

4    the interests of the class." Fed. R. Civ. P. 23(a)(4).  When assessing adequacy, the Court must

5    address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts

6    of interest with other putative class members, and (2) whether the named plaintiffs and their

7    counsel will prosecute the action vigorously on behalf of the proposed class.  *See In re Mego Fin.*

8    *Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).  This inquiry too "tend[s] to merge" with the

9    commonality and typicality criteria.  *See Falcon*, 457 U.S. at 158, n.13.

10        In its March 30, 2023 order on Plaintiffs' class certification motion, the Court found

11    adequacy satisfied.  *See Stiner*, 665 F. Supp. 3d at 1185.  Defendants do not contend a different

12    outcome is warranted now, and since the Court's view on the matter has not changed, it again

13    affirms that the named plaintiffs and their counsel are adequate representatives for the interests of

14    the proposed subclasses.

15                       \* \* \* \* \*

16        In sum, the Court finds that Plaintiffs have satisfied Rule 23(a)'s requirements of

17    numerosity, commonality, typicality, and adequacy for all but the Rule 23(b)(3) Hemet facility-

18    based subclass.  The Court now turns to assessing Plaintiffs' proposed Rule 23(b)(3) damages

19    subclasses based on the San Ramon, Scotts Valley, Brookhurst, Tracy, and Fountaingrove

20    facilities.

21            c.   Rule 23(b)(3)

22                 1. Predominance

23        The predominance inquiry "tests whether proposed classes are sufficiently cohesive to

24    warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453

25    (2016) (quotation omitted).  When "one or more of the central issues in the action are common to

26    the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3)

27    even though other important matters will have to be tried separately, such as damages or some

28    affirmative defenses peculiar to some individual class members." *Id.*  The Supreme Court has

United States District Court
Northern District of California

defined an individual question as "one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id*. (quotation omitted).  This "inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*. (quotation omitted).  The Supreme Court has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a).  *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).  In short, "'Rule 23(a)(2) asks whether there are issues common to the class,' and 'Rule 23(b)(3) asks whether these common questions predominate.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010)).

Plaintiffs contend that "the predominance test is satisfied because significant aspects of the case (indeed resolution-driving issues) can be resolved through evidence common to the subclasses."  Cert. Mot. at 29.  In particular, they emphasize that "Plaintiffs' inspections have produced objective measurements and data that show that Brookdale's newly constructed facilities violate the 1991 ADAAG and the CBC," which "establishes Defendants' liability under the ADA and the Unruh Act as to all members of the proposed damages subclasses."  *Id*.  While Plaintiffs acknowledge that sorting out who is entitled to recover damages is not necessarily a common question, they stress that their decision to seek only statutory rather than actual damages under the Unruh Act significantly reduces the need for individual inquiries.  Cert. Mot. at 30; *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007) ("The litigant need not prove she suffered actual damages to recover the [Unruh Act's] independent statutory damages of $4,000.").  According to Plaintiffs, establishing standing for statutory damages is straightforward: class members need only show that they "personally encountered" an Unruh Act violation that "interfered with their full and equal access" to the facility, which they can do by showing that the violation caused them "difficulty, discomfort, or embarrassment."  Cal. Civ. Code § 55.56(b), (c); *see Doran v. 7-Eleven, Inc.*, 509 F. App'x 647, 648 (9th Cir. 2013) (affirming denial of statutory

damages under the Unruh Act because the plaintiff did not prove he personally encountered violation and experienced difficulty, discomfort, or embarrassment) [11]; *see also Molski*, 481 F.3d at 731 ("Any violation of the ADA necessarily constitutes a violation of the Unruh Act.").

Plaintiffs suggest that class members seeking to recover damages can make these showings through a claim form process once liability is adjudicated. Specifically, they propose that class members can use affidavits to identify the unlawful barrier(s) they encountered (if any), "confirm they suffered injury as a result of encountering ADAAG violations and being denied full and equal access," and "confirm that such encounters caused them difficulty, discomfort or embarrassment under Cal. Civ. Code § 55.56(a)-(c)." Cert. Reply at 16–17. Per Plaintiffs, damages calculations will come down to simply multiplying $4,000 by the number of occasions class members indicate in their affidavits that they encountered access barriers in the Facilities that caused them difficulty, discomfort, or embarrassment. *Id*. at 30. This analytical and logistical bifurcation of the liability and damages inquiries has been, they urge, approved of and applied in other cases.

Unsurprisingly, Defendants disagree. Their core contention is that standing to recover damages under the Unruh Act depends on a highly individualized inquiry. Cert. Opp. at 20–25. To greenlight a class member's recovery for an encounter with an unlawful access barrier, Defendants argue that the Court must first determine whether a given barrier *actually* interfered with a given member's "full and equal access to the premises" by causing them "difficulty, discomfort, or embarrassment." Assessing standing on a class-wide basis is infeasible, they argue, because (1) members have different types of disabilities, (2) the nature of residents' impairments resulting from those vision and/or mobility disabilities differs, and (3) the services required by Brookdale staff to assist residents with their different impairments vary. Cert. Opp. at 22–23. On that basis, Defendants contend that "'each putative class member's entitlement to damages hinges on factual determinations requiring individualized proof' with respect to whether alleged barriers interfered with class members' full and equal access to the premises." Cert. Opp. at 25 (quoting

---

[11] *Doran v. 7-Eleven, Inc.* and the other unpublished Ninth Circuit decisions cited in this order are not precedent, but may be considered for their persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 2012 WL 3762440, at *6 (S.D. Cal. Aug. 28, 2012)). Moreover, Defendants argue that these individualized determinations as to standing cannot be shunted to a claims process designed to tally damages, as the standing inquiry focuses on whether a class member has suffered an injury at all, rather than on simple mathematical calculations. Cert. Opp. at 25.

The Court, with some reluctance, agrees. Plaintiffs' proposition – that adjudicating liability (using common proof) is the main event and that assessing damages (using claim forms) is just the sideshow – has some intuitive appeal. But it is in tension with the Court's prior decisions, and with other authorities finding the standing inquiry to be a fact-intensive, individualized liability issue rather than a pure damages one. Faced with similar arguments as to standing and predominance last year, for instance, the Court concluded that "an individualized inquiry would be needed to determine whether class members actually suffered an injury sufficient to confer Article III standing to bring a claim because the standard at issue focuses on whether the Fleet Safety Policy 'affect[ed] the plaintiff's full and equal enjoyment of the facility on account of his particular disability.'" *Stiner*, 665 F. Supp. at 1199 (quoting *Chapman*, 631 F.3d at 947). As a result, the Court found that "individualized inquiry is necessary to determine Brookdale's *liability* to any given class member as a threshold matter." *Id.* (emphasis in original). Plaintiffs have not explained why the character of the subclasses they now propose would compel a contrary conclusion given that the relevant standard (i.e. "full and equal enjoyment") is unchanged.

Other courts have have also recognized the individualized nature of the standing inquiry in the context of the Unruh Act, and found it to pose a core question of substantive liability. Judge Hamilton in this district analyzed the issue in detail in *Moeller v. Taco Bell Corporation*, which concerned certification of (b)(2) and (b)(3) subclasses challenging access barriers in Taco Bell restaurants across California. 2012 WL 3070863 (N.D. Cal. July 26, 2012). Though the court had previously certified certain classes, Taco Bell moved for decertification in the wake of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In its order ruling on the decertification motion, the *Moeller* court considered the propriety of certifying a (b)(3) class for plaintiffs to pursue statutory damages under the Unruh Act. It ultimately declined

United States District Court
Northern District of California

to certify such a class as it found predominance, among other factors, lacking.  Judge Hamilton

observed that "damages for California disability claims are inextricably intertwined with

individualized liability questions," rendering it "impossible to make an across-the-board

conclusion as to recovery of damages by any class member."  *Moeller*, 2012 WL 3070863 at *5.

Though plaintiffs in that case had proposed bifurcating the liability and damages inquiries so as to

cabin the number of member-by-member issues, the court rejected that approach because

individualized inquiries into how "each class member was personally affected and was denied full

and equal access by the defendant" did not go only to damages, but also to "liability and

causation."  *Id*.  In other words, the court found that the inquiry into a class member's standing

relates to "whether an individual class member has any claim at all," not just whether they may

recover damages for their injury.  *Id*.  As a result, the court was not convinced that the

superficially straightforward plan to "add[] up the number of times each class member was

aggrieved by noncompliant barriers" was workable, since determining aggrievement itself was a

fact-intensive, individualized effort.  *Id*.

A few years later, a court in the Central District of California took a similar tack in

*Vondersaar v. Starbucks Corporation*.  No. CV 12-05027 DDP AJWX, 2015 WL 629437 (C.D.

Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018).  Plaintiffs in that case sought to

certify a (b)(3) class to pursue Unruh Act claims for access barrier violations at Starbucks stores

across California and the nation.  The court declined to certify the proposed classes, as it

determined that "individualized inquires would be required [] with respect to high handoff

counters, and would predominate over the relatively straightforward common question whether

handoff counters of a certain height violated the ADA."  *Id*. at *4; *see also Antoninetti*, 2012 WL

3762440 at *6 (coming to similar conclusion on motion to certify Unruh Act damages class of

disabled Chipotle patrons).  Implicit in that determination is the view that demonstrating the denial

of full and equal access is not segregable from the liability inquiry for a given class member.  In

the order affirming the district court's holding, the Ninth Circuit agreed that "class-wide issues

[did] not predominate over the numerous individual questions posed by plaintiffs' Unruh Act

claims," including "whether the class member was actually denied full and equal access."

*Vondersaar v. Starbucks Corp.*, 719 F. App'x 657, 659 (9th Cir. 2018).

That said, the Court recognizes that not all courts confronted with this question have come to the same conclusion.  In *Nevarez v. Forty Niners Football Company LLC*, the court was not persuaded that resolving whether class members '"personally encountered' an Unruh Act violation that caused 'difficulty discomfort, or embarrassment'" would destroy predominance, and certified a (b)(3) damages class.  *Nevarez*, 326 F.R.D. at 585.  The court in *Davis v. Laboratory Corporation of America Holdings* was similarly unmoved by defendant's argument that individual inquiries into class members' barrier encounters would predominate over common questions.  *Davis v. Lab'y Corp. of Am. Holdings*, 604 F. Supp. 3d 913, 929–30 (C.D. Cal. 2022), *aff'd*, No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024).  In particular, the *Davis* court rejected LabCorp's contention that "eligibility for statutory damages cannot be addressed by way of a claim form after class wide liability has been determined," *id*. (internal quotations omitted), observing that "the fact that the *amount* of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery," *id*. (quoting *Pulaski & Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 989 (9th Cir. 2015) (emphasis added)).

Plaintiffs, of course, urge the Court to follow *Nevarez*, *Davis*, and similar authority. [12] Echoing the rationale relied upon in *Nevarez* to find predominance, Plaintiffs argue that in terms of class size and case stage, this case is closer to *Nevarez* (which dealt with a single facility and a few thousand class members) than *Moeller* (which covered all Taco Bells in California and involved more than a hundred thousand possible class members).  But the Court is not persuaded that class size is the dispositive differentiator, when the real question seems to be whether standing can be established by a claims process in an Unruh Act access barrier case where class members' interaction with the barriers is variable.  And while *Davis* explicitly embraced the bifurcation of

---

[12] Plaintiffs also rely on *Castaneda v. Burger King*, which ultimately certified ten subclasses to pursue Unruh Act damages for disability access barriers at Burger King restaurants.  However, the *Castaneda* court notably "did not conduct a separate analysis of predominance or the other Rule 23 factors with respect to the Unruh Act claims."  *Vondersaar*, 2015 WL 629437 at *4, n.5 (discussing *Castaneda*, 264 F.R.D. at 571–74).  As a result, the *Casteneda* decision does not provide meaningful insight into how to assess standing and predominance for Unruh Act class claims.

the liability and damages phases based on precedents holding that individualized damages calculations cannot preclude certification, the Court is of the view that the standing questions here implicate the actual existence of injury, rather than just the arithmetic of damages.[13]  In the absence of controlling Ninth Circuit authority that squarely permits establishment of this jurisdictional element through a claims process, the Court finds *Moeller*, *Antoninetti* and *Vondersaar* persuasive.

Plaintiffs seem to suggest that *Briseno v. ConAgra Foods Inc.* is that authority.  844 F.3d 1121 (9th Cir. 2017).  But the Court is not convinced, because *Briseno*'s discussion of claims for damages has no bearing on the key question here.  Rather, the *Briseno* court raised the possibility of a claims process as a way for ConAgra to validate whether a person attempting to recover damages "really bought the product or used the service at issue."  *Id*. at 1130.  But this validation process did not stand to affect ConAgra's aggregate exposure, since the damages it owed could be determined by "(1) calculating the price premium attributable to the allegedly false statement that appeared on every unit sold during the class period, and (2) multiplying that premium by the total number of units sold during the class period."  *Id*. at 1132.  In other words, the court endorsed a claims process as a way for a defendant to determine how it needed to slice the fixed damages pie, and who exactly got a slice.  This conclusion makes sense in the context of authorities affirming that individualized damages *calculations* are no barrier to predominance.  *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification.") (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.").

But Plaintiffs propose employing a claims process to do more than just crunch numbers:

_____

[13] In affirming the *Davis* court's certification of an Unruh Act damages class, the Ninth Circuit did not comment on the viability of the bifurcation approach.  Instead, it clarified that since plaintiffs there were not pursuing construction-related Unruh Act claims (as Plaintiffs in this case are), class members (contrary to defendant's arguments) did not need to individually demonstrate "difficulty, discomfort, or embarrassment," and found that it was not an abuse of discretion for the district court to determine that "six common issues" predominated in the case.  *Davis v. Lab'y Corp. of Am. Holdings*, 22-55873, 2024 WL 489288 at *2 (9th Cir. Feb. 8, 2024).

22

they also seek to use it as a vehicle for establishing standing, which is highly individualized in this case.  Given the important analytical distinction between using a claims process to assess individual damages amounts in a product labeling case with a formulaic amount of exposure and using it to determine who was injured *and* what they are resultingly owed in a fact-intensive disability access case, the Court is of the view that it cannot readily extrapolate from one context to another as Plaintiffs urge.[14]  As a result, the Court finds that the question of standing to obtain damages would need to be resolved on a member-by-member basis during trial.  Accordingly, and in light of the nature of the barriers in this case, it comes to the same conclusion it did last year: that determining whether a given barrier caused a class member injury in the form of "difficulty, discomfort or embarrassment" is an individualized inquiry that predominates over the common issues.[15] [16]

As such, the Court **DENIES** Plaintiffs' motion for certification of its proposed Rule 23(b)(3) subclasses.[17]

    d.   Rule 23(b)(2)

"Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"  *Dukes*, 564 U.S. at 360 (quoting Fed. R. Civ. P. 23(b)(2)).  "[U]nlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule

---

[14] The fact that the Ninth Circuit's affirmance in *Vondersaar* (albeit in a memorandum disposition) was handed down after *Briseno* at least tends to suggest that the panel did not view the district court's approach to be inconsistent with that case.

[15] However, given the divergence of authorities within the circuit and the significance of the answer for people with disabilities, the Court is of the view that further clarification regarding the relationship between standing and Rule 23(b) predominance in Unruh Act cases would benefit the courts and litigants.  Accordingly, the Court would consider a request from the parties to certify this question to the Ninth Circuit.

[16] The Court does not mean to suggest that standing is necessarily such a thorny question to resolve in *all* Unruh Act construction claim cases.  Though "Unruh Act claims are [not] inherently incapable of class treatment[,]" "an alleged barrier's uniquity, severity, and uniformity of impact will, of course, vary from case to case" and affect the standing analysis.  *Vondersaar*, 2015 WL 629437 at *4 n.4 (C.D. Cal. Feb. 12, 2015).  The issue here is that Plaintiffs do not base their claims on a uniform encounter with a barrier of such clear severity and ubiquity that the inference of injury on a class-wide basis is necessarily established.

[17] In light of this conclusion, the Court will not conduct a Rule 23(b)(3) superiority analysis.

23(b)(2) class." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 587 (N.D. Cal. 2015).  Instead, the "key" to finding a class under Rule 23(b)(2) "is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined . . . only as to *all* of the class members or as to *none* of them." *Dukes*, 564 U.S. at 360 (quotation omitted) (emphasis added).  Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant," or "to an individualized award of monetary damages." *Id.* at 360–61 (emphasis in original).

Plaintiffs' proposed Rule 23(b)(2) subclasses consist of persons with mobility and vision impairments at the San Ramon, Scotts Valley, and Brookhurst facilities.  Each subclass seeks declaratory relief finding that those facilities are in violation of applicable disability access standards, and an order requiring the facilities to come into compliance.  Defendants do not seriously counter Plaintiffs' argument that the nature of the allegedly unlawful conduct necessitates class-wide injunctive relief.  They argue only that the proposed (b)(2) subclasses improperly seek an award of money damages.  Cert. Opp. at 29–30.  But, as Plaintiffs' Reply makes clear, this contention is incorrect: Plaintiffs have *not* sought to certify any damages subclasses under Rule 23(b)(2).  *See* Cert. Reply at 6.  They instead seek an order finding the San Ramon, Scotts Valley, and Brookhurst facilities out of compliance with governing disability access law and directing Defendants to remedy the violations.  The Court is persuaded that Plaintiffs' desired remedy is "indivisible" in than it is well-suited to provide class-wide relief from Defendants' allegedly unlawful practice of maintaining noncompliant facilities.

Accordingly, the Court **GRANTS** Plaintiffs' request to certify the San Ramon, Scotts Valley, and Brookhurst facilities to pursue injunctive and declaratory relief pursuant to Rule 23(b)(2).

\* \* \* \* \*

To summarize: the Court **GRANTS** Plaintiffs' motion to certify the San Ramon, Scotts Valley, and Brookhurst Rule 23(b)(2) facility-based subclasses (as defined at Dkt. No. 740 at 10) to pursue declaratory and injunctive relief, but **DENIES** Plaintiffs' motion to certify the San Ramon, Scotts Valley, Brookhurst, Fountaingrove and Tracy Rule 23(b)(3) facility-based

United States District Court
Northern District of California

subclasses to seek statutory damages for lack of predominance.  It also **DENIES** the motion to certify Plaintiffs' proposed Hemet subclass for lack of numerosity.

### B.  Defendants' Motion for Clarification of March 30, 2023 Order

Defendants' motion requests that the Court clarify aspects of its March 30, 2023 order certifying and defining a Rule 23(b)(2) subclass with respect to the "Fleet Safety Policy" ("FSP"). Dkt. No. 782.  As relevant here, the Court adopted the following definition for the (b)(2) Wheelchair and Scooter Users Subclass in its March 30 order:

> All persons with disabilities who *use wheelchairs*, scooters, or other powered mobility aids and *who reside or have resided at a residential care facility* for the elderly located in California and owned, operated and/or managed by Brookdale *during the three years prior to the filing of the Complaint* herein through the conclusion of this action, including their successors-in-interest if deceased, excluding any persons who are subject to arbitration.

Dkt. No. 594 ("March 30 Order") at 48 (emphasis added).  Defendants argue that the adopted class definition (1) does not cover manually powered wheelchairs and (2) should not cover former residents.  *See* Clarification Mot.  The Court is strongly disinclined to reopen settled issues, and thus considers only one thing as it evaluates Defendants' requests for clarification: what the Court intended to do in its March 30, 2023 order on the facts before it at the time, not what the parties think it should have done.

With that approach in mind, the Court turns to whether users of manually powered wheelchairs fall into the Subclass definition.  The Court agrees with Defendants that they do not. This is evident from the language and context of the ruling, for all the reasons Defendants discuss in their motion.  *See* Clarification Mot. 4–7.  First, the opening clause of the definition ("[a]ll persons with disabilities who use wheelchairs, scooters, or *other powered mobility aids . . .*") is a strong indication of the Court's intent.  While the word "wheelchair" is not itself modified, the subclass definition immediately proceeds to reference "other powered mobility aids," implying that the definition only encompasses wheelchairs of the powered variety.  Second, subsequent references to the (b)(2) definition in the Court's March 30, 2023 order reinforce that interpretation. When defining the (b)(3) transportation subclass two pages after establishing the relevant (b)(2)

1    subclass definition, the Court ruled it would adopt for the (b)(3) subclass "the same amended class

2    definition it used to certify the Rule 23(b)(2) class, namely users of *motorized* wheelchairs,

3    scooters or other powered mobility aids."  March 30 Order at 50 (emphasis added).  Finally, the

4    factual background strongly supports the notion that the Subclass encompasses only users of

5    *motorized* mobility devices, as this subclass at issue was certified in order to pursue transportation

6    claims related to the FSP, which governs residents' use of such motorized devices.  Plaintiffs'

7    arguments reflect this policy scope: they maintain that the FSP is unlawful because it requires

8    "scooter and *power* wheelchair users [attempting to access Brookdale's transportation services] to

9    transfer" from their mobility device to the Brookdale vehicle in violation of the ADA.  *Id*. at 44

10   (emphasis added).

11        While Plaintiffs concede in their opposition that aspects of the March 30, 2023 order

12   suggest that the class definition is limited to motorized wheelchair users, they argue that residents

13   who use a manually powered wheelchair should be included in the definition since they "may at

14   any time decide to use a [powered mobility device]."  Clarification Opp. at 9.  But this argument

15   was not raised in the briefing for class certification, and is therefore not probative of the Court's or

16   parties' views at the time.  Accordingly, the Court **GRANTS** Defendants' request for confirmation

17   that the Wheelchair and Scooter User Subclass definition adopted in the March 30, 2023 class

18   certification order does not include manually powered wheelchair users.

19        Next, Defendants urge that the Subclass definition should be limited to current Brookdale

20   residents given that former residents are not subject to imminent harm and therefore do not have

21   standing for prospective injunctive relief.  Clarification Mot. at 7.  They admit that the March 30,

22   2023 order did not limit the class in this way, but suggest that Court only included former

23   residents in the definition "inadvertently."  *Id*. at 8.  Defendants argue that modifying the subclass

24   definition to exclude former residents and include only current ones would better comport with the

25   guidance in *Ellis v. Costco Wholesale Corporation* for district courts to "consider how best to

26   define the class(es) to ensure that all class members have standing to seek injunctive relief."  657

27   F.3d 970, 988 (9th Cir. 2011).

28        At this stage, the Court declines to modify the Wheelchair and Scooter Users Subclass

United States District Court
Northern District of California

definition to exclude former residents.  The Court certified the subclass it did, and the Court finds no legal infirmity in that subclass as defined.  *See Stiner*, 665 F. Supp. at 1199 ("[A]t least in this Circuit there is no per se rule preventing district courts from certifying a class that may include more than a de minimis number of uninjured class members").  Since the Court is not persuaded that the Subclass definition is deficient, it will not disturb its prior ruling.  This aspect of Defendants' request is **DENIED**.

### III.    CONCLUSION

The Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for certification of subclasses, Dkt. No. 740.  Plaintiffs may proceed on a class basis for the (b)(2) San Ramon, Scotts Valley, and Brookhurst facility-based subclasses seeking injunctive and declaratory relief, but may not proceed on their proposed (b)(3) facility-based subclasses seeking statutory damages.  Further, the Court **GRANTS in part** and **DENIES in part** Defendants' motion for clarification of its March 30, 2023 order, Dkt. No. 782.  The Court confirms that the Court's March 30, 2023 order excluded manually powered wheelchair users from the Wheelchair and Scooter User Subclass definition, but did not limit that definition to include just "current residents."

The Court also **SETS** a case management conference on August 1, 2024, at 1:00 p.m.  The hearing will be held by Zoom Webinar.  All counsel shall use the following link to access the hearing: https://cand-uscourts.zoomgov.com/j/1607976056?pwd=aW5IeE14UkJRbkdPTGJFWFUrRG1Cdz09.

- Meeting ID: 1607976056
- Password: 129759

All attorneys and pro se litigants appearing for the hearing are required to call in at least fifteen minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.

//

//

//

//

United States District Court
Northern District of California

1    Finally, the Court confirms that trial in this matter remains scheduled to start on Monday,

2  January 27, 2025 at 8:30 a.m.  However, the Court will **ADVANCE** the pretrial conference,

3  currently scheduled for Tuesday, January 7, 2025 to Tuesday, December 17, 2024 at 3:00 p.m. in

4  order to permit the Court and the parties adequate time to frontload and work through trial-related

5  issues in an orderly manner.

6    **IT IS SO ORDERED.**

7  Dated:    7/22/2024

8

9  HAYWOOD S. GILLIAM, JR.
   United States District Judge